# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF LABOR
AND CONGRESS OF INDUSTRIAL
ORGANIZATIONS,
815 Black Lives Matter Plaza NW,
Washington, DC 20006.

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-
CIO,
80 F Street NW,
Washington, D.C. 20001,

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO,
1625 L Street, NW,
Washington, D.C. 20036,

SERVICE EMPLOYEES
INTERNATIONAL UNION, AFL-CIO,
1800 Massachusetts Ave. NW,
Washington, DC 20036,

COMMUNICATION WORKERS OF
AMERICA, AFL-CIO
501 3rd Street, NW, 6th Floor
Washington, DC 20001,

ECONOMIC POLICY INSTITUTE
1225 I St NW #600
Washington, DC 20005

         *Plaintiffs*,

         *vs.*              Case No. XX

DEPARTMENT OF LABOR
200 Constitution Ave., NW,
Washington, DC 20210

VINCE MICONE, in his official capacity
as Acting Secretary, Department of Labor
200 Constitution Ave., NW,

1

Washington, DC 20210

U.S. DIGITAL SERVICE (U.S. DOGE
SERVICE)
736 Jackson Pl NW
Washington, DC 20503

U.S. DOGE SERVICE TEMPORARY
ORGANIZATION
736 Jackson Pl NW
Washington, DC 20503

                    *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Since President Trump's inauguration on January 20, the "U.S. DOGE Service,"
led by White House official Elon Musk, has launched a sweeping campaign to access highly-
sensitive information systems and dismantle and restructure multiple federal agencies
unilaterally.

2.      The speed of these efforts is core to the project. At every step, DOGE is violating
multiple laws, from constitutional limits on executive power, to laws protecting civil servants
from arbitrary threats and adverse action, to crucial protections for government data collected
and stored on hundreds of millions of Americans.

3.      DOGE seeks to gain access to sensitive systems before courts can stop them,
dismantle agencies before Congress can assert its prerogatives in the federal budget, and
intimidate and threaten employees who stand in their way, worrying about the consequences
later.

4.      The results have already been catastrophic. DOGE has seized control of some of
the most carefully-protected information systems housed at the Treasury Department, taken hold

of all sensitive personnel information at the Office of Personnel Management, and dismantled an entire agency within a week.

5.      Today, they will come for the Department of Labor. On information and belief, the pattern will be the same: they will demand that DOGE staff be granted access to systems that they are legally barred from; they will fire any employee who protects the integrity of those systems; and they will claim power and authority that Congress has never granted them with respect to agency staff and Department programs.

6.      Contrary to its statutory and regulatory obligations, the Department of Labor and its current leadership are acceding to this takeover, ordering Department employees to give DOGE access to whatever they ask for regardless of security protocols—or risk termination.

7.      As detailed below, DOGE's imminent access to sensitive information systems, with the Department's blessing, lack statutory authority and violates the Privacy Act and the Administrative Procedure Act.

8.      Absent this Court's intervention, DOGE will have access to highly sensitive data, including, among many others, medical and benefits information about all federal workers with worker compensation or Black Lung claims, the identities of vulnerable workers who have sought the Department's protection via wage and hour or occupational safety complaints, and investigative and litigation records of the Bureau of Labor Statistics data crucial to an accurate understanding of the state of our economy.

9.      DOGE will also have access to information regarding investigations of Mr. Musk's corporate interests and the sensitive trade secret information held by the Department, including those of the competitors of those corporate interests.

10.    Plaintiffs file this complaint and seek a temporary restraining order, or an administrative stay, to maintain the status quo until the Court has an opportunity to more fully consider the illegality of the proposed actions.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the Privacy Act, 5 U.S.C. § 552a, and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are agencies of the United States and officers or employees of those federal agencies who are sued in their official capacity. Further, Defendants are headquartered in the District of Columbia, where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## PARTIES

13.    The American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") is a federation of 63 national and international labor organizations with a total membership of over 13 million working men and women. The AFL-CIO is headquartered at 815 Black Lives Matter Plaza NW, Washington, DC 20006.

14.    The American Federation of Government Employees ("AFGE") is a labor organization and unincorporated association that is affiliated with the AFL-CIO, headquartered at 80 F Street NW, Washington, D.C. 20001AFGE, the largest federal employee union, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

15.    The American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association

headquartered at 1625 L Street NW, Washington, D.C. 20036. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils and other affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME, through its affiliate District Council 20 and its constituent local unions, represents federal civilian employees in agencies and departments across the federal government.

16.    Service Employees International Union, AFL-CIO ("SEIU") is a labor organization of approximately two million working people in the United States and Canada united by the belief in the dignity and worth of workers and the services they provide. SEIU is headquartered at 1800 Massachusetts Ave. NW, Washington, DC 20036,

17.    The Communications Workers of America, AFL-CIO ("CWA") is a union of hundreds of thousands of public and private sector workers in communities across the United States, Canada, Puerto Rico, and other U.S. territories. Its members work in telecommunications and IT, the airline industry, manufacturing, federal service contracts, news media, broadcast and cable television, education, health care, public service, and other fields. It is headquartered at

18.    Economic Policy Institute ("EPI") is a nonprofit, nonpartisan think tank created in 1986 to include the needs of low- and middle- income workers in economic policy discussions. EPI conducts research and analysis on the economic status of working America, proposes public policies that protect and improve working conditions of low- and middle-income workers, and assesses policies with respect to how well they further these goals.

19.    Defendant U.S. Department of Labor ("DOL") is a federal agency with responsibilities governing occupational safety and health, wage and hour standards, unemployment benefits, reemployment services, and economic statistics.

20.    Defendant Vince Micone is the Acting Secretary of the Department of Labor. He is sued in his official capacity.

21.    Defendant U.S. DOGE Service ("USDS") is a federal entity situated within the Executive Office of the President. Upon information and belief, Elon Musk, a special government employee, is the acting Administrator for USDS or is otherwise directing the work of USDS. Mr. Musk is the wealthiest person in the world, with an estimated net worth of over $400 billion. Concurrent with his tenure in government, Mr. Musk has numerous large business concerns, many of which have substantial ties to the federal government and U.S. politics. They include SpaceX, a space technology company and extensive federal government contractor; Tesla Motors, an electric vehicle company; Neuralink, a neurotechnology startup seeking to embed computer hardware into the human brain; the Boring Company, a tunnel construction company; and X, formerly known as Twitter, a large social media platform.

