UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF LABOR
AND CONGRESS OF INDUSTRIAL
ORGANIZATIONS, et al.,

     Plaintiffs,

       v.

DEPARTMENT OF LABOR, et al.,

     Defendants.

Civil Action No.  25-0339 (JDB)

## MEMORANDUM OPINION AND ORDER

Plaintiffs, a collection of labor unions and a think tank, move to temporarily restrain the Department of Labor, the United States Digital Service (now known as the United States DOGE Service), and the United States DOGE Service Temporary Organization (together, "defendants"), from providing any person outside the Department of Labor—most pointedly, the other defendants' employees—with access to non-public Department of Labor information or data, and from requiring Department employees to grant access to said information or data.  This data includes the medical and financial records of millions of Americans.  But on the current record, plaintiffs have failed to establish standing.  So although the Court harbors concerns about defendants' alleged conduct, it must deny plaintiffs' motion at this time.

## BACKGROUND

On February 5, 2025, the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"), four of its affiliates,[1] and the Economic Policy Institute filed this

---

[1] These affiliates are: American Federation of Government Employees; American Federation of State, County, and Municipal Employees; Service Employees International Union; and Communication Workers of America.  Compl. [ECF No. 1] ¶¶ 13–17.

1

lawsuit and the instant motion for a temporary restraining order ("TRO").  See Compl. [ECF No. 1]; Mot. TRO [ECF No. 3]; Mem. of L. in Supp. Pl.'s Mot. TRO [ECF No. 2] ("Mem.").  The motion avers that, within the immediate future, the Department of Labor will grant the U.S. DOGE Service access to "core data at the Department of Labor—data that contains sensitive personal information regarding America's workers, data regarding our labor statistics, and even health information." Mem. at 1–2.  Plaintiffs allege this would be unlawful because, inter alia, (1) USDS lacks legal authority to take these actions and (2) the Department is required under the Privacy Act of 1974 to get individuals' approval before sharing records with another agency or person, see 5 U.S.C. § 552(a)(b).  See Mem. at 23–29.

## I.    United States DOGE Service and the Department of Labor

On January 20, 2025, President Donald Trump was inaugurated to his second term as president.  That same day, he issued an Executive Order creating the "Department of Government Efficiency," otherwise known as "DOGE."  Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025).  As a technical matter, the Order renamed the United States Digital Service as the United States DOGE Service ("USDS") and established the service within the Executive Office of the President.  Id. § 3(a).  DOGE's mission is to "moderniz[e] Federal technology and software to maximize governmental efficiency and productivity." Id. § 1.

The new USDS consists of two parts: the U.S. DOGE Service Temporary Organization and DOGE Teams.  Set to exist for only eighteen months, the U.S. DOGE Service Temporary Organization is headed by a USDS Administrator—who reports to the White House Chief of Staff—and is "dedicated to advancing the President's 18-month DOGE agenda."  Id. § 3(b).  DOGE Teams, in contrast, are housed within other agencies.  See id. § 3(c).  The Executive Order requires each executive agency head to "establish within their . . . [a]genc[y] a DOGE Team of at

least four employees." Id.  The four team members "may include Special Government Employees,

hired or assigned within thirty days of th[e] Order," but in any event must be chosen "in

consultation with the USDS Administrator."[2]  Id.  Agency heads are obligated to "ensure that

DOGE Team[s] . . . coordinate their work with USDS." Id.

In the recent days (although when exactly is unclear), four USDS employees have been

"detailed to the Department of Labor" to "assist the Department with improving its information

technology and data organization systems and in obtaining accurate and complete data to inform

policy decisions."  Decl. of Adam Ramada [ECF No. 16-1] ("Ramada Decl.") ¶ 5.[3]  The

Department of Labor contains many bureaus and agencies.  In total, it houses data in over 50

systems.[4]  Plaintiffs point out four divisions of the Department that house sensitive data:  the

Federal Employees' Compensation Act ("FECA") Claims Administration, which administers

workers compensation claims; the Wage and Hour Division, which enforces federal labor

standards; the Occupational Safety and Health Administration ("OSHA"), which enforces anti-

retaliation provisions of the Occupational Safety and Health Act and other federal whistleblower

laws; and the Bureau of Labor Statistics ("BLS"), which collects data in order to produce labor

and economic statistics.  Mem. at 5–12.

