# EXHIBIT U

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AFL-CIO, *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF LABOR, *et al.*,

*Defendants*.

Case No. 1:25-cv-00339

## DECLARATION OF JOHN ALEXANDER VAN SCHAICK

I, John Alexander "Alex" van Schaick, declare as follows:

1.      My name is Alex van Schaick. I am a Counsel at Communications Workers of

America ("CWA" or "the Union"). I submit this declaration in support of Plaintiffs' application

for a renewed temporary restraining order in this matter. The statements made in this declaration

are based on my personal knowledge, materials I have reviewed, and information made available

to me pursuant to my duties at CWA.

2.      CWA is an international labor union representing working people in a broad range

of industries, including telecommunications, cable, information technology, airline,

manufacturing, print and broadcast news media, customer service, education, public service, and

health care, among others. CWA's central purpose is protecting the rights of workers through

collective bargaining and public advocacy. Our members work, live, and seek employment

throughout the United States. Our Union is divided into eight geographic regions—seven

Districts and CWA Canada—and several industry sectors, covering the entirety of the United

States, Puerto Rico, other U.S. territories, and several other countries. CWA has an elected president, secretary-treasurer, and executive board, which is composed of seventeen vice presidents and a CWA Canada director.

3.      Eligibility for membership in CWA is defined under Articles V and VI of the CWA constitution. As described above, CWA accepts members not only in the communications field but also in other private- and public-sector fields. Membership in the Union is obtained and maintained through membership in a chartered local of the Union. Members are required to pay a $2.00 initiation fee (unless it is waived), and to stay current in paying their dues. In most cases, CWA members are represented for purposes of collective bargaining by CWA with their employer. In other cases, CWA members work for an employer that does not have a formally recognized collective bargaining relationship with CWA. Either way, CWA members enjoy all the same rights and privileges, which include voting and running for elected officer positions within their local union and for delegate positions to the biannual CWA convention (the highest decision-making body within the national union at which resolutions, national union officer elections, and various other actions are voted on). Members can serve on union committees on a volunteer, appointed, or elected basis, including bargaining committees, issue-based committees, election committees, and so forth.

4.      I joined CWA in 2016 as one of the Union's counsel and, since January of 2022, have served as its Organizing and Campaigns Counsel.  In my role, I advise and assist CWA in new organizing campaigns, in campaigns to obtain first collective bargaining agreements, and in efforts to maintain industry standards. From 2013 to 2016, I served as an attorney in the Department of Labor's ("DOL") Office of the Solicitor, where I gained experience with the Service Contract Act ("SCA"), labor and antidiscrimination-related executive action under the

Procurement Act, and the Fair Labor Standards Act. Prior to becoming a lawyer, I was involved

in several union organizing campaigns as a worker, volunteer, and union staff organizer,

including organizing that involved making complaints or filing lawsuits over wage and hour and

labor law violations. Throughout my career in the labor movement and as a DOL attorney, I have

dealt with the difficulties inherent to supporting workers who come forward to government

agencies with information regarding legal violations and the importance of confidentiality and

informant's privilege in assuaging workers' fears of retaliation.

5.      CWA's mission includes defending and improving workplace standards in the

industries in which our members work—for members and non-members alike. As part of this

work, the Union regularly files complaints with DOL agencies regarding violations of wage and

hour laws, anti-discrimination laws, and the Occupational Safety and Health Act ("OSHA").

6.      I have filed thirteen complaints with the DOL's Wage and Hour Division

("WHD") since December 2016, one of which is still an open case. All these complaints alleged

that certain federal contractors failed to pay their employees the proper minimum rate required

under the SCA—one of the laws administered by the WHD. Of the thirteen complaints I have

filed, WHD has found violations of federal law in nine of them. Through these efforts, CWA

complaints have led to over $2,300,000 recovered for affected employees.

7.      The SCA does not provide a private right of action, so unions and employees

must file complaints with the WHD to obtain relief. WHD considers the complaints submitted by

unions to be "third-party complaints." After receiving an initial complaint, WHD usually opens

an investigation and decides whether there is merit to the complaint or not. When WHD finds

violations, it will attempt to settle with the employer and obtain back wages for the affected

employees.

3

8.      Potential violations of labor and employment law are brought to the attention of CWA's attorneys by the Union's organizers. CWA organizers receive this information when workers reach out to them or, in some cases, by proactively approaching the workers they organize. Frequently, combatting labor and employment law violations is a motivating factor for employees reaching out to the Union and seeking to organize in their workplace. In our campaign to organize federally contracted call center employees, for example, employees have raised potential violations of the SCA in nearly every workplace.

9.      Typically, once an organizer brings potential SCA violations to my attention, I will ask our organizers to connect me with employees who can provide evidence relevant to potential violations. In my experience, to achieve a good result from an SCA investigation, it is critical to submit a complaint letter to WHD that contains a detailed recitation of the relevant facts, to provide as much evidence as possible off the bat, and to furnish worker witnesses who can speak about the facts to the WHD investigator. To that end, I conduct extensive one-on-one interviews with as many of the affected workers as possible and ask whether they are willing to speak with a WHD investigator in support of CWA's complaint.

10.      Workers are usually afraid of retaliation from their employers, so it is critical throughout the entire complaint process that our organizers and I explain that WHD treats informants as confidential sources, whose identities, evidence, and testimony will be protected from disclosure to the maximum extent provided by the law. Our ability to make assurances of WHD's policies around the confidentiality of witness information has been important for me and our organizers in obtaining affidavits about potential workplace violations, worker contact information (such as names, phone numbers, email addresses, and home addresses), and

paystubs, along with other evidence, to submit to WHD in support of their investigations into SCA violations.

