# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS et al., | Case No. 1:25-cv-00339-JDB |
| Plaintiffs, | Judge John D. Bates |
| v. | |
| DEPARTMENT OF COMMERCE et al., | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 1

I.    The United States DOGE Service ....................................................................... 1

II.    The USDS Teams At The Defendant Agencies ................................................... 2

    A.    Department of Labor ................................................................................. 2

    B.    Department of Health & Human Services .................................................. 3

    C.    Consumer Financial Protection Bureau ..................................................... 4

III.    This Litigation ..................................................................................................... 4

STANDARD OF REVIEW ............................................................................................ 5

ARGUMENT ................................................................................................................. 5

I.    Plaintiffs' Suit Improperly Attacks the President's Article II Powers .................. 5

II.    Plaintiffs Have Not Shown A Significant Likelihood Of Standing ...................... 7

    A.    Plaintiffs Fail to Establish Associational Standing .................................... 8

        1.    Injury-in-fact ................................................................................. 8

        2.    Causation ..................................................................................... 11

        3.    Participation ................................................................................ 11

    B.    Plaintiffs Fail to Establish Organizational Standing ............................... 12

III.    A Temporary Restraining Order Is Unwarranted Here .................................... 15

    A.    Plaintiffs Have Not Shown Irreparable Injury ........................................ 15

    B.    Plaintiffs are Unlikely to Succeed on the Merits of Their Claims ........... 16

        1.    Plaintiffs' Claims Are Not Reviewable Under The APA ............. 17

            a.    Plaintiffs Have Not Identified Final Agency Action .................... 17

            b.    Plaintiffs Has An Adequate, Alternative Remedy Under The
                    Privacy Act .................................................................................. 20

2.     Plaintiffs Have Not Alleged A Likely Violation Of Any Statute .............. 24

     c.     The Individual Advancing The Agencies' USDS Agenda Are Federal Employees ................................................................. 24

     d.     The Plaintiffs Are Not Likely To Succeed In Establishing A Privacy Act Violation ..................................................... 27

     e.     The Plaintiffs Are Not Likely To Establish A Violation Of Any Other Statute ...................................................... 28

3.     Defendants' Actions Are Not Arbitrary Or Capricious ............................ 32

4.     Defendants' Access Policies Are Procedurally Proper ............................ 33

5.     Defendants' Actions Are Not *Ultra Vires* .................................................. 34

IV.     The Balance of Equities Favors Defendants ........................................................ 34

V.     Plaintiffs' Proposed Injunction Is Improper ....................................................... 35

CONCLUSION ................................................................................................................ 36

## INTRODUCTION

Plaintiffs brings this unsupported challenge to the President's ability to exercise politically accountable oversight of agency activities and to implement his policy priorities. Dissatisfied with those priorities, Plaintiffs seek a temporary restraining order barring employees of three separate agencies—the Department of Labor ("DOL"), the Consumer Financial Protection Bureau ("CFPB"), and the Department of Health and Human Services ("HHS")—whose responsibilities include liaising with the United States DOGE Service ("USDS"), from accessing systems at these agencies which are necessary to perform their Presidentially-directed mandate of reducing waste, fraud, and abuse. As demonstrated below, Plaintiffs are not entitled to the injunction they seek, which would raise separation-of-powers concerns by impermissibly intruding into the President's superintendence of these agencies. Further, Plaintiffs cannot establish neither standing nor irreparable harm. Nor are Plaintiffs likely to succeed on the merits of their claims. The Administrative Procedure Act ("APA") does not provide a cause of action for the claims. Even if it did, there is no violation of the Privacy Act, or the other authorities Plaintiffs invoke, when employees of an agency access agency systems to perform their job duties. Plaintiffs complain of no public disclosure from these systems, and this case hardly constitutes a "data breach," as they repeatedly call it. Finally, the balance of harms favors Defendants and the public interest in implementing the mandate for which the President was elected. For these reasons, Plaintiffs' motion for a temporary restraining order should be denied.

## BACKGROUND

### I.      The United States DOGE Service

On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established United States Digital Service in order to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software,

network infrastructure, and information technology ("IT") systems." 90 Fed. Reg. 8441, § 4 ("USDS E.O."). The USDS E.O. redesignated the United States Digital Service as the Department of Governmental Efficiency Service, or U.S. DOGE Service. *Id.* § 3(a). Similarly, it established a "U.S. DOGE Service Temporary Organization" within the Executive Office of the President pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. USDS E.O. § 3(b). Agency heads are required under the USDS E.O. to establish within their respective agencies a USDS Team of at least four employees, which may include Special Government Employees. *Id.* § 3(c).

The USDS E.O. directs USDS to collaborate with executive agencies to modernize the technology and software infrastructure of the federal government to increase efficiency and productivity as well as ensure data integrity. *Id.* § 4. To accomplish its objectives, the USDS E.O. directs USDS to work with relevant agency heads, and vice versa, to ensure USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law[.]" *Id.* § 4(b). At all times, the USDS E.O. instructs, USDS must "adhere to rigorous data protection standards." *Id.*

## II.    The USDS Teams At The Defendant Agencies

### A.  Department of Labor

There is currently only one employee at the DOL working to effectuate the goals laid out by the USDS E.O. Decl. of Ricky J. Kryger, ECF No. 30-1 ¶ 13. That employee is a direct hire of the DOL. *Id.* He has been provided a standard laptop, with standard office productivity applications, but has not been provided access to any sensitive IT systems. *Id.*

The DOL, however, plans to bring aboard additional employees to implement the USDS E.O.'s modernization goals, although it has not yet determined whether they will be direct DOL hires, detailees, or a mix of both. *Id.* ¶ 6. Either way, DOL has established guidelines to cover employees carrying out the USDS E.O. to protect the integrity of the DOL's informational systems.

2

*Id.* ¶ 8.  For example, relevant employees will be overseen by a DOL supervisor.  *Id.* ¶ 7.  They must provide 24-hour notice before seeking access to each DOL IT system to allow for mitigation of conflicts, establishment of confidentiality protocols, and so DOL can identify and account for any legally protected information.  *Id.* ¶ 9.  Further, relevant employees seeking access will need to complete a Request to Access DOL Information Systems form, which states the type of access requested, DOL Point of Contact, and notifies the requester in writing of the restrictions and sensitive information requirements of the specific IT system for which access is being requested. *Id.* ¶ 10.  The form specifically requests that the requester acknowledge a long list of certifications relating to cybersecurity risk, the Privacy Act, and additional governing statutes and directives.

Finally, no user data, information of documents from DOL systems is permitted to be shared outside DOL without specific approval of DOL's Office of the Chief Information Officer. *Id.* ¶ 11.  DOL retains the right to deny access to informational systems regardless of the employee's status as a direct hire or detailee until all necessary forms are completed.  *Id.* ¶ 12. Access to DOL informational systems without proper approval subjects the accessor to potential criminal penalties.  *Id.* ¶ 12.

### B.  Department of Health & Human Services

There are currently two employees at HHS implementing the USDS E.O.  One is a detailee from USDS; the other is an HHS direct hire.  Decl. of Garey Rice, ECF No. 30-2 ¶ 5.  Both have access to HHS's financial management systems to audit for waste, fraud, and abuse.  *Id.* ¶ 6.

