# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *AFL-CIO, et al.,*<br><br>    *Plaintiffs,*<br><br>    *vs.*<br><br>*Department of Labor, et al.,*<br><br>    *Defendants.* | Case No. 1:25-cv-00339-JDB |

**DECLARATION OF ERIE MEYER**

I, Erie Meyer, declare as follows,

1. I served as the Chief Technologist and Senior Advisor to the Director at the Consumer Financial Protection Bureau from October 2021 until February 7, 2025, when I resigned. Prior to my most recent position, I served as a founding member of the Technology and Innovation Unit at the Bureau from March 2011 to September 2018. Based on that work, I have personal knowledge of numerous aspects of the Bureau's work, including the Bureau's technology systems and protocols for systems access.

2. In my role at CFPB, I had access to several systems at the CFPB. For each system, I had a business need that justified my access and the appropriate controls were also in place. Those systems included selected case files related to market monitoring orders, consumer complaints, and others. Access meant that I was able to independently log into those systems and examine records stored on them.

3. For each system, I typically had to document my request for access, and have that request approved by my supervisor of record. In situations where those databases would include certain sensitive information, there was specific training on how to handle the sensitive

1

records to which I was provided access. For example, Controlled Unclassified Information (CUI) or Personally Identifiable Information had specific protocols and protections in place.

4. I have reviewed the legal filings in this matter, including the declaration of Adam Martinez, ECF No. 31-3, concerning access by DOGE staff to CFPB's systems.

5. Some of the facts attested to in the Martinez Declaration or argued by the government are incomplete with regards to relevant issues in this case, and do not fully capture my experience at the Bureau.

6. First, the Martinez Declaration acknowledges that the White House has ordered agencies such as CFPB to grant DOGE "full access to all unclassified agency records and software and IT systems." ECF No. 31-3 ¶ 3.

7. The CFPB has maintained 30 systems of record. Access to each system ordinarily requires an employee to have a true need to know for their CFPB roles to be able to log into each one. These systems serve a wide variety of purposes—from managing internal human resources, to collecting and publishing anonymized consumer complaint data, to maintaining the CFPB's IT infrastructure, to storing sensitive enforcement information collected in the course of the CFPB's enforcement and supervision actions.

8. To the best of my knowledge, no employee, contractor, or detailee at the CFPB has *ever* before been granted blanket access to all unclassified systems maintained by the Bureau. I served as the Bureau's Chief Technologist and Senior Advisor to the Director, and worked extensively on matters related to enforcement and supervision. I am not aware of any role at the CFPB that would have a stronger justification for universal systems access than mine, but even I was not granted, nor did I seek, such access.

2

9. Universal access to all unclassified systems at the CFPB is not compatible with the carefully-controlled, segmented access to sensitive data that was core to CFPB's approach during my time at the Bureau. It is difficult to imagine any CFPB employee who could have a true "need to know" that would justify access to every system within the Bureau. Based on my understanding of DOGE's mission, as described in the Executive Order establishing DOGE and Defendants' representations in this matter, it seems unlikely that DOGE employees have a true "need" for such broad access. The act of granting any employee access to all unclassified systems at the CFPB represents an unprecedented and very substantial change to Bureau policies.

10. Second, the Martinez Declaration implies that DOGE employees were provided all necessary training for systems access. *See* ECF No. 31-3 ¶ 6 ("All six detailees . . . were provided privacy and cyber training as a prerequisite to receiving a laptop and equipment . . . The CFPB Management followed all established procedures to provision equipment and provide access to the detailees.").

11. These representations are difficult to reconcile with public reporting about DOGE staff's access to CFPB systems and my experiences undergoing training for CFPB systems access.

12. DOGE entered CFPB for the first time on February 7,[1] and Acting Director Vought emailed CFPB staff that day to inform them that DOGE personnel were authorized to "begin work on all unclassified CFPB systems."[2]

---

[1] Bobby Allen et al., *Musk's team takes control of key systems at Consumer Financial Protection Bureau*, NPR (Feb. 7, 2025), https://www.npr.org/2025/02/07/g-s1-47322/musks-team-takes-control-of-key-systems-at-consumer-financial-protection-bureau.

[2] Holly Otterbein and Megan Messerly, *Vought takes helm at CFPB after Musk incursion*,

3

13. The Martinez Declaration states only that DOGE staff were provided privacy and cyber training, but those trainings alone, assuming they were completed, would not be sufficient under CFPB policies to grant the degree of access authorized by the Acting Director.

14. For example, the Martinez Declaration makes no mention of DOGE employees undergoing ethics training, which is required for all agency employees before they are authorized to begin work at the Bureau.

