## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AFL-CIO et al.,

          *Plaintiffs*,

vs.

U.S. DEPARTMENT OF LABOR et al.,

          *Defendants*.

Case No. 1:25-cv-339

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................i

INTRODUCTION ..........................................................................................................1

BACKGROUND ............................................................................................................2

    I.   DOGE's Creation and Access to Agency Systems ...............................................2

    II.  Plaintiffs' Claims ...................................................................................................4

LEGAL STANDARD .....................................................................................................5

ARGUMENT .................................................................................................................5

    I.   Plaintiffs have standing ........................................................................................6

        A.  Plaintiffs have associational standing ..........................................................6

            1.  Plaintiffs' injuries are concrete and cognizable under Article III, and their members would have standing to challenge the DOGE Access Policies in their own right .......................................................................................7

            2.  Plaintiffs' members need not participate individually in Plaintiffs' Privacy Act claims .......................................................................................10

        B.  Plaintiffs have organizational standing .......................................................12

            1.  Plaintiffs' have alleged that they have been injured by Defendant Agencies' sharing their data .........................................................................12

            2.  The DOGE Access Policies directly impair Plaintiffs' core activities ..............13

            3.  Plaintiffs allege that the DOGE Access Policies force Plaintiffs to divert resources .........................................................................................16

    II.  This Court can grant relief for Plaintiffs' claims................................................17

        A.  Defendants' Access Policies violate the APA ..............................................18

            1.  The Access Policies are final agency action....................................................18

            2.  The Access Policies violate the Privacy Act....................................................21

            3.  Defendants' failures to comply with the Privacy Act are reviewable under the APA ...............................................................................................23

            4.  The Access Policies violate other laws and regulations ...................................25

            5.  The Access Policies are procedurally infirm ...................................................28

         B.  Defendants' Access Policies violate the Privacy Act...................................29

        C.  Defendant DOGE is operating *ultra vires* and Defendants DOL, HHS, and CFPB may been joined from executing DOGE's orders ...................................................29

CONCLUSION ..............................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*100Reporters LLC v. U.S. Dep't of Just.*,
   307 F.R.D. 269 (D.D.C. 2014)...............................................................................12

*Action All. of Senior Citizens of Greater Philadelphia v. Heckler*,
   789 F.2d 931 (D.C. Cir. 1986)..............................................................................16

*Am. Ass'n of Cosmetology Schools v. Devos*,
   258 F. Supp. 50 (D.D.C. 2017)...............................................................................6

*Am. Fed. Teachers v. Bessent*,
   8:25-cv-00430, 2025 WL 582063 (D. Md. Feb. 24, 2025)................................................8, 20

*Am. Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902)...........................................................................................30

*Ariz. All. for Retired Ams. v. Mayes*,
   117 F.4th 1165 (9th Cir. 2024) ..............................................................................14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................5

*Ass'n for Comm. Affiliated Plans v. U.S. Dep't of Treasury*,
   966 F.3d 782 (D.C. Cir. 2020)..............................................................................27

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991)..........................................................................................33

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................5

*Bennett v. Spear*,
   520 U.S. 154 (1997)..........................................................................................19

*Butz v. Economou*,
   438 U.S. 478 (1978)..........................................................................................29

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)...........................................................................30, 32

*Chem. Weapons Working Grp., Inc. v. Dep't of the Army*,
   111 F.3d 1485 (10th Cir. 1997) .............................................................................18

*City of Providence v. Barr*,
   954 F.3d 23 (1st Cir. 2020)..................................................................................33

i

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017) ...........................................................................28

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) .......................................................................26

*Ctr. for Biological Diversity v. McAleenan*,
404 F. Supp. 3d 218 (D.D.C. 2019) ...............................................................30

*D.C. v. USDA*,
444 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................17

*Doe v. Chao*,
540 U.S. 614 (2004) ........................................................................................24

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) .....................................................................24

*F.C.C. v. NextWave Personal Comms, Inc.*,
537 U.S. 293 (2003) ........................................................................................23

*Fair Emp't Council of Greater Washington, Inc. v. BMC Marketing Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) .......................................................................15

*Fair Hous. Ctr. of Metro Detroit v. Singh Senior Living, LLC*,
No. 23-3969 (6th Cir.) ....................................................................................14

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ...................................................................30, 32

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ..................................................................................12, 13

*Grell v. Trump*,
330 F. Supp. 3d 311 (D.D.C. 2018) .................................................................5

*Griffith v. Fed. Labor Rels. Auth.*,
842 F.2d 490 (D.C. Cir. 1988) ...................................................................32, 34

*Haase v. Sessions*,
893 F.2d 370 (D.C. Cir. 1990) .......................................................................11

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ........................................................................................13

*Humane Soc. of the U.S. v. Hodel*,
840 F.2d 45 (D.C. Cir. 1988) ....................................................................10, 11

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977).............................................................................................10

*Iowaska Church of Healing v. Werfel,*
    105 F.4th 402 (D.C. Cir. 2024)............................................................................17

*Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers,*
    No. 23-cv-3570, 2024 WL 4239936 (D.D.C. Sep. 19, 2024)................................7

*L.M.-M. v. Cuccinelli,*
    442 F. Supp. 3d 19 (D.D.C. 2020)........................................................................23

*Laird v. Tatum*
    408 U.S. 1 (1972).............................................................................................9, 10

*Latson v. Holder,*
    82 F. Supp. 3d 377 (D.D.C. 2015)........................................................................33

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)..................................................................................12

*Lexmark Intern., Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014)..............................................................................................22

*Liquid Energy Pipeline Ass'n v. Fed. Energy Regul. Comm'n,*
    109 F.4th 543 (D.C. Cir. 2024)............................................................................28

*Mach Mining, LLC v. E.E.O.C.,*
    575 U.S. 480 (2015)..............................................................................................25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012)..............................................................................................22

*Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. D.C.,*
    62 F.4th 567 (D.C. Cir. 2023)................................................................................6

*Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.,*
    604 F. Supp. 2d. 665 (S.D.N.Y. 2009)..................................................................11

*Nat'l Mi. Ass'n v. McCarthy,*
    758 F.2d 243 (D.C. Cir. 2014)..............................................................................19

*Nat'l Treasury Employees Union v. Vought,*
    1:25-cv-00381 (D.D.C. Feb. 27, 2025)................................................................16

*Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.,*
    No. 14-1915, 2016 WL 4435175 (D.D.C. Aug. 19, 2016)...................................15

*Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*,
  358 F. Supp. 3d 66 (D.D.C. 2019) .................................................................15, 16

*New York v. Trump*,
  No. 25-cv-39, 2025 WL 357368 (D.R.I. Jan. 31, 2025) ......................................33

*People for the Ethical Treatment of Animals v. U.S. Dep't. of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ...................................................................15, 7

*PFLAG, Inc. v. Trump*,
  No. CV 25-337, 2025 WL 685124 (D. Md. Mar. 4, 2025)....................................32

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946).........................................................................................11

*Radack v. U.S. Dep't of Just.*,
  402 F. Supp. 2d 99 (D.D.C. 2005) .....................................................................24

*S.W. General, Inc. v. Nat'l Labor Rels. Bd.*,
  796 F.3d 67 (D.C. Cir. 2015) ............................................................................22

*Sackett v. EPA*,
  566 U.S. 120 (2012).........................................................................................24

*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020) ............................................................................19

*Sluss v. U.S. Dep't of Justice, Int'l Prisoner Transfer Unit*,
  898 F.3d 1242 ...................................................................................................25

*Smith v. Nixon*,
  807 F.2d 197 (D.C. Cir. 1986) ..........................................................................12

*Sparrow v. United Air Lines, Inc.*,
  216 F.3d 1111 (D.C. Cir. 2000) ..........................................................................5

*State v. Trump*,
  25-cv-01144, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) ..............................7, 8

*Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776, 2025 WL 27162
  (D.D.C. Jan. 3, 2025) .......................................................................................10

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021).....................................................................................7, 13

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019) .............................................................................7

*United Food and Com. Workers Union Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996) ...................................................................................11

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*,
    409 F.3d 359 (D.C. Cir. 2005) .............................................................12, 20

*Venetian Casino Resort, L.L.C. v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008) ...................................................................20

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977). ....................................................................................6

