## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFL-CIO, et al., | |
| *Plaintiffs*, | |
| *vs.* | Case No. 1:25-cv-339-JDB |
| U.S. Department of Labor, et al., | |
| *Defendants*. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION

This Court should reject Defendants' attempt to dodge the discovery that this Court has already ordered. Defendants submitted declarations and paperwork showing that three individuals working for DOGE are now employees of the Defendant Agencies. To Defendants, their filing fully resolves all disputed facts relevant to this Court's consideration of a Preliminary Injunction motion. But Defendants overstate the relevance of their new employment arrangements to the issues this Court approved discovery to explore.

Because Defendants' motion does not meet the exceedingly high bar for granting a protective order, and because discovery remains relevant to this Court's ability to resolve Plaintiffs' forthcoming preliminary injunction motion, Defendants' motion should fail.[1]

## BACKGROUND

Plaintiffs brought this case arguing that the DOGE Access Policies implementing data sharing between Defendant Agencies and DOGE are unlawful for four primary reasons:

---

[1] Plaintiffs also believe that given the additions made by Defendants to the record in this case, limited modifications to the discovery approved by this Court are appropriate. Plaintiffs anticipate filing a separate motion seeking such modifications shortly.

(1) DOGE is not an entity authorized to access Defendant Agencies' sensitive systems, and cannot cure this deficiency by entering into inter-agency personnel agreements with Defendant Agencies, nor can such agreements convert DOGE personnel into agency employees or authorize DOGE to compel system access; *see* Pltfs. First Am. Compl., ECF No. 21 ¶ 235 (FAC);

(2) the DOGE Access Policies violate the Privacy Act, both because DOGE employees are not agency employees, and because access by DOGE does not fall into the exceptions to 5 U.S.C. § 552a(b), including the "routine use" exception; *see*, *e.g.*, FAC ¶¶ 241, 253, 260, 267; Pltfs. Memo. of Law in Support of Renewed Mot. For Temp. Restraining Order, ECF No. 29-1 at 24-26;

(3) the DOGE Access Policies violate the Administrative Procedure Act, because such access is contrary to multiple statues and regulations (including the Privacy Act), and because such these policies are arbitrary and capricious, with Defendants having failed to engage in reasoned agency decisionmaking about how to craft and implement the DOGE Access Policies in a way that would protect Americans' data; *see* FAC ¶¶ 238-247, 251-255, 258-262;

(4) the DOGE Access Policies represent changes to agency rules that should have been subject to notice and comment under the Privacy Act, APA, and/or agency regulations. *See* FAC ¶¶ 248, 256, 263.

This Court has already recognized—twice—the need for the discovery Defendants now seek to avoid. First, in its Scheduling Order, the Court decided that it would entertain a motion for expedited discovery. ECF No. 43 at 1-2. This Court explained that, on the record it had considered in two previous TRO motions, it would be unable to identify "whether defendants

even took the actions (or established the policies) that plaintiffs challenge . . . or the follow-up question of whether those policies were in accordance with law—without some evidence of defendants' decisionmaking process." *Id.* This Court also noted that discovery would be "beneficial" to evaluating plaintiffs "theories of standing, likelihood of success on the merits, and irreparable harm" by providing more clarity as to "whether individuals not permitted under the Privacy Act to view personal information are viewing or will view that information." *Id.* at 2.

Second, the Court granted Plaintiffs' Motion for Expedited Discovery, approving, with modest alterations, Plaintiffs' discovery requests as "narrowly tailored to the issues that this Court has already indicated would be essential to deciding plaintiffs' impending preliminary injunction motion." ECF No. 48 at 1.

Despite these decisions, Defendants have now moved for reconsideration of the Court's discovery order, claiming that because three employees associated with DOGE are now papered as employees of Defendant Agencies rather than detailees, the discovery requests this Court approved are no longer relevant. *See* Def. Mot. for Reconsideration, ECF No. 51-1 at 1-2 (Def. Mot.). But the new facts that Defendants have introduced into the record do not resolve the factual bases of Plaintiffs' claims, or the reasons this Court ordered expedited discovery in the first place. To the contrary, the new facts Defendants have introduced create new factual questions and answer almost none. As a result, this Court should deny Defendants' motion and allow discovery to proceed as ordered.

