# EXHIBIT G

```
                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA


  National Treasury Employees     )
  Union, et al.,                  ) Civil Action
                                  ) No. 25-cv-381
             Plaintiffs,          )
                                  ) EVIDENTIARY HEARING
  vs.                             ) Day 1
                                  )
  Russell Vought, et al.,         ) Washington, DC
                                  ) March 10, 2025
             Defendants.          ) Time:  10:18 a.m.
  _____

             TRANSCRIPT OF EVIDENTIARY HEARING
                        HELD BEFORE
          THE HONORABLE JUDGE AMY BERMAN JACKSON
                 UNITED STATES DISTRICT JUDGE
  _____

                     A P P E A R A N C E S

  For Plaintiff:      Deepak Gupta
                      Robert D. Friedman
                      GUPTA WESSLER LLP
                      2001 K Street, NW
                      Suite 850 North
                      Washington, DC 20006
                      (202) 888-1741
                      Email:  Deepak@guptawessler.com
                      Email:  Robert@guptawessler.com

                      Jennifer D. Bennett
                      GUPTA WESSLER LLP
                      505 Montgomery Street
                      San Francisco, CA  94111
                      (415) 573-0335
                      Email:  Jennifer@guptawessler.com

                      Allison Marcy Zieve
                      Wendy Liu
                      PUBLIC CITIZEN LITIGATION GROUP
                      1600 20th Street, NW
                      Washington, DC 20009
                      (202) 588-1000
                      Email:  Azieve@citizen.org
                      Email:  Wliu@citizen.org
```

```
 1    For Defendant:      Brad P. Rosenberg
                          U.S. DEPARTMENT OF JUSTICE
 2                        1100 L Street, NW
                          Washington, DC 20005
 3                        (202) 514-3374
                          Email:  Brad.rosenberg@usdoj.gov
 4   _____

 5    Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                          Official Court Reporter
 6                        United States Courthouse, Room 6523
                          333 Constitution Avenue, NW
 7                        Washington, DC  20001
                          (202) 354-3267
 8
                              *   *   *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    binders.  We've got two courtrooms full of people.  But, okay.
 2              MR. ROSENBERG:  Old school.
 3              The defense calls Mr. Martinez.
 4                         ADAM MARTINEZ,
 5    was called as a witness and, having been first duly sworn, was
 6    examined and testified as follows:
 7    BY MR. ROSENBERG:
 8    Q.  Good morning.  Can you please state your full name for the
 9    record?
10    A.  Yes.  It's Adam Martinez.
11    Q.  And, Mr. Martinez --
12              THE COURT:  Mr. Martinez, let me just tell you one
13    thing.  If you can move that microphone kind of closer to your
14    mouth, because the chair doesn't move, but it does.
15              THE WITNESS:  Is that better?
16              THE COURT:  All right.  Thank you.
17              THE WITNESS:  Wonderful.
18    BY MR. ROSENBERG:
19    Q.  Mr. Martinez, can you tell us where you went to college?
20    A.  I went to the College of Santa Fe, in Santa Fe, New Mexico.
21    Q.  When did you graduate from college?
22    A.  I graduated in 1999.
23    Q.  Can you just give us an overview of your post-college
24    career, at a high level, until your first interaction with
25    CFPB?
```

```
 1   absolutely.  Yes.
 2              THE COURT:  So you weren't saying wind down, resizing
 3   after you spoke with them.  That's not what you were saying.
 4   You're saying it now, but that's not what you were saying then.
 5              THE WITNESS:  Let me clarify one piece of it.  My
 6   understanding directly from the DOGE folks was that there would
 7   still be statutory-required individuals representing the CFPB.
 8   I didn't know how many and I didn't know how many people would
 9   support those individuals.
10              THE COURT:  How do you close the Agency and do
11   statutory-required work?
