# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
    *Plaintiffs*,

v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,

    *Defendants*.

Case No. 25-cv-0381-ABJ

**DECLARATION OF DREW DOE**

I, Drew Doe, declare as follows:

1.    I am an employee at the Consumer Financial Protection Bureau (CFPB). This declaration is being written to establish a written record of conditions that I observed over the past month. The statements in this declaration are based on my personal knowledge.

2.    I am filing this declaration pseudonymously because I fear retaliation. If requested, I would be willing to share my name and position at the CFPB with the Court ex parte and under seal.

3.    On Thursday, February 6, and Friday, February 7, 2025, employees of the United States DOGE Service visited the CFPB and were given CFPB laptops. Contrary to the affidavit of Adam Martinez filed in *AFL-CIO v. Dep't of Labor* (No. 25-339), those DOGE employees had not—and to this day, still have not—completed the required cybersecurity and privacy training. In addition, contrary to CFPB policy, they were allowed access to the CFPB's systems and data before any agreement between the CFPB and DOGE regarding their work was signed.

4.    On February 7, DOGE employees were given full privileged access to CFPB systems and data, without following the process that the CFPB ordinarily requires to do so. For

1

example, the DOGE employees did not sign the documents that outline the rules governing the use of CFPB systems and data. They did not complete the training required for users who have such a high level of access to CFPB systems and data. Nor was any document waiving these requirements signed by an official with the power to authorize such a waiver.

5. On multiple occasions between Friday, February 7, 2025 and Tuesday, February 25, 2025, multiple Senior Executives shared that the intention of the leadership was to fire everyone but the five positions required by the Dodd-Frank Act. They also shared that all five of the CFPB's buildings (the headquarters in DC and all of the agency's regional offices) were being returned to the agencies that had leased the buildings to CFPB. On multiple occasions, staff were told by Senior Executives that "the writing was on the wall" and that "it was all over but the terminations." By Thursday, February 13th, most of the CFPB's contracts had been terminated, all of the probationary employees had been fired (via a failed mail merge), and all term employees who had not already agreed to resign were fired. It was clear to internal staff that this was not a pause, nor audit, nor any form of analysis.

6. The CFPB terminated all contracts for Supervision, Enforcement, Consumer Response, Regulations, Front Office, and most of Operations contracts—approximately $200 million terminated contracts out of approximately $227 million total contracts. The hasty termination of almost all of the Bureau's contracts resulted in systems and services being turned off before CFPB or contract personnel returned CFPB data. Because not all systems have off-line backups, some of the CFPB's data may have been deleted. Among other things, this data may include CFPB Human Resource records, Reasonable Accommodation records, Ombudsman records, and Equal Employment Opportunity records. The data may not be recoverable and as of February 25th, CFPB is trying to now figure out which systems and services have records.

7. During meetings about the CFPB's shut-down that took place between Monday, February 18 and Tuesday, February 25, staff were told by Senior Executives that the CFPB would be eliminated except for the five statutorily mandated positions; that the CFPB would exist in name only; and that, once this Court's injunction was over, everything would need to be either removed from the building or destroyed. Staff were told by Senior Executives that the CFPB would no longer have an employee location and that data could not be stored at any CFPB location because there wouldn't be any locations left. Staff were told that no DHS, OIG, GAO, OMB, Internal Controls, Congressional, or other compliance would be necessary because the CFPB would "not exist" and it would no longer be "our problem."

8. Senior Executives explained that the work stoppage on February 10 was characterized as a work stoppage to avoid the 10-day legal limit on administrative leave. Because of the work stoppage, only the barest of information intake has been happening, and full data handling has been slowed if not eliminated due to the contract terminations and reversals. There has been no attempt internally to hide the fact that the disassembly of the CFPB continues despite the Court's order. The status quo as of February 14th has not been maintained.

9. When Senior Executives were approached by staff about the inaccuracies in affidavits provided by Adam Martinez, the Senior Executives stated that they were not going to discuss the facts, and staff were told to stop asking. The majority of operations have been terminated. Moreover, for those few systems that have been allowed to continue, their operations staff have been largely terminated. Given the stop work order, the CFPB's systems may be able to detect and log an ongoing issue, but may not be able to maintain secure operations or respond to a problem, as most of the contract staff are gone with no transfer of institutional knowledge.

10. Because of the stop-work order, the work required to maintain the security and stability of the CFPB's computer systems—including systems that collect and maintain CFPB data—is not happening. Requests to perform this necessary work were denied by Senior Executives. Multiple iterations of cuts have left the CFPB systems with unclear support and maintenance. If this continues, almost all CFPB systems will be ended, with the few remaining systems reported to be transferred to another agency. The direction given was not to conduct streamlining but instead mandated that programs, staff, and contracts be pared beyond what can sustain any effective operation. One Senior Executive said that CFPB will become a "room at Treasury, White House, or Federal Reserve with five men and a phone in it." Concerns raised to the Senior Executives have been largely ignored, even when positions or requirements are mandated by statutes other than Dodd-Frank. I am unaware of any effort to assess whether these actions have or will create any streamlining or efficiency gains.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 26, 2025, in Washington, D.C.

/s/ *Drew Doe*
Drew Doe