**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, et al., | Case No. 1:25-cv-00339-JDB |
| Plaintiffs, | Judge John D. Bates |
| v. | |
| DEPARTMENT OF LABOR et al., | |
| Defendants. | |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 1

I.     Plaintiffs Lack Article III Standing............................................................................ 1

     A.    Plaintiffs Lack Associational Standing ......................................................... 1

     B.    Plaintiffs Lack Organizational Standing ....................................................... 6

II.    Plaintiffs Fail To State Claims Upon Which Relief Can Be Granted ................................. 8

     A.    The APA Claims Must Be Dismissed ........................................................... 8

          1.    No Final Agency Action Has Been Alleged ...................................... 8

          2.    Plaintiffs Cannot Use The APA To Bring Claims Under The Privacy Act.... 11

          3.    Plaintiffs Fail To Allege Violations Of The Privacy Act, And Cannot Use The Privacy   Act To Challenge Internal Personnel Practices ............................. 13

          4.    Plaintiffs' Other Data Protection Statute Claims Should Be Dismissed ....... 14

          5.    Plaintiffs' Procedural APA Claims Should Be Dismissed ............................ 17

     B.    The Freestanding Privacy Act Claim Must Be Dismissed.................................. 17

     C.    The *Ultra Vires* Claim Must Be Dismissed.......................................................... 19

CONCLUSION................................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Air Brake Sys., Inc. v. Mineta,*
  357 F.3d 632 (6th Cir. 2004) ................................................................ 11

*All. for Retired Ams. v. Bessent,,*
  --- F. Supp. 3d ----, 2025 WL 74040 (D.D.C. Mar. 7, 2025) ....................... 4

*Am. Fed. Teachers v. Bessent,*
  --- F. Supp. 3d ----, 2025 WL 582063 (D. Md. Feb. 24, 2025) .................... 4

*Ass'n for Community Affiliated Plans v. U.S. Department of Treasury,*
  966 F.3d 782 (D.C. Cir. 2020) .............................................................. 16

*AT&T Co. v. EEOC,*
  270 F.3d 973 (D.C. Cir. 2001) ................................................................ 9

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
  502 U.S. 32 (1991) ............................................................................. 20

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................. 9

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) ........................................................................... 11

*Bohnak v. Marsh & McLennan Companies, Inc.,*
  79 F.4th 276 (2d Cir. 2023) ................................................................... 3

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ......................................................................... 3, 6

*Cobell v. Kempthorne,*
  455 F.3d 301 (D.C. Cir. 2006) .............................................................. 14

*Doe v. Chao,*
  540 U.S. 614 (2004) ........................................................................... 12

*Doe v. Stephens,*
  851 F.2d 1457 (1988) ..................................................................... 12, 18

*Fed. Exp. Corp. v. U.S. Dep't of,*
  *Com.*, 39 F.4th 756 (D.C. Cir. 2022) .................................................... 20

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ........................................................................................... 6, 7, 8, 9

*Grosdidier v. Chairman, Broad Bd. of Governors*,
  560 F.3d 495 (D.C. Cir. 2009) ........................................................................... 11

*Haase v. Sessions*,
  893 F.2d 370 (D.C. Cir. 1990) ........................................................................... 18, 19

*Hastings v. Judicial Conference of U.S.*,
  770 F.2d 1093 (D.C. Cir. 1985) ......................................................................... 11

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................................... 6

*In re U.S. OPM Data Security Breach Litig.*,
  928 F.3d 42 (2019) ............................................................................................. 2

*Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*,
  No. 23-cv-3570, 2024 WL 4239936 (D.D.C. Sept. 19, 2024) ........................... 2

*L.M-M. v. Cuccinelli*,
  442 F. Supp. 3d 19 (D.D.C. 2020) ..................................................................... 14, 18

*Laird v. Tatum*,
  408 U.S.  (1972) ................................................................................................. 5, 6, 8

*Lepre v. Dep't of Labor*,
  275 F.3d 59 (D.C. Cir. 2001) ............................................................................. 21

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ........................................................................................... 17

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ........................................................................................... 14

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ............................................................................................. 6

*New York v. Trump*,
  --- F. Supp. 3d ----, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) ..................... 3

*Norton v. S. Utah Wilderness*,
  *All.*, 542 U.S. 55 (2004) ................................................................................... 9, 17

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ............................................................. 21

*O'Leary v. TrustedID, Inc.*,
   60 F.4th 240 (4th Cir. 2023) ................................................................. 3

*Parks v. IRS*,
   618 F.2d 677 (10th Cir. 1980) .............................................................. 4

*Radack v. U.S. Dep't of Just.*,
   402 F. Supp. 2d 99 (D.D.C. 2005) ..................................................... 12

*Smith v. Nixon*,
   807 F.2d 197 (D.C. Cir. 1986) ........................................................... 19

*Southwest General, Inc. v. NLRB*,
   796 F.3d 67 (D.C. Cir. 2015) ............................................................. 14

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 ...................................................................................... 19

*TransUnion v. Ramirez*,
   594 U.S. 413 (2021) ......................................................................... 5, 6

*Venetian Casino Resort, LLC v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008) ........................................................... 10

*Westcott v. McHugh*,
   39 F. Supp. 3d 21 (D.D.C. 2014) ....................................................... 11

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ........................................................... 11

