# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------x

AFL-CIO, et al.,          :

      plaintiffs,    :

v.                        :   CASE NO.

DEPARTMENT OF LABOR,      :   1:25-cv-00339-JDB

et al.,                   :

      Defendant.      :

------------------------x


30(b)(6) Deposition of DOGE

Through KENDALL LINDEMANN

Monday, April 7, 2025

9:33 a.m.


BEFORE: Cassandra E. Ellis, RMR, RDR, CRR,

RSA, CA-CSR 14448, WA-CCR, HI-CSR


Job no: 10515

1                    30 (b)(6) Deposition of DOGE

2     through KENDALL LINDEMANN, taken before

3     CASSANDRA E. ELLIS, Registered Professional

4     Reporter, Registered Merit Reporter,

5     Registered Diplomate Reporter, Certified

6     Realtime Reporter, Realtime Systems

7     Administrator; California Certified

8     Shorthand Reporter; Washington State

9     Certified Court Reporter; Hawaii Certified

10    Shorthand Reporter; Notary Public, held in

11    Washington, D.C., on Monday, April 7, 2025,

12    commencing at 9:33 a.m. and concluding at

13    2:16 p.m.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2         ON BEHALF OF THE PLAINTIFFS:
                AMAN T GEORGE, ESQUIRE
 3              MARK B. SAMBURG, ESQUIRE
                DEMOCRACY FORWARD FOUNDATION
 4              P.O. Box 34553
                Washington, D.C.  20043
 5              (202) 448-9090
                Ageorge@democracyforward.com
 6              Msamburg@democracyforward.com

 7

 8         ON BEHALF OF THE PLAINTIFFS:
                ZOILA E. HINSON, PRO HAC VICE
 9              ALEXA MILTON, PRO HAC VICE
                RELMAN COLFAX PLLC
10              1225 19th Street, Northwest
                Suite 600
11              Washington, D.C.  20036
                (202) 728-1888
12              Zhinson@relmanlaw.com
                Amilton@relmanlaw.com
13

14         ON BEHALF OF THE DEFENDANT:
                BRADLEY P. HUMPHREYS, ESQUIRE
15              BENJAMIN S. KURLAND, ESQUIRE
                MARCIA BERMAN, ESQUIRE
16              US DEPARTMENT OF JUSTICE
                1100 L Street, Northwest
17              Washington, D.C.  20005
                (202) 305-0878
18              Bradley.humphreys@usdoj.gov

19

20    ALSO PRESENT:
           Austin Raynor, US DOGE SERVICE
21

22

23

24

25
```

1                    INDEX TO EXAMINATION

2     30(b)(6) deposition of DOGE

3     Through KENDALL LINDEMANN

4     EXAMINATION                         PAGE

5         By Mr. George                   5

6

7                     INDEXED PAGES

8                                         PAGE

9     KENDALL LINDEMANN, sworn            5

10    REPORTER CERTIFICATE                130

11    INSTRUCTIONS TO WITNESS (none)

12    DECLARATION UNDER PENALTY OF PERJURY    129

13    ERRATA SHEET                        131

14

15                 INFORMATION REQUESTED

16                      None

17

18        WITNESS INSTRUCTED NOT TO ANSWER

19                          PAGES

20                      16, 22, 47, 121

21

22        INDEX TO PLAINTIFFS EXHIBITS

23                      NONE

24

25

```
 1              P R O C E E D I N G S

 2              30(b)(6) deposition of DOGE

 3              Through KENDALL LINDEMANN

 4      having been sworn, testified as follows:

 5                      EXAMINATION

 6  BY MR. GEORGE:

 7         Q     It's great to meet you.

 8               I'm Aman.  So I'm just going to

 9      walk through quick preliminaries for how

10      to help us go smoothly.

11               So we'll want to ensure that

12      the court reporter is able to get a

13      really clean written record of our

14      conversation, so it may feel a little

15      unnatural, but if you could give

16      verbal responses to questions rather

17      than nodding or shaking your head,

18      which she can't write down, that would

19      be helpful.

