# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------x

AFL-CIO, et al.,          :

     plaintiffs,    :

v.                        :   CASE NO.

DEPARTMENT OF LABOR,      :   1:25-cv-00339-JDB

et al.,                   :

     Defendant.     :

------------------------x



30(b)(6) Deposition of

DEPARTMENT OF HEALTH AND HUMAN SERVICES

through GAREY RICE

Tuesday, April 8, 2025

1:46 p.m.




BEFORE: Cassandra E. Ellis, RMR, RDR, CRR,

RSA, CA-CSR 14448, WA-CCR, HI-CSR



Job No.: 10519

19173c2b-8370-4ccc-b770-46fbda9e23d5

1          The 30(b)(6) Deposition of

2     DEPARTMENT OF HEALTH AND HUMAN SERVICES

3     through GAREY RICE, taken before CASSANDRA

4     E. ELLIS, Registered Professional Reporter,

5     Registered Merit Reporter, Registered

6     Diplomate Reporter, Certified Realtime

7     Reporter, Realtime Systems Administrator;

8     California Certified Shorthand Reporter;

9     Washington State Certified Court Reporter;

10    Hawaii Certified Shorthand Reporter; Notary

11    Public, held in Washington, D.C., on

12    Tuesday, April 8, 2025, commencing at 1:46

13    p.m. and concluding at 2:53 p.m.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1              A P P E A R A N C E S

 2      ON BEHALF OF THE PLAINTIFFS:
             ZOILA E. HINSON, PRO HAC VICE
 3           ALEXA MILTON, PRO HAC VICE
             RELMAN COLFAX PLLC
 4           1225 19th Street, Northwest
             Suite 600
 5           Washington, D.C.  20036
             (202) 728-1888
 6           Zhinson@relmanlaw.com
             Amilton@relmanlaw.com
 7

 8      ON BEHALF OF THE PLAINTIFFS:
             AMAN T GEORGE, ESQUIRE
 9           MARK B. SAMBURG, ESQUIRE
             DEMOCRACY FORWARD FOUNDATION
10           P.O. Box 34553
             Washington, D.C.  20043
11           (202) 448-9090
             Ageorge@democracyforward.org
12           Msamburg@democracyforward.org

13

14

15      ON BEHALF OF THE DEFENDANT:
             BRADLEY P. HUMPHREYS, ESQUIRE
16           BENJAMIN S. KURLAND, ESQUIRE
             ANDREW BERNIE, ESQUIRE
17           US DEPARTMENT OF JUSTICE
             1100 L Street, Northwest
18           Washington, D.C.  20005
             (202) 305-0878
19           Bradley.humphreys@usdoj.gov

20

21

22

23

24

25
```

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 4

1            INDEX TO EXAMINATION

2   30(b)(6) Deposition of

3   DEPARTMENT OF HEALTH AND HUMAN SERVICES

4   through GAREY RICE

5   EXAMINATION                        PAGE

6       By Ms. Hinson                  7

7

8               INDEXED PAGES

9                                      PAGE

10  GAREY RICE, sworn                  7

11  REPORTER CERTIFICATE               48

12  INSTRUCTIONS TO WITNESS (none)

13  DECLARATION UNDER PENALTY OF PERJURY    47

14  ERRATA SHEET                       49

15

16            INFORMATION REQUESTED

17                  None

18

19       WITNESS INSTRUCTED NOT TO ANSWER

20                  None

21

22

23

24

25

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 5

1            INDEX TO PLAINTIFFS EXHIBITS

2                    GAREY RICE

3                Tuesday, April 8, 2025

4   MARKED          DESCRIPTION            PAGE

5   Exhibit 1  Plaintiffs' Notice of Rule   12

6         30(b)(6) Deposition of

7         Department of Health and Human

8         Services

9   Exhibit 2  Declaration of Garey Rice    15

10         Filed 02/13/25

11   Exhibit 3  Declaration of Garey Rice    17

12         Filed 03/11/25

13   Exhibit 4  U.S. DOGE Service            22

14         Assignment Agreement Bates

15         Stamped 25CV339_HHS00028-031

16   Exhibit 5U.S. DOGE Service Assignment   22

17         Agreement Bates Stamped

18         25CV339_HHS00032-035

19   Exhibit 6  Withdrawn                    34

20   Exhibit 7  Defendants' Objections       36

21         And Responses to Plaintiffs'

22         Requests For Expedited

23         Discovery, Including Supplemental

24         Responses

25

19173c2b-8370-4ccc-b770-46fbda9e23d5

