# EXHIBIT 7

Case 1:25-cv-00339-JDB   Document 80-9   Filed 04/18/25   Page 2 of 83

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-----------------------x

AFL-CIO, et al.,          :

          plaintiffs,   :

v.                        : CASE NO.

DEPARTMENT OF LABOR,      : 1:25-cv-00339-JDB

et al.,                   :

          Defendant.    :

-----------------------x



          30(b)(6) Deposition of

     DEPARTMENT OF LABOR through

          RICKY KRYGER

     Tuesday, April 8, 2025

          9:26 a.m.




BEFORE: Cassandra E. Ellis, RMR, RDR, CRR,

RSA, CA-CSR 14448, WA-CCR, HI-CSR



Job No.: 10519

Page 2

1              The 30(b)(6) Deposition of

2     DEPARTMENT OF LABOR through RICKY KRYGER,

3     taken before CASSANDRA E. ELLIS, Registered

4     Professional Reporter, Registered Merit

5     Reporter, Registered Diplomate Reporter,

6     Certified Realtime Reporter, Realtime

7     Systems Administrator; California Certified

8     Shorthand Reporter; Washington State

9     Certified Court Reporter; Hawaii Certified

10    Shorthand Reporter; Notary Public, held in

11    Washington, D.C., on Tuesday, April 8, 2025,

12    commencing at 9:26 a.m. and concluding at

13    12:14 p.m.

14

15

16

17

18

19

20

21

22

23

24

25

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 3

1              A P P E A R A N C E S

2       ON BEHALF OF THE PLAINTIFFS:
              ZOILA E. HINSON, PRO HAC VICE
3             ALEXA MILTON, PRO HAC VICE
              RELMAN COLFAX PLLC
4             1225 19th Street, Northwest
              Suite 600
5             Washington, D.C.  20036
              (202) 728-1888
6             Zhinson@relmanlaw.com
              Amilton@relmanlaw.com
7

8       ON BEHALF OF THE PLAINTIFFS:
              AMAN T GEORGE, ESQUIRE
9             MARK B. SAMBURG, ESQUIRE
              DEMOCRACY FORWARD FOUNDATION
10            P.O. Box 34553
              Washington, D.C.  20043
11            (202) 448-9090
              Ageorge@democracyforward.org
12            Msamburg@democracyforward.org

13

14
        ON BEHALF OF THE DEFENDANT:
15            BRADLEY P. HUMPHREYS, ESQUIRE
              BENJAMIN S. KURLAND, ESQUIRE
16            ANDREW BERNIE, ESQUIRE
              US DEPARTMENT OF JUSTICE
17            1100 L Street, Northwest
              Washington, D.C.  20005
18            (202) 305-0878
              Bradley.humphreys@usdoj.gov
19

20
        ALSO PRESENT:  Joe Plick, DOL
21

22

23

24

25

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 4

1              INDEX TO EXAMINATION

2    30(b)(6) Deposition of

3    DEPARTMENT OF LABOR through

4    RICKY KRYGER

5    EXAMINATION                        PAGE

6        By Ms. Hinson                  7

7

8              INDEXED PAGES

9                                       PAGE

10   RICKY KRYGER, sworn                7

11   REPORTER CERTIFICATE               138

12   INSTRUCTIONS TO WITNESS (none)

13   DECLARATION UNDER PENALTY OF PERJURY   137

14   ERRATA SHEET                       139

15

16              INFORMATION REQUESTED

17                  None

18

19        WITNESS INSTRUCTED NOT TO ANSWER

20                  PAGES

21           4, 5, 120, 134, 136

22

23

24

25

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 5

```
 1              INDEX TO PLAINTIFFS EXHIBITS

 2                    RICKY KRYGER

 3                 Thursday, April 8, 2025

 4   MARKED            DESCRIPTION             PAGE

 5   Exhibit 1  Plaintiffs' Notice of Rule    13

 6        30(b)(6) DEPOSITION OF Department

 7        Of Labor

 8   Exhibit 2  Declaration of Adam Ramada     16

 9   Exhibit 3  Declaration of Ricky J.        19

10        Kryger

11   Exhibit 4  EPACS Operator Account         31

12        Request Bates Stamped

13        25CV339_DOL00001

14   Exhibit 5  Privileged User/System         31

15        Administrator Request Bates

16        Stamped 25CV339 DOL00028

17   Exhibit 6  Defendants' Objections and     46

18        Responses to Plaintiffs'

19        Requests For Expedited Discovery,

20        Including Supplemental Responses

21   Exhibit 7  Presidential Documents:        61

22        Executive Order 14243 of

23        March 20, 2025

24

25
```

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 6

```
 1        INDEX TO PLAINTIFFS EXHIBITS CONTINUED

 2                    RICKY KRYGER

 3                Thursday, April 8, 2025

 4   MARKED              DESCRIPTION              PAGE

 5   Exhibit 8   Request to Access DOL          93

 6        Information Systems Bates

 7        Stamped 25CV339_DOL00022

 8   Exhibit 9   U.S. Department of Labor       108

 9        User Agreement Bates Stamped

10        25CV339_DOL00194

11   Exhibit 10   U.S. Department of Labor      108

12        User Agreement Bates Stamped

13        25CV339_DOL00104

14

15

16

17

18

19

20

21

22

23

24

25
```

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 7

1              P R O C E E D I N G S

2              MR. HUMPHREYS:  Let me say

3        that defendants Mr. Kryger would

4        like to read ask sign.

5              MS. HINSON:  No problem.

6              MR. HUMPHREYS:  Thank you.

7    30(b)(6) Deposition of DEPARTMENT OF LABOR

8              Through RICKY KRYGER

9     having been sworn, testified as follows:

10                   EXAMINATION

11   BY MS. HINSON:

12        Q    Good morning.

13        A    Good morning.

14        Q    Thank you so much for joining

15    us this morning.

16              How are you?

17        A    Good.

18        Q    Can you state and spell your

19    name for the record?

20        A    It's -- my legal name is Ricky,

21    R-i-c-k-y, and last name is Kryger,

22    K-r-y-g-e-r, but I go by Rick.

23        Q    Thank you.

24              So I'm just going to start by

25    going over a few ground rules for today,

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 8

```
 1      just to make sure we're on the same page,
 2      things go as smoothly as they can.
 3              Do you understand today that
 4      you are testifying on behalf of the
 5      Department of Labor about the topics
 6      listed in the deposition notice?
 7          A    Yes.
 8          Q    In terms of those ground rules,
 9      can you continue -- you're doing a great
10      job so far of giving verbal responses
11      instead of a nod or shake of the head,
12      and that's just so the court reporter can
13      get what we're saying; does that make
14      sense?
15          A    Yes.
16          Q    And it's important we don't
17      speak over each other, so I'm going to do
18      my best to let you finish, if you can do
19      your best to let me finish that would be
20      great; can you do that?
21          A    Yes.
22          Q    Wonderful.  Are you represented
23      by counsel today?
24          A    Yes.
25          Q    And who is that?
```

Page 9

1          A       The Department of Justice and

2     Department of Labor.

3          Q       So your counsel might object to

4     a question that I ask, that's okay, he's

5     making his objection for the record, but

6     unless he instructs you not to answer you

7     should go ahead and answer the question,

8     all right?

9          A       Yes.

10         Q       If at any time you need a

11    break, you can just let me know.  We're

12    going to take at least one break

13    throughout the morning, but if you do

14    want to take a break, just answer the

15    question, if I've asked a question before

16    we take a break; does that make sense?

17         A       Yes.

18         Q       If you don't understand a

19    question, can you please just let me know

20    and I'll do my best to rephrase it, but

21    if you don't ask me to rephrase it I'll

22    assume that understood it; does that

23    work?

24         A       Yes.

25         Q       And along the same lines, if at

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 12

1        Q      And if I say HHS, do you
2    understand that to mean Department of
3    Health and Human Services?
4        A      Yes.
5        Q      Okay.  If I refer to DOGE that
6    will refer collectively to the US Digital
7    Service and the US Digital Service
8    Temporary Organization; does that work?
9        A      Yes.
10       Q      And the DOGE EO is the
11   executive -- is Executive Order 14158,
12   establishing and implementing the
13   President's Department of Government
14   Efficiency, all right?
15       A      Yes.
16       Q      All right.  Last one, the DOGE
17   team affiliates, that will be people
18   hired by or detailed to the agency since
19   January 19th, 2025 to work as part of the
20   DOGE team; understand?
21       A      Yes.
22       Q      All right.
23              Sorry, DOGE should be the US
24   DOGE Service and the US DOGE Service
25   Temporary Organization?

