# EXHIBIT 13

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------x

AFL-CIO, et al.,          :

            plaintiffs,   :

v.                        :   CASE NO.

DEPARTMENT OF LABOR,      :   1:25-cv-00339-JDB

et al.,                   :

            Defendant.    :

------------------------x




30(b)(6) Deposition of

DEPARTMENT OF HEALTH AND HUMAN SERVICES

through JENNIFER WENDEL

Tuesday, April 8, 2025

1:46 p.m.




BEFORE: Cassandra E. Ellis, RMR, RDR, CRR,

RSA, CA-CSR 14448, WA-CCR, HI-CSR




Job No.: 10519

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

1              The 30(b)(6) Deposition of

2    DEPARTMENT OF HEALTH AND HUMAN SERVICES

3    through JENNIFER WENDEL, taken before

4    CASSANDRA E. ELLIS, Registered Professional

5    Reporter, Registered Merit Reporter,

6    Registered Diplomate Reporter, Certified

7    Realtime Reporter, Realtime Systems

8    Administrator; California Certified

9    Shorthand Reporter; Washington State

10   Certified Court Reporter; Hawaii Certified

11   Shorthand Reporter; Notary Public, held in

12   Washington, D.C., on Tuesday, April 8, 2025,

13   commencing at 2:58 p.m. and concluding at

14   4:12 p.m.

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2       ON BEHALF OF THE PLAINTIFFS:
              ZOILA E. HINSON, PRO HAC VICE
 3            ALEXA MILTON, PRO HAC VICE
              RELMAN COLFAX PLLC
 4            1225 19th Street, Northwest
              Suite 600
 5            Washington, D.C.  20036
              (202) 728-1888
 6            Zhinson@relmanlaw.com
              Amilton@relmanlaw.com
 7

 8       ON BEHALF OF THE PLAINTIFFS:
              AMAN T GEORGE, ESQUIRE
 9            MARK B. SAMBURG, ESQUIRE
              DEMOCRACY FORWARD FOUNDATION
10            P.O. Box 34553
              Washington, D.C.  20043
11            (202) 448-9090
              Ageorge@democracyforward.org
12            Msamburg@democracyforward.org

13

14
         ON BEHALF OF THE DEFENDANT:
15            BRADLEY P. HUMPHREYS, ESQUIRE
              BENJAMIN S. KURLAND, ESQUIRE
16            ANDREW BERNIE, ESQUIRE
              US DEPARTMENT OF JUSTICE
17            1100 L Street, Northwest
              Washington, D.C.  20005
18            (202) 305-0878
              Bradley.humphreys@usdoj.gov
19

