**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, *et al.*,<br><br>        Plaintiffs,<br>    v.<br>DEPARTMENT OF LABOR, *et al.*,<br><br>        Defendants. | Case No. 1:25-cv-00339-JDB<br><br>Judge John D. Bates |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND.................................................................................................................4

I.   The Privacy Act.........................................................................................................4

II.  USDS and the DOGE Agenda....................................................................................4

III. DOGE Access at the Agency Defendants...................................................................6

    A.  DOGE Team Access at the Department of Health and Human Services.........................6

    B.  DOGE Team Access at the Department of Labor.........................................................10

IV.  Procedural History...................................................................................................13

LEGAL STANDARD........................................................................................................15

ARGUMENT....................................................................................................................16

I.   Plaintiffs Cannot Demonstrate Irreparable Harm....................................................16

II.  Plaintiffs are Unlikely to Succeed on the Merits of Their Claims............................22

    A.  Plaintiffs Must Run the Table to Demonstrate They are Likely to Succeed on the Merits..................................................................................................................22

    B.  Plaintiffs Fail to Establish Standing for Their Claims..................................................25

        1.  Plaintiffs fail to establish a likelihood of concrete injury.........................................27

        2.  Plaintiffs fail to establish a likelihood of actual and imminent injury......................31

    C.  Plaintiffs Fail to Establish Likelihood of Success on their APA Claims.........................32

        1.  Plaintiffs do not challenge final agency action.......................................................32

        2.  Plaintiffs cannot assert violations of the Privacy Act through the APA....................34

        3.  DOGE-affiliated employees' access is not contrary to the Privacy Act and related regulations.................................................................................................34

            a.  The access does not violate the Privacy Act........................................................34

                i.   DOGE-affiliated employees are employees of the Agency Defendants........34

                ii.  DOGE Teams require access to agency systems...........................................39

            b.  Since access does not violate the Privacy Act, access does not violate the agency regulations implementing the Privacy Act..............................................43

        4.  Plaintiffs are unlikely to prevail on their arbitrary and capricious claim..................43

III. The Balance of Equities Favors Defendants.............................................................45

CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*All. for Retired Ams. v. Bessent,*
  --- F. Supp. 3d ----, 2025 WL 740401 (D.D.C. 2025)................................. 17, 18, 19

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.,*
  No. CV 25-339 (JDB), 2025 WL 1129227 (D.D.C. Apr. 16, 2025)...................................... 29

*Am. Fed'n of Tchrs. v. Bessent,*
  No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 4, 2025) ................................... 22, 24, 25, 40

*Am. Fed'n of State, County, and Mun. Emps. v. SSA,*
  --- F. Supp. ----, 2025 WL 1141737 (D. Md. Apr. 17, 2025)................................. 19

*Am. Fed'n of Tchrs. v. Bessent,*
  --- F. Supp. ----, 2025 WL 895326 (D. Md. Mar. 24, 2025)................................. 19

*Ashland Oil, Inc. v. FTC,*
  409 F. Supp. 297 (D.D.C. 1976) ....................................................................... 20

*Ass'n of Flight Attendants—CWA, AFL-CIO v. U.S. Dep't of Transp.,*
  564 F.3d 462 (D.C. Cir. 2009) ........................................................................... 26

*Baker DC v. Nat'l Labor Rels. Bd.,*
  102 F. Supp. 3d 194 (D.D.C. 2015)................................................................... 20

*Bigelow v. Dep't of Def.,*
  217 F.3d 875 (D.C. Cir. 2000) ........................................................................... 39

*Cal. Comm. Against Toxics v. EPA,*
  934 F.3d 627 (D.C. Cir. 2019) ........................................................................... 24

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ................................................................... 17, 21

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)............................................................................................. 31

*Cobell v. Norton,*
  391 F.3d 251 (D.C. Cir. 2004) ........................................................................... 15

*Comm. for a Constructive Tomorrow v. Dep't of the Interior,*
  No. 24-cv-774 (LLA), 2024 WL 2699895 (D.D.C. May 24, 2024)...................................... 17

*Dallas Safari Club v. Bernhardt,*
  453 F. Supp. 3d 391 (D.D.C. 2020)................................................................... 17

*Davis v. Pension Ben. Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ................................................................. 16

*Dickson v. Direct Energy, LP*,
  69 F.4th 338 (6th Cir. 2023) ..................................................................... 28

*Doe v. Chao*,
  540 U.S. 614 (2004) .................................................................................. 24

*Doe v. Off. of Pers. Mgmt.*,
  No. 25-cv-234 (RDM), 2025 WL 513268 (D.D.C. Feb. 17, 2025) ............... 20

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ................................................................... 26

*Gadelhak v. AT&T Servs., Inc.*,
  950 F.3d 458 (7th Cir. 2020) ............................................................... 28, 29

*Garey v. James S. Farrin, P.C.*,
  35 F.4th 917 (4th Cir. 2022) ..................................................................... 28

*Giri v. Nat'l Bd. of Med. Exam'rs*,
  718 F. Supp. 3d 30 (D.D.C. 2024) ............................................................. 16

*Hanson v. Dist. of Columbia*,
  120 F.4th 223 (D.C. Cir. 2024) ................................................................. 45

*Hirschfeld v. Stone*,
  193 F.R.D. 175 (S.D.N.Y. 2000) ............................................................... 20

*Human Touch DC, Inc. v. Merriweather*,
  No. 15-cv-00741 (APM), 2015 WL 12564166 (D.D.C. May 26, 2015) .......... 20

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
  48 F.4th 1236 (11th Cir. 2022) ................................................................. 33

*Immigr. & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*,
  510 U.S. 1301 (1993) ................................................................................ 45

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ................................................................... 39

*Elec. Priv. Info. Center v. U.S. Dep't of Com.*,
  928 F.3d 95 (D.C. Cir. 2019) ..................................................................... 26

*Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ................................................................... 28

iii

*Jeffries v. Volume Servs. Am. Inc.*,
  928 F.3d 1059 (D.C. Cir. 2019) ............................................................... 31

*Krakauer v. Dish Network*,
  925 F.3d 643 (4th Cir. 2019) .................................................................. 28

*LaRoque v. Holder*,
  650 F.3d 777 (D.C. Cir. 2011) ................................................................ 28

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................................... 16, 25

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................ 34

*Lupia v. Medicredit, Inc.*,
  8 F.4th 1184 (10th Cir. 2021) ................................................................ 28

*Mach Mining, LLC v. E.E.O.C.*,
  575 U.S. 480 (2015) ............................................................................ 40

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Augo Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................. 44

*Nat'l Sec. News Serv. v. Dep't of the Navy*,
  584 F. Supp. 2d 94 (D.D.C. 2008) .......................................................... 20

*Navajo Nation v. Azar*,
  292 F. Supp. 3d 508 (D.D.C. 2018) ......................................................... 16

*New York v. Trump*,
  --- F. Supp. ----, 2025 WL 1095147 (S.D.N.Y. Apr. 11, 2025) ..................... 19

*New York v. Trump*,
  --- F. Supp. ----, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) ...................... 19

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................ 16

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) .............................................................................. 44

*People for the Ethical Treatment of Animals v. U.S. Fish & Wildlife Serv.*,
  130 F. Supp. 3d 999 (E.D. Va. 2015) ....................................................... 44

*Plante v. Gonzalez*,
  575 F.2d 1119 (5th Cir. 1978) ............................................................... 20

*Randolph v. ING Life Ins. & Annuity Co.*,
  973 A.2d 702 (D.C. 2009) ........................................................................... 29

*Sampson v. Murray*,
  415 U.S. 61 (1974) ...................................................................................... 16

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ................................................................... 16

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ...................................................................... 45

*Six v. IQ Data Int'l, Inc.*,
  129 F.4th 630 (9th Cir. 2025) .................................................................... 28

*Sluss v. U.S. Dep't of Just., Int'l Prisoner Transfer Unit*,
  898 F.3d 1242 (D.C. Cir. 2018) ................................................................. 40

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .................................................................................... 26

*\*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................ 16, 23, 26, 28, 30

*Tureen v. Equifax, Inc.*,
  571 F.2d 411 (8th Cir. 1978) ..................................................................... 29

*\*Univ. of Cal. Student Ass'n v. Carter*,
  --- F. Supp. 3d ----, 2025 WL 542586 (D.D.C. Feb. 17, 2025) ............ 2, 17, 18, 19, 20, 21

*Venetian Casino Resort, LLC v. EEOC*,
  530 F.3d 925 (D.C. Cir. 2008) ................................................................... 33

*Warth v. Seldin*,
  422 U.S. 490 (1975) .................................................................................... 28

*WhaleCo Inc. v. Shein Tech. LLC*,
  No. 23-cv-3706 (TJK), 2025 WL 445187 (D.D.C. Feb. 9, 2025) ............ 16

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................ 15

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................... 16

*\*Wolf v. Regardie*,
  553 A.2d 1213 (D.C. 1989) .................................................................. 27, 29

**Statutes**

5 U.S.C. § 552(b)(6) ...................................................................................................... 20

5 U.S.C. § 552a ............................................................................................................... 14

5 U.S.C. § 552a(b) ............................................................................................................. 4

*5 U.S.C. § 552a(b)(1) ........................................................................... 4, 25, 35, 39, 45

5 U.S.C. § 552a(g)(4) ................................................................................................ 21, 32

5 U.S.C. § 552a(v) ........................................................................................................... 37

5 U.S.C. § 704 ................................................................................................................. 32

5 U.S.C. § 706 ................................................................................................................. 13

5 U.S.C. § 3161 ................................................................................................................. 5

5 U.S.C. § 551(4) ............................................................................................................ 24

5 U.S.C. § 551(6) ............................................................................................................ 24

5 U.S.C. § 551(8) ............................................................................................................ 24

5 U.S.C. § 551(10) .......................................................................................................... 24

5 U.S.C. § 551(11) .......................................................................................................... 24

44 U.S.C. § 3551-58 ....................................................................................................... 14

44 U.S.C. § 3572(c)(1) .................................................................................................... 14

**Executive Orders and Regulations**

*Exec. Order No. 14,158,
    90 Fed. Reg. 8441 (Jan. 29, 2025) ........................................... 1, 4, 36, 37, 40, 42

*Exec. Order No. 14,210,
    90 Fed. Reg. 9669 (Feb. 11, 2025) ......................................................... 5, 43

*Exec. Order No. 14,222,
    90 Fed. Reg. 11095 (Feb. 26, 2025) ....................................................... 5, 43

*Exec. Order No. 14,243,
    90 Fed. Reg. 13681 (Mar. 20, 2025) ........................................................... 42

12 C.F.R § 1070.40.................................................................................................14

12 C.F.R § 1070.59.................................................................................................14

20 C.F.R. § 10.10..............................................................................................14, 43

45 C.F.R. § 5.9(a)...................................................................................................43

45 C.F.R. § 5b........................................................................................................14

45 C.F.R. § 160.103...............................................................................................14

# INTRODUCTION

Discovery has confirmed that Plaintiffs' Motion for a Preliminary Injunction (PI Motion), ECF No. 80, suffers from many of the same deficiencies as their two unsuccessful Motions for a Temporary Restraining Order (TRO). For several independent reasons, the PI Motion should be denied.

