# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-----------------------x

AFL-CIO, et al.,           :

      plaintiffs,     :

v.                         :   CASE NO.

DEPARTMENT OF LABOR,       :   1:25-cv-00339-JDB

et al.,                    :

      Defendant.       :

-----------------------x

30(b)(6) Deposition of DOGE

Through KENDALL LINDEMANN

Monday, April 7, 2025

9:33 a.m.

BEFORE: Cassandra E. Ellis, RMR, RDR, CRR,

RSA, CA-CSR 14448, WA-CCR, HI-CSR

Job no: 10515

Page 2

1                    30 (b)(6) Deposition of DOGE

2      through KENDALL LINDEMANN, taken before

3      CASSANDRA E. ELLIS, Registered Professional

4      Reporter, Registered Merit Reporter,

5      Registered Diplomate Reporter, Certified

6      Realtime Reporter, Realtime Systems

7      Administrator; California Certified

8      Shorthand Reporter; Washington State

9      Certified Court Reporter; Hawaii Certified

10     Shorthand Reporter; Notary Public, held in

11     Washington, D.C., on Monday, April 7, 2025,

12     commencing at 9:33 a.m. and concluding at

13     2:16 p.m.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2         ON BEHALF OF THE PLAINTIFFS:
                AMAN T GEORGE, ESQUIRE
 3              MARK B. SAMBURG, ESQUIRE
                DEMOCRACY FORWARD FOUNDATION
 4              P.O. Box 34553
                Washington, D.C.  20043
 5              (202) 448-9090
                Ageorge@democracyforward.com
 6              Msamburg@democracyforward.com

 7

 8         ON BEHALF OF THE PLAINTIFFS:
                ZOILA E. HINSON, PRO HAC VICE
 9              ALEXA MILTON, PRO HAC VICE
                RELMAN COLFAX PLLC
10              1225 19th Street, Northwest
                Suite 600
11              Washington, D.C.  20036
                (202) 728-1888
12              Zhinson@relmanlaw.com
                Amilton@relmanlaw.com
13

14         ON BEHALF OF THE DEFENDANT:
                BRADLEY P. HUMPHREYS, ESQUIRE
15              BENJAMIN S. KURLAND, ESQUIRE
                MARCIA BERMAN, ESQUIRE
16              US DEPARTMENT OF JUSTICE
                1100 L Street, Northwest
17              Washington, D.C.  20005
                (202) 305-0878
18              Bradley.humphreys@usdoj.gov

19

20    ALSO PRESENT:
           Austin Raynor, US DOGE SERVICE
21

22

23

24

25
```

Page 4

```
 1                INDEX TO EXAMINATION

 2    30(b)(6) deposition of DOGE

 3    Through KENDALL LINDEMANN

 4    EXAMINATION                        PAGE

 5        By Mr. George                  5

 6

 7                 INDEXED PAGES

 8                                       PAGE

 9    KENDALL LINDEMANN, sworn           5

10    REPORTER CERTIFICATE               130

11    INSTRUCTIONS TO WITNESS (none)

12    DECLARATION UNDER PENALTY OF PERJURY   129

13    ERRATA SHEET                       131

14

15              INFORMATION REQUESTED

16                    None

17

18       WITNESS INSTRUCTED NOT TO ANSWER

19                          PAGES

20                      16, 22, 47, 121

21

22          INDEX TO PLAINTIFFS EXHIBITS

23                    NONE

24

25
```

Page 5

```
 1              P R O C E E D I N G S
 2            30(b)(6) deposition of DOGE
 3          Through KENDALL LINDEMANN
 4     having been sworn, testified as follows:
 5                   EXAMINATION
 6   BY MR. GEORGE:
 7        Q     It's great to meet you.
 8              I'm Aman.  So I'm just going to
 9     walk through quick preliminaries for how
10     to help us go smoothly.
11              So we'll want to ensure that
12     the court reporter is able to get a
13     really clean written record of our
14     conversation, so it may feel a little
15     unnatural, but if you could give
16     verbal responses to questions rather
17     than nodding or shaking your head,
18     which she can't write down, that would
19     be helpful.
20              And if we can try not to
21     speak over each other.  I'll try and
22     let you finish before I ask another
23     question, and it will great if you can
24     let me finish a question before you
25     start answering.
```

1          Your attorney may object to

2     a question, and that's okay.  He's

3     making an objection for the record,

4     but unless he specifically says not to

5     respond to a question, you should go

6     ahead and answer.

7          If you need to take a break,

8     let me know, let us know, we'll

9     periodically take some breaks, if we

10    do take a break please finish

11    answering whatever question we were

12    talking about, you can go ahead and

13    answer, and then we'll take a break.

14         If you don't understand a

15    question, let me know and I'll try and

16    rephrase it.

17         And if you don't ask me to

18    rephrase a question I assume that you

19    understand it in the way that I ask

20    it.

21         And then, last, if you do

22    answer a question and realize that

23    there was something you forgot say, we

24    can come back to it later.  Let me

25    know and we can come back and get a

Page 7

```
 1      more complete record on the answer to

 2      that question.

 3              So do you understand today

 4      that you will be testifying on behalf

 5      of the US DOGE Service and US DOGE

 6      Service temporary organization about

 7      the topics in the deposition notice?

 8      A    Yes.

 9      Q    All right.  And you understand

10      that you're testifying under penalty of

11      perjury?

12      A    Yes.

13      Q    Is there any reason that you

14      can't give complete and truthful

15      testimony today?

16      A    No.

17      Q    All right.  Can you tell me how

18      you prepared for the deposition?

19      A    Yes.  I worked with the US DOGE

20      Service lawyers and legal team, DOJ

21      lawyers, and discussed with Amy Gleason

22      on the topics.

23              I reviewed documents, the ones

24      in front of me, and did kind of live

25      practice over the last couple of weeks.
```

Page 8

```
 1       Q    Was there anybody that you
 2  interviewed, aside from Amy Gleason, to
 3  prepare?
 4       A    That I interviewed?
 5       Q    Well, you said you had a
 6  conversation with Amy Gleason?
 7       A    Yeah.
 8       Q    Was there anyone else that you
 9  had a conversation with to prepare for
10  the deposition?
11       A    No.
12       Q    All right.  Thanks.
13            So for our purposes, I'm
14  going to say DOGE.  And when I say
15  DOGE, unless I specify otherwise, what
16  I mean is both the US DOGE Service and
17  the US DOGE Service temporary
18  organization, collectively.
19            So maybe we can start there:
20  Could you explain the difference, as
21  you understand it, between the US DOGE
22  Service and the US DOGE Service
23  temporary organization?
24       A    Yes.  So the US DOGE Service
25  temporary organization was established in
```

1      the Executive Order 14158 on January

2      20th, and the primary difference is that

3      the temporary organization has more

4      flexible hiring abilities than the

5      permanent, let's call it, organization.

6              And then the nature of the

7      temporary organization is temporary,

8      right, and expires on July 4th of

9      2026.

10     Q    Do they have different

11     missions, the two organizations?

12     A    Both organizations implement

13     the President's DOGE agenda, as outlined

14     in executive order, and as furthered by

15     subsequent executive orders.

16             So functionally, no, they both

17     implement the same mission.

18     Q    Is there a division of

19     responsibilities between the two

20     organizations?

21     A    There's no functional

22     difference in how they implement the

23     President's DOGE agenda.

24     Q    There's no function difference

25     in how they implement the DOGE agenda,

Page 10

1    but just to be clear, did -- did they --

2    did the two organizations take

3    responsibility for different aspects of

4    the President's DOGE agenda?

5        A    They may have different

6    focuses, but they don't take -- I would

7    not say that they take responsibility for

8    different aspects of the DOGE agenda, no.

9        Q    Could you -- do you understand

10   them to have different focuses?

11       A    Not exclusively, no.

12       Q    Could you give me your best

13   approximation of how you would describe

14   the two focuses of the organizations?

15       A    Sure.  I mean, the permanent

16   organization is not entirely made up of

17   this, but is -- does include a lot of the

18   employees who were employed prior to

19   January 20th, and so the part of the DOGE

20   agenda that is software modernization

21   continues to be a focus of that group.

22            But that, like I said, if

23   that's not exclusive to that group, the

24   temporary organization does do the

25   software modernization initiative, as

Page 11

1      well, and then also helps implement some

2      of the additions to the DOGE agenda that

3      have been since January 20th.

4              But again, both help in various

5      ways.  I would not say those are

6      exclusive.

7         Q    Yeah, understood.

8              And are the employees of the

9      two organizations distinct?

10        A    No, not exclusively.

11        Q    Are you saying that there are

12     employees who are employees of both

13     organizations?

14        A    Oh, I apologize, no.  No, well,

15     you're either an employee of one or an

16     employee of the other.

17        Q    You spoke about employees prior

18     to January 20th being primarily in the

19     permanent organization.

20             Are there any such employees

21     who are employees of the temporary

22     organization?

23             MR. HUMPHREYS:  Objection,

24        form.

25        A    Not according to my knowledge.

1        Q      To the best of your knowledge,

2   there are not employees of the temporary

3   organization who were employees of the US

4   Digital Service prior to January 20th?

5        A      According to the best of my

6   knowledge, yes.

7        Q      Are you familiar with the

8   declaration that Amy Gleason provided in

9   a different case on March 19th?

10       A      Yes, I am familiar.

11       Q      So in that declaration she said

12  there was no organizational chart for

13  DOGE, does that continue to be the case?

14       A      Correct, there's no formal

15  organizational chart.

16       Q      So I'm going to ask you just

17  some questions about how the organization

18  is structured, to understand how it's

19  laid out.

20              Is Amy Gleason the

21  administrator of the US DOGE Service?

22       A      Amy Gleason's active

23  administrator of the US DOGE Service.

24       Q      And is her role as the acting

25  administrator for both organizations?

1        A     Yes, she's acting administrator

2    for both organizations.

3        Q     So she oversees both the

4    software modernization projects that you

5    described, the permanent organization

6    being involved in, as well as overseeing

7    the other aspects of the DOGE agenda work

8    that the temporary organization primarily

9    takes responsibility for?

10             MR. HUMPHREYS:  Objection,

11        mischaracterizes testimony.

12        A     She has formal authority over

13    both organizations as the acting

14    administrator.

15        Q     Is it accurate that she has

16    been in that -- in the role of acting

17    DOGE administrator since around February

18    17th?

19        A     I believe she was appointed

20    acting administrator on February 18th.

21        Q     Okay.  And could you tell me,

22    could you lay out her responsibilities as

23    acting administrator?

24        A     Sure.  So she, like I said,

25    oversees, in a supervisor capacity, both

Page 14

1    the temporary organization and the more

2    permanent organization.

3              She is responsible for kind

4    of the strategy and oversee, like, big

5    decisionmaking as it pertains to the

6    way that the organization implements

7    the mission and the DOGE agenda.

8              And -- yeah, those would

9    be -- and she oversees, like, the

10   different projects, different projects

11   that implement the President's DOGE

12   agenda.

13   Q     USDS DOGE was established in

14   its current form by executive order on

15   January 20th, 2025.

16             The suit in this case was filed

17   on February 5th.

18             Who exercised the authority of

19   acting administrator between February 5th

20   and February 18th?

21   A     Between February 5th and

22   February 18th, there was not a formal

23   acting administrator.  But, at the time,

24   Steve Davis was the senior-most political

25   advisor.  And so there were some

1    decisions such as, like, hiring

2    decisions, for example, that he

3    authorized and that Amy Gleason later

4    ratified.

5        Q     Is Steve Davis currently a

6    member of the US DOGE Service or US DOGE

7    Service temporary organization?

8        A     Yes, he is an employee of the

9    US DOGE Service.

10       Q     He's an employee of the

11   permanent organization?

12       A     He's an employee of the

13   temporary organization.

14       Q     And could you tell me his title

15   within the temporary organization?

16       A     Senior advisor.

17       Q     Would it be accurate to call

18   him, functionally, the chief operating

19   officer of DOGE?

20       A     Steve Davis is a senior

21   advisor, and he gives his advice

22   recommendations on how things should be

23   done.

24       Q     Could you share some of his

25   responsibilities in that role?

1        A      Yeah, so, I mean, as US DOGE

2     Service is a consulting and advisory

3     body, he does help implement that

4     mission.

5              So he gives his expert input to

6     the other USC employees, and some of the

7     DOGE agency teams on how he might

8     implement the President's DOGE agenda.

9        Q      Does he report to Amy Gleason?

10       A      Yes, he reports to Amy Gleason.

11       Q      Are you aware of any orders or

12    directions that Amy Gleason has given to

13    Steve Davis in his role?

14            MR. HUMPHREYS:  Objection,

15        that's outside of the scope.  I

16        instruct the witness not answer.

17              (Instruction)

18            MR. GEORGE:  Can we go off

19        the record for a minute?

20            (Discussion held off the

21        record.)

22            MR. GEORGE:  We can go back

23        on the record.

24    BY MR. GEORGE:

25       Q      We can start with a yes or no

1    answer:  Are you aware of directives that

2    Amy Gleason has given to Steve Davis?

3         A     I'm not privy to every

4    communication that Steve and Amy have

5    between one another.  But I do know that

6    Steve reports to Amy and she has formal

7    authority over him.

8         Q     Are you aware of instances of

9    Amy Gleason giving directives or orders

10   to Steve Davis?

11        A     I'm aware of conversations that

12   they have had, where Amy has maybe -- I'm

13   aware of conversations that they have had

14   with one another, where Amy, like, asks

15   Steve to do something and/or, like,

16   potentially even disagrees with something

17   that is going on and has communicated

18   with him.

19              As far as I don't know exactly

20   what you mean by has ordered him to do

21   something, but I definitely know that

22   they communicate and, like, have back and

23   forth conversation.

24        Q     Does Amy Gleason review any of

25   Steve Davis's work product?

Page 18

```
 1        A      What do you mean by work

 2     product?

 3        Q      For example, written work that

 4     Steve Davis puts together, does it get

 5     reviewed by Amy Gleason before it is

 6     finalized by the organization?

 7              MR. HUMPHREYS:   Objection,

 8        foundation.

 9        A      I am not aware of such work

10     product that would be reviewed.

11        Q      Does -- in Amy Gleason's

12     declaration, that we spoke about earlier,

13     she, I believe, said that there were 79

14     employees across the two organizations,

15     plus ten detailees, is that still,

16     roughly, the staffing of DOGE?

17        A      Roughly, since then I believe

18     there may have been in the process even

19     of one or -- like, a handful of employees

20     being added, but that is about roughly

21     the same.

22        Q      Are there regular DOGE-wide

23     meetings that occur for all of DOGE

24     staff?

25        A      There are lots of
```

Page 19

1    communications across US DOGE Service.

2    I'm not aware of anyone that includes

3    every single member of the US DOGE

4    Service.

5        Q    Are there any meetings that are

6    organizational-wide between the two sides

7    of the house.  So, for example, standing

8    meeting of the permanent organization or

9    a standing meeting of the temporary

10   organization?

11       A    Not one that exclusively

12   contains every member of either

13   organization.

14       Q    Is there any regular meeting

15   that occurs that includes many or most

16   members of the organization?

17       A    The, like, permanent

18   organizations?

19       Q    Either one.

20       A    So the permanent organization

21   has a staff meeting every Tuesday.

22       Q    Okay.  And who leads that staff

23   meeting?

24       A    Amy Gleason.

25       Q    Does the temporary organization

1    have any similar regular meeting cadence?

2        A    Not according to my knowledge,

3    temporary organization does not.

4        Q    Are there any -- is there

5    anybody else within DOGE who plays a

6    leadership role within the organization?

7             We've talked about Amy and

8    Steve, anybody else?

9        A    Yes, there are other senior

10   advisors or more senior-level members

11   within the US DOGE Service.

12       Q    Could you tell me who they are?

13       A    Sure.  I don't know -- I

14   wouldn't say I know every single one, off

15   the top of my head, but a few examples of

16   some would on be, like, James Berman, Rod

17   Smith, Anthony Armstrong, Earl Morris,

18   Junior, more senior political members of

19   the US DOGE Service.

20       Q    Could you describe Elon Musk's

21   role with respect to DOGE?

22       A    Elon Musk is a senior advisor

23   to the President.  He is not an employee

24   of the US DOGE Service.

25       Q    Does Elon Musk meet with

1    leaders of DOGE?

2        A    I'm not aware of every

3    communication that Elon has with members

4    of the US DOGE Service.  He advises on

5    the DOGE policy agenda, right, that the

6    President has outlined.  He advises the

7    President on that, and so I would assume

8    there's some communication, but I don't

9    know the exact cadence or frequency with

10   which that happens.

11       Q    Are you aware of communications

12   between Elon Musk and DOGE leaders?

13       A    Can you define DOGE leaders?

14       Q    The folks that we've

15   identified, so Amy Gleason, Steve Davis,

16   James Berman, Brad Smith, Anthony

17   Armstrong?

18       A    I believe he talks to them on

19   occasion, sure.

20       Q    When you say on occasion, could

21   you -- do you think that that happens

22   weekly?

23            MR. HUMPHREYS:  Objection.

24       I'm going to object on scope and

25            instruct her not to answer.  I

```
 1          think that's beyond decisionmaking

 2          structure.

 3                    (Instruction)

 4               MR. GEORGE:  Can we go off

 5          the record for a minute.

 6                    (Discussion held off the

 7          record.)

 8               MR. GEORGE:  Let's go back

 9          on the record.

10     BY MR. GEORGE:

11          Q     You said that Elon Musk advises

12      the President on the DOGE agenda; is that

13      right?

14          A     Mm-hmm, yes.

15          Q     Does he advise DOGE leaders on

16      the DOGE agenda?

17          A     He's a senior advisor to the

18      President, and he may influence the

19      President's decisions on what the DOGE

20      agenda -- what is included within the

21      DOGE agenda, which then trickles down to

22      how the US DOGE Service implements the

23      DOGE agenda.

24          Q     I think what you're describing

25      is that Mr. Musk advises the President
```

Page 23

1    and that, somehow, trickles down to the

2    DOGE organization.

3            What I'm asking is whether

4    there's direct advice given from Elon

5    Musk to DOGE or DOGE leaders.

6    A    I do not know the nature of the

7    communications between Elon Musk and the

8    leaders within the US DOGE Service.  Like

9    I said, I'm sure that they speak -- I

10   don't know the frequency.  I mean, I do

11   not know exactly what's in those

12   conversations.

13           I do know that he is not a

14   member or an employee, though, of US

15   DOGE Service and doesn't exercise

16   formal authority over anybody within

17   the US DOGE Service.

18   Q    But you understand that the

19   scope of this deposition extends beyond

20   the exercise of formal authority and the

21   actual employment relationships; correct?

22   A    Yes.

23   Q    It also includes the exercise

24   of actual authority, even if not formal

25   within the chain of command that has --

Page 24

1       that exists for DOGE?

2                   MR. HUMPHREYS:  Objection as

3            to the question, which is about

4            the scope of the legal objections

5            and our response.

6                   And I don't think that she's

7            prepared to -- or should be

8            required to answer that question.

9                   MS. HINSON:  Brad, I think

10           that's her preparation for today.

11                  MR. HUMPHREYS:  Yes, she's

12           prepared to answer these questions

13           and, you know, and the topics,

14           and -- but I don't think that she

15           should be required to opine on the

16           scope, itself, of the objections

17           that we've made.

18                  But I understand your

19           question to be:  Does the

20           authority here extend beyond

21           formal.  I will represent that

22           here, on record, and to the

23           witness that, yes, it does, to

24           include any actual authority based

25           on the dictionary definition.

Page 25

 1              If you want to show her our

 2         specific objections, to clarify

 3         that, we would have no objection

 4         to that.

 5              MR. GEORGE:  Great.  Let

 6         me -- good idea.  Let's go

 7         about -- here you go.  Okay.

 8              So I'm just going to read

 9         this, highlight it, underline it

10         and give it to you so you can take

11         a look.

12              THE WITNESS:  Okay.

13    BY MR. GEORGE:

14         Q    So the way the scope of

15    authority is defined, for the purposes of

16    this deposition, as prepared in the

17    government's objections, is formal, legal

18    authority and authority defined to mean

19    the power or right to give orders, make

20    decisions, and enforce obedience, that's

21    the language.

22         A    Thank you.

23         Q    Does Mr. Musk hold authority,

24    under that definition, over DOGE?

25         A    Elon Musk gives advice similar

Page 26

1        to how he gives the President, in

2        recommendations and input.  I do not

3        understand him to be able to enforce

4        obedience, yeah, or make decisions on

5        behalf of the US DOGE Service.

6            Q     Are you aware of the substance

7        of any advice that Mr. Musk has given the

8        DOGE service?

9                  MR. HUMPHREYS:  Objection as

10           to scope and will instruct her not

11           to answer.

12                    (Instruction)

13                  MR. GEORGE:  Can we go off

14           the record for sec?

15                  (Discussion held off the

16           record.)

17                  MR. GEORGE:  We can go back

18           on.

19       BY MR. GEORGE:

20           Q     Are you aware of the substance

21       of any advice that Mr. Musk has given to

22       DOGE?

23           A     I'm not aware of the substance.

24           Q     You mentioned Brad Smith,

25       earlier, I'd like to talk a little bit

1    about him.

2          Can you describe Mr. Smith's

3    role within DOGE?

4     A    Brad Smith is a senior advisor

5    within the US DOGE Service, to that end,

6    he gives advice and consultation to DOGE

7    agency teams on how to implement their

8    DOGE agenda.

9          I also understand him to have

10   an employment relationship at HHS, where

11   he helps lead the DOGE agency team there,

12   distinct from his roles at USDS.

13    Q    And who does he report to?

14    A    While he's doing work at USDS

15   he reports to Amy Gleason.

16          When he's doing work at HHS he

17   reports to his agency leadership.

18    Q    I'd like to read you a couple

19   of things that Mr. Smith has said, if

20   that's okay --

21    A    Okay.

22    Q    -- describing his work at HHS.

23          So Mr. Smith said, maybe 11

24   days ago, when talking about his work

25   at the HHS:  There's a lot of

Page 28

1      opportunity, so if I take NIH as an

2      example, today, if you're an NIH

3      researcher, and you got a hundred

4      dollar grant at the university, today

5      you get to spend 60 OF that and

6      University spends 40 of that, the

7      policy that we're proposing to make is

8      that you get to spend 85 of that and

9      the university spends 15.

10              So that's more money going

11     directly to scientists who are

12     discovering new cures.

13              Can you tell me a little bit

14     what -- can you tell me what capacity

15     Brad Smith was making those statements

16     in?

17              MR. HUMPHREYS:  Objection,

18          foundation.

19     BY MR. GEORGE:

20          Q    Are you familiar with the

21     interview that Mr. Smith gave on TV, I

22     believe on March 27th?

23          A    Yes, I am familiar with it.

24          Q    And are you familiar with the

25     work that I described or that Mr. Smith

Page 29

1    described that I just read back to you?

2         A    Yes, I am familiar with it.

3         Q    Can you describe -- can you

4    tell me what capacity Mr. Smith is

5    undertaking that work in?

6         A    The work that he describes --

7         Q    Yes, that's right.

8         A    -- at NIH indirect rates --

9         Q    Yes, exactly.

10        A    -- is -- is part of his work at

11   HHS as an HHS employee, on the DOGE

12   agency team.

13              So I -- I guess I can't comment

14   on exactly his mindset in saying that in

15   the interview, but the work, itself, I

16   can say is part of his work at HHS as an

17   HHS employee.

18        Q    And who he -- that's work that

19   he's doing at HHS, is it correct that

20   DOGE signed a -- signed an agreement with

21   HHS for Mr. Smith to be employed by HHS

22   to do that work?

23              MR. HUMPHREYS:  Objection to

24        form and foundation.

25        A    Currently, Brad Smith is dual

Page 30

 1    employed at HHS and at USDS.

 2         Q     Is the work at NIH part of

 3    implementing the DOGE agenda?

 4              MR. HUMPHREYS:  Objection,

 5         vague.

 6              THE WITNESS:  Can you

 7         clarify that question?

 8    BY MR. GEORGE:

 9         Q     The work that I described,

10    related to NIH grants, that Brad Smith,

11    senior advisor at DOGE, is doing at HHS,

12    is that work part of the DOGE agenda?

13         A     Yeah, part of DOGE agenda, as I

14    understand it, is to help agencies

15    prioritize projects and reduce overall

16    spending for the government.

17              So as his role on a DOGE agency

18    team at HHS that's one thing that they've

19    explored.

20         Q     I'm going to read back one more

21    quote from this interview.

22              Mr. Smith says:  Another

23    example at NIH is today they have 27

24    different centers.  They got created over

25    time by Congress and typically -- and

1      they're typically by disease state or

2      body system.

3                There's 700 different IT

4      systems today at NIH.  Later he says:

5      They can't speak to each other.

6                Are you familiar with the

7      work that adjust -- that I just

8      described

9          A     Generally, yeah.

10         Q     What's the relationship -- and

11     sorry, let me go back.

12               Is that work also similarly

13     part of the work that Brad Smith does

14     at HHS?

15               MR. HUMPHREYS:  Objection,

16         vague, and to the extent you're

17         pulling out quotes from a fuller

18         statement.

19         A     I described work that Brad

20     Smith is doing at HHS, assessing hundreds

21     of software systems at NIH, and stating

22     that they can't speak to each other.

23               Is that work that I just

24     described part of Brad Smith's work at

25     HHS?

 1              MR. HUMPHREYS:  Objection,

 2         vague, and characterization.

 3    BY MR. GEORGE:

 4         Q     Would you describe that as the

 5    same as -- as being part of Brad Smith's

 6    HHS work the same way as we were

 7    describing the NIH grant issue?

 8              MR. HUMPHREYS:  Same

 9         objection.

10    BY MR. GEORGE:

11         Q     You can answer.

12         A     Similarly, the President's DOGE

13    agenda could include or, like, is meant

14    to maximize productivity and efficiency

15    across the government.

16              So I think, looking at the

17    different systems and the productivity of

18    the way that the agency operates could be

19    within the scope of his work at HHS.

20         Q     And what's the relationship of

21    DOGE to his work at HHS?

22         A     The US DOGE Service consults

23    and advises on work done at the agencies.

24    So there may be times where USCS

25    employees give input but, ultimately, all

1    the decisions and all the actual work

2    being done and implemented is done at the

3    agencies by the agency teams and those

4    employed by the agencies.

5         Q    Is the work that we described

6    Brad Smith doing at HHS a component of

7    DOGE's advice to HHS, is it -- is it --

8    is that part of the work that DOGE does

9    in giving advice to the agencies?

10              MR. HUMPHREYS:  Objection,

11         vague.

12         A    The work being done at HHS is

13   done and decided upon by the people at

14   HHS, the agency -- the DOGE agency team

15   at HHS.

16         Q    Is the work -- the work that I

17   described is work that HHS requested that

18   Brad Smith do; is that right?

19              MR. HUMPHREYS:  Objection,

20         mischaracterizes testimony.

21         A    I don't know exactly what you

22   mean by requested.  But what I can say is

23   the President has the DOGE agenda, right,

24   which is being implemented across the

25   government.  And agency leadership is

Page 34