22.    Defendant U.S. DOGE Service Temporary Organization is a federal temporary organization situated within the Executive Office of the President.[1]

## LEGAL FRAMEWORK

*The Privacy Act of 1974*

23.    The Privacy Act of 1974 was passed to "provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies" to, among other things, "collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose . . . and that adequate safeguards are provided to prevent misuses of such information." Privacy Act

---

[1] Because the division of labor, personnel, authority, and responsibility between the U.S. DOGE Service and U.S. DOGE Service Temporary Organization is not clear, this complaint will simply refer to them collectively as "DOGE."

of 1974 § 2(b), 2(b)(4), 88 Stat. 1896 (1974), *codified as amended at* 5 U.S.C. § 552a. "[I]n order to protect the privacy of individuals identified in information systems maintained by Federal agencies," Congress decided "to regulate the collection, maintenance, use, and dissemination of information by such agencies." *Id.* § 2(a)(5), 88 Stat. 1896, 1896.

24.    To that end, the Privacy Act regulates "records," defined as

any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph,

5 U.S.C. § 552a(a)(4).

25.    Individuals under the Privacy Act are any "citizen of the United States or [] alien lawfully admitted for permanent residence." *Id.* at § 552a(a)(2).

26.    As relevant for this case, the Privacy Act regulates the disclosure of records and imposes requirements on agencies to responsibly maintain their recordkeeping systems.

27.    With respect to disclosure, the Act provides, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552b.[2]

*The Federal Information Security Modernization Act of 2014*

28.    The Federal Information Security Modernization Act of 2014 ("FISMA"), 44 U.S.C. §§ 3551-58, requires agencies to provide information security protection "commensurate with the risk and magnitude of the harm resulting from unauthorized access [or] use" of information or information systems maintained by the agency. 44 U.S.C. § 3554(a)(1)(A).

---

[2] This provision contains a number of exceptions, listed at 5 U.S.C. § 552a(b)(1)-(13), none of which Plaintiffs have reason to believe are relevant to the facts of this case.

29.    To that end, agencies are responsible for complying with FISMA's requirements and "related policies, procedures, standards, and guidelines" such as "information security standards promulgated under" 40 U.S.C. § 11331 and "policies and procedures issued by the Director" of the Office of Information and Regulatory Affairs. 44 U.S.C. § 3554(a)(1)(B)(i), (iii).

30.    "[S]enior agency officials" are required to "provide information security for the information and information systems that support the operations and assets under their control," including understanding the risks of "unauthorized access, use, disclosure, disruption, modification, or destruction" of sensitive agency records, and implementing policies designed to reduce those risks. *See* 44 U.S.C. § 3554(a)(2).

*The Administrative Procedure Act*

31.    The Administrative Procedure Act ("APA") allows individuals "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of the action. 5 U.S.C. § 702. Under the APA, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious an abuse of discretion, or otherwise not in accordance with law," *id*. § 706(2)(A).

## FACTUAL ALLEGATIONS

**I.    The "Department of Government Efficiency."**

32.    On November 12, 2024, then President-Elect Trump announced his intent to create the "Department of Government Efficiency" ("DOGE") to "provide advice and guidance from outside of Government" to "the White House and Office of Management & Budget," to

help "pave the way" for the Trump-Vance Administration to "dismantle," "slash," and "restructure" federal programs and services.[3]

33.    On the day of his inauguration, January 20, 2025, President Trump signed Executive Order 14158, Establishing and Implementing the President's "Department of Government Efficiency," ("the E.O."), reorganizing and renaming the United States Digital Service as the United States DOGE Service, established in the Executive Office of the President.[4]

34.    The E.O. established the role of U.S. DOGE Service Administrator in the Executive Office of the President, reporting to the White House Chief of Staff.[5]

35.    The E.O. further established within U.S. DOGE Service a temporary organization known as "the U.S. DOGE Service Temporary Organization." The U.S. DOGE Service Temporary Organization is headed by the U.S. DOGE Service Administrator and is tasked with advancing "the President's 18-month DOGE agenda."[6]

36.    The E.O. also requires each Agency Head to establish a "DOGE Team" comprised of at least four employees within their respective agencies. DOGE Teams are required to "coordinate their work with [U.S. DOGE Service] and advise their respective Agency Heads on implementing the President's DOGE Agenda."[7]

37.    The E.O. directs Agency Heads to take all necessary steps "to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems,"[8]

---

[3] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024, 7:46 PM ET), https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.
[4] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025).
[5] *Id.* at § 3(b).
[6] *Id.*
[7] *Id.* at § 3(c).
[8] *Id.* at 4(b).

but makes no mention of this directive being subject to applicable law. The E.O. nominally

directs the U.S. DOGE Service to adhere to "rigorous data protection standards."[9]

38.    The E.O. does not vest any statutory authority in DOGE.

II.    **DOGE'S Pattern of Rapidly Entering Agencies, Seizing Critical Systems, and Unilaterally Dismantling and Restructuring them**

39.    Since Inauguration Day, DOGE personnel have sought and obtained

unprecedented access to information systems across numerous federal agencies, including the

United States Agency for International Development, the Department of Treasury, the National

Oceanic and Atmospheric Administration, the Office of Personnel Management, and the

Department of Education.

40.    DOGE personnel also played critical rules in the dismantling of the U.S. Agency

for International Development and ongoing concurrent efforts to largely cripple the Department

of Education.

41.    DOGE's behavior repeats itself across virtually every agency it enters: swooping

in with new DOGE staff, demanding access to sensitive systems, taking employment action

against employees who resist their unlawful commands, and then beginning to re-work the

agencies at their will. This process moves incredibly quickly, with agencies transformed roughly

overnight; or fully dismantled within a week.

A.    Sensitive data takeovers at Treasury and OPM

---

[9] *Id.*

42.     Shortly before President Trump's inauguration,  DOGE operatives demanded access to sensitive Treasury systems, including the system used by the Bureau of the Fiscal Service ("BFS") to control the vast majority of federal payments.[10]

43.     The career official serving as Acting Secretary of the Treasury prior to Secretary Bessent's confirmation denied DOGE operatives' request for access to the BFS payment system, and was subsequently placed on administrative leave.[11]

44.     Following his confirmation, Secretary Bessent granted DOGE operatives access to BFS, though the precise identities of DOGE-affiliated personnel with access, and their level of access, are not reliably known by the public.[12]

45.     At a minimum, DOGE-affiliated individuals have access to the wealth of personally identifiable information housed in BFS' system.