---

[2] A special government employee is "an officer or employee of the executive or legislative branch . . . who is retained, designated, appointed, or employed to perform . . . temporary duties" for not more than 130 days a year. 18 U.S.C. § 202(a).

[3] In their Reply, plaintiffs argue that the USDS employees are not "detailed" to the Department because that would not be permitted by the statute that permits detailing—the Economy Act of 1932.  See Pls.' Reply in Supp. Mot. TRO [ECF No. 17] ("Reply") at 7–8.  By quoting the declaration of the USDS employee to the contrary, the Court takes no position on whether the employee indeed could be detailed consistent with law.

[4] Privacy Impact Assessments, U.S. Dep't of Labor, Off. of the Ass't Sec. for Admin. & Mgmt., https://www.dol.gov/agencies/oasam/centers-offices/ocio/privacy.  See  Carik v. U.S. Dep't of Health & Human Servs., 4 F. Supp. 3d 41, 48 n.4 (D.D.C. 2013) (courts can take judicial notice of information on government agency's website).

On February 4, 2025, Department of Labor leadership reportedly told its employees—including an unnamed Department of Labor employee and member of plaintiff American Federation of Government Employees ("AFGE")—that USDS would be accessing the Department headquarters around 4 p.m. on February 5, 2024.  Decl. of Rushab Sanghvi [ECF No. 2-3] ("Sanghvi Decl.") ¶ 5.  That information from Department leadership ostensibly came with an instruction to Department employees: do whatever USDS asks.  Id.  This included providing access to any requested Department system without regard to security protocols.  Id.

## II.    Procedural History

In light of the above, plaintiffs filed this case and moved for a temporary restraining order on February 5, 2025.  Initially, plaintiffs sought relief by 5 p.m. that same day, pointing to the reports that USDS would soon be entering the Department and accessing its data.  Mot. TRO at 3.  The Court, however, postponed ruling on the motion based on defendants' representation that the Department of Labor would not give USDS access to any Department data before the Court resolved plaintiffs' TRO motion today.  See Order [ECF No. 5].  The Court thus scheduled a hearing on the TRO motion for February 7, 2025.  Id.  Before the hearing, defendants filed an opposition to plaintiffs' motion, Defs.' Mem. in Opp'n to Pls.' Mot. TRO [ECF No. 16], and plaintiffs replied, Pls.' Reply in Supp. Mot. TRO [ECF No. 17] ("Reply").  The Court held the hearing as scheduled.

## ANALYSIS

"The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order . . . is by now well-established."  Aviles-Wynkoop v. Neal, 978 F. Supp 2d 15, 21 (D.D.C. 2013) (quoting Munaf v. Geren, 553 U.S. 674, 689 (2008)).  "To prevail, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) that the moving

party would suffer irreparable injury if the injunction were not granted; (3) that an injunction would

not substantially injure other interested parties; and (4) that the public interest would be furthered

by the injunction." Id.

Here, the Court's reasoning begins and ends with likelihood of success on the merits. "The

first component of the likelihood of success on the merits prong usually examines whether the

plaintiffs have standing." Barton v. District of Columbia, 131 F. Supp. 2d 236, 243 n.6 (D.D.C.

2001); Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009) (A "court has an independent

obligation to assure that standing exists."). A plaintiff may only sue in federal court if she has an

injury in fact, caused by the challenged conduct, and redressable by the relief requested. Lujan v.

Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). When seeking a TRO, at least one plaintiff must

"demonstrate a substantial likelihood of standing for the court to maintain jurisdiction." Gomez

v. Trump, 485 F. Supp. 3d 145, 170 (D.D.C. 2020). That means a "plaintiff cannot 'rest on . . .

mere allegations, but must set forth by affidavit or other evidence specific facts' that, if 'taken to

be true,' demonstrate a substantial likelihood of standing." Elec. Priv. Info. Ctr. v. Presidential

Advisory Comm'n on Election Integrity, 878 F.3d 371, 377 (D.C. Cir. 2017) (quoting Lujan, 504

U.S. at 561).

Organizations—like plaintiffs here— have two routes for establishing standing: asserting

an injury to their members (i.e., associational standing) or asserting its own injury (i.e.,

organizational standing). Equal Rights Ctr. v. Post Props., Inc., 633 F.3d 1136, 1138 (D.C. Cir.

2011). Plaintiffs argue they satisfy both. But, on the present record, they satisfy neither.