11.    Among its other members, CWA represents tens of thousands of customer service agents and has a longstanding interest in organizing and improving standards in this industry. Since 2016, CWA has expended significant resources—including millions of dollars in salaries for organizing, research, and legal staff—to make a significant push to organize and raise industry standards for federally contracted customer service and call center workers, employees who are covered by the SCA. In my work with federally contracted customer service workers specifically, the promise of confidentiality has been integral to our work combatting labor violations and to our members, assuring them that their information is protected, particularly from their employers.

12.    CWA also has a department dedicated to protecting worker health and safety, including by filing complaints with the Occupational Safety and Health Administration ("OSHA") and participating in OSHA investigations. Our OSH Department helps CWA local unions, CWA members, and employees in non-union shops who are organizing with CWA write and file complaints and collect supporting documentation. We also help them understand their rights—including confidentiality—during investigations conducted by an OSHA Compliance Safety and Health Officer (CSHO). In both the complaint and investigation processes, OSHA collects personal information, such as name, job title, work hours, assigned work areas, employer injury and illness records, and testimony.

13.    Our members and employees in non-union shops who are organizing with CWA always have fears when they decide to submit an OSHA complaint or participate in a subsequent OSHA investigation. And rightfully so. Our members fear retaliation by their employers if they

were to find out which individuals spoke to, and provided information to, the CSHO. That fear is especially strong for our members who are new employees or within their probationary periods, who are particularly vulnerable to retaliation that could result in disciplinary measures or job loss, as well as for employees in non-union shops, who are organizing with CWA because they do not yet have the protections provided in most collective bargaining agreements.

14.    CWA is also involved in aiding our members in submitting claims to the Office of Federal Contract Compliance Programs ("OFCCP"), the part of DOL charged with ensuring that government contractors follow antidiscrimination laws and regulations. As with other components of DOL, OFFCP collects sensitive personal identifying information from employees of federal contractors, including CWA members. At the start of an investigation, OFFCP may collect data such as the name and address of the complainant, the name and information of their employer, and information about the alleged discrimination. Over the course of an investigation, OFCCP may collect additional information from other employees about the workplace. OFCCP has specific protections in place to ensure that their compliance officers maintain this data to the utmost degree—and that is essential for ensuring that our members come forward to report discrimination in their workplaces.

15.    Our ability—across CWA departments—to assure members and other workers that DOL will keep their identities and their complaints confidential is vital to our success as a union. Fear of employer retaliation is a powerful deterrent to employees from seeking assistance from the DOL to enforce their workplace rights, and, for many workers, confidentiality is essential to their decision to come forward. And because many of these workers are economically vulnerable, they cannot risk any loss of income or other retaliation.

16.     If DOGE retains access to the Department of Labor's records, it will threaten our members who have submitted complaints, whether about stolen wages or workplace harms, and whose sensitive information may be transmitted into non-secure hands. It may also chill our members from making claims in the future.

17.     Absent assurances of confidentiality, CWA would face difficulty in organizing and submitting complaints on behalf of impacted workers. For example, we would be forced to spend additional legal and organizing staff time to identify workers who are willing to provide information for our complaints. This would require diverting legal and organizing staff time away from other CWA work, such as supporting other campaigns to form a union or to obtain collective bargaining agreements. Our inability to rectify injustices in the workplaces of our members would harm our members and cut directly against CWA's mission to protect the lives of workers. It also may, in the long term, have an impact on our membership—as noted earlier, our work and victories on labor violations are often a driver for people to join.

18.     CWA itself is subject also to investigation by DOL's Office of Labor-Management Standards ("OLMS") based on complaints our members file with OLMS alleging that CWA or one of its locals has infringed upon their rights protected by the Labor Management Reporting and Disclosure Act ("LMRDA"). Usually, these complaints involve allegations that a local union has not conducted its local officer nominations or elections in accordance with the LMRDA. These complaints often involve sensitive matters of internal union politics, where a losing candidate or candidates for union office allege election improprieties by the victors. CWA's legal department often acts as a liaison during OLMS investigations. Our attorneys provide confidential information (such as financial records and information about union officers, employees, vendors, consultants, investments, and employers such as individual employee

7

expenses and reimbursements) or furnish union members or staff to provide confidential information related to the complaint. Improper disclosure of confidential investigatory information provided to OLMS could result in the release of sensitive and potentially embarrassing internal governance matters.

19.     These concerns are heightened since DOGE is led by Elon Musk, the owner of major U.S. employers subject to regulation by DOL, who has opposed unions and discussed the idea of firing striking workers with the President.

20.     Separate and apart from DOGE's access to systems at the Department of Labor, CWA is concerned about how DOGE's access to confidential information at the Department of Health and Human Services will harm its members. CWA has members who themselves rely on confidentiality to conduct their work. For example, CWA represents a number of health care workers who make commitments to keep their patients' sensitive health information confidential. This assurance encourages patients to be as transparent with these medical provider members and allows these members to do their jobs to the best of their abilities. Our medical members are concerned that if patients understand that medical information transmitted to HHS—for example, for Medicare or Medicaid reimbursements—is not confidential, it will hamper their ability to do their work. This, in turn, would cut against CWA's commitment to ensuring that our health care-worker members can operate under the best conditions possible to provide the communities they serve with the best care possible.

21.     Without the ability to assure confidentiality across these government agencies, our members and CWA will be harmed.

* * *

8

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States that the foregoing declaration is true and correct to the best of my knowledge,

information, and belief.

Executed on February 11, 2025.

*/s/ Alex van Shaick*
Alex van Schaick