The USDS detailee is operating under a signed detail agreement between USDS and HHS. This agreement includes provisions requiring the detailee to report to HHS leadership and to comply will all rules, regulations, and restrictions of HHS, including FISMA, the Privacy Act, the Federal Acquisition Act, and the Trade Secrets Act.  *Id.* ¶ 7.  The detailee is also limited to accessing HHS data, information, and systems for legitimate purposes, including but not limited to IT

modernization, the facilitation of HHS operations, and the improvement of Government efficiency. *Id.*

### C. Consumer Financial Protection Bureau

The CFPB currently hosts six employees who serve as the core team advancing the USDS E.O.'s initiatives.  Decl. of Adam Martinez, ECF No. 30-3 ¶ 3.  Five of these individuals are detailed from other agencies; one is detailed from USDS.  *Id.* ¶ 5.

All six of the detailees signed nondisclosure agreements prior to accessing CFPB systems and received privacy and cyber security training before receiving government issued laptops and equipment.  *Id.* ¶ 6.  The detailees report to the Director of the CFPB, or a CFPB designee, while performing work for the CFPB.  *Id.* ¶ 8.  All access to CFPB systems was approved by the agency's Chief Information Officer pursuant to established processes and procedures.  *Id.* ¶ 9.

## III.  This Litigation

Plaintiffs filed suit on February 5, 2025.  Compl., ECF No. 1.  The Complaint included seven causes of action directed solely against the Department of Labor and the USDS: two advancing ultra vires claims (Counts One and Two) and four pursuant to the Administrative Procedures Act, 5 U.S.C. § 706 (Counts Three through Seven).   On the same day, Plaintiffs filed their Memorandum of Law in Support of Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 2, and Motion for a Temporary Restraining Order ("Mot."), ECF No. 3.  The Court held a hearing on the motion on February 7, 2025, and denied the motion in an order entered later that day on standing grounds.  ECF No. 18.  Plaintiffs subsequently amended their complaint on February 11, 2025, adding new plaintiffs and two new agency defendants, CFPB and HHS, and their respective leaders.  ECF No. 21.  Plaintiffs then renewed their motion for a temporary restraining order on February 12, 2025.  Memo. of Law ISO Plaintiffs' Renewed Motion for a Temporary Restraining Order, ECF No. 29-1 ("Renewed Mot.").

## STANDARD OF REVIEW

A temporary restraining order, like a preliminary injunction, is extraordinary relief granted only to preserve the status quo. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 1:25-cv-239, 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025). It is "an extraordinary and drastic remedy" and "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). As such, it may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain this relief, a plaintiff "must show (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 20); *see also Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) ("The decision of whether to award a TRO is analyzed using the same factors applicable to preliminary injunctive relief[.]" (cleaned up)). When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs bear the burden of showing subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

## ARGUMENT

### I.    Plaintiffs' Suit Improperly Attacks the President's Article II Powers

By Executive Order on January 20, the President set in motion a "government-wide" initiative "to improve the quality and efficiency of . . . software, network infrastructure, and information technology (IT) systems." E.O. 14,158 § 4(a). The need for this urgent intervention

is well documented.  The Government Accountability Office's 2024 Annual Report identified the opportunity for the federal government to achieve billions of dollars in savings from implementing various efficiency and effectiveness measures.  Gov't Accountability Off., 2024 Annual Report, GAO-24-106915,  https://www.gao.gov/assets/gao-24-106915.pdf.    To meet that need, the Executive Order calls for federal employees in each federal agency to collaborate with the United States DOGE Service, an entity within the Executive Office of the President.  E.O. 14,158 § 4(b), (c).  As outlined in the attached declarations, federal employees are playing an important role in implementing the USDS E.O. at DOL, HHS, and CFPB.  Understood in the proper light, the implementation of the USDS E.O. is entirely unremarkable:  the President, as head of the Executive Branch, has identified a policy priority and has directed federal employees to implement it.  *See Seila Law, LLC v. CFPB*, 591 U.S. 197, 203-04 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'  Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." (quoting U.S. Const. art. II, § 1, cl. 1; *id.*, § 3)).

Plaintiffs have conjured a very different, more sinister, image of events.  The thrust of their narrative is that the federal employees implementing the USDS E.O. (some of whom are detailees from USDS to the agencies, some of whom are detailees from other executive branch agencies, and some of whom are employees of those agencies) are somehow outside those agencies and therefore not entitled to receive their information under the Privacy Act.  But that argument rests entirely on distinctions that do not exist in the relevant statutes.  As described in greater detail *infra*, the Privacy Act uses the term "employee" in establishing the parameters of access to personal

information. And the relevant employees are straightforwardly federal government employees of the three agencies named in the Amended Complaint.

Defendants explain below why Plaintiffs' claims fail for both threshold (jurisdictional, APA) and merits reasons. Because this suit does not belong in federal court at all, there is no occasion for the Court to address the constitutional principles at which Plaintiffs, seeking to impose their preferred policies through litigation, takes direct aim. It is nevertheless appropriate to highlight that those principles are, ultimately, implicated by the relief Plaintiffs seek. In particular, the United States Constitution requires that the federal bureaucracy be supervised and directed by political leadership that is ultimately accountable to the President. *Cf. Seila Law*, 591 U.S. at 223-24. Federal employees charged with carrying out executive functions may be called upon by the President to gather information, and to share that information with the President. *See United States v. Nixon*, 418 U.S. 683 (1974) ("The President's need for complete candor and objectivity from advisors calls for great deference from the courts."). An order restraining them from doing so would thus be an extraordinary interference with the President's ultimate constitutional obligation to oversee the Executive Branch.

If the statutes in question required such interference, they could raise serious constitutional questions. *Cf. Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989) (interpreting the Federal Advisory Committee Act to avoid separation of powers concerns). Because they do not require that result, *see infra*, the Court may leave these weighty questions for another day.

## II.    Plaintiffs Have Not Shown A Significant Likelihood Of Standing

The Court denied Plaintiffs' prior TRO motion on standing grounds, and it should do so here too. At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury

and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan*, 504 U.S. 555, 560 (1992)

In an effort to address the Court's denial of their initial TRO motion, Plaintiffs have filed twenty-seven new declarations in an attempt to establish both associational and organizational standing.  These efforts fall short, however, as Plaintiffs still cannot establish a concrete, particularized, and imminent injury that would ground standing, or a causal connection between Defendants choice to give systems access to employees working to implement the USDS E.O. and the alleged injuries.

## A.  Plaintiffs Fail to Establish Associational Standing

To demonstrate associational standing, Plaintiffs must establish that "(1) at least one of [its] members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit."  *Elec. Privacy Inf. Ctr. v. U.S. Dep't of Comm.*, 928 F.3d 95, 101 (D.C. Cir. 2019) (citations omitted); *see also Ass'n of Flight Attendants— CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009).  Plaintiffs assert that they have associational standing to challenge the actions of HHS and DOL.  *See* Renewed Mot. at 22 (alleging that Plaintiffs EAMF and VPLC "have shown organizational standing . . . at the CFPB" only) (emphasis added).  That argument fails for three independent reasons: (1) Plaintiffs cannot establish injury-in-fact for their members; (2) Plaintiffs have failed to establish causation; and (3) the individuals members' participation is necessary in this case.