15. Additionally, the Martinez Declaration makes no mention of DOGE employees undergoing a background investigation, while CFPB's Personnel Security Policy states that "all persons employed by or seeking employment with the CFPB, or those who perform work for or on behalf of the CFPB (for example, contractors), are required to undergo an initial background investigation[.]"[3]

16. Further, in my experience, *each system* with particularly sensitive data at CFPB typically comes with its own training prior to granting access to any employee. These trainings provide employees specific instructions on things like how to access a system, safeguards in place to ensure integrity of system data, authorized routine uses of records stored in the system, and any other legal or ethical rules governing or guiding access to those systems. Typically, these trainings each last up to an hour; some may be completed via on-demand webinar, but others are conducted live with an instructor.

---

POLITICO (Feb. 8, 2025), https://www.politico.com/news/2025/02/08/vought-takes-helm-at-cfpb-after-musk-incursion-00203247.

[3] CFPB Office of the Inspector General, 2024-IT-C-019, 2024 Audit of the CFPB's Information Security Program at 16 (Oct. 31, 2024), https://oig.federalreserve.gov/reports/cfpb-information-security-program-oct2024.pdf.

17. Access to CFPB enforcement systems is particularly sensitive and requires training on how the Bureau manages confidential investigatory information. These are among the most competitively-sensitive records stored at the CFPB, containing information collected by the Bureau in its investigations. Because these records are so sensitive, direct access is not granted to CFPB employees outside of the Bureau's enforcement functions, and training and onboarding processes for enforcement staff can take place over multiple days.

18. Finally, the Martinez Declaration makes no representations about DOGE employees' compliance with the CFPB's ethical requirements, except inasmuch as it represents that "the six detailees are required to abide by all applicable federal rules and regulations regarding data privacy and other topics." ECF No. 31-3 ¶ 10.

19. To my knowledge, all CFPB employees are required to comply with the Bureau's Supplemental Standards of Ethical Conduct, codified at 5 C.F.R. Part 9401.

20. Those standards prohibit CFPB employees, spouses, or minor children from owning or controlling securities in certain prohibited entities. *See* 5 C.F.R. § 9401.106(a).

21. The list of prohibited entities is updated annually by the Bureau, and includes all financial institutions under CFPB supervision, as well as additional entities, including non-financial institutions and technology companies, that could create the appearance of a conflict of interest between CFPB staff's professional responsibilities and their personal financial interests.

22. All CFPB employees are required to review the prohibited holdings list and its periodic updates and divest ownership interests in any holding on the list.

23. To the best of my knowledge, the list of prohibited entities currently includes Tesla, Inc., the auto manufacturer owned by Elon Musk.[4]

24. While I am not aware of all of the DOGE employees detailed to CFPB, public reporting has identified multiple DOGE staff as being current or former employees of Tesla.[5]

25. CFPB employees' ethical standards also require disclosure and divestment from other financial interests, beyond those detailed on the prohibited entities list, that could give an appearance of a conflict of interest.

26. Because another of Mr. Musk's companies, X, has publicly announced plans to enter the consumer finance market, it may be subject to CFPB's regulatory authority, and financial holdings in X would trigger CFPB employees' ethical obligations.[6]

27. Public reporting has also identified multiple DOGE staff as being current or former employees of X.[7]

28. The Martinez Declaration does not address whether DOGE employees have complied with the Bureau's Standards of Ethical Conduct and Financial Disclosure requirements, and that is a conspicuous omission to me, given that multiple DOGE employees may hold securities or other financial interests in multiple entities triggering disclosure and divestment pursuant to CFPB's ethical standards.

29. Given the known timeline of DOGE's entry to CFPB and their access to the Bureau's systems, it is not credible to me that, prior to gaining access, DOGE employees could

---

[4] Matt Egan, *Elon Musk is waging war on a key check on his business empire*, CNN (Feb. 11, 2025), https://edition.cnn.com/2025/02/11/business/elon-musk-cfpb/index.html.

[5] Avi Asher-Schapiro et al., *Elon Musk's Demolition Crew*, ProPublica (Feb. 6, 2025), https://projects.propublica.org/elon-musk-doge-tracker/.

[6] *See* Bobby Allyn, *Elon Musk's DOGE takes aim at agency that had plans of regulating X*, NPR (Feb. 12, 2025) https://www.npr.org/2025/02/12/nx-s1-5293382/x-elon-musk-doge-cfpb.

[7] Asher-Schapiro, *supra* n. 4.

6

have completed ethics review, a background investigation, or received federal records and other training that is required for the sort of first-ever universal access that they have been granted. While I respect and worked alongside Mr. Martinez for several years, the statement that "All accesses to CFPB internal systems were authorized by the Chief Information Officer pursuant to CFPB processes and procedures," ECF No. 31-3 ¶ 9, is not plausible based on my experiences and knowledge of the CFPB.

30. I am over eighteen years old, of sound mind, and submit this declaration of my own account, not subject to any duress, fraud, or undue influence. Pursuant to 28 § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct to the best of my knowledge, information, and belief.

Executed in Washington, D.C. on February 19, 2025.

*/s/ Erie Meyer*
Erie Meyer