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................17

## Statutes

5 U.S.C. 706(2) ...................................................................................................24

5 U.S.C. § 559 .....................................................................................................30

5 U.S.C. § 704 .....................................................................................................23

5 U.S.C. § 2302(b)(9)(D) ....................................................................................27

5 U.S.C. § 7026(2)(D) .........................................................................................29

44 U.S.C. § 3554(a)(1)(A) ..............................................................................25, 26

44 U.S.C. § 3572(c)(1) .........................................................................................27

Privacy Act of 1974, 5 U.S.C. § 552a.................................................... *passim*

## Regulations

12 C.F.R. 1070.40-48 ...........................................................................................28

12 C.F.R. § 1070.4 ...............................................................................................27

20 C.F.R. 10.10 ....................................................................................................28

45 C.F.R. part 5b ..................................................................................................28

## Other Authorities

Exec. Order No. 14158 ...........................................................................................2

U.S. SENATE COMM. ON GOV. OPS AND U.S. HOUSE COMM. ON GOV. OPS.,
SOURCE BOOK ON PRIVACY, LEGISLATIVE HISTORY OF THE PRIVACY ACT OF
1974, (1976), https://www.justice.gov/d9/privacy_source_book.pdf.......................................9

## INTRODUCTION

In the few short weeks since President Trump created the Department of Government Efficiency ("DOGE"), it has sought and been granted unprecedented access to many of the most sensitive record systems at many of the largest agencies in the federal government. DOGE has been gaining this access at breathtaking speed—speed that makes reasoned agency decisionmaking about DOGE's access impossible and makes judicial review challenging.

To facilitate the speed demanded by DOGE, the Defendant Agencies in this case (the Department of Labor, Department of Health & Human Services, and Consumer Financial Protection Bureau) have, at the drop of a dime, opened their systems unconditionally and without regard to the laws governing access to Americans' data.

These overnight transformations in the protections for millions of Americans' data violate the Administrative Procedure Act, the Privacy Act, and a host of other federal laws and regulations. These laws do not simply disappear in the face of a Presidential assertion of absolute authority to designate any individual for unfettered access to Americans' data.

The Plaintiffs in this case face innumerable harms from the Agency Defendants' new data access policies, from risks to sensitive personal and financial information, to disclosure of the identities of individuals who have aided the agencies' law enforcement missions, to the sudden evisceration of enforcement tools critical to achieving their missions, and have standing to bring the claims in this case.

Further, because Defendants' new data access policies bear all the hallmarks of agency rulemaking (even though the rules have not been publicly disclosed), these policies are properly reviewable under the Administrative Procedure Act.

Finally, DOGE's actions are quintessentially *ultra vires*. No statute created DOGE or imbued it with any authority besides advising the President, yet it asserts unrestricted dominion over federal agencies and their data systems.

## BACKGROUND

### I.  DOGE's Creation and Access to Agency Systems

President Trump created DOGE on his first day in office, ordering all federal agencies to "ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." Exec. Order No. 14158, Establishing and Implementing the President's 'Department of Government Efficiency' § 4(b) (2025) (the "E.O."). The E.O. ordered each agency to host its own "DOGE Team" to implement the "DOGE Agenda." E.O. § 3(c).

The E.O. did not vest any statutory authority in DOGE, nor could it, and Congress has not passed any law vesting DOGE with such authority. DOGE has instead held itself out as a component of the Executive Office of the President whose function is to advise or assist the President. Plaintiffs' First Amended Complaint, ECF No. 21 ("FAC") ¶¶ 47-48.

Since the E.O., DOGE has moved rapidly to take control over sensitive information systems at a number of federal agencies, ordering agencies to grant access, threatening to fire (or firing) federal employees who don't immediately comply with DOGE instructions, and re-working agencies and their IT systems at the will OF DOGE personnel. FAC ¶¶ 49-53. The three Agency Defendants in this case, DOL, HHS, and CFPB, are among the agencies that have implemented policies permitting DOGE to access (and potentially alter) vast troves of sensitive data on millions of Americans.

DOL ordered employees to provide DOGE unfettered access to all sensitive systems, without regard to any existing security protocols. FAC ¶¶ 68-73, 238-39 (describing the "DOL DOGE Access Policy"). DOL's databases include detailed medical information on workers who

have filed medical claims, the identities of confidential witnesses in law enforcement investigations, competitively-sensitive information on union operations, and independently-managed economic data crucial to understanding the state of the country. FAC ¶¶ 81-117.

At HHS, DOGE has requested access to a number of sensitive systems, including the centralized financial accounting systems at the Center for Medicare and Medicaid Services (CMS), and has begun tweeting about "fraud" and "scams" found in HHS services. FAC ¶¶ 118-129, 258 (describing the "HHS DOGE Access Policy"). HHS houses hundreds of systems of records with sensitive information, including detailed medical histories of Medicare and Medicaid patients and personal information about HHS employees and their family members. FAC ¶¶ 130-140.

CFPB gave DOGE access to all unclassified systems, at the same time as the rest of the agency has seemingly been wound down, with most employees barred even from entering the building. FAC ¶¶ 146-154, 251 (describing the "CFPB DOGE Access Policy"). CFPB intakes millions of complaints from consumers who have been harmed by financial institutions, storing information such as Social Security numbers, bank accounts, credit histories, and income. FAC ¶¶ 158-60. It also maintains records of enforcement actions containing whistleblower identities, trade secrets, and proprietary business information, ¶¶ 161-162, and market-wide information collected from individuals but only shared in aggregated or anonymized forms. FAC ¶¶ 163-169.

Access to these systems is not typically granted lightly. Systems access is governed by a number of overlapping laws, including the Privacy Act, Federal Information Security Modernization Act of 2014 (FISMA), and agency- and system-specific regulations. *See* FAC ¶¶ 32-39, 237-264. These rules generally prohibit disclosures of information to unauthorized individuals (including other government employees or agencies), limit the permissible uses of

information stored on government systems, and require public transparency and input when making significant changes to systems access policies. *See id.*

The scope and purpose of DOGE's access to Defendant Agencies' systems is obscured. DOGE appears to be entering Agencies' systems to "dismantle," "slash," and "restructure" federal programs and services. FAC ¶ 41. Given the breadth of DOGE's access across the federal government and the fact that individual DOGE staffers work at multiple agencies concurrently, DOGE appears to be combining and cross-referencing sensitive data collected from across separate systems. FAC ¶ 52. It may be seeking access to competitively sensitive information about Elon Musk and his companies. *See* FAC ¶¶ 74-80. And it appears to be searching sensitive systems for confidential information that it can post on the internet to claim that it has identified fraud. *See* FAC ¶¶ 127-28.

## II.    Plaintiffs' Claims

Plaintiffs are labor unions and non-profit organizations seeking to protect themselves, their members, and the communities they serve from Defendant Agencies' attempts to rewrite, virtually overnight, their rules for accessing Americans' data. The unions have members and employees whose sensitive medical information is stored by DOL and HHS, *see* FAC ¶¶ 136, 176, 182, 200, and members whose identities are currently shielded in conjunction with DOL enforcement proceedings against their employers, FAC ¶¶ 172-175, 190-193, 203-204, 212-213. The unions also seek to protect confidential, competitively-sensitive information stored by DOL on the unions themselves, FAC ¶¶ 104-106, 178, 205, and ensure that their efforts to fight for better treatment of workers aren't compromised by confidentiality breaches at that agency. FAC ¶¶ 175-176, 185, 194, 204, 208, 213. The non-profit organizations also seek to protect the confidentiality of CFPB records so that they can continue assisting consumers harmed by

abusive financial practices using CFPB's enforcement tools, and ensure the integrity of DOL's essential publicly available data. FAC ¶¶ 218, 222-225

Plaintiffs filed this case to protect sensitive data systems at Defendant Agencies and shield their data from unauthorized access by DOGE. Plaintiffs argue that the DOGE Access Policies violate the Administrative Procedure Act and the Privacy Act, and that DOGE's attempts to gain access to Defendants' systems are *ultra vires*. Defendants have now moved to dismiss.

## LEGAL STANDARD

In deciding Defendants' motion to dismiss, under either Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant [P]laintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted); *see, e.g.*, *Grell v. Trump*, 330 F. Supp. 3d 311, 315 (D.D.C. 2018). "[D]etailed factual allegations" are not necessary, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Thus, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, although Defendants' motion may be denied even if "recovery is very remote and unlikely," *id*. at 556. Plaintiffs have satisfied this standard.