## LEGAL STANDARD

A party seeking a protective order under Fed. R. Civ. P. 26(c) "bears the burden of making the showing of good cause contemplated by the rule." *Alexander v. F.B.I.*, 186 F.R.D 60, 64 (D.D.C. 1998). The party requesting such an order must "make a specific demonstration of facts in support of the request," rather than "conclusory or speculative statements about the need

for a protective order." *Id.* The moving party "has a heavy burden of showing extraordinary circumstances based on specific facts that would justify such an order." *Id.* (cleaned up).

In some "rare" cases, an appellate court may conclude that a district court has abused its discretion to manage discovery by "allowing discovery of documents that would have no bearing on [] the merits" or "no conceivable bearing on the case." *Food Lion, Inc. v. United Food and Comm. Workers Intern. Union, AFL-CIO-CLC*, 103 F.3d 1007, 1012 (D.C. Cir. 1997) (cleaned up).

**ARGUMENT**

Defendants have not shown good cause that a protective order should be entered in this case. Defendants have not identified "specific facts" that present "extraordinary circumstances" requiring a protective order to shield Defendants from "annoyance, embarrassment, oppression, or undue burden or expense." *Alexander*, 186 F.R.D. at 64. Nor have Defendants shown that the approved discovery has "no conceivable bearing on the case." *Food Lion*, 103 F.3d at 1012.

**I.    Defendants have not identified extraordinary circumstances warranting the entry of a protective order.**

Defendants have offered scant (if any) argument that any "specific facts" at issue present "extraordinary circumstances" such that a protective order is needed to protect Defendants from "annoyance, embarrassment, oppression, or undue burden or expense." *Alexander*, 186 F.R.D. at 64. At most, Defendants ask the court to cease "impos[ing] the burdens of discovery on USDS," Def. Mot. 13, but do not proffer any specific facts about why this burden is unusual, let alone extraordinary. Nor could they, given the limited discovery that this Court has already approved and concluded would "impose a minimal burden on defendants." ECF No. 48 at 12.

To the extent Defendants intended to argue that separation of powers concerns constitute an extraordinary circumstance (an argument that is not explicit on the face of their brief), they

have not met their burden to go beyond "conclusory or speculative statements about the need for a protective order." *Alexander*, 186 F.R.D. at 64. Defendants do not make any specific arguments about how the discovery intrudes upon separation of powers concerns, or why this Court's approved discovery requests will unduly intrude upon the Executive Branch. In any event, such arguments would fail: Plaintiffs' discovery about DOGE focuses almost exclusively on actions DOGE is purporting to take as part of federal agencies, not its activities "within the Executive Office of the President and reports directly to the Chief of Staff," Def. Mot. 12, and to the extent discovery does touch on these issues, it seeks only to understand the authority that DOGE wields *at* Defendant Agencies themselves.

## II.    Defendants have not shown that the approved discovery has no bearing on this case

Defendants' brief focuses almost exclusively on the continued relevance of the discovery this Court approved, in light of the new representations made by Defendant Agencies. Defendants vastly overstate the degree to which their new representations alter the material facts and legal disputes underpinning this Court's February 27 Order. Defendants' new paperwork has not transformed this matter into the "rare" case where approved discovery has "no bearing' on a preliminary injunction motion. *See Food Lion*, 103 F.3d at 1012 (cleaned up).

### A.    Defendants have not cured all issues related to the Economy Act

Defendants represent that "USDS is no longer detailing employees to any of the" Defendant Agencies and that therefore no ongoing violations of the Economy Act are possible. *See* Memo. of Law in Support of Defs. Mot. For Reconsideration, ECF No. 51-1 at 1 ("Defs. Mot."). This bare assertion is insufficient to cure concerns about improper detailing, for four reasons.

*First,* while Defendants represent that some DOGE employees at Defendant Agencies are now "employees of the agencies themselves," Defendants maintain that other DOGE employees

at Defendant Agencies will still be "detailees from another agency" subject to the Economy Act. *Id.* Defendants do not explain who those employees are will be. *See*, *e.g.*, Martinez Decl., ECF No. 51-5 at ¶ 4 (noting that there are six DOGE employees at CFPB, but only explaining the employment status of one of the six).