12              THE WITNESS:  Well, there's -- what I understood from
13   them was there was a possibility to, one, have a small
14   presence.  I don't know where they would be, that was not
15   discussed.  Or, the second part of that was potentially some of
16   the statutory-required work could go to other FIRREAs or
17   regulators that had done the work before.
18              THE COURT:  So that would require -- how would that
19   happen?  How would things that you're statutorily required to
20   do get assigned to some other agency?  What's involved there?
21              THE WITNESS:  That I don't know.
22              THE COURT:  Does it involve Congress saying that?
23              THE WITNESS:  I would anticipate that Congress would
24   have a lot to say about that.
25              THE COURT:  So when did your impression of what was
```

```
 1   happening change and why?
 2           THE WITNESS:  I would say for that week, from the
 3   10th through the 14th, was all focused on this action.  The
 4   following week, as more people arrived on detail from the
 5   Office of Management and Budget, it became increasingly clear
 6   that there was, in my opinion, misalignment between the DOGE
 7   people and the OMB people.
 8           THE COURT:  Well, who sent out the stop-work order?
 9           THE WITNESS:  That was Director Vought.
10           THE COURT:  Okay.  Keep going.
11   BY MR. ROSENBERG:
12   Q.  And just to be clear on the chronology, approximately how
13   many days after he was announced as acting director did Acting
14   Director Vought send out the stop-work order?
15   A.  Two days.
16           THE COURT:  Has it been rescinded?
17           THE WITNESS:  It's been -- he has not rescinded that
18   email, although the chief legal officer who represents him has
19   gone back and told people that they need to be doing their
20   statutorily-required work.
21           THE COURT:  That was the February 27 email that went
22   out?
23           THE WITNESS:  That was one of them, yes.
24           THE COURT:  Has he further refined what that means?
25   That means this unit, this unit, this unit, this employee, this
```

1   we're referring to the team, it assumes facts not in evidence
2   as to who is on the team, who is sending these emails, and what
3   they mean by them.
4            THE COURT:  Do you know who those emails were from?
5            THE WITNESS:  I do.
6            THE COURT:  Okay.  Were they members of the
7   termination team?
8            THE WITNESS:  They were.
9            THE COURT:  Okay.  Next question.
10  BY MS. BENNETT:
11  Q.  Okay.  So just to clarify the chain of events that happened
12  here, you got an email from a member of the termination team
13  saying the hearing is happening at 2 p.m., right?
14  A.  Right.
15  Q.  You immediately respond "Thank you," right?
16  A.  Yep.
17  Q.  And then that person emails the team at OPM, I think --
18  A.  Um-hum.
19  Q.  -- that says we can't wait until the close of business,
20  right?
21  A.  They were looking -- yes.
22  Q.  And the thing they couldn't wait until the close of
23  business on was to get the documents they needed to be able to
24  execute these terminations, right?
25  A.  That is correct.

1  Q.  Okay.  And as I understood your second declaration -- and
2  now I'm thinking I misunderstood it.  I understood your second
3  declaration to suggest that essentially this was all a mistake,
4  right?
5  A.  It was not a mistake.
6  Q.  It was not a mistake?
7  A.  No.
8  Q.  So these terminations were directed by new leadership?
9          MR. ROSENBERG:  Objection.  Also vague, repeated
10 references to new leadership.  It could be unclear if who
11 plaintiffs' counsel is referring to as new leadership are the
12 same individuals as the witness believes constitute new
13 leadership.
14         THE COURT:  All right.  Well, we've seen documents
15 indicating who the new leadership was, but if you want to
16 clarify that, go ahead.
17 BY MS. BENNETT:
18 Q.  I asked you at the beginning of the cross-examination who,
19 in your view, was new leadership, right?
20 A.  Yes.
21 Q.  You said Acting Director Vought, yes?
22 A.  At the week of the 10th of February, there were two tracks
23 going on at the same time, that's what's a little bit
24 confusing.