**Statutes**

5 U.S.C. § 552a(b)(1) ............................................................................. 13, 19

5 U.S.C. § 552a(e)(7) ............................................................................... 5, 18

5 U.S.C. § 552a(g)(1)(D) ........................................................................ 18, 19

5 U.S.C. § 552a(g)(4) ................................................................................... 18

5 U.S.C. § 2302(b)(9)(D) ............................................................................. 16

31 U.S.C. § 1535(a) ..................................................................................... 20

38 U.S.C. § 3301 ............................................................................................................... 12

38 U.S.C. § 5701 ............................................................................................................... 12

38 U.S.C. § 5701(j) ........................................................................................................... 12

42 U.S.C. §§ 1320d-5–1320d-6 ........................................................................................ 16

44 U.S.C. § 3554(a)(1)(A) ........................................................................................... 15, 16

Pub. L. No. 102–40 ........................................................................................................... 12

**Regulations**

12 C.F.R. § 1070.4 ............................................................................................................ 17

12 C.F.R. § 1070.59 .......................................................................................................... 16

20 C.F.R. § 10.10 .............................................................................................................. 16

## INTRODUCTION

Plaintiffs' First Amended Complaint seeks to elevate what is, at most, an issue with whether federal agencies chose the correct formal onboarding mechanism for individuals who are employees at the U.S. DOGE Service ("USDS") prior to giving them access to records systems, into a basis for prohibiting such employees from ever working at the agencies. That theory is untenable for three principal reasons. First, Plaintiffs lack Article III standing to bring such a case in federal court, as they have not alleged an injury-in-fact similar to the harms courts vindicated at common law. Their efforts to analogize this case to those involving hacking, unauthorized data use, and fraud lack merit. Second, a decision to provide system access lacks the characteristics of "final agency action" that can be challenged under the Administrative Procedure Act ("APA"), and Plaintiffs cannot cure that problem by aggregating a series of actions that are not subject to APA review, or by alleging that they are challenging a policy judgment that, by its nature, does not consummate any access-provision decision and does not result in legal consequences to anyone. Third, Plaintiffs cannot utilize the APA to seek forms of relief that Congress did not authorize within the comprehensive remedial scheme of the Privacy Act. Plaintiffs fail to make out a violation of the APA, the Privacy Act, or any other statute, and their ultra vires claim against USDS is similarly lacking in merit. Accordingly, the Court should grant Defendants' motion, and dismiss Plaintiffs' First Amendment Complaint.

## ARGUMENT

## I.    Plaintiffs Lack Article III Standing

### A.    Plaintiffs Lack Associational Standing

Defendants' opening brief explained that the injuries to Plaintiffs' members described in the first amended complaint were generalized grievances over the government's operations that lacked an analogue to common-law injury sufficient to give rise to Article III standing. Defs.'

1

Mot. to Dismiss Pls.' First Am. Compl. at 13–18, ECF No. 49 ("MTD").  Plaintiffs' response resists this conclusion as to DOL and HHS (but not CFPB), and tries to reframe the case to be about the Defendant Agencies' "failure to adequately secure [their] databases" by permitting access to those working to implement the DOGE E.O.  Pls.' Resp. to Defs.' Mot. to Dismiss  at 7–8, ECF No. 50 ("MTD Opp.").  This analogy, which springs from cases like *In re U.S. OPM Data Security Breach Litig.*, 928 F.3d 42 (2019) ("*OPM Data Breach*"), simply does not reflect the law or the facts pled by Plaintiffs and should be rejected.

In *OPM Data Breach*, the plaintiffs alleged that outside hackers had breached OPM's systems through an unauthorized cyberattack, stolen their sensitive information, and used (or were likely to) that stolen information in the future in ways that would injure the plaintiffs.  *Id.* at 56; *see also Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*, No. 23-cv-3570, 2024 WL 4239936, at *1, *4 (D.D.C. Sept. 19, 2024) (concluding standing existed for claims by union members that their PII was compromised via the union's failure to adequately safeguard data, leading to a cyberattack that compromised personally identifiable information).  The Court concluded that one of the union plaintiffs in that case had standing to bring constitutional claims against OPM because, "given [their] allegations regarding OPM's continued failure to adequately secure its databases, it is reasonable to infer that there remains a 'substantial risk' that their personal information will be stolen from OPM again in the future." *OPM Data Breach*, 928 F.3d at 54–55.

But no data breach has been alleged in this case, nor have facts been alleged which would lead to a plausible, non-speculative inference that one may occur in the future.  Rather, as Plaintiffs do not dispute, the system access decisions being challenged here are being made by the agencies themselves, who are implementing government-wide policy directives set forth in the DOGE E.O.  MTD at 5 (summarizing these portions of the amended complaint).  At most, Plaintiffs can assert

that a concern exists, as to a subset of these individuals, as to whether or not a particular way of onboarding the USDS employees at DOL, HHS, or CFPB agency was proper. That is a far cry from the Defendant Agencies not taking sufficient measures to prevent theft of personal information by outside cybercriminals seeking to engage in crimes.