20               And if we can try not to

21      speak over each other.  I'll try and

22      let you finish before I ask another

23      question, and it will great if you can

24      let me finish a question before you

25      start answering.
```

1        Your attorney may object to

2    a question, and that's okay.  He's

3    making an objection for the record,

4    but unless he specifically says not to

5    respond to a question, you should go

6    ahead and answer.

7        If you need to take a break,

8    let me know, let us know, we'll

9    periodically take some breaks, if we

10   do take a break please finish

11   answering whatever question we were

12   talking about, you can go ahead and

13   answer, and then we'll take a break.

14       If you don't understand a

15   question, let me know and I'll try and

16   rephrase it.

17       And if you don't ask me to

18   rephrase a question I assume that you

19   understand it in the way that I ask

20   it.

21       And then, last, if you do

22   answer a question and realize that

23   there was something you forgot say, we

24   can come back to it later.  Let me

25   know and we can come back and get a

1    more complete record on the answer to

2    that question.

3              So do you understand today

4    that you will be testifying on behalf

5    of the US DOGE Service and US DOGE

6    Service temporary organization about

7    the topics in the deposition notice?

8        A    Yes.

9        Q    All right.  And you understand

10   that you're testifying under penalty of

11   perjury?

12       A    Yes.

13       Q    Is there any reason that you

14   can't give complete and truthful

15   testimony today?

16       A    No.

17       Q    All right.  Can you tell me how

18   you prepared for the deposition?

19       A    Yes.  I worked with the US DOGE

20   Service lawyers and legal team, DOJ

21   lawyers, and discussed with Amy Gleason

22   on the topics.

23              I reviewed documents, the ones

24   in front of me, and did kind of live

25   practice over the last couple of weeks.

Page 8