```
 1              P R O C E E D I N G S
 2              30(b)(6) Deposition of
 3      DEPARTMENT OF HEALTH AND HUMAN SERVICES
 4                through GAREY RICE
 5      having been sworn, testified as follows:
 6                    EXAMINATION
 7      BY MS. HINSON:
 8          Q      Mr. Rice, can you state and
 9      spell your name, for the record, please?
10          A      My name is Garey Rice, spelled
11      G-a-r-e-y, last name R-i-c-e.
12          Q      And do you understand that
13      today you are testifying on behalf of the
14      Department of Labor about topics listed
15      in the deposition notice?
16          A      Department of Labor?
17          Q      Sorry, Department of Health and
18      Human Services.
19                 Apologies, it's been a long
20      day.
21          A      HHS.
22          Q      Yeah.  So I've got a couple of
23      ground rules to hopefully make things go
24      as smoothly as possible today.
25                 First, please continue to give
```

19173c2b-8370-4ccc-b770-46fbda9e23d5

1    verbal answers instead of shaking or

2    nodding your head, that just makes it

3    easier for the court reporter to get a

4    clear transcript; can you do that?

5        A    Yes.

6        Q    It's important we don't speak

7    over each other.  So I will try to let

8    you finish and if you can try and let me

9    finish that would be great; can you do

10   that?

11       A    Yes.

12       Q    Are you represented by counsel

13   today?

14       A    My HHS counsel.

15       Q    And DOJ, as well?

16       A    Yes.

17       Q    Your counsel might object to a

18   question, that's fine, he's making an

19   objection for the record, but unless he

20   specifically instructs you not to answer

21   you should just go ahead and answer; can

22   we agree to that?

23       A    Yes.

24       Q    And if at any time you need a

25   break, just let me know.  I ask, though,

Page 10

1      Q      And without revealing any

2   communications you may have had with your

3   attorneys, what do you know about this

4   lawsuit?

5      A      Basically what I read in the

6   documents, the concern is basically

7   understanding what the DOGE role at HHS

8   was for the work that we're doing there

9   for government efficiencies.

10      Q      I wanted to just, like,

11   identify a couple of terms that I'm going

12   to use today.

13            First, if I refer to DOGE I'm

14   talking about the US DOGE Service and the

15   USDS Temporary Organization,

16   collectively; does that work?

17      A      Yes.

18      Q      And when I'm talking about the

19   DOGE team affiliates, that's people hired

20   by or detailed to HHS since January 19th,

21   2025; does that work?

22      A      Yes.

23      Q      And I'm sorry, that's not even

24   complete.

25            Since January 19th, 2025 to

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 11

1    work as part of the DOGE team; is that

2    clear?

3        A    Yes.

4        Q    Okay.  Great.

5            MS. HINSON:  Can we mark

6        this as Exhibit 1.

7            (Exhibit No. 1 was marked

8        for identification.)

9    BY MS. HINSON:

10       Q    All right.  So you've just been

11   handed what's been marked as Exhibit 1,

12   which is the deposition notice for

13   today's deposition.

14            And do you want to look at page

15   5 of that?  And are you prepared to

16   testify about topic two, except for

17   access to and use of HHS sensitive

18   systems?

19       A    Yes.

20       Q    Great.

21            So we spoke a moment ago about

22   the DOGE team affiliates, and I'm just

23   going to read a list of names to make

24   sure we're talking about the same people,

25   those are Amy Gleason, Brad Smith, Luke

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 12

1    Farritor, Edward Coristine, Marko Elez,

2    Kyle Schutt, Conor Fennessy, Zach

3    Terrell, Rachel Riley, and Jeremy Lewin;

4    are you familiar with those names?

5          A    Yes.

6          Q    And given the -- based on the

7    definition I gave earlier, are those

8    people all DOGE team affiliates?

9          A    Yes.

10         Q    Since January 19, 2025, has

11   anyone else worked at DOL as an

12   employee -- or, gosh, sorry -- HHS as an

13   employee or detailee while simultaneously

14   being employed at DOGE?

15         A    So simultaneously employed?

16         Q    At DOGE?

17         A    -- at DOGE?  So what I'm saying

18   is that a lot of those employees are