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 13

1        A      Yes, I understand.

2        Q      Okay.  All right.

3               (Exhibit No. 1 was marked

4        for identification.)

5    BY MS. HINSON:

6        Q      All right.  I'm handing you

7    what has been marked as Exhibit 1.

8               MR. HUMPHREYS:  Thank you.

9               MS. HINSON:  Two copies for

10       you guys.

11              MR. HUMPHREYS:  Great.

12   BY MS. HINSON:

13       Q      That is the deposition notice

14   for this deposition, have you seen this

15   before?

16       A      Yes, I have seen this --

17   this -- this is the latest one, just want

18   to -- I don't know if it's changed or --

19   this is -- what's the date on this?  I

20   don't see a date.

21       Q      It's from over the weekend.

22       A      Oh, over the weekend.

23       Q      The topics haven't changed

24   since the original.

25       A      So this is from the same as

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 14

1    like, a week or two weeks ago?

2        Q    Yes.

3        A    Okay.  I have seen it.

4        Q    And do you understand that

5    you're testifying on behalf of DOL to

6    provide information known by the

7    department about the topics in this

8    notice?

9        A    I understand that.

10       Q    Great.  And are you prepared to

11   testify about those topics?

12       A    I am.

13       Q    Wonderful.  Okay.

14            You can set that aside.

15       A    Okay.

16       Q    So it's my understanding, from

17   reviewing DOL's interrogatory responses,

18   that the DOGE team affiliates at DOL are

19   Marko Elez, Aram Moghaddassi and Miles

20   Collins; is that correct?

21       A    Yes, that's correct.

22       Q    Since January 19th, 2025, has

23   anyone else worked at DOL, as an employee

24   or a detailee, while simultaneously being

25   employed at DOGE?

b7697e3a-7f70-4490-af68-d89c44ceedd6

1        A      No.

2        Q      And since January 19th, 2025,

3    has anyone else been detailed to DOGE

4    whilst simultaneously being employed

5    or -- employed by or detailed to DOL?

6        A      No.

7        Q      Since January 19th, 2025, has

8    anyone else worked as an employee or

9    detailee on the DOGE team while

10   simultaneously being employed by another

11   federal agency?

12       A      So simultaneously -- can you

13   read that back to me again?

14       Q      Sure.

15              So has anyone worked on the DOL

16   DOGE team while being simultaneously

17   employed by another federal agency?

18       A      No.

19       Q      And since January 19th, 2025,

20   has anyone else been hired by DOL to work

21   on the DOGE team?

22       A      No.

23       Q      Okay.  So it's just the three

24   people that I identified earlier?

25       A      Yes.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 20

1    familiar.

2         Q      Thanks.

3         A      It's been a couple months.

4         Q      I obviously maybe, like all of

5    us, need to get a little more sleep.

6              MR. HUMPHREYS:  Or just like

7         the movie.

8              MS. HINSON:  I've never seen

9         the movie.  I feel disappointed.

10   BY MS. HINSON:

11        Q      I'm handing you what's been

12   marked as Exhibit 3, and this is a

13   declaration by Ricky Kryger, that's you,

14   filed in this case on February 13th; do

15   you recognize this?

16        A      Yes.

17        Q      Can you look at paragraph 13.

18             Okay.  It says:  As of this

19   date there's one relevant worker who is

20   now a DOL employee working solely on

21   budget review.

22             Who were you referring to in

23   this paragraph?

24        A      This was Marko Elez.

25        Q      And was he, at this point, a

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 21

1    detailee -- or sorry -- was he, at some

2    point, a detailee to DOL?

3         A    No.

4         Q    Okay.  And do you remember when

5    he retired at DOL?

6         A    I believe it was February 12th.

7         Q    Okay.  What has his role been

8    at DOL since February 12th?

9         A    He -- he has been reviewing

10   financial records and acquisition

11   information, expenditures of the

12   Department of Labor, grant information,

13   you know, procurement-type information,

14   accounting system data.

15        Q    And what has he been doing with

16   that information?

17        A    He has been reviewing it for

18   expenditures of the department that don't

19   necessarily align with the -- with the

20   executive orders issued by the President

21   or that could be considered fraud, waste

22   or abuse.

23        Q    And who makes the determination

24   of whether the expenditures are fraud,

25   waste or abuse or don't align with the

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 22

1    executive order of the President?

2         MR. HUMPHREYS:  Object on

3         the basis of scope and instruct

4         the witness not to answer that

5         just to get more into his

6         activities and not the access to

7         the data.

8              MS. HINSON:  It has to do

9         with the role and responsibilities

10        working at DOL, topic two.

11             MR. HUMPHREYS:  That is

12        fair, apologies.

13             THE WITNESS:  Can you repeat

14        the question, please?

15             MS. HINSON:  Sure.

16  BY MS. HINSON:

17       Q    So you said that Mr. Elez's

18  responsibilities included reviewing

19  expenditures for fraud, waste and abuse

20  or whether they were in line with the

21  DOGE DOL; is that right?

22       A    I said with the President's

23  policies and other executive orders.

24       Q    Okay.

25       A    There's multiple executive

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 23

1     orders that relate to the President's

2     policies and fraud, waste and abuse.

3          Q     Okay.  Thank you.

4               When he does that review,

5     does he make the decision of

6     whether -- or the determination of

7     whether the expenditures align with

8     the President's executive orders or

9     constitute fraud, waste or abuse?

10         A     He makes recommendations, I

11    don't believe he makes decisions.

12         Q     Okay.  And who do those

13    recommendations go to?

14         A     His supervisors, the chief of

15    staff and the office of the secretary, so

16    I believe it goes there, it -- it could

17    be also in consultation with other

18    departments' executives that are

19    responsible for different program areas.

20         Q     Are his recommendations

21    typically followed?

22         A     I -- I can't speak to that,

23    because the number of recommendations

24    he's made and how many of those were, you

25    know, acted upon.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 24

1      Q      What has his title been at DOL?

2      A      He is a policy advisor.

3      Q      Okay.  What does that mean?

4      A      Okay.  Policy advisor is

5    someone who interprets policies, such as

6    executive orders, and examines other data

7    and information and actions to determine

8    whether they're in alignment with

9    departmental or presidential policies and

10   orders.

11     Q      And is this a title that

12   existed at DOL on January 19th, 2025?

13     A      Yes.

14     Q      It's my understanding that

15   Mr. Elez is also detailed to HHS; is that

16   right?

17     A      Yes.

18     Q      Okay.  To your knowledge, has

19   Mr. Elez been employed by any other

20   federal agencies since January 19th,

21   2025?

22     A      He is also employed by the US

23   DOGE Service.

24     Q      And has he been detailed to any

25   other federal agencies since January

Page 32

1    administration and management.

2        Q    And did he, at any point,

3    supervise Mr. Elez?

4        A    He did, for a short period of

5    time.  I -- I don't remember the exact

6    timeline, but it was a point where then

7    the supervision shifted to Mr. Han in the

8    secretary's office.

9        Q    Do you know why it shifted?

10        A    The -- they felt that the --

11    that the work was best supervised and

12    operated out of the secretary's office

13    rather than a subordinate agency of the

14    office of the assistant secretary for

15    administration management.

16        Q    Do you know why they felt that

17    way?

18        A    It's a department-wide

19    activity, kind of it meets the authority

20    of the secretary's office to -- to

21    operate in the best manner.

22        Q    And who made that decision?

23        A    I know that Mr. Finnegan was

24    involved in that discussion, I can't --

25    maybe the acting secretary -- maybe

Page 33

1      Acting Secretary Vince Micone, at the

2      time, was the ultimate decisionmaker.

3          Q      And then, have you ever

4      supervised Mr. Elez?

5          A      I have never supervised him.

6          Q      All right.  Do you know why you

7      signed this Exhibit 4 as a supervisor?

8          A      Yes, so I -- I signed that so I

9      believe, again, this is a period of time

10     when Mr. Finnegan was the supervisor, I

11     signed in that area, to -- to -- just for

12     administrative ease in the process.

13              We had another form, which is

14     also in the binder, where Mr. Finnegan

15     also did sign or the assistant secretary

16     for administration management signed, so

17     that kind of covered that requirement.

18              So to have the form, for the

19     record, I signed in that area for

20     administrative burden to alleviate that

21     from the -- from the assistant secretary

22     for administration management.