20

21

22

23

24

25
```

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 4

1              INDEX TO EXAMINATION

2    30(b)(6) Deposition of

3    DEPARTMENT OF HEALTH AND HUMAN SERVICES

4    through JENNIFER WENDEL

5    EXAMINATION                        PAGE

6        By Ms. Hinson                  6

7        By Mr. Humphreys               50

8

9                INDEXED PAGES

10                                      PAGE

11   JENNIFER WENDEL, sworn             6

12   REPORTER CERTIFICATE               54

13   INSTRUCTIONS TO WITNESS (none)

14   DECLARATION UNDER PENALTY OF PERJURY    53

15   ERRATA SHEET                       55

16

17           INFORMATION REQUESTED

18                None

19

20      WITNESS INSTRUCTED NOT TO ANSWER

21                              PAGE

22                            43, 49

23

24

25

1      INDEX TO PLAINTIFFS EXHIBITS CONTINUED

2              JENNIFER WENDELL

3            Tuesday, April 8, 2025

4   MARKED              DESCRIPTION              PAGE

5   Exhibit 8   Table of Investments          9

6   Exhibit 9   List                          27

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 6

1              P R O C E E D I N G S
2              30(b)(6) Deposition of
3    DEPARTMENT OF HEALTH AND HUMAN SERVICES
4              through JENNIFER WENDEL
5    having been sworn, testified as follows:
6                   EXAMINATION
7    BY MS. HINSON:
8         Q     Good afternoon.
9         A     Good afternoon.
10        Q     Could you please state and
11   spell your name for the record?
12        A     Jennifer Wendel,
13   J-e-n-n-i-f-e-r, W-e-n-d-e-l.
14        Q     And do you understand that
15   today you are testifying on behalf of the
16   Department of Health and Human Services
17   about the topics listed in the deposition
18   notice?
19        A     Yes, I am.
20        Q     So I've got a few ground rules,
21   just to make the next hour or so of our
22   lives go as smoothly as possible.
23              First, please continue to
24   give a verbal answer instead of
25   shaking or nodding your head, so that

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

1    the court reporter can get what we're

2    saying; can you do that?

3        A     Yes, I can.

4        Q     And it's important that we

5    don't speak over each other, so I will

6    try to let you finish speaking before I

7    ask another question, and can you let me

8    try and finish speaking before you

9    answer?

10       A     Yes.

11       Q     Great.

12             Are you represented by counsel

13   today?

14       A     Department of Justice.

15       Q     Great.  So your counsel might

16   object to a question that I ask, that's

17   fine, he's making an objection for the

18   record, but unless he specifically

19   instructs you not to answer you should go

20   ahead and answer the question; can you do

21   that?

22       A     Yes.

23       Q     If at any time you need to take

24   a break, please just let me know.  All I

25   ask is that if you take a break you just

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 8

1    answer any question that's pending at

2    that time; can you do that?

3        A    Yes.

4        Q    If you don't understand a

5    question, just let me know and I'll try

6    to rephrase it, but if you don't tell me

7    I'm going to assume that you understand

8    the question as I've asked it; is that

9    fair?

10       A    Yes.

11       Q    Along the same lines, if at any

12   point in the deposition you remember

13   something that you forgot to say earlier

14   or you want to clarify any testimony from

15   earlier, that's fine, just let me know

16   and we can put it on the record, so

17   please just do let me know.

18       A    Yes.

19       Q    Do you understand that you're

20   testifying under penalty of perjury

21   today?

22       A    Yes.

23       Q    Is there any reason you cannot

24   give complete and truthful testimony

25   today?

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 9

1      A     No.

2      Q     Did you speak to anyone in

3   preparation of your deposition today?

4      A     Yes.

5      Q     And who was that?

6      A     The HHS OGC as well as DOJ OGC.

7      Q     Aside from your attorneys, did

8   you speak with anyone else in preparation

9   for your deposition today?

10     A     Yes, I spoke to some of the

11  system owners that are responsible for

12  the case, responsible for the systems.

13     Q     Great.  I was about to ask

14  about that.

15     A     Yes.

16           (Exhibit 8 was marked for

17      identification.)

18  BY MS. HINSON:

19     Q     Okay.  And I see you did bring

20  a document with you, which we have

21  labeled -- we have labeled Exhibit 8.

22           Thank you.

23           And are you familiar with this

24  lawsuit?

25     A     Yes.

Page 10

1        Q        And without revealing to me

2    anything your counsel may have said to

3    you, what do you know about this lawsuit?

4        A        My understanding of this

5    lawsuit is that there is a question on

6    whether certain HHS employees on the DOGE

7    team should have been given access to

8    systems.

9        Q        I actually want to start with

10   Exhibit 8, which is this table that

11   you've brought with us today or for us

12   today.

13                Can you explain what this

14   is?

15       A        Yes, I put this table together,

16   which is a summary of all of the system

17   names with a description of the system as

18   well as the information that PII or the

19   PHI, that's in that system, also a

20   summary of the access requirements and

21   then who was granted access to those

22   systems.

23       Q        The far left column says:

24   Current UII?

25       A        That's the investment

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 11

1    identifier.

2        Q     What -- what does that mean?

3        A     An investment means that it's a

4    system that we track across the

5    department, and so this came from --

6    originally came from our database that we

7    track the systems, the first two columns.

8        Q     Okay.  Thank you.

9              And to the best of your

10   knowledge, is the information on this

11   table accurate?

12       A     Yes.

13       Q     Okay.  I wanted to ask

14   specifically about access to HIGLAS and

15   IDR, which HIGLAS is the health care

16   integrated general ledger accounting

17   system and IDR is the integrated data

18   repository; do you understand that?

19       A     Yes.

20       Q     In the normal course, is

21   someone granted access to IDR without

22   going through the IDR training?

23       A     No, they are normally granted

24   training for those systems.

25       Q     Okay.  And I guess, similar

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 12

1    question for HIGLAS, is in the normal

2    course is a user granted HIGLAS without

3    going through the HIGLAS security

4    briefing?

5         A     They go through the briefing.

6         Q     Okay.  Based on the

7    interrogatory responses that have been

8    given in this case, it appears that

9    Mr. Aram Moghaddassi was granted access

10   to these systems without going through

11   those trainings.

12            Should he have been granted

13   access without going through those

14   trainings?

15            MR. HUMPHREYS:  Objection as

16       to characterization and

17       foundation.

18   BY MS. HINSON:

19        Q     You can answer.

20        A     May I refer to the

21   interrogatory for --

22        Q     Sure.  If you look at page 12

23   of the interrogatory responses, which are

24   Exhibit 7.

25        A     Thank you.

Page 13