First, Plaintiffs have failed to demonstrate a likelihood of irreparable harm justifying a preliminary injunction. This Court granted limited discovery principally to explore issues concerning irreparable harm, if any, resulting from Department of Government Efficiency (DOGE)[1]-affiliated employees' access to systems containing Plaintiffs' members' information. ECF No. 48 at 10. The discovery demonstrated that there is no such harm. The PI Motion does not contend—presumably because the information produced through discovery provides no basis for contending—that there is a serious risk that personal information will be publicly disclosed or otherwise more broadly disseminated. Rather, Plaintiffs' assertions of irreparable harm amount to

---

[1] A few words on the terminology in this brief. The Department of Government Efficiency or "DOGE" is the umbrella term for the government-wide initiative to implement the President's DOGE Agenda. It consists of the United States DOGE Service (USDS), the USDS Temporary Organization, and Agency DOGE Teams. Exec. Order No. 14,158, § 3(a)–(c) , 90 Fed. Reg. 8441 (Jan. 20, 2025). Consistent with Executive Order 14,158 and as the government has repeatedly explained in this case and in other litigation, Agency DOGE Teams (which consist of employees from the relevant agency and detailees, who take actions within their agency, and who report to agency leadership) are distinct from USDS and the USDS Temporary Organization (which are nonstatutory components with limited and purely advisory responsibilities). In this brief, we use the term "DOGE" and "DOGE Agenda" to refer to the overarching policy initiative and use the term "USDS" when discussing the USDS or the USDS Temporary Organization components in particular. We use the terms "Agency DOGE Teams" or "DOGE Teams" to correspond to the DOGE Teams described in section 3(c) of Executive Order 14,158. And we use the term "DOGE-affiliated employees" to describe the broader group of employees encompassed by the PI Motion, which includes "(1) any current or former employee of, including detailees from or to, USDS or the USDS Temporary Organization, or (2) any current or former member of a DOGE Team established at any federal agency." PI Motion at 3 n.2.

an argument that DOGE access *itself* qualifies as irreparable harm. But it does not, as two Judges in this District have concluded in denying similar motions for preliminary relief in DOGE access cases. As Judge Moss explained, there is "no authority for the proposition that mere 'access' to personal data by government employees who are not formally authorized to view it, without more, creates an irreparable injury." *Univ. of Cal. Student Ass'n v. Carter*, --- F. Supp. 3d ----, 2025 WL 542586, at *6 (D.D.C. Feb. 17, 2025). Rather, "[c]ourts find dissemination of information to be an irreparable injury where, for example, highly sensitive information will be made *public*, or ends up in the hands of someone with no obligation to keep it confidential." *Id.* at *5 (emphasis in original). Plaintiffs do not allege—let alone demonstrate—that this is happening or likely will happen. For this reason alone, the preliminary injunction should be denied.

That is not the only way in which Plaintiffs have failed to demonstrate irreparable harm. Even if access by DOGE-affiliated employees alone qualified as an injury, it is well-established that the possibility of compensatory relief weighs heavily against a finding of *irreparable* harm. Thus, any harm to Plaintiffs resulting from that access is not irreparable given the availability of a private cause of action and compensatory relief under the Privacy Act. And, in any event, even if access alone qualified as cognizable irreparable harm (and it does not), that access has already occurred and has been occurring for several months. This Court should accordingly deny the requested injunction without consideration of the remaining *Winter* requirements.

Plaintiffs cannot satisfy the other preliminary injunction requirements either. Plaintiffs have not demonstrated they are likely to succeed on the merits. At least four difficult issues stand between Plaintiffs and ultimate success on their APA claims, and Plaintiffs must prevail on *all of them* while the Government need only prevail on one.

2

First, Plaintiffs are unlikely to establish that they have standing. Plaintiffs' alleged injuries—related to certain government employees' access to information Plaintiffs provided to the government—are, as this Court recognized, based on allegations that are quite different from the sorts of injuries that the tort of intrusion upon seclusion has traditionally encompassed; discovery has only confirmed that Plaintiffs' alleged injuries bear no resemblance to that tort or any other common-law tort. Second, Plaintiffs attempt to assert claims under the APA, but the conduct they challenge (internal decisions to grant access to certain agency systems to certain federal government employees) is far from agency activities traditionally subject to APA review.

Third, Plaintiffs seek injunctive relief on their Privacy Act challenges under the APA. But the Privacy Act impliedly precludes both the injunctive relief they seek as well as does not encompass claims brought by organizational plaintiffs. Indeed, neither the D.C. Circuit nor the Supreme Court has squarely held that a plaintiff can bring an independent APA claim predicated on a Privacy Act violation.

Finally, even if the Court ultimately concludes that it can reach the merits of Plaintiffs' Privacy Act claims, to resolve those claims in Plaintiffs' favor the Court would have to (1) determine that agency employees are not, in fact, employees (a contention that discovery has also clearly rebutted); or (2) second-guess the agencies' determinations that DOGE-affiliated employees require access to agency systems to perform their duties, despite both the broad mandates of the relevant Executive Orders and the complex functions being performed by agency DOGE Teams.

Taken separately, those obstacles are formidable—collectively, they are insurmountable.

Finally, although the remaining factors do not require extended discussion, they too militate against the injunctive relief Plaintiffs seek. It does not serve the public interest or the equities for

courts to micro-manage agencies' day-to-day operating decisions, as Plaintiffs would have this Court do. Accordingly, Plaintiffs' motion should be denied.

## BACKGROUND

### I. The Privacy Act

The Privacy Act prohibits agencies from disclosing "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b). There are thirteen exceptions to this prohibition including, as relevant here, disclosure "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." *Id.* § 552a(b)(1).

### II. USDS and the DOGE Agenda

The U.S. DOGE Service was originally founded as the U.S. Digital Service in 2014 under President Barack Obama with the goal of, among other things, improving the federal government's information technology and data organization systems. *See* Delivering a Customer-Focused Government Through Smarter IT, WhiteHouse.gov (Aug. 11, 2014).[2] On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established U.S. Digital Service in order to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." Exec. Order No. 14,158, § 4, 90 Fed. Reg. 8441 (Jan. 20, 2025).

Executive Order 14,158 redesignated the U.S. Digital Service as the United States DOGE Service, and moved it from under the Office of Management and Budget (OMB) to a free-standing

---

[2]    *Available at* https://obamawhitehouse.archives.gov/blog/2014/08/11/delivering-customer-focusedgovernment- through-smarter-it.

component of the Executive Office of the President reporting to the White House Chief of Staff. *Id.* § 3(a). Similarly, it established a "U.S. DOGE Service Temporary Organization" within USDS pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. *Id.* § 3(b). "The U.S. DOGE Service Temporary Organization shall be headed by the USDS Administrator and shall be dedicated to advancing the President's 18-month DOGE agenda." *Id.* Separately, agency heads are required to "establish *within their respective Agencies* a DOGE Team of at least four employees, which may include Special Government Employees." *Id.* § 3(c) (emphasis added). "Each DOGE Team will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney." *Id.*

Among other Executive Orders related to the DOGE agenda, on February 11 President Trump signed Executive Order 14,210. That Executive Order directs OMB to submit a plan to reduce the size of the Federal Government's workforce, Exec. Order No. 14,210, § 3(a), 90 Fed. Reg. 9669 (Feb. 11, 2025), and directs agency heads to, among other things, "promptly undertake preparations to initiate large-scale reductions in force," *id.* § 3(c). The Order explains that "this order commences a critical transformation of the Federal bureaucracy" and that "[b]y eliminating waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself." *Id.* § 1. On February 19, 2025, President Trump signed Executive Order 14,222, which directs agency heads, in consultation with their DOGE Teams, to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." Exec. Order No. 14,222, § 3(b), 90 Fed. Reg. 11095 (Feb. 11, 2025). "This process shall commence immediately and shall prioritize the review of funds

disbursed under covered contracts and grants to educational institutions and foreign entities for waste, fraud, and abuse." *Id.*

### III. DOGE Access at the Agency Defendants

Discovery has revealed that a discrete group of DOGE-affiliated employees have been given access on a system-by-system basis as necessary to perform their work. We describe that access in this section, first at the Department of Health and Human Services (HHS) and then at the Department of Labor (DOL). We also discuss Plaintiffs' critiques of the security requirements and safeguards the Agency Defendants have imposed. As discussed further below, although Plaintiffs contend that HHS "has dispensed with training and security briefing requirements," PI Brief at 18, and that DOL "has dispensed with its security requirements in providing access to DOGE Teams," *id.* at 15, no information substantiates those claims. Rather, Plaintiffs at most identify a few alleged process errors that, even if accurate, do not call into question the safeguards Agency Defendants have put in place. And Plaintiffs' narrow critiques are for the most part not accurate, and rely on misunderstandings (misunderstandings that, explained further below, are partially the result of an email transmission oversight by counsel for Defendants).

#### A. DOGE Team Access at the Department of Health and Human Services

A total of ten DOGE-affiliated employees within the Department of Health and Human Services (HHS) have been given access to at least one sensitive system. ECF No. 80-5 at 5–16.[3] All ten individuals are either employed by HHS directly or are detailed to HHS from another federal agency. *Id.* Five of the individuals—Amy Gleason, Luke Farritor, Edward Corristine, Marko Elez, and Kyle Schutt—are either also detailed to USDS or, in the case of Ms. Gleason, an

---

[3] Unless otherwise indicated, when citing to the exhibits to Plaintiffs' PI Motion, the page numbers correspond to the pages in the underlying document rather than on the ECF stamp.

employee of both HHS and USDS (where Ms. Gleason serves as Acting Administrator). *Id.* at 6–11. Five other individuals are part of HHS's DOGE Team and have no employment relationship with USDS—Aram Moghaddassi, Conor Fennessy, Jeremy Lewin, Zach Terrell, and Rachel Riley. *Id.* at 11–16.

HHS has made no changes to any of its practices concerning access to records since January 19, 2025. *See* Exhibit B to Declaration of Andrew M. Bernie (Wendel Dep.) at 37:13–16. DOGE Team members are typically granted access to particular systems upon request by that individual, based on the work being performed by the individual. *Id.* at 31:12–21. The DOGE Team member typically speaks to the system owner and explains why access is needed and the system owner, upon confirming that the reason is legitimate, grants access. *Id.* at 36:14–20.[4] Although DOGE-affiliated employees are generally given access to more systems than most other HHS employees (because of the broad responsibilities vested in those employees by the DOGE Executive Orders), the policy—to give these employees access that is needed to carry out their responsibilities—is the same for DOGE-affiliated employees as it is for any other HHS employees. *Id.* at 39:6–19.

And because each of the ten individuals has sought and been granted access on a system-by-system basis based on their work needs, there is a wide variation in system access. To take some examples, Ms. Gleason and Mr. Schutt have each been granted access to only one system, Mr. Farritor has been granted access to twelve, Mr. Corristine has been granted access to three, Mr.