```
 1        aware of that agenda and, ultimately,

 2        seeks to implement priorities that the

 3        President has given.

 4               So -- and so when the DOGE

 5        agency team is consulting with him, and

 6        doing work that aligns with that, they

 7        have the ultimate decisionmaking

 8        authority to say yes or no to the work

 9        that is being done.

10        Q     Understood.

11               I'm not trying to get at, in

12        this question, whether the agency has

13        final authority over the projects that we

14        described.

15        A     Mm-hmm.

16        Q     What I'm trying to understand

17        is, whether the projects that we

18        described are part of the DOGE agenda and

19        part of the core work of DOGE as an

20        entity.

21               MR. HUMPHREYS:  Is there a

22        question posed?

23   BY MR. GEORGE:

24        Q     Is the work that Brad Smith has

25        described part of DOGE's core work in
```

1    carrying out its mission?

2        A    The work we just described,

3    that Brad Smith is doing, is part of his

4    work at the DOGE agency team, which is

5    part of the, like, umbrella of the DOGE

6    mission, right, and the President's DOGE

7    agenda.

8            US DOGE Service advises and

9    consults.  And so in this case that

10   specific work would be his -- the work

11   that's being carried out by a DOGE

12   agency team, not work that's being

13   carried out by the US DOGE Service we

14   may have given advice or consulted

15   over those things, but --

16       Q    That's helpful.  Thank you for

17   bearing with me.

18       A    Yeah, you're welcome.

19       Q    Can you tell me about how DOGE

20   agencies -- if -- actually, let's start

21   here.

22            Is there coordination that

23   takes place across DOGE agency teams?

24       A    Are you asking between agency

25   teams or between --

1        Q      Between agency teams.

2        A      I'm speaking on behalf of US

3    DOGE Service, so I'm -- I don't want to

4    speak for things that only agencies may

5    know.  I don't know if they coordinate

6    with one another, but I do know that US

7    DOGE Service coordinates with the

8    different agency teams in implementing

9    the DOGE agenda.

10       Q      Can you tell me if -- can you

11   tell me what US DOGE Service's

12   coordination of DOGE agency teams looks

13   like, what does that consist of?

14       A      Yeah, so US DOGE Service, like

15   I said, has a role in helping agency

16   teams understand the different priorities

17   within the agency or the President's DOGE

18   agenda and, like, different things that

19   they may want to focus on, so there could

20   be consultation around a lot of things.

21              And so that coordination looks

22   different by agency and it looks

23   different by project, but very general

24   communication advice given.

25       Q      Is there somebody who manages

1    that coordination process?

2        A    There's a lot of people that

3    are involved in the coordination process.

4    I wouldn't say there's one person that

5    manages all of the communications between

6    the agencies and the US DOGE Service.

7        Q    Could you tell me who the

8    people are in charge of coordinating DOGE

9    teams within DOGE?

10       A    Can you repeat the last part of

11    your question, DOGE teams within DOGE?

12       Q    Sorry.  What I meant is, can

13    you tell me the people within DOGE.  As I

14    defined it, USDS and USDS temporary

15    organization, can you tell me who the

16    people are, within DOGE, who -- who are

17    in charge of coordinating across the DOGE

18    teams?

19            MR. HUMPHREYS:  Objection,

20        mischaracterizes testimony.

21       A    There are several, like I said,

22    people involved in the coordination

23    function, for example, Amy Gleason helps

24    with the different, like, detail

25    arrangements for -- to the extent that we

1    have those at some agencies, and

2    different projects going on in different

3    agencies, so she's definitely a key

4    player in that.

5            Some of the other senior

6    advisers, that I previously mentioned,

7    help coordinate on kind of areas on

8    their expertise.

9            So, like, Anthony Armstrong,

10    for example, or Steve Davis or Brad

11    Smith, right, they all have their

12    expertise that they were brought in

13    with, and so they help coordinate and

14    give advice to different agencies.

15            And, like I said, that looks

16    different on, like, there's a lot of

17    use cases, so it looks different

18    across the board.

19        Q    You're familiar with the Fox

20    News interview that I described earlier,

21    that I quoted from; is that right?

22        A    I'm familiar with it, yes.

23        Q    In that interview, as I

24    understood it, there were a number of

25    individuals from different DOGE teams at

Page 39

1      different agencies speaking about the

2      work that they were doing at the agencies

3      to further the President's DOGE agenda.

4              Would you agree with that

5      characterization?

6          A    Yes.

7          Q    During that interview, a couple

8      of the leaders of that effort, who were

9      included in the interview, were Elon Musk

10     and Steve Davis.

11             Would you agree with that?

12             MR. HUMPHREYS:  Objection,

13         foundation -- excuse me --

14         foundation.

15             THE WITNESS:  Can you

16         specify the question?

17     BY MR. GEORGE:

18         Q    Were Elon Musk and Steve Davis

19     part of that interview?

20         A    They were part of the

21     interview, yes.

22         Q    Can you describe for me the

23     capacity in which Steve Davis was a part

24     of that interview?

25         A    He was a member of the

Page 40

1       interview.  I don't remember exactly all

2       the things that he said, but I believe he

3       spoke generally about -- I mean, he's a

4       US DOGE Service employee, so he spoke

5       about his work as a US DOGE Service

6       employee.

7            Q     So it seems natural that

8       because he's a US DOGE Service employee

9       he would be --

10           A     Sure --

11           Q     -- part of that interview.

12                 Mr. Musk is not a US DOGE

13      Service employee, it seems like you're

14      saying that it was natural for

15      Mr. Davis to be a part of that

16      interview because he's a US DOGE

17      Service employee, why would it be

18      natural for somebody other than a US

19      DOGE Service employee to be part of

20      the interview?

21                 MR. HUMPHREYS:  Objection,

22            speculation, mischaracterizes

23            testimony.

24      BY MR. GEORGE:

25           Q     Is it also natural for Mr. Musk

Page 41

1      to be a part of that interview?

2                  MR. HUMPHREYS:  Objection,

3          this is beyond the scope.  We're

4          talking about a Fox News interview

5          and I would instruct her not to

6          answer.

7                  (Instruction)

8                  MR. GEORGE:  Could we go off

9          the record for a minute.

10                  (Discussion held off the

11          record.)

12                  MR. GEORGE:  Go back on the

13          record.

14      BY MR. GEORGE:

15          Q    Okay.  We described earlier, I

16      think, two categories of employees who

17      are roughly allocated across the two DOGE

18      organizations.  There were, within the

19      permanent organization, predominantly,

20      employees of the US Digital Service prior

21      to January 20th, 2025, and within the

22      temporary organization employees --

23      predominantly employees hired after

24      January 20th, 2025.

25                  Does that roughly match what we

Page 42

1    discussed earlier about your

2    understanding?

3         A     Roughly, yes.

4         Q     I'd like to focus on people

5    hired by DOGE since January 20th, 2025?

6         A     Okay.

7         Q     Could you tell me how those

8    people, if you can, send job applications

9    to DOGE?

10        A     It varies, there's a lot of

11   different ways that people join the

12   organization.

13        Q     Can you walk me through the

14   most common?

15        A     I just asked if I can think

16   through a few use cases in my head.

17        Q     Sure.

18        A     Okay.  So there are, like I

19   said, a few ways that people came into

20   the organization.  One is through an

21   online portal, where people could submit

22   applications; another is people could be

23   recommended, just like they often are

24   across the government; and then in some

25   cases people were interviewed by the

Page 43

```
1      presidential personnel office or PPO, and
2      did interviews with them, so they were
3      kind of vetted through the political --
4      more political process.
5              Those are a few of the -- of
6      the primary ways.
7          Q    Are you aware of the breakdown
8      or can you tell me, within the temporary
9      organization, are people mostly career
10     civil servants or some other category of
11     federal employee?
12         A    Within the temporary
13     organization, most are hired -- well,
14     there's all sorts of different employees.
15         Q    I understand.
16         A    Some are special government
17     employees and volunteers, and some are
18     hired under schedule AR and, like, a
19     termed appointment.
20         Q    Do employees within the
21     temporary organization have DOGE.EOP.gov
22     e-mail addresses?
23         A    Yes, they do.
24         Q    Do employees within the
25     permanent organization have DOGE.EOP.gov
```

Page 44

1    e-mail addresses?

2        A    Yes, they do.

3        Q    And is that kind of categorical

4    across the board?

5        A    According -- as far as I know,

6    yes, that is true.  If you're a US DOGE

7    Service employee you would generally get

8    a DOGE.EOP.gov e-mail.

9        Q    Who had final hiring authority

10   for hires within the temporary

11   organization since January 20th?

12       A    So for the hires since January

13   20th, until now, before Amy Gleason

14   became acting administrator, Steve Davis

15   authorized those hires.  And then, once

16   she became acting administrator, she

17   ratified those hires and is now

18   responsible for authorizing hires going

19   forward.

20       Q    What does it mean to ratify a

21   hire?

22            MR. HUMPHREYS:  Objection to

23       the extent it calls for a legal

24       conclusion.

25       A    I'm not a -- a lawyer, and I

Page 45

1        don't want to assume a definition on,

2        like, what it legally means to ratify

3        something.

4                But my colloquial understanding

5        is that it's like to affirm that decision

6        that was made now in her acting

7        authority.

8        Q      So we're talking about people

9        who were already hired into and serving

10       in the government; is that right, at the

11       time that Amy Gleason was appointed?

12       A      It was hires that were made and

13       they were already serving in the

14       organization, yes.

15       Q      Was it understood that their

16       hires needed to be ratified?

17               MR. HUMPHREYS:  Objection,

18          vague.

19       BY MR. GEORGE:

20       Q      Was there paperwork filled out

21       to ratify their hiring?

22               MR. HUMPHREYS:  Objection, I

23          think that's outside of the scope.

24          If you want to explain which one

25          it ties to, I'm happy to think

Page 46

1          about it.

2                  MR. GEORGE:  Can we go off

3          the record?

4                  (Discussion held off the

5          record.)

6                  MR. GEORGE:  Can we go back

7          on the record.

8     BY MR. GEORGE:

9          Q     Was there paperwork filled out

10    to ratify the hires?

11         A     Yes, there was, but I don't

12    want to comment further on legal advice I

13    was given.

14         Q     Prior to ratification, was

15    there an understanding that Amy Gleason

16    had the authority to dismiss all of the

17    people hired between January 20th and

18    ratification?

19                 MR. HUMPHREYS:  Objection,

20         vague.

21                 THE WITNESS:  Can you

22         clarify what you mean by

23         understanding?

24    BY MR. GEORGE:

25         Q     Maybe, why did the organization

1      go through a ratification process for

2      these hires?

3          A      Like I said, it's my

4      understanding that that's privileged and

5      I don't want to comment on that.

6              MR. HUMPHREYS:  And I would

7          instruct her not to answer, to the

8          extent providing an answer would

9          reveal information that's

10         privileged.

11              (Instruction)

12              MR. GEORGE:  Understood.

13              MR. HUMPHREYS:  Thank you.

14              MS. HINSON:  Brad, what's

15         the basis for the privilege?

16              MR. HUMPHREYS:  We may need

17         to discuss it at break, but she

18         says it's based on information

19         with counsel, so we'd have to

20         explore that.

21              Should we take a break?

22              MR. GEORGE:  Yeah it's a

23         great time for a break, it's been

24         about an hour.

25              We can go off the record and

1        take a break.

2            (Recess.)

3            MR. GEORGE:  We can go back

4        on the record.

5            And you wanted to start?

6            MR. HUMPHREYS:  Yes, thank

7        you.  Defendants would like to

8        read and sign the deposition,

9        please.

10           The witness would like to

11       read and sign.

12           MR. GEORGE:  Keep going?

13           MR. SAMBURG:  Yeah.

14           MR. GEORGE:  Great.

15   BY MR. GEORGE:

16       Q    Okay.  I want to loop back.

17           I want to loop back to a couple

18   of things we talked about earlier, and

19   we'll keep going.

20           I think, at some point earlier

21   today, you mentioned a deputy

22   administrator of DOGE, can you tell me

23   who that is?

24       A    Yes, Amy Gleason is the deputy

25   administrator of US DOGE Service and the

1      acting administrator of the US DOGE

2      Service.

3          Q    I see.  So there's no full --

4      there's no non-acting administrator of

5      DOGE?  There is an acting administrator,

6      who is Amy Gleason, and a deputy

7      administrator, who's also Amy Gleason; is

8      that right?

9          A    Yes, Amy Gleason is the deputy

10     administrator and also serving as the

11     acting administrator.

12         Q    Are there any other acting

13     deputy administrators of DOGE?

14         A    No.  There are no other deputy

15     administrators of the US DOGE Service.

16         Q    Are there any acting deputy

17     administrators?

18         A    Not to my knowledge, there are

19     no other deputy acting administrators.

20         Q    And you said Steve Davis's

21     title is senior advisor; is that right?

22         A    Yes.

23         Q    Senior advisor to who?

24         A    His title is just senior

25     advisor, but he reports to Amy Gleason,

Page 50

1     the acting administrator.

2         Q     So he's a senior advisor to the

3     acting administrator?

4         A     That is not the formal title.

5     I don't know if -- the title is simply

6     senior advisor.

7         Q     You mentioned earlier that

8     there are -- have been instances in which

9     Steve Davis and Amy Gleason have

10    disagreed about work that DOGE is doing;

11    is that right?  Do you recall that?

12              MR. HUMPHREYS:  Objection,

13         mischaracterizes testimony.

14    BY MR. GEORGE:

15        Q     You can answer the question.

16        A     Yes, I do recall saying that.

17        Q     In those instances, does Amy

18    Gleason's decision carry the day?

19        A     Amy Gleason has the formal

20    decisionmaking authority.  I would say

21    that there's definitely back and forth,

22    right, like he's an influential senior

23    advisor, so sometimes she accepts his

24    viewpoint, sometimes he accepts her

25    viewpoint, but ultimately she has the

Page 51

1    formal authority.

2        Q    Are you aware of -- and this is

3    a yes or no question -- are you aware of

4    instances in which a disagreement has

5    resolved itself with Amy Gleason's

6    decision overruling Steve Davis's

7    opinion?

8              MR. HUMPHREYS:  Objection as

9         to scope, but I'll let her answer

10        it.

11       A    Yes, I'm aware of an instance.

12       Q    We also talked about Elon Musk

13   sometimes providing advice to DOGE.  Does

14   that accurately characterize one of the

15   things that Mr. Musk does?

16       A    He advises on US DOGE or the

17   DOGE and policy agenda, yes.

18       Q    Including providing advice to

19   DOGE leaders; is that right?

20       A    Elon can provide advice to DOGE

21   leaders, yes.

22       Q    Are you aware of instances

23   where Mr. Musk provided advice to DOGE

24   leaders that was not followed?

25             MR. HUMPHREYS:  Objection as

1          to scope, and I'll instruct her

2          not to answer.

3                  (Instruction.)

4              MR. GEORGE:  Can we go off

5          the record?

6                  (Discussion held off the

7          record.)

8              MR. GEORGE:  Okay.  Can we

9          go back on the record.

10    BY MR. GEORGE:

11        Q    My question was:  Are you aware

12     of any instances in which Mr. Musk has

13     provided advice to DOGE leaders that DOGE

14     leaders did not follow?

15              MR. HUMPHREYS:  I'm

16          objecting and instructing the

17          witness not to answer as beyond

18          the scope of the topics.

19              MR. GEORGE:  And for the

20          record, as I understand it, the

21          objection is that it is not

22          relevant to the decisionmaking

23          structure and leadership of DOGE

24          if Mr. Musk provides advice that

25          is uniformly followed by the

Page 53

1          entity.

2                  MR. HUMPHREYS:  My objection

3          is that the Court has authorized

4          specific topics that said that

5          other questions are not permitted,

6          and your question does not fall

7          within the mission

8          responsibilities leadership

9          structure and decisionmaking

10          structure of USDS, as the witness

11          has already testified that

12          Mr. Musk is not part of USDS or

13          DOGE, as you've defined it.

14                  MR. GEORGE:  Can we go off

15          the record for a minute.

16                  (Discussion held off the

17          record.)

18                  MR. GEORGE:  Okay.  We can

19          go back on the record.

20      BY MR. GEORGE:

21          Q     Okay.  So the question was:

22      You previously said that Mr. Musk

23      sometimes provides advice to DOGE

24      leadership; and the question was:  Are

25      you aware of instances in which DOGE

Page 54

1    leadership did not follow Mr. Musk's

2    advice?

3                MR. HUMPHREYS:  Objection,

4         we continue to object on the basis

5         of scope, but we'll let the

6         witness answer.

7         A     Yes, it was my understanding

8    that Elon does give advice to USDS

9    leadership.  I am not aware if -- whether

10   that advice is always accepted or not.

11   However, as he's a senior advisor to the

12   President on the topic with which the US

13   DOGE Service does its work, it's natural

14   to -- it's natural that his advice would

15   hold weight to the extent that he conveys

16   the wishes of the President.

17        Q     Are you aware of any instances

18   in which Mr. Musk gave advice to senior

19   leaders of DOGE that was not followed by

20   DOGE leaders?

21                MR. HUMPHREYS:  Same

22        objection, but she can answer.

23        A     As I said, I do not know

24   whether all of the advice has been

25   accepted or not.

Page 55