46.     According to some reporting, DOGE-affiliated individuals have the ability to stop individual payments from the BFS system, to change data in the system, or to alter system code.[13]

---

[10] Katelyn Polantz et al., *How an arcane Treasury Department office became ground zero in the war over federal spending*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/01/31/politics/doge-treasury-department-federal-spending/index.html.

[11] Jeff Stein, Isaac Arnsdorf & Jaqueline Alemany, *Senior U.S. Official Exits After Rift with Musk Allies over Payment System*, Wash. Post (Jan. 31, 2025), https://www.washingtonpost.com/business/2025/01/31/elon-musk-treasury-department-payment-systems/.

[12] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payment System*, N.Y. Times (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.

[13] Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, Wired (Feb. 4, 2025), https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system/.

47.    DOGE-affiliated individuals followed a similar pattern to seize control of OPM systems, which contain significant personally identifiable information about federal job applicants, employees, and retirees, including information about employees in the Judicial Branch and the Congressional Branch. On January 20, 2025, DOGE affiliates moved into OPM headquarters, eventually setting up sofa beds on the building's fifth floor, which contains the OPM Director's Office.[14]

48.    DOGE-affiliated individuals directed OPM staff to grant them high-level access to OPM computer systems, and quickly took control of them, including systems containing large troves of personally identifiable information. DOGE-affiliated individuals also locked career civil servants at OPM out of at least some of those systems, giving them completely unchecked control over the systems and the information they contain.[15]

49.    The identities of the DOGE personnel who have access to Treasury and OPM systems and to whom sensitive information has been disclosed are not yet clear, and to the extent there is available information on those individuals, it is only available from public reporting.

B.    Agency dismantlement at USAID and the Department of Education

50.    During the week of January 27th, Elon Musk and his team began joining staff calls at USAID,[16] and the DOGE team asked "detailed questions during meetings about organizational charts, contractors and aid programs."[17]

---

[14] *Id.*

[15] Tim Reid, *Exclusive: Musk Aides Lock Workers out of OPM Computer Systems*, Reuters (Feb. 1, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31/.

[16] Will Steakin et al., *Turmoil inside USAID as Musk calls the agency 'criminal' and says it 'has to die.'* ABC News (Feb. 3, 2025), https://abcnews.go.com/Politics/turmoil-inside-usaid-doge-reps-offices-senior-officials/story?id=118368900.

[17] *Behind DOGE's Standoff at USAID: Desk Searches and Elon Musk Calling,* Bloomberg News (Feb. 2, 2025), https://www.bloomberg.com/news/articles/2025-02-03/behind-doge-s-standoff-at-usaid-desk-searches-and-elon-musk-calling.

51.　　On January 29, USAID's director of employee and labor relations was placed on leave after he reversed the terminations of dozens of senior USAID staff. DOGE had ordered him to issue "immediate termination notices to a group of employees without due process."[18]

52.　　On January 31, the DOGE team gained access to and control of several USAID systems at USAID.[19] On February 1st, two security officials at USAID were placed on administrative leave after they refused to give members of the DOGE team access to additional systems at the agency, including systems containing classified information.[20]

53.　　As of February 2nd, "[m]ore than 1,000 USAID employees and contractors, including more than 300 people in the Bureau of Global Health and 600 in the Bureau of Humanitarian Assistance, have already been fired or furloughed" from USAID.[21]

54.　　On February 2nd, Elon Musk tweeted: "USAID is a criminal organization. Time for it to die."[22]

55.　　On February 3rd, staffers at USAID were physically locked out of their headquarters in Washington, D.C. Yellow police tape and federal law enforcement officers blocked the agency's lobby.[23]

---

[18] Abigail Williams and Vaughn Hillyard, *Senior USAID official ousted after fighting back against removal of career leadership*, NBC News (Jan. 31, 2025), https://www.nbcnews.com/politics/donald-trump/usaid-labor-director-pushed-fighting-back-removal-career-leadership-rcna190132.

[19] Steakin, *supra* note 16.

[20] *Id.*

[21] Abigail Williams et al., *USAID security leaders removed after refusing Elon Musk's DOGE employees access to secure systems*, NBC News (Feb. 2, 2025), https://www.nbcnews.com/politics/national-security/usaid-security-leaders-removed-refusing-elon-musks-doge-employees-acce-rcna190357.

[22] Elon Musk (@elonmusk), X (Feb. 2, 2025, 12:20 PM ET), https://x.com/elonmusk/status/1886102414194835755.

[23] https://abcnews.go.com/US/wireStory/usaid-headquarters-washington-blocked-after-musk-trump-agrees-118391601.

56.     On February 3, Elon Musk tweeted: "We spent the weekend feeding USAID into the woodchipper. Could [sic] gone to some great parties. Did that instead."[24]

57.     On February 3, in X Spaces, Elon Musk said about USAID, "It became apparent that its [sic] not an apple with a worm it in…What we have is just a ball of worms." "You've got to basically get rid of the whole thing. It's beyond repair." "We're shutting it down."[25]

58.     On February 4th, USAID sent out an email, placing nearly its entire workforce on administrative leave.[26]

59.     The same pattern appears to be beginning at the Department of Education. Beginning the week of January 27th, DOGE officials began an effort to unilaterally dismantle the Department of Education.

60.     According to reporting, about 20 DOGE officials are working inside the department in order to cut spending and agency staff.[27]

61.     Some officials with DOGE "have gained access to multiple sensitive internal systems…including a financial aid dataset that contains the personal information for millions of students enrolled in the federal student aid program."[28]

---

[24] Elon Musk (@elonmusk), X (Feb. 3, 2025, 1:54 AM ET), https://x.com/elonmusk/status/1886307316804263979.
[25] Ellen Knickmeyer, *Elon Musk says President Donald Trump has 'agreed' USAID should be shut down*, AP News (Feb. 3, 2025), https://apnews.com/article/doge-musk-trump-classified-information-usaid-security-35101dee28a766e0d9705e0d47958611.
[26] Alex Marquardt et al., *USAID employees around the world will be placed on leave Friday and ordered to return to US*, CNN (Feb. 4, 2025), https://www.cnn.com/2025/02/04/politics/usaid-officials-administrative-leave/index.html.
[27] Laura Meckler, *Trump preps order to dismantle Education Dept. as DOGE probes data*, Washington Post (Feb. 3, 2025), https://www.washingtonpost.com/education/2025/02/03/trump-education-department-dismantling-executive-order-draft/.
[28] *Id.*