Associational standing requires that an organization show "(1) 'its members would

otherwise have standing to sue in their own right;' (2) 'the interests it seeks to protect are germane

to the organization's purpose;' and (3) 'neither the claim asserted nor the relief requested requires

the participation of individual members in the lawsuit.'" Ctr. for Sustainable Econ. v. Jewell, 779

F.3d 588, 596 (D.C. Cir. 2015) (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S.

333, 343 (1977)).

For the first requirement, plaintiffs put forward evidence some of their members may suffer

an injury because of defendants' challenged conduct.  Plaintiffs state that USDS's access to

Department of Labor data will "harm millions of workers and their families" because it will result

in "unauthorized access to sensitive employee health and disability data."  Mem. at 30–31; Decl.

of Matthew Ginsburg, AFL-CIO [ECF No. 2-2] ("Ginsburg Decl.") ¶ 11 ("If DOGE is allowed to

access these claims, highly personal information will be disclosed in violation of [members']

privacy interests.").  They also assert that the data sharing will chill their members' willingness to

raise complaints with the Department of Labor.  See, e.g., id. ¶ 9, 11; Mem. at 32–33.

Associational standing's first requirement, however, necessitates more than generalizations

about the organization's members.  The organization must point to a particular member and

establish she would have standing if she were a plaintiff herself.  See Nat. Ass'n of Home Builders

v. EPA, 667 F.3d 6, 15 (D.C. Cir. 2011); Summers, 555 U.S. at 499 (explaining that an

organization must "identify members who have suffered the requisite harm"); Am. Chem. Council

v. Dep't of Transp., 468 F.3d 810, 819 (D.C. Cir. 2006) ("It is not enough to allege that . . .

associations comprise the majority" of affected individuals.).  When seeking preliminary relief,

this requires a submission on the record showing at least one particular member is substantially

likely to suffer an injury at the hands of the defendant.  See Am. Chem. Council, 468 F.3d at 819;

Lujan, 504 U.S. 561; Gomez, 485 F. Supp. 3d at 170.[5]  It's not enough that three of Plaintiffs'

---

[5] Plaintiffs argue that they need not provide an affidavit from a member in order to establish associational standing if the "administrative record" shows a member would have standing.  Reply at 4–5 (citing Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 41 F.4th 586, 593–94 (D.C. Cir. 2022)).  There are two

general counsels submitted declarations that plaintiffs' members will be harmed.  See Sierra Club

v. EPA, 292 F.3d 895, 901 (D.C. Cir. 2002) ("The submission of counsel describ[ing] the injuries

allegedly suffered by Sierra Club members" was insufficient.).[6]

So if one of the plaintiffs is to have standing, it must be organizational.  Organizational

standing requires the plaintiff organization, "like an individual plaintiff, to show actual or

threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be

redressed by a favorable court decision."  Equal Rights Ctr., 633 F.3d at 1138 (internal quotation

omitted).  The injury cannot be "simply a setback to the organization's abstract social interests"—

it must be a "concrete and demonstrable injury to [an] organization's activities . . . with [a]

consequent drain on the organization's resources."  Havens Realty Corp. v. Coleman, 455 U.S.

363, 379 (1982).  In other words, "an organization must allege that the defendant's conduct

perceptibly impaired the organization's ability to provide services."  Turlock Irrigation Dist. v.

FERC, 786 F.3d 18, 24 (D.C. Cir. 2015) (quotation marks omitted).  So courts in this Circuit first

ask "whether the agency's action or omission to act injured" or will injure "the organization's

interest and" then ask "whether the organization used" or will use "its resources to counteract that

---

issues with this argument.  Most obviously, there is no administrative record in this case.  But the argument would
still fail even if the Court were to read that case to say no affidavit is required if standing is apparent from the record.
In Advocates for Highway & Auto Safety, the administrative record contained specific members' individual responses
to a survey the organization conducted.  Id.  Some of those individual responses showed that the defendant's
challenged conduct would harm the individual members.  See id. at 593 ("The survey responses from specific,
individual Teamsters members demonstrate that those members" would have standing.).  The record here contains no
such "specific, individual[ized]" information about the likelihood of harm to any of plaintiffs' members.