### 1.  Injury-in-fact

As explained by Defendants' previous briefing, to establish associational standing, Plaintiffs must show that its individual members have suffered injury-in-fact—"actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely

to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not come to pass, it must be "certainly impending"; "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And it must be "concrete— that is, real, and not abstract." *TransUnion v. Ramirez*, 594 U.S. 413, 424 (2021) (citations omitted).

Here, Plaintiffs' theory of injury-in-fact is that their members have provided various forms of information to DOL and HHS with the expectation of confidentiality and privacy, and that Defendants' actions in allowing certain employees of the agency to access those records violates the members' reasonable expectations. For example, Plaintiffs rely on their declarations to assert standing against DOL and HHS by claiming that their members "have suffered or will suffer" harm from Defendants' "access to and disclosure of their data" to the employees implementing the USDS E.O. Renewed Mot. at 18–19, 21 (citations omitted).

Plaintiffs' reasonable-expectation theory is neither legally cognizable nor supported by precedent. Defendants acknowledge that "[v]arious intangible harms can . . . be concrete." *TransUnion*, 594 U.S. at 425. But cognizable injuries are limited to those "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," *id.*, including when the plaintiff alleges harm related to the handling of her personal information, *see id.* (surveying common-law privacy torts and looking to "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury"). Plaintiffs cite no case espousing the notion that the alleged violation of a plaintiff's reasonable expectations, standing alone, suffices for Article III standing. The absence of any on-point authority is unsurprising. Were it enough for a plaintiff to establish standing simply by alleging that the holder of her personal information used it in a manner contrary to her expectations, the requirement to find a traditionally cognizable harm

(including with reference to common-law analogues) would not be a meaningful one. *See generally TransUnion*, 594 U.S. 413.

Plaintiffs' members' "reasonable expectation" theory boils down to an allegation that Defendants have violated the Privacy Act and other data protection statutes. Defendants, of course, disagree with these allegations. But the Supreme Court's decision in *TransUnion* leaves no doubt that a statutory violation, by itself, is not a cognizable Article III injury. *Id.* at 426-27. Rather, "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that . . . defendant over that violation in federal court." *Id.* at 427 (emphasis in original). Plaintiffs' members do not allege—much less establish—tangible harm. There is thus no cognizable injury from the agency employees' alleged access.

Despite Plaintiffs' repeated labeling of this case as a data breach case, it is not a data breach case. Such a case typically involves a breach by an outside intruder, and thus public disclosure of the data. *See, e.g., In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 55 (D.C. Cir. 2019) (per curiam). In contrast, here, taking Plaintiffs' allegations as true, there has merely been, at most, intra-governmental information exchange. *Barclift v. Keystone Cred. Servs., LLC*, 585 F. Supp. 3d 748, 758-59 (E.D. Pa. 2022) ("Even assuming that the employees of the mailing vendor read Barclift's personal information, sharing her personal information with 'a small group of persons is not publicity.'" (citation omitted)), *aff'd*, 93 F.4th 136, 146 (3d Cir. 2024) ("Like our sister circuits, we conclude that the harm from disclosures that remain functionally internal are not closely related to those stemming from public ones."). Indeed, Plaintiffs' members' declarations make clear that their true complaint is that they disagree with access to their information by certain governmental employees. Decl. of Courtney King, ECF No. 29-9 ¶ 10 ("I am concerned about unauthorized individuals, including those associated with DOGE, accessing my sensitive private information.").

This does not establish concrete injury, however, as "under Article III, an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427.

### 2.   Causation

Plaintiffs also fail to establish the crucial element of causation for their members.  For example, some of Plaintiffs' claims amount to an allegation that intra-governmental access could lead to retaliation by their members' employers, if the employers were to discover that they had submitted claims or evidence in an agency investigation.  *See, e.g.*, Decl. of Brian Hannon, ECF No. 29-4 ¶ 7; Decl. of [REDACTED], SEIU Member, ECF. No. 29-17 ¶ 8.  But Plaintiffs do not explain, and indeed cannot show, that intra-governmental access by government employees and detailees, versed in the privacy concerns of the systems they access, will lead to the disclosure of personal information to extra-governmental private employers.  Relying on a "speculative chain of possibilities[, however,] does not establish that injury based on potential future [action] is certainly impending or is fairly traceable[.]"  *Clapper*, 568 U.S. at 414.

Indeed, Plaintiffs' assertion that access to agency information by a limited number of government employees will likely result in the information being compromised by third-party bad actors is unfounded.  The contention that Defendants are failing to comply with security protocols without explaining what specific protocols they are allegedly ignoring is, in essence, an *ad hominem* attack without basis.

### 3.   Participation

Finally, Plaintiffs have failed to demonstrate that the participation of their individual members who claim injury is unnecessary.  Instead, they merely claim individual participation is not necessary because members' alleged harms are "universal."  Renewed Mot. at 19, 21.

Plaintiffs' APA claim is—inappropriately—premised on violations of the Privacy Act.  But the Privacy Act does not provide for injunctive relief and requires specific disclosures with respect

to specific persons; in other words, the violations themselves are individualized. *See* 5 U.S.C. § 552a(g)(4) (providing for a damages suit with recovery based on the "actual damages sustained by the individual"). Because the Privacy Act requires "individualized determinations" to establish violations, the participation of individual members is required—and Plaintiffs lack associational standing. *See, e.g., Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776 (CKK), 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025) (rejecting associational standing claim when "individualized determinations" were required). Indeed, precisely because organizations and associations cannot statutorily bring Privacy Act claims—because those claims are specific and personal to individual persons—they should not be permitted to side-step those requirements here.

### B.  Plaintiffs Fail to Establish Organizational Standing

As explained in Defendants' previous briefing, an organization asserting standing on its own behalf must demonstrate that it has suffered a "concrete and demonstrable injury to [its] activities—with [a] consequent drain on [its] resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). "'[T]he organization must allege that discrete programmatic concerns are being directly and adversely affected' by the challenged action." *Nat'l Taxpayers*, 68 F.3d at 1433 (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)). Further, plaintiff organizations cannot "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402.

Here, the alleged injuries are unavailing. Against DOL, AFL-CIO, AFGE, CWA, and SEIU allege that Defendants' actions have made it less likely that members will come forward about workplace abuses and that they will therefor need to divert resources to rebut that loss in confidence. Renewed Mot. at 19–20. Further, the unions allege that their own information, which is collected by the Department's Office of Labor-Management Standards, is at risk of improper disclosure, as well. *Id.* at 20.