## ARGUMENT

Plaintiffs have established their standing—both associational and organizational—to bring this action. And each of Plaintiffs' claims provides an adequate basis on which relief can be granted. Defendants have undertaken final agency action subject to review under the Administrative Procedure Act, and Plaintiffs have alleged that Defendants' action violated numerous laws, including both the Privacy Act and the Administrative Procedure Act itself.

Lastly, Plaintiffs have met the standard to plead an *ultra vires* claim arising from DOGE's unauthorized activities.

## I.    <u>Plaintiffs have standing</u>

Plaintiffs have both associational and organizational standing. Plaintiffs' members would have standing to sue in their own right, but resolution of Plaintiffs' claims will not require the involvement of those members. And Plaintiffs have established their entitlement to organizational standing because the Agencies' DOGE Access Policies directly impair their core missions. As a threshold matter, as long as there is "at least one individual plaintiff who has demonstrated standing to assert these rights as his own" with respect to each defendant, a court "need not consider whether the other ... plaintiffs have standing to maintain the suit." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264 & n. 9 (1977).

### A.    <u>Plaintiffs have associational standing</u>

To demonstrate associational standing, a plaintiff must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. D.C.*, 62 F.4th 567, 572 (D.C. Cir. 2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). When an organization seeks prospective relief on behalf of its members, "actual participation by individual members is generally not required." *Am. Ass'n of Cosmetology Schools v. Devos*, 258 F. Supp. 50, 67 (D.D.C. 2017) (quoting *Warth v. Seldin*, 422 U.S. 490 (1975)). Plaintiffs meet all three elements.

Union Plaintiffs in this case bring claims on behalf of their members whose sensitive data is stored in DOL's and HHS's systems. FAC ¶¶ 172-177, 180-184, 187-88, 190-93, 198-200, 203-10, 212-15. Defendants do not contest that the interests Plaintiffs seek to protect via

associational standing are germane to Plaintiffs' purposes. Defendants also do not argue that the participation of individual members is needed for Plaintiffs' APA or *ultra vires* claims.

> 1.     *Plaintiffs' injuries are concrete and cognizable under Article III, and their members would have standing to challenge the DOGE Access Policies in their own right*

Defendants argue that any access by or disclosures to DOGE, and the corresponding evisceration of federal privacy laws, are harmless under Article III. *See* Defs. Mem. Supp. Mot. To Dismiss, ECF No. 49-1 ("MTD") at 14-18. But, as a number of other courts have recognized, Defendants' arguments ignore the differences between retrospective and injunctive relief, and improperly minimize the harms to Plaintiffs.

Plaintiffs suffer "concrete" injuries when they are subjected to "reputational harms, disclosure of private information, [or] intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). When a plaintiff is "exposed to a risk of future harm" of this sort, they "may pursue forward-looking, injunctive relief to prevent the harm from occurring." *Id.* at 435.

An agency's "failure to adequately secure its databases" creates the sort of "substantial risk" to plaintiffs whose personal information is stored that constitutes a "concrete, particularized, and actual injury in fact" for Article III standing. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54-55 (D.C. Cir. 2019) ("*OPM Breach*"). While the *OPM Breach* case predated *TransUnion*, courts in this district and elsewhere have continued to find that plaintiffs have standing to seek injunctive relief to cure security failures by custodians of their records. *See*, *e.g.*, *Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*, No. 23-cv-3570, 2024 WL 4239936 at *4 (D.D.C. Sep. 19, 2024) (Plaintiffs have standing to bring claims against a defendant's "continued failure to adequately secure [their] databases," because these failures create a "substantial risk [ ] sufficient to support standing for injunctive relief."); *State v. Trump*, 25-cv-01144, 2025 WL 573771 at *12 (S.D.N.Y. Feb. 21, 2025) ("*N.Y. v. Trump*")

("Courts have routinely found that plaintiffs have standing to seek injunctive relief where inadequate cybersecurity measures put their confidential information at risk of disclosure.") (collecting cases).

Other courts have recently grappled with DOGE's access to sensitive data at federal agencies and found concrete injuries to plaintiffs whose data is stored. As one court found, "there is a realistic danger that the rushed and ad hoc process that has been employed to date by the Treasury DOGE Team has increased the risk of exposure of [plaintiffs'] information." *N.Y. v. Trump*, 2025 WL 573771 at *12. Another rejected the same argument that the government makes in this case about internal information sharing, *see* MTD at 17, concluding that "[t]o say that the plaintiffs suffer no cognizable injury when their personal information is improperly disclosed to government employees would nullify their interest in preventing unlawful government intrusion into their private affairs." *Am. Fed. Teachers v. Bessent*, 8:25-cv-00430, 2025 WL 582063 at *7 (D. Md. Feb. 24, 2025).

The Plaintiffs in this case similarly seek to protect personal and competitively sensitive information from the risks of disclosure caused by the DOL and HHS DOGE Access Policies, which have left Plaintiffs' data inadequately secured in violation of multiple laws and the agencies' own policies. These injuries are cognizable under Article III, and Plaintiffs may seek injunctive relief to correct them.

Defendants' counterarguments are not persuasive. First, Defendants seek to frame the standing inquiry as whether Plaintiffs would be entitled to retrospective relief, asking whether the agencies have yet "released confidential information to injure or defame" Plaintiffs, or intruded on the personal privacy of Plaintiffs or demonstrated an intent to do so. *See* MTD at 15.

But Defendants entirely ignore the long line of cases, described above, finding that plaintiffs may seek *injunctive relief* to correct security failures by custodians of their sensitive data.

Second, Defendants argue that improper data sharing within the Executive Branch cannot harm Plaintiffs, because, as agents of the President, DOGE must have unfettered access to all Executive Branch records. *See* MTD at 17. Defendants cite no caselaw for the proposition that the President has absolute authority to disregard the Privacy Act's protections, nor could they have given longstanding separation of powers principles.

The government's position would come as a surprise to the Privacy Act's author, Senator Sam J. Ervin, Jr., who said when introducing the Act that the Watergate scandal had taught Americans that "there must be limits upon what the Government can know about each of its citizens," and that the Act would, in part, ensure that "[f]ederal agencies are specifically restricted in disseminating information only to authorized employees of Federal agencies." Introductory remarks of Senator Sam J. Ervin, Jr. on S. 3418 (19474), *reprinted in* U.S. SENATE COMM. ON GOV. OPS AND U.S. HOUSE COMM. ON GOV. OPS., SOURCE BOOK ON PRIVACY, LEGISLATIVE HISTORY OF THE PRIVACY ACT OF 1974, at 3, 8 (1976), https://www.justice.gov/d9/privacy_source_book.pdf. Defendants should not be permitted to pull the rug out from American's feet after over 50 years of sensitive data collection under the Privacy Act. Their assertion of Presidential power to ignore a longstanding statute properly passed by Congress would disrupt the settled constitutional order and should be rejected out of hand.

Finally, Defendants point to *Laird v. Tatum* as foreclosing claims against agencies for information collections on the theory that an agency "might in the future take some other and additional action detrimental to" a plaintiff. *See* MTD at 16-17 (citing 408 U.S. 9-10 (1972)).

9

*Laird* is readily distinguishable. It concerned information that amounted to "nothing more than a good newspaper reporter would be able to gather by attendance at public meetings and the clipping of articles from publications available on any newsstand." 408 U.S. at 9. Here, Plaintiffs seek to protect some of the most sensitive information that the government stores about individuals, that is not readily available to the general public. And granting relief to Plaintiffs here would simply involve restoring system access policies that existed two months ago, far from the "broad-scale investigation . . . into the Army's intelligence-gathering activities" that the *Laird* Court sought to avoid. *Id.* at 14. Lastly, *Laird* was decided before Watergate and the Privacy Act. While the *Laird* Court may have believed at the time that Americans are not harmed by "data-gathering activity that is . . . broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose," *id.* at 10, Watergate soon led Congress to a very different conclusion.

2. *Plaintiffs' members need not participate individually in Plaintiffs' Privacy Act claims*

Organizations may not bring claims on behalf of their members where adjudicating members' claims would require "individualized proof" that cannot be "properly resolved in a group context." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 344 (1977). However, as Defendants' brief implies, this prong is typically a barrier to associational standing in cases seeking *monetary* relief, because individualized proof of damages requires the participation of members. *See* MTD at 18 (citing *Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776, 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025). But requests for "declaratory and injunctive relief" typically do not require such individualized proof. *See Hunt*, 432 U.S. at 344; *see also*, *e.g.*, *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 53 (D.C. Cir. 1988) ("the

10

declaratory and injunctive relief requested by the Society is clearly not of a type that requires the participation of any individual member").