Court filings in other cases show that DOGE is continuing to directly detail employees to other federal agencies. Decl. of Florence Felix-Lawson, *Am. Fed. Of State, Cnty and Mun. Employees, AFL-CIO v. Social Sec. Admin.*, No. 1:25-cv-00596, ECF No. 36-2 ¶ 7 (D. Md. Mar. 12, 2025) (attached as Exhibit A). The DOGE staff at Defendant Agencies may still be unlawfully detailed from DOGE to a third agency, and then re-detailed to Defendant Agencies.[2] And Defendants have not made any effort to argue that only the final links in chains of detailing and redetailing arrangements would be relevant in this case.

*Second*, Defendants make no representations about the scope of work performed prior to Defendant Agencies' new employment agreements, and whether any resulting harms have been cured. Plaintiffs have sought relief in this case that would ensure that "DOGE personnel [] immediately return or destroy all copies of material unlawfully accessed from agency systems and records," and that Agency Defendants "remove any software installed by DOGE personnel on agency systems." FAC ¶¶ 272-73. But Defendants' new submissions shed almost no light on the actual usage of Sensitive Systems by current and former DOGE staff at Defendant Agencies, and provide no information that would allow this Court to evaluate the existence or disposition

---

[2] This is a reasonable inference from prior declarations submitted in this case. At CFPB, for example, Mr. Martinez previously identified the DOGE staff at CFPB as consisting of one employee "on detail from [DOGE], and five [] on detail from other federal agencies." ECF No. 31-3 at 4-5.

of records moved from Defendant Agencies' systems or shared externally under prior unlawful detailing arrangements.

These concerns are not merely speculative. In an ongoing case against the Social Security Administration, the former acting Chief of Staff to the acting Administrator shared in a declaration her understanding that one of the DOGE engineers "was working off-site at OPM while he was analyzing the SSA data" and that "other, non-SSA people were with him and may have also had access to this protected information." Declaration of Tiffany Flick, *AFSCME v. SSA*, ECF No. 22-10 ¶ 28 (Mar. 7, 2025) (attached as Exhibit B). This arrangement "didn't seem to align with" SSA's "standard telework agreements [which] state that employees need to work in a private location and should be careful to protect systems and data from unauthorized access." *Id.* This teleworking arrangement was a bespoke exception to SSA's requirement that the information office "work onsite full-time." *Id.* This "non-secure off-site access" raises concerns that "protections built into SSA's data systems may not work," and that "[o]thers could take pictures of the data, transfer it to other locations, and even feed it into AI programs." *Id.* ¶ 49.

Similarly, a declaration submitted in litigation about the U.S. Agency for International Development described a USAID employee working in technology and cybersecurity being told to "provide systems access to individuals from DOGE." Declaration of J. Doe 2, *J. Doe 1-26 v. Musk*, No. 8:25-cv-462, ECF No. 17-2 at 227 (D. Md. Feb. 18, 2025) (attached as Exhibit C). This employee raised concerns about public reporting indicating that "the individuals from DOGE . . . have a history of issues with data misuse," but "thereafter discovered that DOGE personnel had already been given . . . *root access* to USAID systems, the highest level of access one can obtain and which allows a person to take over a system." *Id.* at 227-28 (emphasis in

original). This employee shared their understanding that "DOGE personnel took information out of the agency and sent it elsewhere." *Id.* at 229.

News reporting has also suggested that DOGE staff at DOL have been granted permission to install software that would allow them to access DOL systems, including transferring files in and out of systems, remotely.[3]

In short, even if Defendants' representations were adequate to demonstrate that Defendants will not participate in unlawful detail arrangements (they are not), substantial questions about ongoing harms flowing from previously-unlawful arrangements would remain. Discovery is still appropriate to ascertain whether agency records were "modified, copied, shared or removed from Defendant Agencies' systems" or the "identity of any person(s) with whom those records have been shared." *See* ECF No. 44-2 at 3; (discovery requests approved in this Court's February 27 Order, ECF No. 48); *see also id.* at 6 (similar deposition topics). Nor do Defendants provide any information about any "software installed by, or caused to be installed by" DOGE on Agency systems. ECF No. 44-2 at 3.

*Third*, the declarations attached to Defendants' motion do not show that Defendant Agencies will no longer rely on unlawful detailing from DOGE. Each declaration uses the same language: that the agency declarant is not aware "of any plans to onboard new detailed employees in the future to work on DOGE" projects. *See* ECF No. 51-2 ¶ 7, ECF No. 51-4 ¶ 11, ECF No. 51-5 ¶ 6.