25 Q.  Are you saying that when you say "new leadership," you say

```
 1   sometimes you mean actual new leadership, but other times you
 2   mean other people?
 3   A.  Well, I use new leadership together.  But I'm not -- I
 4   didn't get the impression that people were on the same page
 5   about what exactly was going on.
 6             THE COURT:  Was Mr. Vought the leader the day he sent
 7   out the email on February 8th?
 8             THE WITNESS:  He was ultimately the leader, yes.
 9             THE COURT:  Was he the leader that day?
10             THE WITNESS:  Yes.
11             THE COURT:  Was he the leader on February 10th when
12   he sent out the memo saying don't work?
13             THE WITNESS:  Yes.
14             THE COURT:  So who are the people directing you
15   since -- you got involved in OPM and the RIFs, correct?
16             THE WITNESS:  I did.
17             THE COURT:  At whose direction?
18             THE WITNESS:  DOGE.
19             THE COURT:  Okay.  At that point had DOGE become
20   Christopher Young of the CFPB because he was designated?
21             THE WITNESS:  He did.
22             THE COURT:  Who would have to designate him then?
23             THE WITNESS:  The acting director.
24             THE COURT:  So Vought designated the DOGE people to
25   be CFPB people?
```

1            THE WITNESS: That is correct.
2            THE COURT: They got to tell you to go do this thing
3    with OPM?
4            THE WITNESS: Yes.
5            THE COURT: Okay.
6    BY MS. BENNETT:
7    Q.  Okay. So could you turn to plaintiffs' Exhibit JJ at 1.
8    So that's an email on February 13th?
9    A.  Correct.
10   Q.  Right. And that's before these terminations were supposed
11   to happen, right?
12   A.  That's correct.
13   Q.  Okay. And it's from Jeremy Lewin, right?
14   A.  Yes.
15   Q.  And he's a -- I think you identified him as a member of
16   DOGE, yes?
17   A.  That's correct.
18   Q.  And that email says we owe acting Director Vought an update
19   at 10 a.m. tomorrow, right?
20   A.  Yes.
21   Q.  So they were keeping Acting Director Vought apprised?
22   A.  Yes.
23   Q.  Is it your testimony that Acting Director Vought knew but
24   didn't do anything?
25   A.  I would presume that he knew.

1  Q. -- so this employee says we're going to lose all of our
2  historical data if we don't make this payment, right?
3  A. Yes, yes.
4  Q. And there's no answer about how to ensure that doesn't
5  happen, right?
6  A. That is correct.
7  Q. Okay. I'm going to ask to change gears again. And let's
8  talk about the stop-work order.
9      So we have the February 10th email, right?
10 A. Yes.
11 Q. And Acting Director Vought was appointed, says employees
12 should stand down from performing work tasks, right?
13 A. Yes.
14 Q. Okay. That has not been rescinded, has it?
15 A. No.
16 Q. And I believe you testified on direct this is a unique
17 situation, right?
18 A. It is unique.
19 Q. You're not aware of any other example where this has
20 happened, right?
21 A. Not in my career, no.
22 Q. Okay. I just want to talk about what happened after the
23 stop-work order was issued.
24     So that stop-work order was in effect when you submitted
25 your declaration on February 24th, the first declaration?

```
 1    A.   Yes.
 2    Q.   And you said in that declaration that CFPB leadership has
 3    worked to comply with statutorily-required functions, right?
 4    A.   That's what they -- yes, that's what they told me.
 5    Q.   And that's what they told you.  The leadership was telling
 6    you that it was working with --
 7    A.   That intent was to follow statutory requirements.
 8    Q.   And you testified that the CFPB had maintained operations
 9    when you --
10          THE COURT:  When you say that, are you talking about
11    the Vought/Paoletta or the whole other team that you've been
12    talking about as a leadership team, including the DOGE people
13    who have now been deputized?  Who told you the intention prior
14    to your declarations on --
15          THE WITNESS:  It was Mark Paoletta, because the
16    timing -- there were about two weeks from when, like, DOGE
17    started to my declaration being, you know, filled out and
18    signed.  And it was towards the latter part that it was very
19    clear that I think there was -- I got the perception there was
20    concerns about not following statutory requirements.  Is --
21    yeah.