To the extent Plaintiffs assert that mere access provision unacceptably increases the risk that cyberattack, or other form of injury-causing information leak (whether intentional or accidental), will happen in the future, that does not constitute "certainly impending" future harm for purposes of Article III standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiffs' theory of harm also raises serious causation problems. For Plaintiffs' theory to hold water, they would have to demonstrate: (1) that access by the DOGE individuals will—by some unknown mechanism—materially increase the risk of hacking; (2) that there will be a cybersecurity incident that will compromise the Defendant Agencies' information; (3) that the Plaintiffs' members' information specifically will be compromised; and (4) that compromise will cause the Plaintiffs' members cognizable harm. Relying on this "speculative chain of possibilities . . . does not establish that injury based on potential future [action] is certainly impending or is fairly traceable[.]" *Id.* at 414; *see also O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 244 (4th Cir. 2023) ("[B]eing subjected to a data breach isn't in and of itself sufficient to establish Article III standing without a nonspeculative, increased risk of identity theft."). The Court should reject this analogy, and eschew reliance on recent decisions from other jurisdictions that rely upon it.[1]

---

[1] *New York v. Trump*, --- F. Supp. 3d ----, 2025 WL 573771, at *11–12 (S.D.N.Y. Feb. 21, 2025) (relying on an analogy to *Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276, 279-80 (2d Cir. 2023), which involved a "targeted data breach of [the plaintiff's] employer", to conclude that standing existed to challenge disclosure of information to officials of USDS).

Another case Plaintiffs rely upon, as well as a recent decision of this Court, articulate a narrower theory: that Article III standing exists when "personal information is improperly disclosed to government employees," following an analogy to common law torts like the invasion of privacy. *Am. Fed. Teachers v. Bessent*, --- F. Supp. 3d ----, 2025 WL 582063, at *7 (D. Md. Feb. 24, 2025); *see also All. for Retired Ams. v. Bessent*, --- F. Supp. 3d ----, 2025 WL 740401, at *16–17 (D.D.C. Mar. 7, 2025). These analogies also falter. In the *Am. Fed. Teachers* case, the Court relied on a Tenth Circuit case, *Parks v. IRS*, 618 F.2d 677 (10th Cir. 1980), decided decades prior to much of the Supreme Court's modern standing jurisprudence for the point that standing existed to challenge inter-governmental sharing. The disclosures at issue in *Parks*, although made to other agency employees, "were made to inappropriate users for other than officially designated purposes," and "the information was not needed by agency officials and employees in the regular performance of their work." *Id.* at 679–80. Similarly, the Court in *Alliance for Retired Americans* relied on an analogy to accessing a bank account with a fraudulent court order to conclude that standing could exist based on allegations "individuals falsely purporting to have lawful access to that information demanded its disclosure." 2025 WL 740401, at *17. That is not the case here, as the allegations in the complaint demonstrate. Rather, agency officials, tasked with implementing the President's DOGE E.O., have determined that the employees at issue have a need to access agency systems; and they are accessing those systems at the agencies with the knowledge and permission of the agencies. MTD at 4–5 (summarizing these allegations). Even if there are situations where sharing with other government officials constitutes an actionable injury-in-fact, this case does not present them.

Plaintiffs' responses to Defendants' arguments lack merit for similar reasons. First, Defendants are not seeking to frame this issue as one for retrospective relief. As outlined above,

the problem is that Plaintiffs have not alleged a sufficiently proximate risk of a prospective harm that is actionable in federal court. Second, Plaintiffs' reliance on legislative history proves little. No one disputes that unauthorized disclosures to other government employees, such as that described by Sen. Earvin and the *Parks* case, could give rise to Article III standing. The relevant question here is whether *authorized* disclosures to those who are working for the agency, with the agency's knowledge and approval, in order to carry out the agency's business, are actionable under Article III merely because, at most, the employee was not properly onboarded.

Plaintiffs resist the comparison of this case to *Laird v. Tatum*, 408 U.S. 5 (1972), but the case strongly counsels in favor of dismissal of this action on standing grounds, and their attempts to dismiss it fall flat. Certainly, the plaintiffs who brought *Laird* were not comforted by the fact that the database contained information on activities "thought to have at least some potential for civil disorder," the equivalent of what a "good newspaper reporter would be able to gather." *Id.* at 6, 9. Indeed, the Privacy Act expressly forbids the collection of data on "how any individual exercises rights guaranteed by the First Amendment," which are generally public activities, absent a valid law enforcement purpose. 5 U.S.C. § 552a(e)(7). Congress's decision to enact the Privacy Act after the *Laird* decision is also a non-sequitur: the Privacy Act clearly does not create a cause of action for Plaintiffs to enjoin the government on an improper disclosure theory, which is why they have resorted to a novel method of asserting their Privacy Act claims through the APA. In any event, *Laird* is an Article III standing decision that the Privacy Act does not negate or overturn. *TransUnion v. Ramirez*, 594 U.S. 413, 426 (2021).

Finally, Plaintiffs are engaging in precisely the enterprise the Supreme Court refused to sanction in *Laird*: a "broad-scale investigation, conducted by themselves as private parties armed with the subpoena power of a federal district court and the power of cross-examination, to probe

into" USDS's work at the Defendant Agencies, "with the district court determining at the conclusion of that investigation the extent to which those activities may or may not be appropriate to" the mission of these agencies.  408 U.S. at 14.  Then as now, the courts are not "virtually continuing monitors of the wisdom and soundness of Executive action."  *Id.* at 15; *see also Murthy v. Missouri*, 603 U.S. 43, 76 (2024) ("This Court's standing doctrine prevents us from 'exercis[ing such] general legal oversight' of the other branches of Government." (quoting *TransUnion*, 594 U.S. at 423-24)).  The Court should accordingly conclude that Plaintiffs fail to plead associational standing.