```
 1        Q      Was there anybody that you
 2   interviewed, aside from Amy Gleason, to
 3   prepare?
 4        A      That I interviewed?
 5        Q      Well, you said you had a
 6   conversation with Amy Gleason?
 7        A      Yeah.
 8        Q      Was there anyone else that you
 9   had a conversation with to prepare for
10   the deposition?
11        A      No.
12        Q      All right.  Thanks.
13              So for our purposes, I'm
14   going to say DOGE.  And when I say
15   DOGE, unless I specify otherwise, what
16   I mean is both the US DOGE Service and
17   the US DOGE Service temporary
18   organization, collectively.
19              So maybe we can start there:
20   Could you explain the difference, as
21   you understand it, between the US DOGE
22   Service and the US DOGE Service
23   temporary organization?
24        A      Yes.  So the US DOGE Service
25   temporary organization was established in
```

1    well, and then also helps implement some

2    of the additions to the DOGE agenda that

3    have been since January 20th.

4              But again, both help in various

5    ways.  I would not say those are

6    exclusive.

7         Q    Yeah, understood.

8              And are the employees of the

9    two organizations distinct?

10        A    No, not exclusively.

11        Q    Are you saying that there are

12   employees who are employees of both

13   organizations?

14        A    Oh, I apologize, no.  No, well,

15   you're either an employee of one or an

16   employee of the other.

17        Q    You spoke about employees prior

18   to January 20th being primarily in the

19   permanent organization.

20             Are there any such employees

21   who are employees of the temporary

22   organization?

23             MR. HUMPHREYS:  Objection,

24        form.

25        A    Not according to my knowledge.

Page 12

1        Q     To the best of your knowledge,
2    there are not employees of the temporary
3    organization who were employees of the US
4    Digital Service prior to January 20th?
5        A     According to the best of my
6    knowledge, yes.
7        Q     Are you familiar with the
8    declaration that Amy Gleason provided in
9    a different case on March 19th?
10       A     Yes, I am familiar.
11       Q     So in that declaration she said
12   there was no organizational chart for
13   DOGE, does that continue to be the case?
14       A     Correct, there's no formal
15   organizational chart.
16       Q     So I'm going to ask you just
17   some questions about how the organization
18   is structured, to understand how it's
19   laid out.
20             Is Amy Gleason the
21   administrator of the US DOGE Service?
22       A     Amy Gleason's active
23   administrator of the US DOGE Service.
24       Q     And is her role as the acting
25   administrator for both organizations?

1        A     Yes, she's acting administrator

2    for both organizations.

3        Q     So she oversees both the

4    software modernization projects that you

5    described, the permanent organization

6    being involved in, as well as overseeing

7    the other aspects of the DOGE agenda work

8    that the temporary organization primarily

9    takes responsibility for?

10              MR. HUMPHREYS:   Objection,

11          mischaracterizes testimony.

12       A     She has formal authority over

13   both organizations as the acting

14   administrator.

15       Q     Is it accurate that she has

16   been in that -- in the role of acting

17   DOGE administrator since around February

18   17th?

19       A     I believe she was appointed

20   acting administrator on February 18th.

21       Q     Okay.  And could you tell me,

22   could you lay out her responsibilities as

23   acting administrator?

24       A     Sure.  So she, like I said,

25   oversees, in a supervisor capacity, both

Page 14

1    the temporary organization and the more

2    permanent organization.

3           She is responsible for kind

4    of the strategy and oversee, like, big

5    decisionmaking as it pertains to the

6    way that the organization implements

7    the mission and the DOGE agenda.

8           And -- yeah, those would

9    be -- and she oversees, like, the

10   different projects, different projects

11   that implement the President's DOGE

12   agenda.

13   Q    USDS DOGE was established in

14   its current form by executive order on

15   January 20th, 2025.

16          The suit in this case was filed

17   on February 5th.

18          Who exercised the authority of

19   acting administrator between February 5th

20   and February 18th?

21   A    Between February 5th and

22   February 18th, there was not a formal

23   acting administrator.  But, at the time,

24   Steve Davis was the senior-most political

25   advisor.  And so there were some

1     decisions such as, like, hiring

2     decisions, for example, that he

3     authorized and that Amy Gleason later

4     ratified.

5          Q     Is Steve Davis currently a

6     member of the US DOGE Service or US DOGE

7     Service temporary organization?

8          A     Yes, he is an employee of the

9     US DOGE Service.

10         Q     He's an employee of the

11    permanent organization?

12         A     He's an employee of the

13    temporary organization.

14         Q     And could you tell me his title

15    within the temporary organization?

16         A     Senior advisor.

17         Q     Would it be accurate to call

18    him, functionally, the chief operating

19    officer of DOGE?

20         A     Steve Davis is a senior

21    advisor, and he gives his advice

22    recommendations on how things should be

23    done.

24         Q     Could you share some of his

25    responsibilities in that role?

1        A      Yeah, so, I mean, as US DOGE

2     Service is a consulting and advisory

3     body, he does help implement that

4     mission.