19   detailed from other agencies to HHS.

20         Q    Mm-hmm?

21         A    So not necessarily employees of

22   DOGE.

23              So I know, like, Amy Gleason

24   and Brad Smith are dual appointees at

25   DOGE and HHS.

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 18

1        Q      Okay.  And is it the normal

2    practice for HHS to have employees from

3    other federal agencies detailed at HHS

4    who are performing work for both agencies

5    at the same time?

6        A      Yes, it happens.

7        Q      Okay.  What policies typically

8    govern those relationships?

9        A      So the policies that permit the

10   detail in between agencies, generally, so

11   it just depends, basically, on need and,

12   again, like, were there cost-cutting

13   activities.  It's just general

14   collaboration that we typically do

15   details for.

16       Q      In a normal course, how do

17   you -- how does HHS coordinate work with

18   the other agency that someone is being

19   detailed from or to?

20       A      Yeah.

21           MR. HUMPHREYS:  Objection,

22       foundation.

23           THE WITNESS:  So I could

24       answer?

25   ///

Page 19

1   BY MS. HINSON:

2        Q     You can answer.

3              MR. HUMPHREYS:  You can

4        answer.  I'll tell you if you

5        can't.

6        A     Okay.  Okay.  So it's a

7   collaboration, so depending upon what is

8   needed, you know, generally there's an

9   agreement that comes out, and there's

10  some description of what will or will not

11  be done, what the need is that we're

12  trying to solve by hiring generally what

13  is, you know, some kind of a specialist

14  that we have at HHS, or if it's something

15  that we do where we have these kind of

16  cost-cutting things where we're

17  collaborating for a joint goal for the

18  overall good of the government.

19              I -- it just really depends on

20  what the need is at the time, how those

21  ground rules are laid, and it's generally

22  a collaborative process.

23        Q     Okay.  Why did HHS decide to

24  enter into these cross-detailing

25  arrangements with respect to the DOGE

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 20

1    team affiliates?

2        A    I -- I think the -- the point

3    was to kind of create the government

4    efficiencies that we're looking for as

5    part of the executive orders that have

6    established DOGE.

7            So there were some expertise

8    that was recommended and HHS accepted

9    those experts to help us perform these

10   tasks.

11       Q    And who made that

12   recommendation?

13       A    I think Brad Smith made most of

14   the recommendations, that I'm aware of.

15       Q    And did he recommend that he be

16   detailed to HHS?

17           MR. HUMPHREYS:  Objection as

18       to scope, but you can answer.

19       A    I -- I think so, yes.

20       Q    Who decided -- who at HHS made

21   the decision to enter into these

22   arrangements?

23       A    Scott Rowell is the deputy

24   chief of staff for operations.

25       Q    And why did he decide to enter

Page 21

1      into these arrangements?

2         A      As it was a collaboration to

3      make sure that we met the goals and the

4      requirements of the executive order, so

5      we were kind of building our scope and --

6      and team to get the accomplishments that

7      we wanted to get to meet the requirements

8      of the EO, executive order.

9               I said EO which is just a

10     jargon for executive order, sorry.

11              MS. HINSON:  Okay.  Are we

12         on 4 and 5?

13              (Exhibit No's. 4 and 5 were

14         marked for identification.)

15     BY MS. HINSON:

16         Q    Okay.  So you've been handed

17     two documents which have been labeled

18     Exhibits 4 and 5, one starts at HHS28,

19     and the other starts at HHS32, and

20     they're both labeled or titled:

21     Assignment Agreement Centers For Medicare

22     and Medicaid Services From the Executive

23     Offices of -- Executive Office of the

24     President US DOGE Service; right?

25              First, who are these agreements

19173c2b-8370-4ccc-b770-46fbda9e23d5

1    for?

2            MR. HUMPHREYS:  I'm sorry, I

3        may have missed what you said, but

4        there's a difference in the title,

5        one's HHS and one's CMS.

6            MS. HINSON:  Thank you, that

7        was actually going to be one of my

8        questions.

9        A    So the one for CMS, I believe,