23          Q      Is it the normal practice at

24     DOL for you to sign an access form or, I

25     should say, an account -- an operator

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 34

1    account request for someone that you're

2    not supervising?

3        A    Yeah, it's not a normal

4    practice, but I do have the authority

5    overall DOL systems, so I used my

6    authority in this case to ease the

7    administrative burden on upper-level

8    agency management.

9        Q    I'd like to switch gears

10   slightly to talk about Mr. Moghaddassi.

11            He's employed directly at DOL;

12   right?

13       A    Yes.

14       Q    Okay.  What has his role been

15   at DOL since January 19th, 2025?

16       A    His role has also been to, you

17   know, review the department's practices

18   or compliance with executive orders, as

19   well as to review data and information

20   for fraud, waste and abuse.

21       Q    Is there any functional

22   difference between his role and

23   Mr. Elez's role?

24       A    I'm not aware of any functional

25   difference between those two.  They --

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 35

1    they perform the same types of duties.

2        Q    And have his

3    responsibilities -- responsibilities

4    changed at all since he started at the

5    Department of Labor?

6        A    No.

7        Q    Am I right that he's detailed

8    to HHS?

9            MR. HUMPHREYS:  Objection to

10      scope.

11            You can answer if you know.

12        A    I don't -- unless I've

13    submitted here, I don't have, off the top

14    of my head, if he's been detailed to

15    other agencies.

16            My understanding is he has been

17    detailed to other agencies.  I don't know

18    what the list of that is.

19        Q    Are you aware of any other

20    agencies he's been detailed to?

21            MR. HUMPHREYS:  Same

22      objection.

23    BY MS. HINSON:

24        Q    You can answer.

25        A    Again, I don't have the list of

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 36

```
1      agencies, you know, off the top of my

2      head, that he's been detailed to.

3           Q     Do you know how the decision

4      was made to hire any of the DOGE team

5      affiliates?

6                MR. HUMPHREYS:  Objection to

7           scope.

8                You can answer if you know.

9           A     Again, just like other schedule

10     C hires at the Department of Labor,

11     whether in this administration or past

12     administrations, I don't -- I don't know

13     how they reach those decisions to hire

14     those individuals.

15          Q     Given that it's not -- well,

16     let me take a step back.

17               I believe you testified

18     earlier that it's not the normal

19     practice of DOL to have employees who

20     are employed or detailed across

21     multiple federal agencies; is that

22     accurate?

23               MR. HUMPHREYS:  Objection to

24          form.

25     ///
```

Page 37

1    BY MS. HINSON:

2        Q    You can answer.

3        A    Sorry, restate that, please.

4        Q    Sure.  Did you testify earlier

5    that it's not the normal practice of DOL

6    to have employees or detailees who are

7    simultaneously employed across multiple

8    federal agencies?

9        A    I'm not aware of that being a

10   normal practice, no.

11       Q    Okay.  Why did DOL decide to do

12   that in this case?

13            MR. HUMPHREYS:  Objection as

14       to scope.

15            You can answer.

16       A    Again, I can't speak to the

17   employment decisions, you know, for this

18   schedule -- for these schedule C

19   employees or any other schedule C

20   employees of how hiring decisions were

21   made.

22       Q    What is the authority of the

23   DOGE team affiliates to direct DOL

24   employees?

25       A    Sorry, repeat, what was that

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 38

1    again?

2        Q    What is the authority of the

3    DOGE team affiliates to give direction to

4    other DOL employees?

5            MR. HUMPHREYS:  Objection,

6        foundation.

7        A    They might -- they do not have

8    any authority to give direction.

9        Q    Okay.  So they -- I think

10   it's -- how do they relate to other DOL

11   employees?

12       A    Can you clarify?

13       Q    Sure.

14           So you know there -- if there

15   is a disagreement between one of the DOGE

16   team affiliates and a DOL employee about

17   something that's within the scope of the

18   DOGE team's work, how does that conflict

19   get resolved?

20       A    It would be escalated through

21   normal management channels, possibly all

22   the way up to the secretary's office.

23       Q    And when you say normal

24   management channels, who would that be

25   to?

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 39

1       A     So supervisory channels of the

2    individual or the dispute resides with --

3    discuss it with their supervisor, and so

4    on and so forth, potentially up to the

5    office of the secretary.

6       Q     And has that happened?

7       A     It has not happened.

8       Q     How do the DOGE team affiliates

9    coordinate their work with DOGE?

10      A     So --

11            MR. HUMPHREYS:  Objection,

12      foundation.

13            Sorry, go ahead.

14            THE WITNESS:  Okay.

15      A     So the -- the DOGE team

16   affiliates report to the chief of staff

17   in the office of the secretary.  I do not

18   know of any other coordination with, I

19   guess, DOGE, as we defined at the

20   beginning of this deposition.

21      Q     Do you know a coordination with

22   anyone else, outside of DOL?

23      A     I -- I don't know of any other

24   coordination and in my discussions with

25   the DOGE team affiliates they say they

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 40

1      take their instructions from the chief of

2      staff, the secretary's office or deputy

3      secretary, potentially, since they work

4      in the secretary's office.

5          Q    Do they take any direction

6      directly from DOGE?

7              MR. HUMPHREYS:  Objection as

8          to scope.

9          A    I have not heard of any

10     direction being taken from outside of the

11     Department of Labor.

12         Q    Does DOGE have -- recognizing

13     that you said they didn't have taken

14     direction from the Department of Labor,

15     does DOGE have the authority to direct

16     them whether or not it's been exercised?

17             MR. HUMPHREYS:  Objection as

18         to scope, but go ahead.

19         A    No, as far as I'm aware.

20         Q    Are there any written policies

21     documenting the authority of the DOGE

22     team affiliates to direct or not direct

23     DOL employees?

24         A    So there are executive orders,

25     which speaks to their work, which

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 41

1      obviously serves as an instruction or a
2      guide for Department of Labor employees
3      to -- to -- to work with those staff.
4      There's no other policies in place.
5          Q     So when you're saying there are
6      instructions to DOL employees to work
7      with the DOGE affiliates, DOGE team
8      affiliates, what does that -- what does
9      that mean, in practice?
10         A     Did I say the word
11     instructions?  Okay.
12         Q     I guess I -- I -- I thought so,
13     but --
14         A     So the executive orders, you
15     know, are -- are clear on -- you know, in
16     the establishment of the -- the internal
17     DOGE teams, within agencies or referred
18     to as DOGE affiliates, here, to work
19     within the agency to identify fraud,
20     waste and abuse, and to make
21     recommendations on those findings or -- I
22     think there's also related executive
23     orders that have been issued on -- I
24     don't recall the exact number -- but on
25     data silos and reviewing data to assist

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 42

1    in finding fraud, waste and abuse by

2    presidential -- those working under the

3    President's authority or working within

4    agencies that are part of those executive

5    orders.

6         Q     Does DOL interpret those

7    executive orders and other directions to

8    mean that it should take the

9    recommendations of the DOGE team

10   affiliates?

11             MR. HUMPHREYS:  Objection as

12        to scope.

13             You can answer.

14        A     No.

15        Q     What does it take them to mean?

16        A     It takes the -- so the

17   executive orders are to identify fraud,

18   waste and abuse through -- through using

19   data and information and internal

20   discussions, and to make recommendations

21   to the appropriate personnel, such as

22   those chief of staff or others in the

23   office of the secretary or it could be

24   other executives in the Department of

25   Labor, where fraud, waste and --

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 43

1      potential fraud, waste and abuse has been

2      identified and to, you know, just try and

3      stop those activities.

4          Q     So let's say you have a DOGE

5      team affiliate who says that I think X is

6      fraud, waste or abuse, and you have

7      another Department of Labor employee who

8      thinks, no, this is actually really

9      necessary for agency function, what --

10     what happens to make the decision as to

11     what to do with that particular function?

12         A     So normal escalation

13     management, escalation channels will be

14     used, as I described earlier, to reach a

15     final decision.

16         Q     What's involved in making that

17     final decision?

18              MR. HUMPHREYS:  Objection as

19         to scope.

20         A     So information from both sides

21     would be considered, like in any

22     difference of opinion.  So both -- after

23     both sides being considered potential

24     risks or impact, then the -- depending on

25     how far it's had to escalate, if it's

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 44

1    escalated to the office of the secretary

2    then the chief of staff or deputy

3    secretary will make a final decision on

4    what to do.