```
 1        Q     And what it says is that just
 2   that he has access to the systems and
 3   then it says what training he received,
 4   and it does not include the security
 5   briefing or the IDR training.
 6        A     No, the interrogatory does not.
 7   I would have to verify if he received
 8   that specific training.
 9        Q     But if he didn't he should not
10   have received access to IDR and HIGLAS;
11   is that correct?
12             MR. HUMPHREYS:  Objection to
13        form.
14   BY MS. HINSON:
15        Q     You can answer.
16        A     He should have received the
17   training.
18        Q     I understand that.  I think I'm
19   asking something a little bit different.
20             If -- assuming
21   Mr. Moghaddassi did not receive the
22   training, should he have been granted
23   access to IDR or HIGLAS?
24        A     I would have to look at the
25   specific requirements of that training to
```

Page 14

1    find out if it would require -- what type

2    of access that had the training

3    specifications.  I do not know that.

4        Q    Sorry, can you just clarify

5    what kind of access had the training

6    specifications?

7        A    Right.  There's certain --

8    sometimes training is required for

9    specific access types, and I got to know

10    the specifications for IDR, I just don't

11    know those specific requirements.

12        Q    Okay.  Okay.  I want to switch

13    gears a little bit and ask about remote

14    access.  Have any -- actually, okay, when

15    I spoke to your colleague we established

16    eventually a list of people that we were

17    referring to as the DOGE team affiliates,

18    and I'm going to go over that again with

19    you, just so that we can talk about their

20    access to different systems and make sure

21    we're on the same page; does that work?

22        A    Yes.

23        Q    Okay.  So those people are Aram

24    Moghaddassi, Amy Gleason, Brad Smith,

25    Luke Farritor, Edward Coristine, Marko

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 15

1    Elez, Kyle Schutt, Conor Fennessy, Zach

2    Terrell, Rachel Riley and Jeremy Lewin,

3    okay?

4              So if I uses the term DOGE team

5    affiliates will you understand me to be

6    referring to those 11 people?

7        A    Based on what you just said,

8    yes.

9        Q    Great.  Have any of the DOGE

10   team affiliates set up remote access to

11   any HHS system?

12       A    Not to my knowledge.

13       Q    Have they requested remote

14   access to any HHS system?

15       A    They have not, to my knowledge.

16       Q    Have any of them set up a

17   backdoor to the system?

18       A    They have not.

19            MR. HUMPHREYS:  Objection,

20       vague.

21       A    To my knowledge, they have not.

22       Q    And what do you understand a

23   backdoor to a system to be?

24       A    A backdoor to the system would

25   mean that they would be going through

Page 26

1      their interrogatory responses, that

2      referred to them, have any of them

3      copied, even within HHS, any HHS records?

4          A      No.

5                 MR. HUMPHREYS:  Objection.

6                 Objection, form.

7          A      To my knowledge, no, they have

8      not.

9          Q      Okay.  And have any of them

10     shared, even within HHS, any HHS records?

11         A      To my knowledge, they have not.

12         Q      Okay.  Have any of the DOGE

13     team affiliates removed any records from

14     any HHS system?

15         A      To my knowledge, they have not.

16         Q      And have any of the DOGE team

17     affiliates shown someone from outside of

18     HHS any records from sensitive system?

19                MR. HUMPHREYS:  Objection,

20         vague.

21     BY MS. HINSON:

22         Q      You can answer.

23         A      To my knowledge, they have not.

24         Q      The interrogatory responses at

25     11 say that Mr. Farritor's access to HHS,

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

1    which I believe stands for HHS

2    consolidated acquisition system, has been

3    deactivated; is that accurate?

4        A     Yes, it is.

5        Q     Why was it deactivated?

6        A     It was deactivated for the fact

7    that it was no longer needed -- no longer

8    needed access.

9        Q     Why had he needed access

10   before?

11       A     He needed access because under

12   the executive order HHS was required to

13   look at systems for waste, fraud and

14   abuse, and the systems -- with a system

15   that maintained contract information.

16       Q     And why did he no longer need

17   access to it?

18       A     My understanding is that he had

19   finished his initial analysis.

20             MS. HINSON:  Okay.  I'm

21        going to give you a -- what

22        exhibit are we on -- 9.  Can you

23        mark this as Exhibit 9.

24             (Exhibit No. 9 was marked

25        for identification.)

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 28

1    BY MS. HINSON:

2        Q    Okay.  You've been handed a

3    sheet of paper, it's been marked as

4    Exhibit 9, this is just a list of all the

5    sensitive systems at HHS that were in

6    HHS's interrogatory responses, to the

7    best of my knowledge.

8             I put it together, so are there

9    any systems that are missing from this

10   list, as far as you recall?

11            MR. HUMPHREYS:  Feel free to

12        check, if you need to.

13   BY MS. HINSON:

14       Q    So looks like I might be

15   missing one.

16            MR. HUMPHREYS:  Yes.

17       A    The one that you are missing is

18   part of our EHR -- is part of our HR

19   systems.  Oh, excuse me, I'm sorry, no,

20   this is the workforce analysis work bench

21   system.

22       Q    Okay.

23       A    Part of NIH's HR systems.

24       Q    Okay.  And it's the last one on

25   your chart?

Page 29