---

[4] Plaintiffs cite one of HHS's 30(b)(6) depositions for the proposition that HHS "does not review systems individually to determine whether to grant access to a DOGE Team member." PI Brief at 17. But the HHS deponent noted that the individuals "were granted access to the systems requested based on the needs to perform their duties," Wendel Dep. at 31:19–21, and the deponent explained that she looked at these systems and "there's many things that are in common with determining if there is fraud, waste, or abuse for HHS, and these systems meet those requirements." Wendel Dep. at 32:9–13.

Elez has been granted access to four, and Mr. Fennessy and Ms. Riley have each been granted access to seven. ECF No. 80-5 at 6–10, 13, 16. At the same time, at least one individual, Brad Smith, has not been granted access to any sensitive systems. *Id.* at 17. When individuals no longer require access to a particular system to perform their work, access to that system has been deactivated. *See, e.g.*, Wendel Dep. at 27:16–19.

Notably, the vast majority of permissions granted to these individuals have been only "read-only access" (the only exceptions are that Mr. Farritor has been granted administrator privileges for four of the twelve systems to which he has been granted access, ECF No. 80-5 at 8, and Ms. Riley was granted administrator privileges for one system but her access to that system has since been deactivated, *id.* at 16). Read-only capabilities do not allow the individual to modify the data or to share it. Wendel Dep. at 34:7–16.

In addition, every HHS system contains controls, including an ability to "monitor what happens in the system" and "whether the data leaves the system." *Id.* at 20:15–17. Across HHS's nineteen systems storing sensitive information, there is no way a user can access one of those systems without creating a log showing that access. *Id.* at 36:1–5. None of the ten individuals discussed above have modified, copied, and shared with any unauthorized users, or removed any records from any of the systems to which they have been granted access. ECF No. 80-5 at 6–16; *see also* Wendel Dep. at 24:5–26:23 (explaining how, based on discussion with system owners and their review of activity logs, there is no indication that any individuals have improperly copied or shared information). Nor have any of them installed, or requested to be installed, any unapproved software on HHS networks or systems. ECF No. 80-5 at 6–17. It is also impossible to access any of the HHS systems without using an HHS-issued computer. Wendel Dep. at 51:15–18.

All ten DOGE-affiliated employees were required to complete training concerning their obligation to safeguard sensitive information, among other subjects. Generally, this training consisted at least of a requirement that they acknowledge the Rules of Behavior for General Users, as well as undertake cybersecurity training. *See, e.g.*, PI Brief at 6. Users with access to more sensitive systems were also required to complete additional training, such as the Rules of Behavior for Privileged Users, or system-specific training where required. *See, e.g.*, *id.* at 8 (noting that Mr. Farritor "acknowledged the Rules of Behavior for General Users; the Rules of Behavior for Privileged Users; a security briefing for HIGLAS; completed IDR computer-based training; and completed Cybersecurity training" as well as "completed Information Security and Information Management Training at NIH"); *id.* at 10 (in addition to the Rules of Behavior, Mr. Elez acknowledged "the Rules of Behavior for the Office of Child Support Enforcement, completed Cybersecurity training, and received training from the Office of Child Support Services on navigating the screens to get to the NDNH database"); *id.* at 17 (in addition to the Rules of Behavior and Cybersecurity Training, Ms. Riley "also completed the NIH Information Security and Information Management Training; the 2024 Information Security and Management Refresher; Remote Access and Security Training; and acknowledged the NIH Access/Disclosure Agreement for the Office of Human Resources").

Plaintiffs ignore this evidence when they argue that HHS "has dispensed with training and security briefing requirements," based on the fact that three DOGE-affiliated employees did not receive training specific to HHS's HIGLAS system and four did not receive IDR computer-based training. PI Brief at 18. But as Ms. Wendel explains in the attached declaration, "security-based training specific to HIGLAS is not required before access is granted to this system." Declaration of Jennifer Wendel ¶ 8. "While a security briefing is available to users, and they may choose to

complete it, it is entirely optional and not required for access to HIGLAS." *Id.* As to IDR, what is required for access to CMS systems, including IDR, is computer based training (CBT). *Id.* ¶ 4. "This CBT is generalized training for CMS's systems and is not specific to any particular CMS system, including" IDR. *Id.* And all four of the identified individuals received CBT prior to being granted access to the CMS systems, including IDR, consistent with the procedures required for any new user of these systems. *Id.* ¶ 6.[5]

## B.  DOGE Team Access at the Department of Labor

Three DOGE-affiliated employees within the Department of Labor (DOL) have been given access to sensitive systems within the agency: Marko Elez, Aram Moghaddassi, and Miles Collins. ECF No. 80-5 at 17–20. All three are DOL employees, but only Mr. Elez has an employment relationship with USDS. *Id.* at 17–19.

Like their HHS counterparts, DOL's DOGE-affiliated employees have been granted access to different systems depending on the nature of their work. These three individuals have been given access to, collectively, eight systems containing sensitive information by the close of discovery.[6]

---

[5] Thus, as Ms. Wendel's declaration notes, the statement in Defendants' interrogatory responses that Luke Farritor completed "IDR computer-based training" was inaccurate. Wendel Decl. ¶ 5. Defendants regret this mistake. By contrast, HHS's deponents did not, as Plaintiffs suggest, state that HIGLAS-specific training was mandatory. Plaintiffs cite the 30(b)(6) depositions of HHS for the proposition that "HHS employees must have 'higher level training' for access to HIGLAS and IDR because the information in them is especially sensitive." PI Brief at 18. But nothing in the portions of the depositions Plaintiffs cite suggest that there is mandatory, HIGLAS-specific training. *See, e.g.*, Exhibit A to Declaration of Andrew M. Bernie (Rice Dep.) at 32:4–7 (stating generally, *inter alia*, that "there would be systems training that would happen, you know, how to use the system, be familiar with the system, all that kind of stuff"); Wendel Dep. at 12:1–5 (stating generally "[t]hey go through the briefing" in response to question asking "is in the normal course is a user granted HIGLAS without going through the HIGLAS security briefing?").

[6] The information in this brief is generally provided as of close of discovery. As of today, we are informed that one individual has since been added to the DOL DOGE Team and that the above three individuals have since been granted access to a few additional systems. Counsel for Defendants will provide this updated information to counsel for Plaintiffs as soon as practicable.

Mr. Moghaddassi and Mr. Collins have each been granted access to five sensitive systems, while Mr. Elez has been granted access to four. *Id.* at 17–19. Access to each system for each individual was granted by either Dean Heyl, Assistant Secretary for Administration and Management, his predecessor Troy Finnegan, or Thomas Shedd, DOL's Acting Chief Information Officer. *Id.*

At DOL, DOGE-affiliated employees generally request access to sensitive systems in the same manner as any other DOL employee, by submitting forms seeking access to a particular system. *See* Exhibit C to Declaration of Andrew M. Bernie (Kryger Dep.) at 73:10–25. DOL applies the same standard when evaluating requests for access from DOGE-affiliated employees (though because the Executive Order generally makes the need for access apparent, sometimes no additional information is needed). *Id.* at 75:1–79:18. DOL is unaware of any of the DOGE-affiliated employees viewing data in systems to which they do not have access. *Id.* at 80:1–8.

While Plaintiffs proclaim that DOL "has dispensed with its security requirements in providing access to DOGE Teams[,]" that is not the case. PI Brief at 15. First, under the heading "Not requiring User Agreements," Plaintiffs assert that Mr. Moghaddassi's user agreement form "is not signed." PI Brief at 15. In fact, it was signed. Mr. Moghaddassi's digital signature was inadvertently stripped from the form in DOL's original production while assembling the documents for production. Government counsel had explained this in an April 9 email to counsel for Plaintiffs, which also included the form with Mr. Moghaddassi's digital signature. Exhibit D to Declaration of Andrew M. Bernie; *see also* Exhibit F (document with signature). But Government counsel realized this afternoon, shortly before they were prepared to file this opposition, that counsel for Plaintiffs did not receive this email, due to the size of the attached supplemental production. Government counsel had received a bounceback email but, due to a rule established on his email, he did not see the bounceback email until today when he specifically checked the folder where it

was automatically filed. Counsel sincerely regrets this oversight, which was his alone. We have informed Plaintiffs and will promptly produce the documents counsel believed had been produced on April 9. But to be clear, Mr. Moghaddassi's user agreement *was* signed.

Plaintiffs also state that Mr. Elez's form was not signed until March 25, 2025, after he had already received access to sensitive systems. PI Brief at 15. But all three DOGE-affiliated employees (including Mr. Elez) also signed user agreements when they were first onboarded at DOL in February 2025, which are identical to the form Mr. Elez signed on March 25. Again, counsel for the United States believed those documents had been produced on April 9 as part of the same production but learned this afternoon that Plaintiffs did not receive them. *Compare* ECF No. 80-11, *with* Exhibit G to Declaration of Andrew M. Bernie (documents counsel attempted to produce on April 9, including Mr. Elez's User Agreement form, signed February 13, 2025).[7]

Second, Plaintiffs complain that Mr. Elez and Mr. Moghaddassi obtained access to one system—the Unemployment Insurance Data and Related Records system—without signing Rules of Behavior for that system. PI Brief at 15. As DOL's deponent explained, there are no Rules of

---

[7] Plaintiffs assert that the DOL's deponent "testified that Moghaddassi should not have been given access to Sensitive Systems, and that Elez should not have been prior to March 25." PI Brief at 15. As to Mr. Moghaddassi, the deponent agreed—upon being shown Mr. Moghaddassi's unsigned user agreement—that the form "appears" incomplete and thus said "I believe that's accurate to say" when asked if that meant he should not have been given access. Kryger Dep. at 110:13–111:6. But as noted above, Mr. Moghaddassi's form was signed. As to Mr. Elez, the deponent initially agreed that "I would say the answer to that is yes" when asked if Mr. Elez should not have had access before March 25 but then immediately qualified this response, explaining that "as part of the normal on-boarding of employees, the department's office of human resources works with the individuals that are on-boarding to review and—and acknowledge completion of the computer security training" and that he would "want the opportunity to go back and see if that was just completed through a different process, at the beginning of their employment, to see if that exists." Kryger Dep. at 112:3–16. And that computer security training was in fact completed by all three DOGE-affiliated employees before they were onboarded and received access to sensitive systems.

Behavior specific to the Unemployment Insurance Data and Related Records system, "but the rules of behavior certainly for our general network would apply." Kryger Dep. at 107:18–24.

Finally, Plaintiffs allege that Mr. Elez installed two software systems at DOL without permission but that there were no consequences. PI Brief at 15. But as DOL's deponent explained, the two software systems Mr. Elez installed—Visual Studio Code and PYTHON—are software packages that had *been previously approved* for use at the Department of Labor and, after DOL learned through a conversation with Mr. Elez that he had installed them, DOL determined that there was no need to remove them. Kryger Dep. at 113:1–116:19. Mr. Elez should have sought approval before installing them, but it was harmless error.