```
 1        Q      To be clear, you are not aware
 2    of instances in which Mr. Musk's advice
 3    was not followed by DOGE leaders?
 4              MR. HUMPHREYS:  Objection,
 5        vague.
 6        A      Like I said, I am not aware of
 7    whether or not advice has been followed
 8    consistently or not.
 9        Q      That wasn't the question.
10              So I'd just like a clear
11    answer to this question:  Are you
12    aware of instances in which Mr. Musk's
13    advice to DOGE leaders was not
14    followed?
15              MR. HUMPHREYS:  Same
16        objection as to scope.
17        A      I am not aware of whether his
18    advice has always been followed or not.
19        Q      Do you understand that that's
20    not the question?
21              MR. HUMPHREYS:  She also
22        said she just doesn't know.
23        A      I you don't know.
24        Q      Are you aware of instances --
25    can -- can you give me a yes or no answer
```

Page 56

1       to this question?

2              Are you aware of instances in

3       which Mr. Musk's advice to senior leaders

4       of DOGE was not followed?

5              MR. HUMPHREYS:  Objection as

6          to scope.

7       A      I am not aware whether his

8       advice has been followed or not.

9       Q      Are you aware of any instances

10      in which Mr. Musk's advice to senior

11      leaders at DOGE was followed?

12      A      Like I said, I do not know the

13      outcome of every time he's given advice.

14      I would assume that there are times when

15      he's given advice and it's been followed.

16      I would -- like to the extent that his

17      advice persuades -- or conveys the wishes

18      of the President.

19      Q      But you said that you're not

20      aware of every instance of whether

21      Mr. Musk's advice is followed, are you

22      aware of instances in which Mr. Musk's

23      advice was followed?

24             MR. HUMPHREYS:  Can I put a

25          standing objection to the line of

Page 57

1          questioning, so I don't have to

2          interrupt you every time?

3                  MR. GEORGE:  Yes,

4          understood.

5     BY MR. GEORGE:

6          Q    You can answer the question.

7                  Are you aware -- are you

8     aware -- you said you were not aware of

9     every instance, what I'm asking is:  Are

10    you aware of any instance in which

11    Mr. Musk's advice was followed?

12                  MR. HUMPHREYS:  Objection,

13         vague.

14         A    I think I can reasonably assume

15    that advice he has given has been

16    followed at some point.  I do not know

17    the specific thing that he said that has

18    specifically been followed but, like, I

19    can generally assume that he's given

20    advice that has been taken.

21                  He's an expert and he's a

22    senior advisor to the President on this

23    topic.

24         Q    That's still not an answer to

25    the question that I asked.  I'm not

Page 58

1      asking you to assume, one way or another,

2      what I'm asking about is what you have

3      actual knowledge of or, in this sense,

4      that what you, as the 30(b)(6) witness

5      for DOGE, has actual knowledge of, so I'd

6      ask you not to assume or conjecture or

7      provide conjecture, but I'm asking

8      whether you are aware of instances in

9      which Mr. Musk's advice was followed by

10     DOGE leaders?

11            MR. HUMPHREYS:  Objection,

12         asked and answered.

13     BY MR. GEORGE:

14         Q     You can answer that question.

15         A     I think you're asking if I know

16     a specific instance, and I want to be

17     truthful.  Like, I don't know of a

18     specific instance, content-wise, like,

19     yes or no, but again, I would assume that

20     to the extent that he conveys wishes of

21     the President that people take his advice

22     into serious consideration, and I'm sure

23     there are times that has been followed.

24         Q     Do you know of specific

25     instances in which Mr. Musk has given

Page 59

1    advice to DOGE leaders whether or not it

2    was followed?

3        A    I am aware of instances that

4    he's given advice to DOGE leadership,

5    yes.

6        Q    Are you aware of, in those

7    instances, whether that advice was

8    followed?

9            MR. HUMPHREYS:  Objection,

10       asked and answered.

11       A    I'm not aware of the outcome of

12   the -- of the advice that was given to

13   DOGE leadership.

14       Q    In any of those instances?

15       A    I am not aware, correct.

16       Q    Okay.  All right.

17           I want to go back to hiring of

18   folks into DOGE.  You talked about a few

19   different ways that people have been

20   hired into DOGE, and I'd like to focus

21   here on the temporary organization rather

22   than the folks who are already hired as

23   part of the USDS permanent organization.

24           You mentioned an online

25   portal, can you describe the online

Page 60

1    hiring portal process for me?

2        A    Sure.  So there is an online

3    website, where people can apply for

4    various different positions, members

5    within the US DOGE Service review these

6    applications, certain individuals receive

7    a phone call, they go through a series of

8    interviews and assessments, and then

9    ultimately they're hired or not, just

10   similar to most other organizations.

11       Q    Who reviewed -- who reviews the

12   materials submitted through the online

13   portal?

14           MR. HUMPHREYS:  Objection as

15       to scope.  And I'll instruct her

16       not to answer.

17               (Instruction)

18           MR. GEORGE:  Can we go off

19       the record?

20           MR. HUMPHREYS:  Actually,

21       can we stay on the record for

22       these?  I mean, I feel like

23       they're -- each one --

24           MR. GEORGE:  Sure.

25           MS. HINSON:  Yeah, it's our

1            time.

2                  MR. SAMBURG:  It's our time.

3                  MR. HUMPHREYS:  Okay, for

4            now, but we should consent before

5            going off the record.

6                  MR. GEORGE:  Okay.  Would

7            you consent to going off the

8            record?

9                  MR. HUMPHREYS:  I do, for

10           now, yes.

11                 (Discussion held off the

12           record.)

13                 MR. GEORGE:  Okay.  We can

14           go back on the record.

15                 While the parties were off

16           the record, we discussed general

17           objections that the defendants

18           have to a line of questioning

19           about who exercises authority over

20           employment decisions within DOGE.

21                 The defendants believe that

22           that is not within the scope of

23           exhibit -- the examination topics.

24           Plaintiffs have made their

25           position clear that the decisions

Page 62

1          to hire or fire individuals within

2          an agency are relevant to

3          understandings that entity's

4          leadership structure and

5          decisionmaking structure of DOGE,

6          per that entity's leadership

7          structure and decisionmaking

8          structure, that defendants

9          maintain that they may continue to

10         have objections to this line of

11         questioning, but for now I believe

12         are not instructing the witness

13         that she may not answer.

14             Does that summarize fairly?

15             MR. HUMPHREYS:  I don't

16         necessarily agree -- I don't

17         necessarily agree with that

18         characterization.

19             Our dispute is that we think

20         structure here has to do some work

21         and does not mean that plaintiffs

22         are able to ask the witness about

23         granular decisionmaking of

24         everything that the agency does.

25             But for this question, we

Page 63

1          continue to object on the basis of

2          scope but we'll let the witness

3          proceed.

4    BY MR. GEORGE:

5          Q     Who reviews application

6     materials submitted through the online

7     portal?

8          A     It varies, there are a lot of

9     different roles that people apply for

10    within the online portal, so depending on

11    the different roles there are different

12    people involved in the process.

13         Q     And where is the online portal

14    located, on the web?

15              MR. HUMPHREYS:  Objection as

16         to scope.

17              You may answer.

18              THE WITNESS:  I can answer?

19              MR. GEORGE:  Did you say

20         can't?

21              MR. HUMPHREYS:  You can.

22         Yes, you can.

23              THE WITNESS:  I'm sorry.

24              Okay.

25         A     Yes, there's a website.

1        Q    Can you tell me the website?

2        A    So there are two websites

3    people can apply for, to apply within the

4    US DOGE Service, one I believe is

5    DOGE.gov/join and the other is

6    USDS.gov/join.

7        Q    And does your description of

8    the online portal process, has this

9    accurately described the online portal

10   process for the entire period from

11   January 20th to now or has it changed?

12            MR. HUMPHREYS:  Standing

13        objection as to scope for this

14        entire line of questioning.

15            You can answer.

16            THE WITNESS:  Can you

17        clarify what you're asking has

18        changed or not?

19   BY MR. GEORGE:

20        Q    So what you described is an

21   online portal --

22        A    Yes.

23        Q    -- located at two different

24   websites, DOGE.gov/join or USDS.gov/join,

25   those are the places where people submit

Page 65

1     applications to join DOGE?

2          A     Mm-hmm.

3          Q     Has that been the case since

4     January 20th?

5          A     Yes, both of the websites have

6     allowed applications to come through, and

7     they've been reviewed but, like I said,

8     by various people, depending on the types

9     of roles over that time period.

10         Q     For -- okay.

11               So you described three paths

12    through which the people have gotten

13    employed by DOGE, one was an online

14    portal, one was, I believe,

15    recommendations, and the third was people

16    interviewed by PPL.

17               Does that describe kind of the

18    three categories of paths to DOGE

19    employment?

20         A     Generally speaking, yes.  I

21    would say that's how the majority of

22    people come through.

23         Q     And the -- are those mutually

24    exclusive?

25         A     Not necessarily, I think

Page 66

1    there's people that could apply that may

2    also be recommended, so not mutually

3    exclusive.

4              And I would also say PPO could

5    also include, like, through the

6    transition process.

7         Q    Are there -- who exercises

8    final hiring authority for DOGE temporary

9    organization employees?

10        A    As acting administrator, Amy

11   Gleason has formal hiring authority over

12   US DOGE Service employees, including the

13   temporary organization.

14        Q    Are you aware of instances in

15   which Ms. Gleason's hiring authority was

16   exercised via ratification?

17              Let me ask that a different

18   way.

19              Prior to February 18th, when

20   Ms. Gleason joined as administrator,

21   who exercised final hiring authority

22   for the USDS temporary organization?

23        A    Before Amy Gleason was deputy

24   or deputy and acting administrator, Steve

25   Davis was the senior-most political and

Page 67

1      he, therefore, authorized the hires at

2      that time.

3          Q      Since February 18th, as the

4      USDS temporary organization continued to

5      hire new employees?

6          A      Can you repeat the question?

7          Q      Since February 18th or since

8      Ms. Gleason took over as acting

9      administrator --

10         A      Yes.

11         Q      -- has the temporary

12     organization continued to hire employees?

13         A      The hiring process has

14     continued, I do -- I am not aware of

15     anyone that has been hired into -- that

16     has been officially hired into the

17     temporary organization since February

18     18th.

19         Q      Are you aware of -- I think

20     Ms. Gleason mentioned in her declaration,

21     last month, that there are ten

22     individuals detailed to USDS from other

23     agencies.  Does that seem roughly correct

24     still?

25         A      Yes, that seems roughly

Page 68

1        correct.

2            Q      And in the responses that the

3    agencies have provided, here, I think

4    four of the individuals named as

5    detailees to USDS, were Luke Farritor,

6    Edward Coristine, Kyle Schutt, and Marko

7    Elez; is that correct?

8            A      I'm familiar with those, yes,

9    and they're detailees, yes.

10           Q      They're detailees to USDS?

11           A      That's my understanding.

12           Q      Can you tell me the scope of

13   the detail Lee arrangement with USDS?

14           A      Can you clarify what you mean

15   by scope?

16           Q      What are they detailed to --

17   what -- what are their duties as

18   detailees to USDS?

19           A      Similar to employees of USDS,

20   they are to advise and consult on the

21   President's DOGE agenda.

22           Q      Were any of those individuals I

23   named previously hired into the DOGE

24   temporary organization?

25           A      I do not believe so.  I think

Page 69

1        it's possible that Marko was a volunteer

2        within the US DOGE Service organization,

3        at the time, but I don't know that for

4        certain.

5            Q      So as far as you're aware -- I

6        guess, let me ask this a different way.

7                   Those four individuals are

8        currently detailees to USDS?

9            A      That is my understanding.

10           Q      Since January 20th, other than

11       potentially Mr. Elez being a volunteer --

12           A      Mm-hmm.

13           Q      -- have any of them had any

14       other formal employment relationship with

15       DOGE?

16           A      Not to my knowledge, no, just

17       as detailees.

18           Q      As detailees did they have

19       DOGE.EOP.gov e-mail addresses?

20           A      Yes, detailees receive DOGE

21       e-mail addresses.

22           Q      You said you are not aware -- I

23       may get this wrong, because this was a

24       little while ago, so please let me know

25       if I'm mischaracterizing it.

1        A      Okay.

2        Q      But I think you said that you

3    are not aware of any regular standing

4    meetings of temporary -- of the entire

5    temporary organization?

6        A      I am not aware of a regular

7    meeting in which every single person of

8    the temporary organization attend.

9             There are, as you can imagine,

10   lots of meetings within the temporary

11   organization, of differing sizes and of

12   differing regularity.

13       Q      Can you describe any regular

14   meetings that exist within the temporary

15   organization?  Are there any meetings --

16   are there any regular meetings where

17   temporary organization leaders are

18   meeting with temporary organization

19   staff, even if it's not the whole

20   temporary organization?

21       A      Well, for example, I know that

22   the lawyers meet regularly, and most of

23   them -- I believe all of them are members

24   of the temporary organization.

25             Yeah, and I would imagine

Page 71

1      there are other one-off meetings

2      within members of the temporary

3      organization.

4          Q     Are you aware of any regular

5      standing meetings, other than potentially

6      the meetings of the lawyers?

7                MR. HUMPHREYS:  Objection,

8          vague.

9   BY MR. GEORGE:

10         Q     Are you aware of any regular

11     standing meetings of temporary

12     organization employees, other than the

13     lawyers?

14         A     Like I said, there are a lot of

15     different meetings.  I'm aware of some

16     that are more regular, that may include

17     different amounts of members of the

18     temporary organization.

19                Like I said, I'm not aware of

20     one that includes everybody, but I do

21     think there are -- there are regular

22     meetings within the temporary

23     organization that include them and, you

24     know, others that they work with on a

25     regular basis.

Page 72

1          Q    Are you aware of any practices

2    by DOGE leaders in doing regular

3    check-ins with individual temporary

4    organization members or teams of

5    temporary organization members?

6               MR. HUMPHREYS:  Objection,

7         vague.

8          A    I'm not aware of things I would

9    describe as, like, a -- like a one-on-one

10   regular check-in, as from, like, a

11   supervisory capacity within the temporary

12   organization.

13              Like I said, I think the

14   lawyers meet, and I'm sure that they

15   have, like, regular, I guess you could

16   say, like, check-ins as a group, but I'm

17   not aware of, like, a one-on-one

18   supervisory check-in meeting, but that's

19   not -- I don't know of every instance or

20   every communication that happens from the

21   temporary organization.

22         Q    So not one-on-one, but what

23   about with particular teams of temporary

24   organization members or -- yeah, teams of

25   temporary organization members, are you

Page 73

```
1    aware of any regular meetings between

2    DOGE leadership and particular teams?

3         A     Within the temporary

4    organization, besides the lawyers, I

5    would not really classify as, like -- I

6    wouldn't classify there to be any other,

7    like, teams within the temporary

8    organization, so not according to my

9    knowledge.

10        Q     There are other people in the

11   federal government whose main job is

12   implementation of the DOGE agenda, am I

13   right, who don't -- who are not employees

14   or detailees of DOGE?

15        A     Yes, there are DOGE agency

16   teams at the agencies that implement the

17   DOGE agenda that are not employees of

18   USCS, yeah, that's right.

19        Q     And some of those people,

20   correct me if I'm wrong, have been hired

21   since January 20th, 2025, as noncareer

22   employees, am I right?

23             MR. HUMPHREYS:  Objection,

24        foundation.

25        A     I don't know how every employee
```

Page 74

1      at an agency has been employed.  I'm

2      speaking on behalf of USDS.

3          Q      Are there any individuals, that

4      you're aware of, who have DOGE.EOP.gov

5      e-mail addresses, who are not employees

6      or detailees of DOGE?

7          A      I don't have any reason to

8      believe that that is the case, no.

9          Q      Some of the DOGE team

10     individuals that are identified by the

11     agency in their discovery responses

12     are -- I'm just going to list three --

13     Aram Moghaddassi, Jeremy Lewin, and Gavin

14     Kliger.

15             Are you familiar with these

16     three people?

17         A      I'm generally, like, aware of

18     who they are, yes.

19         Q      They don't have DOGE.EOP.gov

20     e-mail addresses?

21         A      Not according to my knowledge.

22         Q      Are you familiar with how they

23     were hired into the federal government?

24         A      I am not.

25         Q      Are -- let's talk about

Page  75

1      training.

2              Can you tell me a little bit

3      about any -- about the training or

4      on-boarding of DOGE temporary

5      organizations as they join the

6      government or what was that training

7      and on-boarding process like?

8      A      Sure.  So any employee that is

9      on-boarded into the US DOGE Service, for

10     either organization, is on-boarded into

11     the executive office of the President,

12     and so -- that were on-boarding process

13     is similar to any other employee at the

14     executive office of the President.

15             So there is paperwork that

16     you have to sign, right, there is a

17     technology agreement, there is an

18     ethics briefing that you attend with

19     the ethics counsel, and then a -- for

20     I believe all employees except --

21     actually, I think all employees do a

22     financial disclosure report, there's

23     two different kinds you can do

24     depending on your role and salary, and

25     then --

Page 76

1      Q     Is there any training that is

2   specific to DOGE?  I think it sounded

3   like what you described is general

4   on-boarding --

5      A     Yes.

6      Q     -- for the executive office of

7   the President, is there anything that is

8   DOGE-specific?

9      A     There's not a uniform training

10   that is DOGE-specific.  I would assume

11   individual employees, you know, speak

12   with the people that they work with and

13   get up to speed, but there's no formal

14   training that I'm aware of.

15           MR. GEORGE:  Could we get a

16       time check?

17   BY MR. GEORGE:

18      Q     DOGE -- and again, I'm speaking

19   about being the temporary organization,

20   specifically, here, sometimes sends

21   employees to federal agencies to help

22   them implement the DOGE agenda; am I

23   understanding that correctly?

24           MR. HUMPHREYS:  Objection,

25       foundation.

Page 77

1          A     US DOGE Service employees can

2     be detailed or dual on-boarded as such,

3     in the case of the defendant agencies

4     here, to help implement the DOGE agenda,

5     yes.

6          Q     You said detailed or dual

7     on-boarded, is there any other formal

8     mechanism that is used to share out DOGE

9     staff to agencies?

10         A     No other formal mechanisms,

11    that I'm aware of.

12         Q     In what situations does DOGE

13    detail versus dual employ an individual

14    at an agency?

15         A     Traditionally, USDS has

16    detailed and, upon the Court's order,

17    changed their practices, and I'm not to

18    comment on privileged information given

19    from legal counsel.

20             MR. GEORGE:  Would you

21        consent to going off the record

22        for a minute?  I don't think

23        you'll want to go through --

24             MR. HUMPHREYS:  Yes, we can

25        go off the record.

Page 78

```
 1              (Recess.)

 2              MR. GEORGE:  Okay.  All

 3         right.  Let's go back on the

 4         record.

 5    BY MR. GEORGE:

 6         Q    I wanted to go back briefly --

 7              MR. HUMPHREYS:  May I stop

 8         you for just a second?  I'm sorry,

 9         the witness had something she

10         wanted to clarify, and I forgot.