62.    According to reporting, the dataset that DOGE-affiliated personnel infiltrated includes personal information, such as financial tax information, and other sensitive and legally protected data, for every person who has applied for or received federal student aid and some of their families' financial information.[29]

63.    These actions are in anticipation of a White House executive order expected later in February that would "fulfill Trump's campaign pledge to defund the department." Specifically, Trump's executive order "is expected to direct the Education Department to develop a legislative plan to present to Congress. But it also will instruct the department to come up with a plan to diminish its staff and functions."[30]

64.    On February 3rd, Musk retweeted a screenshot of a Washington Post article headline on Trump preparation of orders dismantling Education Department as DOGE probes data and responded with "😎."[31]

## III.    Threats to the Department of Labor

A.    Recent threats and DOGE's intent to enter the Department of Labor

65.    Yesterday evening, a journalist shared on social media that her sources told her that "DOGE is going after the Department of Labor next. DOL workers have been ordered to give DOGE access to anything they want-or risk termination."[32]

66.    As detailed in the attached affidavit of Rushab Sanghvi, General Counsel of Plaintiff AFGE, this report was substantiated by one of Plaintiff's members. That member was

---

[29] *See* National Student Loan Data System (NSLDS), Frequently Asked Questions. https://nsldsfap.ed.gov/help/faq (last accessed Feb. 2, 2025).
[30] *Id.*
[31] Elon Musk (@elonmusk), X (Feb. 3, 2025, 10:50 PM ET), https://x.com/elonmusk/status/188662344690740067.
[32] Kim Kelly (@GrimKim), X (Feb. 4, 2025, 5:04 PM ET), https://x.com/GrimKim/status/1886898588099240401.

told by Department leadership that when Mr. Musk and his team visit the Department, they are to do whatever they ask, not to push back, not to ask questions. They were told to provide access to any DOL system they requested access to and not to worry about any security protocols; just do it. Based on leadership's statements, the employee believed they could face termination if they did not comply.

67.    On information and belief, later today, DOGE staff will enter the Department of Labor and attempt to gain access to sensitive systems to which they do not have access, using threats of employment action to coerce cooperation from the employees tasked with safeguarding the data of millions of Americans and many federal employees.

68.    DOGE staff may also attempt to begin an unlawful wholesale dismantling or restructuring of the agency to suit the private business interests or political preferences of DOGE leaders or President Trump.

B.  Ongoing Department enforcement against Mr. Musk's companies and competitors

69.    Mr. Musk's companies have been subject to multiple investigations and fines by Labor components.

70.    The Occupational Safety and Health Administration ("OSHA") within the Department is responsible for enforcing safety standards at American companies. OSHA has investigated Mr. Musk's space technology company, SpaceX, over multiple safety incidents, and has fined SpaceX in connection with one worker's death and seven other serious safety incidents.[33]

---

[33] Marisa Taylor, *At SpaceX, worker injuries soar in Elon Musk's rush to Mars*, Reuters (Nov. 10, 2023), https://www.reuters.com/investigates/special-report/spacex-musk-safety/ .

71.     OSHA has also investigated and issued fines to Tesla for unsafe working conditions in its factories.[34]

72.     OSHA also has open investigations into the Boring Company, and has issued it multiple fines for serious citations, according to OSHA's website.[35]

73.     On information and belief, the Department of Labor also currently has open investigations into one or more competitors of Mr. Musk's companies.

74.     Mr. Musk would ordinarily be unable to access non-public information regarding those investigations.  *See* 18 U.S.C. § 1832(a) (Trade Secrets Act); 5 U.S.C. § 552(b)(4) (FOIA exemption for trade secrets).

75.     In light of the blanket instruction to provide DOGE employees with "anything they want," Mr. Musk or his associates will be able to access that information simply by asking DOL employees for it.

C.   <u>Sensitive and valuable systems within the Department of Labor</u>

76.     Many sensitive data sources and processes are housed within the Department, including some classified information. The Department lists over 50 different systems containing personally identifiable information across its functions.[36] Unlawful changes to these systems'

---

[34] Brandon Lingle, *Tesla hit with federal fines for worker safety violations at its Gigafactory Texas in Austin*, San Antonio Express-News (Nov. 26, 2024), https://www.expressnews.com/business/article/tesla-texas-gigafactory-osha-fines-worker-safety-19943647.php.

[35] OSHA, *Inspection: 1677194.015 - Tbc The Boring Company*, https://www.osha.gov/ords/imis/establishment.inspection_detail?id=1677194.015 (last accessed Feb. 5, 2025).

[36] *Privacy Impact Assessments*, U.S. Dep't of Labor, Office of the Assistance Secretary for Administration and Management, https://www.dol.gov/agencies/oasam/centers-offices/ocio/privacy (last accessed Feb. 5, 2025) (collecting Privacy Impact Assessments for over 50 systems across various Department functions).

(and others') access or control could have substantial negative effects, for individual privacy as well as for agency effectiveness.

77.    There is no public indication that Mr. Musk or DOGE personnel on leave from Mr. Musk's corporate interests will be recused from access to any of this data.

78.    Some examples follow.

    1.  *FECA*

79.    Among DOL's functions, it administers workers compensation programs, including all federal employees' compensation claims through the Federal Employees' Compensation Act ("FECA") Claims Administration. This administration adjudicates new claims for benefits and manages ongoing cases; pays medical expenses and compensation benefits to injured workers and survivors; and helps injured employees return to work when they are medically able to do so.

80.    Because DOL administers all workers' compensation claims for federal employees it is responsible for all of these records.[37] FECA records include highly sensitive personal information, including the following information:

> Reports of injury by the employee and/or employing agency; claim forms filed by or on behalf of injured Federal employees or their survivors seeking benefits under FECA; forms authorizing medical care and treatment; other medical records and reports; bills and other payment records; compensation payment records; formal orders for or against the payment of benefits; transcripts of hearings conducted; and any other medical, employment, or personal information submitted or gathered in connection with the claim. The system may also contain information relating to dates of birth, marriage, divorce, and death; notes of telephone conversations conducted in connection with the claim; information relating to vocational and/or medical rehabilitation plans and progress reports; records relating to court proceedings, insurance, banking and employment; articles from newspapers and other publications; information relating to other benefits (financial and otherwise) the claimant may be entitled to; and information

---

[37] 20 C.F.R. 10.10; *see also* DOL/GOVT-1, available at https://www.govinfo.gov/content/pkg/PAI-2023-DOL/xml/PAI-2023-DOL.xml#govt1 (last accessed Feb. 5, 2025)

received from various investigative agencies concerning possible violations of Federal civil or criminal law. The system may also contain information relating to certain claims under the War Hazards Compensation Act (WHCA).