[6] The only individual member plaintiffs' declarations mention is the unnamed Department of Labor employee
who told AFGE's general counsel about the communication from Department of Labor leadership.  See Sanghvi Decl.
¶ 5.  Based on that communication, "the employee believed they could face termination if they did not comply" with
USDS's requests.  Id.  That, however, isn't enough to establish that employee would have standing in his own right.
He did not say he has access to any data USDS may seek to access, that it is likely that USDS will imminently come
to him for that access, or that he intends to deny USDS access if it did request it from him.  See Ctr. for Bio. Diversity
v. Bernhardt, 490 F. Supp. 3d 40, 51–52 (D.D.C. 2020) (standing cannot rest on "a series of subsequent events . . .
which are still purely hypothetical"); Lujan, 504 U.S. at 564 ("[S]ome day intentions—without any description of
concrete plans, or indeed even any speculation of when the some day will be" are insufficient.); cf. Susan B. Anthony
List v. Driehaus, 573 U.S. 149, 159 (2014) (individual must have intent to violate a law to bring a preenforcement
challenge against the law).

harm." People for the Ethical Treatment of Animals v. Dep't of Ag. ("PETA"), 797 F.3d 1087, 1094 (D.C. Cir. 2015).

In their motion, plaintiffs assert that they will be "irreparabl[y] harm[ed] if they cannot ensure worker privacy." Mem. at 31. Steven K. Ury, General Counsel of the Service Employees International Union ("SEIU"), avers that his organization "routinely bring[s] complaints and claims under the various minimum working condition statutes enforced by the Department of Labor" and that complainants come forward in reliance on SEIU's assurance that the Department of Labor will not share their identity or complaint. Decl. of Steven K. Ury, SEIU [ECF No. 2-1] ("Ury Decl.") ¶¶ 4, 6–7; see id. ¶ 8 ("Confidentiality is necessary for our ability to organize workers and represent our members."). If the Department shares complainants' information with unauthorized individuals or agencies, Ury explains, the "trust" between SEIU and possible complainants "will be broken . . . [which] may have a negative impact on [SEIU's] future organization campaigns." Id. ¶ 9. As a result, "SEIU will be harmed in its ability to file persuasive complaints with . . . the Department of Labor" and SEIU's "mission to improve the lives of workers" will be hindered. Id. ¶¶ 3, 8.

Regardless whether or not this adequately shows defendants' challenged conduct would injure SEIU's interest,[7] see PETA, 797 F.3d at 1094, plaintiffs run into an obstacle: the second

---

[7] Determining whether it does involves answering two questions with unclear answers. The first question is whether an organization's interest is sufficiently harmed if the defendant's conduct would make it harder for the organization to assist its members in filing administrative complaints. Compare PETA, 797 F.3d at 1095 (holding a plaintiff organization sufficiently alleged its interest would be injured when it said defendant's action would impair its "ability to . . . bring [statutory] violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public") with Citizens for Responsibility & Ethics in Wash. v. U.S. Office of Special Counsel, 480 F. Supp. 3d 118, 130–31 (D.D.C. 2020) (discussing arguments that PETA's holding was dependent on the organization's asserted informational injury) and Animal Legal Def. Fund v. Vilsack, 640 F. Supp. 3d 134, 148 n.3 (D.D.C. 2022) (holding as much). The second question is whether plaintiffs have put forward evidence sufficient to show that it is substantially likely that the links in the chain of events necessary to lead to such harm would occur. See Clapper v. Amnesty Int'l., 568 U.S. 398, 422 (2013); Texas v. United States, 523 U.S. 296, 300 (1998). The Court need not reach either question today.

requirement of organizational standing. Nowhere does the record state that SEIU—or any other plaintiff—will use its "resources to counteract th[e] harm" alleged caused by defendants' challenged conduct. See id. Nor does plaintiffs' motion even allege any of them will divert resources. But D.C. Circuit precedent clearly requires both a harm and the use of resources for organizational standing. See Equal Rights Ctr., 633 F.3d at 1138; PETA, 797 F.3d at 1094; see also Havens Realty, 455 U.S. at 369, 379. The record here is simply insufficient at this point.

In sum, plaintiffs fail to establish that any one of them has standing under either route an organization can take. That means they are not entitled to preliminary relief at this juncture. See Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) ("[A]n inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction, not dismissal of the case.").

## CONCLUSION

For the reasons explained above, it is hereby **ORDERED** that [3] [2] Plaintiffs' motion for temporary restraining order is **DENIED**. It is further **ORDERED** that the parties shall file a proposed preliminary-injunction motion briefing schedule (or other schedule) by not later than February 12, 2025.

**SO ORDERED.**

/s/
JOHN D. BATES
United States District Judge

Dated: February 7, 2025