The latter argument is easily rebutted; just as their members cannot show cognizable injury on an alleged "reasonable expectation" theory, neither can the unions. As to the former, the alleged loss of confidence by members in coming forward to make such claims as workers compensation or wage and hours is too speculative for purposes of Article III standing. It relies on the attenuated causal chain that intra-governmental sharing would chill third parties' actions. Further, the unions must already exert efforts to counsel their members on submitting claims. Working incrementally harder at a job they must already do does not represent the devotion of significant resources required to demonstrate injury. *See Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 412–13 (D.C. Cir. 2024) (cleaned up) (requiring organizational plaintiffs to show "concrete and demonstrable injury to the organization's activities" such as a "consequent drain on the organization's resources" rather than "simply a setback to the organization's abstract social interests.").

Against HHS, SEIU claims that HHS's action in permitting USDS access to informational systems has harmed its "daily activities" by interfering with its ability to secure healthcare for individual members and frustrating its institutional advocacy goals. Renewed Mot. at 21–22 (relying on Decl. of Heather Anne Pfrimmer, SEIU, ECF No. 29-15). A closer examination of this claim, however, reveals two fundamental flaws.

First, SEIU's claims rest on an attenuated chain of derivative harm. In essence, the argument is that SEIU's members include many Medicare beneficiaries, who themselves value privacy and the sharing of their information may chill them from having candid discussion with their providers, which will result in less effective and informed care, which will in turn harm SEIU's efforts to secure healthcare for its members. *See* Pfrimmer Decl. ¶ 9. This chain crumbles under its own weight. There is no suggestion that intra-governmental sharing will harm patient confidence or that the harm is to SEIU, rather than its members. SEIU cannot shoehorn an associational standing claim into an organizational standing claim merely by arguing harm to it when there is a harm to a member, especially when, as previously established, this "reasonable expectation" injury is not cognizable.

Second, this is abstract, not economic harm. *See Iowaska Church of Healing*, 105 F.4th at 412–13. SEIU complains that HHS's sharing of information harms its "extensive [advocacy] work to expand and protect" Medicare and Medicaid, Renewed Mot. at 21–22, given that the organization places a high fundamental value on privacy, *see also* Pfrimmer Decl. ¶ 4. But alleged advocacy is the quintessential "setback[s] to [an] organization's abstract social interests" *Iowaska Church of Healing* found insufficient to establish organizational standing.

Finally, as to CFPB, VPLC and EAMF claim that they rely on CFPB data and referrals in conducting their work advising low-income clients, and without either, the organizations will have to rely on less efficient tools to accomplish their work. Renewed Mot. at 22 (relying on Decl. of Jay Speer, VPLC, ECF No. 29-26 and Decl. of Marceline White, Economic Action, ECF No. 29-27). A close reading of these declarations, however, reveals, again, Plaintiffs' reliance on attenuated causal links to establish their own injury.

For example, the thrust of the Speer Declaration is that VLPC often assists clients in filing complaints to the CFPB to resolve their issues. Speer Decl. ¶ 10. Filing a complaint with the CFPB is, as the Declaration explains, easier than other means of resolving disputes, like negotiating directly with the creditor. *Id.* ¶ 11. "If the complaint system went away," the Declaration explains, "it would make our consumer mission much more difficult." *Id.* ¶ 15. What the Declaration fails to specify is how access by certain government employees would lead to the complaint system going away. Further still, there is no explanation of how access by certain government employees to complaints stored in CFPB systems would drastically change VPLC's daily operations and expenditures. The same goes for EAMF, who advance the same claims. *See* White Decl. ¶¶ 7–8.

As such, Plaintiffs have failed to establish organizational standing as to all defendants.

## III.    A Temporary Restraining Order Is Unwarranted Here

### A.  Plaintiffs Have Not Shown Irreparable Injury

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Plaintiffs' motion should be denied because they have not demonstrated the "certain and great" injury that this Circuit requires to demonstrate irreparable injury. *See Wis. Gas*, 758 F.2d at 674; *see also Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (applying *Wisconsin Gas* requirement that irreparable injury must be "certain and great").

Plaintiffs cannot establish irreparable injury, for themselves or their members. Their claims of irreparable injury rest largely on the same claims as their standing arguments. *See* Renewed Mot. at 37–41. As detailed above, these claims fail, as Plaintiffs' alleged "reasonable expectations" injury is not cognizable, and certainly not violated by sharing amongst limited intra-governmental group. Again, no public disclosure has occurred nor have plaintiffs established one is imminent.

For the same reason, injury to the organizations themselves is too speculative. Plaintiffs have not shown that it is certain their members will stop reporting to them merely because of limited intra-governmental sharing or that they will face concrete injury. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

**B.  Plaintiffs are Unlikely to Succeed on the Merits of Their Claims**

As has been established, the Court need not consider the merits of Plaintiffs' claims, or its likelihood of success thereon, at all. *See Aamer v. Obama*, 953 F. Supp. 2d 213, 223 (D.D.C. 2013) (denying a motion for preliminary injunction for lack of jurisdiction); *Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F. Supp. 3d 48, 53-54 (D.D.C. 2017) (denying a motion for injunctive relief because irreparable harm absent). If the Court does reach the merits, however, it should decline to grant the relief requested. Plaintiffs' entire theory rests on the erroneous notion that the individuals carrying out the USDS E.O. in these agencies are not employees of these agencies. In fact, they are employees of these agencies. What is more, they need access to large datasets (including material that may be covered by the Privacy Act) to carry out their (again, Presidentially-directed) functions. Plaintiffs have thus not established any chance of success, let alone a likelihood, on their theory that Defendants are acting in excess of their authority. Nor have

16

Plaintiffs established that Defendants have acted arbitrarily or capriciously. For these merits reasons, a temporary restraining order is not warranted.

### 1. Plaintiffs' Claims Are Not Reviewable Under The APA

Plaintiffs bring most of their claims under the APA. Renewed Mot. 23-34. But the APA does not permit "judicial review over everything done by an administrative agency." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (quotation omitted). Rather, the cause of action that statute provides, 5 U.S.C. § 704, is limited in two ways material here. Agency action must be "final" to be reviewable. *Id.* And if there is an adequate alternative remedy, including a distinct statutory cause of action, the plaintiff must sue under the alternative instead. *See id.* Plaintiffs' claims satisfy neither condition. They thus lacks a cause of action under the APA. *See Genesis Cap., LLC v. Lauravin Luxury Apts. Homes, LLC*, Civ. A. No. 23-795 (JEB), 2023 WL 3452305, at *2 (D.D.C. May 15, 2023) (denying a motion for preliminary injunction because plaintiff had no cause of action).

### a. Plaintiffs Have Not Identified Final Agency Action

APA review is limited to "final agency action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004) (quoting 5 U.S.C. § 704) ("*SUWA*"). Agency action is final only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Plaintiffs have alleged that the Defendants' "DOGE Access Policies . . . grant DOGE employees access to information systems." Renewed Mot. at 23. Across all agencies, employees who are working to implement the USDS E.O.'s agenda have been given appropriate access to agency systems and technology that they need to complete their work. *See* Kryger Decl. ¶¶ 7–12; Rice Decl. ¶¶ 5–9; Martinez Decl. ¶¶ 6–9. Plaintiffs allege that providing these

employees access to systems and technology constitutes a final agency action capable of judicial review.  Renewed Mot. at 23-24.