Here, Plaintiffs seek declaratory and injunctive relief of precisely the type that courts allow to proceed because they don't need individualized proof. However, Defendants assert that because the Privacy Act "provides only for damages, not injunctive relief," Plaintiffs cannot rely on associational standing for claims arising under the Privacy Act. MTD at 18.[1]

The Privacy Act provides for judicial review of claims that the government has "fail[ed] to comply with" certain of its provisions, including the disclosure provisions of § 552(b) that are central to this case, "in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D). It has long been established that when Congress thus authorizes jurisdiction, courts' "inherent equitable powers . . . are available for the proper and complete exercise of that jurisdiction," and cannot "be denied or limited in the absence of a clear and valid legislative command." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

As such, courts have contemplated the Privacy Act as providing for broader equitable relief than simply the provisions of § 552a(g)(1) and (g)(2). *See, e.g.*, *Haase v. Sessions*, 893 F.2d 370, 374 n.6 (D.C. Cir. 1990) ("[i]t is not at all clear . . . that Congress intended to preclude

---

[1] Defendants also gesture at an argument that because the Privacy Act provides relief for "individuals," associational standing is unavailable. MTD at 18. This underdeveloped argument ignores that the purpose of the third prong of the associational standing test is prudential one, focused on "administrative convenience and efficiency," rather than a formal inquiry into the "elements of a case or controversy within the meaning of the Constitution." *United Food and Com. Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 557 (1996). The core of this prong is an inquiry into whether a litigant may effectively "assert the right[] of absent third parties." *Id.* Thus, for example, a labor union was found to have associational standing to challenge violations of HIPAA and the Privacy Act, where "individualized inquiry [was] not required to resolve the broader legal question[s]" of the agency's authority to seek disclosures of private information. *Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d. 665, 672 (S.D.N.Y. 2009).

broad equitable relief (injunctions) to prevent" violations of 552a(e)(7)"); *see also Smith v. Nixon*, 807 F.2d 197, 204 (D.C. Cir. 1986) (stating that courts may use equitable authority to order expungement of records in an action brought under 552a(e)(7)). Because this Court retains inherent authority to grant equitable relief under the Privacy Act, participation of Plaintiffs' members is not required for associational standing.

    B.    <u>Plaintiffs have organizational standing</u>

        *1.    Plaintiffs' have alleged that they have been injured by Defendant Agencies' sharing their data*

First, certain organizations have sufficiently alleged concrete and particularized injury traceable to Defendants' conduct because they allege their own organizational data has been compromised. As a general matter, where "new obstacles unquestionably make it more difficult for [organizational plaintiffs] to accomplish their primary mission . . . they provide injury for purposes both of standing and irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*AHM*") (standing established if a defendant "directly affected and interfered with [the plaintiff's] core business activities"). Organizations sufficiently allege standing when they allege that defendants' disclosure of their information will "harm [their] concrete and particularized interest in retaining the confidentiality of protected information." *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 367 (D.C. Cir. 2005); *see also 100Reporters LLC v. U.S. Dep't of Just.*, 307 F.R.D. 269, 283 (D.D.C. 2014).

Here, AFL-CIO and CWA both allege that they submit their own sensitive data, including sensitive union financial and membership information and complaints regarding the infringement of the union's own rights, to DOL's Office of Labor-Management Standards system. Am. Compl. ¶¶ 178, 205. Due to the sensitive and confidential nature of this information, these unions have a

concrete and particularized interest in the confidentiality of that information and are therefore injured by the unlawful disclosure of that information. Am. Compl. ¶¶ 177, 205. And for the reasons described above in Section I.A.1, continued risk of ongoing and further disclosure again allows Plaintiffs to "pursue forward-looking, injunctive relief" to address concrete harms. *TransUnion*, 594 U.S. at 435.

The Defendant Agencies contend that Plaintiffs' injuries constitute mere "disagreement with the judgments made by the Executive Branch" and, as a result are "not concrete and are highly speculative." Mot. to Dismiss at 19. But this is wrong. As explained below in Section II.A.2, Defendant Agencies are only permitted to share sensitive data under narrow and specific circumstances, none of which Plaintiffs allege are present here. Am. Compl. ¶¶ 6, 7, 32-39, 41-53, 68-117. Moreover, far from speculating, Plaintiffs allege that the injury they have suffered—the unlawful sharing of their organizational information—has already occurred and is ongoing. Am. Compl. ¶¶ 6, 7, 49-53, 68-129.

### 2.    *The DOGE Access Policies directly impair Plaintiffs' core activities*

Certain Plaintiffs have organizational standing because the DOGE Access Policies directly impair Plaintiffs' organizational activities. Throughout briefing in this matter, the Parties have, at times, assumed that Plaintiffs must demonstrate both the impairment of their activities *and* diversion of their resources to counteract that frustration to establish organizational standing. The Supreme Court recently clarified, however, that an organizational plaintiff can establish standing merely by showing that the defendant's actions "perceptibly impaired" its organizational activities, without a separate showing that the organization diverted resources. *AHM*, 602 U.S. at 395-96; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can

13

be no question that the organization has suffered injury in fact."). Since the Supreme Court

decided *AHM*, multiple circuit courts have confirmed this understanding. *See, e.g.*, *Ariz. All. for*

*Retired Ams. v. Mayes*, 117 F.4th 1165, 1180 (9th Cir. 2024) ("As the Supreme Court explained, a

plaintiff group has organizational standing if it can show harm to its 'core business

activities'…."); *Fair Hous. Ctr. of Metro Detroit v. Singh Senior Living, LLC*, No. 23-3969 (6th

Cir.), Dkt. 56-2 at 3 ("If, for example, a defendant's actions interfered with the counseling and

referral services that a housing organization provided, that conduct could suffice to establish

standing."). In this case, the Court does not need to decide whether a diversion requirement

exists because Plaintiffs adequately pled diversion of their resources and thus adequately pled

organizational standing under either standard.

   With respect to the first prong, certain Plaintiffs have standing because they have alleged

that the unlawful disclosure of sensitive data by the Defendant Agencies perceptibly impairs core

organizational activities central to their missions of assisting members. Plaintiff unions AFL-

CIO, AFGE, SEIU, and CWA allege that their core organizational activities include filing

complaints and claims and assisting their members to file complaints with DOL. *See* FAC ¶¶

170, 182, 191-92, 203, 206-07, 212.

   Similarly, VPLC and EAM allege that their core activities include counseling consumers

in filing complaints to the CFPB's Consumer Response system. *Id.* ¶¶ 220-22. All of these

plaintiffs allege that these complaints include sensitive and confidential information, and that

they can only file and counsel others to file complaints and claims with DOL and the CFPB

because of the confidentiality and integrity of the agencies' complaint systems. *See id.* ¶¶ 172-75,

182, 185, 192-94, 204, 208, 212-13, 221, 223. Defendants' unlawful disclosure of data from

these systems effectively renders them unavailable to Plaintiffs and thus impairs Plaintiffs' core

organizational activities. *See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
797 F.3d 1087, 1094 (D.C. Cir. 2015) ("*PETA*") (holding that depriving an organization of the
ability to use a complaint procedure perceptibly impaired its core organizational activities); *see
also Fair Emp't Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268,
1276 (D.C. Cir. 1994) (finding sufficient that conduct made plaintiff's "overall task more
difficult"); *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, No. 14-1915, 2016 WL
4435175, at *6 (D.D.C. Aug. 19, 2016) (sufficient that the challenged conduct "undermine the
organization's ability to perform its fundamental programmatic services"). Because these
organizations have suffered this concrete and particularized injury, they have organizational
standing.