None of these statements constitutes a commitment by DOGE or any of Defendant Agencies to cease unlawful detail arrangements. If Defendant Agencies wished to provide more

---

[3] David Ingram, *DOGE software approval alarms Labor Department employees*, NBC News (Feb. 13, 2025), https://www.nbcnews.com/tech/security/doge-software-approval-alarms-labor-department-employees-data-security-rcna191583.

concrete assurances, they could, but they have chosen not to. Further, none of these statements are made by individuals who purport to have decision-making authority at either DOGE or Defendant Agencies about whether to detail DOGE employees to Defendant Agencies.[4] Their assurances that they are not currently aware of plans to continue detailing DOGE staff to Defendant Agencies are of little value.

*Fourth*, it is not even clear that the declarations submitted reliably account for all DOGE employees at Defendant Agencies. HHS's declaration states that "at least one USDS employee was detailed to HHS" in early February 2025, and that the declarant has "since learned that another USDS employee was detailed to the Centers for Medicare and Medicaid Services" in the same time frame. Second Rice Decl., ECF No. 51-3 at ¶ 6-7. However, HHS's publicly-available employee database appears to list *five* additional DOGE employees on HHS staff who are not the two individuals HHS identifies in its latest declarations. *See* Decl. of Mark Samburg, attached as Exhibit D; *see also* Attachment A to Rice Decl., Filed Under Seal, ECF No. 51-4.

B.    Defendants have not shown that DOGE Access is not a disclosure

The core contention in this case is that DOGE is not legally authorized to access Defendants' sensitive systems. Although Defendants have argued that the Economy Act provides a legal basis to grant DOGE access, Plaintiffs' dispute this argument and the issue remains unresolved.[5] As a result, Plaintiffs remain entitled to the discover regarding fundamental

---

[4] Indeed, as detailed further in section II.D, below, one of Defendants' declarants in this case testified in another matter earlier this week, and admitted to making incorrect statements in declarations because he did not have personal knowledge of certain management decisions, but was simply repeating what he was told by agency leadership.

[5] Contrary to Defendants' claim that Plaintiffs "introduce[ed] the Economy Act argument to this case," Def. Mot. 12, the Economy Act arose as an issue in this case because Defendants asserted that the Economy Act provided the legal basis for granting DOGE access, as a *defense* to Plaintiffs' claims.

questions about whether DOGE may legally access Defendant Agencies' records remain even if DOGE staff are now papered differently than they were last week.

        1.     *Defendants have not explained the terms of DOGE staffers' concurrent employment by both Defendant Agencies and DOGE*

Defendants' explanations of DOGE's new employment arrangements lack key details. HHS and CFPB acknowledge that DOGE staff employed at the agencies will continue to be concurrently employed at DOGE. *See* ECF-51-3 at ¶ 8 (HHS); ECF No. 51-5 at ¶ 4 (CFPB). DOL has not shared whether this is the case at that agency as well. Defendant Agencies make no representations about the chain of command that DOGE staff employed at Defendant Agencies are subject to, or whether their employment responsibilities to DOGE may supersede their responsibilities to Defendant Agencies.

Questions about whether DOGE staff are actually subordinate to agency officials, or whether their employment agreements accurately describe their work, authority, or chain of command are well-grounded in available information about DOGE and how it is operating.

At the Social Security Administration, the newly-appointed Chief Information Officer "introduced himself as a DOGE representative to multiple employees on multiple occasions." Exhibit B ¶ 11. This CIO appeared "evasive" about describing his work to the SSA Administrator, and that "[i]t appeared . . . he was actually reporting to DOGE." *Id.* ¶¶ 21-22. Even after this DOGE staffer was onboarded as the agency CIO, SSA employees continued to receive orders from a DOGE executive at the White House to circumvent normal agency processes in order to grant DOGE rapid access to SSA's systems. *See id.* ¶¶ 14-16 (describing the involvement of "DOGE manager Steve Davis" in ordering rapid access to SSA systems for a DOGE engineer).