22    BY MS. BENNETT:
23    Q.   So there were concerns about not following statutory
24    requirements?
25    A.   Yes.
```

1  Q. That's what you're testifying. Okay. But, in fact, at the
2  time that your declaration was submitted, most statutory
3  functions were not up and running at the Bureau, right?
4  A. I didn't know what was being -- necessarily what was being
5  implemented. I mean, I'm not, again, part of the mission side
6  of the house. What I understood from the chief legal officer
7  and his team was that they were going to follow the statutory
8  requirements for the agency.
9  Q. I see. So you were -- when you say in your declaration --
10 you say it in several different ways, I think -- that the
11 Bureau is fulfilling its statutory functions --
12 A. That was the direction that we had received.
13          MR. ROSENBERG: Objection. That's misleading. I
14 don't think he says in his declaration the Bureau was
15 fulfilling statutory functions. He used different language.
16 BY MS. BENNETT:
17 Q. So the Bureau, in your view, on February 24th, you didn't
18 know whether it was actually fulfilling its statutory
19 functions, right?
20 A. There was some work that was -- that had continued, yes. I
21 mean, they were looking at enforcement cases and -- yeah. I
22 mean, there was some work being done.
23 Q. So when you -- in your declaration --
24          THE COURT: You said, in paragraph 20, the closure of
25 the headquarters has not prevented them --

```
 1                THE WITNESS:  Correct.
 2                THE COURT:  -- from performing statutory functions.
 3     And they had the ability to work from home.
 4     A.   Um-hum.
 5     BY MS. BENNETT:
 6     Q.   Fair to say that the impression that your declaration gives
 7     is that statutory functions are ongoing, right?
 8                MR. ROSENBERG:  Objection.
 9                THE COURT:  All right.  Its either in there or it's
10     not.  But did you -- you don't have a sentence in here where he
11     said they are in fact performing the statutory functions?
12                MS. BENNETT:  So I'll just -- we'll just go directly
13     to the declaration.
14                THE COURT:  Here it is, paragraph 19.  Since the
15     arrival of the Acting Director, the new leadership is engaging
16     in ongoing decisionmaking to assess how to make the Bureau more
17     effective and accountable.  Our leadership has worked to comply
18     with statutorily-required functions and my operations team has
19     been mindful of this as we advise on operational-related
20     issues.  Is that the sentence you want to ask him about?
21                MS. BENNETT:  Yeah.
22                THE COURT:  All right /ask him a question.
23                MS. BENNETT:  So when you said that, your information
24     was coming -- it's just based, on what Mark Paoletta told you,
25     right?
```

```
 1    A.   Yes, yes.
 2    Q.   It's not based on any insight into the mission side of the
 3    agency, right?
 4    A.   Not at all.
 5    Q.   Okay.  And, in fact, at that time, if you know, most of the
 6    functions were not up and running, right?
 7    A.   That's what I know now.
 8    Q.   You know now that when you submitted your declaration on
 9    February 24th, most of the functions were not up and running,
10    right?
11    A.   Most of the functions.
12    Q.   So supervision, not up and running?
13    A.   I was not aware of what -- I was only aware of what was in
14    the bullet point.  Again, I'm not mission programmatic.
15    Q.   Sure.
16    A.   So I have no control over that.  I also don't know what
17    engagement was taking place behind the scenes between those
18    entities and Mark Paoletta and the leadership.
19              THE COURT:  I think we've established he didn't know.
20    So you can ask your next question, as opposed to more about
21    what he didn't know.
22              MS. BENNETT:  Sure.
23    BY MS. BENNETT:
24    Q.   You didn't know about the mission side of the agency?
25    A.   No.
```