### B.    Plaintiffs Lack Organizational Standing

Defendants' opening brief also explained why, for similar reasons, Plaintiffs have failed to allege standing in their own right under Article III.  MTD at 19–21.  Organizational standing has not been adequately alleged in this case for much the same reason that associational standing does not exist: the sensitive information of Plaintiffs has not been exposed in a manner that parallels an injury at common law traditionally redressable in court.  The Court should also reject Plaintiffs' standing under a diversion-of-resources theory pursuant to cases like *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  Plaintiffs do not have "standing because they incurred certain costs as a reasonable reaction to a risk of harm," and the "harm respondents seek to avoid is not certainly impending," *Clapper*, 568 U.S. at 416, and because their injuries lack a common law analogue that would traditionally support a lawsuit, *TransUnion*, 594 U.S. at 425.

Plaintiffs also rely on the Supreme Court's recent decision in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*Alliance*"), but that decision strongly counsels against the type of standing argument Plaintiffs make here.  *See* MTD Opp. at 12–14.  In *Alliance*, the plaintiffs asserted organizational injuries on the grounds that the FDA's loosening of rules requiring the reporting of serious adverse events to the drug sponsor (and in turn, the FDA)

had "'caused' [them] to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks[]" and "forced" them to expend resources drafting citizen petitions, public advocacy, and public education. *Id.* at 375, 394. The Supreme Court found these injuries insufficient for standing purposes. *Id.* The plaintiffs then attempted to pivot to a *Havens Realty* theory of organizational standing which the Supreme Court also rejected. The Court clarified that *Havens Realty* does not mean "standing exists when an organization diverts its resources in response to a defendant's actions[,]" and that it only applies when a defendant's "actions directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 396. It further cautioned that *Havens* "was an unusual case" with a holding that should not "extend . . . beyond its context." *Id.* The Supreme Court ultimately concluded the *Alliance* plaintiffs failed to meet this narrow standard, which was predicated on allegations that "FDA is not properly collecting and disseminating information about mifepristone, which the associations say in turn makes it more difficult for them to inform the public about safety risks." *Id.* at 395–96.

Plaintiffs suggest that the Supreme Court somehow *liberalized* associational standing in *Alliance* by holding that "an organizational plaintiff can establish standing merely by showing that the defendant's actions 'perceptibly impaired' its organizational activities, without a separate showing that the organization diverted resources." MTD Opp. at 13. If anything, the opposite is true. The Supreme Court labeled as "incorrect" the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions" under *Havens Realty*; rather, a defendant's actions must impact the "core business activities" of Plaintiffs. *Alliance*, 602 U.S. at 395. And this case certainly falls well outside the limited "context" in which *Havens Realty* was

decided. *Alliance*, 602 U.S. at 396. Plaintiffs also ignore how the Supreme Court actually applied standing doctrine in *Alliance* to reject claims that government action that plaintiffs allege impeded their ability to inform the public about the risks of mifepristone. Those claims are analogous to their own claims of harm to their ability to counsel clients and conduct research as a result of the data-access decisions they challenge here.

Plaintiffs' organizational standing claims fall well short of demonstrating the type of injury redressable in federal court, and *Havens Realty* does not provide an alternative vehicle for standing. Accordingly, the Court should conclude standing is not properly alleged here and grant Defendants' motion.

## II. Plaintiffs Fail To State Claims Upon Which Relief Can Be Granted

### A. The APA Claims Must Be Dismissed

#### 1. No Final Agency Action Has Been Alleged

Defendants' opening brief showed that Plaintiffs have failed to allege a proper final agency action that can be challenged through the APA, for two key reasons. First, there is no "agency action" being challenged at all, because access decisions are routine matters of internal agency business that do not have outward-facing impact on the regulated public in a manner that is characteristic of "agency action," as defined by the APA. MTD at 22–23. Second, even if the Court finds an "agency action" here, it is not "final agency action" because, even if provision of access has significant practical consequences on the regulated public, it does not set legal rights and obligations for Plaintiffs or their members in a conclusive way. *Id.* at 23–25. Plaintiffs cannot articulate a theory of final agency action that resolves both of these concerns, and as such, their APA claims should be dismissed.

Plaintiffs appear to concede that a "routine grant[] of access" decision would not be sufficient to trigger APA review. MTD Opp. at 18. So instead of challenging decisions to grant

8

any particular individual access to any particular system, they frame their suit as a challenge to "systemic decisions to grant full and unusual levels of access" to those implementing the DOGE E.O., alleging that the agencies have made departures from the policies they would typically employ prior to giving employees system access. *Id.* But that "systematic decision" certainly fails to qualify as final agency action under the *Bennet v. Spear* test, for at least two reasons. First, such a decision is not "final" in the sense required by *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), because it precedes any actual decision to request access for a specific individual to access a specific system, which is the earliest possible point at which something resembling a legal consequence could befall an agency employee or a citizen whose data resides in an agency system. Second, even when an agency's course of action strongly suggests a certain outcome, a plaintiff cannot aggregate non-final agency actions (or non-actions) to prompt judicial review before a final agency action occurs. *See AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001) (rejecting argument that "the entire course of the Commission's actions with respect to the Company's service credit policy, including the Letters of Determination, in the aggregate shows the agency has reached a final conclusion concerning its legal position" that could be challenged through an APA lawsuit because the agency had not actually filed a lawsuit). Indeed, Plaintiffs' framing of its claims as "systemic," rather than an attack on discrete access decisions, suggests that it is making precisely the sort of "broad programmatic attack" on the Defendant Agencies' operations that the APA does not countenance. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

Plaintiffs' other arguments also fall short. They attempt to distinguish authorities Defendants relied upon in the opening brief on the basis that agency employees "could [not] ignore" their agencies' policies and "must comply with them." MTD Opp. at 19. Of course, workers cannot ignore workplace policies. But not every workplace policy marks a consummation

of agency decision-making from which legal consequences flow, and Plaintiffs' alleged "systemic decision" about how to provide system access does not meet those criteria. Plaintiffs reliance on *American Federation of Teachers*, if anything, only underscores how untenable Plaintiffs' argument that granting system access constitutes final agency action truly is. 2025 WL 582063. It would mean that any time an agency decides to grant access to a record in a system of records on any basis listed in § 552a(b) that does not require an individual's written authorization, the decision would constitute reviewable final agency action because the agency necessarily concluded it did not need to seek consent. Something more than access must be present to meet the two-pronged *Bennett* test.