5             So he gives his expert input to

6     the other USC employees, and some of the

7     DOGE agency teams on how he might

8     implement the President's DOGE agenda.

9        Q      Does he report to Amy Gleason?

10       A      Yes, he reports to Amy Gleason.

11       Q      Are you aware of any orders or

12    directions that Amy Gleason has given to

13    Steve Davis in his role?

14            MR. HUMPHREYS:  Objection,

15        that's outside of the scope.  I

16        instruct the witness not answer.

17               (Instruction)

18            MR. GEORGE:  Can we go off

19        the record for a minute?

20            (Discussion held off the

21        record.)

22            MR. GEORGE:  We can go back

23        on the record.

24    BY MR. GEORGE:

25       Q      We can start with a yes or no

1    answer:  Are you aware of directives that

2    Amy Gleason has given to Steve Davis?

3         A     I'm not privy to every

4    communication that Steve and Amy have

5    between one another.  But I do know that

6    Steve reports to Amy and she has formal

7    authority over him.

8         Q     Are you aware of instances of

9    Amy Gleason giving directives or orders

10   to Steve Davis?

11        A     I'm aware of conversations that

12   they have had, where Amy has maybe -- I'm

13   aware of conversations that they have had

14   with one another, where Amy, like, asks

15   Steve to do something and/or, like,

16   potentially even disagrees with something

17   that is going on and has communicated

18   with him.

19             As far as I don't know exactly

20   what you mean by has ordered him to do

21   something, but I definitely know that

22   they communicate and, like, have back and

23   forth conversation.

24        Q     Does Amy Gleason review any of

25   Steve Davis's work product?

Page 34

1         aware of that agenda and, ultimately,

2         seeks to implement priorities that the

3         President has given.

4                   So -- and so when the DOGE

5         agency team is consulting with him, and

6         doing work that aligns with that, they

7         have the ultimate decisionmaking

8         authority to say yes or no to the work

9         that is being done.

10        Q      Understood.

11                  I'm not trying to get at, in

12        this question, whether the agency has

13        final authority over the projects that we

14        described.

15        A      Mm-hmm.

16        Q      What I'm trying to understand

17        is, whether the projects that we

18        described are part of the DOGE agenda and

19        part of the core work of DOGE as an

20        entity.

21                  MR. HUMPHREYS:  Is there a

22            question posed?

23     BY MR. GEORGE:

24        Q      Is the work that Brad Smith has

25        described part of DOGE's core work in

1      carrying out its mission?

2          A      The work we just described,

3      that Brad Smith is doing, is part of his

4      work at the DOGE agency team, which is

5      part of the, like, umbrella of the DOGE

6      mission, right, and the President's DOGE

7      agenda.

8              US DOGE Service advises and

9      consults.  And so in this case that

10     specific work would be his -- the work

11     that's being carried out by a DOGE

12     agency team, not work that's being

13     carried out by the US DOGE Service we

14     may have given advice or consulted

15     over those things, but --

16         Q      That's helpful.  Thank you for

17     bearing with me.

18         A      Yeah, you're welcome.

19         Q      Can you tell me about how DOGE

20     agencies -- if -- actually, let's start

21     here.

22              Is there coordination that

23     takes place across DOGE agency teams?

24         A      Are you asking between agency

25     teams or between --

1          Q      Between agency teams.

2          A      I'm speaking on behalf of US

3     DOGE Service, so I'm -- I don't want to

4     speak for things that only agencies may

5     know.  I don't know if they coordinate

6     with one another, but I do know that US

7     DOGE Service coordinates with the

8     different agency teams in implementing

9     the DOGE agenda.

10         Q      Can you tell me if -- can you

11    tell me what US DOGE Service's

12    coordination of DOGE agency teams looks

13    like, what does that consist of?

14         A      Yeah, so US DOGE Service, like

15    I said, has a role in helping agency

16    teams understand the different priorities

17    within the agency or the President's DOGE

18    agenda and, like, different things that

19    they may want to focus on, so there could

20    be consultation around a lot of things.

21              And so that coordination looks

22    different by agency and it looks

23    different by project, but very general

24    communication advice given.

25         Q      Is there somebody who manages

1    he, therefore, authorized the hires at

2    that time.

3         Q    Since February 18th, as the

4    USDS temporary organization continued to

5    hire new employees?

6         A    Can you repeat the question?

7         Q    Since February 18th or since

8    Ms. Gleason took over as acting

9    administrator --

10        A    Yes.

11        Q    -- has the temporary

12   organization continued to hire employees?

13        A    The hiring process has

14   continued, I do -- I am not aware of

15   anyone that has been hired into -- that

16   has been officially hired into the

17   temporary organization since February

18   18th.

19        Q    Are you aware of -- I think

20   Ms. Gleason mentioned in her declaration,

21   last month, that there are ten

22   individuals detailed to USDS from other

23   agencies.  Does that seem roughly correct

24   still?

25        A    Yes, that seems roughly

Page 68