10   is for Amy Gleason.

11       Q    Mm-hmm.

12       A    And the one for HHS probably

13   should be Brad.

14       Q    Do you know if, aside from the

15   differences, the one is the CMS and one

16   is to HHS, do you know if these

17   agreements are the same?

18       A    I'd have to read them to verify

19   that.

20       Q    Oh, yeah, you don't need to do

21   that, I just wasn't sure if you maybe

22   knew.

23       A    I mean, they -- it looks like a

24   standard agreement, so there may be

25   nuances within them that, you know, that

Page 30

1    with it, would HHS consider that a

2    conflict of interest?

3            MR. HUMPHREYS:  Objection,

4        vague.

5    BY MS. HINSON:

6        Q    You can answer.

7        A    Yes.

8        Q    I want to switch gears a little

9    bit to talk about training, and

10    specifically about -- let me -- two

11    systems, the health care integrated

12    general ledger accounting system and the

13    integrated data repository.

14            What is the integrated data

15    repository?

16            MR. HUMPHREYS:  Oh --

17            MS. HINSON:  I'm trying to

18        ask about training for them.

19            MR. HUMPHREYS:  Yeah, give

20        us a second.  Do you want to go

21        off the record for a second?

22            MS. HINSON:  Yeah, fine.

23            (Discussion held off the

24        record.)

25    ///

19173c2b-8370-4ccc-b770-46fbda9e23d5

1   BY MS. HINSON:

2       Q     What is the integrated data

3   repository or IDR?

4       A     So I'm familiar with the system

5   name, but I don't really know what it

6   does.

7       Q     Okay.  Do you know what HIGLAS?

8       A     That's the basic accounting

9   system that CMS uses.

10      Q     Okay.  What training does a new

11  user for IDR receive, typically?

12      A     So they would -- would go

13  through the basic training for rules of

14  behavior, cyber security.  They would

15  have basic training for, you know, how to

16  use the system, and they would also, you

17  know, probably have special training for

18  those two systems for the information

19  that's in them, because they're HIGLAS,

20  in particular financial systems.

21            We do a little higher level

22  training for some of that, because the

23  information that's in them is a little

24  more sensitive than just, like, network

25  access.

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 32

1        Q        What kind of training do you do

2     for HIGLAS?

3        A        Well, like I said, I mean,

4     there would be systems training that

5     would happen, you know, how to use the

6     system, be familiar with the system, all

7     that kind of stuff.

8                 There would be, like, a rules

9     of behavior that just basically outlined

10    what you -- you know, when you get access

11    to the system what you can and cannot do

12    and how you should use it as a government

13    employee, that kind of stuff.

14                Cyber training is pretty

15    standard with all systems and stuff like

16    that.

17       Q        Is there typically

18    documentation for the training with IDR?

19       A        Yes.

20       Q        And is there typically

21    documented training for HIGLAS?

22       A        Yes.

23       Q        If someone received training

24    for IDR and HIGLAS is there some reason

25    there wouldn't be documentation of it?

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 33

1         A      No.

2                MS. HINSON:  So you can take

3         a look at -- actually -- okay.  I

4         think we're at Exhibit 6.

5                (Exhibit No. 6 was marked

6         for identification.)

7    BY MS. HINSON:

8         Q      Okay.  So you've been handed

9    exhibit -- I think it's Exhibit 6, and

10   it's the defendant's objection and

11   responses to the plaintiff's requests for

12   discovery including supplemental

13   responses.

14               And can you take a look at

15   page 8, please.  So the responses,

16   here, says that, among other things,

17   Mr. Farritor received a security

18   briefing for HIGLAS and completed IDR

19   computer-based training; do you see

20   that, about the middle of the page?

21        A      Where are we at, down here?

22        Q      The second paragraph, before it

23   says -- I'm sorry, I think we're on the

24   wrong page.  It's page 8.

25        A      I've got page 8.

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 34