5        Q    What authority do Department of

6    Labor employees have to direct the DOGE

7    team affiliates?

8        A    Certainly the chief of staff

9    has the authority to direct their

10   activities or the deputy secretary has

11   the authority to direct their activities,

12   but nobody else would have that authority

13   to direct their work.

14       Q    And, sorry, you said chief of

15   staff and who else?

16       A    Deputy secretary.

17       Q    All right.

18       A    And the secretary of labor, of

19   course.

20       Q    Okay.  And have the chief of

21   staff, secretary or deputy secretary, in

22   fact, directed their activities at DOL?

23            MR. HUMPHREYS:  Objection as

24       to scope.

25   ///

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 58

1    would be typically another field on

2    that form.

3         Q    How are these requests

4    evaluated?

5         A    The request -- the primary

6    reason -- thing that's evaluated is the

7    need to know or reason for request.

8         Q    And what factors are you used

9    to determine if someone requesting access

10   has a need to access the system?

11        A    So again, what's the reason or

12   purpose for that access, what do they --

13   what are they going to do with that

14   access.

15        Q    Anything else?

16        A    I think, again, I think, at a

17   high level, that covers it.

18        Q    I mean, you're saying sort of

19   at a high level, is there another answer

20   at a more granular level?

21        A    I mean, there can be lots of

22   follow-up discussion about need to know

23   or, you know, purpose of access or what

24   the individual intends to do with that

25   access.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 59

1      Q     So is that -- would you say

2   that's a robust analysis of the need to

3   know?

4            MR. HUMPHREYS:  Objection,

5      form.

6   BY MS. HINSON:

7      Q     You can answer.

8      A     Yes.

9      Q     I wanted to ask about the

10  unemployment insurance data and related

11  records, what is this system?

12     A     This specifically refers to the

13  data that was transferred from the

14  department's office of the inspector

15  general, as was outlined in the executive

16  order on data silos, again, I don't

17  recall the executive order number, that

18  was transferred to the main Department of

19  Labor.

20     Q     And what information does it

21  contain?

22     A     Unemployment insurance claims

23  data from states' unemployment insurance

24  agencies.

25     Q     And what PII does it include?

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 60

1        A     It would include things such as

2     name, address, I believe it has birth

3     date, bank account information, address,

4     person's address.  I believe that will --

5     if I recall correctly there's flags in

6     there for whether the -- it matched to

7     the Social Security death match file,

8     like is the individual deceased or not

9     deceased.

10       Q     Does it have Social Security

11    numbers for people?

12       A     It would, yes, it would have

13    Social Security numbers.

14       Q     Anything else?

15       A     I -- I -- that's all I can

16    remember, off the top of my head.

17       Q     So you said it was data

18    transferred from OIG, when did that

19    transfer take place?

20       A     I believe it was on the same

21    day or the day following the issuance of

22    the executive order.  I don't know that

23    we have that in here.  It's the executive

24    order on data silos.

25       Q     Is it March 20th, 2025?

Page 61

1      A      So your question was what,

2    again?

3      Q      I'm just -- when was the data

4    transferred from OIG?

5      A      Again, it was the -- it was the

6    same day or the day following the

7    executive order being -- and I don't have

8    that information.

9            MS. HINSON:  Okay.  I think

10       we might be able to clarify that.

11            Can you mark this as Exhibit

12       7.

13            (Exhibit No. 7 was marked

14       for identification.)

15            MS. HINSON:  Thank you,

16       Cassandra.

17    BY MS. HINSON:

18      Q      So you've been handed Exhibit

19    7, which is the executive order 14243,

20    stop waste, fraud and abuse by

21    eliminating information silos.

22            Is this the executive order you

23    were just referencing?

24      A      Yes.

25      Q      And you see that it's dated

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 62

1    March 20th, 2025?

2         A      I do see that.

3         Q      Okay.  So does that mean the

4    information -- the data was transferred

5    from OIG on or around March 20th of 2025?

6         A      On or around is correct.  I

7    don't recall if it was the same day or

8    the following day.

9         Q      Okay.  Thank you.

10               What procedures have been

11   established regarding access to the

12   unemployment insurance data and related

13   records?

14        A      So the data are -- are located

15   in a tightly controlled area of our IT

16   systems, with very, very limited access

17   to -- to very few individuals.

18        Q      Okay.  And how would you

19   request access to that information?

20        A      A request for access to that

21   particular data would have to go through

22   the department's chief information

23   officer.

24        Q      And would that be written down?

25        A      It -- it will be done in the

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 63

1    procedures identified by the chief

2    information officer.

3        Q    Do you know what those

4    procedures are?

5        A    I do not know what those

6    procedures are.

7        Q    Okay.  But it's the typical

8    course of the Department of Labor, when

9    you're requesting access to a sensitive

10   system, to make that request, at least in

11   part, in writing; correct?

12           MR. HUMPHREYS:  Objection,

13       mischaracterizes testimony.

14   BY MS. HINSON:

15       Q    You can answer.

16       A    Can you repeat that again?

17       Q    Okay.  It's the normal course

18   of the Department of Labor when someone

19   is requesting access to a sensitive

20   system that they need to fill out a form

21   as part of making that request; correct?

22       A    Yes.

23       Q    Okay.  And in that form they

24   would need to write down their need to

25   access that system of records; correct?

Page 71

1    an e-mail, but it would not be a --

2    necessarily be a form like you see for

3    the system access.

4       Q    Are there any written policies

5    at DOL governing the use of data extracts

6    by people who do not have access to the

7    underlying sensitive system?

8       A    There are department policies

9    governing the use and protection of data

10   that are universal, regardless of whether

11   you have access to the system that

12   contains the data or you're handling the

13   data outside the system.

14      Q    I think you also testified

15   earlier that sometimes the need for an

16   access to a sensitive system is apparent

17   based on the type of system; is that

18   right?

19      A    I would say based on the -- the

20   person's role or work responsibilities or

21   duties.

22      Q    How does a system owner make

23   the determination that someone needs

24   access to a system based on their role or

25   duties?

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 72

1      A     It could be in the request form

2    itself or it could be based on the, you

3    know, the person's role within the

4    organization or within the department, it

5    could be apparent that they would need to

6    have access to that data.

7      Q     What do you mean it could be

8    apparent?

9      A     So in this example here, I

10   believe it's apparent from the executive

11   orders that the -- these individuals on

12   the -- the affiliates, I guess we're

13   calling them here, need access to data

14   within departmental systems, whether it's

15   the UI data or whether it's financial

16   records or grant information, that it

17   would be apparent that falls within that

18   roles and responsibilities as outlined in

19   the executive orders.

20     Q     So does that mean that the DOGE

21   team affiliates were granted access to

22   the sensitive systems, that I listed

23   before the break, based on that apparent

24   need from the -- the information silos

25   EO?

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 73

1        A      I would say that it is

2    apparent, but that doesn't mean that they

3    may still not explain why they need it or

4    state why they need it, and you'll see

5    that in some of the access forms.

6        Q      How were DOGE team affiliates

7    request to -- let me take a step back.

8               How do DOGE team affiliates

9    request access to sensitive systems?

10       A      They -- they log into the

11   system, like a user, with that same type

12   of role, whatever role it is they're

13   granted within that system.

14       Q      Do -- do they use -- do they

15   submit a form requesting access?

16       A      Yes, they do submit forms.

17       Q      And what do those forms need to

18   show in order for them to gain access to

19   a system?

20       A      I feel like it's the same

21   question as earlier.

22              So the forms, again, would have

23   their name and contact information, the

24   organization they work for, and include

25   the type of role that's being requested.

Page 74

1          Q      I guess what I'm trying to ask

2     is -- is this:  You did outline this

3     process earlier, for how someone at the

4     Department of Labor requests access to a

5     sensitive system, but it sounded like,

6     from what you were just saying about the

7     information silos EO, that for the DOGE

8     team affiliates it was apparent based on

9     that EO that they would need access to

10    those systems; is that -- am I accurately

11    describing your testimony?

12              MR. HUMPHREYS:  Object to

13         form.

14    BY MS. HINSON:

15         Q      You can answer.

16         A      So -- so again, can you restate

17    that, please?

18         Q      Sure.

19              I understood your testimony a

20    few minutes ago to be saying it was

21    apparent, based on the information silos

22    EO, that the DOGE team affiliates needed

23    access to sensitive systems at DOL; is

24    that accurate?