```
 1        A     That's correct.  That's
 2    correct.
 3        Q     Okay.  Thank you.  So in --
 4    aside from the 18 systems that I've
 5    listed here, and then also the workforce
 6    analytics bench system that you just
 7    pointed out, are there any other records
 8    with PHI or PII that any of the DOGE team
 9    affiliates have had access to?
10        A     Not to my knowledge.
11        Q     Okay.  Were the DOGE team
12    affiliates granted access to these
13    systems because of the executive orders
14    related to DOGE that the President has
15    issued?
16             MR. HUMPHREYS:  Objection to
17        the scope, but you can answer if
18        you know.
19        A     Yes, they were.
20        Q     And can you identify which
21    executive orders, to the best of your
22    ability?
23        A     There's three executive orders.
24        Q     Okay.
25        A     There was one on January 21st,
```

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 30

1    that established DOGE, then there was one

2    on -- in February, that was regarding the

3    payment managements about tracking

4    contracts and grants and of getting

5    approval, and then there was one in March

6    regarding data silos.

7        Q    Okay.  Were there any other

8    reasons a DOGE team affiliate was granted

9    access to one of these systems?

10            MR. HUMPHREYS:  Objection as

11        to scope.

12   BY MS. HINSON:

13       Q    You can answer.

14       A    Not to my -- no, they were all

15   involved in those executive order

16   requirements.

17       Q    And just so I'm clear, I

18   understand that they were, because of the

19   executive orders, were they only because

20   of the executive orders or were there

21   also other reasons?

22            MR. HUMPHREYS:  Same

23        objection.

24       A    My understanding is because

25   they were carrying out the work required

Page 31

1    in the executive order.

2        Q    Okay.  And only that?

3        A    To my knowledge, yes.

4        Q    Okay.  When HHS was deciding to

5    grant DOGE team affiliates access to

6    these systems did they -- or did HHS

7    engage in an individualized review of the

8    DOGE team affiliates' need for a specific

9    system?

10            MR. HUMPHREYS:  Objection as

11       to scope and form.

12       A    Each system was not

13    individually reviewed, holistically.  The

14    individuals were reviewed to ensure,

15    before they were given accounts, that

16    they had completed the cyber security

17    training as well as signed the rules of

18    behavior.

19            And then they were granted

20    access to the systems requested based on

21    the needs to perform their duties.

22       Q    When you say they were granted

23    access to the systems requested, did the

24    DOGE team affiliates make those requests?

25       A    They did.

Page 32