## IV. Procedural History

Plaintiffs, a group of labor unions and not-for-profit organizations, filed their original complaint on February 5, 2025 against DOL, its Acting Secretary, and the two USDS organizations. ECF No. 1. That same day, Plaintiffs filed their first Motion for a Temporary Restraining Order (TRO). ECF No. 3. On February 7, 2025, this Court denied the motion, finding that Plaintiffs were unlikely to succeed on the merits of their claim because they failed to establish either associational or organization standing. ECF No. 18.

On February 11, 2025, Plaintiffs filed an amended complaint, which is the operative complaint in this matter, against DOL, HHS, and the Consumer Financial Protection Bureau (CFPB) (collectively, Agency Defendants), their political leadership in their official capacities, as well as the two USDS organizations. ECF No. 21 (FAC). Plaintiffs advanced five cases of action.

Court I is leveled against USDS, and alleges that USDS is acting *ultra vires*. FAC ¶¶ 226–36. As discussed further below, that claim is not relevant to this Motion. Counts II, III, and IV bring an Administrative Procedure Act, 5 U.S.C. § 706, claim against each Agency Defendant, claiming each agency has adopted a policy of granting USDS access (which they coin the

"DOL/CFPB/HHS DOGE Access Policy"), which is contrary to law, arbitrary and capricious, and adopted without proper procedure. FAC ¶¶ 237–49 (DOL); *id.* ¶¶ 250–57 (CFPB); *id.* ¶¶ 258–64 (HHS). Plaintiffs contend that the alleged DOGE Access Policies are contrary to the Privacy Act, 5 U.S.C. § 552a, the Confidential Information Protection and Statistical Efficiency Act of 2002 (CISPEA), 44 U.S.C. § 3572(c)(1), the Federal Information Security Modernization Act of 2014 (FISMA), 44 U.S.C. § 3551-58, and internal regulations specific to each agency (20 C.F.R. § 10.10 (DOL); 12 C.F.R §§ 1070.59, 1070.40 (CFPB); and 45 C.F.R. §§ 5b, 160.103 (HHS)). FAC ¶¶ 241–45, 253–55, 260–62. Count V is advanced against the Agency Defendants and USDS, alleging a stand-alone violation of the Privacy Act. FAC ¶¶ 265–69. That claim has since been dismissed.

On February 12, 2025, Defendants again sought a TRO. ECF No. 29. Again, the Court denied the Motion. ECF No. 34. Specifically, the Court found that Plaintiffs had failed to establish likelihood of success on the merits of their claims. The Court noted, *inter alia*, that the materials before the Court indicated that USDS employees detailed to the Agency Defendants were not "running rampant" at the agencies, and likely not violating the Privacy Act, the APA, FISMA, or the other cited statutes and regulations. *Id.* at 3–10.

Plaintiffs then moved the Court for leave to seek expedited discovery on February 19, 2025. ECF No. 44. The Court granted the Motion over Defendants' opposition, with some alterations to Plaintiffs' proposed discovery. ECF No. 48. Pursuant to the discovery order, Defendants answered Plaintiffs' interrogatories and produced documents. *See* ECF No. 80-5. Plaintiffs also took 30(b)(6) depositions of all three agencies and USDS, through five witnesses (HHS split its 30(b)(6)

14

deposition between two witnesses). *See* Declaration of Andrew M. Bernie, Exhibits A–C, E.[8]

On February 28, 2025, Defendants moved to dismiss Plaintiffs' Amended Complaint. ECF No. 49. On April 16, 2025, the Court granted in part and denied in part the motion. ECF No. 78 (MTD Order). The Court dismissed Plaintiffs' stand-alone Privacy Act claim (Count V) and Plaintiffs APA claims (II, III, IV) except insofar as those APA claims contend that the alleged DOGE Access Policies violate the Privacy Act and regulations implementing the Privacy Act or are arbitrary and capricious. *Id.* at 42. The Court also found that Plaintiffs had adequately pled their ultra vires claim against USDS. *Id.* at 44–46.

Two days later, Plaintiffs filed the present PI Motion. *See* PI Motion; PI Brief. The PI Motion does not seek relief against CFPB or USDS. PI Motion at 1. Further, the Motion advances arguments based only on Plaintiffs' APA claim; it does not seek relief based on Plaintiffs' *ultra vires* claim. Plaintiffs seek to enjoin access by "DOGE Affiliates"[9] to agency systems containing sensitive data, and also seek related relief.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). It is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To warrant preliminary injunctive relief, the moving party

---

[8] Plaintiffs provide excerpts of the relevant depositions. We provide the full HHS depositions as well as the DOL and USDS depositions so the Court has complete transcripts of those depositions rather than two sets of excerpts. Because Plaintiffs do not seek relief against CFPB in their motion, we do not address the facts as to CFPB.

[9] Defined by Plaintiffs as (1) any current or former employee of, including detailees from or to, USDS or the USDS Temporary Organization, or (2) any current or former member of a DOGE Team established at any federal agency. PI Motion at 3 n.2. As discussed in footnote 1, we use the term "DOGE-affiliated employees" to describe this set of individuals.

must show (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities "tips in his favor," and (4) that an injunction is in the public interest. *Id.* at 20. Where the Government is the party opposing injunctive relief, as here, the latter two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"Historically, these factors have been evaluated on a sliding scale." *Giri v. Nat'l Bd. of Med. Exam'rs*, 718 F. Supp. 3d 30, 38 (D.D.C. 2024) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009)). The D.C. Circuit has since "suggested without deciding that a movant must independently establish both likelihood of success on the merits and irreparable harm." *WhaleCo Inc. v. Shein Tech. LLC*, No. 23-cv-3706 (TJK), 2025 WL 445187, at *4 (D.D.C. Feb. 9, 2025) (citing *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011)). But "[e]ither way, 'it is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion.'" *Id.* (quoting *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)).

Additionally, Plaintiffs bear the burden of showing subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

## ARGUMENT

### I.  Plaintiffs Cannot Demonstrate Irreparable Harm

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). Although Plaintiffs' failure to demonstrate concrete injury sufficient to establish Article III standing would also mean they cannot demonstrate irreparable harm, the *converse* is of course not necessarily true: that a plaintiff has or will suffer

an injury in fact does not mean that they have demonstrated irreparable harm for purposes of the preliminary injunction inquiry. *See, e.g.*, *All. for Retired Ams. v. Bessent*, --- F. Supp. 3d ----, 2025 WL 740401, at *20–24 (D.D.C. 2025) (finding, in denying preliminary injunction against DOGE access, that plaintiff had not demonstrated irreparable harm and thus was not entitled to preliminary injunction, despite concluding that plaintiff had Article III standing); *Comm. for a Constructive Tomorrow v. Dep't of the Interior*, No. 24-cv-774 (LLA), 2024 WL 2699895, at *4 (D.D.C. May 24, 2024) ("While Plaintiffs have shown a substantial likelihood of standing, they have not demonstrated that they will suffer irreparable harm in the absence of a preliminary injunction or administrative stay. That is a sufficient basis to deny their motion.").

Critically, "[a] movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Univ. of Cal. Student Ass'n*, 2025 WL 542586, at *4 (denying TRO in DOGE Access case because plaintiff failed to make a clear showing of irreparable harm and "leav[ing] for another day consideration of whether [the plaintiff] has standing to sue and has stated a claim upon which relief may be granted"); *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) (explaining that "if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors"). Because Plaintiffs have not established irreparable harm—and because this failure requires denial of their motion—we address that issue first.

Plaintiffs treat irreparable harm as a virtual afterthought. Their irreparable-harm analysis spans less than three pages, a significant portion of which is devoted to recitation of legal standards, and bullet points describing and quoting from Executive Orders. PI Brief at 46–49. And what is most striking about this brief discussion is what is missing. Plaintiffs do not attempt to establish

that their information will be made public or disseminated more broadly.[10] Nor do they otherwise allege—let alone establish—any other irreparable harm separate from DOGE access. This is understandable in light of the DOL and HHS-specific discussion above: as previously explained, both agencies have in place extensive measures to ensure protection of sensitive information, including training requirements, system monitoring, other security measures, and generally limited access (*e.g.*, read-only access), among other safeguards. *See supra* at 6–13.

Instead, Plaintiffs' irreparable-harm contentions rest on the argument that DOGE Team members' access to their information *itself* qualifies as irreparable harm. *See, e.g.* PI Brief at 23, 47. But such access is simply not enough to establish irreparable harm, for at least three reasons.

*First*, as two Judges in this District have observed in denying injunctive relief in DOGE access cases, "courts in this District have consistently 'declined to find irreparable injury' from the disclosure of private information 'where the challenged disclosure is not public,' but instead is to a small number of 'individuals obligated to keep [the information] confidential.'" *All. for Retired Ams.*, 2025 WL 740401, at *21 (quoting *Univ. of Cal. Student Ass'n*, 2025 WL 542586, at *5 (some quotation marks omitted)). Thus, in *Alliance for Retired Americans*, Judge Kollar-Kotelly denied—for failure to establish a likelihood of irreparable injury—an injunction preventing the Department of the Treasury from sharing information with individuals associated with USDS. *See id.* at *1. And in *University of California Student Association*, Judge Moss denied on irreparable harm grounds the plaintiff's motion for a temporary restraining order preventing the Department of Education from disclosing student members' personal information to individuals affiliated with

---

[10] Plaintiffs assert in passing that they are "reasonably worried that their information will be leaked or otherwise misused." PI Brief at 48. But the motion contains no further analysis of this point, and Plaintiffs do not even attempt to establish that such speculation warrants injunctive relief. *See* MTD Order at 13 n.6.

USDS. 2025 WL 542586, at *1. As Judge Kollar-Kotelly explained, where information is disclosed to an identified group of individuals with an obligation not to disseminate it publicly, "a court could fashion adequate corrective relief after the fact." *All. for Retired Ams.*, 2025 WL 740401, at *21 (cleaned up). "For example, this Court could order the small number of individuals who received the information to return or destroy it." *Id.* "The possibility that adequate relief of that kind 'will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'" *Id.* (cleaned up).[11]

Other cases in this District similarly reject the notion that mere disclosure of information constitutes irreparable harm, when the recipient of the information is under an obligation not to disseminate the disclosed information to the public or otherwise disclose it more broadly. *See, e.g.,*

---

[11] Three courts have found irreparable harm to support injunctive relief for plaintiffs in similar cases. In *American Federation of Teachers v. Bessent*, --- F. Supp. ----, 2025 WL 895326 (D. Md. Mar. 24, 2025), the court concluded that access to the plaintiffs' members' data was sufficient for an injunction against the Treasury Department, the Office of Personnel Management, and the Department of Education. The Fourth Circuit, however, granted the government's motion to stay that injunction. *See Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL, 1023638 (4th Cir. Apr. 4, 2025). A majority of the Fourth Circuit panel concluded that the plaintiffs were unlikely to establish injury-in-fact sufficient for standing. *Id.* at *2–3 (Agee, J., concurring); *id.* at *4–5 (Richardson, J. concurring). In *American Federation of State, County, and Municipal Employees v. Social Security Administration*, --- F. Supp. ----, 2025 WL 1141737 (D. Md. Apr. 17, 2025), the court also found that access to information was sufficient for irreparable harm. *Id.* at *68–70. The government has appealed that decision and requested a stay of the injunction from the Fourth Circuit. Finally, in *New York v. Trump*, --- F. Supp. ----, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025), the court granted a preliminary injunction based on the "risk of 'expanded' access" to Treasury's Bureau of the Fiscal Services payment systems "that will possibly compromise the systems to become 'far more vulnerable to hacking or activities that render the information corrupted or compromised.'" *Id.* at *26 (quoting the plaintiffs' allegations). The court has since lifted the injunction in part to permit one member of the Treasury DOGE team to continue work at the agency. *See New York v. Trump*, --- F. Supp. ----, 2025 WL 1095147, at *12 (S.D.N.Y. Apr. 11, 2025). To the extent that the facts in any of those cases are analogous to this one, those injunctions are inconsistent with the well-established law in this District making clear that limited disclosures to recipients bound to keep the information confidential does not by itself constitute irreparable harm.