11    BY MR. GEORGE:

12         Q    Sure.

13         A    At the very beginning you asked

14    who I had interviewed for the purposes of

15    the deposition, and I may have taken the

16    word "interview" a little bit too

17    seriously or too technically, so I wanted

18    to add that I also spoke with the White

19    House IT lead, just on general, like, IT

20    matters within EOP and kind of how our

21    computers and advices are handled, and

22    then also the former HRUS representative

23    of US DOGE Service on some personal

24    related questions, just wanted to add

25    that for the record.
```

Page 79

1          Q     I appreciate that, thank you.

2          A     Yep.

3          Q     I wanted to go back, we were

4    talking about Brad Smith's work at HHS,

5    and you can correct me if I

6    mischaracterize this, but I think what

7    you said was that that's the work that he

8    does at HHS on behalf of the agency, I

9    think, is that how you characterized it;

10   is that right?

11         A     Yeah, let's clarify again.  The

12   work that we discussed, when that work is

13   being implemented, he's doing it on

14   behalf of the work or on behalf of the

15   agency as an employee of HHS, that's not

16   to say he can't advise or consult on that

17   work as a USCS employee, but the work

18   he's implementing and carrying out is

19   during his or as a function of his

20   employment at HHS.

21         Q     Can you explain what you mean

22   by that's not to say that he can't

23   consult and advise on that work?  What

24   are the two things that you're

25   envisioning, it sounds like you're

Page 80

1    describing two different types of work?

2         A    Yeah, sure.

3              So US DOGE Service has an

4    advise and consult role, like we

5    discussed, and so as an employee of USDS

6    Brad can give consultation and advice on

7    how HHS DOGE team could implement or

8    could implement the DOGE agenda as an

9    employee of USDS.

10             When he's at HHS, working on

11   his HHS devices and implementing the

12   work, actually, like, helping the

13   agency team do the work, he's doing

14   that on -- as an employee of HHS, like

15   being supervised by HHS leadership.

16        Q    So when he's giving advice and

17   consultation to HHS, as a US DOGE Service

18   employee, he's doing so in his capacity

19   as an employee of the DOGE service and

20   reporting up through the US DOGE Service

21   chain of command.

22             But when he's undertaking work

23   at HHS, otherwise, he's subject to the

24   HHS chain of commands; is that right, and

25   supervised by HHS officials?

1          MR. HUMPHREYS:  Objection to

2     form.

3  BY MR. GEORGE:

4     Q    Did that make sense?  You can

5  feel free to restate, as you need.

6     A    Yeah, I'll restate.

7          So when Brad, for example, is

8  doing work at USCS, on his USCS advices

9  in an advisory consult role, he reports

10 up to the USCS supervisory chain of

11 command.

12          When he's doing work at HHS he

13 is reporting up to HHS agency leadership.

14    Q    And is the work that he does at

15 USDS to advise and consult HHS part of

16 the employment agreement that he has with

17 HHS or is it separate from his

18 responsibilities under the employment

19 agreement he has with HHS?

20    A    The work he does as a USCS

21 employee to advise and consult is within

22 the scope of his responsibilities at

23 USDS, to advise and consult on the

24 President's DOGE agenda.

25          That's not say he can't give

Page 82

1           advice, of course, like as an HHS

2           employee to HHS -- his HHS people, but

3           that wouldn't be, like, as a -- in his

4           capacity as a USDS employee.

5                Q     I wanted to ask you about, I

6           think, one of these binders, here.  Grab

7           me the response binder there, thanks.

8                      So these are, I think, the

9           document productions that we got from the

10          agencies a little while ago, and there's

11          a second copy there, if you guys want to

12          look along, too.  I'm looking at tab two,

13          page HHS 29.

14                     MR. KURLAND:  Is this binder

15               different --

16                     MR. GEORGE:  Yeah, the

17               responses binder is the one that

18               I'm looking at.

19                     MR. HUMPHREYS:  Got you.

20          BY MR. GEORGE:

21               Q     So in tab two of the responses

22          binder, which is documents from HHS,

23          Kendall, does this agreement look like

24          the type of agreement that DOGE employees

25          would be subject to at HHS when being

Page 83

1    sent out from DOGE to work at HHS?

2        A    It looks like specific to CMS

3    in this case but, yes, it looks typical.

4        Q    I wanted to ask you about some

5    language on the second page on page 29,

6    there's language that says:  USDS

7    assignees well?

8        A    Mm-hmm.

9        Q    And the first bullet, the

10   second sentence, says:  USDS assignees

11   shall, however, report to and be

12   supervised by their USDS supervisor when

13   at USDS facilities and on USDS systems,

14   even when performing work within the

15   scope of the agreement.

16            What -- did you read that?

17       A    Yes.

18       Q    What sort of work within the

19   scope of the agreement might an employee

20   be supervised by a USDS supervisor for?

21       A    Can I familiarize myself with

22   the scope of the agreement?

23       Q    Sure.

24       A    If I can read it?

25            So my understanding is that

Page 84

1    this is consistent with what I said

2    before, which is when employees are

3    doing, like, work for USDS, on their USDS

4    like assets, so, for example, in this

5    case, they could be advising on the sort

6    of work they're supervising with their

7    USDS supervisor versus when at CMS doing

8    CMS work they're supervised by their CMS

9    advisor or supervisor, sorry.

10       Q    This document, as I understand

11   it, describes the work that will be

12   performed at CMS on behalf of CMS, is

13   there anything -- is DOGE signing an

14   agreement here with CMS for CMS to do

15   work on behalf of DOGE?

16          MR. HUMPHREYS:  Objection to

17       characterization of the document.

18       A    Any work that's carried out at

19   CMS is on behalf of CMS and is subject to

20   their supervisory control.

21       Q    And when that work takes place

22   at USDC facilities, and on USDS systems,

23   that work is supervised by the USDS's

24   supervisor; is that right?

25          MR. HUMPHREYS:  Objection to

Page 85

1        form.

2        A    I maintain that any work done

3    at CMS or, like, as part of CMS's, let's

4    say, DOGE agency team, reports to the CMS

5    leadership, DOGE -- or, like, US DOGE

6    Service simply provides a consult and

7    advisory function.

8            So in the capacity that that

9    individual is doing those duties as

10   within their USCS capacity, yeah, they

11   report to their USCS supervisor.

12       Q    Can you say that second part

13   again?

14       A    Yeah, when the individual is

15   doing work within their capacity as a

16   USDS employee, meaning they're advising

17   and consulting on the President's DOGE

18   agenda, they report to their USCS

19   supervisor.

20       Q    Is providing advice -- is

21   providing advice, in their capacity as a

22   US DOGE Service employee, within the

23   scope of the employment agreements they

24   have with the agencies?

25       A    It appears to me that those

Page 86

1      agreements with the agencies, like,

2      acknowledge that the employee also has an

3      employment relationship with the USCS,

4      and so may also perform duties as a USCS

5      employee relating to CMS, but not, like,

6      the -- there's still a delineation, I

7      would say, between the work that's being

8      done at CMS as an implementing body or as

9      an implementing employee at CMS versus

10     being kind of a consulting function

11     within USCS.

12         Q     But does DOGE -- does a DOGE

13     employee have to have an assignment

14     agreement or an employment agreement with

15     an agency in order to give advice coming

16     from USDS?

17         A     No, they don't have to have an

18     employment agreement, in this case I

19     think it -- there is one, obviously,

20     because this person is taking on this

21     kind of dual employment relationship, but

22     that is not always the case.

23             USCS inherently has an advise

24     and consult function whether they have a

25     dual employment relationship at an agency

1    or not.

2              And, yeah, there's like

3    incomplete overlap, potentially, in the

4    types of things you can do, but -- and I

5    think that's fair and understood.

6         Q    Is Steve Davis an employee of a

7    federal agency outside of his employment

8    relationship with DOGE?

9         A    I believe that he is a detailee

10   to GSA in addition to being a USCS

11   employee.

12        Q    Is that the only other agency

13   you're aware of?

14        A    That is the only other agency

15   that I'm aware of.

16        Q    And it's a detail agreement,

17   not on employment agreement?

18        A    Yes, that's correct.

19        Q    It sounds like what you

20   described with the HHS agreement is that

21   an individual DOGE employee may wear

22   multiple hats when they're at an agency.

23   They might be an employee of the agency,

24   but they might also be there in their

25   capacity as a DOGE employee.

Page 88

1              They might undertake work as an

2       agency employee, while also giving advice

3       as a DOGE employee.  Does that sound

4       correct to you?

5              MR. HUMPHREYS:  Objection,

6          mischaracterizes testimony.

7       A    How I understand it an employee

8       doesn't wear both hats at the same time.

9       When they're at an agency doing agency

10      work they're an HHS employee, in this

11      example, an HHS employee.  And at other

12      times, they're separately a USDS employee

13      and can function as such.

14      Q    But they might wear one hat or

15      the other in their interactions with an

16      agency?

17             MR. HUMPHREYS:  Objection.

18             Is that a question?

19  BY MR. GEORGE:

20      Q    Is that right?

21      A    Yes, there are employees who do

22      have two function, so that could relate

23      to the same agency, one at that agency

24      and one consulting with them.

25      Q    Are DOGE employees given any

Page 89

1    training or guidance about how to

2    communicate with agency officials whether

3    they are acting with their agency hat on

4    or their DOGE hat on?

5            MR. HUMPHREYS:   Objection to

6        form.

7        A    Well, every employee, in this

8    case independent agencies, we have people

9    that are dual on-boarded, so in this case

10   we're talking about dual on-boarded --

11   dual on-boards, they each have employment

12   agreements with each agency with which

13   they describe who they really -- or who

14   they are supervised by, so in some sense

15   I would say that they are like that

16   guidance, as far as who they technically

17   report to and, therefore, how they

18   probably should communicate with those

19   individuals and what their job

20   responsibilities are, so to that extent,

21   sure.

22       Q    Are you aware that some DOGE

23   employees and detailees are concurrently

24   working in some capacity at multiple

25   agencies at once?

Page 90

1          MR. HUMPHREYS:  Objection,

2      foundation.

3      A    I'm aware that some employees

4  have multiple detail agreements that are

5  active, yes.

6      Q    How many different agencies

7  might one employee have a detail

8  agreement with at any given time, is

9  there, like, a maximum number, that

10  you're aware of?

11      A    It varies by person.  I don't

12  think there's a formal maximum number.

13      Q    What's the highest number that

14  you're aware of?

15          MR. HUMPHREYS:  Objection as

16      to scope.  I think if you phrase

17      it in terms of policies,

18      procedures, and protocols it would

19      be okay, but as phrased it's

20      outside the scope and I'll

21      instruct her not answer.

22          (Instruction)

23          MR. GEORGE:  I want to push

24      back on that.

25          MR. HUMPHREYS:  Okay.

1           MR. GEORGE:  I think in our

2      briefing about discovery and in

3      Judge Mates's (phonetic) opinions

4      it has been pretty clear that

5      understanding concurrent

6      employment across multiple

7      agencies for DOGE employees is a

8      core factual inquiry that is

9      supposed to be explorable in

10     discovery here.

11          MR. HUMPHREYS:  I -- I

12     disagree.  I think topic three

13     relates to detailed or otherwise

14     working at defendant agencies, and

15     then in the bullet serving in the

16     subparts to the question,

17     including policies and procedures

18     and protocols, if you want to, you

19     should point me to the order.

20          We can take a break and go

21     off the record if you want.

22          MR. GEORGE:  If we limited

23     it to the people identified

24     already by agencies would you --

25     would you allow her to answer?

Page 92

1          MR. HUMPHREYS:  As to -- you

2     mean asking the responses that are

3     already in the interrogatory

4     response?

5          MR. GEORGE:  Yeah, so --

6     where is my -- so on the note in

7     the interrogatory responses, one

8     of the questions was the number of

9     federal agencies that the DOGE

10     employee is concurrently detailed

11     to or otherwise employed by, and

12     in the deposition notice in

13     examination topic three, we ask

14     about DOGE employees'

15     responsibilities at defendant

16     agency, DOGE, and any other

17     federal government entities to

18     which they have been detailed or

19     otherwise assigned.

20          I think this is squarely

21     within the scope of the discovery

22     in this case.

23          MR. HUMPHREYS:  Okay.  Thank

24     you.

25          THE WITNESS:  Can you repeat

Page 93

1           the question?

2                  MR. GEORGE:  Yeah.

3    BY MR. GEORGE:

4           Q     Is there -- what's the highest

5    number of agencies that a DOGE employee

6    or detailee is concurrently employed at

7    or detailed at, that you're aware of?

8                  MR. HUMPHREYS:  Still object

9           as to scope, but I will let her

10          answer it.  I think that's

11          different from responsibilities,

12          but if she knows then she may

13          answer it.

14          A     The most I have seen, including

15   detailees and employees of USCS, is

16   eight.

17                 But I will also add that that

18   is not the common number, I say -- would

19   say most people I see between one and --

20   one, two or three.

21          Q     Does DOGE provide any training

22   or guidance to employees on -- employees

23   or detailees on how to manage

24   responsibilities across multiple

25   agencies?

1       A       USCS gives some guidance on

2    general data sharing policies and how to

3    help them manage and comply according to

4    various laws in place.

5               As far as their actual

6    responsibilities I would say those are

7    governed by their agency agreements that,

8    you know, dual either their on-boarding

9    employee agreements or their detail

10   agreements.

11      Q    Can you -- you mentioned data

12   sharing policies, could you tell me a

13   little bit about the data sharing

14   policies that DOGE gives employees

15   guidance about when they're employed at

16   multiple agencies?

17      A     At a high level, the

18   guidance -- the guidance helps employees

19   know what logs are applicable and

20   instructs them to comply by statute.  But

21   this is privileged legal information, so

22   I don't want to share more.

23      Q    Does DOGE give any guidance to

24   the receiving agencies about the

25   concurrent employment of DOGE employees

1    at multiple agencies?

2        A    I'm not aware of any guidance

3    that USCS gives to the agencies,

4    themselves, outside the detail agreements

5    or the direct on-boarding.

6        Q    Who decides to -- are you

7    familiar with Chris Young and Nikhil

8    Rajpal?

9        A    I'm familiar with them, yes.

10       Q    Have they ever had -- have they

11   ever been employed by DOGE or the DOGE

12   temporary organization, aside from their

13   detailed unit from OPM?

14           MR. HUMPHREYS:  Objection as

15       to scope.

16           Can you help me tie it to

17       the topics?

18           MR. GEORGE:  I'm asking

19       about the employment relationship

20       between DOGE detailees and DOGE.

21           MR. HUMPHREYS:  Sorry,

22       apologies.

23           Objection, foundation.

24           MR. GEORGE:  Yeah.

25           MR. HUMPHREYS:  Go ahead.

Page 96

1   BY MR. GEORGE:

2        Q     Chris Young and Nick Rajpal are

3   detailees from OPM to DOGE; is that

4   right?

5        A     They're detailees from OPM to

6   USCS, yes.

7        Q     Have they ever been formally

8   employed by DOGE in some other mechanism,

9   directly employed by USDS or the

10  temporary organization?

11       A     Not to the best of my

12  knowledge.

13       Q     Who hired Marko Elez into the

14  federal government?

15       A     At what instance are you

16  referring to?

17       Q     Initially, who was the first

18  person who made a decision to hire Marko

19  Elez into the federal government, whether

20  as a volunteer or otherwise?

21            MR. HUMPHREYS:  Objection as

22       to scope to the extent that

23       Mr. Elez was not at the defendant

24       agencies at the time.

25            MR. GEORGE:  I don't think

Page 97

1          that's relevant.  The fact that he

2          wasn't at the defendant agencies

3          at the time doesn't mean that it's

4          not on scope.

5               I assume that many people

6          are hired somewhere and then

7          detailed to the federal -- to the

8          agencies later.

9               MR. HUMPHREYS:  Okay.  I'll

10          let her answer.

11               Thank you.

12     A     I do not know who originally

13   hired Marko.

14     Q     What about Edward Coristine?

15     A     Similarly, if you're asking who

16   originally authorized his original hire,

17   I do not know.

18     Q     Kyle Schutt?

19     A     Same, he's not a USCS employee.

20   I do not know who hired him.

21     Q     Luke Farritor?

22     A     Same.

23     Q     Chris Young?

24     A     Same.

25     Q     Nikhil Rajpal?

Page 98

1          A      Same.

2          Q      Are you familiar with the White

3    House's executive order implementing the

4    workforce optimization initiative?

5          A      I'm familiar with it, yes.

6          Q      Is that one of the documents in

7    the binder?

8          A      Yes.

9          Q      Section 3B3 direct the DOGE

10   team lead at each agency to provide the

11   USDS administrator with a monthly hiring

12   report for the agency; do you see that?

13         A      Yes, I see that.

14         Q      Has a USC administrator been

15   receiving those reports?

16         A      I know she, as the acting

17   administrator, has definitely been

18   receiving reports from agencies.  I don't

19   see all of those reports, and I know

20   there's various executive orders that ask

21   for reports to be sent, so I don't know

22   exactly which reports have all been sent,

23   and the work is ongoing.

24         Q      Okay.  Turning to -- back to

25   DOGE employees who are working out of

1      agencies like Labor, HHS, CFPB, are those

2      employees able to access sensitive

3      systems within those agencies from

4      outside the agency building?

5           A    I -- it's my understanding

6      they're able to access those systems from

7      their agency laptops, if given access to

8      do so on the basis that they need it for

9      the work that they are performing.

10               I believe oftentimes that's

11     at the agency.  But I guess I don't

12     know for sure that that can't happen

13     outside of the four walls of the

14     building if they're on their agency

15     laptop.

16          Q    Do you know whether they use

17     their agency laptop to access those

18     systems from outside those four walls?

19               MR. HUMPHREYS:  Objection,

20          vague.

21     BY MR. GEORGE:

22          Q    You can answer.

23          A    I think that that has happened

24     on some occasion, but I would say the

25     general practice, from my knowledge, is

Page 100

```
1       for them to be at the agency that they're

2       working on the systems from that agency.

3            Q     And when you say you think that

4       has happened, to your knowledge, do you

5       know the location where that access

6       happened?

7            A     Not specifically, there's --

8       I'm sure there's been various locations

9       that that's happened.

10           Q     Have DOGE teams at agencies

11      made any changes to information systems

12      at federal agency -- at the agencies to

13      facilitate offsite access by DOGE

14      employees?

15                 So some examples might include

16      installing remote access software, making

17      changes to system security software or

18      policies, or making changes to agency

19      firewalls?

20                 MR. HUMPHREYS:  Objection as

21           to form.

22           A     As I previously said, when

23      employees are at the agency they're under

24      the direction of their agency

25      supervision, so might be a better
```

1      question to ask the agencies.

2              I'm not familiar with

3      everything that they have done while at

4      the agency.  But I would say not

5      according to my knowledge, I don't know

6      of an instance of that occurring.

7      Q      To your knowledge or to DOGE's

8      knowledge, DOGE's knowledge, has anybody

9      who works at or is detailed to DOGE ever

10     seen personally identifiable information

11     from another agency's systems that they

12     were not detailed to or employed at?

13     A      I'm not aware of every

14     instance, it is not my -- not according

15     to my knowledge has this happened, but I

16     can't promise that that has never

17     happened.

18             But there's no reason for me

19     to believe that it has, given the

20     people doing the work at the agency

21     received the appropriate, you know,

22     access and data that they need to do

23     the work at their own agency, and USCS

24     can, for example, can advise and

25     consult without seeing PII.

Page 102

1        Q     Are you aware of any efforts or

2    any work by DOGE employees or detailees

3    or DOGE teams that cross-referenced,

4    compare or combine data from multiple

5    systems containing PII?

6              MR. HUMPHREYS:   Objection to

7         form.

8        A     So as far as I understand the

9    laws related to sensitive information,

10   there are times when there are

11   interagency agreements that allow for

12   such data sharing, and there can also be

13   exceptions to the privacy act to certain

14   information being shared.

15             All employees of USCS, and I

16   know of the agencies, as well, receive

17   guidance and are expected to comply with

18   all applicable laws related to the

19   information that they have.

20        Q     Are you aware of any efforts

21   that cross-reference or compare or

22   combine data from multiple different

23   systems containing PII?

24        A     I'm not aware of any specific

25   efforts, that said, I would assume that

Page 103

1      if there are such efforts they all comply

2      with the applicable law that we expect

3      employees to comply by.

4              And again, the agencies have

5      ultimate authority and control over their

6      own information that's being accessed.

7      Q    Can the agency choose to

8      disclose records to DOGE for this sort of

9      the cross-referencing comparison or

10     combination of data?

11             MR. HUMPHREYS:  Objection,

12         calls for a legal conclusion.

13             MR. GEORGE:  I don't think

14         it calls for a legal conclusion.

15     A    Yes, to my understanding

16     agencies, like an executive order, can

17     share unclassified information to USCS to

18     allow them to consult, but it must

19     continue, again, to comply with relevant

20     law pertaining to those -- for those

21     specific data sets.

22             And also, again, worth noting,

23     there's really no reason to share any

24     sensitive information with USCS.  We

25     don't have databases, really, besides our

Page 104

```
1       HR system, and all we're doing is

2       advising and consulting and so --

3               MR. GEORGE:  Could we get a

4          time check?

5               (Discussion held off the

6          record.)

7               MR. GEORGE:  I'll go back on

8          the record.

9    BY MR. GEORGE:

10        Q     Have any DOGE employees or

11     detailees made any copies, including

12     screen shots or data dumps of records

13     containing PII retrieved from agency

14     servers?

15               MR. HUMPHREYS:  Objection,

16          vague.

17    BY MR. GEORGE:

18        Q     You can answer.

19        A     Again, I'm not aware of every

20     instance or.  Like I'm not aware of that

21     happening.  I can't promise it hasn't,

22     but once -- if an employee is at an

23     agency I would assume that they have all

24     of the information they need as a member

25     of that agency to carry out their work.
```

Page 105

1              And we -- our practice and

2      policy as an organization, and that we've

3      shared with employees, like I said, is to

4      adhere to data protection standards,

5      including those that are set by their

6      agency.

7              And so we expect employees to

8      comply with -- with that, although I

9      can't speak to every individual's level

10     of compliance.

11     Q      Are you aware of any instance

12     of noncompliance?

13     A      I'm not aware of any specific

14     instances, no.

15     Q      Are you familiar with the

16     President's executive order on

17     eliminating information silos?

18     A      Yes, I am familiar with it.

19     Q      The executive order directs the

20     intra and interagencies sharing and

21     consolidation of agency records, is that

22     your understanding of the purpose as

23     well?

24     A      Can I see the executive order?

25     Q      Yes.

Page 106

1          A      Thank you.  I'm not sure I have

2     this.

3          Q      That's in the DOGE binder, tab

4     number 11.

5          A      That's not the one I have.

6          Q      So if you --

7          A      Yes, it says:  Purpose removing

8     unnecessary barriers to federal employees

9     accessing government data and promoting

10    interagency data sharing.

11         Q      Is DOGE currently working on

12    implementing this executive order?

13              MR. HUMPHREYS:  Objection as

14         to scope.  Can you tie it to one

15         of the topics?

16              MR. GEORGE:  Yes.  I think

17         it goes to the mission of DOGE and

18         the responsibilities of DOGE

19         between January 20th and today.

20              MR. HUMPHREYS:  I think

21         that's different from mission, but

22         you can go ahead with your

23         question.

24    BY MR. GEORGE:

25         Q      Is DOGE working on implementing

1    this executive order?

2         A    I believe, yes, they have

3    ongoing work to help implement this as

4    part of the broader scope of the

5    President's DOGE agenda.

6         Q    If you look at section 3A,

7    which is -- well, I'm looking at the end

8    of it, which is on the back of the page.

9         A    Okay.

10        Q    But it orders agency heads to

11   ensure federal officials designated by

12   other agency heads to, among other

13   things, towards the end, authorizing and

14   facilitating both the intra and

15   interagency sharing and consolidation of

16   unclassified agency records.

17             Are you aware of any DOGE --

18   any projects either conducted by DOGE or

19   advised on by DOGE related to

20   consolidating unclassified agency records

21   interagency?

22             MR. HUMPHREYS:  Objection as

23        to scope.  She can answer.

24        A    Again, I'm not aware of

25   specific -- maybe specific projects that

1    are working on this.  But, like I said

2    earlier, I know that this is part of the

3    President's DOGE agenda, and the other

4    executive orders also say that this can

5    happen, according to a law for

6    unclassified information.

7              And I understand that this is

8    one of the, like, missions and part of

9    improving efficiency and productivity

10   across the government.

11             But USCS has, I would say,

12   visibility into all the projects being

13   done, but doesn't have complete

14   visibility into every project being done

15   at every agency.

16             So, therefore, I don't have a

17   specific example in mind to share.

18        Q    You're not aware of any

19   specific examples of USDS consulting on

20   the consolidation of agency records

21   interagency?

22             MR. HUMPHREYS:  Objection as

23        to scope.  Go ahead.

24        A    My understanding is that this

25   happens, but that I'm not aware of the

Page 109

1    specific example to share.

2         Q    What's confusing, when you say

3    you're not aware of a specific example to

4    share, are you saying you're aware of

5    specific examples but don't want to

6    share?

7         A    No.

8         Q    You're not?

9         A    I'm not aware of a specific

10   example.

11        Q    Okay.  Section B says:  Within

12   30 days of the date of this order agency

13   heads shall, to the maximum extent

14   consistent with law, rescind or modify

15   all the agency guidance that serves as a

16   barrier to be inter or intra-agency

17   sharing of unclassified information

18   specified in the previous section that we

19   were talking about, are you aware of any

20   rules or regulations governing data

21   access that had been rescinded since this

22   order?

23             MR. HUMPHREYS:  Objection as

24        to scope.

25             Go ahead.

Page 110

```
 1        A     I'm here on behalf of USCS,

 2   yes, and so I think more to fall into the

 3   agency's understanding, so I'm not aware

 4   of any specific ones on behalf of the

 5   agencies that have been rescinded.

 6        Q     To the extent that -- I could

 7   ask this two ways, I guess.  First is,

 8   are you aware of any recisions or

 9   modifications to agency guidance in line

10   with this subsection that USDS has

11   consulted or advised on?

12             MR. HUMPHREYS:  Will you

13        agree to a standing scope

14        objection to this line of

15        questioning?

16             MR. GEORGE:  Sure.

17             MR. HUMPHREYS:  Go ahead.

18             THE WITNESS:  Sure.  Let me

19        read it.

20        A     I'm not specifically aware of

21   sections, aware of sections, yes.

22             MR. GEORGE:  Okay.  Would it

23        be okay to take a little break and

24        then do a short home stretch?