The system may also contain consumer credit reports on individuals indebted to the United States, information relating to the debtor's assets, liabilities, income and expenses, personal financial statements, correspondence to and from the debtor, information relating to the location of the debtor, and other records and reports relating to the implementation of the Federal Claims Collection Act (as amended), including investigative reports or administrative review matters. Individual records listed here are included in a claim file only insofar as they may be pertinent or applicable to the employee or beneficiary.[38]

81.    Given the sensitive nature of these records, regulations require they be treated "considered confidential and may not be released, inspected, copied or otherwise disclosed" except under certain proscribed circumstances, and only if such release is consistent with the purpose for which the record was created.[39]

82.    In FY 2024, over 86,000 new FECA cases were created, implicating the privacy interests of tens of thousands of federal employees.[40]

### 2.    The Wage and Hour Division

83.    The Wage and Hour Division of the Department of Labor enforces federal minimum wage, overtime pay, recordkeeping, and child labor requirements of the Fair Labor Standards Act among other worker protection laws.

84.    The Wage and Hour Division accepts and processes complaints from employees covered by the Fair Labor Standards Act.

---

[38] DOL /GOVT-1.
[39] 20 C.F.R. 10.10.
[40] Office of Workers' Compensation Programs, *Federal Employees' Compensation Act (FECA) Claims Administration*, https://www.dol.gov/agencies/owcp/FECA/about (last accessed Feb. 5, 2025).

85.    The Department promises that all information shared with the Wage and Hour Division is confidential, including the complaints; the name of the complainant and the nature of the complaint.[41] Complaint information is stored in the Wage & Hour Investigative Support and Reporting Database ("WHISARD"). The Privacy Impact Assessment for WHISARD states that "The WHISARD system does not share PII information with any internal organizations" within the Department, and that "WHISARD does not share PII with any external organization."[42]

86.    This confidentiality is crucial to protect workers who report wage theft by their employers from retaliation. Workers who report minimum wage violations, for example, are by definition the lowest-wage workers, and are particularly vulnerable to retaliation by employers should those employers become aware that the workers have sought to protect their rights.

### 3.    Occupational Safety and Health Administration

87.    The Occupational Safety and Health Administration's mission is to assure America's workers have safe and healthful working conditions free from unlawful retaliation.

88.    Workers are able to file complaints with OSHA about injuries, safety issues, and retaliation. They may do so with their names or as anonymous whistleblowers.

89.    OSHA promises to keep these complaints confidential. Confidentiality is necessary to encourage vulnerable workers to come forward with information about their worksite and employer and to protect against retaliation. In the context of this case, disclosure of OSHA records to the leader of multiple companies with ongoing OSHA investigations presents clear risks both to workers and to the integrity of OSHA's enforcement efforts.

---

[41] Wage and Hour Division, *Frequently Asked Questions: Complaints and the Investigation Process*, https://www.dol.gov/agencies/whd/faq/workers (last accessed Feb. 5, 2025).
[42] Wage and Hour Division, *Privacy and Impact Assessment – WHD – WHISARD*, https://www.dol.gov/agencies/oasam/centers-offices/ocio/privacy/whd/whisard (last accessed Feb. 5, 2025).

90.    OSHA's databases include but are not limited to OSHA's Integrated Management Information Systems,[43] which houses OSHA complaints both against Tesla and against Tesla's competitors. This database makes some information regarding complaints public.[44] DOGE-affiliated personnel gaining access to the non-public information contained in these complaints could provide confidential information to Mr. Musk, such as regarding a claimant's personal information, or regarding claims against his competitors.

### 4.    The Bureau of Labor Statistics

91.    The Bureau of Labor Statistics ("BLS") was established in 1884, with a goal of collecting and publishing disinterested information about labor markets that "could promote effective, rational, and equitable decisionmaking."[45]

92.    It describes itself as the "principal fact-finding agency in the broad field of labor economics and statistics" and "collects, calculates, analyzes, and publishes data essential to the public, employers, researchers, and government organizations."[46]

93.    BLS is one of the "flagship" sources of statistics published by federal agencies.[47]

94.    The quality of data from statistical agencies is highly dependent on their independence and autonomy.

---

[43] *See* OSHA Integrated Management Information System, https://www.osha.gov/ords/imis/establishment.html (last accessed Feb. 5, 2025).

[44] *See, e.g.*, 20 partially publicly available complaints against Tesla in 2024, *available at* https://www.osha.gov/ords/imis/establishment.search?p_logger=1&establishment=TESLA&State=all&officetype=all&Office=all&sitezip=&p_case=all&p_violations_exist=all&startmonth=01&startday=01&startyear=2024&endmonth=12&endday=31&endyear=2024

[45] Janet L. Norwood, *One Hundred Years of BLS*, Monthly Labor Review 3, 3 (July 1985), https://www.bls.gov/opub/mlr/1985/07/art1full.pdf.

[46] U.S. Bureau of Labor Statistics, *About the U.S. Bureau of Labor Statistics*, https://www.bls.gov/bls/about-bls.htm (last accessed Feb. 5, 2025).

[47] Constance F. Citro et al., *What Protects the Autonomy of the Federal Statistical Agencies? An Assessment of the Procedures in Place to Protect the Independence and Objectivity of Official U.S. Statistics.*, 10 Stat. & Pub. Policy 1, 1 (2023).

Autonomy supports data quality directly by allowing leaders and staff to adhere to professional standards. It also supports trust in and use of the products of a statistical agency by reducing suspicions that the products have been manipulated for political purposes. Higher trust and better data quality operate in a positive feedback cycle with survey participation. And data quality and trust are necessary for people to use data products.[48]

95.     Indeed, Congress recognized the value of statistical agencies and specifically directed them in the Foundations for Evidence-Based Policymaking Act of 2018 to "(A) produce and disseminate relevant and timely information; (B) conduct credible and accurate statistical activities; (C) conduct objective statistical activities; and (D) protect the trust of information providers by ensuring the confidentiality and exclusive statistical use of their responses." Pub. L. No. 115-435, § 302, 132 Stat. 5529 (2019), *codified at* 44 U.S.C. § 3563.