As a matter of common sense, it is difficult to understand how providing a new employee with system access necessary to his functions "consummat[es]" the hiring agency's decisionmaking process in any formal sense.  *Hawkes Co.*, 578 U.S. at 597.  And "informal" agency actions, as a general matter, have not been considered "final" under *Bennett*'s first prong. *See Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (*Abbott Laby's v. Gardner*, 387 U.S. 136, 151 (1967)).  Nor is it apparent how an employee being able to access a system and the data therein has "direct and appreciable legal consequences" for anyone at all.  *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019).  To establish finality, Plaintiffs would need to show (at the very least) that their members' data has, in fact, been improperly disclosed (including to the employees implementing the President's USDS E.O.)—not just that they had access to it.  By analogy, an agency's decision to give an employee access to its systems is not itself final agency action, even if the employee might conceivably use the computer to effect final agency action (*e.g.*, in approving or denying benefits).  Because finality is analyzed from a "pragmatic" point of view, these facial oddities seriously undermine Plaintiffs' claim that it exists here.  *See Hawkes Co.*, 578 U.S. at 599.

The Court need not rely on pragmatism alone.  Precedent confirms what common sense suggests:  that "broad programmatic attack[s]" like Plaintiffs' fall categorically outside the ambit of judicial review under § 704.  *See SUWA*, 542 U.S. at 64.  In *Lujan v. National Wildlife Federation*, the plaintiffs challenged an agency's "land withdrawal review program" in its entirety. 497 U.S. 871, 890 (1990).  That challenge could not proceed, the Supreme Court held, because the "program" did "not refer to a single [agency] order or regulation, or even to a completed universe

of particular [agency] orders and regulations." *Id.* Instead, the "program" was "simply the name by which [the plaintiffs] have occasionally referred to the continuing (and thus constantly changing) operations of the [agency] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by" federal law. *Id.*

Plaintiffs' challenge to these employees' "access" to Defendants' systems is deficient in similar ways. Despite the framing, a "decision[] to disclose [Defendants'] information to DOGE employees," Renewed Mot. at 24, is not a single, discrete event with legal consequences for Plaintiffs' members. It is rather the name by which Plaintiffs refer to Defendants' "continuing (and thus constantly changing) operations," which include taking various steps to modernize and strengthen protections for its data systems. *See Nat'l Wildlife Federation*, 497 U.S. at 890.

Limiting judicial review to final agency action in circumstances like those at issue in *National Wildlife Federation*—and at issue here—preserves "the APA's conception of the separation of powers." *City of New York v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019). As *National Wildlife Federation* recognizes, one facet of that conception arises out of respect for the democratic process. 497 U.S. at 891 (A plaintiff may not "seek *wholesale* improvement of [an agency's] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." (emphasis added)). But another, equally important facet recognizes the limits of judicial resources. *See City of New York*, 913 F.3d at 431 ("[Courts] are woefully ill-suited, however, to adjudicate generalized grievances asking us to improve an agency's performance or operations. In such a case, courts would be forced either to enter a disfavored "obey the law" injunction, or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so." (internal citation omitted)). Those concerns are directly relevant to this case, where Plaintiffs seek

19

"a general review" of the Department's "day-to-day operations." *See Nat'l Wildlife Federation*, 497 F.3d at 899.

*Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), does not compel a contrary conclusion. *See* Renewed Mot. at 23 (citing *Venetian Casino Resort*). There, the EEOC was held to have a concrete policy (albeit informal) of disclosing confidential information, including trade secrets, without providing notice to the submitter. *Venetian Casino Resort*, 530 F.3d at 929-30. In other words, *Venetian Casino* involved an explicit agency policy of disclosing third-party information under specific circumstances. But here, Plaintiffs do not evidence facts showing the existence of a new policy—rather, their claim is simply that Defendants inappropriately gave access to certain records to certain personnel. This is, if anything, the routine *application* of an existing policy, which is not reviewable final agency action. *See SUWA*, 542 U.S. at 61-62 (programmatic challenges are not permissible). Moreover, if Plaintiffs claim that Defendants misapplied the Privacy Act or other policies to their members in a way that caused those members cognizable harm, those members could potentially bring a standalone lawsuit to vindicate their rights. Plaintiffs cannot claim that every time a policy is followed that it is final agency action—just like it would not be final agency action every time an employee is given access to their email accounts, even though there may be an underlying email access policy that could itself be final agency action.

### b. Plaintiffs Have An Adequate, Alternative Remedy Under The Privacy Act

Plaintiffs' APA claims fail for the additional, independent reason that the APA does not grant a cause of action where there is "[an]other adequate remedy in any court." 5 U.S.C. § 704. This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*,

487 U.S. 879, 903 (1988).  Accordingly, a plaintiff has adequate relief—and thus cannot avail herself of § 704—"'where a statute affords an opportunity for *de novo* district-court review' of the agency action."  *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)).  Stated differently, where an agency action is subject to review in some manner under a statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme.  The mode of review established by the statutory review scheme is presumed exclusive.  This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA.  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999).  It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices.  *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. U.S. Dep't of Hous. & Urban Dev.*, No. 11 CIV. 0846 (RJD) (JMA), 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). The Privacy Act applies only to individuals, not corporate or organizational entities. 5 U.S.C. §552a(g)(1)(D) (authorizing a cause

21

of action for adversely affected "individuals"); *id.*, §552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."). Although Plaintiffs purport to sue on behalf of their members' interests, they could not bring their own Privacy Act claim, which underscores that they should not be permitted to circumvent statutory limits through the APA.

Relief under the Privacy Act is carefully circumscribed. Civil remedies are available—and thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," (an "Amendment Action"), 5 U.S.C. § 552a(g)(1)(A), (2) when the agency refuses to comply with an individual's request for access to her records, (an "Access Action"), *id.* § 552a(g)(1)(B), (3), when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," (a "Benefits Action"), *id.* § 552a(g)(1)(C), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse act on an individual," (an "Other Action"), *id.* § 552a(g)(1)(D). For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the "agency acted in a manner which was intentional or willful" and if that plaintiff could prove "actual damages," which is "limited to proven pecuniary or economic harm." *Cooper*, 566 U.S. at 291, 299.

Beyond these monetary damages, the Act allows for injunctive relief in only two narrow circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow

an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). Injunctive relief, as the D.C. Circuit has recognized, is not available for any other situation arising out of the Privacy Act. *See Sussman v. U.S. Marshal Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs . . . .") (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)); *see also Cell. Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Given the Privacy Act's comprehensive remedial scheme, courts have repeatedly recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also Tripp v. DOD*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002); *Poss v. Kern*, No. 23-cv-2199, 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024) (citing cases). That is consistent with the principle that "[w]here [a] 'statute provides certain types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief.'" *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell. Assocs.*, 579 F.2d at 1161-62). This is especially true with the Privacy Act because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell. Assocs.*, 579 F.2d at 1158-59.

Indeed, as the Ninth Circuit concluded, were injunctive relief available for violations of the Privacy Act generally, "the detailed remedial scheme adopted by Congress would make little sense. We think it unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.* at 1160. Plaintiffs' efforts to obtain an agency-wide injunction on both information sharing and personnel actions by channeling Privacy Act

claims through the APA would be an end-run around these common-sense principles and should be rejected.