Similarly, AFT, EPI, VPLC and EAMF have standing to challenge data disclosures at
CFPB. These Plaintiffs allege that their core organizational activities include conducting research
and direct services work that relies on data collected by CFPB, including through its public
complaint database. Am. Compl. ¶¶ 217-18, 223.[2] They further allege that the utility of this data
depends on its integrity and confidentiality, *id.* ¶¶ 217-18, 223, and that the integrity and
confidentiality of the CFPB databases have been compromised through the unlawful and
unnecessary disclosure of data to DOGE Employees, *id.* ¶¶ 147-69.[3] Because the CFPB DOGE

---

[2] Defendants characterize these plaintiffs' injury as a "informational injury." Mot. to Dismiss at
20. This is not correct. In the D.C. Circuit, informational standing has specific requirements that
are independent from those of organizational standing. *See, e.g.*, *Nat'l Women's L. Ctr. v. Off. of
Mgmt. & Budget*, 358 F. Supp. 3d 66, 78 (D.D.C. 2019) (discussing both types of standing).
Rather, these plaintiffs allege that they have standing because their core activities have been
impaired by Defendant Agencies' conduct. *Id.*

[3] Indeed, declarations filed in the District of Maryland regarding the illegal dismantling of the
CFPB demonstrate that the CFPB's databases, including its public complaints database, have in
fact already begun to deteriorate. *See Nat'l Treasury Employees Union v. Vought*, 1:25-cv-00381,
Dkt. 38-4 at ¶¶ 5, 12 (Decl. of Charlie Doe), Dkt. 38-5 at ¶¶ 6, 9-10 (Decl. of Drew Doe), Dkt.
38-9 at ¶¶ 2-8, 11-17 (Third Decl. of Erie Meyer).

Access Policy renders the agency's databases effectively useless, the policy has perceptibly impaired this set of Plaintiffs' core research activities and they consequently have standing. *Cf. Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986) ("[T]he challenged regulations deny the AASC organizations access to information and avenues of redress they wish to use in their routine … activities."); *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, 358 F. Supp. 3d 66, 78 (D.D.C. 2019) (EEOC's failure to produce pay data on which organization relied for its activities was sufficient injury to establish organizational standing).

### 3.    Plaintiffs allege that the DOGE Access Policies force Plaintiffs to divert resources

Assuming the second prong of organizational standing is still required after *AHM*, Plaintiffs have also sufficiently alleged that they will divert resources to counteract the effects of Defendants' illegal conduct—which Defendants largely do not dispute.[4] Defendants only specifically challenge the sufficiency of the diversion allegations pled by VPLC and EAMF, claiming that these Plaintiffs allege that they will shift resources toward "roles" that Defendants claim are "already part of those organizations' mission" and that shifting resources towards those activities "is not sufficient to demonstrate injury." Mot. to Dismiss at 20.

This argument misrepresents the law in the D.C. Circuit. Before *AHM*, the D.C. Circuit repeatedly held that in order to establish diversion of resources, an organization need only show that it "used its resources to counteract [defendant's] harm." *PETA*, 797 F.3d at 1093 (quoting *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). Indeed, courts in this

---

[4] Plaintiffs' declarations attached to their Motion for a Temporary Restraining Order include further details about the diversion of Plaintiffs' resources from their organizational activities to counteract Defendants' illegal actions. *See* Dkt. 29-8 at ¶ 19; Dkt. 29-14 at ¶¶ 18-19, Dkt. 29-23 at ¶ 17.

circuit have expressly recognized that an increased demand on an organization's services such that the organization must divert resources from other activities to respond to the demand—in other words, diverting resources to do more of what an organization already does—is sufficient to establish diversion. *See*, *e.g. Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 22 (D.D.C. 2020); *D.C. v. USDA*, 444 F. Supp. 3d 1, 40–42 (D.D.C. 2020).

*Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 412-13 (D.C. Cir. 2024), on which Defendants exclusively rely for this alleged rule, plainly does not say what Defendants claim. At most, *Iowaska Church* stands for the unremarkable proposition that an organizational plaintiff must show a "concrete and demonstrable injury to the organization's activities" rather than "simply a setback to its abstract social interests." *Id.* VPLC and EAMF do just that: they allege that their core activities of filing and counseling others to file complaints with the CFPB depend on the confidentiality and integrity of CFPB databases, that the CFPB DOGE Access Policy therefore perceptibly impairs those organizational activities, and that they will need to divert resources from other organizational activities to counteract the consequences of CFPB's actions. Am. Compl. ¶¶ 220-25. At this early stage of the litigation these allegations are more than sufficient to plead diversion.

## II.    **This Court can grant relief for Plaintiffs' claims**

Plaintiffs have alleged several distinct claims on which this Court could grant relief. Defendants' access policies constitute final agency action subject to Administrative Procedure Act review, and various violate the Privacy Act, the APA itself, and other laws. DOGE has also acted in excess of its very limited authority, and Plaintiffs have alleged an *ultra vires* claim against that conduct.

17

A.    Defendants' Access Policies violate the APA

Defendants' access policies are the consummation of decisionmaking at respective Defendant agencies, and significant legal consequences flow from each of those policies—they are final agency action subject to review under the Administrative Procedure Act. They are also unlawful: they violate the Privacy Act, the Administrative Procedure Act itself, and numerous other laws.

1.    The Access Policies are final agency action

Adoption of a new policy of information disclosure—or change of an existing one—is indisputably final agency action. And that is precisely what Defendants have done here: changed their policies for access to systems or adopted wholly new policies. Defendants argue that they have done nothing more than grant systems access to certain individuals, and that routine grants of access to employees are not final agency action subject to APA review. But Plaintiffs are not challenging routine grants of access—they are challenging systemic decisions to grant full and unusual levels of access to everyone affiliated with a certain government entity. Those decisions are not rote individual applications of an agency's standing policy and procedures for systems access; instead, they represent a new policy of blanket access for all DOGE personnel.

Each agency Defendant maintains—or did until recently—careful protocols regarding systems access, ensuring, among other things, that access is subject to and consistent with applicable laws. *See* FAC ¶¶ 32-39, 237-264. Agencies concededly may grant access to systems "thousands," of times each day under their access policies, MTD at 22, but each of those grants is simply an effectuation of a policy. *See Chem. Weapons Working Grp., Inc. v. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997) (individual instance of weapons disposal pursuant to previously finalized disposal plan was "the implementation of a final disposition already made" and thus not final agency action) (quotation marks omitted). In contrast, the Defendant agencies

18

adopted new policies of granting access to DOGE personnel in significant departures from their prior existing protocols and policies. *See* FAC ¶¶ 68-73, 118-129, 146-154, 238-39, 251, 258. Plaintiffs challenge those new *policies*; and judicial review of agency policies—as opposed to individual decisions made pursuant to those policies—is far from the day-to-day oversight Defendants portray it to be. MTD at 22.

Defendants separately argue that their DOGE access policies do not satisfy the second factor for identifying final agency action under *Bennett v. Spear*, 520 U.S. 154 (1997).[5] Defendants are wrong. "[R]ights or obligations have been determined" and "legal consequences will flow," *id.* at 177-178, from Defendant agencies' adoption of new access policies granting DOGE affiliates unbridled access to agency systems. The policies abrogate the rights of those— including plaintiffs' members—whose information has been accessed, determines legal obligations for those employees who are required to provide unlawful access to DOGE personnel, and gives rise to substantial legal consequences by requiring violation of several laws.

Defendants' authorities purportedly to the contrary are inapposite or support a conclusion that the access policies at issue here satisfy the second *Bennett* factor. In *Nat'l Mi. Ass'n v. McCarthy*, 758 F.2d 243 (D.C. Cir. 2014), the D.C. Circuit concluded that non-binding policy recommendations were not final agency action in part because anyone covered by it could ignore it without consequences. The D.C. Circuit reached the same conclusion about other guidance that affected entities were free to ignore in *Sierra Club v. EPA*, 955 F.3d 56 (D.C. Cir. 2020). But the policies here cannot simply be ignored: agency employees *must* comply with them, and their consequences—including the unlawful disclosure of plaintiffs' members' information—are

---

[5] Defendants apparently do not dispute that the access policies reflect the consummation of agency decisionmaking, thus satisfying the first *Bennett* factor.

19

unavoidable. Further, the policies reflect Defendant agencies' determination that "to comply with the Privacy Act, they do not need the plaintiffs' written authorization to disclose their records to DOGE affiliates. Thus, [the agencies] made determinations about the plaintiffs' rights to protect their personal information and the agencies' legal obligations under the Privacy Act." *Amer. Fed'n. of Teachers v. Bessent*, 2025 WL 582063 at *8 (D.Md. Feb. 24, 2025) (concluding that similar agency decisions to grant DOGE access to systems containing personally identifiable information constituted final agency action).