At another agency, the U.S. African Development Foundation, DOGE staff directed the agency to sign a memorandum of understanding with the agency to detail employees to USADF that would allow DOGE to work to "modernize [USADF's] computer systems." Decl. of Elisabeth Feleke, *Brehm v. Marocco*, 25-cv-660, ECF No. 7-3 ¶¶ 4, 12 (D.D.C. Mar. 6, 2025) (attached as Exhibit E). But "[o]nce the MOU was signed," the "true purpose" of DOGE's detail to the agency was revealed to be directing USADF to dismantle itself. *Id.* ¶ 5. A DOGE employee explained that the USADF board was expected to approve a reduction in force "where all USADF staff would be fired," and if the board didn't approve the plan, "the Board would be dismissed." *Id.* ¶ 6. The agency general counsel later "withdrew the MOU" with DOGE because DOGE had "secured the memorandum of understanding under false pretenses"—purporting to detail DOGE employees to the agency to help modernize USADF's systems when DOGE's true task was to manage and oversee the agency's unwinding. *Id.* ¶ 12.

At the U.S. Agency for International Development, DOGE staff reportedly used their access to agency systems to "veto [] payments" *after* particular payments had been specifically approved by the Secretary of State and White House officials.[6]

In litigation about the Office of Personnel Management's guidance to federal agencies to terminate virtually all probationary employees, OPM has represented that the Acting OPM Director did not participate in a government-wide call instructing agency leaders to begin firing probationary employees, but that DOGE staffer Amanda Scales participated on OPM's behalf instead. *See* Email from Jim Todd, U.S. Dept. of Justice, to Danielle Leonard (Mar. 9, 2025,

---

[6] Matt Bai, *The blinding contempt of the DOGE bros*, Washington Post (Feb. 24, 2025), https://www.washingtonpost.com/opinions/2025/02/24/musk-doge-usaid-cuts-dc/.

6:48pm), *Am. Fed. Gov. Employees, AFL-CIO v. U.S. Off. Of Personnel Management*, 25-cv-01780, ECF No. 86-1 at 3 (Mar. 10, 2025) (attached as Exhibit F).[7]

At the CFPB, Mr. Martinez testified on Monday that he has perceived "two tracks" of instructions to agency staff; one from Acting Director Vought and one from DOGE, and they were not "on the same page" about agency operations. *See* Transcript of Evidentiary Hearing Held Before The Honorable Judge Amy Berman Jackson, *Nat'l Treas. Employees Union v. Vought*, 25-cv-381 at 136-37 (D.D.C. Mar. 10, 2025) (referenced excerpts attached in Exhibit G). He testified that DOGE directed him to get "involved in OPM and the RIFs" at the agency. *Id.* at 137. And while Mr. Martinez characterized DOGE staff as "designated" by Acting Director Vought to be CFPB employees, *id.*, Mr. Martinez frequently separated CFPB leadership and DOGE staff in his testimony. *See also id.* at 56 ("there was, in my opinion, misalignment between the DOGE people and the OMB people" about how quickly to wind down CFPB).

Notably, in other litigation in this courthouse, the government has not disputed that plaintiffs' allegations plausibly suggest that Elon Musk and DOGE are directing the operations of federal agencies. *See* Defs. Mot. To Dismiss, *New Mexico v. Musk*, 1:25-cv-429, ECF No. 58 at 22-29 (D.D.C. Mar. 7, 2025). Instead, the government has argued it is lawful for Mr. Musk to "'direct[]' certain actions across multiple agencies." *Id.* at 23 (emphasis in original). The government has argued that DOGE may direct the dismantling of the U.S. Agency for International Development or cancel Department of Education contracts as long as their

---

[7] *See also* Eric Katz, *OPM retroactively edits probationary firing guidance to note it did not order probationary firings*, Government Executive (Mar. 4, 2025), https://www.govexec.com/workforce/2025/03/opm-retroactively-edits-probationary-firing-guidance-note-it-did-not-order-probationary-firings/403458/ (describing the February 13 call); *The People Carrying Out Musk's Plans at DOGE*, N.Y. Times (updated Mar. 11, 2025), https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html ("NY Times DOGE Tracker") (identifying Ms. Scales as a DOGE staffer).

decisions were ratified by agency leadership. *See id.* at 25. And the government has argued that it is permissible for Mr. Musk to have "*de facto* power over Executive Branch operations." *Id.* at 26 (cleaned up).