Finally, Defendants distinguished *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), in their opening brief. MTD at 24–25. Plaintiffs continued attempts to rely upon it rest on an error similar to the one that infects their standing analysis. The plaintiff in *Venetian* sued the EEOC in order to resist a subpoena to provide confidential documents because it believed EEOC policy permitted the EEOC to disclose those documents to "competitors and labor unions" without its prior consent. 530 F.3d at 927. Plaintiffs have similarly conflated access decisions with hacking or targeted leaks of confidential information to score reprisals on whistleblowers, and the Court should reject the analogy here as well. Contrary to Plaintiffs' argument, MTD Opp. at 20, there is in fact a material distinction between a policy of turning over a company's confidential business information to those who could use it to undermine the company's competitive standing and contract negotiations, and permitting system access to government employees authorized by the agency to work on matters germane to the agency's mission, is untenable. Plaintiffs' speculation about potential harms arising from the latter scenario are far more speculative than the former, and far too speculative to give rise to final agency action. To

the extent the provision of access alone has some consequences for Plaintiffs, as they allege it has, those consequences are different in kind from the loss of control of information at issue in *Venetian*, and fail to meet *Bennett*'s requirement of "legal" consequences that denotes final agency action. *See Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004) (acknowledging that adverse effects "accompany many forms of indisputably nonfinal government action").

### 2. Plaintiffs Cannot Use The APA To Bring Claims Under The Privacy Act

Defendants also argued previously that Plaintiffs cannot smuggle alleged violations of the Privacy Act for which the Privacy Act does not provide redress through the APA. MTD at 25–28. The argument is straightforward. The D.C. Circuit has recognized that the Privacy Act is a "comprehensive remedial scheme," akin to the Freedom of Information Act, the Civil Rights Act of 1964, and the Civil Service Reform Act ("CSRA"). *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008). That scheme permits certain forms of injunctive relief and, by implication, precludes all others. *See, e.g.*, *Hastings v. Judicial Conference of U.S.*, 770 F.2d 1093, 1104 (D.C. Cir. 1985) ("[E]ven if a claim of a violation of the Privacy Act could be made out, appellant would not be entitled to the declaratory and injunctive relief he seeks, such relief not being among those expressly made available to remedy past disclosures made in violation of the Privacy Act.").

In the face of such a scheme, plaintiffs are not permitted to "circumvent the [scheme's] requirements and limitations by resorting to the catchall APA," even when "the plaintiff cannot prevail in a claim" under the scheme. *Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (discussing the CSRA); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). Multiple decisions by this Court have reaffirmed this principle by dismissing APA claims alleging violations of the Privacy Act. *See, e.g.*, *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014). Plaintiffs essentially ignore this argument in their responsive brief. *See* MTD Opp at 23–25.

Plaintiffs respond to this argument by relying on language in cases that does not squarely support their view.  MTD Opp at 23–25.  Indeed, *Doe v. Stephens*, 851 F.2d 1457 (1988), actually supports Defendants' position. In that case, the D.C. Circuit granted an injunction on an APA claim alleging violations of "the Veterans' Records Statute, as amended by the Privacy Act."  *Id.* at 1466. The Veterans Records Statute, today codified at 38 U.S.C. § 5701,[2] is an entirely separate statute from the Privacy Act. It incorporates the Privacy Act's disclosure standards, but not its causes of action.  *See* 38 U.S.C. § 5701(j) ("[A]ny disclosure made pursuant to this section shall be made in accordance with the provisions of section 552a of title 5."). The Plaintiff had asserted a separate claim for injunctive relief banning disclosure of his records under the Privacy Act, and the court rejected that claim because it was not one of the two specific situations in which the Privacy Act authorized the entry of injunctive relief.  *Stephens*, 851 F.2d at 1463.  That claim was not brought under the APA.

*Stephens*, as well as the D.C. Circuit's precedents on comprehensive statutory schemes, is difficult to reconcile with the other decision Plaintiffs rely upon, *Radack v. U.S. Dep't of Just.*, 402 F. Supp. 2d 99 (D.D.C. 2005).  *Radack* does not cite either *Stephens* or *Hastings*, and its holding that the Privacy Act was not an adequate remedy because the plaintiff sought "declaratory and injunctive relief in addition to damages," *id.* at 104, cannot be squared with binding D.C. Circuit law.  The Supreme Court's footnote in *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004), stating that the "inattention" to standards of equitable relief in the Privacy Act "may be . . . explained by the

---

[2] Per the statute's amendment history, § 5701 was initially codified at 38 U.S.C. § 3301 (which is how the D.C. Circuit referred to the statute in *Stevens*), and was subsequently renumbered to § 5701 in a 1991 amendment of the statute.  Pub. L. No. 102–40, title IV, § 402(b)(1), (d)(1), May 7, 1991, 105 Stat. 187, 238-39.

general provisions for equitable relief within the APA," is plainly dicta, and not a sufficient basis

for this Court to ignore longstanding precedent of the D.C. Circuit.