```
 1      correct.
 2          Q     And in the responses that the
 3      agencies have provided, here, I think
 4      four of the individuals named as
 5      detailees to USDS, were Luke Farritor,
 6      Edward Coristine, Kyle Schutt, and Marko
 7      Elez; is that correct?
 8          A     I'm familiar with those, yes,
 9      and they're detailees, yes.
10          Q     They're detailees to USDS?
11          A     That's my understanding.
12          Q     Can you tell me the scope of
13      the detail Lee arrangement with USDS?
14          A     Can you clarify what you mean
15      by scope?
16          Q     What are they detailed to --
17      what -- what are their duties as
18      detailees to USDS?
19          A     Similar to employees of USDS,
20      they are to advise and consult on the
21      President's DOGE agenda.
22          Q     Were any of those individuals I
23      named previously hired into the DOGE
24      temporary organization?
25          A     I do not believe so.  I think
```

Page 69

1    it's possible that Marko was a volunteer

2    within the US DOGE Service organization,

3    at the time, but I don't know that for

4    certain.

5        Q    So as far as you're aware -- I

6    guess, let me ask this a different way.

7             Those four individuals are

8    currently detailees to USDS?

9        A    That is my understanding.

10       Q    Since January 20th, other than

11   potentially Mr. Elez being a volunteer --

12       A    Mm-hmm.

13       Q    -- have any of them had any

14   other formal employment relationship with

15   DOGE?

16       A    Not to my knowledge, no, just

17   as detailees.

18       Q    As detailees did they have

19   DOGE.EOP.gov e-mail addresses?

20       A    Yes, detailees receive DOGE

21   e-mail addresses.

22       Q    You said you are not aware -- I

23   may get this wrong, because this was a

24   little while ago, so please let me know

25   if I'm mischaracterizing it.

Page 76