```
 1       Q    Did I hand you the wrong one?
 2   Oh, you know what, I have the old one
 3   here.
 4           MS. MILTON:  You just took
 5       his.
 6           MS. HINSON:  I took your
 7       copy but, yeah, I think that's the
 8       wrong -- I'm realizing I think
 9       that's the wrong one.  My
10       apologies.
11           Oh, these are not the
12       supplementals, these are the
13       originals.
14           MS. MILTON:  Oh.
15           MS. HINSON:  Okay.
16           MS. MILTON:  He had them.
17       He had a copy that he reviewed it.
18           MS. HINSON:  Yes.
19       Apologies.
20           Can we make this an exhibit,
21       are you guys okay with that?
22           MR. HUMPHREYS:  Yeah.
23           MS. HINSON:  Yeah?  And can
24       you make it, actually, Exhibit 7,
25       again, in that case?  You can just
```

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 35

1           totally set that one aside.

2           Sorry, guys.

3                 MR. HUMPHREYS:  No problem.

4                 MR. BERNIE:  No problem.

5                 (Exhibit No. 7 was marked

6           for identification.)

7     BY MS. HINSON:

8           Q     All right.  So we're talking

9     about Exhibit 7, which is actually the

10    supplemental responses.

11          A     Page 8?

12          Q     Yes, go to page 8, please.

13          A     What was the --

14          Q     Sure.

15                Do you see where it says that

16    Mr. Farritor completed a security

17    briefing for HIGLAS and completed IDR

18    computer-based training?

19          A     Which paragraph?

20          Q     Sure.  It's, I think, right in

21    there.

22          A     I'm just reading, it says:

23    Mr. Farritor acknowledged rules of

24    behavior for general users, the rules of

25    behavior for privileged users, security

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 36

1    briefing for HIGLAS, and completed IDR

2    computer-based training, that's what

3    you're talking about?

4         Q    Yes.

5         A    Okay.  Yes.

6         Q    Then, if you look at page 12,

7    they're talking about Mr. Moghaddassi in

8    here, and it says that he was granted

9    permission to access IDR and HIGLAS, and

10   that he did access IDR and HIGLAS, but if

11   you look at the training he completed, it

12   doesn't include that security training

13   for HIGLAS or the IDR computer-based

14   training.

15        A    Users, yeah, security, yes, I

16   see that.

17        Q    Okay.  So does that mean that

18   Mr. Moghaddassi did not complete a

19   security briefing for HIGLAS or IDR

20   computer-based training?

21        A    Yes, that's what it says.

22        Q    Okay.  Does a user typically

23   have to complete those trainings before

24   accessing HIGLAS and IDR?

25        A    I can't say definitively on

19173c2b-8370-4ccc-b770-46fbda9e23d5

1    that, because I'm not a user of those

2    systems, but that's CMS so I know those

3    are, like, the general trainings are the

4    rules of behavior, the -- the privilege

5    rules of cyber security, that kind of

6    stuff.  I don't know why there were --

7    the other trainings weren't done by him.

8        Q    I guess I think I'm asking a

9    slightly different question, which is

10    just, in the normal course is a user

11    permitted to access IDR without going

12    through the IDR computer-based training?

13            MR. HUMPHREYS:  Objection as

14        to scope.  You can answer if you

15        know.

16        A    I don't know.

17        Q    And in the normal course is a

18    user of -- or would a user of HIGLAS

19    permitted to access HIGLAS without doing

20    the security briefing?

21            MR. HUMPHREYS:  Same

22        objection.

23        A    I don't know.

24            MS. HINSON:  Okay.  Can we

25        take a break?

Page 39

1      or Ms. Gleason?

2                MR. HUMPHREYS:  Objection as

3          to scope, but can you answer.

4          A     No.

5          Q     And did HHS do anything to

6      assess conflicts of interest for

7      Mr. Smith?

8                MR. HUMPHREYS:  Same

9          objection.

10         A     No.  I'd just like to amplify

11     that I mean per my knowledge, no conflict

12     came up, so there was nothing to, you

13     know, deal with, so --

14         Q     How would -- how do conflicts

15     typically come up?

16         A     I mean, I -- I would say that

17     if there was a conflict somebody would

18     have a disagreement and we would sit down

19     and talk about it, a conflict of interest

20     based on, you know, what they were doing

21     with the work, you know?

22                So if they ask us to do

23     something that wasn't part of the DOGE

24     agreement or something that would be a

25     conflict.

Page 40

1     Q    So your understanding of