25         A      Yes.

Page 75

1      Q      Okay.  Does that -- does the

2    fact that their need for since

3    sensitive -- for access to sensitive

4    systems is apparent on the basis of the

5    EO change the process that they use to

6    request access?

7      A      No.

8      Q      Okay.  Does it change how that

9    need for access is evaluated?

10     A      Yes.

11     Q      And how does it change how the

12    need for access is evaluated?

13     A      Because the need is apparent by

14    their role and responsibilities outlined

15    in the EO.  You know, there's -- I would

16    say there's fewer additional follow-up

17    questions with regard to, you know, what

18    the need is about, because it's already

19    been publicly outlined.

20     Q      So what are some examples of

21    follow-up questions that would be asked

22    of another user that are not being asked

23    of a DOGE team affiliate?

24            MR. HUMPHREYS:  Objection,

25      form.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 76

```
 1       A     So a normal question, like if

 2    it's coming from another area of the

 3    department, as an example, that's not --

 4    that's not normally worked with that area

 5    of sensitive data, is to ask, you know,

 6    what's -- what -- what is the access --

 7    why is the access needed, what will the

 8    access be used for, maybe what -- yeah,

 9    will there be any potential sharing of

10    that data?

11           So it's -- it's making sure

12    that the security of the data and the use

13    of the data conform with the, you know,

14    legal responsibilities and policies of

15    the department.

16       Q     And those are all questions

17    that don't get asked of the DOGE team

18    affiliates; correct?

19       A     Yes, I would say that's

20    correct.

21       Q     Okay.  Was the need for the

22    DOGE team to have access to sensitive

23    systems apparent based on the January

24    20th DOGE EO?

25       A     I would say the -- the need was
```

Page 77

1     apparent, yes.

2         Q     And did the January 20th DOGE

3     EO also alter how DOGE team affiliates

4     request for access were evaluated at the

5     Department of Labor?

6              MR. HUMPHREYS:  Objection.

7     BY MS. HINSON:

8         Q     You can answer.

9         A     I would say it didn't alter,

10    because they didn't exist prior to

11    January 20th, if I'm understanding your

12    question -- your question correctly.

13        Q     It was a bad question.

14              There's -- you described

15    earlier today a process by which

16    employees -- the requested employees

17    of the Department of Labor are

18    evaluated in terms of access to

19    sensitive systems, is that right?

20        A     Yes.

21        Q     Did the January 20th DOGE EO

22    cause the Department of Labor to use a

23    different standard when evaluating the

24    requests of the DOGE team affiliates?

25        A     No, I don't think so.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 78

```
 1        Q     Okay.  Did the fact that the --
 2     there was an apparent need, based on the
 3     DOGE team -- sorry -- based on the DOGE
 4     EO, from January 20th, for the DOGE team
 5     affiliates to access the systems, play a
 6     role in evaluating their requests for
 7     access?
 8               MR. HUMPHREYS:  Objection to
 9          form.
10               THE WITNESS:  Yeah, I'm --
11          can you restate?
12               MS. HINSON:  That was also a
13          bad question.
14     BY MS. HINSON:
15        Q     So you -- you testified that
16     the -- the need for the DOGE team
17     affiliates to have access to sensitive
18     systems was apparent based on the January
19     20th DOGE EO; correct?
20        A     Yes.
21        Q     Did that play a role when --
22     when DOL evaluated whether DOGE team
23     affiliates could access sensitive
24     systems?
25               MR. HUMPHREYS:  Object to
```

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 79

1        the form.

2    BY MS. HINSON:

3        Q    You can answer.

4        A    Yes.

5        Q    How did it play a role?

6        A    It -- it played a role in that

7    it made the role and responsibility of

8    the individuals performing that work,

9    that there was a -- a clear and apparent

10   need for accessing those systems and that

11   data.

12       Q    Did the individuals evaluating

13   the requests for access need any other

14   information about the DOGE team

15   affiliates' need to access the sensitive

16   systems?

17       A    The answer to that is no, if

18   I'm understanding the correct question.

19       Q    All right.  Have any DOGE team

20   affiliates viewed data extracts from

21   sensitive systems that they do not

22   otherwise have access to?

23           MR. HUMPHREYS:  Objection as

24       to scope, but you can answer if

25       you know.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 80

1        A      So the question is, have they

2    reviewed data extracts but not had system

3    access?

4        Q      Correct.

5              MR. HUMPHREYS:  Same

6    objection.

7        A      I think the answer to that is

8    no.

9        Q      Okay.  Do DOGE team affiliates

10   need to fill out a written request to

11   access the sensitive system?

12       A      Do DOGE team affiliates --

13       Q      Yeah.

14       A      -- need to fill out a request

15   to access the system?  Yes.

16       Q      Okay.  Can you look at it's

17   Exhibit 6, I believe, the interrogatory

18   responses.

19       A      Exhibit 6?

20       Q      And if you'll look at page 17,

21   it says that Mr. Elez has been granted

22   access -- sorry -- granted permission to

23   access core sensitive systems, including

24   the unemployment insurance data and

25   related records; do you see that?

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 81

1          A     Yes.

2          Q     All right.  And then on page 18

3     it says that Mr. Moghaddassi has been

4     granted permission to access five

5     sensitive systems, including the

6     unemployment insurance data and related

7     records; do you see that?

8          A     Yes.

9          Q     Has Mr. Elez submitted a

10    written request to access the

11    unemployment insurance data and related

12    records?

13         A     I -- I don't have -- I don't

14    know for sure if it was a written request

15    via e-mail.  There is no form, if that's

16    your question.

17         Q     Do you know if they submitted a

18    written request of any kind?

19         A     I don't know how that request

20    was made.

21         Q     And do you know if

22    Mr. Moghaddassi submitted a written

23    request for the unemployment insurance

24    data and related records?

25         A     Same response.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 82

1          Q      Are you aware that the

2     Department of Labor has produced

3     documents in this case?

4          A      Yes.

5          Q      Okay.  Those documents did not

6     include written requests by Mr. Elez or

7     Mr. Moghaddassi for access to the

8     unemployment insurance data and related

9     records, does that mean that they don't

10    exist?

11              MR. HUMPHREYS:  Objection to

12         form and to scope.

13    BY MS. HINSON:

14         Q      You can answer.

15         A      Does that mean they don't

16    exist?  I don't believe that's a hundred

17    percent the case.

18         Q      So what is -- what does that

19    mean, you don't believe it's 100 percent

20    the case?

21         A      So if a request was made via

22    e-mail, and I guess if that e-mail was

23    not part of the documents provided, it

24    may exist, there's that potential.

25         Q      I'll come -- I'll come back to

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 86

 1              MR. HUMPHREYS:  Objection,

 2         vague.

 3              THE WITNESS:  Can you

 4         clarify?

 5              MS. HINSON:  Sure.

 6    BY MS. HINSON:

 7         Q    So if there were any other DOGE

 8    team affiliate who requested access to

 9    the unemployment insurance data and

10    related records would they be granted

11    access to that because of the information

12    silos EO?

13              MR. HUMPHREYS:  Objection,

14         speculative.

15    BY MS. HINSON:

16         Q    You can answer.

17         A    So again, I'm not one.  The

18    chief information officer is the one

19    specifically controlling access to that,

20    so that would be within his determination

21    or decision.

22              But I believe any of the three

23    individuals it falls within their role

24    and responsibility in -- in accessing

25    that data.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 87

1        Q      If you look at the

2    interrogatory responses at pages 18 to

3    20, they indicate that Mr. Elez and

4    Mr. Moghaddassi and Mr. Collins were all

5    denied access to ASAP.gov and Adobe

6    licensing portal.

7              So what's ASAP.gov?

8        A      ASAP.gov is a treasury system

9    that tracks payments for the Department

10    of Labor, specifically payments related

11    to grants.

12              And the Adobe licensing portal

13    is to -- to view the Department of

14    Labor's -- how many licenses we own and

15    what's the utilization of that licensing,

16    how many licenses were in use.

17        Q    Why were they denied access to

18    ASAP.gov.

19        A      ASAP.gov was denied due to

20    ongoing litigation involving Treasury and

21    access to that system.  Yeah.

22        Q    And why were they denied access

23    to Adobe Licensing Portal?

24        A      Adobe Licensing Portal was

25    denied because it did not have a

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 88

1    read-only view of the data.

2              Access could only be granted

3    that would allow an individual to change

4    to provision and de-provision licenses,

5    not just view usage.