```
 1      Q     Okay.  Do you know how they
 2   chose which systems to access?
 3            MR. HUMPHREYS:  Objection as
 4      to scope.
 5            You can answer.
 6      A     I don't know necessarily how --
 7   how they -- how they made the
 8   determination, but when I looked at those
 9   lists of systems there's very -- there's
10   many things that are in common with
11   determining if there is fraud, waste or
12   abuse for HHS, and these systems meet
13   those requirements.
14      Q     Sorry, can you clarify, what
15   requirements did they meet?
16      A     They wouldn't -- they would
17   give information for them to determine if
18   there was waste, fraud and abuse on the
19   information that's retained in these
20   systems.
21      Q     And what kind of information
22   are you referring to?
23      A     For an example would be the
24   acquisition lifecycle system, the -- the
25   CMS com system that has information on
```

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 33

1    contracting.

2            And so, therefore, they were

3    looking at contracts to see if there was

4    any waste, fraud or abuse with the

5    contracts.

6            There are similar systems

7    regarding grants.

8    Q    And just so I'm clear, when you

9    said they would be looking at that for

10   waste, fraud or abuse, were you

11   specifically told that that's why they

12   were requesting access to that system or

13   is it your inference that that's why they

14   requested access to that system?

15   A    I had read the executive order,

16   so I knew that that's what they were

17   doing, and so it was my inference that

18   that was why they were making those

19   requests.

20           MS. HINSON:  Okay.  Can we

21       take a break?

22           MR. HUMPHREYS:  Okay.

23           (Recess.)

24  BY MS. HINSON:

25   Q    Okay.  Just a few more

Page 34

1    questions.

2         MR. HUMPHREYS:  Oh, I'm

3      sorry, sorry, the witness would

4      like to make a short

5      clarification.

6         MS. HINSON:  Okay.

7    A    Yeah, I would like to clarify

8    that when I was speaking about sharing

9    data most of the access that we provided

10   to the DOGE team or that was provided was

11   for read only -- read only capabilities,

12   and any time access was given to somebody

13   for read only that -- there was no

14   ability to share that data or modify the

15   systems in any way, so I just wanted to

16   clarify that.

17   Q    Thank you.  Actually, to follow

18   up a little bit on -- on that, and some

19   of your testimony earlier, are the DOGE

20   team affiliates able to access HHS

21   records physically, outside of HHS?

22   A    I'm sorry, could you clarify

23   that?

24   Q    Sure.  Are DOGE team affiliates

25   able to take a laptop, physically, go

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 35

1    home and access HHS records on that

2    laptop?

3        A    Yes.

4        Q    So I think you testified

5    earlier that the DOGE team affiliates had

6    not shown people outside of HHS records

7    of HHS, is that an accurate description

8    of your testimony?

9        A    That they have not shared that

10   data, correct.

11       Q    Okay.  I think I wanted to ask

12   something slightly different, which

13   is have --

14       A    Okay.

15       Q    Do you know if the DOGE team

16   affiliates have literally just shown

17   someone, outside HHS, HHS records?

18           MR. HUMPHREYS:  Object as to

19       scope.

20       A    I do not know that.

21       Q    Okay.  Thank you.

22           Is it possible to access HHS

23   systems or HHS sensitive systems in a

24   manner that does not reveal a reviewable

25   log?

Page 36

1        A    For these systems, no, there's
2     not an ability to not have a log.
3        Q    And that's true for all of the
4     19 systems that we identified earlier?
5        A    That is correct.
6        Q    Okay.  We talked a little bit
7     before about the need for DOGE team
8     affiliates to access these systems.
9             When a DOGE team affiliate
10    seeks access to a system are they
11    required to identify to someone the
12    particular reason they need to access the
13    system?
14       A    They speak with the system
15    owner to let them know why they're
16    requesting that, the system, in order to
17    get the access to the system.
18       Q    Does the system owner evaluate
19    whether that reason is valid or not?
20       A    Yes.
21       Q    And have -- has any system
22    owner denied a DOGE team affiliate access
23    to a system?
24       A    They have not.
25       Q    Okay.  What would be a reason

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 37

1    to deny a DOGE team affiliate access to

2    the system?