*Baker DC v. Nat'l Labor Rels. Bd.*, 102 F. Supp. 3d 194, 203 (D.D.C. 2015) (no irreparable harm from disclosure of plaintiffs' personal information to a union because regulations placed "limits" on the union's use of the information); *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 308 (D.D.C. 1976) (disclosure of trade secrets to congressional subcommittee would not cause irreparable harm because it would "not lead inexorably to either public dissemination or disclosure"). Rather, "[c]ourts find dissemination of information to be an irreparable injury where, for example, highly sensitive information will be made *public*, or ends up in the hands of someone with no obligation to keep it confidential." *Univ. of Cal. Student Ass'n*, 2025 WL 542586, at *5 (emphasis in original).

The cases Plaintiffs cite in support of their irreparable harm arguments also reflect this distinction. In *Human Touch DC, Inc. v. Merriweather*, No. 15-cv-00741 (APM), 2015 WL 12564166, at *1 (D.D.C. May 26, 2015), the defendant accessed *and forwarded* emails with confidential patient information without authorization to her personal email account. In *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000), the court explained that "[p]ublic disclosure of highly personal and confidential information, the likes of which are at issue in this case, result in a harm that is both substantial and irreversible."[12]

This well-established distinction forecloses Plaintiffs' irreparable-harm contentions, and requires denial of their preliminary injunction motion. As this Court has previously observed,

---

[12] The other two cases Plaintiffs cite for the proposition that DOGE Team access itself constitutes irreparable harm do not support their position either. *Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir. 1978) is not a preliminary injunction decision and does not discuss irreparable harm. *Nat'l Sec. News Serv. v. Dep't of the Navy*, 584 F. Supp. 2d 94 (D.D.C. 2008) is a Freedom of Information Act case. *Cf. Doe v. Off. of Pers. Mgmt.*, No. 25-cv-234 (RDM), 2025 WL 513268, at *7 (D.D.C. Feb. 17, 2025) ("Were this a case brought under [FOIA], the Court might conclude that the agency is entitled to withhold the email addresses on the ground that disclosure 'would constitute a clearly unwarranted invasion of personal privacy,' 5 U.S.C. § 552(b)(6). But this is not a FOIA case, and the requirement for issuance of a TRO is far more demanding.").

DOGE "team members have signed nondisclosure agreements, received security training, and are otherwise subject to agency requirements as to data permissions and accesses." ECF No. 34 at 4. The discovery has reinforced all of this. *See supra* at 6–13. Defendants respectfully submit that the mere provision of access to DOGE Team members to systems containing Plaintiffs' personal information does not constitute concrete injury for purposes of Article III standing. *See infra* at 27–31. But even if Plaintiffs could establish a likelihood of standing—and even if Plaintiffs could overcome the other legal obstacles to their claims discussed further below—such access, without more, is simply insufficient to satisfy Plaintiffs' much higher burden of showing irreparable harm.

*Second*, and as Judge Moss also noted in *University of California Student Association*, "the remedies provided in the Privacy Act . . . confirm that [Plaintiffs] are not suffering (and will not suffer) an irreparable harm." 2025 WL 542586, at *6. The Privacy Act provides a private right of action and money damages for intentional or willful unauthorized disclosures. 5 U.S.C. § 552a(g)(4). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (quotation marks omitted). As discussed further below, Plaintiffs are unlikely to succeed on the merits of their Privacy Act claim even if the Court reaches the merits of that claim. *See infra* at 34–43. But to the extent Plaintiffs' "members have been injured by violations of these statutes, and they meet the other requirements for obtaining relief, there is at least a 'possibility' of compensatory relief at a later date." *Univ. of Cal. Student Ass'n*, 2025 WL 542586, at *6. [13]

---

[13] This Court's Order on Defendants' Motion to Dismiss is not to the contrary. In that Order, this Court held that the Privacy Act did not provide an adequate alternative remedy sufficient to

*Third*—although unnecessary to a finding that Plaintiffs have not demonstrated irreparable harm—the alleged irreparable injuries Plaintiffs invoke have substantially already occurred. *See Am. Fed'n of Tchrs.*, 2025 WL 1023638, at *3 (Richardson, J., concurring) ("[P]reliminary injunctions typically focus on forestalling impending events that would be difficult to reverse. Once the cat is out of the bag, that rationale loses much of its force." (citation omitted)). In this case, DOGE-affiliated individuals have had access to the DOL and HHS records they require to complete their work for close to three months. *See* ECF No. 29 (second motion for temporary restraining order).

Plaintiffs wholly fail to demonstrate a likelihood of irreparable harm sufficient to justify a preliminary injunction. This Court should accordingly deny the motion without consideration of the remaining three *Winter* requirements.

## II.  Plaintiffs are Unlikely to Succeed on the Merits of Their Claims

### A.  Plaintiffs Must Run the Table to Demonstrate They are Likely to Succeed on the Merits

To succeed on the merits, Plaintiffs will have to overcome several obstacles, any one of which would independently be fatal. As Judge Richardson recently observed in a different case that similarly involves Privacy Act and related challenges to DOGE-affiliated employees' access to agency systems, "[a]s a matter of mathematics, this is an unfavorable structure for the plaintiffs." *Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 1023638, at *3 (Richardson, J., concurring).

―――――――――――

preclude an APA claim for violation of the Privacy Act. MTD Order at 28–33. The Court explained that "[d]amages and injunctions belong to different genres: one compensates for harm while the other prevents it." *Id.* at 30. Although Defendants respectfully disagree with the Court's conclusion that the Privacy Act is not an adequate alternative remedy, the Court's analysis is not inconsistent with the separate and well-established principle that the possible availability of compensatory relief weighs heavily against a finding of irreparable harm for preliminary injunction purposes.

"Even if the plaintiffs have a high probability of success on any one issue, the fact that they must run the table to receive their desired relief craters their overall odds." *Id.* That is because "[a]s probabilities are multiplied, their product shrinks rapidly, which means the mere existence of multiple hurdles tips the scales against granting a preliminary injunction." *Id.*

The same "unfavorable structure" militates strongly against a preliminary injunction here. As noted, just to prevail on the merits, Plaintiffs will have to succeed on at *least* four issues. First, to establish standing they must demonstrate a "concrete harm" of the sort "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," including "reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC*, 594 U.S. at 425. Second, Plaintiffs must show that the agencies' provision of access to agency systems qualifies as a final agency action for purposes of the APA. Third, Plaintiffs must demonstrate that the availability of monetary damages under the Privacy Act does not qualify as an adequate remedy precluding a cause of action under the APA—particularly given Congress's implied *preclusion* of injunctive relief under the Privacy Act for the types of claims Plaintiffs assert here. And fourth, Plaintiffs would have to demonstrate that the provision of access does not fall within the Privacy Act's exception for agency employees with a need for the record in the performance of their duties.

We discuss each of these issues individually below. But for present purposes, it suffices to note that each of the four issues is substantial. As to standing, although this Court previously held that the Amended Complaint adequately alleged standing to sue DOL and HHS for violating the APA and the Privacy Act, the Court acknowledged in doing so both that the common-law tort it identified as providing a sufficient analog (the tort of intrusion upon seclusion) "was not a tort heard in the common law courts of England, or at the Founding," MTD Order at 14 n.8, and

predicated on allegations that are "different in kind" from the sorts of concrete harms (like peeping into someone's bedroom window) traditionally encompassed by the tort, *id.* at 15–16 (quotation marks omitted); *see also Am. Fed'n of Tchrs.*, 2025 WL 1023638, at *5 (Richardson, J., concurring) ("The harm that might come from granting database access to an additional handful of government employees . . . strikes me as different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi."). As to the final agency action requirement, the access decisions Plaintiffs purport to challenge are fundamentally unlike the five actions listed in the APA as types of agency action, 5 U.S.C. §§ 551(4) ("rule"), (6) ("order"), (8) ("license"), (10) ("sanction"), (11) ("relief"), and are also not "final" in any traditional sense (*e.g.*, they have no "direct and appreciable legal consequences" for any of the Plaintiffs, *see Cal. Comm. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019), and are also tentative and interlocutory in nature, as the nature of the DOGE Teams' composition and projects are in flux). As to the APA cause of action question, this Court previously acknowledged that "[t]his argument is formidable," MTD Order at 29, and "that there are many cases from this District that broadly declare that 'a plaintiff cannot bring an independent APA claim predicated on a Privacy Act violation.'" *Id.* at 31. And for good reason; the Privacy Act permits certain forms of injunctive relief and, by implication, precludes all others, and provides for monetary damages under other circumstances. The Privacy Act does not permit organizations to sue for injunctive relief over a decision to provide access to particular government employees. And although the Supreme Court has implied in a footnote that plaintiffs may seek non-monetary relief under the APA for Privacy Act violations, *see Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004), that footnote is plainly dicta. Overcoming all these obstacles, moreover, merely gets Plaintiffs to the merits of their Privacy Act claim. The Privacy Act

authorizes disclosure to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1).

This multiplicity of independent barriers to relief is significant in assessing whether Plaintiffs have shown they are entitled to the extraordinary remedy of a preliminary injunction. Fundamentally, it matters that, to obtain an injunction, Plaintiffs must prevail on all those questions while the Government need prevail on just one. This Court should require the clearest of showings before granting Plaintiffs an injunction that requires resolving all of these questions in Plaintiffs' favor. *See Am. Fed'n of Tchrs.*, 2025 WL 1023638, at *4 (Richardson, J., concurring) ("And for each of the five issues, the plaintiffs had to show their likelihood of success was not just high but extremely high—otherwise, the multiplicative product of the five probabilities, i.e. the likelihood of winning the entire case, would be too low."). As discussed in the following sections, Plaintiffs do not meet that demanding standard.

### B. Plaintiffs Fail to Establish Standing for Their Claims

Plaintiffs' primary contention is that they are likely to establish standing based on "past and ongoing unlawful disclosures of their [members'] private and confidential records to DOGE Team members." PI Brief at 23. Plaintiffs are unlikely to establish that mere access to information they voluntarily provided to the agencies provides them with standing.