25             MR. HUMPHREYS:  Yes.
```

Page 111

1              THE WITNESS:  Yes.

2              Like I get a say.

3              MR. HUMPHREYS:  You get a

4        say.

5              Off the record.  Thank you.

6              (Recess.)

7              MR. GEORGE:  Back on the

8        record.

9    BY MR. GEORGE:

10        Q    I want to loop back to one

11    point before -- you'll remember that I

12    read you a bunch of names and asked you

13    who hired them.  I just wanted to go

14    through a similar exercise really

15    quickly.

16        A    Okay.

17        Q    If you're able to tell me

18    whether these individuals submitted

19    employment applications to the online

20    portal that you described.

21        A    Okay.

22        Q    Marko Elez?

23        A    Not according to my knowledge.

24        Q    Edward Coristine?

25        A    Not according to my knowledge.

Page 112

1       Q      Kyle Schutt?

2       A      Not according to my knowledge.

3       Q      Luke Farritor?

4       A      Not according to my knowledge.

5       Q      Chris Young?

6       A      Not according to my knowledge.

7       Q      Nikhil Rajpal?

8       A      Not according to my knowledge.

9       Q      Rachel Riley?

10      A      Not according to my knowledge.

11      Q      Conor Fennessy?

12      A      Yeah, not according to my

13   knowledge.  I don't know.

14      Q      Zach Terrell?

15      A      Not according to my knowledge,

16   and I want to confirm, when I say:  Not

17   according to my knowledge, I don't know.

18      Q      Understood.

19             Jerry Lewin?

20      A      Not according to my knowledge.

21      Q      Gavin Kliger?

22      A      Not according to my knowledge.

23      Q      Aram Moghaddassi?

24      A      Not according to my knowledge.

25      Q      And Miles Collins?

Page 113

1        A     Not according to my knowledge.

2        Q     Going back to the point about

3    comparing or consolidating agency records

4    across agencies, I want to go to tab two

5    of that binder, figure out exactly where.

6    Give me one second to find the exact

7    spot.

8                MR. HUMPHREYS:  For the

9          record, this appears to be a

10         reported transcript of the Fox

11         News interviews?

12               MR. GEORGE:  That's right,

13         yeah.

14               Unfortunately, I could not

15         find an official transcript, this

16         is the best I got from some news

17         website that seems to do an okay

18         job of transcribing it.

19               So we're going to -- you

20         might see it in the corners.

21         They're very tiny page numbers,

22         I'm going to page 16 of 24 here.

23   BY MR. GEORGE:

24         Q     So before I had asked whether

25    you were aware of any DOGE work to

Page 114

1      compare or consolidate or cross-reference

2      agency records across multiple agencies?

3          A      Mm-hmm.

4          Q      Here Mr. Musk is giving an

5      interview, and he says -- he notes that,

6      according to him, there were over 300

7      million dollars of small business

8      administration loans that has been given

9      out to people under the age of 11.

10              Well, actually, to add to it,

11     it's 300 million dollar under the age 11

12     and over 300 million dollars over the age

13     20.

14              If we go to the next page, a

15     team member, I'm not sure which team

16     member, it doesn't say, says that the

17     reason this is happening is because the

18     two systems are not talking to each

19     other.  And so you don't know at the

20     Small Business Administration that you're

21     giving a loan to a nine-month-old, which

22     happened in one case because you're not

23     cross-referencing that with a Social

24     Security Administration data that has

25     birth dates, so that very, very simple

1    fix eliminates tremendous fraud.

2            Are you aware of an effort

3    to cross-reference information from

4    these two agencies of the type that I

5    was asking about before?

6            MR. HUMPHREYS:  Objection as

7        to scope, but you can answer if

8        you know.

9    A    As I said before, I'm aware of

10    this generally occurring across -- or

11    DOGE teams implementing a President's

12    DOGE agenda, to my understanding, both of

13    these agencies it's referring to the

14    Small Business Administration and Social

15    Security Administration are out of the

16    scope of this case.

17            So I was not aware of this --

18    not aware of the specific project on or

19    more details than I can read here.

20    Q    Understood.  So you weren't

21    aware of this specific project; is that

22    right?

23            MR. HUMPHREYS:  Same

24        objection.

25    A    You asked if I'm aware of

Page 116

1    cross-referencing --

2         Q      Mm-hmm.

3         A      -- in this case?

4         Q      I was asking if you were aware

5    of efforts to cross-reference information

6    across databases from multiple agencies

7    undertaken by DOGE?

8              MR. HUMPHREYS:  Objection as

9         to scope.  You can answer.

10        A      Like I said, I'm not aware of

11   specific instances with the defendant

12   agencies.

13        Q      You're not aware with -- so

14   when you said you weren't aware you meant

15   with respect to the specific agencies who

16   are defendants in this case?

17        A      I will repeat, I am aware

18   generally that this is a mission and

19   purpose that DOGE teams generally are

20   working on, I'm not aware of a specific

21   instance.

22              I now read this, and see that

23   there is, you know, could be an instance

24   here, but I don't know more information

25   than -- than that.

1          Q      Do DOGE employees or detailees

2     ever use agency laptops at DOGE

3     facilities?

4               MR. HUMPHREYS:  Objection,

5          vague.

6               Are we talking about the

7          defendant agencies or everywhere?

8     BY MR. GEORGE:

9          Q      Everywhere.

10              MR. HUMPHREYS:  Then

11         objection as to scope.

12              You can answer.

13         A      Yes, I believe, at times, there

14    are employees that, like, will use their

15    agency laptop, sometimes.

16              Like I said, at the agency,

17    sometimes not at the agency, is the

18    common practice for employees to conduct

19    their agency work at their agency.

20              But I'm aware of instances

21    where that may have occurred elsewhere.

22         Q      You're aware of specific

23    instances where that may have occurred

24    elsewhere?

25         A      Yeah, sure, so like, for

1       example, in the past, like, US Digital

2       Service, they've always been detailed to

3       different agencies and they use --

4       they -- they'll often go on site, but

5       oftentimes they want to be onsite or

6       they'll be at Jackson Place and doing

7       their work on their -- still on their

8       agency devices and within the -- within

9       the scope of their responsibilities

10      there.

11              So in that case, sure.

12      Q      Do the DOGE employees ever use

13      DOGE laptops and cell phones when working

14      on site at defendant agencies?

15      A      Like I said, it's the practice

16      for the employees to use the assets that

17      they've been given for a certain agency

18      when they've been doing work at that

19      agency.

20              If someone were to use their

21      USDS assets at another agency I would

22      assume that it would be for that work

23      exclusively for their USDS work.

24              And, again, I can't comment on

25      anyone that's individual compliance but

Page 119

1    that's the general practice is to use the

2    agency that you're working on asset's,

3    generally, at that location, you know,

4    it -- it varies where people perform

5    their work.

6        Q    You made reference to, for

7    example, historically US Digital Service

8    employees have sometimes done work off --

9    agency work off site at Jackson Place.

10            Is that where the temporary

11   organization, also, is currently

12   headquartered and works?

13       A    So US DOGE Service currently

14   occupies a few different spaces, they

15   occupy Jackson Place, there's some

16   portion of US DOGE Service that are

17   remote employees and that are

18   transitioning to being in person at

19   different federal agencies buildings as

20   the return to office has been rolled out,

21   and then also we have location within the

22   EEOB.

23       Q    Does DOGE have any written

24   policies or guidance on sharing agency

25   data?

Page 120

1          A       Yeah, like I said, USCS has

2      given information or given guidance,

3      legal guidance, on data sharing to be,

4      like, as it pertains to the applicable

5      law that governs data sharing.

6                  And of course agencies have

7      their own data sharing policies that

8      employees are expected to comply by, as

9      well.

10         Q       And the policies that you're

11     referring to inform DOGE employees of

12     their legal obligations while conducting

13     their work; is that right?

14                 MR. HUMPHREYS:   Objection,

15         mischaracterizes testimony.

16     BY MR. GEORGE:

17         Q       I'm trying to repeat back or

18     summarize what you said.

19         A       Mm-hmm.

20         Q       Which is -- you tell me, did --

21     did they receive written guidance about

22     their legal obligations when it comes to

23     managing agency data?

24         A       They received legal guidance on

25     general data sharing policies, but

1    agency-specific data sharing policies

2    come from that agency.

3         Q    Understood.  Have DOGE

4    employees ever been advised that they

5    would receive a pardon if they broke the

6    law in the course of their work?

7              MR. HUMPHREYS:  Objection,

8         that is far outside the scope,

9         instruct the witness not to

10        answer.

11             (Instruction)

12             MR. GEORGE:  We're talking

13        about the training employees

14        receive on their legal -- legal

15        obligations in order to do the

16        work that is an issue on these --

17        in this case and at these

18        agencies.

19             MR. HUMPHREYS:  I -- I still

20        believe that's outside of the

21        scope.

22             And any legal advice

23        provided we covered -- would be

24        privileged, if not, the witness

25        shouldn't provide it.

Page 122

1           MR. GEORGE:  Is that legal

2      advice?

3           MR. HUMPHREYS:  I'm saying

4      it's outside the scope.  I don't

5      know what the answer is, but there

6      could be -- there could be legal

7      advice involved, if that ever

8      happens, I'm not saying it did,

9      and I just instructed the witness

10      not to answer based on the scope

11      and, separately, to the degree it

12      calls for sharing legal advice.

13           MR. GEORGE:  Okay.  Mind if

14      we take, like, a two-minute break?

15           MR. HUMPHREYS:  Okay.  Go

16      off the record.

17           (Recess.)

18           MR. GEORGE:  Just a few last

19      questions I wanted to follow-up

20      on.

21           THE WITNESS:  Okay.

22  BY MR. GEORGE:

23      Q    We talked about whether certain

24    individuals had applied for employment

25    through the online portal.

1              Do you know of people who have
2    applied for jobs through the online
3    portal?
4         A    Yes, I do.
5         Q    Does DOGE have any written
6    policies related to data sharing or
7    concurrent employment?
8              MR. HUMPHREYS:  Objection,
9         form.
10        A    As I have said, there is
11   guidance on data sharing but no -- and
12   then there are, like, technology
13   agreements that every EOP employee signs,
14   that talks vaguely about just, like,
15   presidential records after keeping all
16   the things that they have to do to comply
17   with that, and just consenting with their
18   data on their computer stays on their
19   computer, that sort of thing, but no
20   formal policies, I wouldn't say policy
21   that is USCS specific.
22        Q    The guidance about data
23   sharing, is that a written document?
24             MR. HUMPHREYS:  I just
25        instructed the witness not to

1        answer to the extent it would

2        reveal privileged communication.

3              You can answer that

4        question.

5        A     It is written, yes.

6        Q     Are there requirements for DOGE

7    teams at agencies to coordinate with DOGE

8    with USCS and USC organization?

9              MR. HUMPHREYS:   Objection,

10        form.

11        A     To the extent that the

12    executive orders talk about the US DOGE

13    Service is helping DOGE agency teams

14    implement, but there are not -- well, the

15    EOs talk about some specific ways in

16    which the DOGE agency teams should

17    interact with USDS.

18              I don't know exactly what you

19    mean by requirements, but DOGE, like,

20    USCS certainly coordinates with most, if

21    not all, the DOGE agency teams but in

22    varying capacities and volumes.

23        Q     Is there any division of labor

24    internally, within DOGE, for which DOGE

25    leaders take primary responsibility for

Page 125

1    managing operations of the USDS and which

2    leaders take primary responsibility for

3    managing operations of the temporary

4    organization?

5        A    As I said, there is no formal

6    org chart within USDS, outside of Amy

7    Gleason being the acting administrator

8    and her --

9        Q    I think you said having

10   supervisory authority?

11       A    Having supervisor authority

12   over the temporary organization and the

13   permanent organization.

14       Q    In practice, is there any

15   division of labor between different

16   leaders spending more time on one side of

17   the house versus the other?

18            MR. HUMPHREYS:  Objection to

19       form.

20       A    In practice, there are, like,

21   many USCS employees that help execute the

22   mission of USCS across the organization.

23            I would say that there is no

24   formal division of labor, as you said.

25   And like I said in the very beginning,

Page 126

1        the function of the temporary

2        organization and the permanent

3        organization are all to implement the

4        President's DOGE agenda, and there are

5        leaders that help advise and consult on

6        how that's done across the organization.

7            Q      Do all 89-ish employees at

8        detailee employees at USDS report

9        directly to Amy Gleason or is there --

10       are there any intervening layers of

11       structural authority?

12           A      Correct.  Amy Gleason has

13       formal authority over all of the

14       employees within USDS.

15           Q      Do any of them report to

16       somebody else who then reports to Amy

17       Gleason or do they all directly report --

18       are they all direct reports to Amy

19       Gleason?

20           A      Can you define report?

21           Q      So I think -- I think of a

22       direct report as a subordinate.  A

23       subordinate's kind of lowest or first

24       level of contact in an organization.

25       Often it is, like, a manager, for

Page 127

1    example.

2              In most organizations you will

3    have line employees, and then some layers

4    of management before you get to the head

5    of the organization.

6              So I'm curious, within USDS and

7    the USDS temporary organization, are

8    there any intervening managers or layers

9    of authority between the 89 employees and

10   Amy Gleason?

11       A    Nobody that has formal

12   authority to make any -- an authority, as

13   we've defined it, in this case.

14             In the permanent organization,

15   for example, they have, like, informal

16   directors, but like that they may have,

17   like, varying relationships with

18   different people on and talk to them

19   about different things.

20             I think, as a principal of an

21   organization, that's common, right, for

22   there to be people that help carry out

23   some different functions.

24             But there's no formal

25   supervisory authority, and even within

Page 128

1     the permanent organization there's no

2     formal org chart, like I've said before.

3         Q     Is there a process for employee

4     reviews or ratings within the USDS

5     temporary organization?

6         A     There is not performance review

7     process.  Employees are on termed

8     appointments and so that's not a common

9     practice.

10            MR. GEORGE:  Okay.  I think

11        that is it for me.

12            THE WITNESS:  Thank you.

13            MR. HUMPHREYS:  No redirect

14        from us, so thank you so much.

15            (Signature having not been

16        waived, the deposition of KENDALL

17        LINDEMANN was concluded at 2:16

18        p.m.)

19

20

21

22

23

24

25

Page 129

1                ACKNOWLEDGMENT OF DEPONENT

2

3            I, KENDALL LINDEMANN, do hereby

4    acknowledge that I have read and examined

5    the foregoing testimony, and the same is a

6    true, correct and complete transcription of

7    the testimony given by me and any

8    corrections appear on the attached Errata

9    sheet signed by me.

10

11    _____    _____

12        (DATE)                      (SIGNATURE)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 130

1              CERTIFICATE OF SHORTHAND REPORTER

2         I, Cassandra E. Ellis, Registered

3    Professional Reporter, Registered Merit

4    Reporter, Registered Diplomate Reporter,

5    California Certified Shorthand Reporter, the

6    officer before whom the foregoing

7    proceedings were taken, do hereby certify

8    that the foregoing transcript is a true and

9    correct record of the proceedings; that said

10   proceedings were taken by me

11   stenographically and thereafter reduced to

12   typewriting under my supervision; and that I

13   am neither counsel for, related to, nor

14   employed by any of the parties to this case

15   and have no interest, financial or

16   otherwise, in its outcome.

17              IN WITNESS WHEREOF, I have

18   hereunto set my hand this 9th day of April

19   2025.

20

21

22   _____

23   Cassandra E. Ellis, CA, HI-CSR, WA-CCR, RMR,

24   RDR, CRR, Realtime Systems Administrator

25

Page 131

1            E R R A T A   S H E E T

2        IN RE:  AFL-CIO, et al., v. DEPARTMENT

3    OF LABOR, et al.

4    RETURN BY: _____

5    PAGE    LINE    CORRECTION AND REASON

6    _____   _____    _____

7    _____   _____    _____

8    _____   _____    _____

9    _____   _____    _____

10   _____   _____    _____

11   _____   _____    _____

12   _____   _____    _____

13   _____   _____    _____

14   _____   _____    _____

15   _____   _____    _____

16   _____   _____    _____

17   _____   _____    _____

18   _____   _____    _____

19   _____   _____    _____

20   _____   _____    _____

21   _____   _____    _____

22   _____   _____    _____

23

24   _____    _____

25      (DATE)                (SIGNATURE)

Case 1:25-cv-00339-JDB    Document 82-7    Filed 04/29/25    Page 133 of 148

```
1     E R R A T A   S H E E T   C O N T I N U E D

2          IN RE:  AFL-CIO, et al., v. DEPARTMENT

3     OF LABOR, et al.

4     RETURN BY: _____

5     PAGE     LINE     CORRECTION AND REASON

6     _____    _____    _____

7     _____    _____    _____

8     _____    _____    _____

9     _____    _____    _____

10    _____    _____    _____

11    _____    _____    _____

12    _____    _____    _____

13    _____    _____    _____

14    _____    _____    _____

15    _____    _____    _____

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19    _____    _____    _____