96.     Congress also sought to protect the collection of confidential data by statistical agencies in the Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA). Pub. L. No. 107-347, § 501-526, 116 Stat. 2900 (2002), *codified at* 44 U.S.C. §§ 3572-73. CIPSEA sought to use "[p]ledges of confidentiality by agencies" to "provide assurances to the public that information about individuals or organizations or provided by individuals or organizations for exclusively statistical purposes will be held in confidence and will not be used against such individuals or organizations in any agency action." 44 U.S.C. § 3571(2). As such CIPSEA provides that, among other things, "[d]ata or information acquired by an agency under a pledge of confidentiality for exclusively statistical purposes shall not be disclosed by an agency in identifiable form, for any use other than an exclusively statistical purpose, except with the informed consent of the respondent." *Id.* § 3572(c)(1). Further, disclosures may be permitted "only when the head of the agency approves such disclosure and the disclosure is not prohibited by any other law." *Id.* § 3572(c)(2).

---

[48] *Id.* at 4.

97.     BLS's independence can be a source of political angst, as it has a long tradition of releasing benchmark data on the state of the U.S. economy with minimal advance notice to political leaders at the White House before the public release.[49]

98.     This is because BLS data releases often "move markets" and have other significant effects on the U.S. economy.[50]

99.     When President Trump has previously taken issue with economic indicators released by BLS, he has attacked the Bureau's credibility, accusing them of "fraudulently manipulating job statistics,"[51] and calling their data "phoney."[52]

100.     Political leaders may wish for a BLS that is less independent; one that, for example, is more willing to give the White House longer notice of economic data so that the President can prepare his messaging; or one that alters data to support the President's political needs.

101.     A DOGE takeover of the type seen at other agencies could overturn over a century of the BLS's independence and turn it from a reliable source of data across the economy into a far less valuable political mouthpiece.

## HARMS TO PLAINTIFFS

---

[49] Tucker Higgins, *Trump can spin economic numbers – but he likely can't manipulate them, experts say*, CNBC (Sep. 10, 2019), https://www.bls.gov/bls/about-bls.htm.

[50] *See* Julia Press & Saleha Mohsin, BNN Bloomberg, W*hy Key U.S. Economic Data is under Threat* (Dec. 12, 2024), https://www.bnnbloomberg.ca/business/company-news/2024/12/12/why-key-us-economic-data-is-under-threat/.

[51] Alicia Wallace, *Trump routinely calls economic data 'fake.' Here's why that's dangerous.* CNN (Jan. 26, 2025), https://edition.cnn.com/2025/01/26/economy/us-economic-data-trump/index.html.

[52] Mona Chalabi, *Statisticians fear Trump White House will manipulate figures to fit narrative*, The Guardian (Jan. 30, 2017), https://www.theguardian.com/us-news/2017/jan/30/statistics-trump-administration-numbers-manipulation.

102.    Plaintiffs include numerous unions, AFL-CIO, AFGE, AFSMCE, SEIU, and CWA,  collectively representing millions of members, as well as the Economic Policy Institute.

103.    Plaintiff AFGE represents over 800,00 federal and D.C. government workers, including workers at the Department of Labor.

104.    These employees' sensitive personnel information, including employment information (such as social security numbers, tax forms such as W-2, banking information for payment purposes, and similar) are stored in the Department of Labor's data systems.

105.    These employees face irreparable harm to their privacy interests if this information is improperly accessed or disseminated (such as by being downloaded to a private server). Once the information is improperly accessed and/or disseminated, it cannot be recovered.

106.    These employees, like any federal employee, may be injured on the job and therefore entitled to workers' compensation. In such instances, they must file claims with the Department of Labor through the Federal Employees' Compensation Act Claims Administration. These claims include sensitive personal information such as medical records, including about injuries, illness, prognosis, long-term effects of an injury, medical appointments and treatment plans. These claims also include sensitive personal information such as financial information, regarding costs, benefits, taxes, and similar. AFGE assists members in filing for these claims including approximately 1,500 such claims in 2024.

107.    AFGE and its members will be irreparably harmed if this sensitive private information, including medical information, financial information, and personnel information, is improperly accessed and or/disseminated.

108.    AFGE members who are employees at the Department of Labor have also been ordered to violate the law by granting access to sensitive systems in violation of the Privacy Act, FISMA, CISPEA, the APA, and other statutes. At least one of these statutory schemes, the Privacy Act, creates individual civil and criminal liability for employees who violate the law with the requisite degree of knowledge. AFGE members will be irreparably harmed by being exposed to criminal and civil liability if they violate the law on the orders of Department officials or DOGE-affiliated personnel.

109.    In addition, AFGE members will be chilled from exercising their rights to seek workers' compensation for injuries on the job if their private information, reported confidentially as part of their workers' compensation claims, is released publicly. AFSCME and its members have a significant interest in multiple categories of records maintained by DOL, including records of a sensitive nature which would harm AFSCME and its members if disclosed.  As the chief enforcement entity of many labor statutes for which it has both investigative and prosecutorial authority, DOL conducts investigations, and maintains sensitive records in connection therewith, regarding a wide range of matters involving AFSCME, including but not limited to employer violations of AFSCME members' rights in the areas of wage and hour law, occupational safety and health, and more.  DOL's Employment and Training Administration is the top federal agency overseeing the nation's Unemployment Insurance system, which provides critical benefits (involving sensitive beneficiary information) to AFSCME members.

110.    Plaintiff SEIU represents over 2 million members across 150 local union affiliates.

111.    SEIU regularly assists and supports its members in filing numerous legal complaints with the Department of Labor, including under the Fair Labor Standards Act and the Occupational Safety and Health Act.

112.    For example, SEIU recently filed a complaint on behalf of an affiliate Union against Waffle House for violations of the Fair Labor Standards Act.

113.    SEIU, and its affiliate unions and members, is only able to file such complaints based on the guarantee that the Department of Labor will keep the identity of complainants confidential.