### 2.  Plaintiffs Have Not Alleged A Likely Violation Of Any Statute

#### c.    The Individual Advancing The Agencies' USDS Agenda Are Federal Employees

The Privacy Act establishes a general ban on disclosure of covered personal information, but excludes "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties."  5 U.S.C. § 552a(b)(1).  At the heart of Plaintiffs' suit is the erroneous allegation that individuals working to implement the USDS E.O. are somehow outside the category of federal employees, or else outside the category of federal employees in the agencies in which they are operating.  Neither criticism withstands scrutiny.

Start with the initial question of federal employment.  The Privacy Act uses the term "employee."  5 U.S.C. § 552a(b)(1); 26 U.S.C. § 6103(*l*)(13)(E).  "[F]or purposes of" Title 5 of the U.S. Code, "employee" "means an officer and an individual who is" first "appointed in the civil service by one of the following acting in an official capacity." 5 U.S.C. § 2105(a)(1).  As relevant here, the ensuing list of potential appointers includes "the President" and "an individual who is an employee under this section."  *Id.* § 2105(a)(1)(A), (D).  An employee must also be "engaged in the performance of a Federal function under authority of law or an Executive act; and . . . subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position."  *Id.* § 2105(a)(2).  Because the Privacy Act is part of Title 5, § 2105's definition of employee directly applies to its use of the term "employee."  *See id.* § 552a(b)(1).

The relevant employees working in HHS, CFPB, and DOL to implement the USDS E.O. satisfy § 2105(a)'s definition of "employee."  All have been appointed to their positions under

federal law, including the detailees.  Kryger Decl. ¶ 13; Rice Decl. ¶ 5; Martinez Decl. ¶ 6.  All are

"engaged in the performance of a Federal function under authority of . . . an Executive act," *i.e.*,

Executive Order 14,158.  *Id.* ¶¶ 3–4.  And all are ultimately subject to the supervision of the senior

leadership of the agencies in which they serve, Kryger Decl. ¶ 7; Rice Decl. ¶ 7; Martinez Decl. ¶

8, whether because they have been appointed as employees of those agencies, or because they have

been detailed to them.

     The relevant employees also satisfy the requirement that they be employees "of" these

agencies.  *See* 5 U.S.C. § 552a(b)(1).  Some have been directly hired by these agencies, thus

resolving their status.  The detailees from other components of the Executive Branch qualify, too.

In evaluating the employment status of detailees, the D.C. Circuit has adopted a functional

approach, looking to the subject matter and purpose of the individual's work, their supervision,

and their physical worksite as illustrative (but not conclusive) factors.  *Judicial Watch v. Dep't of*

*Energy*, 412 F.3d 125, 131-32 (D.C. Cir. 2005).  Here, those factors clearly cut in favor of the

detailees' status as employees of these agencies.  They are subject to the supervision of senior

Department leadership.  Ramada Decl. ¶ 7; Rice Decl. ¶ 7; Martinez Decl. ¶ 8.  They perform their

work on agency IT and technology assets, subject to various agreements and understandings with

the agencies.  Rice Decl. ¶¶ 6; Martinez Decl. ¶¶ 6-7; Kryger Decl. ¶¶ 8-12.  These facts lead to

the inescapable conclusion that they are, detail or no detail, employed by the Defendants.  *See*

*Judicial Watch*, 412 F.3d at 131-32; *Freeman v. EPA*, No. 02-0387, 2004 WL 2451409, at *4-5

(D.D.C. Oct. 25, 2004) (finding that disclosure of plaintiffs' drug testing schedules and results by

EPA OIG to an EPA-hired DOD investigator did not violate Privacy Act because "according to the

OMB 1975 Guidelines, an agency that hires a member of another agency to serve in a temporary

task force or similar, cross-designated function can share otherwise protected information with that

hired person and still satisfy exception (b)(1)"); *cf. Ciralsky v. CIA*, 689 F. Supp. 2d 141, 155 (D.D.C. 2010) (permitting disclosure to "a group of Agency contractors engaged specifically to conduct an official CIA investigation into allegations of anti-Semitism at the Agency"); *Mount v. U.S. Postal Serv.*, 79 F.3d 531, 532, 533 (6th Cir. 1996) (describing "physician under contract with [United States Postal Service]" as an employee or agent of Postal Service under § 552a(b)(1)); *Laible v. Lanter*, 91 F.4th 438, 442 (6th Cir. 2024) (local employee detailed to federal task force was a federal employee for purposes of the Westfall Act).

Plaintiffs argue that although USDS once had the authority to detail employees out to other agencies when it was organized under the Office of Management and Budget, it now lacks the authority to do so under its current structure, on the theory that the Economy Act, 31 U.S.C. § 1535(a), is limited to "agencies," and the USDS is not an "agency." Renewed Mot. 34-37. In relevant part, § 1535(a) provides that the "head of an agency or major organizational unit within an agency may place an order with a major organizational unit within the same agency or another agency for goods or services . . . ." Although it is certainly true that USDS is not an "agency" in the way that DOL or HHS is an "agency," the Economy Act is not so limited. Title 31, which encompasses the Economy Act, defines an "agency," 31 U.S.C. § 101, as "a department, agency, or instrumentality of the United States Government." This includes an "instrumentality in the executive branch of the United States Government," which is part of the Economy Act's narrower definition of the term "executive agency." 31 U.S.C. § 102. The Office of Legal Counsel has long understood the term "instrumentality" to have the plain and ordinary meaning of "a thing through which a person or entity acts." Office of Legal Counsel, Dep't of Justice, *Application of the Government Corporation Control Act and the Miscellaneous Receipts Act to the Canadian Softwood Lumber Settlement Agreement*, 30 Op. OLC 111, 117 (Aug. 22, 2006). Regardless of

whether it is organized under OMB, or operates independently within the EOP, USDS is an "instrumentality in the executive branch," and is therefore able to participate in the Economy Act.

That conclusion is supported by this Court's decision in *Citizens for Responsibility & Ethics in Washington v. Office of Administration*, 559 F. Supp. 2d 9 (D.D.C. 2008). In that case, plaintiff sought to obtain records from the OA, which is organized in the EOP and reports directly to the President. *See Office of Administration in the Executive Office of the President*, E.O. 12,028, 42 Fed. Reg. 62,895 (Dec. 12, 1977). In attempting to argue that OA was an "agency" subject to FOIA, the plaintiff argued "that many of OA's contract with non-EOP agencies are described as 'interagency agreements' under the authority of the Economy Act, 31 U.S.C. §1535." *CREW*, 559 F. Supp. 2d at 15-16. The Court rejected this argument, acknowledging that "the Economy Act defines the term 'agency' to mean a 'department, agency, or instrumentality of the United States Government,'" and agreeing that OA's participation in the Economy Act did not imply it was an agency for other purposes, such as FOIA. *Id.* at 30. The participation of entities within the EOP that are directly supervised by the President, such as the OA, in the Economy Act is supported by the plain language of the Economy Act, and gives USDS ample authority to detail its employees to other agencies, as well.