      Finally, binding authority leaves no question that agency policies concerning disclosure of information are final agency action. In *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008), the D.C. Circuit held that the Equal Employment Opportunity Commission's adoption of a policy allowing disclosure of an employer's confidential information without notice to that employer constituted final agency action reviewable under the APA. The D.C Circuit treated this question as so self-evident that its discussion of the issue was limited to an acknowledgment that the policy was "surely a 'consummation of the agency's decisionmaking process,' and 'one by which . . . rights and . . . obligations have been determined.'" *Id.* (quoting *Bennett*, 520 U.S. at 177-178). Defendants attempt to distinguish *Venetian Casino* by emphasizing that it concerned a policy of disclosure of information. This is no distinction: the various policies adopted by agency Defendants also concern policies of disclosure; disclosure occurs whether an agency transmits information or simply grants access to outsiders. In fact, while the policy at issue in *Venetian Casino* only *allowed* disclosure, the policies here *require* disclosure—if anything, such policies are even more clearly final agency action.

2.    *The Access Policies violate the Privacy Act*

The Privacy Act of 1974 was passed to "provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies" to, among other things, "collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose . . . and that adequate safeguards are provided to prevent misuses of such information." Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 §§ 2(b), 2(b)(4) (1974) (Congressional Findings and Statement of Purpose, codified at 5 U.S.C. § 552a note). "[I]n order to protect the privacy of individuals identified in information systems maintained by Federal agencies," Congress decided "to regulate the collection, maintenance, use, and dissemination of information by such agencies." *Id.* § 2(a)(5).

The Privacy Act regulates the disclosure of records, and imposes requirements on agencies to responsibly maintain sensitive record systems. With respect to disclosure, the Act provides, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b).

Agency Defendants' systems collectively house hundreds of systems of records subject to the Privacy Act, many of which contain personally identifiable information. FAC ¶¶ 81-117, 130-140, 155-169. Because DOGE is an entity within the White House rather than within any of the Agency Defendants, any disclosure of records containing PII by the Department to DOGE and DOGE staff would fall under the prohibition in § 552a(b).

Defendants argue that the Privacy Act's restrictions on data sharing across agencies may be overcome by the use of detailing authority, and that that authority is effectively unreviewable. *See* MTD 29-30.

The zone-of-interests test invoked by Defendants is "not meant to be especially demanding," and must be applied "in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (internal citations and quotations omitted). Claims may be litigated under the APA even when an underlying statutory violation lacks "any indication of congressional purpose to benefit the would-be plaintiff," and "the benefit of any doubt goes to the plaintiff." *Id.* This "lenient approach" advances "the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

While the Economy Act itself has not been heavily litigated, courts have regularly inquired into whether a government official is validly serving in their role to determine whether actions they took may be lawful. *See, e.g., S.W. General, Inc. v. Nat'l Labor Rels. Bd.*, 796 F.3d 67 (D.C. Cir. 2015) (vacating an order by the NLRB because the Acting General Counsel of the NLRB could not legally serve in their position under the Federal Vacancies Reform Act).

Plaintiffs allege that DOGE has no legal authority to access sensitive systems at Defendant Agencies, nor any authority to detail employees to Defendant Agencies in order to access those systems. *See* FAC ¶¶ 234-35. These questions of what sort of entity DOGE is, what legal authority it has, and what power it may exercise standing in the shoes of an agency, are as susceptible to judicial review in an APA case as whether a statutory line of succession was

followed. *See, e.g., L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 19, 25-26, 34-36 (D.D.C. 2020) (setting aside actions taken by an unlawfully-appointed USCIS director as in excess of statutory authority under the APA).

> 3.    *Defendants' failures to comply with the Privacy Act are reviewable under the APA*

Defendants argue that new agency-wide access policies are unreviewable, and that plaintiffs being harmed by systematic unlawful disclosures must simply wait to be alerted to a data breach and sue for damages later. *See* MTD at 27-28. The Privacy Act and the APA do not mandate such an outcome.

Plaintiffs may challenge agency action under the APA unless other laws provide for an "adequate remedy in court." 5 U.S.C. § 704. And as the Supreme Court has noted, "[t]he Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law'—which means, of course, *any* law." *F.C.C. v. NextWave Personal Comms, Inc.*, 537 U.S. 293, 300 (2003) (citing 5 U.S.C. § 706(2)(A)) (emphasis in original).

While the Privacy Act lists some remedies available for violations—injunctive relief to force the release or modification of records, and monetary damages for unlawful disclosures, 5 U.S.C. § 552a(g)(3), (g)(4)—these do not displace judicial review of agency action under the APA. Many courts, including in this Circuit, have acknowledged the APA as a mechanism for providing injunctive relief beyond the remedies listed in the Privacy Act. The Supreme Court has noted that the "inattention" of the Privacy Act's text to the "standards of proof governing equitable relief that may be open to victims of adverse determinations or effects . . . may be . . .

explained by the general provisions for equitable relief within the" APA. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004).

In *Doe v. Stephens*, the D.C. Circuit considered a claim that the Veterans Administration improperly disclosed medical records in violation of the Privacy Act. 851 F.2d 1457, 1460-61, 1463 (D.C. Cir. 1988). After finding that the "Privacy Act [did] not by itself authorize the injunctive relief sought by Doe," the court went on to explain that such relief nevertheless *was* available under the APA, because Doe's "clearly [was] a case of agency action 'not in accordance with law' within the meaning of 5 U.S.C. 706(2) . . . [where] the disclosure of Doe's psychiatric records violated the Veterans' Records Statute, as amended by the Privacy Act." *Id.* at 1463, 1466.

And in *Radack v. U.S. Dep't of Just.*, another judge in this district explicitly held that the Privacy Act does not provide an adequate remedy for plaintiffs who seek declaratory and injunctive relief, and that the APA is the source for equitable relief to such plaintiffs. 402 F. Supp. 2d 99, 104 (D.D.C. 2005). The APA is a particularly appropriate vehicle where a plaintiff alleges a "violation of [an agency's] own internal policies" with respect to disclosures subject to the Privacy Act. *Id.*

Plaintiffs here seek injunctive relief to halt Defendants' DOGE Access Policies, because those policies violate the APA in a number of ways, including being contrary to the Privacy Act. FAC ¶¶ 237-64. As described in Section I.A.1, above, Defendants' DOGE Access Policies bear all the hallmarks of final agency action reviewable under the APA. The Privacy Act by itself does not provide an adequate remedy for Plaintiffs' claims.

That is particularly true here, where the government's position that they are simply proceeding lawfully will frustrate access to the Privacy Act's listed remedies. *Cf. Sackett v. EPA*,

566 U.S. 120, 127 (2012) (APA review must be available where a Plaintiff is "cannot initiate" the alternate statutory remedy and must simply await further injury). The government will not treat DOGE's access as a data breach, will not provide Plaintiffs or their members notice of a disclosure to facilitate claims for retrospective relief under the Privacy Act, and will not provide notice or an opportunity for public input on their changes to agency access policies. The APA provides the only adequate remedy for Plaintiffs' claims.

4.    *The Access Policies violate other laws and regulations*

*The Federal Information Security Modernization Act*: FISMA mandates that the "head of each agency shall be responsible for providing information security protections commensurate with the risk and magnitude of the harm resulting from unauthorized access, use, disclosure, disruption, modification, or destruction of" information or information systems maintained by the agency. 44 U.S.C. § 3554(a)(1)(A). Defendants have failed to meet FISMA's mandate.

Defendants point to caselaw in this Circuit that has resisted judicial review of agencies' exercise of discretion in carrying out their FISMA duties. MTD at 30 (citing *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006). But a statute may provide an agency wide latitude, using language that "smacks of flexibility," while still allowing for "barebones review" that an agency is complying with its basic obligations. *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 492, 494 (2015). Where a statute directs an agency official to consider certain factors when making a decision, "narrow" review is available to "ensure that the [official] addressed the terms" of the statute while still "allowing the exercise of broad discretion" by refusing to "reach the correctness of the [official's] assessment of the factors considered or of the ultimate decision." *Sluss v. U.S. Dep't of Justice, Int'l Prisoner Transfer Unit*, 898 F.3d 1242, 1252.

While FISMA may not provide for searching review of the DOGE Access Policies, at a minimum the Agencies' decision-making should evince *some* consideration of the "risk and

25

magnitude of the harm resulting from" unauthorized uses of Agencies' systems. Plaintiffs allege that DOGE demands and grants itself access to Agencies' systems, that this access happens "roughly overnight," that the access DOGE is granted is unfettered, that Defendant Agencies' employees have specifically been directed to *ignore* existing security protocols to grant DOGE access, and that the DOGE Access Policies have been implemented without complying with any of the procedural requirements or documentation that would enable or evidence any consideration of the risks of harm. FAC ¶¶51, 68-69, 147-50, 248, 256, 263. The facts alleged by Plaintiffs are entirely distinct from cases such as *Cobell*, where a court was asked to study a years-long record of an agency's IT decisions and changes, including reports to Congress and multiple inspector general reports, to make its own judgments about an agency's compliance with FISMA. *See* 455 F.3d at 307-311. The facts here suggest *no* meaningful attempt by the agency to consider or comply with FISMA requirements, an approach that should be susceptible to judicial review.