Against this backdrop, it is reasonable for discovery in this matter to clarify the actual chain of command for DOGE employees concurrently serving at Defendant Agencies, and evaluate whether those arrangements are consistent with the Privacy Act's protections against external disclosure. *See*, *e.g.*, ECF No. 44-2 at 4, 6, 7 (discovery requests exploring supervision authority for DOGE employees at Defendant Agencies).

> ### 2. *Defendants have not explained the terms of DOGE Employees' concurrent employment across multiple agencies*

Further, Defendant Agencies provide no details about how many different agencies a DOGE employee may be concurrently employed by, how they plan to reconcile the competing demands of multiple-agency employment arrangements, or how they will use sensitive data across agencies. *See*, *e.g.*, ECF No. 44-2 at 4, 7 (discovery requests related to data sharing by DOGE employees at Defendant Agencies).

DOGE Employees are likely working at multiple agencies at any given time. A declaration recently filed in another case explained that one DOGE staffer at the Social Security Administration, Akash Bobba, is "assisting DOGE in multiple agencies." Exhibit B ¶ 13. Adam Ramada, the DOGE employee who first filed a declaration in this case about his service at DOL, ECF No. 16-1, has filed similar declarations about his work at least one other agency, representing that he was working at the Department of Education "50-60 hours per week." Supplemental Declaration of Adam Ramada, *Univ. of Calif. Student Assoc. v. Carter*, 1:25-cv-00354, ECF No. 18-2 ¶¶ 3-4 (D.D.C. Feb. 16, 2025) (representing that Mr. Ramada was "on

detail" to the Department of Education, where he spends "50-60 hours per week working at Department [of Education] facilities.").

Public news reporting has similarly identified DOGE staff working at many agencies at once (or at least, at various points over a period of seven weeks). For example, Luke Farritor, one of the DOGE employees publicly linked to Defendant Department of Health and Human Services, is listed as having been involved in DOGE's work at the General Services Administration, U.S. Agency for International Development, Department of Energy, and Department of Education. [8] Gavin Kliger, one of the DOGE employees publicly linked to Defendant Consumer Financial Protection bureau, is also listed as being involved in DOGE's work at the Office of Personnel Management, Commerce Department, USAID, Internal Revenue Service, and Department of Agriculture.

And the public reporting likely undercounts the number of agencies DOGE staff are working at by some magnitude. *See* Exhibit E at ¶ 4 (identifying at least Ethan Shaotran and Nate Cavanaugh as DOGE detailees at the U.S. African Development Fund since February 21); NY Times DOGE Tracker (does not currently identify Mr. Shaotran or Mr. Cavanaugh as associated with USADF).

    C.    <u>Defendants have provided no additional evidence relevant to Plaintiffs' arbitrary and capricious or notice and comment claims</u>

Defendants have submitted no new evidence that would contradict Plaintiffs' arbitrary and capricious or notice and comment claims. Even if DOGE staff are employed by Defendant Agencies, new access policies that disregard agencies' legal obligations may harm Plaintiffs. And despite Defendants' representations, there are substantial reasons to be concerned that these

---

[8] NY Times Doge Tracker, *supra* n. 7.

access policies are not being carried out in accordance with normal agency policies and procedures.

For example, Mr. Martinez has asserted in this case that "CFPB Management followed all established procedures to provision equipment and provide access to" detailees to the agency from DOGE. ECF No. 31-3 ¶ 6. He also said that "[a]ll accesses to CFPB internal systems were authorized by the Chief Information Officer pursuant to CFPB processes and procedures and with authorization from our Acting Director." *Id.* ¶ 9.

But the CFPB's former Chief Technology Officer has described this declaration to this Court as "not plausible" given, among other things, the volume of training required to access multiple systems at CFPB. Declaration of Erie Meyer, ECF No. 44-1 at ¶ 29. She also noted that to the best of her knowledge, no employee at CFPB "has *ever* before been granted blanket access to all unclassified systems maintained by the Bureau," that it "seems unlikely" that any employee could meet the "need to know" requirements to be granted such broad access, and that the act of granting such access "represents an unprecedented and very substantial change to Bureau policies." *Id.* ¶ 9.