Plaintiffs argue that they must proceed under the APA because if they cannot, it "will

frustrate access to the Privacy Act's listed remedies." MTD Opp. at 24. But it is the Privacy Act

that frustrates Plaintiffs' access to these remedies. The statute does not provide remedies to

organizations, and it does not provide any plaintiff the type of injunctive relief against disclosures.

Courts respect Congress's choices on this score by dismissing lawsuits brought on theories that

seek to provide remedial avenues that Congress did not itself create. As such, Plaintiffs' APA

claims under the Privacy Act must be dismissed.

### 3. Plaintiffs Fail To Allege Violations Of The Privacy Act, And Cannot Use The Privacy Act To Challenge Internal Personnel Practices

Regardless, the access does not violate the Privacy Act to begin with. The Act exempts

from its general disclosure bar disclosure to "those officers and employees of the agency which

maintains the record who have a need for the record in the performance of their duties." 5 U.S.C.

§ 552a(b)(1). Plaintiffs do not dispute that the USDS Executive Order directs that DOGE teams

are to be created "within their respective Agencies[.]" Exec. Order No. 14,158, 90 Fed. Reg. 8441

("USDS E.O.") § 3(c) (Jan. 20, 2025). Nor do they dispute that, as a general rule, detailees at an

agency are properly considered employees of the agency to which they are detailed. MTD at 28.

Plaintiffs likewise do not dispute that, consistent with § 552a(b)(1), the relevant individuals have

a need for the records in the performance of their duties. And particularly since DOGE teams are

accountable to agency heads in the same way other agency employees are, Plaintiffs offer nothing

in their operative complaint or opposition to the motion to dismiss to rebut the presumption of

regularity that such team members will observe ordinary agency data protection, privacy, and

related rules and policies.

The sole substantive basis for Plaintiffs' Privacy Act claim then is an argument that USDS lacks authority to send detailees in the first place. As discussed previously, this hyper-technical complaint does not give rise to an Article III controversy to begin with. But in any event and as discussed in the motion to dismiss, Plaintiffs are not even plausibly within the zone of interests protected by the Economy Act. Plaintiffs reference cases challenging acts by putative officials alleged to be unlawfully appointed. MTD Opp. at 22-23 (citing *Southwest General, Inc. v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015), and *L.M-M. v. Cuccinelli*, 442 F. Supp. 3d 19, 25-26 (D.D.C. 2020)). But in those cases, there was a much clearer relationship between the alleged statutory violation and the zone of interests protected by the relevant statute—for example, in *Southwest General*, between the Federal Vacancies Reform Act and a specific unfair labor practices complaint against the petitioner company that was allegedly unauthorized. 796 F.3d at 69–70. By contrast, notwithstanding that the zone-of-interests test "is 'not meant to be especially demanding,'" MTD Opp. at 22 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)), Plaintiffs simply do not stand within the zone of interests of the Economy Act, which regulates the relationship between different parts of the Executive Branch. And for reasons discussed in the motion to dismiss, the Privacy Act is simply not a vehicle for making granular challenges to Executive Branch employment decisions such as these.

### 4. Plaintiffs' Other Data Protection Statute Claims Should Be Dismissed

#### a. FISMA

Defendants' opening brief explained that the Federal Information Security Modernization Act ("FISMA") does not contemplate "a role for the judicial branch," *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) and, as such, judicial review of agencies' compliance with FISMA is barred by § 701(a)(2) of the APA. MTD at 30–32. To be sure, the Court in *Cobell* did not definitively decide that judicial review is not available. But the Court's skepticism on this point is

well supported by the language and structure of the statute. The statute's principal directive—that the "head of each agency shall be responsible for providing information security protections commensurate with the risk and magnitude of the harm resulting from unauthorized access, use, disclosure, disruption, modification, or destruction of" information or information systems maintained by the agency, 44 U.S.C. § 3554(a)(1)(A)—does not provide any manageable standards for judicial review. It does not, for example, offer any specific prescriptions for the tools or methods required. And the detailed mechanisms Congress chose to ensure compliance with FISMA's broad and open-ended goals—vesting in the OMB Director broad enforcement responsibility, requiring the Director to review and approve (or disapprove) each agency's security programs at least annually, and requiring annual reports to Congress, MTD at 31—do not include judicial review or any implied role for the judiciary. These features, coupled with the statute's open-ended language, further supports what this Court suggested in *Cobell*: that this question is committed to agency discretion by law.

Plaintiffs' opposition simply confirms the point. Plaintiff assert that "[t]he facts here suggest *no* meaningful attempt by the agency to consider or comply with FISMA requirements." MTD Opp. at 26. But Plaintiffs do not even attempt to suggest any judicially manageable standards—grounded in the text of FISMA itself—to determine whether an agency's attempt to comply with FISMA was "meaningful." This claim must be dismissed.

### b. CIPSEA

Plaintiffs failed to make out a CIPSEA claim in their first amendment complaint because (1) they have not alleged that an improper "disclosure" has taken place that would trigger the statute, and (2) they have not shown that the disclosure was for a "non-statistical" purpose. MTD at 32. Plaintiffs insist that the amended complaint alleges that Defendants have been granted access to DOL systems generally, MTD Opp. at 26, but this generalized contention does not adequately

plead facts necessarily to raise a possibility, beyond the speculative, that Defendants have violated CIPSEA at all, let alone that they have done so or inevitably will do so. Because Plaintiffs' CISPEA claim rests on nothing more than unsupported speculation, it too must be dismissed.