```
 1        Q    Is there any training that is
 2   specific to DOGE?  I think it sounded
 3   like what you described is general
 4   on-boarding --
 5        A    Yes.
 6        Q    -- for the executive office of
 7   the President, is there anything that is
 8   DOGE-specific?
 9        A    There's not a uniform training
10   that is DOGE-specific.  I would assume
11   individual employees, you know, speak
12   with the people that they work with and
13   get up to speed, but there's no formal
14   training that I'm aware of.
15             MR. GEORGE:  Could we get a
16        time check?
17   BY MR. GEORGE:
18        Q    DOGE -- and again, I'm speaking
19   about being the temporary organization,
20   specifically, here, sometimes sends
21   employees to federal agencies to help
22   them implement the DOGE agenda; am I
23   understanding that correctly?
24             MR. HUMPHREYS:  Objection,
25        foundation.
```

Page 77

```
 1        A     US DOGE Service employees can
 2     be detailed or dual on-boarded as such,
 3     in the case of the defendant agencies
 4     here, to help implement the DOGE agenda,
 5     yes.
 6        Q     You said detailed or dual
 7     on-boarded, is there any other formal
 8     mechanism that is used to share out DOGE
 9     staff to agencies?
10        A     No other formal mechanisms,
11     that I'm aware of.
12        Q     In what situations does DOGE
13     detail versus dual employ an individual
14     at an agency?
15        A     Traditionally, USDS has
16     detailed and, upon the Court's order,
17     changed their practices, and I'm not to
18     comment on privileged information given
19     from legal counsel.
20             MR. GEORGE:  Would you
21        consent to going off the record
22        for a minute?  I don't think
23        you'll want to go through --
24             MR. HUMPHREYS:  Yes, we can
25        go off the record.
```

Page 78

1              (Recess.)

2              MR. GEORGE:  Okay.  All

3         right.  Let's go back on the

4         record.

5    BY MR. GEORGE:

6         Q    I wanted to go back briefly --

7              MR. HUMPHREYS:  May I stop

8         you for just a second?  I'm sorry,

9         the witness had something she

10        wanted to clarify, and I forgot.

11   BY MR. GEORGE:

12        Q    Sure.

13        A    At the very beginning you asked

14    who I had interviewed for the purposes of

15    the deposition, and I may have taken the

16    word "interview" a little bit too

17    seriously or too technically, so I wanted

18    to add that I also spoke with the White

19    House IT lead, just on general, like, IT

20    matters within EOP and kind of how our

21    computers and advices are handled, and

22    then also the former HRUS representative

23    of US DOGE Service on some personal

24    related questions, just wanted to add

25    that for the record.

Page 86

1      agreements with the agencies, like,

2      acknowledge that the employee also has an

3      employment relationship with the USCS,

4      and so may also perform duties as a USCS

5      employee relating to CMS, but not, like,

6      the -- there's still a delineation, I

7      would say, between the work that's being

8      done at CMS as an implementing body or as

9      an implementing employee at CMS versus

10     being kind of a consulting function

11     within USCS.

12          Q     But does DOGE -- does a DOGE

13     employee have to have an assignment

14     agreement or an employment agreement with

15     an agency in order to give advice coming

16     from USDS?

17          A     No, they don't have to have an

18     employment agreement, in this case I

19     think it -- there is one, obviously,

20     because this person is taking on this

21     kind of dual employment relationship, but

22     that is not always the case.

23                USCS inherently has an advise

24     and consult function whether they have a

25     dual employment relationship at an agency

1    or not.

2              And, yeah, there's like

3    incomplete overlap, potentially, in the

4    types of things you can do, but -- and I

5    think that's fair and understood.

6       Q    Is Steve Davis an employee of a

7    federal agency outside of his employment

8    relationship with DOGE?

9       A    I believe that he is a detailee

10   to GSA in addition to being a USCS

11   employee.

12      Q    Is that the only other agency

13   you're aware of?

14      A    That is the only other agency

15   that I'm aware of.

16      Q    And it's a detail agreement,

17   not on employment agreement?

18      A    Yes, that's correct.

19      Q    It sounds like what you

20   described with the HHS agreement is that

21   an individual DOGE employee may wear

22   multiple hats when they're at an agency.

23   They might be an employee of the agency,

24   but they might also be there in their

25   capacity as a DOGE employee.

Page 88

1              They might undertake work as an

2       agency employee, while also giving advice

3       as a DOGE employee.  Does that sound

4       correct to you?

5              MR. HUMPHREYS:  Objection,

6          mischaracterizes testimony.

7       A      How I understand it an employee

8       doesn't wear both hats at the same time.

9       When they're at an agency doing agency

10      work they're an HHS employee, in this

11      example, an HHS employee.  And at other

12      times, they're separately a USDS employee

13      and can function as such.

14      Q      But they might wear one hat or

15      the other in their interactions with an

16      agency?

17              MR. HUMPHREYS:  Objection.

18              Is that a question?

19      BY MR. GEORGE:

20      Q      Is that right?

21      A      Yes, there are employees who do

22      have two function, so that could relate

23      to the same agency, one at that agency

24      and one consulting with them.

25      Q      Are DOGE employees given any

Page 89

1    training or guidance about how to

2    communicate with agency officials whether

3    they are acting with their agency hat on

4    or their DOGE hat on?

5              MR. HUMPHREYS:   Objection to

6         form.

7         A    Well, every employee, in this

8    case independent agencies, we have people

9    that are dual on-boarded, so in this case

10   we're talking about dual on-boarded --

11   dual on-boards, they each have employment

12   agreements with each agency with which