2    conflict of interest is that it would be

3    a disagreement about the work within the

4    scope of the DOGE executive order?

5             MR. HUMPHREYS:  Objection as

6        to scope.

7     A    Yeah, that's the way I took the

8    context of the question.

9     Q    Did HHS do anything to assess

10   whether there -- whether Ms. Gleason or

11   Mr. Smith had a financial interest that

12   could be in conflict with the agency?

13            MR. HUMPHREYS:  Same

14       objection.

15    A    When they're employed as part

16   of the employment agreement they have to

17   provide ethics clearances, and that's --

18   so ethics document on-board, so long as

19   that's on-boarding of any employee.

20    Q    And is that self-reporting?

21            MR. HUMPHREYS:  Same

22       objection.

23    A    Yes.

24    Q    With -- regarding Mr. Smith, I

25   believe you testified earlier that he had

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 41

1    recommended that he be detailed to HHS;

2    is that correct?

3        A    Yes.

4        Q    Okay.  In what capacity did he

5    make that recommendation?

6             MR. HUMPHREYS:  Objection as

7        to scope.

8             You can answer if you know.

9        A    Just working with HHS full time

10   that it made sense that he be detailed.

11       Q    And I think I'm asking

12   something a little bit different.

13            When Mr. Smith made that

14   recommendation to HHS, what role was he

15   acting in?

16            MR. HUMPHREYS:  Objection to

17       scope, but go ahead.

18       A    He was acting as the HHS DOGE

19   lead for HHS, lead to HHS.

20       Q    Lead to HHS from DOGE?

21       A    Yes.

22       Q    All right.  Has Mr. Smith

23   continued to make recommendations in his

24   capacity as a DOGE employee and since he

25   has been detailed to HHS?

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 42

1        A      The recommendations that he

2    makes I interpret as his role as an HHS

3    detail.  He's making recommendations to

4    HHS based on the work that we do, you

5    know, his role with USDS, because he's in

6    this dual appointment thing, that's -- I

7    don't have any visibility into what he

8    does with USDS.

9        Q      How can you tell whether he's

10   making a recommendation in his USDS

11   capacity versus his HHS capacity?

12       A      So I -- I don't know what his

13   functions are at USDS.  All I can tell

14   you is he's making recommendations about

15   the contracts activities, grants, things

16   that we do at HHS to create efficiencies

17   that we have within HHS.

18       Q      So is it that you understand

19   him to be acting in his capacity of HHS

20   because he's making recommendations about

21   HHS?

22       A      Yes, he's -- yes.

23       Q      Okay.  Is there any other

24   reason you understand him to be working

25   in his capacity as an HHS employee when

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 43

1    he's making recommendations to HHS?

2         A    Say that -- say that again?

3    I'm sorry, that was a bit of a tongue

4    twister.

5         Q    Yeah, fair enough.

6              I'm trying to ask if that's the

7    only reason you understand him to be

8    acting in his HHS capacity versus his

9    DOGE capacity?

10             MR. HUMPHREYS:  Objection as

11        to form.

12        A    That's the only reason I have

13   to believe that, yes.

14        Q    Okay.  Was Mr. Smith the HHS

15   DOGE team lead before he was detailed to

16   HHS?

17        A    Yes.

18        Q    Is he the HHS DOGE team lead

19   now?

20        A    Yes.

21        Q    Has his -- has his

22   responsibilities functionally changed

23   since he was detailed to HHS?

24        A    No.

25             MS. HINSON:  All right.  I

19173c2b-8370-4ccc-b770-46fbda9e23d5

Page 44

1          think that's it.

2                  MR. HUMPHREYS:  Great.

3                  Give us two minutes to talk

4          to him.

5                  MS. HINSON:  Sure.

6                  MR. HUMPHREYS:  Maybe five.

7                  (Recess.)

8                  MR. HUMPHREYS:  Back on the

9          record.

10         A    I just wanted to clarify that

11    Brad Smith was detailed to HHS at the

12    start of the administration, so when he

13    came to work for Mr. Rowell, on the 21st

14    he introduced me to Brad that he was

15    going to be, you know, our DOGE team lead

16    here at HHS, and that's when I started

17    working with him, so not that he was a

18    DOGE employee at HHS but he was our HHS

19    DOGE lead.

20         Q    So had he -- when you say the

21    21st, is that the 21st of what month?

22         A    January.  Sorry.

23         Q    And had he already been

24    detailed to HHS on the 21st of January?

25         A    Yes.  Yes.

19173c2b-8370-4ccc-b770-46fbda9e23d5