6    Q     Were these denials documented?

7    A     They weren't documented, but

8    the access request process was halted, it

9    was not completed, so there's not, like,

10   a form that says denied on it, if that's

11   what you're referring to.

12   Q     And for ASAP.gov, is it fair to

13   say that the denial was unrelated to

14   whether or not they had a need to access

15   the system?

16             MR. HUMPHREYS:  Objection as

17        to scope, but you can answer.

18   A     The denial was related to the

19   litigation so, yes, it was unrelated to

20   the need in this case.

21             MS. HINSON:  All right.  Can

22        we go back to your declaration

23        from February 13th.

24             And I will be honest, I have

25        lost track of what the exhibit

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 89

1         number is.

2                  MR. HUMPHREYS:  2 or 3.

3                  MS. MILTON:  3.

4                  MS. HINSON:  3?  Great.

5         It's Exhibit 3.  Thank you, guys.

6    BY MS. HINSON:

7         Q     So if you look at paragraph

8    nine, it says:  Relevant employees will

9    provide 24 hours notice before seeking

10   access to each DOL IT system to allow DOL

11   an opportunity to meet its obligations to

12   ascertain and mitigate any conflicts of

13   interest, establish confidentiality

14   protocols, and identify and account for

15   any system that may contain legally

16   protected information; do you see that?

17        A     Yes.

18        Q     Okay.  Was this policy in place

19   as of January 19th, 2025?

20        A     I would say no.

21        Q     When did this policy come into

22   place?

23        A     The -- this is specifically

24   about the DOGE affiliates, so it came

25   into place with the -- with the, I guess,

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 90

1    executive order and individuals when

2    individuals were on-boarding to DOL to do

3    their work.

4        Q    How does this differ from the

5    policy that applies to other DOL

6    employees?

7        A    I would say the policy is --

8    it's the same.  The main difference here

9    is just treat it with more urgency I

10   would say is the main difference.

11       Q    When you say treating it with

12   more urgency, are you talking about the

13   request for access?

14       A    Yeah, the request for access,

15   yes.

16       Q    Okay.  How long does it

17   typically take for someone requesting

18   access to a sensitive system at DOL to

19   receive that access?

20       A    It depends, it could take -- I

21   think, as you've seen, it could take

22   awhile.  Even here, it takes awhile to

23   get all the signatures on the form.

24            So it could take, you know,

25   two to three days, you know, just

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 91

1    depending on how long it takes to get

2    it through that process.  The actual

3    provisioning of the access is pretty

4    fast.

5        Q    In general, are DOGE team

6    affiliates granted access to sensitive

7    systems more quickly than other DOL

8    employees?

9        A    I would say yes.

10       Q    How much more quickly?

11       A    We try to turn around within a

12   day, but it still can take two to three

13   days to get through the process.

14       Q    And why is there a different

15   standard for the DOGE team affiliates

16   than other DOL employees?

17            MR. HUMPHREYS:  Objection to

18       form.

19            Go ahead.

20       A    I would say it's a different

21   standard because of the importance

22   outlined by the President, who's the head

23   of the executive branch, and by the fact

24   that these individuals report, you know,

25   certainly, now, to the -- to the

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 92

1    secretary's office and report to the

2    secretary's chief of staff.

3            Anything in IT, you know, where

4    individuals are working at that level, is

5    treated with more urgency.

6        Q    Do you -- DOL employees seeking

7    access to sensitive systems typically

8    have to provide more than 24 hours notice

9    before seeking access?

10       A    I -- I would say no, that's

11   probably poorly worded here.  We try to

12   grant access as quickly as we can.  I

13   think the main difference here, and the

14   intent is to, you know, get through that

15   review process and approval process, you

16   know, as quickly as possible while still

17   doing our due diligence.

18       Q    This also says that DOL will

19   establish confidentiality protocols.  Are

20   those confidentiality protocols specific

21   to the DOGE team affiliates?

22       A    The one thing we created,

23   that's specific to the DOGE team

24   affiliates, is that request for access

25   form, just so make sure -- that did not

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 93

1    exist prior to January 20th, and it was

2    to ensure, you know, that the -- that,

3    you know, the individuals understood the

4    data that they were handling and any laws

5    or other training or other requirements

6    related to that data.

7            MS. HINSON:  Can you -- I

8        think we're at Exhibit 8.

9            (Exhibit No. 8 was marked

10       for identification.)

11           MS. HINSON:  Thank you.

12   BY MS. HINSON:

13       Q    So you've just been handed

14   Exhibit 8, which begins at DOL 22.

15           Is this the request for access

16   form you were just referencing?

17       A    Yes.

18       Q    And just so I'm clear, this was

19   created specifically for the DOGE team

20   affiliates?

21       A    Yes.

22       Q    Why was a special form created

23   for them?

24       A    So we just wanted to make sure

25   that we were, you know, fully understand

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 94

1    the data contained within the system, the

2    laws pertaining to the protection of that

3    data, and that the individuals requesting

4    and receiving access also had that same

5    understanding.

6        Q    Do -- is that information

7    contained in the forms to request access

8    used by other DOL employees?

9            MR. HUMPHREYS:  Objection,

10        vague.

11       A    Yes, I think in various forms,

12   you know, but I think the -- so in terms

13   of rules of behavior, a lot of the same

14   information is in there, whether it's

15   Privacy Act protected data, for example,

16   so similar or same information is in the

17   normal forms or other artifacts that

18   other DOL employees would encounter or

19   have to complete.

20       Q    So if that's the case why did

21   DOL feel the need to create a separate

22   form for the DOGE team affiliates?

23       A    So I think it was -- so I was

24   involved in that process, along with the

25   office of the solicitor, and it was just

1    extra due diligence with new individuals

2    coming into the department that they

3    fully understood the data they were

4    encountering and using and accessing, and

5    that, you know, it included a full legal

6    review, as well, right?

7                So the office of the solicitor

8    would complete section B in here to

9    reference any laws pertaining to the

10   data.  They would -- office of the

11   solicitor also would conduct a legal

12   review to determine if there was other

13   litigation that may prevent access to the

14   data, which was the case with ASAP.gov,

15   as we were completing this forms process,

16   that could stop the access from being

17   processed.

18      Q    Thanks.

19                Going back to your declaration,

20   I think -- I was asking about the

21   confidentiality protocols.

22                What confidentiality protocols

23   existed before the DOGE team affiliates

24   began seeking access to sensitive

25   systems?

1        A     So there's -- there's -- I

2    mean, there's routine training that the

3    affiliates also had to complete, like

4    Privacy Act training.  There's, you know,

5    account reviews, which is a normal

6    process that people who have access

7    should continue to have access to -- to

8    systems and data.  There's, as I

9    mentioned earlier, data exfiltration

10   monitoring, if data's leaving the

11   department's network that's continuous

12   monitoring.

13             Yeah, I think training and

14   review of system access are probably the

15   key things there.

16        Q     So what confidentiality

17   protocols did DOL need to establish for

18   the DOGE team affiliates?

19             MR. HUMPHREYS:  Objection,

20        foundation.

21             I withdraw my objection.

22        A     So I think the main -- the main

23   one is the creation of this form and

24   ensuring that the requests are

25   understood, the data contained in the

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 97

1       system, the laws related to the data is

2       probably the key one that was created for

3       the affiliates.

4            Q     Were there any others?

5            A     No.

6            Q     Then I think it also says that

7       the DOGE team affiliates need to provide

8       24 hours notice to allow DOL an

9       opportunity, quote, to meet its

10      obligations to ascertain and mitigate any

11      conflicts of interests, unquote.

12               What does DOL do to

13      ascertain conflicts of interest?

14           A     So -- so all of the -- the

15      affiliates also had to take ethics

16      training, so whether they could -- to

17      make sure they have no conflicts.

18               And then, in the course of

19      completing this access request, you know,

20      they would need to apply that ethics

21      training against the access that they're

22      gaining to make sure that there's no

23      conflicts of interest.

24               And then I guess other types of

25      conflicts of interest could be related to

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 98

1    other litigation related to access to

2    systems and data, like I referenced

3    earlier.

4        Q    Just so I'm clear, are -- did

5    you just testify that the DOGE team

6    affiliates are the ones who are assessing

7    whether they have a conflict of interest?

8             MR. HUMPHREYS:  Objection to

9        scope.

10            Go ahead.

11       A    Just like any government

12   employee, they have to apply the ethics

13   training and, you know, what they're

14   doing in their job against things they

15   may be doing in their private life,

16   whether it may pose a conflict and have

17   to -- and then you're required to

18   disclose that, so the same thing would

19   apply to these affiliates.