3              MR. HUMPHREYS:  Objection as

4         to scope.

5              You can answer.

6         A    I do not know.

7         Q    Okay.  Have the DOGE team

8    affiliates used AI as part of their work

9    at HHS with respect to the sensitive

10   systems -- with respect to the sensitive

11   systems?

12        A    To my knowledge, they have not.

13        Q    Okay.  Has HHS made any changes

14   to its practices about providing access

15   to records since January 19th, 2025?

16        A    No, they have not.

17        Q    Okay.  Are there other

18   employees at HHS whose requests for

19   access to sensitive systems is -- are

20   evaluated in the same manner as the DOGE

21   team affiliates?

22             MR. HUMPHREYS:  Objection as

23        to scope and form.

24        A    I'm not sure I'm following your

25   question.

Page 38

1                Can you repeat that?

2        Q     Yeah, I guess my understanding

3    your testimony earlier is that the DOGE

4    team affiliates identify the need to

5    access the system and are able to choose

6    the systems to access; is that correct?

7        A     That is correct.

8        Q     Okay.  Is that true for all HHS

9    employees?

10               MR. HUMPHREYS:  Objection as

11        to scope.

12        A     No, it is not true, because

13    employees are brought in for different

14    reasons, in this case this team was

15    brought in to look across HHS at multiple

16    systems as compared to individuals who

17    are brought in potentially to work on

18    certain systems.

19               So they -- they -- their --

20    they may not be deemed access to any

21    system across HHS because they have

22    different employee -- employee-met

23    responsibilities.

24        Q     So is it fair to say that there

25    are different policies that apply to the

Page 39

1    DOGE team affiliates with respect to

2    access to sensitive systems than those

3    that apply to other HHS employees?

4              MR. HUMPHREYS:  Objection as

5         to form.

6         A     I don't believe that there's

7    different policies.

8         Q     Okay.  Why not?

9         A     Because employees are brought

10   on and given access to the systems that

11   are part of their responsibilities.

12        Q     Mm-hmm.

13        A     Just like the DOGE team was

14   brought on and given access to the

15   systems that were part of their

16   responsibilities.

17             So the policy is the same, they

18   just have access to broad -- broader

19   amount of systems across the department.

20        Q     Are there any systems that the

21   DOGE team affiliates would not be granted

22   access to if they requested access?

23             MR. HUMPHREYS:  Objection as

24        to scope and speculative.

25        A     I do not know.

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 40

1        Q     Can you identify any systems
2    that -- that they would be denied access
3    to?
4        A     They would -- yes, I can,
5    actually, because we have systems that
6    are at the classified level, and they
7    would not be granted access to those
8    systems because I do not believe they
9    have classified access.
10       Q     And aside from classified
11   systems, are there any systems at HHS
12   that the DOGE team affiliates would be
13   denied access to?
14            MR. HUMPHREYS:  Objection as
15       to scope.
16       A     I do not know.  There's over
17   1200 systems, so I can't say that for
18   certain.
19       Q     But you can't identify any
20   specific systems today?
21       A     No, I cannot.
22       Q     Okay.  Has anyone at HHS raised
23   concerns about violations of the law
24   regarding the DOGE team affiliates'
25   actions at HHS?

Page 41

1          MR. HUMPHREYS:  Objection as

2     to scope, and I'll instruct the

3     witness not to answer.

4          (Instruction)

5          MS. HINSON:  Can we take a

6     really short break?

7          (Recess.)

8          MS. HINSON:  Are we ready to

9     go back on?

10          MR. HUMPHREYS:  She would

11     like to make -- never mind, I'm

12     losing it.

13          MS. HINSON:  Okay.

14          THE WITNESS:  Okay.

15  BY MS. HINSON:

16     Q    Just a few more questions.

17          Do DOGE team affiliates make

18   requests for access to systems in

19   writing?

20     A    It's been through e-mails.

21     Q    Through e-mails?

22          So I take it there's not, like,

23   a formal form that they're filling out?

24     A    There is not.

25     Q    Has there been another position

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 42

1    at HHS that HHS views as needing access

2    as broad as that given to the DOGE team

3    affiliates?

4             MR. HUMPHREYS:  Objection as

5        to scope and form.