At its "irreducible constitutional minimum," the doctrine of standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560. As organizations, Plaintiffs have two routes to demonstrate standing: "associational standing—*i.e.*, relying on their members' injuries—or

organizational standing—*i.e.*, relying on their own." MTD Order at 11 (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914, 919 (D.C. Cir. 2015)).

Plaintiffs advance only associational standing against DOL and HHS. *See* PI Brief at 22–27.[14] To establish associational standing, Plaintiffs must demonstrate that "(1) at least one of [its] members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Elec. Priv. Info. Center v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019) (citations omitted); *see also Ass'n of Flight Attendants—CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009).

As the Court noted in its Motion to Dismiss Order, "the bulk of the action lies in requirement one" and whether Plaintiffs can establish that one of their members has sustained an injury in fact. MTD Order at 12. Injuries in fact are those which are "particularized," "actual or imminent," and "concrete." *Id.* (quoting *TransUnion*, 594 U.S. at 423). Further, injuries are "concrete" when they bear a "close relationship" to a "harm traditionally recognized as providing a basis for a lawsuit in American courts[.]" *TransUnion*, 594 U.S. at 417, 424 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–341 (2016)). Plaintiffs' claims fail on both the "actual or imminent" and "concrete" prongs.

---

[14] As Defendants argued in their Motion to Dismiss, Plaintiffs also lack organizational standing to sue DOL and HHS. *See* ECF No. 49 at 19–21. The Court did not address organizational standing in its Order on the motion to dismiss (except as to CFPB, against whom Plaintiffs do not seek relief in the PI Motion). *See* MTD Order at 20–23. And because Plaintiffs do not discuss organizational standing in their PI Brief, we do not address it here either.

### 1. Plaintiffs fail to establish a likelihood of concrete injury

Plaintiffs allege concrete injury through DOGE-affiliated employees' access to agency systems containing their members' personal information. At the Motion to Dismiss stage, the Court found such claims were akin to the common law torts of intrusion upon seclusion and breach of confidence. MTD Order at 14–19. Although Defendants disagree with the Court's analysis, discovery has plainly confirmed that DOGE Team access alone bears no resemblance to the torts of intrusion upon seclusion, breach of confidence, or any other harm traditionally recognized as providing a basis for a lawsuit in American courts.

The tort of intrusion upon seclusion makes liable any person "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B; *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989) (cleaned up). The tort has three elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person." *Wolf*, 553 A.2d at 1217 (cleaned up). The D.C. Court of Appeals has explained that the "the kind of invasion that this cause of action seeks to redress" are various forms of offensive "invasions" including harassment, peeping, eavesdropping, etc. *See id.* at 1217–18; *see also Krakauer v. Dish Network*, 925 F.3d 643, 653 (4th Cir. 2019) (addressing "intrusions made via phone calls"). Or, as then-Judge Barrett termed it in a

case cited by *TransUnion*, "irritating intrusions." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *see also TransUnion*, 594 U.S. at 425.[15]

First, discovery has made clear that there has been no "invasion" or "interference" to begin with. Plaintiffs are correct that, in evaluating standing, the Court must "assume [Plaintiffs] will prevail on the merits." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011). At the same time, "[i]n the context of a preliminary injunction motion, [courts] require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (internal quotations and citations removed); *see also Warth v. Seldin*, 422 U.S. 490, 501-02 (1975). In other words, "a plaintiff must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation[,]" including that "[a]t later stages of [] litigation—including at the preliminary injunction stage—plaintiffs will no longer be able to rest on mere allegations, but must set forth by affidavit or other evidence specific facts that establish that there is a substantial likelihood plaintiffs have standing." *Am.*

---

[15] For additional examples of injury contemplated by the tort of intrusion upon seclusion, *compare Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022) (finding standing where defendants had obtained plaintiffs information to mail unsolicited advertising materials to the plaintiffs' homes); *Krakauer*, 925 F.3d at 653 (addressing "intrusions made via phone calls"); *Gadelhak*, 950 F.3d at 462 (finding standing based on "irritating intrusions" caused by unwanted text messages, which is "analogous to [the] type of "intrusive invasion of privacy" covered by the tort of intrusion upon seclusion); *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345 (6th Cir. 2023) (concluding that "invasion-of-privacy-like harm flow[s] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into [the recipient's] private sphere"); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (standing based on unwanted telephone communications because they were an "unwanted intrusion into [the plaintiff's] peace and quiet"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir. 2025) (explaining that other courts have "found that the harm caused by *unwanted communications* bears a close relationship to intrusion upon seclusion" (emphasis added)).

*Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, No. CV 25-339 (JDB), 2025 WL 1129227, at *11 (D.D.C. Apr. 16, 2025) (internal quotes and cites removed).

Here, discovery has confirmed that DOGE-affiliated employees are both formally and functionally employees of the agencies at which they work and bound by agency rules of behavior not to disclose or misuse the information they access. *See infra* at 34–38. Plaintiffs' discovery inquiries have not revealed instances where DOGE Team access resulted in a member of the team introducing or "thrust[ing], forc[ing], or driv[ing] in" their presence into the personal lives of Plaintiffs' members in any perceivable way. *Intrude*, Oxford English Dictionary, https://www.oed.com/dictionary/intrude_v?tab=meaning_and_use#164205. Indeed, there is no allegation that Plaintiffs' members are even certain their specific records have been accessed by the DOL or HHS DOGE Teams. In sum, this is not the "irritating intrusions" envisioned by the tort of intrusion upon seclusion. *Gadelhak*, 950 F.3d at 462; *see also* Restatement (Second) of Torts § 652B (1977) ("Locating and supplying information for one's own files is not an intrusion"); *Tureen v. Equifax, Inc.*, 571 F.2d 411, 416 (8th Cir. 1978) (finding that searching internal corporate files does not constitute an intrusion).

Second, Plaintiffs' members voluntarily provided the information in these systems to the agencies. They cannot then maintain an expectation of privacy for these records from agency employees to whom they provided the records. *See Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 711–12 (D.C. 2009) ("Without an allegation that the data involved here were disclosed to and viewed by someone unauthorized to do so, appellants have failed to state a claim[.]"); *Wolf*, 553 A.2d at 1218 ("a colloquy in which [plaintiff] voluntarily participated, could hardly be considered intrusive.").

Third, even if Plaintiffs could show that DOGE-affiliated employees' access could be analogized to an "invasion or interference" that has traditionally been actionable, the access is not at all analogous to the types of conduct that have been deemed "highly offensive to an ordinary, reasonable person" for purposes of the tort. As noted above, there is no contention that Plaintiffs' members' information has been shared outside the agency or to others likely to misuse their information. Essentially then, Plaintiffs' claim of injury amounts to the following: (1) they provided information to the agencies knowing that employees would be authorized to access it as necessary; and (2) a defined group of other government employees are viewing their information, who plaintiffs claim have not demonstrated a need to access the information, but who are bound by the same legal and ethical restrictions from exposing it outside the agency.

Although Congress may be able to "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law," ECF No. 78 (quotation marks omitted; alteration supplied by Court), Plaintiffs have not identified a single case suggesting that mere intra-governmental sharing of information such as this, without more, is analogous to any injury recognized as a basis for an intrusion-upon-seclusion claim. Indeed, as in *TransUnion*, in practice, Plaintiffs' members would have no reason to *even know* that a DOGE-affiliated employee has accessed their information. *See* 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an injury sufficient to support standing where no evidence showed they "even knew" their files contained inaccurate information). Even if DOGE-affiliated employees' access technically violated the Privacy Act—which, respectfully, it does not—courts "cannot treat an injury as concrete for Article III purposes based only on Congress's say-so." *Id.* at 426 (cleaned up). The access allegations here are simply nothing like the sorts of objectively "highly offensive" intrusions that have been the basis of liability in intrusion-upon-seclusion suits.

The same is true for breach of confidence, which "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." MTD Order at 18 (quoting *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019)). As explained above, the information was provided with the expectation that the Government would use it. Again, Plaintiffs provide no examples of the tort being applied to intra-governmental disclosures of the sort at issue here. Thus, there is no breach in providing authorized employees with access to information which was given in confidence.

## 2. Plaintiffs fail to establish a likelihood of actual and imminent injury

For the reasons explained above, DOGE-affiliated employees' access does not itself give rise to an actionable Article III injury. Nor can Plaintiffs establish any other imminent injury. Imminent injury is "certainly impending" and mere "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Thus, for example, the Court rightly dismissed any claims Plaintiffs raised as "knock-on harms[,]" such as employment retaliation and disruption of patient care. MTD Order at 13 n.6. And as discussed above, Plaintiffs do not allege any other current or certainly impending future harms; instead, they assert that the access itself is the harm that confers them standing (and gives rise to irreparable harm). For reasons previously explained, that is incorrect.

***

Plaintiffs have not established that one of their members would have standing to bring this suit.[16]

_____

[16] Defendants recognize that the Court previously rejected their argument that the participation of Plaintiffs' members is necessary, a separate argument which, if accepted, would also defeat Plaintiffs' claim to associational standing. MTD Order at 19–20; *see* ECF No. 49 at 18. For

### C. Plaintiffs Fail to Establish Likelihood of Success on their APA Claims

#### 1. Plaintiffs do not challenge final agency action

Plaintiffs are also unlikely to prevail on their claims because they do not challenge any final agency action. 5 U.S.C. § 704. The Court previously concluded that Plaintiffs plausibly alleged the adoption of a "policy" of granting broad access to sensitive record systems. MTD Order at 25–27. Defendants respectfully disagree with the Court's conclusion for the reasons stated in their Motion to Dismiss. The facts borne out through discovery, however, confirm at this stage of the litigation that there is no such policy at either DOL or HHS.

DOL's Rule 30(b)(6) deponent made clear, for instance, that DOGE Team members at that agency go through the same process for access to DOL systems as any other employee. Kryger Dep. at 77:25–79:11. DOL assessed the DOGE Team members' need before granting access. *Id.* 78. Plaintiffs point to the fact that DOL has granted broad access based on the directives in the EO. PI Motion at 12. The access granted is not indicative of a policy, but rather that the President has given DOGE Teams a broad mandate within the agencies. That DOL has not adopted an across-the-board policy is further evidenced by DOL's *denial* of access to members of the DOGE Team to the Adobe Licensing Portal system. *See* ECF No. 80-5 at 18-20; Kryger Dep. 87:22–88:5. Plaintiffs attempt to downplay those denials, *see* PI Brief at 13, but the denials demonstrate that DOL exercised case-by-case judgment as to when access grants was appropriate.

HHS, similarly, does not have a blanket policy of granting access to DOGE team members, such that APA review would be appropriate. As described above, HHS has made no changes to any

_____

preservation of the argument, Defendants contend that the appropriate remedy in a case where a Plaintiff's member's information was disclosed to a non-approved individual—which is not the case here—is damages pursuant to the Privacy Act. 5 U.S.C. § 552a(g)(4).

of its practices concerning access to records since January 19. Wendel Dep. at 37:13-16; *see also supra* at 7. Access for each of the HHS DOGE Team members is granted or revoked based on their specific work needs at the time, just like any other employee of HHS. *Id.* at 36:6–39:19. The discovery also demonstrates the absence of any blanket policy in an even more fundamental respect: namely, the vastly *different* access given to different DOGE-affiliated employees, based on their individual work needs. *See supra* at 7–8, 10–11; *infra* at 40.