20    _____    _____    _____

21    _____    _____    _____

22    _____    _____    _____

23

24    _____    _____

25        (DATE)                  (SIGNATURE)
```

**A**

abilities 9:4
able 5:12 26:3
  62:22 99:2,6
  111:17
accepted 54:10,25
accepts 50:23,24
access 99:2,6,7,17
  100:5,13,16
  101:22 109:21
accessed 103:6
accessing 106:9
accurate 13:15
  15:17
accurately 51:14
  64:9
acknowledge 86:2
  129:4
ACKNOWLED...
  129:1
act 102:13
acting 12:24 13:1
  13:13,16,20,23
  14:19,23 44:14,16
  45:6 49:1,5,11,12
  49:16,19 50:1,3
  66:10,24 67:8
  89:3 98:16 125:7
active 12:22 90:5
actual 23:21,24
  24:24 33:1 58:3,5
  94:5
add 78:18,24 93:17
  114:10
added 18:20
addition 87:10
additions 11:2
addresses 43:22
  44:1 69:19,21
  74:5,20
adhere 105:4
adjust 31:7
administration
  114:8,20,24
  115:14,15
administrator 2:7
  12:21,23,25 13:1

13:14,17,20,23
  14:19,23 44:14,16
  48:22,25 49:1,4,5
  49:7,10,11 50:1,3
  66:10,20,24 67:9
  98:11,14,17 125:7
  130:24
administrators
  49:13,15,17,19
advice 15:21 23:4
  25:25 26:7,21
  27:6 33:7,9 35:14
  36:24 38:14 46:12
  51:13,18,20,23
  52:13,24 53:23
  54:2,8,10,14,18
  54:24 55:2,7,13
  55:18 56:3,8,10
  56:13,15,17,21,23
  57:11,15,20 58:9
  58:21 59:1,4,7,12
  80:6,16 82:1
  85:20,21 86:15
  88:2 121:22 122:2
  122:7,12
advices 78:21 81:8
advise 22:15 68:20
  79:16,23 80:4
  81:15,21,23 86:23
  101:24 126:5
advised 107:19
  110:11 121:4
advisers 38:6
advises 21:4,6
  22:11,25 32:23
  35:8 51:16
advising 84:5 85:16
  104:2
advisor 14:25
  15:16,21 20:22
  22:17 27:4 30:11
  49:21,23,25 50:2
  50:6,23 54:11
  57:22 84:9
advisors 20:10
advisory 16:2 81:9
  85:7

affirm 45:5
AFL-CIO 1:4
  131:2 132:2
age 114:9,11,12
agencies 30:14
  32:23 33:3,4,9
  35:20 36:4 37:6
  38:1,3,14 39:1,2
  67:23 68:3 73:16
  76:21 77:3,9
  82:10 85:24 86:1
  89:8,25 90:6 91:7
  91:14,24 92:9
  93:5,25 94:16,24
  95:1,3 96:24 97:2
  97:8 98:18 99:1,3
  100:10,12 101:1
  102:16 103:4,16
  110:5 113:4 114:2
  115:4,13 116:6,12
  116:15 117:7
  118:3,14 119:19
  120:6 121:18
  124:7
agency 16:7 27:7
  27:11,17 29:12
  30:17 32:18 33:3
  33:14,14,25 34:5
  34:12 35:4,12,23
  35:24 36:1,8,12
  36:15,17,22 62:2
  62:24 73:15 74:1
  74:11 77:14 79:8
  79:15 80:13 81:13
  85:4 86:15,25
  87:7,12,14,22,23
  88:2,9,9,16,23,23
  89:2,3,12 92:16
  94:7 98:10,12
  99:4,7,11,14,17
  100:1,2,12,18,23
  100:24 101:4,20
  101:23 103:7
  104:13,23,25
  105:6,21 107:10
  107:12,16,20
  108:15,20 109:12

109:15 110:9
  113:3 114:2 117:2
  117:15,16,17,19
  117:19 118:8,17
  118:19,21 119:2,9
  119:24 120:23
  121:2 124:13,16
  124:21
agency's 101:11
  110:3
agency-specific
  121:1
agenda 9:13,23,25
  10:4,8,20 11:2
  13:7 14:7,12 16:8
  21:5 22:12,16,20
  22:21,23 27:8
  30:3,12,13 32:13
  33:23 34:1,18
  35:7 36:9,18 39:3
  51:17 68:21 73:12
  73:17 76:22 77:4
  80:8 81:24 85:18
  107:5 108:3
  115:12 126:4
Ageorge@democ...
  3:5
ago 27:24 69:24
  82:10
agree 39:4,11 62:16
  62:17 110:13
agreement 29:20
  75:17 81:16,19
  82:23,24 83:15,19
  83:22 84:14 86:14
  86:14,18 87:16,17
  87:20 90:8
agreements 85:23
  86:1 89:12 90:4
  94:7,9,10 95:4
  102:11 123:13
ahead 6:6,12 95:25
  106:22 108:23
  109:25 110:17
al 1:4,8 131:2,3
  132:2,3
ALEXA 3:9

aligns 34:6
allocated 41:17
allow 91:25 102:11
  103:18
allowed 65:6
Aman 3:2 5:8
Amilton@relma...
  3:12
amounts 71:17
Amy 7:21 8:2,6
  12:8,20,22 15:3
  16:9,10,12 17:2,4
  17:6,9,12,14,24
  18:5,11 19:24
  20:7 21:15 27:15
  37:23 44:13 45:11
  46:15 48:24 49:6
  49:7,9,25 50:9,17
  50:19 51:5 66:10
  66:23 125:6 126:9
  126:12,16,18
  127:10
and/or 17:15
answer 4:18 6:6,13
  6:22 7:1 16:16
  17:1 21:25 24:8
  24:12 26:11 32:11
  41:6 47:7,8 50:15
  51:9 52:2,17 54:6
  54:22 55:11,25
  57:6,24 58:14
  60:16 62:13 63:17
  63:18 64:15 90:21
  91:25 93:10,13
  97:10 99:22
  104:18 107:23
  115:7 116:9
  122:5,10 124:1,3
answered 58:12
  59:10
answering 5:25
  6:11
Anthony 20:17
  21:16 38:9
anybody 8:1 20:5,8
  23:16 101:8

apologies 95:22
apologize 11:14
appear 129:8
appears 85:25
  113:9
applicable 94:19
  102:18 103:2
  120:4
application 63:5
applications 42:8
  42:22 60:6 65:1,6
  111:19
applied 122:24
  123:2
apply 60:3 63:9
  64:3,3 66:1
appointed 13:19
  45:11
appointment 43:19
appointments
  128:8
appreciate 79:1
appropriate 101:21
approximation
  10:13
April 1:15 2:11
  130:18
AR 43:18
Aram 74:13 112:23
areas 38:7
Armstrong 20:17
  21:17 38:9
arrangement 68:13
arrangements
  37:25
aside 8:2 95:12
asked 42:15 57:25
  58:12 59:10 78:13
  111:12 113:24
  115:25
asking 23:3 35:24
  57:9 58:1,2,7,15
  64:17 92:2 95:18
  97:15 115:5 116:4
asks 17:14
aspects 10:3,8 13:7
assessing 31:20

assessments 60:8
assets 84:4 118:16
  118:21
asset's 119:2
assigned 92:19
assignees 83:7,10
assignment 86:13
assume 6:18 21:7
  45:1 56:14 57:14
  57:19 58:1,6,19
  76:10 97:5 102:25
  104:23 118:22
attached 129:8
attend 70:8 75:18
attorney 6:1
Austin 3:20
authority 13:12
  14:18 17:7 23:16
  23:20,24 24:20,24
  25:15,18,18,23
  34:8,13 44:9 45:7
  46:16 50:20 51:1
  61:19 66:8,11,15
  66:21 103:5
  125:10,11 126:11
  126:13 127:9,12
  127:12,25
authorized 15:3
  44:15 53:3 67:1
  97:16
authorizing 44:18
  107:13
aware 16:11 17:1,8
  17:11,13 18:9
  19:2 21:2,11 26:6
  26:20,23 34:1
  43:7 51:2,3,11,22
  52:11 53:25 54:9
  54:17 55:1,6,12
  55:17,24 56:2,7,9
  56:20,22 57:7,8,8
  57:10 58:8 59:3,6
  59:11,15 66:14
  67:14,19 69:5,22
  70:3,6 71:4,10,15
  71:19 72:1,8,17
  73:1 74:4,17

76:14 77:11 87:13
  87:15 89:22 90:3
  90:10,14 93:7
  95:2 101:13 102:1
  102:20,24 104:19
  104:20 105:11,13
  107:17,24 108:18
  108:25 109:3,4,9
  109:19 110:3,8,20
  110:21 113:25
  115:2,9,17,18,21
  115:25 116:4,10
  116:13,14,17,20
  117:20,22
a.m 1:16 2:12

_____

**B**
b 2:1 3:3 109:11
back 6:24,25 16:22
  17:22 22:8 26:17
  29:1 30:20 31:11
  41:12 46:6 48:3
  48:16,17 50:21
  52:9 53:19 59:17
  61:14 78:3,6 79:3
  90:24 98:24 104:7
  107:8 111:7,10
  113:2 120:17
barrier 109:16
barriers 106:8
based 24:24 47:18
  122:10
basis 47:15 54:4
  63:1 71:25 99:8
bearing 35:17
beginning 78:13
  125:25
behalf 3:2,8,14 7:4
  26:5 36:2 74:2
  79:8,14,14 84:12
  84:15,19 110:1,4
believe 13:19 18:13
  18:17 21:18 28:22
  40:2 61:21 62:11
  64:4 65:14 68:25
  70:23 74:8 75:20
  87:9 99:10 101:19

107:2 117:13
  121:20
BENJAMIN 3:15
Berman 3:15 20:16
  21:16
best 10:12 12:1,5
  96:11 113:16
better 100:25
beyond 22:1 23:19
  24:20 41:3 52:17
big 14:4
binder 82:7,14,17
  82:22 98:7 106:3
  113:5
binders 82:6
birth 114:25
bit 26:25 28:13
  75:2 78:16 94:13
board 38:18 44:4
body 16:3 31:2
  86:8
Box 3:4
Brad 21:16 24:9
  26:24 27:4 28:15
  29:25 30:10 31:13
  31:19,24 32:5
  33:6,18 34:24
  35:3 38:10 47:14
  79:4 80:6 81:7
BRADLEY 3:14
Bradley.humphr...
  3:18
break 6:7,10,13
  47:17,21,23 48:1
  91:20 110:23
  122:14
breakdown 43:7
breaks 6:9
briefing 75:18 91:2
briefly 78:6
broader 107:4
broke 121:5
brought 38:12
building 99:4,14
buildings 119:19
bullet 83:9 91:15
bunch 111:12

business 114:7,20
  115:14

_____

**C**
C 3:1 5:1 132:1
CA 130:23
cadence 20:1 21:9
California 2:7
  130:5
call 9:5 15:17 60:7
calls 44:23 103:12
  103:14 122:12
capacities 124:22
capacity 13:25
  28:14 29:4 39:23
  72:11 80:18 82:4
  85:8,10,15,21
  87:25 89:24
career 43:9
carried 35:11,13
  84:18
carry 50:18 104:25
  127:22
carrying 35:1
  79:18
case 1:6 12:9,13
  14:16 35:9 65:3
  74:8 77:3 83:3
  84:5 86:18,22
  89:8,9 92:22
  114:22 115:16
  116:3,16 118:11
  121:17 127:13
  130:14
cases 38:17 42:16
  42:25
Cassandra 1:20 2:3
  130:2,23
categorical 44:3
categories 41:16
  65:18
category 43:10
CA-CSR 1:21
cell 118:13
centers 30:24
certain 60:6 69:4
  102:13 118:17

122:23
**certainly** 124:20
**CERTIFICATE** 4:10 130:1
**Certified** 2:5,7,9,9 130:5
**certify** 130:7
**CFPB** 99:1
**chain** 23:25 80:21 80:24 81:10
**changed** 64:11,18 77:17
**changes** 100:11,17 100:18
**characterization** 32:2 39:5 62:18 84:17
**characterize** 51:14
**characterized** 79:9
**charge** 37:8,17
**chart** 12:12,15 125:6 128:2
**check** 76:16 104:4
**check-in** 72:10,18
**check-ins** 72:3,16
**chief** 15:18
**choose** 103:7
**Chris** 95:7 96:2 97:23 112:5
**civil** 43:10
**clarify** 25:2 30:7 46:22 64:17 68:14 78:10 79:11
**classify** 73:5,6
**clean** 5:13
**clear** 10:1 55:1,10 61:25 91:4
**CMS** 83:2 84:7,8,8 84:12,12,14,14,19 84:19 85:3,4 86:5 86:8,9
**CMS's** 85:3
**COLFAX** 3:9
**collectively** 8:18
**Collins** 112:25
**colloquial** 45:4
**COLUMBIA** 1:2

**combination** 103:10
**combine** 102:4,22
**come** 6:24,25 65:6 65:22 121:2
**comes** 120:22
**coming** 86:15
**command** 23:25 80:21 81:11
**commands** 80:24
**commencing** 2:12
**comment** 29:13 46:12 47:5 77:18 118:24
**common** 42:14 93:18 117:18 127:21 128:8
**communicate** 17:22 89:2,18
**communicated** 17:17
**communication** 17:4 21:3,8 36:24 72:20 124:2
**communications** 19:1 21:11 23:7 37:5
**compare** 102:4,21 114:1
**comparing** 113:3
**comparison** 103:9
**complete** 7:1,14 108:13 129:6
**compliance** 105:10 118:25
**comply** 94:3,20 102:17 103:1,3,19 105:8 120:8 123:16
**component** 33:6
**computer** 123:18 123:19
**computers** 78:21
**concluded** 128:17
**concluding** 2:12
**conclusion** 44:24 103:12,14

**concurrent** 91:5 94:25 123:7
**concurrently** 89:23 92:10 93:6
**conduct** 117:18
**conducted** 107:18
**conducting** 120:12
**confirm** 112:16
**confusing** 109:2
**Congress** 30:25
**conjecture** 58:6,7
**Conor** 112:11
**consent** 61:4,7 77:21
**consenting** 123:17
**consideration** 58:22
**consist** 36:13
**consistent** 84:1 109:14
**consistently** 55:8
**consolidate** 114:1
**consolidating** 107:20 113:3
**consolidation** 105:21 107:15 108:20
**consult** 68:20 79:16 79:23 80:4 81:9 81:15,21,23 85:6 86:24 101:25 103:18 126:5
**consultation** 27:6 36:20 80:6,17
**consulted** 35:14 110:11
**consulting** 16:2 34:5 85:17 86:10 88:24 104:2 108:19
**consults** 32:22 35:9
**contact** 126:24
**containing** 102:5 102:23 104:13
**contains** 19:12
**content-wise** 58:18
**continue** 12:13

54:4 62:9 63:1 103:19
**continued** 67:4,12 67:14
**continues** 10:21
**control** 84:20 103:5
**conversation** 5:14 8:6,9 17:23
**conversations** 17:11,13 23:12
**conveys** 54:15 56:17 58:20
**coordinate** 36:5 38:7,13 124:7
**coordinates** 36:7 124:20
**coordinating** 37:8 37:17
**coordination** 35:22 36:12,21 37:1,3 37:22
**copies** 104:11
**copy** 82:11
**core** 34:19,25 91:8
**Coristine** 68:6 97:14 111:24
**corners** 113:20
**correct** 12:14 23:21 29:19 59:15 67:23 68:1,7 73:20 79:5 87:18 88:4 126:12 129:6 130:9
**CORRECTION** 131:5 132:5
**corrections** 129:8
**correctly** 76:23
**counsel** 47:19 75:19 77:19 130:13
**couple** 7:25 27:18 39:7 48:17
**course** 82:1 120:6 121:6
**court** 1:1 2:9 5:12 53:3
**Court's** 77:16
**covered** 121:23

**created** 30:24
**cross-reference** 102:21 114:1 115:3 116:5
**cross-referenced** 102:3
**cross-referencing** 103:9 114:23 116:1
**CRR** 1:20 130:24
**cures** 28:12
**curious** 127:6
**current** 14:14
**currently** 15:5 29:25 69:8 106:11 119:11,13

**D**

**D** 5:1 132:1
**data** 94:2,11,13 101:22 102:4,12 102:22 103:10,21 104:12 105:4 106:9,10 109:20 114:24 119:25 120:3,5,7,23,25 121:1 123:6,11,18 123:22
**databases** 103:25 116:6
**date** 109:12 129:12 131:25 132:25
**dates** 114:25
**Davis** 14:24 15:5 15:20 16:13 17:2 17:10 18:4 21:15 38:10 39:10,18,23 40:15 44:14 50:9 66:25 87:6
**Davis's** 17:25 49:20 51:6
**day** 50:18 130:18
**days** 27:24 109:12
**decided** 33:13
**decides** 95:6
**decision** 45:5 50:18 51:6 96:18

**decisionmaking**
14:5 22:1 34:7
50:20 52:22 53:9
62:5,7,23
**decisions** 15:1,2
22:19 25:20 26:4
33:1 61:20,25
**declaration** 4:12
12:8,11 18:12
67:20
**defendant** 1:9 3:14
77:3 91:14 92:15
96:23 97:2 116:11
117:7 118:14
**defendants** 48:7
61:17,21 62:8
116:16
**define** 21:13
126:20
**defined** 25:15,18
37:14 53:13
127:13
**definitely** 17:21
38:3 50:21 98:17
**definition** 24:25
25:24 45:1
**degree** 122:11
**delineation** 86:6
**DEMOCRACY**
3:3
**DEPARTMENT**
1:7 3:16 131:2
132:2
**depending** 63:10
65:8 75:24
**DEPONENT** 129:1
**deposition** 1:13 2:1
4:2 5:2 7:7,18
8:10 23:19 25:16
48:8 78:15 92:12
128:16
**deputy** 48:21,24
49:6,9,13,14,16
49:19 66:23,24
**describe** 10:13
20:20 27:2 29:3
32:4 39:22 59:25

65:17 70:13 72:9
89:13
**described** 13:5
28:25 29:1 30:9
31:8,19,24 33:5
33:17 34:14,18,25
35:2 38:20 41:15
64:9,20 65:11
76:3 87:20 111:20
**describes** 29:6
84:11
**describing** 22:24
27:22 32:7 80:1
**description** 64:7
**designated** 107:11
**detail** 37:24 68:13
77:13 87:16 90:4
90:7 94:9 95:4
**detailed** 67:22
68:16 77:2,6,16
91:13 92:10,18
93:7 95:13 97:7
101:9,12 118:2
**detailee** 87:9 93:6
126:8
**detailees** 18:15
68:5,9,10,18 69:8
69:17,18,20 73:14
74:6 89:23 93:15
93:23 95:20 96:3
96:5 102:2 104:11
117:1
**details** 115:19
**devices** 80:11 118:8
**dictionary** 24:25
**difference** 8:20 9:2
9:22,24
**different** 9:10 10:3
10:5,8,10 12:9
14:10,10 30:24
31:3 32:17 36:8
36:16,18,22,23
37:24 38:2,2,14
38:16,17,25 39:1
42:11 43:14 59:19
60:4 63:9,11,11
64:23 66:17 69:6

71:15,17 75:23
80:1 82:15 90:6
93:11 102:22
106:21 118:3
119:14,19 125:15
127:18,19,23
**differing** 70:11,12
**Digital** 12:4 41:20
118:1 119:7
**Diplomate** 2:5
130:4
**direct** 23:4 95:5
98:9 126:18,22
**direction** 100:24
**directions** 16:12
**directives** 17:1,9
**directly** 28:11 96:9
126:9,17
**directors** 127:16
**directs** 105:19
**disagree** 91:12
**disagreed** 50:10
**disagreement** 51:4
**disagrees** 17:16
**disclose** 103:8
**disclosure** 75:22
**discovering** 28:12
**discovery** 74:11
91:2,10 92:21
**discuss** 47:17
**discussed** 7:21 42:1
61:16 79:12 80:5
**Discussion** 16:20
22:6 26:15 41:10
46:4 52:6 53:16
61:11 104:5
**disease** 31:1
**dismiss** 46:16
**dispute** 62:19
**distinct** 11:9 27:12
**DISTRICT** 1:1,2
**division** 9:18
124:23 125:15,24
**document** 82:9
84:10,17 123:23
**documents** 7:23
82:22 98:6

**DOGE** 1:13 2:1
3:20 4:2 5:2 7:5,5
7:19 8:14,15,16
8:17,21,22,24
9:13,23,25 10:4,8
10:19 11:2 12:13
12:21,23 13:7,17
14:7,11,13 15:6,6
15:9,19 16:1,7,8
18:16,23 19:1,3
20:5,11,19,21,24
21:1,4,5,12,13
22:12,15,16,19,21
22:22,23 23:2,5,5
23:8,15,17 24:1
25:24 26:5,8,22
27:3,5,6,8,11
29:11,20 30:3,11
30:12,13,17 32:12
32:21,22 33:8,14
33:23 34:4,18,19
35:4,5,6,8,11,13
35:19,23 36:3,7,9
36:11,12,14,17
37:6,8,9,11,11,13
37:16,17 38:25
39:3 40:4,5,8,12
40:16,19 41:17
42:5,9 44:6 48:22
48:25 49:1,5,13
49:15 50:10 51:13
51:16,17,19,20,23
52:13,13,23 53:13
53:23,25 54:13,19
54:20 55:3,13
56:4,11 58:5,10
59:1,4,13,18,20
60:5 61:20 62:5
64:4 65:1,13,18
66:8,12 68:21,23
69:2,15,20 72:2
73:2,12,14,15,17
74:6,9 75:4,9 76:2
76:18,22 77:1,4,8
77:12 78:23 80:3
80:7,8,17,19,20
81:24 82:24 83:1

84:13,15 85:4,5,5
85:17,22 86:12,12
87:8,21,25 88:3
88:25 89:4,22
91:7 92:9,14,16
93:5,21 94:14,23
94:25 95:11,11,20
95:20 96:3,8 98:9
98:25 100:10,13
101:9 102:2,3
103:8 104:10
106:3,11,17,18,25
107:5,17,18,19
108:3 113:25
115:11,12 116:7
116:19 117:1,2
118:12,13 119:13
119:16,23 120:11
121:3 123:5 124:6
124:7,12,13,16,19
124:21,24,24
126:4
**DOGE's** 33:7
34:25 101:7,8
**DOGE-specific**
76:8,10
**DOGE-wide** 18:22
**DOGE.EOP.gov**
43:21,25 44:8
69:19 74:4,19
**DOGE.gov/join**
64:5,24
**doing** 27:14,16
29:19 30:11 31:20
33:6 34:6 35:3
39:2 50:10 72:2
79:13 80:13,18
81:8,12 84:3,7
85:9,15 88:9
101:20 104:1
118:6,18
**DOJ** 7:20
**dollar** 28:4 114:11
**dollars** 114:7,12
**dual** 29:25 77:2,6
77:13 86:21,25
89:9,10,11 94:8

**dumps** 104:12
**duties** 68:17 85:9
  86:4
**D.C** 2:11 3:4,11,17

**E**

**E** 1:20 2:3 3:1,1,8
  5:1,1 130:2,23
  131:1,1,1 132:1,1
  132:1,1
**Earl** 20:17
**earlier** 18:12 26:25
  38:20 41:15 42:1
  48:18,20 50:7
  108:2
**Edward** 68:6 97:14
  111:24
**EEOB** 119:22
**efficiency** 32:14
  108:9
**effort** 39:8 115:2
**efforts** 102:1,20,25
  103:1 116:5
**eight** 93:16
**either** 11:15 19:12
  19:19 75:10 94:8
  107:18
**Elez** 68:7 69:11
  96:13,19,23
  111:22
**eliminates** 115:1
**eliminating** 105:17
**Ellis** 1:20 2:3 130:2
  130:23
**Elon** 20:20,22,25
  21:3,12 22:11
  23:4,7 25:25 39:9
  39:18 51:12,20
  54:8
**employ** 77:13
**employed** 10:18
  29:21 30:1 33:4
  65:13 74:1 92:11
  93:6 94:15 95:11
  96:8,9 101:12
  130:14
**employee** 11:15,16

15:8,10,12 20:23
  23:14 29:11,17
  40:4,6,8,13,17,19
  43:11 44:7 73:25
  75:8,13 79:15,17
  80:5,9,14,18,19
  81:21 82:2,4
  83:19 85:16,22
  86:2,5,9,13 87:6
  87:11,21,23,25
  88:2,3,7,10,11,12
  89:7 90:7 92:10
  93:5 94:9 97:19
  104:22 123:13
  128:3
**employees** 10:18
  11:8,12,12,17,20
  11:21 12:2,3 16:6
  18:14,19 32:25
  41:16,20,22,23
  43:14,17,20,24
  66:9,12 67:5,12
  68:19 71:12 73:13
  73:17,22 74:5
  75:20,21 76:11,21
  77:1 82:24 84:2
  88:21,25 89:23
  90:3 91:7 92:14
  93:15,22,22 94:14
  94:18,25 98:25
  99:2 100:14,23
  102:2,15 103:3
  104:10 105:3,7
  106:8 117:1,14,18
  118:12,16 119:8
  119:17 120:8,11
  121:4,13 125:21
  126:7,8,14 127:3
  127:9 128:7
**employment** 23:21
  27:10 61:20 65:19
  69:14 79:20 81:16
  81:18 85:23 86:3
  86:14,18,21,25
  87:7,17 89:11
  91:6 94:25 95:19
  111:19 122:24

123:7
**enforce** 25:20 26:3
**ensure** 5:11 107:11
**entire** 64:10,14
  70:4
**entirely** 10:16
**entities** 92:17
**entity** 34:20 53:1
**entity's** 62:3,6
**envisioning** 79:25
**EOP** 78:20 123:13
**EOs** 124:15
**Errata** 4:13 129:8
**ESQUIRE** 3:2,3,14
  3:15,15
**established** 8:25
  14:13
**et** 1:4,8 131:2,3
  132:2,3
**ethics** 75:18,19
**everybody** 71:20
**exact** 21:9 113:6
**exactly** 17:19 23:11
  29:9,14 33:21
  40:1 98:22 113:5
  124:18
**examination** 4:1,4
  5:5 61:23 92:13
**examined** 129:4
**example** 15:2 18:3
  19:7 28:2 30:23
  37:23 38:10 70:21
  81:7 84:4 88:11
  101:24 108:17
  109:1,3,10 118:1
  119:7 127:1,15
**examples** 20:15
  100:15 108:19
  109:5
**exceptions** 102:13
**exclusive** 10:23
  11:6 65:24 66:3
**exclusively** 10:11
  11:10 19:11
  118:23
**excuse** 39:13
**execute** 125:21

**executive** 9:1,14,15
  14:14 75:11,14
  76:6 98:3,20
  103:16 105:16,19
  105:24 106:12
  107:1 108:4
  124:12
**exercise** 23:15,20
  23:23 111:14
**exercised** 14:18
  66:16,21
**exercises** 61:19
  66:7
**exhibit** 61:23
**EXHIBITS** 4:22
**exist** 70:14
**exists** 24:1
**expect** 103:2 105:7
**expected** 102:17
  120:8
**expert** 16:5 57:21
**expertise** 38:8,12
**expires** 9:8
**explain** 8:20 45:24
  79:21