114.    Should the confidential information in Department of Labor's data systems be improperly accessed and/or disseminated, that would cause irreparable injury to SEIU, its affiliate unions, and its members, including but not limited to the personnel involved in the Waffle House complaint. SEIU Decl. ¶¶ 5-10. The individuals who made complaints, their personal information and the details of the complaints that make them identifiable, will likely be irreparably harmed including facing employment retaliation for making such claims. *Id.*

115.    Others will be chilled from making such complaints in the future. *Id.* Indeed, "DOGE's access to other government systems has been broadly publicized" and therefore if they gain unlawful access to Department of Labor systems "even for a short period of time" it will cause "devasting" irreparable harm to SEIU, its members, and its affiliate unions. *Id. ¶ 10.*

116.    Plaintiff AFL-CIO includes 63 labor organizations and over 13 million members. AFL-CIO Decl. ¶ 2.

117.    AFL-CIO "routinely brings complaints and claims" under the Fair Labor Standards Act and the Occupational Safety and Health Act to the Department of Labor. AFL-CIO Decl. ¶ 4. These claims are brought "on behalf of vulnerable works, who, without the

Department of Labor's assistance, would be deprived of even minimum wage and safe working conditions." *Id.* ¶ 5.

118.    AFL-CIO and its member organizations are only able to bring such claims due to the confidentiality guaranteed by the Department of Labor. Indeed, "this confidentiality is essential to [the workers'] decision to come forward." AFL-CIO Decl. ¶ 7.

119.    Should the confidential information in Department of Labor's data systems be improperly accessed and/or disseminated, that would cause irreparable injury to the AFL-CIO, its member organizations, and its members. *Id.* ¶¶ 7-9. The individuals who made complaints, their personal information and the details of the complaints that make them identifiable, will be likely be irreparably harmed including facing employment retaliation for making such claims, and others will be chilled from making such complaints in the future. *Id.*

120.    Members of the AFL-CIO also "routinely submit claims under the Black Lung Benefits Act," administered by the Department of Labor. AFL-CIO Decl. ¶ 10-11. These claims include sensitive medical, personal, and financial information. *Id.* AFL-CIO and its members will be irreparably harmed if this sensitive information is improperly accessed and/or disseminated, including by being chilled from making such claims in the future. *Id.*

121.    CWA has filed numerous third-party complaints with DOL agencies in recent years—some of which are still pending—in its efforts to maintain minimum industry standards. CWA also represents employees who work for federal contractors covered by the Service Contract Act and CWA's collective bargaining agreements are routinely submitted electronically to the DOL's Wage and Hour Division as required by WHD as part of its process for issuing wage determinations under Section 4(c) of the Service Contract Act. The privacy interests of

these employees and CWA's ability to continue encouraging them to report labor law violations are imperiled by DOGE access to Department Records.

122.    EPI is a non-profit organization with over 35 years of experience analyzing the effects of economic policy on the lives of working people in the United States. EPI research intentionally centers on low- and middle-income working families in economic policy discussions at the federal, state, and local levels, ensuring every worker has access to a good job with fair pay, affordable health care, retirement security, and a union. EPI research and analysis is grounded in data, including public government data from the Bureau of Labor Statistics, Bureau of Economic Analysis, and U.S. Census. EPI is concerned that the federal government produces, and the general public have access to, quality and accurate data to help inform economic policy making decisions.

123.    Plaintiffs' missions are also all deeply intertwined with the Department's operations. Plaintiffs rely on the Department and its programs to ensure fair treatment of American workers. Were Defendants permitted to allow DOGE to wreak the sort of rapid, arbitrary, and ill-considered fundamental changes to the Department's work, responsibilities, and personnel that it has at other agencies, Plaintiffs, their members, and the communities they serve would be gravely impacted.

### CLAIMS FOR RELIEF

### COUNT ONE
#### *Ultra Vires* – Direction of Agency Actions

124.    Plaintiffs reallege and incorporate by reference the paragraphs written above.

125.    DOGE is purely a creation of executive order; no statute directed or contemplated its existence.

126.    DOGE's limited functions are to advise and assist the President; it is not empowered to perform any other functions.

127.    DOGE has no authority in law to direct operations or decisions at government agencies. Despite this, as alleged above, DOGE-affiliated personnel have directed operations and decisions—including some operations that appear to be contrary to law—at multiple agencies thus far.

128.    On information and belief, DOGE affiliates will direct Department of Labor employees to provide them with access to Department of Labor systems or information from those systems.

129.    On information and belief, DOGE affiliates will also direct employment actions and agency restructuring in order to effectuate DOGE's operational policy objectives.

130.    Such directions are *ultra vires*.

## COUNT TWO
### *Ultra Vires* – Access to Government Systems

131.    Plaintiffs reallege and incorporate by reference the paragraphs written above.

132.    The Executive Order establishing DOGE instructs agencies to provide access to all "unclassified agency records, software systems, and IT systems."

133.    The Department of Labor retains highly-sensitive and confidential information on restricted-access systems.

134.    DOGE has no authority in law to access restricted-access systems.

135.    DOGE-affiliated personnel have previously accessed restricted-access systems, and are likely to direct Department of Labor employees to provide them with access to sensitive and restricted-access information on Department of Labor systems.

136.    Such directions are *ultra vires*.

## COUNT THREE
### Administrative Procedure Act – Not in Accordance with Law – Prohibited Personnel Practice

137.    Plaintiffs reallege and incorporate by reference the paragraphs written above.

138.    On information and belief, the Department of Labor has instructed employees to provide requested system access to DOGE representatives or face termination.

139.    This instruction constitutes final agency action for which there is no other adequate remedy in a court and therefore is subject to judicial review. 5 U.S.C. § 704; *see* 5 U.S.C. § 702.

140.    The instruction by the Department of Labor to its employees is inconsistent with 5 U.S.C. § 2302(b)(9)(D), which prohibits threatening a federal employee with termination for "refusing to obey an order that would require the [employee] to violate a law."

141.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(a), requires courts to hold unlawful and set aside final agency action which is "not in accordance with law."

## COUNT FOUR
### Administrative Procedure Act – Not in Accordance With Law – Confidential Information Protection and Statistical Efficiency Act

142.    Plaintiffs reallege and incorporate by reference the paragraphs written above.

143.    The Confidential Information Protection and Statistical Efficiency Act of 2002 (CISPEA), 44 U.S.C. § 3572(c)(1) prohibits disclosure of information of information collected under a pledge of confidentiality for exclusively statistical purposes.