> **d.    The Plaintiffs Are Not Likely To Succeed In Establishing A Privacy Act Violation**

Plaintiffs are also not likely to succeed in establishing that Defendants are violating the rights of its members under the Privacy Act, even assuming an agency's compliance with the Privacy Act is reviewable under the APA, which it is not. The Privacy Act, 5 U.S.C. § 552a, applies to certain types of protectable records stored by an agency. *See id.* § 552a(a). The statute allows disclosure of records within system of records "to those officers and employees which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. §

552a(b)(1). Here, as addressed above, the individuals who have access to the relevant information are employees of the relevant agencies. *See supra*. Moreover, Executive Order 14,158 provides that these individuals have a need to know "*all* unclassified agency records, software systems, and IT systems" to perform their duties. 90 Fed. Reg. 8441, § 4. As addressed in the attached declarations, the employees implementing the USDS E.O. have a need to access Privacy Act-protected information on Defendants' systems. Kryger Decl. ¶ 5; Rice Decl. ¶ 5; Martinez Decl. ¶ 3.

In their motion, Plaintiffs assert that because "DOGE is an entity within the White House rather than within any of the Agency Defendants," these individuals are not "employees" of the agencies, and § 552a(b)(1) does not apply to them. Renewed Mot. at 26. As explained above, that is incorrect. Whether they are detailed from another part of the executive branch, or directly employed by the agency, every individual working to implement the USDS E.O. in HHS, CFPB, and DOL is an employee of those agencies.

Finally, Plaintiffs purport to proceed under the APA. For the reasons discussed above, they cannot. But even assuming they could proceed under the APA, the relevant inquiry would be whether Defendants acted arbitrarily and capriciously in granting the USDS Team access to the relevant information; it would not be a *de novo* inquiry. *See* 5 U.S.C. § 706(2). Defendants' uses meet that standard, and Plaintiffs have offered no facts establishing otherwise.

### e. The Plaintiffs Are Not Likely To Establish A Violation Of Any Other Statute

Plaintiffs argue that DOL, HHS, and CFPB employees who have access to agency data as part of their agency USDS teams are violating various statutes and regulations in addition to the Privacy Act. They point to several regulations that implement the Privacy Act and require confidentiality for various sets of sensitive data. But according to Plaintiffs' own description, the

regulations prevent disclosure except as permitted by the Privacy Act.  Renewed Mot. at 27–29.

Because the challenged access does not violate the Privacy Act, as discussed above, it does not

violate of any of these regulations.  The same is true of Plaintiffs' citation to 5 U.S.C. §

2302(b)(9)(D), which, according to Plaintiffs, prohibits threatening a federal employee with

termination for "'refusing to obey an order that would require the [employee] to violate a law.'"

Renewed Mot. at 26.  Again, the relevant employees are not violating the law.  Moreover, the

employees are all specifically required to abide by all applicable federal rules and regulations

regarding data privacy and other topics.  Kryger Decl. ¶ 10; Rice Decl. ¶¶ 7–8; Martinez Decl. ¶¶

6–9.  Thus, it is not the case that access is being granted without regard to laws and regulations—

in fact, the opposite is true.

Plaintiffs also claim that the DOL employees' access to data from the Bureau of Labor

Statistics violates the Confidential Information Protection and Statistical Efficiency Act of 2002's

prohibition on disclosure of information collected under a pledge of confidentiality for exclusively

statistical purposes.  Mot. at 27.  But Plaintiffs have not shown that the DOL employees have

accessed any BLS data, let alone BLS data "acquired by an agency under a pledge of

confidentiality for exclusively statistical purposes."  44 U.S.C. § 3572(c)(1).  At most they allege

that "[o]n information and belief, USDS personnel are likely to demand access to BLS data."  Am.

Complt. ¶ 243.  Nor have Plaintiffs shown that the "disclosure" prohibited by § 3572(c)(1) includes

the type of inter-agency, nonpublic disclosure at issue here.

Plaintiffs cite CFPB regulations that prohibit disclosure of records "to any person who is

not an employee of the CFPB," Renewed Mot. at 29 (citing 12 C.F.R. § 1070.4), but the individuals

whose accessed is challenged here *are* employees of CFPB, as discussed above.  12 C.F.R. §

1070.40 et seq. also permits disclosure of confidential information to CFPB employees when relevant to the performance of their duties. *Id.* § 1070.41.

Plaintiffs cite to FISMA as requiring "agencies to provide information security protection 'commensurate with the risk and magnitude of the harm resulting from unauthorized access [or] use' of information or information systems maintained by the agency," but there is no unauthorized use here. Renewed Mot. at 26-27, 29. Moreover, the APA provides no cause of action to review an agency's compliance with its responsibilities under FISMA because a federal agency's compliance with FISMA is committed to agency discretion by law. The judicial review provisions of the APA, 5 U.S.C. §§ 701–06, establish a cause of action for parties adversely affected either by agency action or by an agency's failure to act. *Heckler v. Chaney*, 470 U.S. 821, 827 (1985). However, the APA explicitly excludes from judicial review those agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "Because the APA does not apply to agency action committed to agency discretion by law, a plaintiff who challenges such an action cannot state a claim under the APA." *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009).

To determine whether a matter has been committed to agency discretion, the D.C. Circuit considers "the language and structure of the statute that supplies the applicable legal standards for reviewing that action" and "the nature of the administrative action at issue." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (citing *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)); *see also Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). The D.C. Circuit has examined the statutory structure of FISMA and suggested that the choices an agency makes in carrying out its FISMA obligations are not subject to judicial review. *See Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) ("Notably absent from FISMA is a role for the judicial branch.

30

We are far from certain that courts would ever be able to review the choices an agency makes in carrying out its FISMA obligations.").

The language and structure of FISMA indicate that an agency's choices in implementing its information-security responsibilities are not subject to judicial review under the APA.  Congress passed FISMA to "provide a comprehensive framework for ensuring the effectiveness of information security controls over information resources that support Federal operations and assets." 44 U.S.C. § 3551(1).  However, Congress specifically "recognize[d] that the selection of specific technical hardware and software information security solutions should be left to individual agencies from among commercially developed products."  44 U.S.C.A. § 3551(6).

Accordingly, while FISMA imposes general obligations on agencies to develop and implement information security protections, it offers no specific prescriptions for the tools or methods required—which is unsurprising, in light of the rapidly evolving nature of both technology and cyber threats.  Instead, Congress vested agencies with broad discretion to adopt "security protections commensurate with the risk and magnitude of the harm" resulting from cyber threats. 44 U.S.C. § 3554(a)(1)(A).  FISMA gives agencies latitude to develop security policies and procedures that are "appropriate" and "cost-effectively reduce information security risks to an acceptable level." *Id*. at § 3554(b)(2)(B).  To achieve its goals, FISMA assigns *exclusive* responsibility for overseeing the management and security of information systems of civilian agencies to the Director of the Office of Management and Budget.  FISMA mandates that the OMB Director "shall oversee agency information security policies and practices, including . . . overseeing agency compliance with the requirements of this subchapter [of FISMA.]" *Id.* § 3553(a)(5).  FISMA specifically authorizes the OMB Director "to enforce accountability for compliance," *id.* , through various mechanisms, including by "tak[ing] any action that the Director

31

considers appropriate, including an action involving the budgetary process or appropriations management process." 40 U.S.C. § 11303(b)(5)(A).  Additionally, the Director must review each agency's security programs at least annually and approve or disapprove them.  44 U.S.C. § 3553(a)(5).  Finally, he must report to Congress annually on the "effectiveness of information security policies and practices during the preceding year." *Id.* § 3553(c).