 *Confidential Information Protection and Statistical Efficiency Act*: Defendants argue that Plaintiffs' CIPSEA claims must fail because Plaintiffs have not yet shown actual access of BLS data by DOGE. MTD at 32. But Plaintiffs allege that Defendants have already been granted unfettered access to all DOL systems. FAC ¶¶ 68-69, 238. Further, Plaintiffs have alleged that DOGE is likely to "demand access to BLS data," and alleged that President Trump has repeatedly criticized BLS's data quality when it doesn't further his political needs and may seek to alter data to support his political needs. FAC ¶¶ 115-16.

 Confusingly, Defendants argue that Plaintiffs have not pled that disclosures to DOGE would be prohibited under CIPSEA. MTD at 32. But Plaintiffs explained that CIPSEA prohibits agencies from disclosing data collected pursuant to CIPSEA, FAC ¶ 29 (citing 44 U.S.C. §

3572(c)(1)), and Plaintiffs' arguments about disclosures to DOGE in the context of the Privacy Act apply equally to CIPSEA. And disclosure of CIPSEA data to further the President's political needs would not be an "exclusively statistical purpose" contemplated by CIPSEA. 44 U.S.C. § 3572(c)(1).

*HIPAA*: Defendants argue that because HIPAA does not provide a private cause of action to individuals, that DOGE Access Policies cannot be contrary under the APA to law if they violate HIPAA. *See* MTD at 32-33. Defendants cite no case for the proposition that "APA review is precluded" for agency policies that violate HIPAA. *Id.* Indeed, the D.C. Circuit has previously undertaken precisely this inquiry. *See Ass'n for Comm. Affiliated Plans v. U.S. Dep't of Treasury*, 966 F.3d 782, 787-88 (D.C. Cir. 2020). As with Plaintiffs' Privacy Act claims, the explicit remedies available under HIPAA should not be read to preclude APA review of agency policies that violate HIPAA's mandates.

*Other provisions*: Defendants argue that Plaintiffs' allegations that the DOGE Access Policies violate various agency regulations should be dismissed because DOGE's access to agency data does not constitute a "disclosure." MTD at 33 (citing 20 C.F.R. § 10.10, 12 C.F.R. § 1070.59, 45 C.F.R. § 5b). These regulations are each agency's implementing regulations for the Privacy Act; for the reasons described above, in Section II.A.2, Plaintiffs have adequately pled that disclosures to DOGE constitute disclosures under the Privacy Act, and thus also under these regulations.

Similarly, Defendants argue that Plaintiffs have not alleged violations of 12 C.F.R. § 1070.4 (disclosure to non-CFPB employees) or 5 U.S.C. § 2302(b)(9)(D) (threatening federal employees with termination for refusing unlawful orders), both of which ultimately turn on whether the DOGE Access Policies are legal and whether DOGE personnel may legally be

treated as agency employees under the Privacy Act. For the reasons described above, these claims should not be dismissed.

          5.    *The Access Policies are procedurally infirm*

It is a well-established principle of administrative law that "the Administrative Procedure Act requires agencies to afford notice of a proposed rulemaking and an opportunity for comment prior to . . . the promulgation, amendment, modification, or repeal" of a rule. *Liquid Energy Pipeline Ass'n v. Fed. Energy Regul. Comm'n*, 109 F.4th 543, 547 (D.C. Cir. 2024) (citations omitted). *See, e.g.* 20 C.F.R. 10.10 (governing FECA at Department of Labor); 12 C.F.R. 1070.40-48 (governing confidential data at CFPB); 45 C.F.R. part 5b (privacy act regulations for HHS). Those regulations were promulgated through notice-and-comment rulemaking, and the Administrative Procedure Act prohibits Defendants from amending or repealing them without first engaging in notice-and-comment rulemaking once again. But that is exactly what Defendants have done.[6]

Defendants also failed to undertake notice-and-comment rulemaking required to amend the Systems of Record Notices (SORNs) which control the use of their various systems. The Privacy Act, 5 U.S.C. § 552a(e)(4), requires agencies to publish such SORNs in the Federal Register and to provide an opportunity for public comment. And each time an agency seeks to add a new category of routine use for the information covered by a SORN, it must therefore do so by notice and comment. 5 U.S.C. § 552a(e)(11). But Defendant agencies have attempted to create a new routine use for information in their systems of record—blanket disclosure to

---

[6] Nor is it any answer to characterize the agencies' new policies as exceptions to their prior and permanent ones; the policies do not contemplate such exceptions, and in any event, notice and comment is required even for brief pauses of rules adopted by notice and comment. *Clean Air Council v. Pruitt*, 862 F.3d 1, 8-9 (D.C. Cir. 2017) (agency is required to follow notice and comment even to "issue a brief stay" of a rule promulgated through notice and comment).

DOGE—without following the required notice and comment processes for adding a new routine use to their extant SORNs.

Defendants do not dispute that they were required to undertake notice-and-comment rulemaking to change their privacy regulations and SORNs. Nor do they dispute their failure to do so. Instead, Defendants simply repeat their inaccurate assertion that DOGE affiliates are merely "individuals working for the" Defendant agencies, Mot. at 34, and that those affiliates' access therefore did not require any change to regulations or SORNs. If the DOGE affiliates were not properly employees of the relevant Defendant agencies, Defendants have effectively conceded that their failure to undertake notice-and-comment rulemaking violated 5 U.S.C. § 7026(2)(D).

      B.    <u>Defendants' Access Policies violate the Privacy Act</u>

Defendants argue that Plaintiffs' claims arising directly under the Privacy Act should be dismissed because associations are not proper plaintiffs under the Act, because injunctive relief is not available under the Act, and because Defendants have not violated the Privacy Act. *See* MTD at 34-35. For the reasons stated in Sections I.A.2 and II.A.2, above, these arguments should be rejected.

      C.    <u>Defendant DOGE is operating *ultra vires* and Defendants DOL, HHS, and CFPB may be enjoined from executing DOGE's orders</u>

 Finally, Plaintiffs sufficiently allege an ultra vires claim against Defendants U.S. DOGE Service and U.S. DOGE Service Temporary Organization.

An ultra vires claim is a non-statutory claim for judicial review of lawless government actions. "Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law . . . . All the officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it." *Butz v. Economou*,

438 U.S. 478, 506 (1978). Ultra vires review serves to avoid leaving "the individual . . . to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902). A governmental official or entity's action is ultra vires where it is "plainly beyond the bounds" or "clearly in defiance" of their lawful authority. *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

"Courts have long recognized that an aggrieved party can sue in federal court to challenge agency action as *ultra vires*, even when a statute does not specifically delineate that right." *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 235–36 (D.D.C. 2019) (Brown Jackson, J). Such claims were recognized by the Supreme Court in *McAnnulty* nearly a half-century before the passage of the APA, and "[n]othing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996) (citation omitted). *See also* 5 U.S.C. § 559 ("This subchapter ... do[es] not limit or repeal additional requirements imposed by statute or *otherwise recognized by law*.") (emphasis added). "When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority." *Chamber of Com.*, 74 F.3d 1328 (internal quotation and citation omitted). Rarely, if ever, has Congress withdrawn courts' jurisdiction to correct such lawless behavior. It has certainly not done so here. Because Congress has not withdrawn courts' jurisdiction to review the DOGE Defendants lawless behavior, and because their actions are "plainly beyond the bounds" or "clearly in defiance" of any authority DOGE Defendants possess, *Fed. Express Corp.*, 39 F.4th at 764, Plaintiffs have adequately pled their ultra vires claim.