In a different case in this courthouse, a current CFPB employee represented that DOGE employees gained access to CFPB systems "without following the process that the CFPB ordinarily requires to do so," without signing documentation acknowledging rules governing access, without completing the training required for users to gain such high-level access, and without receiving any waiver of these requirements. *See* Declaration of Drew Doe, *Nat. Treas. Emp. Union v. Vought*, No. 25-cv-0381, ECF No. 38-5 (D.D.C. Feb. 27, 2025) (attached as Exhibit H). After a number of disputes on the record about the accuracy of Mr. Martinez's

declaration in that case, the court ordered him to testify in an evidentiary hearing on March 10. *Id.* at Min. Order (entered Mar. 3, 2025).

As detailed above, in similar litigation at SSA, the former chief of staff to the Acting SSA administrator explained that DOGE ordered SSA employees to circumvent normal agency processes to grant DOGE staff rapid access to SSA's systems. Exhibit B ¶¶ 14-16.

Defendants have represented that all DOGE staff access to sensitive systems is in line with applicable legal requirements and is being granted pursuant to longstanding agency policies. But there is more than a reasonable basis for discovery to ascertain whether that is true, by having Defendants document the actual usage by DOGE staff of sensitive systems and the actual policies in place governing that usage. *See*, *e.g.*, ECF No. 44-2 at 3, 5, 6 (various discovery requests related to these issues).

D.      The government's representations should not be presumed accurate

For the reasons stated above, there is ample reason for this Court to deny Defendants' motion. However, to the extent this Court believes Defendants' motion presents close questions that turn on according the government the presumption of regularity, *see* Def. Mot. at 12, that presumption should carry little weight. In this case and others, the government has refused to provide consistent, accurate, and plausible recitations of basic facts related to DOGE's operations.

In this case, for example, Defendants identified five DOGE employees at Defendant Agencies in declarations prior to TRO hearings. Ramada Decl., ECF No. 16-1 ¶ 5 (identifying three DOGE detailees to DOL); Rice Decl., ECF No. 31-2 ¶ 5 (identifying one DOGE detailee to HHS); Martinez Decl., ECF No. 31-3 ¶ 5 (identifying one DOGE detailee to CFPB). Shortly thereafter, Defendants characterized the number of DOGE employees at the agencies as "untold." ECF No. 45 at 16.

Now, Defendants claim that only two DOGE employees work at HHS, but, as described above, that claim is inconsistent with the agency's own public database of employees. And, as described above, Mr. Martinez's declaration concerning the processes governing DOGE access at CFPB conflicts with sworn testimony from current and former CFPB employees.

Indeed, Mr. Martinez publicly testified earlier this week that he has previously made sworn representations in publicly-filed declarations that he now knows are incorrect. According to Mr. Martinez, these false representations occurred because he did not actually "know about the mission side of the agency" and simply conveyed in his declarations "what they [agency leadership] told [him]." Exhibit G at 184-88.

In another case, the government represented that a DOGE employee would have only "read-only" access to sensitive systems at the Department of Treasury, only to correct themselves later that the employee had in fact previously been granted more expansive access to those systems. *Compare* Defs. Memo of Law in Support of Emergency Mot. To Dissolve, Clarify, or Modify Ex Parte Temporary Restraining Order, *State of N.Y. v. U.S. Dep't of Treas.*, No. 25 Civ. 01144, ECF No. 12 at 6 n. 2 (S.D.N.Y. Feb. 9, 2025) ("Marco Elez [] had 'read only' access to . . . BFS payment systems."), and Declaration of Joseph Gioeli III, *id.*, ECF No. 34 at ¶ 20 (the Department discovered on February 6 that "Mr. Elez's database access . . . had mistakenly been configured with read/write permissions instead of read-only").

With regards to the leadership and structure of DOGE, the government's positions continue to be ephemeral. As detailed in the February 18 status report in this case, ECF No. 42 at 2-3, and in Plaintiffs' February 26 Reply Brief in Support of Expedited Discovery, ECF No. 46 at 9 n. 10, the executive branch has taken multiple conflicting positions on the structure of DOGE's leadership. The executive for the first time stated that Mr. Musk is not the USDS

Administrator in a February 17 court filing, then on February 18 refused to identify the USDS Administrator, then on February 19 President Trump said Mr. Musk is in charge of DOGE, then on February 25 for the first time identified Amy Gleason as the USDS Administrator, while also saying that Mr. Musk is "overseeing DOGE." *See* ECF No. 42 at 2-3, ECF No. 46 at 9 n.10. During a February 28 court hearing in another matter, a DOJ attorney was reportedly asked who the USDS Administrator was prior to Ms. Gleason, and responded that he had asked that question and "was not able to get [an] answer."[9] On March 4, President Trump repeated during a joint address to Congress that Mr. Musk heads DOGE.[10]