### c. HIPAA

Plaintiffs concede that HIPAA does not supply a private cause of action to individuals. MTD Opp. at 27.  They insist that this does not matter because they challenge Defendants' HIPAA compliance under the APA. *Id.* But Congress made the considered choice to leave HIPAA enforcement to HHS and state attorneys general, *see* 42 U.S.C. §§ 1320d-5–1320d-6, and this carefully reticulated scheme would obviously be frustrated if individuals could use the APA's generalized scheme to bring challenges that Congress expressly precluded them from bringing under HIPAA directly. *Ass'n for Community Affiliated Plans v. U.S. Department of Treasury*, 966 F.3d 782 (D.C. Cir. 2020), on which Plaintiffs rely, is not to the contrary. In that case, Plaintiffs challenged an agency rule redefining certain categories of health insurance and the court of appeals reviewed the agencies' construction of the Affordable Care Act, a question as to which interpretation of HIPAA was intertwined.  That is quite different from this case, where Plaintiffs seek to enforce HIPAA's requirements directly, exactly the sort of challenge Congress precluded individuals from bringing. In any event, Plaintiffs' APA challenge fails for all the reasons provided above, including that the access decisions are not reviewable agency actions.

### d. Other Agency Regulations

As discussed in the motion to dismiss, although Plaintiffs rely on several privacy-related regulations, all of those sources require a violation of the Privacy Act or other law. *See* 20 C.F.R. § 10.10 (certain records may not be released "except as provided in . . . the Privacy Act of 1974"); 12 C.F.R. § 1070.59 ("The CFPB will not disclose any record about an individual . . . unless the disclosure is authorized by 5 U.S.C. 552a(b)."); 45 C.F.R. § 5b; *see also* 5 U.S.C. § 2302(b)(9)(D)

(prohibiting threatening a federal employee with termination for "refusing to obey an order that would require the [employee] to violate a law"). And 12 C.F.R. § 1070.4, which prohibits CFPB employees for disclosing records to "any person who is not an employee of the CFPB" is not implicated in this case because the relevant personnel are employees. MTD at 33. Plaintiffs' opposition disputes that these claims should be dismissed but admit that their invocation of these provisions rises and falls with their Privacy Act claims and related arguments that the challenged policies are unlawful. Because these underlying claims fail, Plaintiffs' invocation of these other provisions is likewise unavailing.

### 5. Plaintiffs' Procedural APA Claims Should Be Dismissed

As outline above, Plaintiffs have failed to identify a final agency action which can be reviewed under the APA. *See supra* at II.A.1. Put another way, Plaintiffs have failed to identify an actual change in policy or regulation which required notice and comment rulemaking. As noted in Defendants' Motion to Dismiss, none of the Agency Defendants have disclaimed, formally or otherwise, their regulations about system access or Systems of Record Notices. *See* Mot. at 33–34. Instead, in line with current procedures and policies, the Agency Defendants have granted access to certain informational systems to certain government employees carrying out the policy objectives established by USDS Executive Order.

Plaintiffs' insistence, however, that these actions constitute new or changed policy requiring rulemaking does not make it so. Cobbling together day-to-day agency operations and labeling it agency action does not create agency action. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). Indeed, what it creates is the "broad programmatic attack[s]" disfavored in APA challenges. *Norton v. S. Utah Wilderness All.*, 542 U.S. at 64.

### B. The Freestanding Privacy Act Claim Must Be Dismissed

Plaintiffs make little effort to resurrect their freestanding Privacy Act claim. The law limits such claims to "individuals," rather than associations, and does not provide for Plaintiffs' sought after injunctive relief, and for intentional or willful agency action. *See* MTD at 34–35. Instead, Plaintiffs' Opposition merely refers the Court to arguments that (1) individuals are unnecessary for the purpose of association standing, because Plaintiffs only seek injunctive relief, *see* MTD Opp. at 10–12, and (2) provision of access by the Agency Defendants to certain USDS employees constitutes a disclosure for the purpose of the Privacy Act, *id.* at 21–23.

These arguments fail to establish standing and Plaintiffs' APA claims. *See supra* at I.A., II.A.2, II.A.3. They are in fact counterproductive, because Plaintiffs' assertion that they are not seeking monetary damages reinforces the notion that relief is not available to Plaintiffs under the Privacy Act, which provides only monetary damages for the types of claim Plaintiffs assert here. *See* 5 U.S.C. § 552a(g)(4).