13   they describe who they really -- or who

14   they are supervised by, so in some sense

15   I would say that they are like that

16   guidance, as far as who they technically

17   report to and, therefore, how they

18   probably should communicate with those

19   individuals and what their job

20   responsibilities are, so to that extent,

21   sure.

22        Q    Are you aware that some DOGE

23   employees and detailees are concurrently

24   working in some capacity at multiple

25   agencies at once?

1          MR. HUMPHREYS:  As to -- you

2     mean asking the responses that are

3     already in the interrogatory

4     response?

5          MR. GEORGE:  Yeah, so --

6     where is my -- so on the note in

7     the interrogatory responses, one

8     of the questions was the number of

9     federal agencies that the DOGE

10    employee is concurrently detailed

11    to or otherwise employed by, and

12    in the deposition notice in

13    examination topic three, we ask

14    about DOGE employees'

15    responsibilities at defendant

16    agency, DOGE, and any other

17    federal government entities to

18    which they have been detailed or

19    otherwise assigned.

20          I think this is squarely

21    within the scope of the discovery

22    in this case.

23          MR. HUMPHREYS:  Okay.  Thank

24    you.

25          THE WITNESS:  Can you repeat

Page 93

1          the question?
2              MR. GEORGE:  Yeah.
3     BY MR. GEORGE:
4          Q     Is there -- what's the highest
5     number of agencies that a DOGE employee
6     or detailee is concurrently employed at
7     or detailed at, that you're aware of?
8                   MR. HUMPHREYS:  Still object
9              as to scope, but I will let her
10             answer it.  I think that's
11             different from responsibilities,
12             but if she knows then she may
13             answer it.
14         A     The most I have seen, including
15    detailees and employees of USCS, is
16    eight.
17             But I will also add that that
18    is not the common number, I say -- would
19    say most people I see between one and --
20    one, two or three.
21         Q     Does DOGE provide any training
22    or guidance to employees on -- employees
23    or detailees on how to manage
24    responsibilities across multiple
25    agencies?

Page 94

1        A      USCS gives some guidance on

2    general data sharing policies and how to

3    help them manage and comply according to

4    various laws in place.

5              As far as their actual

6    responsibilities I would say those are

7    governed by their agency agreements that,

8    you know, dual either their on-boarding

9    employee agreements or their detail

10   agreements.

11       Q      Can you -- you mentioned data

12   sharing policies, could you tell me a

13   little bit about the data sharing

14   policies that DOGE gives employees

15   guidance about when they're employed at

16   multiple agencies?

17       A      At a high level, the

18   guidance -- the guidance helps employees

19   know what logs are applicable and

20   instructs them to comply by statute.  But

21   this is privileged legal information, so

22   I don't want to share more.

23       Q      Does DOGE give any guidance to

24   the receiving agencies about the

25   concurrent employment of DOGE employees

Page 98

1          A     Same.

2          Q     Are you familiar with the White

3    House's executive order implementing the

4    workforce optimization initiative?

5          A     I'm familiar with it, yes.

6          Q     Is that one of the documents in

7    the binder?

8          A     Yes.

9          Q     Section 3B3 direct the DOGE

10   team lead at each agency to provide the

11   USDS administrator with a monthly hiring

12   report for the agency; do you see that?

13         A     Yes, I see that.

14         Q     Has a USC administrator been

15   receiving those reports?

16         A     I know she, as the acting

17   administrator, has definitely been

18   receiving reports from agencies.  I don't

19   see all of those reports, and I know

20   there's various executive orders that ask

21   for reports to be sent, so I don't know

22   exactly which reports have all been sent,

23   and the work is ongoing.

24         Q     Okay.  Turning to -- back to

25   DOGE employees who are working out of

Page 99

1      agencies like Labor, HHS, CFPB, are those

2      employees able to access sensitive

3      systems within those agencies from

4      outside the agency building?

5          A      I -- it's my understanding

6      they're able to access those systems from

7      their agency laptops, if given access to

8      do so on the basis that they need it for

9      the work that they are performing.

10             I believe oftentimes that's

11     at the agency.  But I guess I don't

12     know for sure that that can't happen

13     outside of the four walls of the

14     building if they're on their agency

15     laptop.

16         Q      Do you know whether they use

17     their agency laptop to access those

18     systems from outside those four walls?

19             MR. HUMPHREYS:  Objection,

20         vague.

21  BY MR. GEORGE:

22         Q      You can answer.

23         A      I think that that has happened

24  on some occasion, but I would say the

25  general practice, from my knowledge, is

1       for them to be at the agency that they're

2       working on the systems from that agency.

3            Q       And when you say you think that

4       has happened, to your knowledge, do you

5       know the location where that access

6       happened?

7            A       Not specifically, there's --

8       I'm sure there's been various locations

9       that that's happened.

10           Q       Have DOGE teams at agencies

11      made any changes to information systems

12      at federal agency -- at the agencies to

13      facilitate offsite access by DOGE

14      employees?

15               So some examples might include

16      installing remote access software, making

17      changes to system security software or

18      policies, or making changes to agency

19      firewalls?

20               MR. HUMPHREYS:   Objection as

21          to form.

22           A       As I previously said, when

23      employees are at the agency they're under

24      the direction of their agency

25      supervision, so might be a better

Page 115