20       Q    Is anyone else evaluating

21   whether they have a conflict of interest?

22            MR. HUMPHREYS:  Objection to

23       scope.

24       A    No.

25       Q    What would constitute a

Page 99

1    conflict of interest under this policy?

2              MR. HUMPHREYS:  Can I have a

3         standing objection on this line --

4              MS. HINSON:  Sure.

5              MR. HUMPHREYS:  -- as to

6         scope.

7              THE WITNESS:  Sorry, could

8         you repeat that, please?

9              MS. HINSON:  Sure.

10   BY MS. HINSON:

11        Q    Under this policy, as included

12   in your declaration, what constitutes a

13   conflict of interest?

14        A    So -- so just like any

15   government employee, it could be other

16   employment, you know, that -- that the

17   individual may have, that may be related

18   to the work they're doing at the

19   department.

20              You have to apply whether that

21   other work or that other stream of income

22   is related to your work and you may have

23   to disqualify yourself.

24              So it's -- unless -- unless

25   there is something that raises concern

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 100

 1      through other channels, public reports,

 2      then it's -- it's up to the -- to the

 3      individual to disclose potential

 4      conflicts of interest and raise that to

 5      the solicitor's office for review.

 6          Q    Are Mr. Elez, Mr. Moghaddassi

 7      and Mr. Collins paid by the Department of

 8      Labor?

 9          A    They are full-time employees in

10      our HR system, and I have not reviewed

11      payroll records, but from everything that

12      I see they're in the system as a normal

13      employee and should be receiving pay.

14          Q    And as we discussed earlier,

15      Mr. Elez and Mr. Moghaddassi, at least,

16      are also concurrently employed or

17      detailed to other agencies; correct?

18              MR. HUMPHREYS:  Objection to

19          form.

20      BY MS. HINSON:

21          Q    You can answer.

22          A    So who -- who was concurrent?

23      Sorry.

24          Q    Mr. Elez is also detailed to

25      other agencies; correct?

Page 101

1        A     Yes.

2        Q     And as Mr. Moghaddassi is also

3    employed at other agencies; correct?

4        A     No.

5        Q     Is he detailed to other

6    agencies?

7        A     Mr. Moghaddassi, my

8    understanding, is he is detailed to other

9    agencies.

10       Q     Okay.  Do you know if they're

11   being compensated by these other

12   agencies?

13            MR. HUMPHREYS:  Objection as

14        to scope.

15       A     Under a detail, they would not

16   be compensated by the other agencies.

17       Q     Would the -- would their work

18   for other agencies fall within the scope

19   of conflicts of interest that they would

20   need to evaluate?

21       A     Yes.

22       Q     Do you know what they've done

23   to evaluate those conflicts of interest?

24            MR. HUMPHREYS:  Objection as

25        to scope.

Page 106

1        Q     Okay.  And how does that differ

2     from the access agreements when we're

3     referring to other DOL employees?

4             MR. HUMPHREYS:  Objection,

5        form.

6        A     So it's -- it's the same,

7     except the access -- request for access

8     form is in addition to that of normal

9     employees that the affiliates must

10    complete.

11       Q     Okay.  Is there an access

12    agreement for the unemployment insurance

13    data-related records?

14       A     So there is -- there is no

15    exist -- because the data were just

16    transferred from the OIG, there is no

17    existing normal user access request

18    agreement for that data, if that's the

19    question you have.

20       Q     I think so, yes.

21       A     Okay.

22       Q     Can you look back at the

23    interrogatory responses, again, so

24    Exhibit 6.

25       A     Exhibit 6?

Page 107

1          Q       At 19 -- 18 to 19.

2          A       Mm-hmm.

3          Q       Okay.  At the -- in the first

4     paragraph, on the top of 18, second

5     sentence, it says:  To gain access to the

6     systems Mr. Elez signed rules of behavior

7     for each system; do you see that?

8               MR. HUMPHREYS:  Top of 19?

9               MS. HINSON:  Top of 18.

10               THE WITNESS:  Okay.  Yes.

11   BY MS. HINSON:

12          Q       And then, at the top of 19, the

13     second sentence of that first paragraph,

14     it says:  Mr. Moghaddassi signed rules of

15     behavior for each system; do you see

16     that?

17          A       Yes.

18          Q       Okay.  Are there rules of

19     behavior for the unemployment insurance

20     data and related records?

21          A       So not specifically for that

22     data, but the rules of behavior certainly

23     for our general network would apply,

24     which kind of covers all system access.

25               But in some cases there's also

Page 108

1    an additional rules of behavior that may

2    be produced specific to a system, which

3    did -- does not exist for the UI data.

4       Q    What portion of DOL systems

5    have a system specific rules of behavior?

6            MR. HUMPHREYS:  Objection to

7       form.

8       A    I -- I don't know,

9    specifically.  I will say that we have

10   been trying to move everything to that

11   one single rules of behavior that -- that

12   individuals must agree to that -- that's

13   a part of our general network access.

14           So we're trying to reduce

15   individual specific rules of behavior

16   documents per system.

17           MS. HINSON:  Mark this as 9.

18           MR. HUMPHREYS:  Thank you.

19           (Exhibit No 9 was marked for

20      identification.)

21           MS. HINSON:  And, actually,

22      we've got a 10, too.

23           (Exhibit No. 10 was marked

24      for identification.)

25   ///

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 109

1    BY MS. HINSON:

2         Q    Okay.  All right.  You've been

3    handed Exhibit 9 and 10.

4              Exhibit 9 is DOL 194 and

5    Exhibit 10 is DOL 104.

6              And I believe they're the same

7    user agreement form, one with

8    Mr. Moghaddassi's information and one

9    with Mr. Elez's information; is that

10   right?

11        A    Yes, that's the same form.

12        Q    What is this form?

13        A    Oh, so this is the form

14   confirming that the individual has

15   completed the standard computer security

16   training for DOL.

17        Q    Is this form used for non-DOGE

18   team affiliates?

19        A    This form is used for

20   everybody, including Department of Labor

21   employees and contractors.

22        Q    Okay.  Are DOL employees and

23   contractors supposed -- well, when are

24   DOL employees and contractors supposed to

25   complete this form?

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 110

1           MR. HUMPHREYS:  Objection,

2      foundation.

3      A     So this form should be

4  completed at the beginning of their work,

5  either beginning of their employment or,

6  for a contractor, when they begin -- when

7  they on-board at DOL to begin on

8  Department of Labor systems.

9      Q     Should an employee or

10  contractor be given access to sensitive

11  systems without filling out this form?

12     A     The answer to that would be no.

13     Q     Okay.  So you can see that

14  Mr. Moghaddassi's Exhibit 9,

15  Mr. Moghaddassi's form, it's been filled

16  out with his name and address but hasn't

17  been signed; do you see that?

18     A     I do see that.

19     Q     So the form is incomplete;

20  correct?

21     A     It appears so, yes.

22     Q     Okay.  So because this form is

23  incomplete, Mr. Moghaddassi should not

24  have been given access to sensitive

25  systems; correct?

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 111

1              MR. HUMPHREYS:  Objection,

2         form.

3    BY MS. HINSON:

4         Q     You can answer.

5         A     I believe that's accurate to

6    say.

7         Q     And if you look at Exhibit 10,

8    Mr. Elez did digitally sign and date this

9    form, and it's dated March 25th, 2025; do

10   you see that?

11        A     Yes.

12        Q     Am I correct that Mr. Elez was

13   given access to sensitive systems as

14   early as February 25th, 2025?

15              And if you want to reference I

16   believe it's on page 17 of the

17   interrogatory responses.

18        A     That appears correct, yes.

19        Q     Okay.  And so between February

20   25th, 2025 and March 2020 -- March 25th,

21   2025, Mr. Elez should not have been

22   granted access to sensitive systems;

23   correct?

24              MR. HUMPHREYS:  Objection to

25        form.

b7697e3a-7f70-4490-af68-d89c44ceedd6

1    BY MS. HINSON:

2         Q    You can answer.

3         A    I would say the answer to that

4    is yes.  I -- I do want to add a little

5    bit of context, here, in that as part of

6    the normal on-boarding of employees, the

7    department's office of human resources

8    works with the individuals that are

9    on-boarding to review and -- and

10   acknowledge completion of the computer

11   security training.

12             So I do, you know, want the

13   opportunity to go back and see if that

14   was just completed through a different

15   process, at the beginning of their

16   employment, to see if that exists.