6        A    Not to my knowledge.

7        Q    Okay.  I wanted to ask about a

8    couple of specific systems.

9             Why did -- it looks like, based

10   on your chart and based on the

11   interrogatory responses, I'm looking at

12   the third page on the top, that Mr. Elez

13   and Mr. Moghaddassi both had access to

14   the national directory of the new hires;

15   is that correct?

16       A    That is correct.

17       Q    Why did they need access to the

18   national directory of new hires?

19       A    In order to determine if there

20   was potential waste, fraud and abuse

21   within the system.

22       Q    Was there any specific reason

23   to think there was waste, fraud and abuse

24   in the system?

25       A    Well, this system --

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 43

1          MR. HUMPHREYS:  Objection as

2      to scope.

3          Excuse me.

4      A    This system documents child

5  support, and it's an entitlement system,

6  so they were looking at that system as an

7  entitlement system to see if the payments

8  led to any type of potential fraud, waste

9  or abuse.

10     Q    And what, specifically, were

11  they looking for?

12         MR. HUMPHREYS:  Objection as

13      to scope, and I'll instruct the

14      witness not to answer.

15         MS. HINSON:  Brad, it goes

16      to their use of the systems.

17         MR. HUMPHREYS:  Well, it

18      goes to their subjective intent in

19      the use of the systems, not how

20      they actually used them.

21              (Instruction)

22  BY MS. HINSON:

23     Q    Okay.  What was HHS's

24  understanding of why they needed access

25  to the national directory of new hires?

Page 44

1                    MR. HUMPHREYS:  That's fine,

2        go ahead.

3        A      HHS's understanding is the fact

4     that this system tracks child support

5     payments and so, therefore, they were

6     looking to see if there were any fraud,

7     waste and abuse amongst the payments.

8        Q      What kind of fraud, waste and

9     abuse did HHS think might be in the

10    system?

11       A      I do not know.

12       Q      So why did HHS grant Mr. Elez

13    and Mr. Moghaddassi access to look for

14    waste, fraud and abuse?

15       A      Because the system is an

16    entitlement system that captures

17    financial data, and so they were looking

18    to see if it potentially would be a

19    system that had waste, fraud and abuse.

20       Q      First of all, what do you mean

21    by entitlement system?

22       A      An entitlement system is

23    a system -- some of the systems that

24    tracks if somebody is paid money, paid a

25    grant, right, so many of these systems

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 45

1    are entitlement systems, which has

2    payments or tracks -- tracks funding

3    exchanges.

4         Q    So correct me if I'm wrong, but

5    my understanding of what you're saying is

6    there wasn't a specific reason that HHS

7    thought there were waste, fraud and abuse

8    in the system, but the fact that it was

9    an entitlement system meant that the DOGE

10   team affiliates would be permitted to

11   check it for waste, fraud and abuse; is

12   that right?

13            MR. HUMPHREYS:  Objection as

14        to form.

15        A    That is correct.

16        Q    And then I wanted to also ask

17   about the -- oh, yes, sorry, one more

18   question about that one.

19            On the chart, it says, I

20   think it's in the fourth column from

21   the left, which is the PII/PHI column

22   it says:  National directory of new

23   hires, and a bracket, 2025 draft,

24   close bracket.

25            And I guess I'm just -- what

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 46

1    does the 2025 draft claim to mean?

2         A       This is information that I

3    pulled from the privacy impact

4    assessments, and so there was a draft

5    that we are finalizing that this is just

6    the document that I pulled the

7    information from.

8         Q       Does this -- does the

9    information in the national directory of

10   new hires change every year?

11        A       No, it does not.

12        Q       Okay.  Can you maybe explain to

13   me, I understand it's the -- the document

14   that you pulled the data from, but, like,

15   what is -- what does it mean to say, it's

16   a 2025 draft?

17        A       It's just -- it's in -- it's --

18   the draft hasn't been finalized yet.

19        Q       Okay.  Okay.  And then, on the

20   next page, it talks about the -- on

21   unaccompanied children, sorry,

22   unaccompanied alien children and

23   unaccompanied children portal, why -- and

24   I believe Mr. Schutt was granted access

25   to that; is that correct?

Page 47