DOL's and HHS's actual practices with respect to granting access to the agencies' systems—rather than Plaintiffs' mere allegations—readily distinguish this case from the facts of *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), where the EEOC had an informal policy of "disclosing confidential information" as a matter of course. *See id.* at 929–30. Here, there is no such policy at either DOL or HHS—access is granted or denied based on the specific need of the person seeking access.

More fundamentally—and although the Court previously held to the contrary—the agency's onboarding of new personnel and its decision to grant those new employees access to data systems does not alter Plaintiffs' members' rights or obligations, nor carry legal consequences for those members. In *Venetian Casino*, the court recognized that unauthorized third-party disclosures can have direct, immediate consequences for plaintiffs. *Id.* at 931. By contrast, review of data contained in internal agency systems by agency employees does not threaten the same immediate harms. *Cf. Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245–50 (11th Cir. 2022) (en banc) (explaining that without third-party disclosure, claims founded on internal disclosure of data do not state a cognizable injury for standing purposes). As noted above—and similar to *TransUnion*—there is indeed no reason Plaintiffs would necessarily know about particular review of data or fear imminent external disclosure (again, they do not even

33

meaningfully argue that there is a significant risk of imminent external disclosure here). Here, Plaintiffs' APA claims are clearly an attack on DOL's and HHS's "day-to-day operations"—hiring and data access decisions for individual employees—which are not properly the subject of APA review. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).

### 2. Plaintiffs cannot assert violations of the Privacy Act through the APA.

Plaintiffs are also unlikely to ultimately prevail on the merits of their claim that DOL's and HHS's access decisions run contrary to the APA because they violate the Privacy Act, because the Privacy Act's comprehensive statutory scheme precludes APA review. *See* ECF No. 49 at 25–28. Defendants recognize that the Court previously rejected Defendants' "formidable" legal argument on this point. MTD Order at 28–33. Defendants raise the issue here to preserve it and for purposes of any appeal, and because the uncertainty surrounding whether Plaintiffs will prevail on that argument further weighs against preliminary injunctive relief. Because the argument is a legal one, Defendants incorporate herein their previous argument.

### 3. DOGE-affiliated employees' access is not contrary to the Privacy Act and related regulations

Even if the Court could reach the merits of Plaintiffs' APA claim—and for all the reasons stated above, it cannot—Plaintiffs are unlikely to succeed on the merits of that claim. DOGE-affiliated employees' access is not contrary to the Privacy Act or its implementing regulations because these individuals are agency employees with a need for the records to perform their duties. And DOGE-affiliated employees' access—even if it could be characterized as a final agency action subject to arbitrary-and-capricious review—is not arbitrary and capricious.

#### a. The access does not violate the Privacy Act

##### i. DOGE-affiliated employees are employees of the Agency Defendants

As discovery in this matter confirms, DOGE-affiliated employees are employees of the

agencies where they work. As such, they may access the record systems in question as the Privacy Act permits access to "officers and employees of the agency which maintains the record." 5 U.S.C. § 552a(b)(1).

Plaintiffs concede, as they must, that the employees in question have been "papered"—or formally hired—either by the agency at which they work, or by another agency which, in turn, has detailed the employee to the relevant agency. PI Brief at 37; *see also* ECF No. 80-5 at 6–20 (detailing the employment arrangements of the DOGE Teams at DOL and HHS). Accordingly, Plaintiffs fall back on an argument that, despite these working arrangements, the DOGE-affiliated employees are functionally employees of USDS. PI Brief at 37–42. But initially, any such "functional" test would not apply to the relevant employees. The Court in ruling on the Motion to Dismiss applied the functional standard only to detailees, not direct employees, like some of the employees in question. *See* MTD Order at 34–35 (stating that "the cases [Defendants] cite did not determine that a *detailee* was an employee of the agency to which he was detailed merely because he was detailed there" and "these cases show that, to determine a *detailee's* employment, the D.C. Circuit has adopted a functional approach[.]") (emphasis added) (internal citations and quotations omitted). Further, all the current detailees at DOL and HHS come from other agencies, not USDS. Thus, there is no basis to apply the functional test to the employees at issue at DOL and HHS.

Even were the functional test to apply, DOGE Team members are not functional employees of USDS. Previously, the Court found that the Amended Complaint plausibly alleged that USDS personnel were "working on USDS initiatives, for USDS purposes, as directed by USDS leadership." *Id.* at 35. Plaintiffs' PI Brief largely repeats this argument, but fails to support it with real world evidence to refute that DOGE Team employees are employees of their agencies working

to further goals of modernizing agency systems of records and eliminating waste, fraud, and abuse in agency programs.

First, as noted above, the employees in question are either direct employees of DOL or HHS or detailed to those agencies to work on DOGE Teams. DOGE Teams are established within the agencies they work. *See* Exec. Order No. 14,158, § 2(c). True, the Court stated that "established within their respective Agencies" may not necessarily mean the agency head must "establish a DOGE Team consisting of employees of their respective Agencies[.]" *See* MTD Order at 34. We respectfully disagree with that reading of the Executive Order. But in any event, in practice, as shown, DOGE Teams uniformly consist of agency employees or detailees to the agency.

Plaintiffs seek to undermine this straightforward employment relationship by noting that USDS may consult with the hiring agency regarding hiring. PI Brief at 38; *see also* Exec. Order No. 14,158, § 2(c). Consulting on hiring, however, does not negate the fact that the agency makes the final hiring decision. *See* Exhibit E to Declaration of Andrew M. Bernie (USDS Dep.) at 32:22–33:4. Consultation is also a wholly unremarkable proposition. For example, consultation is common in any hiring process, when a hiring authority calls a former employer for a reference. No one would contend that an employee was not truly hired by a new agency merely because the new agency called a reference at an agency where the employee used to work. Plaintiffs contend that "[t]he evidence here shows that DOGE is in fact directing the placement and assignment of DOGE Team members at the agencies," PI Brief at 38, but the supposed evidence they cite in support of this proposition (a deposition cite from this case and a declaration filed in a different case) is that Brad Smith in one instance and USDS in another instance "recommended" particular hires. *Id.* at 38-39. And in any event, even if USDS could be characterized as playing some role in

the hiring decision, that does not change the basic point that, *once hired*, the employees work for the Agency Defendants, not USDS.

Second, DOGE Teams work at their agency to advance their agency's work, not for USDS's internal benefit. Plaintiffs' arguments otherwise ignore the difference between the larger DOGE Agenda and USDS. Executive Order 14,158 establishes an executive-wide initiative to modernize technology and software to maximize government efficiency and productivity. Exec. Order No. 14,158, § 1. USDS, in turn, was reconstituted from the former U.S. Digital Service to advise and consult with agencies on the implementation of that government-wide initiative. *Id.* § 4(a); *see also* USDS Dep. at 36:14–24. But the goal is to improve agency systems, not to improve USDS. *See* USDS Dep. at 79:11–20. Therefore, DOGE Teams, within agencies, are working to implement a government-wide initiative at their agency, on behalf of and for their agency.

Finally, DOGE Team employees are supervised by their agency leadership. This is self-evident for direct employees. It is equally self-evident for the DOGE-affiliated employees at DOL and HHS who have no employment relationship with USDS. And as to detailees at DOL and HHS, those individuals are not detailed from USDS, but from other agencies, meaning that the terms of their supervision while on detail does not trace back to USDS.

Plaintiffs contend that none of this matters because, according to Plaintiffs, DOGE-affiliated employees are functionally controlled by USDS. PI Brief at 40. But nothing in discovery supports this assertion. Initially, USDS's advising and consulting function does not rob the agency of final decision-making authority. *See* USDS Dep. at 32:22–33:4. Take as a rough example the Privacy Act itself, which provides that OMB shall provide guidelines, continuing assistance, and oversight of the implementation of the Act. 5 U.S.C. § 552a(v). That does not mean the Privacy

Act is an OMB initiative, that implementation of the Act at an agency is done at the behest of OMB, or that, if an agency employee consults with OMB, they are functionally an OMB employee.

Discovery has also confirmed that DOGE-affiliated employees at DOL and HHS are supervised in executing their agency DOGE work by the agency, not by USDS. ECF No. 80-5 at 30; USDS Dep. at 80:10–15; 81:6–11; 85:2–5; 100:22-101:1; Kryger Dep. at 23:14–15; 30:4–12; 39:15–20; Rice Dep. at 23:4–27:21. To take one example, when asked what would happen if a DOGE Team employee disagreed on an aspect of implementing the DOGE Agenda with a non-team employee, the DOL deponent stated that the issue would be resolved through the agency chain of command, possibly all the way to the Secretary's office. Kryger Dep. at 38:13–39:5.

As also outlined in discovery, DOGE-affiliated employees at the Defendant Agencies who are also employed by USDS are supervised in their USDS work by USDS, and by the Defendant Agency when working on agency work. USDS Dep. at 27:14–17; 81:7–13; 85:2-11; 88:7–13. They are issued separate laptops, *id.* at 99:5515, and encouraged to keep their agency work at the agency, and USDS work at USDS, *id.* at 99:24–101:2. Plaintiffs suggest that the line between the two can occasionally be somewhat unclear when an employee is both a DOGE Team member and advising the agency in their capacity as a USDS adviser, as is the case with Brad Smith. *See* PI Brief at 10, 38–39. But the fact that Mr. Smith may advise in his USDS capacity and implement in his DOGE Team capacity does not dissolve the division of labor and supervision between USDS and HHS. *See* USDS Dep. at 27:14–17; 86:23–87:5; 88:7–13; 88:21–24.[17] And in any event, Mr. Smith has not been granted access to any sensitive systems at either DOL or HHS.

---

[17] Plaintiffs also point to a single line within the agreements that originally sent Amy Gleason and Brad Smith from USDS to HHS for the proposition that, in some instances, USDS may supervise

### ii.    DOGE Teams require access to agency systems

As outlined above, to benefit from the Privacy Act's employee exception, the individual must be both an "officer[s] or employee[] of the agency" and "have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The D.C. Circuit has explained that access is consistent with that requirement if "the official examined the record in connection with the performance of duties assigned to him and [if] he had to do so in order to perform those duties properly." *Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000).