**explorable** 91:9
**explore** 47:20
**explored** 30:19
**extend** 24:20
**extends** 23:19
**extent** 31:16 37:25
  44:23 47:8 54:15
  56:16 58:20 89:20
  96:22 109:13
  110:6 124:1,11
**e-mail** 43:22 44:1,8
  69:19,21 74:5,20

**F**

**facilitate** 100:13
**facilitating** 107:14
**facilities** 83:13
  84:22 117:3
**fact** 97:1
**factual** 91:8
**fair** 87:5
**fairly** 62:14

**fall** 53:6 110:2
**familiar** 12:7,10
  28:20,23,24 29:2
  31:6 38:19,22
  68:8 74:15,22
  95:7,9 98:2,5
  101:2 105:15,18
**familiarize** 83:21
**far** 17:19 44:5 69:5
  89:16 94:5 102:8
  121:8
**Farritor** 68:5 97:21
  112:3
**February** 13:17,20
  14:17,19,20,21,22
  66:19 67:3,7,17
**federal** 43:11 73:11
  74:23 76:21 87:7
  92:9,17 96:14,19
  97:7 100:12 106:8
  107:11 119:19
**feel** 5:14 60:22 81:5
**Fennessy** 112:11
**figure** 113:5
**filed** 14:16
**filled** 45:20 46:9
**final** 34:13 44:9
  66:8,21
**finalized** 18:6
**financial** 75:22
  130:15
**find** 113:6,15
**finish** 5:22,24 6:10
**fire** 62:1
**firewalls** 100:19
**first** 83:9 96:17
  110:7 126:23
**fix** 115:1
**flexible** 9:4
**focus** 10:21 36:19
  42:4 59:20
**focuses** 10:6,10,14
**folks** 21:14 59:18
  59:22
**follow** 52:14 54:1
**followed** 51:24
  52:25 54:19 55:3

55:7,14,18 56:4,8
56:11,15,21,23
57:11,16,18 58:9
58:23 59:2,8
**follows** 5:4
**follow-up** 122:19
**foregoing** 129:5
130:6,8
**forgot** 6:23 78:10
**form** 11:24 14:14
29:24 81:2 85:1
89:6 100:21 102:7
123:9 124:10
125:19
**formal** 12:14 13:12
14:22 17:6 23:16
23:20,24 24:21
25:17 50:4,19
51:1 66:11 69:14
76:13 77:7,10
90:12 123:20
125:5,24 126:13
127:11,24 128:2
**formally** 96:7
**former** 78:22
**forth** 17:23 50:21
**forward** 3:3 44:19
**foundation** 3:3
18:8 28:18 29:24
39:13,14 73:24
76:25 90:2 95:23
**four** 68:4 69:7
99:13,18
**Fox** 38:19 41:4
113:10
**fraud** 115:1
**free** 81:5
**frequency** 21:9
23:10
**front** 7:24
**full** 49:3
**fuller** 31:17
**function** 9:24 37:23
79:19 85:7 86:10
86:24 88:13,22
126:1
**functional** 9:21

**functionally** 9:16
15:18
**functions** 127:23
**further** 39:3 46:12
**furthered** 9:14

---

## G

**G** 5:1
**Gavin** 74:13
112:21
**general** 36:23
61:16 76:3 78:19
94:2 99:25 119:1
120:25
**generally** 31:9 40:3
44:7 57:19 65:20
74:17 115:10
116:18,19 119:3
**George** 3:2 4:5 5:6
16:18,22,24 22:4
22:8,10 25:5,13
26:13,17,19 28:19
30:8 32:3,10
34:23 39:17 40:24
41:8,12,14 45:19
46:2,6,8,24 47:12
47:22 48:3,12,14
48:15 50:14 52:4
52:8,10,19 53:14
53:18,20 57:3,5
58:13 60:18,24
61:6,13 63:4,19
64:19 71:9 76:15
76:17 77:20 78:2
78:5,11 81:3
82:16,20 88:19
90:23 91:1,22
92:5 93:2,3 95:18
95:24 96:1,25
99:21 103:13
104:3,7,9,17
106:16,24 110:16
110:22 111:7,9
113:12,23 117:8
120:16 121:12
122:1,13,18,22
128:10

**give** 5:15 7:14
10:12 25:10,19
32:25 38:14 54:8
55:25 80:6 81:25
86:15 94:23 113:6
**given** 16:12 17:2
23:4 26:7,21 34:3
35:14 36:24 46:13
56:13,15 57:15,19
58:25 59:4,12
77:18 88:25 90:8
99:7 101:19 114:8
118:17 120:2,2
129:7
**gives** 15:21 16:5
25:25 26:1 27:6
94:1,14 95:3
**giving** 17:9 33:9
80:16 88:2 114:4
114:21
**Gleason** 7:21 8:2,6
12:8,20 15:3 16:9
16:10,12 17:2,9
17:24 18:5 19:24
21:15 27:15 37:23
44:13 45:11 46:15
48:24 49:6,7,9,25
50:9,19 66:11,20
66:23 67:8,20
125:7 126:9,12,17
126:19 127:10
**Gleason's** 12:22
18:11 50:18 51:5
66:15
**go** 5:10 6:5,12
16:18,22 22:4,8
25:6,7 26:13,17
31:11 41:8,12
46:2,6 47:1,25
48:3 52:4,9 53:14
53:19 59:17 60:7
60:18 61:14 77:23
77:25 78:3,6 79:3
91:20 95:25 104:7
106:22 108:23
109:25 110:17
111:13 113:4

114:14 118:4
122:15
**goes** 106:17
**going** 5:8 8:14
12:16 17:17 21:24
25:8 28:10 30:20
38:2 44:18 48:12
48:19 61:5,7
74:12 77:21 113:2
113:19,22
**good** 25:6
**gotten** 65:12
**governed** 94:7
**governing** 109:20
**government** 30:16
32:15 33:25 42:24
43:16 45:10 73:11
74:23 75:6 92:17
96:14,19 106:9
108:10
**government's**
25:17
**governs** 120:5
**Grab** 82:6
**grant** 28:4 32:7
**grants** 30:10
**granular** 62:23
**great** 5:7,23 25:5
47:23 48:14
**group** 10:21,23
72:16
**GSA** 87:10
**guess** 29:13 69:6
72:15 99:11 110:7
**guidance** 89:1,16
93:22 94:1,15,18
94:18,23 95:2
102:17 109:15
110:9 119:24
120:2,3,21,24
123:11,22
**guys** 82:11

---

## H

**H** 131:1 132:1
**HAC** 3:8,9
**hand** 130:18

**handful** 18:19
**handled** 78:21
**happen** 99:12
108:5
**happened** 99:23
100:4,6,9 101:15
101:17 114:22
**happening** 104:21
114:17
**happens** 21:10,21
72:20 108:25
122:8
**happy** 45:25
**hat** 88:14 89:3,4
**hats** 87:22 88:8
**Hawaii** 2:9
**head** 5:17 20:15
42:16 127:4
**headquartered**
119:12
**heads** 107:10,12
109:13
**held** 2:10 16:20
22:6 26:15 41:10
46:4 52:6 53:16
61:11 104:5
**help** 5:10 11:4 16:3
30:14 38:7,13
76:21 77:4 94:3
95:16 107:3
125:21 126:5
127:22
**helpful** 5:19 35:16
**helping** 36:15
80:12 124:13
**helps** 11:1 27:11
37:23 94:18
**hereunto** 130:18
**HHS** 27:10,16,22
27:25 29:11,11,16
29:17,19,21,21
30:1,11,18 31:14
31:20,25 32:6,19
32:21 33:6,7,12
33:14,15,17 79:4
79:8,15,20 80:7
80:10,11,14,15,17

80:23,24,25 81:12
81:13,15,17,19
82:1,2,2,13,22,25
83:1 87:20 88:10
88:11 99:1
**high** 94:17
**highest** 90:13 93:4
**highlight** 25:9
**HINSON** 3:8 24:9
47:14 60:25
**hire** 44:21 62:1
67:5,12 96:18
97:16
**hired** 41:23 42:5
43:13,18 45:9
46:17 59:20,22
60:9 67:15,16
68:23 73:20 74:23
96:13 97:6,13,20
111:13
**hires** 44:10,12,15
44:17,18 45:12,16
46:10 47:2 67:1
**hiring** 9:4 15:1
44:9 45:21 59:17
60:1 66:8,11,15
66:21 67:13 98:11
**historically** 119:7
**HI-CSR** 1:21
130:23
**hold** 25:23 54:15
**home** 110:24
**hour** 47:24
**house** 19:7 78:19
125:17
**House's** 98:3
**HR** 104:1
**HRUS** 78:22
**HUMPHREYS**
3:14 11:23 13:10
16:14 18:7 21:23
24:2,11 26:9
28:17 29:23 30:4
31:15 32:1,8
33:10,19 34:21
37:19 39:12 40:21
41:2 44:22 45:17

45:22 46:19 47:6
47:13,16 48:6
50:12 51:8,25
52:15 53:2 54:3
54:21 55:4,15,21
56:5,24 57:12
58:11 59:9 60:14
60:20 61:3,9
62:15 63:15,21
64:12 71:7 72:6
73:23 76:24 77:24
78:7 81:1 82:19
84:16,25 88:5,17
89:5 90:1,15,25
91:11 92:1,23
93:8 95:14,21,25
96:21 97:9 99:19
100:20 102:6
103:11 104:15
106:13,20 107:22
108:22 109:23
110:12,17,25
111:3 113:8 115:6
115:23 116:8
117:4,10 120:14
121:7,19 122:3,15
123:8,24 124:9
125:18 128:13
**hundred** 28:3
**hundreds** 31:20

___

**I**

**idea** 25:6
**identifiable** 101:10
**identified** 21:15
74:10 91:23
**imagine** 70:9,25
**implement** 9:12,17
9:22,25 11:1
14:11 16:3,8 27:7
34:2 73:16 76:22
77:4 80:7,8 107:3
124:14 126:3
**implementation**
73:12
**implemented** 33:2
33:24 79:13

**implementing** 30:3
36:8 79:18 80:11
86:8,9 98:3
106:12,25 115:11
**implements** 14:6
22:22
**improving** 108:9
**include** 10:17
24:24 32:13 66:5
71:16,23 100:15
**included** 22:20
39:9
**includes** 19:2,15
23:23 71:20
**including** 51:18
66:12 91:17 93:14
104:11 105:5
**incomplete** 87:3
**independent** 89:8
**INDEX** 4:1,22
**INDEXED** 4:7
**indirect** 29:8
**individual** 72:3
76:11 77:13 85:9
85:14 87:21
118:25
**individuals** 38:25
60:6 62:1 67:22
68:4,22 69:7 74:3
74:10 89:19
111:18 122:24
**individual's** 105:9
**influence** 22:18
**influential** 50:22
**inform** 120:11
**informal** 127:15
**information** 4:15
47:9,18 77:18
94:21 100:11
101:10 102:9,14
102:19 103:6,17
103:24 104:24
105:17 108:6
109:17 115:3
116:5,24 120:2
**inherently** 86:23
**Initially** 96:17

**initiative** 10:25
98:4
**input** 16:5 26:2
32:25
**inquiry** 91:8
**installing** 100:16
**instance** 51:11
56:20 57:9,10
58:16,18 72:19
96:15 101:6,14
104:20 105:11
116:21,23
**instances** 17:8 50:8
50:17 51:4,22
52:12 53:25 54:17
55:2,12,24 56:2,9
56:22 58:8,25
59:3,7,14 66:14
105:14 116:11
117:20,23
**instruct** 16:16
21:25 26:10 41:5
47:7 52:1 60:15
90:21 121:9
**instructed** 4:18
122:9 123:25
**instructing** 52:16
62:12
**Instruction** 16:17
22:3 26:12 41:7
47:11 52:3 60:17
90:22 121:11
**INSTRUCTIONS**
4:11
**instructs** 94:20
**inter** 109:16
**interact** 124:17
**interactions** 88:15
**interagencies**
105:20
**interagency** 102:11
106:10 107:15,21
108:21
**interest** 130:15
**internally** 124:24
**interrogatory** 92:3
92:7

**interrupt** 57:2
**intervening** 126:10
127:8
**interview** 28:21
29:15 30:21 38:20
38:23 39:7,9,19
39:21,24 40:1,11
40:16,20 41:1,4
78:16 114:5
**interviewed** 8:2,4
42:25 65:16 78:14
**interviews** 43:2
60:8 113:11
**intra** 105:20
107:14
**intra-agency**
109:16
**involved** 13:6 37:3
37:22 63:12 122:7
**issue** 32:7 121:16

___

**J**

**Jackson** 118:6
119:9,15
**James** 20:16 21:16
**January** 9:1 10:19
11:3,18 12:4
14:15 41:21,24
42:5 44:11,12
46:17 64:11 65:4
69:10 73:21
106:19
**Jeremy** 74:13
**Jerry** 112:19
**job** 1:25 42:8 73:11
89:19 113:18
**jobs** 123:2
**join** 42:11 65:1
75:5
**joined** 66:20
**Judge** 91:3
**July** 9:8
**Junior** 20:18
**JUSTICE** 3:16

___

**K**

**keep** 48:12,19
**keeping** 123:15

**Kendall** 1:14 2:2
  4:3,9 5:3 82:23
  128:16 129:3
**key** 38:3
**kind** 7:24 14:3 38:7
  43:3 44:3 65:17
  78:20 86:10,21
  126:23
**kinds** 75:23
**Kliger** 74:14
  112:11
**know** 6:8,8,15,25
  17:5,19,21 20:13
  20:14 21:9 23:6
  23:10,11,13 24:13
  33:21 36:5,5,6
  44:5 50:5 54:23
  55:22,23 56:12
  57:16 58:15,17,24
  69:3,24 70:21
  71:24 72:19 73:25
  76:11 94:8,19
  97:12,17,20 98:16
  98:19,21 99:12,16
  100:5 101:5,21
  102:16 108:2
  112:13,17 114:19
  115:8 116:23,24
  119:3 122:5 123:1
  124:18
**knowledge** 11:25
  12:1,6 20:2 49:18
  58:3,5 69:16 73:9
  74:21 96:12 99:25
  100:4 101:5,7,8,8
  101:15 111:23,25
  112:2,4,6,8,10,13
  112:15,17,20,22
  112:24 113:1
**knows** 93:12
**KURLAND** 3:15
  82:14
**Kyle** 68:6 97:18
  112:1

___
**L**
___
**L** 3:16

**labor** 1:7 99:1
  124:23 125:15,24
  131:3 132:3
**laid** 12:19
**language** 25:21
  83:5,6
**laptop** 99:15,17
  117:15
**laptops** 99:7 117:2
  118:13
**law** 103:2,20 108:5
  109:14 120:5
  121:6
**laws** 94:4 102:9,18
**lawyer** 44:25
**lawyers** 7:20,21
  70:22 71:6,13
  72:14 73:4
**lay** 13:22
**layers** 126:10 127:3
  127:8
**lead** 27:11 78:19
  98:10
**leaders** 21:1,12,13
  22:15 23:5,8 39:8
  51:19,21,24 52:13
  52:14 54:19,20
  55:3,13 56:3,11
  58:10 59:1 70:17
  72:2 124:25 125:2
  125:16 126:5
**leadership** 26:16
  27:17 33:25 52:23
  53:8,24 54:1,9
  59:4,13 62:4,6
  73:2 80:15 81:13
  85:5
**leads** 19:22
**Lee** 68:13
**legal** 7:20 24:4
  25:17 44:23 46:12
  77:19 94:21
  103:12,14 120:3
  120:12,22,24
  121:14,14,22
  122:1,6,12
**legally** 45:2

**let's** 9:5 22:8 25:6
  35:20 74:25 78:3
  79:11 85:3
**level** 94:17 105:9
  126:24
**Lewin** 74:13
  112:19
**limited** 91:22
**LINDEMANN**
  1:14 2:2 4:3,9 5:3
  128:17 129:3
**line** 56:25 61:18
  62:10 64:14 110:9
  110:14 127:3
  131:5 132:5
**list** 74:12
**little** 5:14 26:25
  28:13 69:24 75:2
  78:16 82:10 94:13
  110:23
**live** 7:24
**loan** 114:21
**loans** 114:8
**located** 63:14 64:23
**location** 100:5
  119:3,21
**locations** 100:8
**logs** 94:19
**look** 25:11 82:12,23
  107:6
**looking** 32:16
  82:12,18 107:7
**looks** 36:12,21,22
  38:15,17 83:2,3
**loop** 48:16,17
  111:10
**lot** 10:17 27:25
  36:20 37:2 38:16
  42:10 63:8 71:14
**lots** 18:25 70:10
**lowest** 126:23
**Luke** 68:5 97:21
  112:3

___
**M**
___
**main** 73:11
**maintain** 62:9 85:2

**majority** 65:21
**making** 6:3 28:15
  100:16,18
**manage** 93:23 94:3
**management** 127:4
**manager** 126:25
**managers** 127:8
**manages** 36:25
  37:5
**managing** 120:23
  125:1,3
**March** 12:9 28:22
**MARCIA** 3:15
**MARK** 3:3
**Marko** 68:6 69:1
  96:13,18 97:13
  111:22
**match** 41:25
**materials** 60:12
  63:6
**Mates's** 91:3
**matters** 78:20
**maximize** 32:14
**maximum** 90:9,12
  109:13
**mean** 8:16 10:15
  16:1 17:20 18:1
  23:10 25:18 33:22
  40:3 44:20 46:22
  60:22 62:21 68:14
  79:21 92:2 97:3
  124:19
**meaning** 85:16
**means** 45:2
**meant** 32:13 37:12
  116:14
**mechanism** 77:8
  96:8
**mechanisms** 77:10
**meet** 5:7 20:25
  70:22 72:14
**meeting** 19:8,9,14
  19:21,23 20:1
  70:7,18 72:18
**meetings** 18:23
  19:5 70:4,10,14
  70:15,16 71:1,5,6

**71**:11,15,22 73:1
**member** 15:6 19:3
  19:12 23:14 39:25
  104:24 114:15,16
**members** 19:16
  20:10,18 21:3
  60:4 70:23 71:2
  71:17 72:4,5,24
  72:25
**mentioned** 26:24
  38:6 48:21 50:7
  59:24 67:20 94:11
**Merit** 2:4 130:3
**Miles** 112:25
**million** 114:7,11,12
**MILTON** 3:9
**mind** 108:17
  122:13
**mindset** 29:14
**minute** 16:19 22:5
  41:9 53:15 77:22
**mischaracterize**
  79:6
**mischaracterizes**
  13:11 33:20 37:20
  40:22 50:13 88:6
  120:15
**mischaracterizing**
  69:25
**mission** 9:17 14:7
  16:4 35:1,6 53:7
  106:17,21 116:18
  125:22
**missions** 9:11
  108:8
**Mm-hmm** 22:14
  34:15 65:2 69:12
  83:8 114:3 116:2
  120:19
**modernization**
  10:20,25 13:4
**modifications**
  110:9
**modify** 109:14
**Moghaddassi**
  74:13 112:23
**Monday** 1:15 2:11

money 28:10
month 67:21
monthly 98:11
Morris 20:17
Msamburg@de...
  3:6
multiple 87:22
  89:24 90:4 91:6
  93:24 94:16 95:1
  102:4,22 114:2
  116:6
Musk 20:22,25
  21:12 22:11,25
  23:5,7 25:23,25
  26:7,21 39:9,18
  40:12,25 51:12,15
  51:23 52:12,24
  53:12,22 54:18
  58:25 114:4
Musk's 20:20 54:1
  55:2,12 56:3,10
  56:21,22 57:11
  58:9
mutually 65:23
  66:2

N

N 3:1 5:1 132:1,1
named 68:4,23
names 111:12
natural 40:7,14,18
  40:25 54:13,14
nature 9:6 23:6
necessarily 62:16
  62:17 65:25
need 6:7 47:16 81:5
  99:8 101:22
  104:24
needed 45:16
neither 130:13
never 101:16
new 28:12 67:5
news 38:20 41:4
  113:11,16
Nick 96:2
NIH 28:1,2 29:8
  30:2,10,23 31:4

31:21 32:7
Nikhil 95:7 97:25
  112:7
nine-month-old
  114:21
nodding 5:17
noncareer 73:21
noncompliance
  105:12
non-acting 49:4
Northwest 3:10,16
Notary 2:10
note 92:6
notes 114:5
notice 7:7 92:12
noting 103:22
number 38:24 90:9
  90:12,13 92:8
  93:5,18 106:4
numbers 113:21

O

O 5:1 132:1
obedience 25:20
  26:4
object 6:1 21:24
  54:4 63:1 93:8
objecting 52:16
objection 6:3 11:23
  13:10 16:14 18:7
  21:23 24:2 25:3
  26:9 28:17 29:23
  30:4 31:15 32:1,9
  33:10,19 37:19
  39:12 40:21 41:2
  44:22 45:17,22
  46:19 50:12 51:8
  51:25 52:21 53:2
  54:3,22 55:4,16
  56:5,25 57:12
  58:11 59:9 60:14
  63:15 64:13 71:7
  72:6 73:23 76:24
  81:1 84:16,25
  88:5,17 89:5 90:1
  90:15 95:14,23
  96:21 99:19

100:20 102:6
  103:11 104:15
  106:13 107:22
  108:22 109:23
  110:14 115:6,24
  116:8 117:4,11
  120:14 121:7
  123:8 124:9
  125:18
objections 24:4,16
  25:2,17 61:17
  62:10
obligations 120:12
  120:22 121:15
obviously 86:19
occasion 21:19,20
  99:24
occupies 119:14
occupy 119:15
occur 18:23
occurred 117:21,23
occurring 101:6
  115:10
occurs 19:15
office 43:1 75:11,14
  76:6 119:20
officer 15:19 130:6
official 113:15
officially 67:16
officials 80:25 89:2
  107:11
offsite 100:13
oftentimes 99:10
  118:5
Oh 11:14
okay 6:2 13:21
  19:22 25:7,12
  27:20,21 41:15
  42:6,18 48:16
  52:8 53:18,21
  59:16 61:3,6,13
  63:24 65:10 70:1
  78:2 90:19,25
  92:23 97:9 98:24
  107:9 109:11
  110:22,23 111:16
  111:21 113:17

122:13,15,21
  128:10
once 44:15 89:25
  104:22
ones 7:23 110:4
one-off 71:1
one-on-one 72:9,17
  72:22
ongoing 98:23
  107:3
online 42:21 59:24
  59:25 60:2,12
  63:6,10,13 64:8,9
  64:21 65:13
  111:19 122:25
  123:2
onsite 118:5
on-boarded 75:9
  75:10 77:2,7 89:9
  89:10
on-boarding 75:4,7
  75:12 76:4 94:8
  95:5
on-boards 89:11
operates 32:18
operating 15:18
operations 125:1,3
opine 24:15
opinion 51:7
opinions 91:3
OPM 95:13 96:3,5
opportunity 28:1
optimization 98:4
order 9:1,14 14:14
  77:16 86:15 91:19
  98:3 103:16
  105:16,19,24
  106:12 107:1
  109:12,22 121:15
ordered 17:20
orders 9:15 16:11
  17:9 25:19 98:20
  107:10 108:4
  124:12
org 125:6 128:2
organization 7:6
  8:18,23,25 9:3,5,7

10:16,24 11:19,22
  12:3,17 13:5,8
  14:1,2,6 15:7,11
  15:13,15 18:6
  19:8,10,13,16,20
  19:25 20:3,6 23:2
  37:15 41:19,22
  42:12,20 43:9,13
  43:21,25 44:11
  45:14 46:25 59:21
  59:23 66:9,13,22
  67:4,12,17 68:24
  69:2 70:5,8,11,15
  70:17,18,20,24
  71:3,12,18,23
  72:4,5,12,21,24
  72:25 73:4,8
  75:10 76:19 95:12
  96:10 105:2
  119:11 124:8
  125:4,12,13,22
  126:2,3,6,24
  127:5,7,14,21
  128:1,5
organizational
  12:12,15
organizational-w...
  19:6
organizations 9:11
  9:12,20 10:2,14
  11:9,13 12:25
  13:2,13 18:14
  19:18 41:18 60:10
  75:5 127:2
original 97:16
originally 97:12,16
outcome 56:13
  59:11 130:16
outlined 9:13 21:6
outside 16:15 45:23
  87:7 90:20 95:4
  99:4,13,18 121:8
  121:20 122:4
  125:6
overall 30:15
overlap 87:3
overruling 51:6

oversee 14:4
overseeing 13:6
oversees 13:3,25
 14:9

**P**

P 3:1,1,14 5:1
page 4:4,8 82:13
 83:5,5 107:8
 113:21,22 114:14
 131:5 132:5
PAGES 4:7,19
paperwork 45:20
 46:9 75:15
pardon 121:5
part 10:19 29:10,16
 30:2,12,13 31:13
 31:24 32:5 33:8
 34:18,19,25 35:3
 35:5 37:10 39:19
 39:20,23 40:11,15
 40:19 41:1 53:12
 59:23 81:15 85:3
 85:12 107:4 108:2
 108:8
particular 72:23
 73:2
parties 61:15
 130:14
paths 65:11,18
penalty 4:12 7:10
people 33:13 37:2,8
 37:13,16,22 42:4
 42:8,11,19,21,22
 42:25 43:9 45:8
 46:17 58:21 59:19
 60:3 63:9,12 64:3
 64:25 65:8,12,15
 65:22 66:1 73:10
 73:19 74:16 76:12
 82:2 89:8 91:23
 93:19 97:5 101:20
 114:9 119:4 123:1
 127:18,22
perform 86:4 119:4
performance 128:6
performed 84:12

performing 83:14
 99:9
period 64:10 65:9
periodically 6:9
perjury 4:12 7:11
permanent 9:5
 10:15 11:19 13:5
 14:2 15:11 19:8
 19:17,20 41:19
 43:25 59:23
 125:13 126:2
 127:14 128:1
permitted 53:5
person 37:4 70:7
 86:20 90:11 96:18
 119:18
personal 78:23
personally 101:10
personnel 43:1
persuades 56:17
pertaining 103:20
pertains 14:5 120:4
phone 60:7
phones 118:13
phonetic 91:3
phrase 90:16
phrased 90:19
PII 101:25 102:5
 102:23 104:13
place 35:23 84:21
 94:4 118:6 119:9
 119:15
places 64:25
plaintiffs 1:5 3:2,8
 4:22 61:24 62:21
player 38:4
plays 20:5
please 6:10 48:9
 69:24
PLLC 3:9
plus 18:15
point 48:20 57:16
 91:19 111:11
 113:2
policies 90:17
 91:17 94:2,12,14
 100:18 119:24

120:7,10,25 121:1
 123:6,20
policy 21:5 28:7
 51:17 105:2
 123:20
political 14:24
 20:18 43:3,4
 66:25
portal 42:21 59:25
 60:1,13 63:7,10
 63:13 64:8,9,21
 65:14 111:20
 122:25 123:3
portion 119:16
posed 34:22
position 61:25
positions 60:4
possible 69:1
potentially 17:16
 69:11 71:5 87:3
power 25:19
PPL 65:16
PPO 43:1 66:4
practice 7:25 99:25
 105:1 117:18
 118:15 119:1
 125:14,20 128:9
practices 72:1
 77:17
predominantly
 41:19,23
preliminaries 5:9
preparation 24:10
prepare 8:3,9
prepared 7:18 24:7
 24:12 25:16
PRESENT 3:20
President 20:23
 21:6,7 22:12,18
 22:25 26:1 33:23
 34:3 54:12,16
 56:18 57:22 58:21
 75:11,14 76:7