144.    BLS data is subject to this protection.

145.    On information and belief, DOGE employees are likely to demand access to BLS data, and Department of Labor employees have been instructed to comply with that demand or face termination.

146. This instruction constitutes final agency action for which there is no other adequate remedy in a court and therefore is subject to judicial review. 5 U.S.C. § 704; *see* 5 U.S.C. § 702.

147. This instruction is inconsistent with 44 U.S.C. § 3572(c)(1).

148. The Administrative Procedure Act, 5 U.S.C. § 706(2)(a), requires courts to hold unlawful and set aside final agency action which is "not in accordance with law."

## COUNT FIVE
### Administrative Procedure Act – Not in Accordance With Law – Privacy Act

149. Plaintiffs reallege and incorporate by reference the paragraphs written above.

150. The Privacy Act, 5 U.S.C. § 552a(b), prohibits disclosure of records from systems of records absent certain conditions.

151. Disclosure from Department of Labor systems of records to DOGE employees would not meet any of the conditions enumerated in 5 U.S.C. § 552a(b), and would therefore be inconsistent with the Privacy Act.

152. Defendant's disclosure to DOGE employees is final agency action for which there is no other adequate remedy in a court and therefore is subject to judicial review. 5 U.S.C. § 704; *see* 5 U.S.C. § 702.

153. The Administrative Procedure Act, 5 U.S.C. § 706(2)(a), requires courts to hold unlawful and set aside final agency action which is "not in accordance with law."

## COUNT SIX
### Administrative Procedure Act – Rulemaking Without Proper Procedure

154. Plaintiffs reallege and incorporate by reference the paragraphs written above.

155. Under the APA, an agency must provide the public with notice of a proposed rule, 5 U.S.C. § 553(b), and give "interested persons an opportunity to participate in the rule making

through submission of written data, views, or arguments." *Id.* § 553(c). Agencies cannot evade the APA's requirements merely by declining to publish a rule for comment.

156.    DOL has established confidentiality requirements for various sets of sensitive data via policy and regulation, which may be released only under identified and limited circumstances. *See*, *e.g.* 20 C.F.R. 10.10 (FECA) ("All records relating to claims for benefits, including copies of such records maintained by an employer, are considered confidential and may not be released, inspected, copied or otherwise disclosed except as provided in the Freedom of Information Act and the Privacy Act of 1974 or under the routine uses provided by DOL/GOVT-1 if such release is consistent with the purpose for which the record was created.").

157.    The instructions provided to DOL staff to "provide access to any DOL system they requested access to and not to worry about any security protocols" effectively revokes these policies and regulations and does so without the opportunity for notice and comment.

## COUNT SIX
### Administrative Procedure Act – Arbitrary and Capricious

158.    Plaintiffs reallege and incorporate by reference the paragraphs written above.

159.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

160.    Permitting DOGE access to any DOL system requested and ignoring security protocols is arbitrary and capricious. Among the many "important aspects of the problem," *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), it failed consider are the impact of such unfettered access on the privacy interests of DOL and other federal employees in their health and benefits information in workers compensation claims held by the agency and the significant potential to chill reporting of wage

and hour or OSHA violations. It also failed to account for the reliance interests of federal employees and workers everywhere who have provided the Department with confidential personal information with the expectation that such information would be protected.

161.    In addition, some of Mr. Musk's companies are currently under investigation by the Department of Labor or the subject of complaints filed with the Department of Labor. For example, 20 OSHA complaints regarding Tesla were filed with the Department in 2024 alone.[53] Providing access to that sensitive data to Mr. Musk, and access to confidential complaints regarding his competitors, without regard to relevant standards for investigations, for ethics laws, or for whether Mr. Musk has complied with federal ethics laws, is arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

162.    Declare that Defendant Department of Labor's decision to authorize DOGE – affiliated personnel to access Department of Labor systems and information, including classified information, is unlawful.

163.    Enjoin Defendant Department of Labor from granting DOGE-affiliated personnel access to Department of Labor systems except as consistent with all applicable law.

164.    Enjoin Defendant Department of Labor from taking any adverse personnel action against any employee who refuses to provide DOGE employees with unlawful access to Department of Labor systems.

---

[53] *See* https://www.osha.gov/ords/imis/establishment.search?p_logger=1&establishment=TESLA&State=all&officetype=all&Office=all&sitezip=&p_case=all&p_violations_exist=all&startmonth=01&startday=01&startyear=2024&endmonth=12&endday=31&endyear=2024

165.    Enjoin Defendants from providing any person with non-public Department of Labor information or access to such information regarding his or her business interests or direct competitors to his or her business interests.

166.    Grant appropriate temporary, preliminary, or permanent injunctive relief to prevent Defendants DOGE and its employees or agents from accessing information in violation of law.

167.    Award Plaintiffs their costs, reasonable attorneys' fees, and any other disbursements as appropriate.

168.    Grant any other relief this Court deems appropriate.

Respectfully submitted,
*/s/ Mark B. Samburg*
Mark B. Samburg (D.C. Bar No. 1018533)
Aman T. George (D.C. Bar No. 1028446)
Benjamin Seel (D.C. Bar No. 1035286)
Rachel F. Homer (D.C. Bar No. 1045077)
Robin F. Thurston (D.C. Bar No. 462679)
Skye L. Perryman (D.C. Bar No. 984573)*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Fax: (202) 796-4426
msamburg@ democracyforward.org
ageorge@democracyforward.org
bseel@democracyforward.org
rhomer@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs*

Teague P. Paterson (D.C. Bar No. 144528)
Matthew S. Blumin (D.C. Bar No. 144528)
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO

1625 L Street N.W.
Washington, DC 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Counsel for American Federation of State,*
*County, and Municipal Employees, AFL-CIO*
*(AFSCME)*

Rushab B. Sanghvi (D.C. Bar No. 1012814)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
*Counsel for Plaintiff American Federation*
*of Government Employees, AFL-CIO (AFGE)*
*and Local 3707*

Steven K. Ury* (D.C. Bar 1643947)
SERVICE EMPLOYEES
INTERNATIONAL UNION
1800 Massachusetts Avenue, NW,
Legal Department, 6th Floor,
Washington, DC 20036
Telephone: (202) 730-7428
steven.ury@seiu.org
*Counsel for Plaintiff Service Employees*
*International Union*


* Motion for admission *pro hac vice*
forthcoming