Accordingly, a federal agency's compliance with FISMA is committed to agency discretion by law, and FISMA cannot be the basis of Plaintiffs' APA claim.

### 3.  Defendants' Actions Are Not Arbitrary Or Capricious

Plaintiffs assert that providing access to employees associated with USDS fails arbitrary and capricious review under the APA.  Renewed Mot. at 30-33.  This argument underscores why Plaintiffs have not articulated proper APA claims in the first place; agencies are not subject to judicial review every time they decide to give a particular employee access to a system that they believe the employee needs to access.  Such decisions are not reviewable final agency action under the APA, and the Privacy Act's detailed remedial scheme does not give outside organizations a right to challenge which employees can access systems, and which cannot, by obtaining an injunction in advance of disclosure.

Even if arbitrary and capricious review were found to apply here, Defendants' actions easily clear that bar.  "[R]eview under [this] standard is deferential," requiring a "court simply [to] ensure[] that the agency has acted within a zone of reasonableness and … reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The President's Executive Order laid out the rationale for providing Defendants' employees with access to each agency's non-classified systems; the Defendants are simply carrying out that policy judgment. Defendants are also cognizant of, and directing their employees to act in accordance with, the Privacy Act and other laws regarding data privacy.

Indeed, the Executive Order itself directs employees to apply "rigorous data protection standards" in carrying out their duties.  USDS E.O. §4(b).  The declarations demonstrate that this approach is being carried through by the agencies.  Defendants have not failed to consider the questions Plaintiffs raise, or neglected the obvious need for data protection in providing system access; they have simply reached a conclusion with which Plaintiffs disagree. But that does not suffice to show a likelihood of success on Plaintiffs' arbitrary and capricious claims.

### 4.  Defendants' Access Policies Are Procedurally Proper

Plaintiffs next argue that it was "procedurally infirm" for Defendants to "modify" access rules governing the confidentiality of information on their systems, suggesting that Defendants needed to engage in notice and comment rulemaking in order to provide employees working to implement the USDS E.O. with system access.  Renewed Mot. at 33-34. Judicial review of systems access decisions is not required by the APA, as discussed above, and it is certainly not the case that agencies have to engage in a rulemaking in order to give particular employees access to those systems

Even so, Defendants have not modified any rule and are thus in compliance with the APA. Rather, as explained in the declarations, they are applying the rules by working to ensure that employees who are working at the agencies to implement the USDS E.O. understand and comply with rules governing confidential information, including Privacy Act protected information. As all of the regulations Plaintiffs cite make clear, sharing of confidential information with individuals working for the agency, consistent with the Privacy Act's exception for disclosures to government employees, is permissible. *See, e.g.*, 20 C.F.R. § 10.10 (FECA information may not be released, inspected, copied, or otherwise disclosed except as provided in, inter alia, the Privacy Act); 12 C.F.R. § 1070.41(a) (prohibiting disclosure of confidential CFPB information to those without an

employment, contracting, or consulting relationship to the agency who lack a need to know the information); 45 C.F.R. part 5b (HHS's Privacy Act regulations).

### 5.  **Defendants' Actions Are Not** *Ultra Vires*

Finally, Plaintiffs purport to raise a freestanding *ultra vires* claim against Defendants, premised on the lack of authority of USDS to detail employees to other executive agencies. Renewed Mot. at 34-37. As discussed *supra*, this argument is based entirely on Plaintiffs' narrow construction of the Economy Act. Because the Economy Act reaches further, to include "instrumentalities in the executive branch of the United States Government," 31 U.S.C. § 102 (defining "executive agency"), USDS is not precluded from employing it, even though it is no longer under the umbrella of OMB.  As such, this claim is unlikely to succeed, as well.

## IV.    **The Balance of Equities Favors Defendants**

The balance of the equities and the public interest "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. at 435.  Neither the balance of the equities nor the public interest favors Plaintiffs' request for preliminary relief.

Plaintiffs make no serious effort to explain why the equities fall in their favor.  Rather, their arguments on this factor collapse into the merits, and they rely on the supposition that the public interest cuts against the government sustaining unlawful action.  Renewed Mot. at 41.  (To be clear, Defendants' practice is *not* unlawful, for the reasons stated above.)  Regardless, the Supreme Court has made clear that considering only likelihood of success is insufficient to justify injunctive relief. *See, e.g.*, *Winter*, 555 U.S. at 376-77 ("In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citations and quotation marks omitted).

Rather, it is the proposed injunction that would harm the public interest. At its core, it would limit the President's ability to effectuate the policy choices the American people elected him to pursue by limiting his advisors and other employees' ability to access information necessary to inform that policy. It would also frustrate the President's ability to identify fraud, waste, and abuse throughout the federal government. And it would draw false distinctions between different types of employees, unsupported in the statutory text, frustrating the flexibility that Congress itself provided in allowing multiple avenues to federal employment.

Finally, contrary to their protests, it would not leave Plaintiffs' members without remedy: if the government violates its legal obligations in a way that meets the standards Congress articulated, those members can pursue monetary remedies under the Privacy Act. *See* 5 U.S.C. § 552a(g)(4).

## V.    Plaintiffs' Proposed Injunction Is Improper

In closing, Defendants call the Court's attention to the scope of the temporary restraining order Plaintiffs seek to impose in this matter. Plaintiffs seek an order that would "temporarily restrain[] Agency Defendants from providing DOGE personnel access to systems containing non-public information or the records contained therein," to "return or destroy any copies of material previously accessed," to "remove any software installed by DOGE personnel on agency systems," and to "enjoin[] DOGE personnel from exercising *ultra vires* authority with respect to Agency Defendants." Renewed Mot. at 42. Although the requested relief "follow the law injunction" problem that plagued Plaintiffs' previous request for a temporary restraining order, it is no less problematic. A prohibition on sharing "non-public" information goes well beyond the scope of information protected by the Privacy Act and other statutes Plaintiffs invoke, and effectively constitutes a directive to these employees to stop all work. Moreover, because the Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before

35

it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018). A sweeping ban on access to *all* non-public data systems maintained by Defendants is in no way tailored to their purported injuries in this case, and would constitute a substantial intrusion on the workings of the Executive Branch.

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order.

Dated: February 13, 2025                         Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

MARCIA BERMAN
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/Michael J. Gerardi*
_____
Michael J. Gerardi
Senior Trial Counsel (DC Bar No. 1017949)
Benjamin S. Kurland
Trial Attorney (D.C. Bar No. 1617521)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: Michael.J.Gerardi@usdoj.gov

*Counsel for Defendants*