Plaintiffs challenge as ultra vires four separate actions by the DOGE Defendants. *First*, DOGE's actions by which it has purported to direct DOL, CFPB, and HHS to provide DOGE and DOGE personnel access to sensitive systems and information maintained by the agencies. FAC ¶¶ 230-233. *Second*, DOGE's actions accessing or altering restricted-access systems at the Defendant Agencies. FAC ¶ 234. *Third*, the personnel agreements DOGE entered into with the Defendant Agencies. FAC ¶ 235. And *fourth*, Plaintiffs challenge as ultra vires any actions by which DOGE purports to direct employment actions and agency restructuring at the Defendant Agencies. FAC ¶ 236. As to each, Plaintiffs allege that DOGE lacked any statutory or constitutional authority for the actions taken. This makes them thus ultra vires, and as such void and without legal effect. FAC ¶ 227-229, 233-236 (noting that DOGE lacked any "authority in law").

Defendants' three arguments about why Plaintiffs' ultra vires claim fails are unavailing.

First, Defendants contend that "an ultra vires claim is unavailable where an alternative remedial forum exists in which a plaintiff may pursue the challenge," and assert that Plaintiffs' ultra vires claims fail in that regard because they "merely repackage their claims under the APA and the Privacy Act." MTD at 35-36. But this is incorrect because Plaintiffs have not brought an APA claim against the DOGE Defendants, so their ultra vires claim (which is only against the DOGE Defendants) could not possibly "merely repackage" a nonexistent APA claim. And notably, Defendants have not offered that an APA challenge *would* be available as to the DOGE Defendants. As to Defendants' assertion that the ultra vires claim merely repackages Plaintiffs' Privacy Act claims, that would at most apply to the second of the four ultra vires actions Plaintiffs allege, DOGE's actions accessing or altering restricted-access systems at the Defendant Agencies. *See* FAC at ¶¶ 265-269 (bringing Privacy Act claim as to "[d]isclosure from

Defendants' systems of records to DOGE personnel). The other three ultra vires actions Plaintiffs

allege are not asserted in, and thus do not duplicate, Plaintiffs Privacy Act claims.

Second, Defendants contend that Plaintiffs' ultra vires claims fail because they "fail to

plead a specific statutory bound which USDS has allegedly exceeded." MTD at 36. But while

many ultra vires cases focus on exploring the contours of a particular statute, the core of an ultra

vires claim is whether government action is within the bounds of an official's or entity's lawful

authority. *Fed. Express Corp.*, 39 F.4th at 764. Plaintiffs do not point to specific statutory grant

of authority that DOGE has exceeded because Plaintiffs are not aware of, nor do Defendants

invoke, *any* statute that conceivably authorizes DOGE to exercise the authority that it has in this

case.[7] Typical ultra vires claims concededly measure actions taken by federal officials and agents

against the statutory authority they purport to exercise. *See Chamber of Com.*, 74 F.3d at 1328

(describing the line of ultra vires cases as examining whether the executive is "obey[ing]

[Congress's] statutory commands.") (internal quotation and citation omitted). But that practice is

inapposite where no such statutory authority exists.

The only source of authority Defendants point to is the President's executive order

creating DOGE. MTD at 36. But an executive order cannot grant statutory or constitutional

authority. "Fundamentally, administrative agencies are creatures of statute, and accordingly

possess only the authority that Congress has provided." *PFLAG, Inc. v. Trump*, No. CV 25-337-

---

[7] For the same reasons, Defendants' invocation of *Griffith v. Fed. Labor Relations Auth.* is
unavailing. MTD at 35 (citing 842 F.2d 487, 493 (D.C. Cir. 1988). The narrow ultra vires review
described in *Griffith* was the result of an existing statutory scheme, with clear bounds on agency
authority, an alternative remedial forum, and an "unusually clear congressional intent generally
to foreclose [judicial] review," 842 F.2d at 490. The factors Defendants quote are those used to
determine whether, despite this unusually clear intent, the claims were nevertheless subject to
review.  *See id* at 492-93. While Plaintiffs allege violations of law that go well beyond the
"garden-variety," *id.* at 493, *Griffith*'s focus on specific and unambiguous statutory directives is
inapplicable to this case.

BAH, 2025 WL 685124, at *16 (D. Md. Mar. 4, 2025), quoting *NFIB v. OSHA*, 595 U.S. 109 (2022) (cleaned up). "'[A]n agency literally has no power to act ... unless and until Congress confers power upon it,'" *New York v. Trump*, No. 25-cv-39, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025) (*citing La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)), and "[a]ny action that an agency takes outside the bounds of its statutory authority is ultra vires," *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (*citing City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)).

Plaintiffs allege that DOGE's actions are ultra vires because *no* statute grants it power, and it is no rebuttal for Defendants to object that Plaintiffs haven't identified a statutory scheme that the court can carefully study the way courts have in other ultra vires cases. If Defendants wished to identify a statutory authority that they believe grants DOGE the power it exercises, or that signals Congressional intent to preclude judicial review of DOGE's actions, they were welcome to, but they have not done so.[8] Absent such statutory authority, DOGE's only lawful power, by its own admission, is to "advise or assist the President," and the actions that Plaintiffs allege DOGE has undertaken go well beyond that limited role. FAC ¶ 47-48.

Further, as part of their claims, Plaintiffs *do* allege some specific statutory bounds that the DOGE Defendants have exceeded. *See* FAC at ¶¶ 234 (Privacy Act prohibitions on access to sensitive information), ¶¶ 235 (limitations on authority to detail employees). The Privacy Act

---

[8] Defendants have thus waived this argument. *Latson v. Holder*, 82 F. Supp. 3d 377, 388 (D.D.C. 2015) (arguments raised for the first time in motion to dismiss reply brief were waived). To the extent Defendants claim that the general availability of the APA precludes judicial review, that contention not an accurate statement of the law. *See, e.g.*, *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991) (holding that only "clear and convincing evidence of a contrary legislative intent" would justify restring access to judicial review, whereas a claim that a "statutory provision that provided for judicial review implied, by its silence, a preclusion of review of the contested determination" would be insufficient.).

forbids an "agency" from disclosing any records to "any person, or to another agency," 5 U.S.C. § 552a(b), except to "officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." Plaintiffs allege that DOGE employees are not and cannot be considered "officers and employees" of the agencies that hold records under the Privacy Act, and DOGE's attempts to stand in the shoes of agency employees or direct the disclosure of agency records are ultra vires.

Third, Defendants are wrong to assert that the detailing of DOGE Defendants' employees is not sufficiently egregious to qualify as ultra vires. MTD at 36-37. DOGE is purporting to unlawfully insert its staff into agencies as legal employees of the agencies in order to access protected and sensitive systems and records that would otherwise be unavailable to it. This "error" is "so extreme that one may view it as jurisdictional or nearly so" for the purpose of ultra vires review. *Griffith*, 842 F.2d at 493. Finally, Defendants notably do not dispute any of the other actions Plaintiffs allege to be ultra vires on this basis, and thus this argument provides no basis for dismissing Plaintiffs ultra vires claim in its entirety.

## <u>CONCLUSION</u>

For the reasons above, the Court should deny Defendants' Motion to dismiss.

Dated: March 7, 2025

Respectfully submitted,

*/s/ Aman T. George*

Mark B. Samburg (D.C. Bar No. 1018533)
Aman T. George (D.C. Bar No. 1028446)
Rachel F. Homer (D.C. Bar No. 1045077)
Robin F. Thurston (D.C. Bar No. 462679)
Skye L. Perryman (D.C. Bar No. 984573)*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Fax: (202) 796-4426
msamburg@democracyforward.org
ageorge@democracyforward.org
rhomer@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs*

Teague P. Paterson (D.C. Bar No. 144528)
Matthew S. Blumin (D.C. Bar No. 1007008)
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, DC 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Counsel for American Federation of State,*
*County, and Municipal Employees, AFL-CIO*
*(AFSCME)*

Rushab B. Sanghvi (D.C. Bar No. 1012814)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
*Counsel for Plaintiff American Federation*
*of Government Employees, AFL-CIO (AFGE)*

Steven K. Ury** (D.C. Bar 1643947)
SERVICE EMPLOYEES INTERNATIONAL
UNION
1800 Massachusetts Avenue, NW,
Legal Department, 6th Floor,
Washington, DC 20036
Telephone: (202) 730-7428
steven.ury@seiu.org
*Counsel for Plaintiff Service Employees
International Union*

Matthew Holder***
COMMUNICATION WORKERS OF
AMERICA, AFL-CIO
501 Third Street N.W.
Washington, D.C. 20001
Telephone: (202) 215-6788
mholder@cwa-union.org


* Admitted *pro hac vice*
** Motion for admission forthcoming
*** Motion for admission *pro hac vice*
forthcoming