In sum, Defendants' new proffered employment arrangements do not diminish the need in this case for discovery into whether and how DOGE is accessing sensitive data systems at Defendant Agencies or how DOGE is actually structured and operates with respect to DOGE employees working at Defendant Agencies. These are live, disputed issues relevant to the disposition of Plaintiffs' preliminary injunction motion, and the information needed to resolve them is uniquely within Defendants' control.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this court deny Defendants' motion for reconsideration and decline to enter the protective order they request.

---

[9] *See* Colin Kalmbacher, *'That seems like a knowable fact, doesn't it?' Judge upbraids Trump admin lawyer for lack of knowledge and 'strange disconnect' about how DOGE operates*, Law & Crime (Mar. 1, 2025), https://lawandcrime.com/high-profile/that-seems-like-a-knowable-fact-doesnt-it-judge-upbraids-trump-admin-lawyer-for-lack-of-knowledge-and-strange-disconnect-about-how-doge-operates/.

[10] *See* WSJ News, *Trump Thanks Elon Musk for DOGE Cost-Cutting Moves in Speech to Congress*, YouTube (Mar. 4, 2025), https://www.youtube.com/watch?v=wthNF10S-DY.

Dated: March 13, 2025                          Respectfully submitted,

                                               */s/ Aman T. George*

                                               Aman T. George (D.C. Bar No. 1028446)
                                               Mark B. Samburg (D.C. Bar No. 1018533)
                                               Rachel F. Homer (D.C. Bar No. 1045077)
                                               Robin F. Thurston (D.C. Bar No. 462679)
                                               Somil B. Trivedi (D.C. Bar. No. 1617967)
                                               Skye L. Perryman (D.C. Bar No. 984573)*
                                               DEMOCRACY FORWARD FOUNDATION
                                               P.O. Box 34553
                                               Washington, D.C. 20043
                                               Telephone: (202) 448-9090
                                               Fax: (202) 796-4426
                                               msamburg@democracyforward.org
                                               ageorge@democracyforward.org
                                               rhomer@democracyforward.org
                                               rthurston@democracyforward.org
                                               strivedi@democracyforward.org
                                               sperryman@democracyforward.org
                                               *Counsel for Plaintiffs*

                                               Teague P. Paterson (D.C. Bar No. 144528)
                                               Matthew S. Blumin (D.C. Bar No. 1007008)
                                               AMERICAN FEDERATION OF STATE,
                                               COUNTY, AND MUNICIPAL
                                               EMPLOYEES, AFL-CIO
                                               1625 L Street N.W.
                                               Washington, DC 20036
                                               Telephone: (202) 775-5900
                                               Facsimile: (202) 452-0556
                                               tpaterson@afscme.org
                                               mblumin@afscme.org
                                               *Counsel for American Federation of State,*
                                               *County, and Municipal Employees, AFL-CIO*
                                               *(AFSCME)*

                                               Rushab B. Sanghvi (D.C. Bar No. 1012814)
                                               AMERICAN FEDERATION OF
                                               GOVERNMENT EMPLOYEES, AFL-CIO
                                               80 F Street N.W.
                                               Washington, DC 20001
                                               Telephone: (202) 639-6426
                                               Facsimile: (202) 329-2928
                                               SanghR@afge.org

*Counsel for Plaintiff American Federation*
*of Government Employees, AFL-CIO (AFGE)*

Steven K. Ury** (D.C. Bar 1643947)
SERVICE EMPLOYEES INTERNATIONAL
UNION
1800 Massachusetts Avenue, NW,
Legal Department, 6th Floor,
Washington, DC 20036
Telephone: (202) 730-7428
steven.ury@seiu.org
*Counsel for Plaintiff Service Employees*
*International Union*

Matthew Holder***
COMMUNICATION WORKERS OF
AMERICA, AFL-CIO
501 Third Street N.W.
Washington, D.C. 20001
Telephone: (202) 215-6788
mholder@cwa-union.org

\* Admitted *pro hac vice*
\*\* Motion for admission forthcoming
\*\*\* Motion for admission *pro hac vice*
forthcoming