*Haase v. Sessions*, 893 F.2d 370 (D.C. Cir. 1990) does not save Plaintiffs' Privacy Act claim because the footnote in *Haase* Plaintiffs has been expressly rejected by the D.C. Circuit in the context of § 552a(b) claims. In *Haase*, the D.C. Circuit examined whether a journalist could obtain attorney's fees for an alleged "Other Action," *see* 5 U.S.C. § 552a(g)(1)(D), where he claimed a violation of 5 U.S.C. § 552a(e)(7). All parties, including the court, acknowledged *Stephens*'s holding that actions pursuant to 5 U.S.C. § 552a(g)(1)(D) are limited to damages. *Haase*, 893 F.2d at 374 (citing *Stephens*, 851 F.2d at 1463). In a footnote, the D.C. Circuit acknowledged that other jurisdictions have held that injunctive relief is available *only* in Amendment and Access Actions, but that none of those cases dealt with Section 552a(e)(7) actions and thus it was not "clear to us that Congress intended to preclude broad equitable relief (injunctions) to prevent (e)(7) violations[.]" *Haase*, 893 F.2d at 374 n.6. But Plaintiffs unmistakably bring a Section

552a(g)(1)(D) action premised on an alleged violation of Section 552a(b), *see* FAC ¶ 267, and the D.C. Circuit has expressly disavowed the *Haase* footnote on which they rely in such circumstances. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 n. 10 (D.C. Cir. 2007) (citing *Haase*, 893 F.2d at 374 n.6) ("As [*Stephens*] . . . concerned remedies under 5 U.S.C. § 552a(g)(1)(D) for violations of § 552a(b), we treat it as controlling, despite this court's subsequent suggestion that the district court retains 'inherent equitable powers' to issue injunctions in § 552a(g)(1)(D) cases predicated on violations of § 552a(e)(7)."). The same is true for *Smith v. Nixon*, 807 F.2d 197 (D.C. Cir. 1986), which also addressed, in dicta, claims brought under Section 552a(e)(7). Plaintiffs fail to establish they can maintain a freestanding Privacy Act claim where they are not "individuals" and not entitled to injunctive relief.

### C.    The *Ultra Vires* Claim Must Be Dismissed

As noted in Defendants' Motion to Dismiss, *ultra vires* is an exceedingly high bar to clear. *See* MTD at 35–37. Plaintiffs seek to challenge four alleged utterly lawless actions by USDS. MTD Opp. at 29–34. None is persuasive.

First, Plaintiffs allege that USDS has, without statutory authority, directed the Agency Defendants to provide its employees access to agency systems. MTD Opp at 31; FAC ¶¶ 230–33. As even the First Amendment Complaint recognizes though, all access is granted and approved by the Agency Defendants, not USDS. *See, e.g.*, FAC ¶¶ 123–24, 147. Plaintiffs have identified no statute prohibiting governmental bodies from making requests to one another.

Second, Plaintiffs accuses USDS of having no "authority in law . . . to access[ ] or alter[ ] restricted-access systems at the" Agency Defendants. MTD Opp. at 31; FAC ¶¶ 234. But USDS employees do have legal authority to access systems of records they are granted access to by the Agency Defendants pursuant to their status as employees of those agencies and the Privacy Act's employee exception. *See* 5 U.S.C. § 552a(b)(1). To the extent relief is available for access

accorded by the Agencies in a wrongful manner, the Privacy Act provides a comprehensive scheme for remedying that access, leaving no place for an ultra vires claim.

Third, Plaintiff challenge as lawless detailing agreements between USDS and the Agency Defendants.  MTD Opp at 31; FAC ¶ 235.  These agreements (which Defendants are no longer relying upon) were entered into under the Economy Act of 1932.  31 U.S.C. § 1535(a).  As this Court has recognized, the question of USDS's authority to utilize the Economy Act is at least a "novel and complex legal issue," Order, ECF No. 34 at 6, and thus certainly not the "extreme agency error" of which *ultra vires* claims are made, *Fed. Exp. Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

Fourth, Plaintiffs contend that USDS has directed employment actions and agency restructuring.  MTD Opp. at 31; FAC ¶ 236.  To the extent the employment actions and agency restructuring Plaintiffs reference is the creation of DOGE Teams and retention of employees to carry out the policies of the USDS Executive Order, it is the Executive Order itself that purports to direct such action, not USDS.  *See* USDS E.O. § 3(c).  To the extent USDS participates in such decisions, the Executive Order itself outlines a role for USDS, instructing "Agency Heads" to make such decisions "[i]n consultation with USDS."  *Id.*  Again, Plaintiffs have identified no statute preventing government organizations from consulting with one another.  If Plaintiffs contend there are other employment actions and agency restructuring, Plaintiffs have failed to sufficiently identify such actions to satisfy Rule 12(b)(6)'s pleading burden.

Contrary to Plaintiffs' assertions, USDS is acting within the bounds of prescribed law and common practice between government entities.  Plaintiffs have failed to plead a colorable claim that USDS is acting *ultra vires* through the actions Plaintiffs allege.  Additionally, Plaintiffs have failed to establish that no alternative is available for their claims.  *See Bd. of Governors of Fed.*

*Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991).  Plaintiffs respond that they have not

brought an APA claim against USDS, so there is no alternative remedy.  *See* MTD at 31.  But that

they have not brought such a claim, or even that they would not ultimately succeed in such a claim,

does not mean there is no "alternative means of judicial review."  *Lepre v. Dep't of Labor*, 275 F.3d

59, 72 (D.C. Cir. 2001).

Thus, Plaintiffs have failed to properly plead the "Hail Mary pass" of *ultra vires* review,

and the court should dismiss their claim.  *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d

445, 449 (D.C. Cir. 2009).

## CONCLUSION

For all the foregoing reasons, the Court should grant Defendants' Motion and dismiss

Plaintiffs' First Amended Complaint.

Dated: March 14, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

MARCIA BERMAN
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Michael J. Gerardi*
Michael J. Gerardi
Senior Trial Counsel (DC Bar No. 1017949)
Benjamin S. Kurland
Trial Attorney (D.C. Bar No. 1617521)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: Michael.J.Gerardi@usdoj.gov

*Counsel for Defendants*