```
1     fix eliminates tremendous fraud.

2              Are you aware of an effort

3     to cross-reference information from

4     these two agencies of the type that I

5     was asking about before?

6              MR. HUMPHREYS:  Objection as

7          to scope, but you can answer if

8          you know.

9     A     As I said before, I'm aware of

10    this generally occurring across -- or

11    DOGE teams implementing a President's

12    DOGE agenda, to my understanding, both of

13    these agencies it's referring to the

14    Small Business Administration and Social

15    Security Administration are out of the

16    scope of this case.

17             So I was not aware of this --

18    not aware of the specific project on or

19    more details than I can read here.

20    Q     Understood.  So you weren't

21    aware of this specific project; is that

22    right?

23             MR. HUMPHREYS:  Same

24         objection.

25    A     You asked if I'm aware of
```

Page 116

1    cross-referencing --

2         Q     Mm-hmm.

3         A     -- in this case?

4         Q     I was asking if you were aware

5    of efforts to cross-reference information

6    across databases from multiple agencies

7    undertaken by DOGE?

8              MR. HUMPHREYS:  Objection as

9         to scope.  You can answer.

10        A     Like I said, I'm not aware of

11   specific instances with the defendant

12   agencies.

13        Q     You're not aware with -- so

14   when you said you weren't aware you meant

15   with respect to the specific agencies who

16   are defendants in this case?

17        A     I will repeat, I am aware

18   generally that this is a mission and

19   purpose that DOGE teams generally are

20   working on, I'm not aware of a specific

21   instance.

22              I now read this, and see that

23   there is, you know, could be an instance

24   here, but I don't know more information

25   than -- than that.

1          Q      Do DOGE employees or detailees

2    ever use agency laptops at DOGE

3    facilities?

4               MR. HUMPHREYS:  Objection,

5         vague.

6               Are we talking about the

7         defendant agencies or everywhere?

8    BY MR. GEORGE:

9          Q      Everywhere.

10              MR. HUMPHREYS:  Then

11        objection as to scope.

12              You can answer.

13         A      Yes, I believe, at times, there

14    are employees that, like, will use their

15    agency laptop, sometimes.

16              Like I said, at the agency,

17    sometimes not at the agency, is the

18    common practice for employees to conduct

19    their agency work at their agency.

20              But I'm aware of instances

21    where that may have occurred elsewhere.

22         Q      You're aware of specific

23    instances where that may have occurred

24    elsewhere?

25         A      Yeah, sure, so like, for

Page 118

1    example, in the past, like, US Digital

2    Service, they've always been detailed to

3    different agencies and they use --

4    they -- they'll often go on site, but

5    oftentimes they want to be onsite or

6    they'll be at Jackson Place and doing

7    their work on their -- still on their

8    agency devices and within the -- within

9    the scope of their responsibilities

10   there.

11              So in that case, sure.

12   Q    Do the DOGE employees ever use

13   DOGE laptops and cell phones when working

14   on site at defendant agencies?

15   A    Like I said, it's the practice

16   for the employees to use the assets that

17   they've been given for a certain agency

18   when they've been doing work at that

19   agency.

20              If someone were to use their

21   USDS assets at another agency I would

22   assume that it would be for that work

23   exclusively for their USDS work.

24              And, again, I can't comment on

25   anyone that's individual compliance but

Page 119

1     that's the general practice is to use the

2     agency that you're working on asset's,

3     generally, at that location, you know,

4     it -- it varies where people perform

5     their work.

6          Q     You made reference to, for

7     example, historically US Digital Service

8     employees have sometimes done work off --

9     agency work off site at Jackson Place.

10               Is that where the temporary

11     organization, also, is currently

12     headquartered and works?

13         A     So US DOGE Service currently

14     occupies a few different spaces, they

15     occupy Jackson Place, there's some

16     portion of US DOGE Service that are

17     remote employees and that are

18     transitioning to being in person at

19     different federal agencies buildings as

20     the return to office has been rolled out,

21     and then also we have location within the

22     EEOB.

23         Q     Does DOGE have any written

24     policies or guidance on sharing agency

25     data?

Page 123

1          Do you know of people who have

2     applied for jobs through the online

3     portal?

4          A    Yes, I do.

5          Q    Does DOGE have any written

6     policies related to data sharing or

7     concurrent employment?

8               MR. HUMPHREYS:  Objection,

9          form.

10         A    As I have said, there is

11    guidance on data sharing but no -- and

12    then there are, like, technology

13    agreements that every EOP employee signs,

14    that talks vaguely about just, like,

15    presidential records after keeping all

16    the things that they have to do to comply

17    with that, and just consenting with their

18    data on their computer stays on their

19    computer, that sort of thing, but no

20    formal policies, I wouldn't say policy

21    that is USCS specific.

22         Q    The guidance about data

23    sharing, is that a written document?

24              MR. HUMPHREYS:  I just

25         instructed the witness not to

Page 124

1        answer to the extent it would

2        reveal privileged communication.

3             You can answer that

4        question.

5        A     It is written, yes.

6        Q     Are there requirements for DOGE

7    teams at agencies to coordinate with DOGE

8    with USCS and USC organization?

9             MR. HUMPHREYS:  Objection,

10       form.

11       A     To the extent that the

12   executive orders talk about the US DOGE

13   Service is helping DOGE agency teams

14   implement, but there are not -- well, the

15   EOs talk about some specific ways in

16   which the DOGE agency teams should

17   interact with USDS.

18            I don't know exactly what you

19   mean by requirements, but DOGE, like,

20   USCS certainly coordinates with most, if

21   not all, the DOGE agency teams but in

22   varying capacities and volumes.

23       Q     Is there any division of labor

24   internally, within DOGE, for which DOGE

25   leaders take primary responsibility for

Page 125

1   managing operations of the USDS and which

2   leaders take primary responsibility for

3   managing operations of the temporary

4   organization?

5       A    As I said, there is no formal

6   org chart within USDS, outside of Amy

7   Gleason being the acting administrator

8   and her --

9       Q    I think you said having

10  supervisory authority?

11      A    Having supervisor authority

12  over the temporary organization and the

13  permanent organization.

14      Q    In practice, is there any

15  division of labor between different

16  leaders spending more time on one side of

17  the house versus the other?

18          MR. HUMPHREYS:  Objection to

19      form.

20      A    In practice, there are, like,

21  many USCS employees that help execute the

22  mission of USCS across the organization.

23          I would say that there is no

24  formal division of labor, as you said.

25  And like I said in the very beginning,