17        Q    I think you can set that aside.

18             Have any DOGE team affiliates

19   made any changes to sensitive systems?

20        A    No.

21        Q    Have any DOGE team affiliates

22   installed any software on any DOL

23   systems?

24        A    Yes.

25        Q    Okay.  Who -- who installed

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 113

1    software on DOL systems?

2        A    So Marko Elez did install some

3    software.

4        Q    And is that Visual Studio Code

5    and PYTHON?

6        A    Yes.

7        Q    Why did he install those on DOL

8    systems?

9        A    To analyze data in the course

10   of his work.

11       Q    Okay.  Did he receive

12   permission to install those programs

13   before he installed them?

14       A    No, he did not.

15       Q    Was -- has he removed those

16   programs from DOL systems?

17       A    Those are approved software

18   packages, and so the software has not

19   been removed.

20       Q    Okay.  When you say they're

21   approved software packages, what does

22   that mean?

23       A    They've -- they've been

24   previously approved for use at the

25   Department of Labor, and so there was no

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 114

1    need to remove them.

2        Q    Just so I'm clear what

3    happened, is it -- is it the case that

4    because they are pre-approved packages it

5    was okay that he installed them in the

6    first instance or was it that he

7    installed them and then somebody at DOL

8    decided it was okay because the packages

9    had been pre-approved or something else?

10       A    So, I'm sorry, can you restate

11   your question?

12       Q    Sure.

13            When Mr. Elez installed

14   these -- actually, let me ask a different

15   question.

16       A    Mm-hmm.

17       Q    For a normal DOL employee is it

18   okay, from the DOL's perspective, for

19   them to install Visual Studio Code on DOL

20   systems?

21            MR. HUMPHREYS:  Objection,

22       vague.

23   BY MS. HINSON:

24       Q    You can answer.

25       A    So for -- so for a normal

Page 115

1    standard user, I would say it -- the

2    answer to that is no.

3        Q    Okay.  And for a normal DOL

4    employee, are they permitted to install

5    PYTHON on DOL systems?

6        A    Again, the answer to that is

7    no.

8        Q    Here, did anyone know Mr. Elez

9    was installing these systems, these

10   programs, on DOL systems when he did it?

11           MR. HUMPHREYS:  Objection as

12       to scope.

13           You can answer.

14       A    No.

15       Q    How was that information

16   learned by DOL?

17       A    That information was learned

18   by -- through a discussion with Mr. Elez

19   and where it was determined that he had

20   installed those two software packages.

21       Q    And when did that happen?

22       A    When did the --

23       Q    When did the discussion happen?

24       A    When did the discussion happen?

25   Roughly, two weeks ago.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 116

1        Q     And when had he installed the

2    systems?

3        A     I -- I don't know specifically

4    when he installed them.

5        Q     Okay.  For a normal DOL

6    employee, what would have happened if DOL

7    had learned that they had installed

8    Visual Studio Code and PYTHON on DOL

9    systems without permission?

10            MR. HUMPHREYS:  Objection to

11        scope.

12        A     So for -- I think for any DOL

13    employee we would have evaluated -- first

14    evaluated, you know, what -- what the

15    need was.  We would still evaluate the

16    need for doing that, but ultimately we

17    may or may not have de-installed that

18    software, but we'd always just evaluate

19    the need.

20            It's up to the individual

21    supervisor to determine any actions

22    beyond that.

23        Q     What was the response when DOL

24    learned that Mr. Elez had installed these

25    programs without permission?

b7697e3a-7f70-4490-af68-d89c44ceedd6

1              MR. HUMPHREYS:  Objection to

2       scope.

3       A       The response was we just -- we

4    evaluated whether those packages were, in

5    fact, or validated those packages were,

6    in fact, on our approved software list,

7    which they were, at which point we did

8    not have any, you know, further concerns

9    with that software being installed.

10      Q       Did it concern DOL that

11   Mr. Elez was installing software without

12   permission from the agency?

13      A       There's always concern when

14   that happens, it's not -- you know, this

15   is not a unique instance of that

16   occurring within the department.

17              So there's always concern, but

18   then, you know, we apply logic to any

19   evaluation as to the level of risk

20   that -- that actually exists in that

21   having been done.

22      Q       Have any other DOGE team

23   affiliates installed any other software

24   on DOL systems?

25      A       No.

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 118

1        Q    Have any DOGE team affiliates

2    requested to install any software on DOL

3    system?

4        A    No.

5        Q    Are you familiar with a program

6    called PuTTY?

7        A    Yes.

8        Q    What is it?

9        A    So PuTTY is used for terminal

10    emulation.  So if you -- you think of

11    a -- well, I don't know how many people

12    have used a mainframe for a long time,

13    but it's basically an application you can

14    use from a Windows-based PC, for example,

15    to connect into a UNIX or Linux-based

16    system or mainframe system to get a

17    terminal command line view into that

18    system.

19        Q    Since January 19th have there

20    been -- has any DOGE team affiliate been

21    granted permission to install or use

22    PuTTY at DOL, even if it wasn't

23    ultimately done?

24        A    So any DOGE team affiliate

25    to -- to install or use, you're saying?

Page 125

1        Q     Have the DOGE team affiliates

2    copied any records from sensitive systems

3    at DOL?

4        A     Have they copied from the

5    systems?  So can you clarify, what do you

6    mean?

7        Q     Have they -- well, have they

8    made copies of any records from sensitive

9    systems at DOL?

10            MR. HUMPHREYS:  Objection,

11       vague.

12       A     Yeah, I -- I don't quite

13    understand what you mean.

14       Q     Well, I guess I was just trying

15    to follow up on sort of your last answer,

16    that PuTTY or similar system could be

17    used to remove or copy records; correct?

18       A     Yeah, I -- I think -- so if

19    you're asking, like, in the question that

20    you asked awhile ago, where data may be

21    kind of moved out of a system for

22    external analysis, then the answer to

23    that would be yes.

24       Q     Okay.  And where have -- well,

25    what -- what records have they copied?

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 126

```
 1       A     So certainly for the
 2  financial -- financial management or
 3  accounting system it would be records in
 4  terms -- that relate to the department's
 5  expenditures, you know, could -- it has
 6  payroll records in there, it has grant
 7  expenditure records in there, it has
 8  obligations invoicing related to
 9  contracts, you know, full range of that
10  type of data.
11       Q     Does it have any PII?
12       A     It does have PII, yes.
13       Q     What kind of PII does it have?
14       A     So the PII there would be -- it
15  could be Social Security numbers for
16  employees, it's part of payroll
17  processing.  It may have -- have EIN
18  information in there, you know, related
19  to contracts or payments made to external
20  entities, so it would have that type of
21  data.
22       Q     Anything else that you can
23  remember right now?
24       A     No.  I think it's mainly
25  employee-type payroll information for
```

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 127

1      normal payroll processing, payments made,

2      contract information, that type of --

3      type of data.

4          Q    And then what did they do with

5      that data?

6              MR. HUMPHREYS:  Objection as

7          to scope.

8          A    So they would -- again, they

9      would analyze that data to examine it for

10     fraud, waste, and the broad categories of

11     fraud, waste and abuse.

12             They would -- they would review

13     that data, potentially for compliance

14     with other -- you know, executive orders,

15     could be related to, like, the hiring

16     freeze, for example, shouldn't be any new

17     employees on-boarding, so they would use

18     it for those purposes.

19         Q    Have they intermingled those

20     records with any other records?

21             MR. HUMPHREYS:  Objection,

22         vague as to scope.

23  BY MS. HINSON:

24         Q    You can answer.

25         A    I -- I don't believe so.  I've

b7697e3a-7f70-4490-af68-d89c44ceedd6

Page 128

1    not seen that.

2        Q    Do you know where they saved --

3    let me try again.

4            Where did they copy these

5    records to?

6            MR. HUMPHREYS:  Objection as

7        to form.

8        A    So they're -- so for those

9    records, as -- as far as I know, they are

10   using them locally on their government

11   issued and encrypted devices.

12       Q    Have they -- have the DOGE team

13   affiliates shared any records from any

14   DOL sensitive system outside of the DOL?

15       A    I am not aware of that

16   occurring.

17       Q    Okay.

18       A    No.

19       Q    Have they shared any records

20   from a DOL sensitive system with someone

21   who's not authorized to view those

22   records?

23       A    Again, I would have to answer,

24   no, not -- not that I have seen.

25       Q    And have they removed any