```
 1        A     That is correct.

 2        Q     And why was he granted access

 3   to that?

 4        A     This one was -- he was granted

 5   access for this to make the determination

 6   that the system had any indication of

 7   waste, fraud or abuse.

 8        Q     Did HHS have any specific

 9   reason to believe that the system

10   contained evidence of waste, fraud or

11   abuse?

12             MR. HUMPHREYS:  Objection to

13        form.

14        A     To my knowledge, they did not.

15        Q     And so why did they grant

16   Mr. Schutt access to the system to check

17   for waste, fraud or abuse?

18        A     Often it was a situation where

19   they looked at the system from an audit

20   perspective, to see if there was any

21   indications of the potential for waste,

22   fraud and abuse.

23        Q     And when you're saying from an

24   audit perspective was for the DOGE team

25   affiliates doing the audit?
```

Page 48

```
 1        A      They were looking, yes, to see
 2    if this potentially had the indication of
 3    waste, fraud and abuse.
 4        Q      What kind of waste, fraud and
 5    abuse were they looking for?
 6        A      For this one, just reading
 7    through the information, give me one
 8    minute.
 9              This one has the employment
10    information and sponsor information, so
11    it has financial account information in
12    that system, so it does track financial
13    information in that system.
14        Q      And whose financial information
15    does it track?
16        A      Has for the sponsors from an
17    unaccompanied child.
18        Q      And can you explain how that
19    would help identify waste, fraud and
20    abuse from the government?
21              MR. HUMPHREYS:  Objection to
22        scope.
23        A      My understanding is they were
24    looking to see if the payments to the
25    sponsors were legal and legitimate.
```

ff7269eb-5b0a-4f92-aa1f-47e3b28ef4dc

Page 49

1      Q     And they were basing that, in

2    part, on the financial information of the

3    sponsors?

4           MR. HUMPHREYS:  Objection as

5        to scope.

6      A     That's correct.

7      Q     Did Mr. Schutt find any

8    indications of waste, fraud or abuse in

9    the unaccompanied children portal?

10          MR. HUMPHREYS:  Objection as

11       to scope, instruct the witness not

12       to answer.

13             (Instruction)

14          MS. HINSON:  It goes

15       directly to the use of sensitive

16       systems.

17          MR. HUMPHREYS:  No, it goes

18       to his findings, not how he used

19       the system, and I think that's

20       how -- his individual findings, I

21       don't think that's within the

22       topic.

23          How he used the systems

24       would be what did he access, you

25       know, what did he look at, I don't