Judicial review of DOL and HHS's access determinations based on need is necessarily narrow. As noted above, the APA was not intended to superintend agency's "workaday" dealings. *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). And neither the Privacy Act nor any other source provides any specific standards to apply when assessing an agency's conclusion that access is needed. Thus, "although there is some 'law to apply,' the scope of judicial review is narrow" where, as here, a statute provides few criteria to guide judicial review. *Sluss v.*

---

those employees' agency work. *See* PI Brief at 40. First, both Ms. Gleason and Mr. Smith are now employed directly by HHS. ECF No. 80-5 at 6, 17. As such, the agreements in question, ECF No. 80-30 (Gleason Agreement) and ECF No. 80-31 (Smith Agreement), are no longer operative and do not support prospective relief. The Agreements both state that the "USDS Assignees will report to and be supervised by the [CMS/HHS] Administrator or her designee when performing work under this Agreement at [CMS/HHS] facilities and on [CMS/HHS] systems. USDS assignees shall, however report to and be supervised by their USDS supervisor when at USDS facilities and on USDS systems, even when performing work within the scope of this Agreement." Gleason Agreement at 2; Smith Agreement at 2. This language confused many at the deposition. *See* USDS Dep. at 83:4–85:19; Rice Dep. at 23:4–27:21. But it did not alter both USDS and HHS's conclusions that Ms. Gleason and Mr. Smith were to be supervised by HHS while doing HHS work. Further, neither Ms. Gleason nor Mr. Smith can access HHS systems from USDS equipment; they must use HHS equipment to access HHS systems. *See* Wendel Dep. at 51:15–18. And putting aside that these agreements are no longer operative, Mr. Smith has not been granted access to any sensitive systems, and Ms. Gleason has only been granted access to a single system at HHS.

*U.S. Dep't of Just., Int'l Prisoner Transfer Unit*, 898 F.3d 1242, 1252 (D.C. Cir. 2018) (quoting *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 494 (2015)).

As Judge Richardson recently opined, "[t]he agency employees here are tasked with 'improving the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems.'" *Am. Fed'n of Tchrs.*, 2025 WL 1023638, at *6 (quoting Exec. Order No. 14,158. § 4(a)). It therefore, "does not stretch the imagination to think that modernizing an agency's software and IT systems would require [] access to those systems, including any internal databases." *Id.* Judge Richardson is correct.

Plaintiffs argue that the DOL and HHS granted "agency-wide system access" without properly probing the DOGE Team Members' need to know. PI Brief at 44; *see also id.* at 42–43. But this is simply incorrect. Discovery in this matter confirms that access was not granted "agency-wide" or to all the records systems at DOL and HHS. Instead, the DOGE-affiliated employees requested, and were granted access to, a limited subset of systems. *See* ECF No. 80-5 at 5-20 (providing the systems to which each USDS Employee was granted access). As discussed above, among the ten HHS DOGE-affiliated employees, one has access to one system, another has access to twelve; others have access to an intermediate number; most access is read-only but in a few instances access has been granted at the administrator level; and access to particular systems is deactivated when it is no longer needed. *See supra* at 8. Similarly, at DOL, three individuals have been given access to, collectively, eight systems containing sensitive information, with two of the three being granted access to five sensitive systems, and the other being granted access to four. *Id.* at 10-11. And at both agencies, in addition to general training required of all DOGE-affiliated employees, employees take additional or specialized training to the extent they need access to systems that require such training. *Id.* at 9-12. This is not an "agency-wide" or blanket policy of

universal access. It is a practice of granting individual-by-individual, system-by-system, access as needed to perform job duties—exactly what the Privacy Act permits.

Additionally, discovery confirms that the process and evaluation did not differ from the normal course. For example, in the DOL deposition, the deponent described the normal course of evaluating requests for access. *See* Kryger Dep. at 57:6–58:25. This includes evaluation of the reason, or need, for the request, but sometimes the "reason for the request is apparent based on the system type." *Id.* at 57:18–19. In the normal course, an authorizing official may ask follow-up questions to determine an applicant's need for system access. *Id.* at 58:21–25. But that is much less likely when the need is apparent from the circumstances of the application. *Id.* at 71:14–21. In the case of the DOL DOGE Team, the deponent testified that the need of the team was readily apparent for the systems they were granted access to. *Id.* at 72:9–19; 76:21–77. That does not mean the process was altered for the DOGE Team. *See id.* at 77:21–25. They just needed fewer follow-up questions because their need for access was apparent. *Id.* at 75:13–19; 79:6–11. Much the same is true at HHS. *See* Wendel Dep. at 36:9–20; 38:2–39:19.

Plaintiffs can point to no statute or regulation imposing a specific process or evaluation criteria in making access determinations that was even arguably violated here. Simply put, the processes in place grant the authorizing officials the discretion they exercised to make the determinations they reached. Indeed, while Plaintiffs demand unspecified additional process that the Privacy Act does not require, they do not really attempt to show that any particular access decision was wrong. Plaintiffs fail, for example, to identify a particular system they believe DOGE-affiliated employees gained access to without a proper need to know. The only systems identified in this portion of Plaintiffs' Motion are the Unemployment Insurance system at DOL, HHS's National Directory of New Hires (NDNH), and the Healthcare Integrated General Ledger

Accounting System (HIGLAS), which constitutes HHS's basic accounting system. PI Brief at 45. But as discovery makes clear, there was ample justification for these systems.

DOL DOGE Team Members were granted access to the Unemployment Insurance system on March 21, 2025. *See* ECF No. 80-5 at 17-18. Prior to their access, the President singled out *this very system* as in need of auditing for waste, fraud, and abuse. *See* Exec. Order No. 14,243. HHS gave similar reasons for granting access to NDNH and HIGLAS, including searching for waste, fraud, and abuse. *See* HHS (Wendel) Dep. at 42:17–44:19. HIGLAS, for example, is the Center for Medicare & Medicaid Services' (CMS) accounting system that standardizes and centralizes federal financial accounting functions for all of CMS's programs. *See* Centers for Medicare and Medicaid Services, Healthcare Integrated General Ledger Accounting System (HIGLAS), https://www.cms.gov/about-cms/information-systems/higlas. It does not stretch the imagination that the authorizing officer could find a need for a software modernization and efficiency expert to access such a system. And as one of HHS's deponents explained, an agency cannot know whether and to what extent a particular system is associated with waste, fraud, and abuse without first examining that system for waste, fraud, and abuse. Wendel Dep. at 51:24–52:5.

Second, Plaintiffs argue that the basis relied on in granting DOGE Team Members access was insufficient because the agencies relied on the Executive Order 14,158, but that Order did not include the "magic" words of "waste, fraud, and abuse." PI Brief at 45; *see also id.* at 44–46. This argument likewise fails. Initially, even confining the analysis to Executive Order 14,158, the purpose of that Order was to "establish[] the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software *to maximize governmental efficiency and productivity*." Exec. Order No. 14,158, § 1 (emphasis added). It is obvious that one aspect of maximizing efficiency and productivity is minimizing and eliminating

waste, fraud and abuse. And subsequent Executive Orders have made that explicit. *See* Exec. Order No. 14,210, § 1 (February 11 Executive Order identifying purpose to "eliminat[e] waste, bloat, and insularity"); Exec. Order No. 14,222, § 3(b) (February 19 Order directing process to review all existing contracts and grants and specifically directing review "for waste, fraud, and abuse"). Thus, as revealed in discovery, it is unsurprising that DOGE-affiliated employees requested, and were granted access, to certain agency information systems to audit their performance and detect waste, fraud, and abuse. That is quite literally the job they are tasked to do—indeed, tasked by the President himself to do.

### b. Since access does not violate the Privacy Act, access does not violate the agency regulations implementing the Privacy Act

As the Court noted in its Motion to Dismiss Order, each of the *other* regulations cited by Plaintiffs prohibit the agencies from disclosing records unless permitted by the Privacy Act. MTD Order at 42 (citing 20 C.F.R. § 10.10; 45 C.F.R. § 5.9(a)). As noted above, access to the systems in question in these circumstances does not violate the Privacy Act. *See supra* at 34-43. As such, Plaintiffs have failed to show that they are likely to succeed on the merits of their APA claim on the grounds that DOL and HHS have also violated these regulations.

### 4. Plaintiffs are unlikely to prevail on their arbitrary and capricious claim.

Plaintiffs assert that providing access to employees associated with USDS fails arbitrary and capricious review under the APA. PI Brief at 29. This argument underscores why Plaintiffs have not articulated proper APA claims in the first place; agencies are not subject to judicial review every time they decide to give a particular employee access to a system that they believe the employee needs to access. In any event, even if the Agency Defendants' decisions were subject to arbitrary-and-capricious review, their decisions easily satisfy that deferential framework.

As demonstrated above, and as discovery has revealed, the alleged "DOGE Data Access Policies" are a fiction of Plaintiffs' creation. There was no "adopt[ion]" of any policy, as Plaintiffs insist, PI Brief at 32, merely the onboarding of new employees and individualized grants of access to agency data systems. And as this Court previously acknowledged, Plaintiffs failed to even adequately allege that there was any change to the agencies' relevant regulations and procedures. MTD Order at 43–44. There was therefore no "important aspect of the problem" for DOL or HHS to consider. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Augo Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs' alleged change in "policy," moreover, amounts to a disagreement with the internal operation of DOL and HHS—*i.e.*, which employees were allowed access to what data systems. Or, at most, flyspecking as to the agencies' personnel decisions. PI Brief at 31. Arbitrary and capricious review, however, is highly deferential to the agency, and "a court is not to substitute its judgment for that of the agency." *Id*. The agency is afforded a presumption that its actions are valid and need only articulate a "satisfactory explanation" that has a "rational connection between the facts found and the choice made." *Id*. And courts should be wary of interfering with the day-to-day management of federal agency business, even if Plaintiffs identify a specific allegedly improper action within such ordinary decisions. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004); *People for the Ethical Treatment of Animals v. U.S. Fish & Wildlife Serv.*, 130 F. Supp. 3d 999, 1001–02 (E.D. Va. 2015).

Nor can Plaintiffs show that DOL or HHS failed to consider any relevant reliance interests. *See* PI Brief at 34. As evidenced by the Privacy Act itself, agencies are permitted to grant access to covered information to their employees and officers, subject only to the requirement that there is a need to know, which was satisfied as discussed above. *See supra* at 39-43; 5 U.S.C.

§ 552a(b)(1). Plaintiffs also largely ignore that members of the DOGE Teams at DOL and HHS are subject to the same training requirements, conflicts of interests checks, and standards of conduct as any other employee of the agencies, *see supra* at 6–13, further undermining their contention that granting access was arbitrary or capricious.

## III. The Balance of Equities Favors Defendants

Although there is no need to consider the remaining two preliminary injunction requirements, they too favor the government.

Initially, the purpose of a preliminary injunction is to preserve the status quo, and "courts must be 'institutionally wary of granting relief that disrupts, rather than preserves, the status quo[.]'" *Hanson v. Dist. of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (quoting *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022)). In this case, the status quo is that DOGE-affiliated employees have had access to the DOL and HHS records they require to complete their work for nearly three months.

More broadly, a preliminary injunction would impinge on two Presidential prerogatives: first, the President's authority over and responsibility for directing agency employees and, second his authority to establish and implement an internal government improvement initiative of high priority to the Executive Branch. An injunction in this circumstance would therefore represent "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Immigr. & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers).

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: April 29, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

MARCIA BERMAN
Assistant Branch Director
Civil Division, Federal Programs Branch

/s/ Andrew M. Bernie
Andrew M. Bernie (D.C. Bar No. 995376)
Trial Attorney
Benjamin S. Kurland (D.C. Bar No.
1617521)
Trial Attorney
Bradley P. Humphreys (D.C. Bar No.
988057)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

*Counsel for Defendants*