presidential 43:1
 123:15
President's 9:13,23
 10:4 14:11 16:8

22:19 32:12 35:6
 36:17 39:3 68:21
 81:24 85:17
 105:16 107:5
 108:3 115:11
 126:4
pretty 91:4
previous 109:18
previously 38:6
 53:22 68:23
 100:22
primarily 11:18
 13:8
primary 9:2 43:6
 124:25 125:2
principal 127:20
prior 10:18 11:17
 12:4 41:20 46:14
 66:19
priorities 34:2
 36:16
prioritize 30:15
privacy 102:13
privilege 47:15
privileged 47:4,10
 77:18 94:21
 121:24 124:2
privy 17:3
PRO 3:8,9
probably 89:18
procedures 90:18
 91:17
proceed 63:3
proceedings 130:7
 130:9,10
process 18:18 37:1
 37:3 43:4 47:1
 60:1 63:12 64:8
 64:10 66:6 67:13
 75:7,12 128:3,7
product 17:25 18:2
 18:10
productions 82:9
productivity 32:14
 32:17 108:9
Professional 2:3
 130:3

project 36:23
 108:14 115:18,21
projects 13:4 14:10
 14:10 30:15 34:13
 34:17 38:2 107:18
 107:25 108:12
promise 101:16
 104:21
promoting 106:9
proposing 28:7
protection 105:4
protocols 90:18
 91:18
provide 51:20 58:7
 93:21 98:10
 121:25
provided 12:8
 51:23 52:13 68:3
 121:23
provides 52:24
 53:23 85:6
providing 47:8
 51:13,18 85:20,21
Public 2:10
pulling 31:17
purpose 105:22
 106:7 116:19
purposes 8:13
 25:15 78:14
push 90:23
put 56:24
puts 18:4
p.m 2:13 128:18
P.O 3:4

**Q**

question 5:23,24
 6:2,5,11,15,18,22
 7:2 24:3,8,19 30:7
 34:12,22 37:11
 39:16 50:15 51:3
 52:11 53:6,21,24
 55:9,11,20 56:1
 57:6,25 58:14
 62:25 67:6 88:18
 91:16 93:1 101:1
 106:23 124:4

**questioning** 57:1
   61:18 62:11 64:14
   110:15
**questions** 5:16
   12:17 24:12 53:5
   78:24 92:8 122:19
**quick** 5:9
**quickly** 111:15
**quote** 30:21
**quoted** 38:21
**quotes** 31:17

————————
          **R**
**R** 3:1 5:1 131:1,1
   132:1,1
**Rachel** 112:9
**Rajpal** 95:8 96:2
   97:25 112:7
**rates** 29:8
**ratification** 46:14
   46:18 47:1 66:16
**ratified** 15:4 44:17
   45:16
**ratify** 44:20 45:2
   45:21 46:10
**ratings** 128:4
**Raynor** 3:20
**RDR** 1:20 130:24
**read** 25:8 27:18
   29:1 30:20 48:8
   48:11 83:16,24
   110:19 111:12
   115:19 116:22
   129:4
**realize** 6:22
**really** 5:13 73:5
   89:13 103:23,25
   111:14
**Realtime** 2:6,6
   130:24
**reason** 7:13 74:7
   101:18 103:23
   114:17 131:5
   132:5
**reasonably** 57:14
**recall** 50:11,16
**receive** 60:6 69:20

102:16 120:21
   121:5,14
**received** 101:21
   120:24
**receiving** 94:24
   98:15,18
**Recess** 48:2 78:1
   111:6 122:17
**recisions** 110:8
**recommendations**
   15:22 26:2 65:15
**recommended**
   42:23 66:2
**record** 5:13 6:3 7:1
   16:19,21,23 22:5
   22:7,9 24:22
   26:14,16 41:9,11
   41:13 46:3,5,7
   47:25 48:4 52:5,7
   52:9,20 53:15,17
   53:19 60:19,21
   61:5,8,12,14,16
   77:21,25 78:4,25
   91:21 104:6,8
   111:5,8 113:9
   122:16 130:9
**records** 103:8
   104:12 105:21
   107:16,20 108:20
   113:3 114:2
   123:15
**redirect** 128:13
**reduce** 30:15
**reduced** 130:11
**reference** 119:6
**referring** 96:16
   115:13 120:11
**Registered** 2:3,4,5
   130:2,3,4
**regular** 18:22
   19:14 20:1 70:3,6
   70:13,16 71:4,10
   71:16,21,25 72:2
   72:10,15 73:1
**regularity** 70:12
**regularly** 70:22
**regulations** 109:20

**relate** 88:22
**related** 30:10 78:24
   102:9,18 107:19
   123:6 130:13
**relates** 91:13
**relating** 86:5
**relationship** 27:10
   31:10 32:20 69:14
   86:3,21,25 87:8
   95:19
**relationships** 23:21
   127:17
**relevant** 52:22 62:2
   97:1 103:19
**RELMAN** 3:9
**remember** 40:1
   111:11
**remote** 100:16
   119:17
**removing** 106:7
**repeat** 37:10 67:6
   92:25 116:17
   120:17
**rephrase** 6:16,18
**report** 16:9 27:13
   75:22 83:11 85:11
   85:18 89:17 98:12
   126:8,15,17,20,22
**reported** 113:10
**reporter** 2:4,4,5,6,8
   2:9,10 4:10 5:12
   130:1,3,4,4,5
**reporting** 80:20
   81:13
**reports** 16:10 17:6
   27:15,17 49:25
   81:9 85:4 98:15
   98:18,19,21,22
   126:16,18
**represent** 24:21
**representative**
   78:22
**requested** 4:15
   33:17,22
**required** 24:8,15
**requirements**
   124:6,19

**rescind** 109:14
**rescinded** 109:21
   110:5
**researcher** 28:3
**resolved** 51:5
**respect** 20:21
   116:15
**respond** 6:5
**response** 24:5 82:7
   92:4
**responses** 5:16
   68:2 74:11 82:17
   82:21 92:2,7
**responsibilities**
   9:19 13:22 15:25
   53:8 81:18,22
   89:20 92:15 93:11
   93:24 94:6 106:18
   118:9
**responsibility** 10:3
   10:7 13:9 124:25
   125:2
**responsible** 14:3
   44:18
**restate** 81:5,6
**retrieved** 104:13
**return** 119:20
   131:4 132:4
**reveal** 47:9 124:2
**review** 17:24 60:5
   128:6
**reviewed** 7:23 18:5
   18:10 60:11 65:7
**reviews** 60:11 63:5
   128:4
**right** 7:9,17 8:12
   9:8 21:5 22:13
   25:19 29:7 33:18
   33:23 35:6 38:11
   38:21 45:10 49:8
   49:21 50:11,22
   51:19 59:16 73:13
   73:18,22 75:16
   78:3 79:10 80:24
   84:24 88:20 96:4
   113:12 115:22
   120:13 127:21

**Riley** 112:9
**RMR** 1:20 130:23
**Rod** 20:16
**role** 12:24 13:16
   15:25 16:13 20:6
   20:21 27:3 30:17
   36:15 75:24 80:4
   81:9
**roles** 27:12 63:9,11
   65:9
**rolled** 119:20
**roughly** 18:16,17
   18:20 41:17,25
   42:3 67:23,25
**RSA** 1:21
**rules** 109:20

————————
          **S**
**S** 3:1,15 5:1 131:1
   132:1
**salary** 75:24
**SAMBURG** 3:3
   48:13 61:2
**saying** 11:11 29:14
   40:14 50:16 109:4
   122:3,8
**says** 6:4 30:22 31:4
   47:18 83:6,10
   106:7 109:11
   114:5,16
**schedule** 43:18
**Schutt** 68:6 97:18
   112:1
**scientists** 28:11
**scope** 16:15 21:24
   23:19 24:4,16
   25:14 26:10 32:19
   41:3 45:23 51:9
   52:1,18 54:5
   55:16 56:6 60:15
   61:22 63:2,16
   64:13 68:12,15
   81:22 83:15,19,22
   85:23 90:16,20
   92:21 93:9 95:15
   96:22 97:4 106:14
   107:4,23 108:23

109:24 110:13
115:7,16 116:9
117:11 118:9
121:8,21 122:4,10
**screen** 104:12
**sec** 26:14
**second** 78:8 82:11
83:5,10 85:12
113:6
**section** 98:9 107:6
109:11,18
**sections** 110:21,21
**security** 100:17
114:24 115:15
**see** 49:3 93:19
98:12,13,19
105:24 113:20
116:22
**seeing** 101:25
**seeks** 34:2
**seen** 93:14 101:10
**send** 42:8
**sends** 76:20
**senior** 15:16,20
20:9,18,22 22:17
27:4 30:11 38:5
49:21,23,24 50:2
50:6,22 54:11,18
56:3,10 57:22
**senior-level** 20:10
**senior-most** 14:24
66:25
**sense** 58:3 81:4
89:14
**sensitive** 99:2
102:9 103:24
**sent** 83:1 98:21,22
**sentence** 83:10
**separate** 81:17
**separately** 88:12
122:11
**series** 60:7
**serious** 58:22
**seriously** 78:17
**servants** 43:10
**servers** 104:14
**serves** 109:15

**service** 3:20 7:5,6
7:20 8:16,17,22
8:22,24 12:4,21
12:23 15:6,7,9
16:2 19:1,4 20:11
20:19,24 21:4
22:22 23:8,15,17
26:5,8 27:5 32:22
35:8,13 36:3,7,14
37:6 40:4,5,8,13
40:17,19 41:20
44:7 48:25 49:2
49:15 54:13 60:5
64:4 66:12 69:2
75:9 77:1 78:23
80:3,17,19,20
85:6,22 118:2
119:7,13,16
124:13
**Service's** 36:11
**serving** 45:9,13
49:10 91:15
**set** 105:5 130:18
**sets** 103:21
**shaking** 5:17
**share** 15:24 77:8
94:22 103:17,23
108:17 109:1,4,6
**shared** 102:14
105:3
**sharing** 94:2,12,13
102:12 105:20
106:10 107:15
109:17 119:24
120:3,5,7,25
121:1 122:12
123:6,11,23
**sheet** 4:13 129:9
**short** 110:24
**Shorthand** 2:8,10
130:1,5
**shots** 104:12
**show** 25:1
**side** 125:16
**sides** 19:6
**sign** 48:8,11 75:16
**Signature** 128:15

129:12 131:25
132:25
**signed** 29:20,20
129:9
**signing** 84:13
**signs** 123:13
**silos** 105:17
**similar** 20:1 25:25
60:10 68:19 75:13
111:14
**similarly** 31:12
32:12 97:15
**simple** 114:25
**simply** 50:5 85:6
**single** 19:3 20:14
70:7
**site** 118:4,14 119:9
**situations** 77:12
**sizes** 70:11
**small** 114:7,20
115:14
**Smith** 20:17 21:16
26:24 27:4,19,23
28:15,21,25 29:4
29:21,25 30:10,22
31:13,20 33:6,18
34:24 35:3 38:11
**Smith's** 27:2 31:24
32:5 79:4
**smoothly** 5:10
**Social** 114:23
115:14
**software** 10:20,25
13:4 31:21 100:16
100:17
**somebody** 36:25
40:18 126:16
**sorry** 31:11 37:12
63:23 78:8 84:9
95:21
**sort** 83:18 84:5
103:8 123:19
**sorts** 43:14
**sound** 88:3
**sounded** 76:2
**sounds** 79:25 87:19
**spaces** 119:14

**speak** 5:21 23:9
31:5,22 36:4
76:11 105:9
**speaking** 36:2 39:1
65:20 74:2 76:18
**special** 43:16
**specific** 25:2 35:10
53:4 57:17 58:16
58:18,24 76:2
83:2 102:24
103:21 105:13
107:25,25 108:17
108:19 109:1,3,5
109:9 110:4
115:18,21 116:11
116:15,20 117:22
123:21 124:15
**specifically** 6:4
57:18 76:20 100:7
110:20
**specified** 109:18
**specify** 8:15 39:16
**speculation** 40:22
**speed** 76:13
**spend** 28:5,8
**spending** 30:16
125:16
**spends** 28:6,9
**spoke** 11:17 18:12
40:3,4 78:18
**spot** 113:7
**squarely** 92:20
**staff** 18:24 19:21
19:22 70:19 77:9
**staffing** 18:16
**standards** 105:4
**standing** 19:7,9
56:25 64:12 70:3
71:5,11 110:13
**start** 5:25 8:19
16:25 35:20 48:5
**state** 2:8 31:1
**statement** 31:18
**statements** 28:15
**STATES** 1:1
**stating** 31:21
**statute** 94:20

**stay** 60:21
**stays** 123:18
**stenographically**
130:11
**Steve** 14:24 15:5,20
16:13 17:2,4,6,10
17:15,25 18:4
20:8 21:15 38:10
39:10,18,23 44:14
49:20 50:9 51:6
66:24 87:6
**stop** 78:7
**strategy** 14:4
**Street** 3:10,16
**stretch** 110:24
**structural** 126:11
**structure** 22:2
52:23 53:9,10
62:4,5,7,8,20
**structured** 12:18
**subject** 80:23 82:25
84:19
**submit** 42:21 64:25
**submitted** 60:12
63:6 111:18
**subordinate** 126:22
**subordinate's**
126:23
**subparts** 91:16
**subsection** 110:10
**subsequent** 9:15
**substance** 26:6,20
26:23
**suit** 14:16
**Suite** 3:10
**summarize** 62:14
120:18
**supervised** 80:15
80:25 83:12,20
84:8,23 89:14
**supervising** 84:6
**supervision** 100:25
130:12
**supervisor** 13:25
83:12,20 84:7,9
84:24 85:11,19
125:11

**supervisory** 72:11
    72:18 81:10 84:20
    125:10 127:25
**supposed** 91:9
**sure** 10:15 13:24
    20:13 21:19 23:9
    40:10 42:17 58:22
    60:2,24 72:14
    75:8 78:12 80:2
    83:23 89:21 99:12
    100:8 106:1
    110:16,18 114:15
    117:25 118:11
**sworn** 4:9 5:4
**system** 31:2 100:17
    104:1
**systems** 2:6 31:4,21
    32:17 83:13 84:22
    99:3,6,18 100:2
    100:11 101:11
    102:5,23 114:18
    130:24

---

**T**

**T** 3:2 131:1,1 132:1
    132:1,1
**tab** 82:12,21 106:3
    113:4
**take** 6:7,9,10,13
    10:2,6,7 25:10
    28:1 47:21 48:1
    58:21 91:20
    110:23 122:14
    124:25 125:2
**taken** 2:2 57:20
    78:15 130:7,10
**takes** 13:9 35:23
    84:21
**talk** 26:25 74:25
    124:12,15 127:18
**talked** 20:7 48:18
    51:12 59:18
    122:23
**talking** 6:12 27:24
    41:4 45:8 79:4
    89:10 109:19
    114:18 117:6

121:12
**talks** 21:18 123:14
**team** 7:20 27:11
    29:12 30:18 33:14
    34:5 35:4,12 74:9
    80:7,13 85:4
    98:10 114:15,15
**teams** 16:7 27:7
    33:3 35:23,25
    36:1,8,12,16 37:9
    37:11,18 38:25
    72:4,23,24 73:2,7
    73:16 100:10
    102:3 115:11
    116:19 124:7,13
    124:16,21
**technically** 78:17
    89:16
**technology** 75:17
    123:12
**tell** 7:17 13:21
    15:14 20:12 28:13
    28:14 29:4 35:19
    36:10,11 37:7,13
    37:15 42:7 43:8
    48:22 64:1 68:12
    75:2 94:12 111:17
    120:20
**temporary** 7:6 8:17
    8:23,25 9:3,7,7
    10:24 11:21 12:2
    13:8 14:1 15:7,13
    15:15 19:9,25
    20:3 37:14 41:22
    43:8,12,21 44:10
    59:21 66:8,13,22
    67:4,11,17 68:24
    70:4,5,8,10,14,17
    70:18,20,24 71:2
    71:11,18,22 72:3
    72:5,11,21,23,25
    73:3,7 75:4 76:19
    95:12 96:10
    119:10 125:3,12
    126:1 127:7 128:5
**ten** 18:15 67:21
**termed** 43:19 128:7

**terms** 90:17
**Terrell** 112:14
**testified** 5:4 53:11
**testifying** 7:4,10
**testimony** 7:15
    13:11 33:20 37:20
    40:23 50:13 88:6
    120:15 129:5,7
**thank** 25:22 35:16
    47:13 48:6 79:1
    92:23 97:11 106:1
    111:5 128:12,14
**thanks** 8:12 82:7
**thing** 30:18 57:17
    123:19
**things** 15:22 27:19
    35:15 36:4,18,20
    40:2 48:18 51:15
    72:8 79:24 87:4
    107:13 123:16
    127:19
**think** 21:21 22:1,24
    24:6,9,14 32:16
    41:16 42:15 45:23
    45:25 48:20 57:14
    58:15 62:19 65:25
    67:19 68:3,25
    70:2 71:21 72:13
    75:21 76:2 77:22
    79:6,9 82:6,8
    86:19 87:5 90:12
    90:16 91:1,12
    92:20 93:10 96:25
    99:23 100:3
    103:13 106:16,20
    110:2 125:9
    126:21,21 127:20
    128:10
**third** 65:15
**three** 65:11,18
    74:12,16 91:12
    92:13 93:20
**tie** 95:16 106:14
**ties** 45:25
**time** 14:23 30:25
    45:11 47:23 56:13
    57:2 61:1,2 65:9

67:2 69:3 76:16
    88:8 90:8 96:24
    97:3 104:4 125:16
**times** 32:24 56:14
    58:23 88:12
    102:10 117:13
**tiny** 113:21
**title** 15:14 49:21,24
    50:4,5
**today** 7:3,15 24:10
    28:2,4 30:23 31:4
    48:21 106:19
**top** 20:15
**topic** 54:12 57:23
    91:12 92:13
**topics** 7:7,22 24:13
    52:18 53:4 61:23
    95:17 106:15
**Traditionally**
    77:15
**training** 75:1,3,6
    76:1,9,14 89:1
    93:21 121:13
**transcribing**
    113:18
**transcript** 113:10
    113:15 130:8
**transcription** 129:6
**transition** 66:6
**transitioning**
    119:18
**tremendous** 115:1
**trickles** 22:21 23:1
**true** 44:6 129:6
    130:8
**truthful** 7:14 58:17
**try** 5:20,21 6:15
**trying** 34:11,16
    120:17
**Tuesday** 19:21
**Turning** 98:24
**TV** 28:21
**two** 9:11,19 10:2,14
    11:9 18:14 19:6
    41:16,17 64:2,23
    75:23 79:24 80:1
    82:12,21 88:22

93:20 110:7 113:4
    114:18 115:4
**two-minute** 122:14
**type** 82:24 115:4
**types** 65:8 80:1
    87:4
**typewriting** 130:12
**typical** 83:3
**typically** 30:25
    31:1

---

**U**

**U** 132:1
**ultimate** 34:7 103:5
**ultimately** 32:25
    34:1 50:25 60:9
**umbrella** 35:5
**unclassified** 103:17
    107:16,20 108:6
    109:17
**underline** 25:9
**understand** 6:14
    6:19 7:3,9 8:21
    10:9 12:18 23:18
    24:18 26:3 27:9
    30:14 34:16 36:16
    43:15 52:20 55:19
    84:10 88:7 102:8
    108:7
**understanding**
    42:2 45:4 46:15
    46:23 47:4 54:7
    68:11 69:9 76:23
    83:25 91:5 99:5
    103:15 105:22
    108:24 110:3
    115:12
**understandings**
    62:3
**understood** 11:7
    34:10 38:24 45:15
    47:12 57:4 87:5
    112:18 115:20
    121:3
**undertake** 88:1
**undertaken** 116:7
**undertaking** 29:5

80:22
**Unfortunately**
113:14
**uniform** 76:9
**uniformly** 52:25
**unit** 95:13
**UNITED** 1:1
**university** 28:4,6,9
**unnatural** 5:15
**unnecessary** 106:8
**USC** 16:6 98:14
124:8
**USCS** 32:24 73:18
79:17 81:8,8,10
81:20 85:10,11,18
86:3,4,11,23
87:10 93:15 94:1
95:3 96:6 97:19
101:23 102:15
103:17,24 108:11
110:1 120:1
123:21 124:8,20
125:21,22
**USDC** 84:22
**USDS** 14:13 27:12
27:14 30:1 37:14
37:14 53:10,12
54:8 59:23 66:22
67:4,22 68:5,10
68:13,18,19 69:8
74:2 77:15 80:5,9
81:15,23 82:4
83:6,10,12,13,13
83:20 84:3,3,7,22
85:16 86:16 88:12
96:9 98:11 108:19
110:10 118:21,23
124:17 125:1,6
126:8,14 127:6,7
128:4
**USDS's** 84:23
**USDS.gov/join**
64:6,24
**use** 38:17 42:16
99:16 117:2,14
118:3,12,16,20
119:1

**V**

**v** 1:6 131:2 132:2
**vague** 30:5 31:16
32:2 33:11 45:18
46:20 55:5 57:13
71:8 72:7 99:20
104:16 117:5
**vaguely** 123:14
**varies** 42:10 63:8
90:11 119:4
**various** 11:4 60:4
65:8 94:4 98:20
100:8
**varying** 124:22
127:17
**verbal** 5:16
**versus** 77:13 84:7
86:9 125:17
**vetted** 43:3
**VICE** 3:8,9
**viewpoint** 50:24,25
**visibility** 108:12,14
**volumes** 124:22
**volunteer** 69:1,11
96:20
**volunteers** 43:17

**W**

**waived** 128:16
**walk** 5:9 42:13
**walls** 99:13,18
**want** 5:11 25:1
36:3,19 45:1,24
46:12 47:5 48:16
48:17 58:16 59:17
77:23 82:11 90:23
91:18,21 94:22
109:5 111:10
112:16 113:4
118:5
**wanted** 48:5 78:6
78:10,17,24 79:3
82:5 83:4 111:13
122:19
**Washington** 2:8,11
3:4,11,17
**wasn't** 55:9 97:2

**way** 6:19 14:6
25:14 32:6,18
58:1 66:18 69:6
**ways** 11:5 42:11,19
43:6 59:19 110:7
124:15
**WA-CCR** 1:21
130:23
**wear** 87:21 88:8,14
**web** 63:14
**website** 60:3 63:25
64:1 113:17
**websites** 64:2,24
65:5
**weekly** 21:22
**weeks** 7:25
**weight** 54:15
**welcome** 35:18
**weren't** 115:20
116:14
**we'll** 5:11 6:8,13
48:19 54:5 63:2
**we're** 28:7 41:3
45:8 89:10 104:1
113:19 121:12
**we've** 20:7 21:14
24:17 105:2
127:13
**WHEREOF**
130:17
**White** 78:18 98:2
**wishes** 54:16 56:17
58:20
**witness** 4:11,18
16:16 24:23 25:12
30:6 39:15 46:21
48:10 52:17 53:10
54:6 58:4 62:12
62:22 63:2,18,23
64:16 78:9 92:25
110:18 111:1
121:9,24 122:9,21
123:25 128:12
130:17
**word** 78:16
**work** 13:7 17:25
18:1,3,9 27:14,16

27:22,24 28:25
29:5,6,10,15,16
29:18,22 30:2,9
30:12 31:7,12,13
31:19,23,24 32:6
32:19,21,23 33:1
33:5,8,12,16,16
33:17 34:6,8,19
34:24,25 35:2,4
35:10,10,12 39:2
40:5 50:10 54:13
62:20 71:24 76:12
79:4,7,12,12,14
79:17,17,23 80:1
80:12,13,22 81:8
81:12,14,20 83:1
83:14,18 84:3,6,8
84:11,15,18,21,23
85:2,15 86:7 88:1
88:10 98:23 99:9
101:20,23 102:2
104:25 107:3
113:25 117:19
118:7,18,22,23
119:5,8,9 120:13
121:6,16
**worked** 7:19
**workforce** 98:4
**working** 80:10
89:24 91:14 98:25
100:2 106:11,25
108:1 116:20
118:13 119:2
**works** 101:9
119:12
**worth** 103:22
**wouldn't** 20:14
37:4 73:6 82:3
123:20
**write** 5:18
**written** 5:13 18:3
119:23 120:21
123:5,23 124:5
**wrong** 69:23 73:20

**X**

**x** 1:3,10

**Y**

**yeah** 8:7 11:7 14:8
16:1 26:4 30:13
31:9 35:18 36:14
47:22 48:13 60:25
70:25 72:24 73:18
79:11 80:2 81:6
82:16 85:10,14
87:2 92:5 93:2
95:24 112:12
113:13 117:25
120:1
**Yep** 79:2
**Young** 95:7 96:2
97:23 112:5

**Z**

**Zach** 112:14
**Zhinson@relma...**
3:12
**ZOILA** 3:8

**1**

**1:25-cv-00339-J...**
1:7
**10515** 1:25
**11** 27:23 106:4
114:9,11
**1100** 3:16
**121** 4:20
**1225** 3:10
**129** 4:12
**130** 4:10
**131** 4:13
**14158** 9:1
**14448** 1:21
**15** 28:9
**16** 4:20 113:22
**17th** 13:18
**18th** 13:20 14:20
14:22 66:19 67:3
67:7,18
**19th** 3:10 12:9

**2**

**2:16** 2:13 128:17
**20** 114:13

**20th** 9:2 10:19 11:3
  11:18 12:4 14:15
  41:21,24 42:5
  44:11,13 46:17
  64:11 65:4 69:10
  73:21 106:19
**20005** 3:17
**20036** 3:11
**20043** 3:4
**202** 3:5,11,17
**2025** 1:15 2:11
  14:15 41:21,24
  42:5 73:21 130:19
**2026** 9:9
**22** 4:20
**24** 113:22
**27** 30:23
**27th** 28:22
**29** 82:13 83:5

---
**3**

**3A** 107:6
**3B3** 98:9
**30** 2:1 109:12
**30(b)(6)** 1:13 4:2
  5:2 58:4
**300** 114:6,11,12
**305-0878** 3:17
**34553** 3:4

---
**4**

**4th** 9:8
**40** 28:6
**448-9090** 3:5
**47** 4:20

---
**5**

**5** 4:5,9
**5th** 14:17,19,21

---
**6**

**6** 2:1
**60** 28:5
**600** 3:10

---
**7**

**7** 1:15 2:11
**700** 31:3

**728-1888** 3:11
**79** 18:13

---
**8**

**85** 28:8
**89** 127:9
**89-ish** 126:7

---
**9**

**9th** 130:18
**9:33** 1:16 2:12