**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AFL-CIO, et al., | |
| *Plaintiffs*, | |
| vs. | Case No. 1:25-cv-339-JDB |
| U.S. DEPARTMENT OF LABOR, et al., | |
| *Defendants*. | |

**<u>PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY
INJUNCTION</u>**

# TABLE OF CONTENTS

I.    The Normal *Winter* Standard for Preliminary Injunctions Applies. ....................................... 2

II.   DOGE's Unlawful Access to Their Data Injures Plaintiffs' Members. ................................. 3

III.  The Evidence Shows That Plaintiffs' Members Face Imminent Risk of Irreparable Injury Based on Agencies' DOGE Access Policies. ........................................................................ 7

    A. Granting Illegal Access to DOGE Affiliates is Sufficient to Demonstrate Irreparable Injury. ......................................................................................................................... 8

    B. Legal Remedies Are Inadequate. .................................................................................. 10

    C. The Irreparable Injury Is Ongoing and Continues to Escalate............................................11

IV.   The DOGE Access Policies Exist and Are Arbitrary and Capricious...................................11

V.    The DOGE Data Access Policies Cannot Be Justified on the Basis of the President's Executive Orders.......................................................................................................... 14

    A. The Pre-March 20 Executive Orders Cannot Plausibly Grant DOGE Unfettered Access to All Systems to Seek Out "Waste, Fraud, and Abuse."..................................................... 15

    B. The March 20 Executive Order Also Cannot Justify the DOGE Data Access Policies.... 16

VI.   DOGE Is An External Actor, and Its Affiliates Are Not Agency Employees....................... 18

VII.  Defendants Should Not Benefit From Their Deficient Discovery........................................ 22

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AARP v. EEOC,*
 226 F. Supp. 3d 7 (D.D.C. 2016) (Bates, J.) ...........................................................8

*Al -Ahmed v. Twitter, Inc.,*
 603 F. Supp. 3d 857 (N.D. Cal. 2022) ...................................................................4

*All. for Retired Ams.v. Bessent*, No. 25-0313, 2025 WL 740401, 15 (D.D.C. Mar.
 7, 2025) ...........................................................................................................5, 6

*Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.,*
 121 F.4th 1314 (D.C. Cir. 2024) ...........................................................................3

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.,*
 No. 25CV1237, 2025 WL 996542 (S.D.N.Y. Apr. 3, 2025) ...................................6

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
 No. 25-0596, 2025 WL 1206246, __ F. Supp. 3d __ (D. Md. Apr. 17, 2025) .................10, 11

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin,.*
 No. 25-1411 (4th Cir. Apr. 30, 2025) (en banc) ...........................................4, 11, 27

*Am. Fed'n of Tchrs. v. Bessent,*
 No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 4, 2025) .......................................2

*Ashland Oil, Inc. v. F.T.C.,*
 409 F. Supp. 297 (D.D.C. 1976) ...........................................................................9

*Baker DC, LLC v. NLRB,*
 102 F. Supp. 3d 194 (D.D.C. 2015) ....................................................................8, 9

*Bin Lep v. Trump,*
 No. 20-3344, 2020 WL 7340059 (D.D.C., Dec. 14, 2020) ...................................3

*Bogie v. Rosenberg,*
 705 F.3d 603 (7th Cir. 2013) .................................................................................5

*Brown-Criscuolo v. Wolfe,*
 601 F. Supp. 2d 441 (D. Conn. 2009) ...................................................................4

*Butera v. District of Columbia,*
 235 F.3d 637 (D.C. Cir. 2001) ............................................................................25

*Calvillo Manriquez v. Devos*,
    345 F. Supp. 3d 1077 (N.D. Cal. 2018) ...................................................................11

*FAA v. Cooper*,
    566 U.S. 284 (2012).......................................................................................................10

*Fletcher v. Price Chopper Foods of Trumann, Inc.*,
    220 F.3d 871 (8th Cir. 2000) ..........................................................................................5

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ........................................................................................2

*Galvin v. Eli Lilly & Co.*,
    No. 03-1797, 2005 WL 3272142 (D.D.C. Sept. 12, 2005).......................................24

*Garay v. Liriano*,
    839 F. Supp. 2d 138 (D.D.C. 2012) ................................................................................5

*Hamberger v. Eastman*,
    206 A.2d 239 (N.H. 1964) ...............................................................................................4

*Haw. Psychiatric Soc'y v. Ariyoshi*,
    481 F. Supp. 1028 (D. Haw. 1979) ................................................................................10

*Hirschfeld v. Stone*,
    193 F.R.D. 175 (S.D.N.Y. 2000) ...................................................................................10

*Human Touch DC, Inc. v. Merriweather*,
    No. 15-cv-00741, 2015 WL 12564166 (D.D.C. May 26, 2015).............................9, 10

*Jackson v. Teamsters Loc. Union 922*,
    310 F.R.D. 179 (D.D.C. 2015)......................................................................................23

*Jud. Watch, Inc. v. Dep't of Energy*,
    412 F.3d 125 (D.C. Cir. 2005) ......................................................................................19

*Lamaute v. Power*,
    339 F.R.D. 29 (D.D.C. 2021).........................................................................................22

*McCutcheon v. Fed. Election Comm'n*,
    496 F. Supp. 3d 318 (D.D.C 2020) .................................................................................3

*In re Meta Pixel Healthcare Litig.*,
    647 F. Supp. 3d 778 (N.D. Cal. 2022) ..........................................................................10

*In re Nickelodeon Consumer Priv. Litig.*,
    827 F.3d 262 (3d Cir. 2016)............................................................................................5

*Paavola v. Hope Vill.*,
  No. 19-1608, 2021 WL 4033101 (D.D.C. Sept. 4, 2021) ......................................................25

*Parks v. IRS*,
  618 F.2d 677 (10th Cir. 1980) .................................................................................................17

*Perez v. C.R. Calderon Constr., Inc.*,
  221 F. Supp. 3d 115 (D.D.C. 2016) .........................................................................................20

*Pileggi v. Wash. Newspaper Publ'g Co., LLC*,
  No. CV 23-345, 2024 WL 324121 (D.D.C. Jan. 29, 2024) .......................................................5

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
  *831 F.3d 500 (D.C. Cir. 2016)* .................................................................................................2

*Randolph v. ING Life Ins. & Annuity Co.*,
  973 A.2d 702 (D.C. 2009) .........................................................................................................6

*Roach v. Harper*,
  105 S.E.2d 564 (W. Va. 1958) ...................................................................................................4

*Sabol v. Cable & Wireless PLC*,
  361 F. Supp. 2d 205 (S.D.N.Y. 2005) ......................................................................................20

*Sabrowski v. Albani-Bayeux, Inc.*,
  124 F. App'x 159 (4th Cir. 2005) ...............................................................................................6

*Salazar v. Nat'l Basketball Ass'n*,
  118 F.4th 533 (2d Cir. 2024) ......................................................................................................5

*Spirides v. Reinhardt*,
  613 F.2d 826 (D.C. Cir. 1979) ..................................................................................................19

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................................................5, 6

*In re United Mine Workers of Am. Int'l Union*,
  190 F.3d 545 (D.C. Cir. 1999) ..................................................................................................17

*Vernars v. Young*,
  539 F.2d 966 (3d Cir. 1976) .......................................................................................................4

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................................................2

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ....................................................................................................7

**Statutes**

Privacy Act of 1974, 88 Stat. 1896 (1974) ............................................................................ *passim*

**Other Authorities**

Federal Rule of Civil Procedure 26(e) ...............................................................................24

Restatement (Second) of Torts § 625B .............................................................................4, 5

Defendants' brief is most remarkable for what it does not dispute. Defendants do not, for example, present evidence that the Department of Labor ("DOL") or the Department of Health and Human Services ("HHS") have undertaken a particularized analysis to establish that any DOGE Affiliate needs access to any sensitive system of records nor do they make a substantive argument that any such access is needed. They do not dispute that three Executive Orders are the *only* basis for the sweeping access DOGE Affiliates have been granted. They largely ignore Plaintiffs' arguments that the policies granting DOGE Affiliates access are arbitrary and capricious and do not even address the Agencies' failure to consider conflicts of interest or other "important aspects of the problem" as identified by the Agencies' own regulations and statutes. And their contentions with respect to the balance of equities are less an argument than an assertion that "Presidential prerogatives" can somehow immunize agency action from review under the Administrative Procedures Act. This is not the law.

What Defendants do dispute, they get wrong, mischaracterizing the facts, the law, or both. In lieu of the D.C. Circuit's standard for preliminary injunctions, they attempt to incorporate a standard articulated in a concurrence from another circuit. They contend that Plaintiffs' members have not been injured by the unlawful disclosure to the DOGE Team, ignoring numerous recent decisions to the contrary—including one from this Court. They assert that unlawful intragovernmental disclosure cannot constitute irreparable harm, but they both mischaracterize the applicable law and ignore the intentional, sweeping access granted to DOGE Affiliates. They argue that there has been no final agency action because DOGE Affiliates have not already been granted access to every sensitive system at DOL and HHS, but the record shows that Defendant Agencies' have in fact adopted a policy of granting DOGE Affiliates access on demand and Defendants have presented no evidence to the contrary. Finally, they press the

1

fiction that DOGE Affiliates are normal agency employees and ignore the evidence that they are functionally controlled by DOGE. Because Defendants' arguments fail both legally and factually, this Court should grant Plaintiffs' motion for a preliminary injunction.

## I.     The Normal *Winter* Standard for Preliminary Injunctions Applies.

When considering a motion for a preliminary injunction, a court must undertake the familiar analysis of whether the movant has demonstrated that: (1) it "is likely to succeed on the merits, (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Defendants' reliance on a recent concurrence from the Fourth Circuit to suggest a more onerous standard is misplaced. This Court should proceed consistently with every other court to evaluate likelihood of success on the merits and decline Defendants' invitation, Defs. Opp., ECF No. 82 at 22–25, to adopt an unprecedented and illogical approach.

The novel approach Defendants propose would require that the Court consider not just the plaintiffs' likelihood of success on each factor, but also the *product* that results from multiplying each of those probabilities. But a plaintiff's likelihood of success on any requisite element of success on the merits is not susceptible to bookmaking; it is therefore unsurprising that Defendants can identify no case to apply this approach besides the concurrence in *Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 4, 2025). To the contrary, the D.C. Circuit has implicitly rejected the notion that a substantial likelihood of success on the merits requires a higher-than-substantial likelihood of success on each predicate component of the merits. *See*, *e.g.*, *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 505 (D.C. Cir. 2016) (applying ordinary analysis for likelihood of success on the merits) (quotation omitted); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (to

demonstrate substantial likelihood of success on merits, party must show only substantial likelihood of predicate component, specifically standing).[1] Consistent with that approach, the D.C. Circuit has long evaluated likelihood of success on the merits without resorting to multiplicative odds. *See, e.g., Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024). And this Court has, correctly, done so as well. *See, e.g., McCutcheon v. Fed. Election Comm'n*, 496 F. Supp. 3d 318, 329 (D.D.C 2020) (Bates, J.); *Bin Lep v. Trump*, No. 20-3344, 2020 WL 7340059, at *5 (D.D.C., Dec. 14, 2020) (Bates, J.).

## II.   DOGE's Unlawful Access to Their Data Injures Plaintiffs' Members.

Defendants assert that Plaintiffs lack standing because their members have not suffered a concrete injury analogous to the common law tort of intrusion upon seclusion. Defendants err in several respects.[2]

*First*, Defendants misstate the scale of the harm here. They attempt to conflate the extraordinary carte blanche access granted to DOGE Affiliates with the routine and necessary access provided to normal agency employees. The record shows that DOGE Affiliates have been granted on-demand access to any system of their choosing without any particularized need, without normal procedural protections, and while functionally working for DOGE. Pls. Mem., ECF 80 at 8–18, 37–42. As a result, this case is not about inadvertent one-off access to a few individual records. Rather, it is about a small army of DOGE personnel accessing any data of

---

[1] The multiplicative probability approach Defendants urge would effectively preclude courts from ever entering injunctive relief: to have even a 51% likelihood of success on the merits of a claim with four predicate components, a plaintiff would need approximately an 84.5% chance of success on *each* independent predicate component.

[2] Although Defendants do contend that Plaintiffs do not have standing because their members have not been injured, they do not dispute either causation or redressability with respect to members' Article III standing.  They also neither dispute that protecting members' data is germane or that the participation of individual members would be necessary.

their choosing on demand. Their access is unlawful under the Privacy Act and therefore unauthorized.

*Second*, Defendants are simply wrong in claiming "Plaintiffs have not identified a single case suggesting that mere intra-governmental sharing of information such as this, without more, is analogous to any injury recognized as a basis for an intrusion-upon-seclusion claim." Defs. Opp., ECF No. 82 at 30. Not only have Plaintiffs identified other cases that have held that intra-governmental disclosure of information to unauthorized people creates a concrete injury, *see* Pls. Mem., ECF No. 80-1 at 23; *this Court* has already recognized *in this case* that it does so, Mem. Op., ECF No. 78 at 14–17.[3]

*Third*, Defendants' specific contentions related to the intrusion-upon-seclusion analogy fail as well. For example, while an "irritating" or perceivable intrusion *may* be actionable as intrusion upon seclusion, Defs. Opp, ECF No. 82 at 29, "irritation" is not *required*, *see* Restatement (Second) of Torts § 652B. Indeed, this alleged requirement would exclude traditional examples expressly listed in the Restatement (Second) of Torts, including a private detective's taking pictures inside a home with a telescopic lens, installing a wiretap, or forging a court order to examine someone's bank documents. *Id.*; *see also, e.g.*, *Vernars v. Young*, 539 F.2d 966, 969 (3d Cir. 1976); *Al -Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 872 (N.D. Cal. 2022); *Brown-Criscuolo v. Wolfe*, 601 F. Supp. 2d 441, 450 (D. Conn. 2009); *Hamberger v. Eastman*, 206 A.2d 239, 242 (N.H. 1964); *Roach v. Harper*, 105 S.E.2d 564, 565 (W.Va. 1958).

---

[3] Since those decisions, the Fourth Circuit, acting *en banc*, has denied an application to stay a district court's preliminary injunction, which found a likelihood of success on a similar intrusion upon seclusion standing theory, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411 (4th Cir. Apr. 30, 2025) (en banc).

To the contrary, the Restatement expressly recognizes that intrusion upon seclusion may include the "investigation or examination into [an individual's] private concerns, as by opening his private and personal mail, searching his safe or his wallet, [or] examining his private bank account." Restatement (Second) of Torts § 652B cmt. b; *Garay v. Liriano*, 839 F. Supp. 2d 138, 144 (D.D.C. 2012) (intrusion may involve "an invasion or interference . . . by use of some other form of investigation or examination . . . into [a person's] private or secret concerns"). And courts in this district—including this Court in this case—have recognized that the unwanted disclosure of Personally Identifiable Information ("PII") constitutes a concrete injury analogous to an intrusion upon seclusion. Mem. Op., ECF No. 78 at 16-17; *see also, e.g.*, *Pileggi v. Wash. Newspaper Publ'g Co., LLC*, No. CV 23-345, 2024 WL 324121, at *8 (D.D.C. Jan. 29, 2024); *All. for Retired Ams.v. Bessent*, No. 25-0313, 2025 WL 740401, at *15 (D.D.C. Mar. 7, 2025).[4]

In reality, the unlawful disclosure of union members' PII and personal health information ("PHI") checks every box courts consider in assessing whether an intangible harm analogizes to intrusion upon seclusion. For example, courts have considered whether the individual has a "reasonable expectation of privacy" in assessing whether information falls within the ambit of intrusion upon seclusion. *See All. for Retired Ams.*, 2025 WL 740401, at *16; *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 294 (3d Cir. 2016); *Bogie v. Rosenberg*, 705 F.3d 603, 611 (7th Cir. 2013); *Fletcher v. Price Chopper Foods of Trumann, Inc.,* 220 F.3d 871, 877 (8th Cir. 2000). In this case, the Court has recognized that individuals reasonably expect that the government will not disclose their data to unauthorized people, in part because of the

---

[4] Even if an irritating or perceptible intrusion were a required element for the intrusion upon seclusion tort, Article III "does not require an exact duplicate in American history and tradition." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021); *see also Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 542 n.6 (2d Cir. 2024) (plaintiff need not establish "*every* element of a common-law analog to satisfy the concreteness requirement").

expectations created by the Privacy Act. Mem. Op., ECF No. 78 at 16–17; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (Congress "may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." (citation omitted)); *All. for Retired Ams.,* 2025 WL 740401, at *16. Defendants' assertion that union members initially shared information with the government "voluntarily"—a fact that is not established here—is therefore of no moment.

And the unlawful disclosure of deeply personal information in this case is "highly offensive to a reasonable person." The DOGE Team has accessed information at DOL and HHS that includes Social Security numbers, medical diagnosis codes, medical procedure codes, health insurance claim numbers, employee identification numbers, and medical notes, among other information. *See* ECF No. 80-14 (Wendel Chart). A reasonable person would find it highly offensive for the government to disclose this information to an unauthorized person, regardless of whether that person is a government employee. *See Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, No. 25CV1237, 2025 WL 996542, at *6 (S.D.N.Y. Apr. 3, 2025); *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009) ("unauthorized viewing" of Social Security numbers and other identifying information "is highly offensive to any reasonable person"); *Sabrowski v. Albani-Bayeux, Inc.*, 124 F. App'x 159, 161 (4th Cir. 2005) (disclosure of "medical records amounts to a per se intrusion into seclusion if the records contain sensitive materials"). These concerns are multiplied because the same DOGE Affiliates have accessed numerous systems across multiple agencies. *See generally* ECF No. 80-5 (Defs. Responses) at 7-20. As a factual matter, the union members who have submitted relevant declarations in this case all state that they find the disclosure offensive. *See* ECF No. 80-18 (Decl. of C. Sullivan) ¶¶ 8–9; ECF No. 80-19 (Decl. of T. Frye) ¶¶ 6–11; ECF No. 80-20 (Decl.

of J. Reese) ¶¶ 5–9; ECF No. 80-21 (Decl. of N. Duckett) ¶¶ 10-14; ECF No. 80-22 (Decl. of P.

Welsh) ¶¶ 5-8; ECF No. 80-23 (Decl. of D.M. Smith) ¶¶ 9–12; ECF No. 80-24 (Decl. of W.

Wetmore) ¶ 6; ECF No. 80-25 (Decl. of D. Gray) ¶¶ 7–9; ECF No. 29-18 (Decl. of I. Dahlgren)

¶¶ 5–7; ECF No. 29-19 (Decl. of L. Dickerson) ¶¶ 5–7; ECF No. 29-21 (Decl. of G. Sanford) ¶¶

6–8; ECF No. 29-22 (Decl. of D. Sosne) ¶¶ 5–8; *see also* ECF No. 80-26 (Decl. of D. McNeil)

¶¶ 15–19; ECF No. 80-27 (Decl. of K. Coakley Harrison) ¶¶ 14-16; ECF No. 80–28 (Decl. of A.

van Schaik) ¶¶ 12-15.

### III.     **The Evidence Shows That Plaintiffs' Members Face Imminent Risk of Irreparable Injury Based on Agencies' DOGE Access Policies.**

The release of Plaintiffs' members' private information to DOGE personnel constitutes

irreparable harm justifying the issuance of a preliminary injunction. To satisfy the D.C. Circuit's

test for irreparable harm, an "injury must be both certain and great." *Wis. Gas Co. v. FERC*, 758

F.2d 669, 674 (D.C. Cir. 1985). Where Plaintiffs point to harm that has not yet occurred, they

must show that "[t]he injury complained of [is] of such *imminence* that there is a 'clear and

present' need for equitable relief to prevent irreparable harm." *Id.* (citations omitted). In order to

demonstrate that the injury is "certain," a movant "must provide proof that the harm has occurred

in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the

near future." *Id*. An injury is generally not irreparable where there is a "possibility that adequate

compensatory or other corrective relief will be available at a later date, in the ordinary course of

litigation." *Id.* (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925

(D.C. Cir. 1958)).

Defendants assert three reasons why the disclosure to DOGE cannot qualify as

irreparable harm: (1) the information has not been disclosed to the public, and disclosure to

DOGE alone cannot constitute irreparable injury, (2) money damages are available under the Privacy Act, and (3) the injuries have already occurred. Each is without merit.

A.    <u>Granting Illegal Access to DOGE Affiliates is Sufficient to Demonstrate Irreparable Injury.</u>

As Plaintiffs have shown, HHS and DOL have granted DOGE Affiliates broad and sweeping access to sensitive systems containing highly sensitive personal information of a broad swath of Americans, including that of Plaintiffs' members. Contrary to Defendants' assertions, courts in this district have *not* consistently held that Plaintiffs are required to show that DOGE personnel have or will further disseminate this private information to the public writ large. For example, in a case involving proposed rules related to the disclosure of medical and genetic information to employers, this Court explained that "the disclosure of confidential information in the first instance could still constitute irreparable harm, regardless of whether" the information is ultimately used against a plaintiff. *AARP v. EEOC*, 226 F. Supp. 3d 7, 21 (D.D.C. 2016) (Bates, J.).[5]

The cases Defendants cite do not, in fact, support a rule that unlawful intragovernmental disclosure cannot constitute irreparable harm. Defendants assert that *Baker DC, LLC v. NLRB*, 102 F. Supp. 3d 194 (D.D.C. 2015), for example, stands for the proposition that there can be no irreparable harm from disclosure of personal information to an entity (there, a union) where regulations place limits on the entity's use of the information. *See* Defs. Opp., ECF No. 82 at 19-20. It does not. In that case, the Court did consider whether the "very fact of the disclosure of the employee information to the Union will cause the employee plaintiffs irreparable harm." *Baker,*

---

[5] Although the Court went on to deny the request to enjoin the regulations in question, it did so on the ground that the organizational plaintiff had not established that it had members whose harms would be addressed by the proposed injunction requested. *AARP v. EEOC*, 226 F. Supp. 3d 7, 23 (D.D.C. 2016).

102 F. Supp. 3d at 204. But it concluded only that the plaintiffs had not established that disclosure of the particular type of information at issue there—"private contact information"— would "automatically constitute irreparable injury." *Id.* It did not conclude that dissemination was required for irreparable injury, and the types of sensitive information at issue in this case go far beyond the kinds of basic contact information at issue in *Baker*.

Defendants likewise cite *Ashland Oil, Inc. v. F.T.C.,* 409 F. Supp. 297, 308 (D.D.C. 1976), *aff'd,* 548 F.2d 977 (D.C. Cir. 1976), for the proposition that disclosure of private information to an entity (here, a congressional subcommittee) subject to confidentiality obligations cannot itself cause irreparable harm. Defs. Opp., ECF No. 82 at 20. But the *Ashland Oil* court did not have occasion to consider that question because the plaintiffs did not argue that disclosure to the subcommittee on its own would cause any irreparable injury. Rather, the plaintiffs argued that because of its history of leaks and breaches, disclosure to the subcommittee was very likely to lead to the dissemination to the public at large and the company's competitors, which would cause it irreparable harm. The court held that this fear of further disclosure was too speculative to support a preliminary injunction; it did not opine on whether a plaintiff in a different case could establish irreparable injury without public disclosure. *Ashland Oil,* 409 F. Supp. at 308.

Defendants further assert that *Human Touch DC, Inc. v. Merriweather*, No. 15-cv-00741, 2015 WL 12564166 (D.D.C. May 26, 2015), which involved a fired employee who forwarded confidential information to her personal email without authorization, follows the supposed rule that only public or otherwise widespread disclosure can constitute irreparable harm, as compared to disclosure to someone already subject to confidentiality obligations. Defs. Opp., ECF No. 82 at 20. But the Defendant in *Merriweather*, who was both the progenitor and recipient of the disclosure in question, was *also* herself subject to obligations to keep the information

confidential. *See* 2015 WL 12564166 at *1 (describing employer's non-disclosure rules). To the extent she made any further disclosure (which was unclear in the record before the court) it was to governmental officials with the District of Columbia, who would also be prohibited from further dissemination the private health information at issue. *Id.* at *2. Nevertheless, and contrary to Defendants' description of the case law, the court granted a preliminary injunction.

      B.    <u>Legal Remedies Are Inadequate.</u>

      Second, Defendants argue that any harms Plaintiffs and their members suffer can be fully compensated through money damages. This too fails. As Judge Hollander recently recognized when granting a preliminary injunction stopping DOGE affiliates from accessing Social Security systems with PII, "money damages cannot rectify" intrusions into the private sphere like the data disclosures at issue here. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,* No. 25-0596, 2025 WL 1206246, at *70, __ F. Supp. 3d __ (D. Md. Apr. 17, 2025) ("*AFSCME I*"). This case similarly involves the past and ongoing disclosure to DOGE Affiliates of both Social Security numbers and private medical information, which is "precisely the kind of intangible injury that cannot be remedied by damages." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 802 (N.D. Cal. 2022); *see also Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) (disclosure of psychiatric and medical treatment and diagnoses "is the quintessential type of irreparable harm that cannot be compensated or undone by money damages."); *Haw. Psychiatric Soc'y v. Ariyoshi*, 481 F. Supp. 1028, 1052 (D. Haw. 1979) ("The disclosure of the highly personal information contained in a psychiatrist's files to government personnel is itself a harm that is both substantial and irreversible"). Furthermore, Plaintiffs' members are experiencing emotional distress regarding the exposure of their sensitive information to DOGE Affiliates. *See supra* at 6-7 (citing declarations). Because emotional distress damages under the Privacy Act are barred by sovereign immunity, *see FAA v. Cooper*,

10

566 U.S. 284, 303–04 (2012), that harm is irreparable, *Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077, 1106 (N.D. Cal. 2018)**.**

      C.    <u>The Irreparable Injury Is Ongoing and Continues to Escalate.</u>

      Third, Defendants argue, without merit, that Plaintiffs and their members are not facing any irreparable harm here because DOGE Affiliates have already had access to the members' sensitive information for the last several months. In fact, the harm here is both continuing and growing. It is continuing because DOGE Affiliates maintain their access to Sensitive Systems. According to Defendants' interrogatory responses, thirteen DOGE Affiliates have been given access to twenty-seven Sensitive Systems at DOL and HHS, with only a few deactivations. *See* Pls. Mem., ECF No. 80-1 at 13, 16; Defs. Responses, ECF No. 80-5 at 11-14, 16. As Judge Hollander explained, "a second look is not legally insignificant just because there was a previous look." *AFSCME I*, 2025 WL 1206246, at *69. And the harm is growing because Defendants are adding people to their DOGE Teams and giving them access to more Sensitive Systems, as Defendants themselves explain. *See* Defs. Opp., ECF No. 82 at 10 n.6. Judge Hollander found that this, too, demonstrates irreparable harm. *AFSCME I*, 2025 WL 1206246, at *69 ("Although the DOGE Team was previously provided with access, the DOGE Team continues to request additional access, and the team itself continues to grow in number. Simply put, the matter is ongoing."). The Fourth Circuit recently declined to stay the injunction. *Am. Fed'n of State, Cnty. & Mun. Emps v. Soc. Sec. Admin.*, No. 25-1411 (4th Cir. Apr. 30, 2025) (en banc).

**IV.**    <u>**The DOGE Access Policies Exist and Are Arbitrary and Capricious.**</u>

      Plaintiffs previously explained that the Defendant Agencies have adopted a policy specific to DOGE Affiliates, and nobody else, of giving those Affiliates access to all the unclassified systems they request, Pls. Mem., ECF No 80-1 at 12-18; that have done so without acknowledging a change in policy for this group from the preexisting policy of requiring any

individual to have and demonstrate a particularized need for access on a system-by-system basis; and that they have done so without considering mandatory statutory factors, reliance interests, or conflicts of interest, all of which renders the DOGE Data Access Policies arbitrary and capricious, *see* Pls. Mem., ECF No. 80-1 at 29–37.

Defendants now wrongly contend that there is no new policy, just a mere application of the preexisting one. This rests on their treatment of executive orders related to DOGE as "self-executing directives" that by themselves establish a comprehensive "need to know" across Defendant Agencies' Sensitive Systems. *See* Pls. Mem., ECF No 80-1 at 43. Under this approach, DOGE "Team members do not have to explain a particularized need for access and the Agencies do not have to confirm a particularized need." *Id.* at 13. And so Defendants effectively concede that they have not undertaken and do not undertake any particularized analysis before granting DOGE access to sensitive systems. That concession is enough to confirm violations of the Privacy Act and APA violations.

Since they cannot show that any particularized demonstration of need is required of DOGE Affiliates, Defendants posit that because different DOGE Affiliates have accessed different and different numbers of systems, no blanket access policy could exist. *See* Defs. Opp., ECF No. 82 at 40. This illogical argument misconstrues the basic premise of Plaintiffs' case and ignores the Court's explanation of that premise. Plaintiffs argue that the Defendant Agencies grant DOGE "*on-demand access* to their most sensitive systems of records." Pls. Mem., ECF No. 80-1 at 7 (emphasis added). The fact that different DOGE Affiliates have demanded access to different systems is not evidence that the underlying policy—to grant DOGE Affiliates access to whatever they seek—does not exist. As the Court explained, "Plaintiffs do not challenge the underlying decisions of the agency defendants to give particular [DOGE] personnel access to

agency systems. Rather, plaintiffs challenge . . . agency defendants' across the board <u>policies</u> . . . to grant [DOGE] personnel access to sensitive records systems." *See* Mem. Op., ECF No. 78 at 24 (emphasis in original). Whether that access is afforded unquestioningly to each system on demand or to all systems at once is immaterial because the policy is the same—DOGE Affiliates get access to whatever they want, and that will continue to be the case. Thus, Defendants claim that Plaintiffs "fail . . . to identify a particular system they believe [DOGE] gained access to without a proper need to know," Defs. Opp., ECF No. 82 at 41, misses the point. The point is that DOGE Affiliates have not provided *anybody*, including the Agencies themselves, with the information necessary to properly evaluate whether they have a particularized need for access to each Sensitive System to which they have demanded and been given access.

Indeed, Defendants also barely contest that the DOGE Data Access Policies are arbitrary and capricious, instead largely continuing to argue that the Defendants' approach is not reviewable agency action. *See* Defs. Opp., ECF No. 82 at 43–44. But for the reasons detailed in Plaintiffs' opening brief, to adopt a new policy for DOGE Affiliates the agencies were required to acknowledge that they were changing their access policies for this select group and to carefully consider the values underpinning federal privacy rules, none of which took place. *See* Pls. Mem., ECF No. 80-1 at 30–36.

As detailed in Exhibit 43, the Unaccompanied Children Portal at HHS illustrates the shortcomings of Defendants' approach. This system contains "highly sensitive" records about children and their sponsors, such as photographs of the children at various ages, detailed medical notes, and in some cases, may include details of abuse or sexual violence children have suffered en route to the United States or while in federal custody. Ex. 43 (Decl. of J. Doe) ¶¶ 8-9. What this system does *not* contain, however, is "any payment information . . . that would be relevant to

identifying financial waste, fraud or abuse." *Id.* ¶ 11. And yet, DOGE has now accessed this database (for purposes unknown) because HHS wrongly assumed the existence of a need to know that is not justified based on the contents of the database. *See* HHS (Wendel) Dep., ECF No. 80-15, 46:19–48:25 (suggesting that DOGE would use access to the system to "see if [] payments to sponsors were legal and legitimate.").

Similarly, as detailed in Exhibit 43, DOGE Teams' actual access in the name of hunting "waste, fraud, and abuse" is substantially broader than what the entities traditionally tasked with those investigations would seek and receive. Ex. 43 (Decl. of J. Grant) ¶¶ 11–12. The HHS Inspector General and Government Accountability Office both have needs to access HHS & CMS data to achieve their missions, but are "not given direct access to sensitive systems to search for fraud," instead "work[ing] with system owners and administrators to build targeted searches that would deliver the more limited subset of information relevant to their particular investigations." *Id.* ¶ 11. This sort of approach prevents the sort of overbroad access that has been granted to DOGE to access systems like HIGLAS, which have substantially more sensitive information needed in them than is needed for investigations into waste, fraud, and abuse. *See id.* ¶ 12. These examples of unnecessary access with little bearing on DOGE's stated need to know are the illogical but predictable outcomes of Defendants' new arbitrary and capricious policy.

## V.    <u>The DOGE Data Access Policies Cannot Be Justified on the Basis of the President's Executive Orders.</u>

As a fall back, Defendants argue that blanket access policies are appropriate under the Privacy Act when an executive order (or executive orders) decrees such blanket access. DOL reiterates that the January 20 EO "makes the need for access apparent" such that no inquiry into their need to know was necessary for any of the systems DOGE accessed. *See* Defs. Opp., ECF No. 82 at 11, 41. HHS admits that there has never been "another position at HHS" granted

"access as broad as that given to [DOGE]." *See* HHS (Wendel) Dep., ECF No. 80-15 41:25-42:6; *see also* Ex. 43 (Decl. of J. Doe) ¶ 6 ("During my tenure, I was aware of no other individual detailed to or employed by HHS that had active concurrent access to as many sensitive databases as DOGE Team member Luke Farritor"); Ex. 44 (Decl. of J. Grant) ¶¶ 9–10 (detailing the normal access limitations that exist even for senior management employees). But HHS argues that such access is both consistent with existing agency policy and consistent with "need to know principles" because the President "vested" "broad responsibilities . . . in those employees by" executive order. Defs. Opp., ECF No. 82 at 7.

    A.    <u>The Pre-March 20 Executive Orders Cannot Plausibly Grant DOGE Unfettered Access to All Systems to Seek Out "Waste, Fraud, and Abuse."</u>

Defendants during their depositions repeated the mantra that the executive order establishing DOGE required DOGE Affiliates to have unfettered sensitive system access to seek out "waste, fraud, and abuse." *See* Rule 30(b)(6) deposition of DOL ("DOL Dep."), ECF No. 80-9, 21:17–22, 34:10–35:1, 41:14–42:5, 42:16–43:3, 126:22–127:18; HHS (Wendel) Dep., ECF No. 80-15, 27:11–14, 32:16–20, 33:2–5, 42:19–21, 43:4–9, 44:3–19, 47:4–22, 48:1–3. But even on their face, the Executive Orders do not state that DOGE has a need to have unfettered access to any system it asks for in order to seek out "waste, fraud, and abuse."

This language *nowhere appears* in the January 20 Executive Order, ECF No. 80-3, so Defendants simply assert that it is "obvious" that Defendant Agencies would interpret the phrase "modernizing Federal technology and software to maximize government efficiency and productivity" as requiring unimpeded rifling through the raw data in Agencies' most sensitive datasets in search of "waste, fraud, and abuse." *See* Defs. Opp., ECF No. 82 at 42–43. That conclusion is not obvious, and the Privacy Act's need to know requirement should not rest on

freewheeling word association. This is particularly true when this explanation is only written down and shared retroactively in response to litigation.

Defendants then point to language about "waste, bloat, and insularity" in an executive order about "reduc[ing] the size of the Federal Government's workforce," (and which does not mention a need to grant DOGE access to any sensitive systems), and an executive order referencing "waste, fraud, and abuse" in "Federal contracts, grants, loans, and related instruments." Defs. Opp., ECF No. 82 at 42-43; Feb. 11 Exec. Order, ECF No. 80–34 at §§ 1, 3; Feb. 26 Exec. Order, ECF No. 80-7 at §§ 2(d), 3(b). These orders are too narrowly targeted to cover the expansive access granted to DOGE; for example, neither order justifies a grant of access to HIGLAS or IDR, which do not contain data relevant to reducing the size of the federal workforce and do not contain "Covered contracts and grants" within the meaning of the February 26 Executive Order. *See* ECF No. 80-7 at § 2(d) (covering "Federal contracts, grants, loans and related instruments" and excluding "direct assistance to individuals").

Nothing in these orders makes it "obvious" or "apparent" that DOGE Affiliates had an established need to know that would cover on-demand access to all unclassified sensitive systems to hunt for "waste, fraud, and abuse."

B.    The March 20 Executive Order Also Cannot Justify the DOGE Data Access Policies.

Only as of March 20 has an executive order existed using the "waste, fraud, and abuse" language Defendants have claimed is adequate to justify DOGE's access to sensitive systems. *See* March 20 Exec. Order, ECF No. 80-8 at § 3(a) (requiring Agency Heads to "ensure Federal official designated by the President or Agency Heads" (presumably, DOGE Teams) "have full and prompt access to all unclassified agency records . . . for purposes of pursuing . . . the

identification and elimination of waste, fraud, and abuse"); *id.* at § 3(d) (ordering such designees to receive access to DOL's unemployment records).

But an executive order cannot alone re-write the Privacy Act. As detailed in Plaintiffs' opening brief, allowing executive orders to open up Americans' sensitive data with the stroke of a pen would run entirely contrary to the purpose of the Act. Pls. Mem., ECF No. 80-1 at 43–44. As another court found, an Executive Order "at odds with the stated legislative purpose of the Privacy Act, does not license the defendants to violate the Privacy Act[.]" *Parks v. IRS*, 618 F.2d 677, 681 (10th Cir. 1980); *see also In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order[.]").

While the March 20 Executive Order purports to allow the President to simply "designate[]" officials to have "full and prompt access to all unclassified agency records" to identify "waste, fraud, and abuse," it should not be read to absolve agencies of the responsibility to safeguard Americans' data by confirming that government officials need access to particular records. March 20 Exec. Order, ECF No. 80-8 at § 3(a). Questions such as "why[] the access is needed," "what [] the access will be used for," and whether there is a "specific reason" to believe that unfettered access to non-anonymized records is necessary to identify "waste, fraud and abuse" must still be interrogated by the agencies regardless of the contents of an executive order. *See* DOL Dep., ECF No. 80-9, 76:1–20; HHS (Wendel) Dep., ECF No. 80-15, 45:4–15. Asking such questions would prevent granting unnecessarily (and therefore unlawfully) broad access to sensitive systems like the UC Portal that do not actually contain material relevant to "waste, fraud, and abuse." *See supra* Section IV.

## VI.     DOGE Is An External Actor, and Its Affiliates Are Not Agency Employees.

Much of Defendants' opposition relies on a summary assertion that individuals working on behalf of DOGE to carry out the "DOGE agenda" do not in fact work for DOGE. That assertion is wrong.

As a threshold matter, Defendants do not even attempt to reconcile their position with the plain text of the January 20 Executive Order, on which they exclusively rely to argue that DOGE has any "need" to access protected information, *see supra* at 16–17. As Plaintiffs argue, Pls. Mem., ECF No. 80-1 at 40–41, and Defendants fail to dispute, the Executive Order makes clear that DOGE Team members work for DOGE—regardless of what government entity formally employs them. That framework has not changed in the period since that Executive Order was issued.

The Executive Order is the only source of instruction for the DOGE Teams' work. For instance, it provides the lone "instruction or guide for Department of Labor employees to – to – work with [DOGE] staff. There's no other policies in place." DOL Dep., ECF No. 80-9 at 41:1–4. And the order makes clear both that DOGE controls DOGE Teams' work, and that their respective agencies do not. DOGE Teams are required to "coordinate their work with USDS," but required only to "advise" the agency heads of their respective agencies. Jan. 20 Executive Order, ECF No. 80-3 at § 3(c). The DOGE Teams and USDS/DOGE itself have followed that order: "DOGE . . . certainly coordinates with most, if not all, the DOGE agency teams." Rule 30(b)(6) Dep. of DOGE) ("DOGE Dep."), ECF No. 82-7 at 124:19–21. As Plaintiffs have already shown, Pls. Mem., ECF No. 80-1 at 41, without answer from Defendants, as a practical matter coordination between each agency DOGE Team throughout the government and USDS/DOGE must mean that USDS/DOGE requires agency DOGE Teams to work in certain ways and to follow USDS/DOGE instruction. In contrast, DOGE Teams need only "advise" their

host agencies, and even that function does not necessarily imply that they do so as employees of those host agencies, *see* DOGE Dep., ECF No. 82-7 at 81:9–11 (when advising HHS on implementation of DOGE agenda, a DOGE affiliate "reports up to the [USDS] supervisory chain of command.").

Defendants resort to a formulaic notion that "direct employees" can only be considered employees of an agency which officially employs them. But this simplistic approach is at odds with precedent and common sense.[6] Plaintiffs are aware of no authority describing a test to identify who "employs" an employee who has a formal employment relationship with one entity while working on behalf of another with whom it has no formal employment relationship—but other circumstances in which courts must identify an individual's employer are instructive, and all strongly suggest that the Court should eschew Defendants' formalism and instead undertake "an evaluation of all the circumstances" of employment to determine what agency, as a "practical matter," employs the DOGE Affiliates. *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 131–32 (D.C. Cir. 2005) (quoting *C.C.E., Inc. v. NLRB*, 60 F.3d 855, 858-59 (D.C. Cir. 1995)).

The D.C. Circuit's functional test is not, as Defendants suggest, Defs. Opp., ECF No. 82 at 35, limited to determining the true employer of detailees. That is *one* valid application of the functional test—and *Judicial Watch* applied the test in that context—but that functional test borrowed heavily from the "economic realities" test used to determine whether "an individual is an employee or an independent contractor." *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979). Such cases are the usual context where courts face a dispute over identifying an

---

[6] Plaintiffs argue, and Defendants do not dispute, that rigid adherence to Defendants' approach would "allow an administration to subvert the entire Privacy Act through one well-placed employee at each government component, assigned to report to a single office." Pls. Mem., ECF No. 80-1 at 42.

individual's employer, though the question also arises in the context of determining an
individual's employer under the Fair Labor Standards Act. There too, courts undertake an
"economic reality inquiry." *See, e.g.*, *Perez v. C.R. Calderon Constr., Inc.*, 221 F. Supp. 3d 115,
140 (D.D.C. 2016). And courts use a similar standard for identifying an individual's "true
employer" among related corporate entities. *See Sabol v. Cable & Wireless PLC*, 361 F. Supp .2d
205, 209 (S.D.N.Y. 2005). At least in that context, the fact that one entity has "formally hired" an
employee, Defs. Opp., ECF No. 82 at 35, does not mean that that entity is *de facto* the
employee's true employer. *See Sabol*, 361 F. Supp. at 209–10 (despite Plaintiff having been
"hired" by one corporate entity, "dispute over the identity of the Plaintiff's true employer"
remained). Each of these tests requires a holistic approach to identifying a true employer, and
each considers the actual work the employee performs and who supervises them.

      Viewed through that lens, the DOGE Teams are plainly employees of USDS/DOGE. As
the January 20 Executive Order makes clear, their job is to perform DOGE work on behalf of
and on the instructions of USDS/DOGE. Even setting aside their failure to address the
supervisory relationship which the executive order creates, Defendants do not meaningfully
address the other considerations that make clear that the DOGE Teams work for DOGE.

      *First*, Defendants characterize USDS' role in agency hiring of DOGE Team employees as
merely advisory. As the record makes clear, however, this is not Defendants' imagined situation
of agencies calling USDS for reference checks. Defs. Opp., ECF No. 82 at 36. Quite the
opposite, USDS is affirmatively recommending that agencies place specific individuals on their
agency DOGE Teams. And regardless of whether USDS' input on hiring—or any other subject,
*see* DOL Dep., ECF No. 80-9 at 39:7—is mandatory, or, based on the evidence in the record
here, merely always followed, *see* Pls. Mem., ECF No. 80-1 at 38–39, the fact remains that

multiple agencies are "choosing" to include the same DOGE affiliates on their agency DOGE

teams, *see* DOGE Dep., ECF No. 82-7 at 93:4–16 (at least one DOGE Affiliate is simultaneously

at eight agencies).

    *Second*, Defendants suggest that DOGE Affiliates' work, which Defendants themselves

characterize as "implement[ing] a government-wide initiative," Defs. Opp., ECF No. 82 at 37,

required by the January 20 Executive Order to be undertaken in coordination with USDS/DOGE,

is nevertheless agency work, not USDS/DOGE work. Defendants cannot change the nature of

the DOGE Affiliates' work simply by calling it something it is not. In Defendants' telling,

because DOGE Affiliates supposedly work neither "for USDS's internal benefit" nor "to improve

USDS," they cannot be performing USDS work. *Id.* But DOGE Affiliates need not be working

for the *internal* benefit of USDS to be performing USDS work on USDS' behalf. To the contrary,

the majority of the work of any component of the federal government is not to improve *itself*, but

to fulfill its mission. The USDS Temporary Organization is wholly "dedicated to advancing the

President's 18-month DOGE agenda," Jan. 20 Exec. Order, ECF No. 80-3 at § 3(b), which is, by

Defendants' own characterization, what the DOGE Affiliates are doing.

    *Finally*, Defendants assert that "DOGE Team employees are supervised by their agency

leadership." Defs. Opp., ECF No. 82 at 37. Defendants describe this as self-evident, and once

again return to mechanistic reliance on the formal employment relationship between the DOGE

Team members and their host agencies. But this conclusory approach ignores the reality here: the

papering arrangements do not tell the full story of how any given DOGE Affiliate's employment

works in practice. For instance, Defendants characterize their own deponents as "confused,"

Defs. Opp., ECF No. 82 at 39 n.17, as to whether USDS or HHS would supervise the work of

USDS detailees to HHS in some circumstances. Notwithstanding that those specific employment

relationships are no longer in place, the inability of 30(b)(6) deponents, including a senior HHS human capital administrator, to definitively delineate whether USDS or HHS would supervise individuals' work makes clear that the DOGE Affiliates' employment status is a special circumstance, and that there is no basis to accept the government's unsubstantiated assumption of an ordinary supervisory relationship with managers at the host agency. Indeed, the January 20 Executive Order provides the only affirmative information about the management of the DOGE Teams, and, as discussed *supra*, it indicates that they are supervised by USDS/DOGE, not by their host agencies.

## VII.    Defendants Should Not Benefit From Their Deficient Discovery.

The Court recently referenced "a change of facts orchestrated by defendants." ECF No. 71 at 1. Shifting and obfuscating the facts has, unfortunately, been a prominent feature of Defendants' approach to discovery. Many facts in the record have shifted as recently as this week. This has impaired Plaintiffs' ability to develop and present their case for a preliminary injunction. The Court may take this into account in assessing the factual record and ruling on the motion.

Plaintiffs asked Defendants to produce electronically stored information ("ESI") in a specific manner—"TIFF" image files and accompanying metadata—designed to preserve information and usability. *See* Ex. 45 at 3–7. Defendants instead produced ESI documents in PDF format, which has less utility. *See, e.g.*, *Lamaute v. Power*, 339 F.R.D. 29, 41 (D.D.C. 2021) ("the PDF format undermines the utility of the data set"). Defendants brushed aside Plaintiffs' objection. *See* Ex. 41 (email from B. Humphreys dated Mar. 28, 2025).

Plaintiffs then took Rule 30(b)(6) depositions on April 7 and 8, 2025 based on discovery Defendants provided. This included questioning DOL regarding Aram Moghaddassi's access to Sensitive Systems despite his "User Agreement" being unsigned, discussed in Plaintiffs' opening

brief. Pls. Mem., ECF No. 80-1 at 15, 29, 31; ECF No. 80-10 (Moghaddassi User Agreement). But three days ago, on April 29, Defendants apprised Plaintiffs that: the unsigned document was actually signed; the signature was stripped when the document was "prepare[d] for production"; they attempted to send the unmodified document with signature as part of a supplemental production on April 9; and they only just discovered the supplemental production did not go through because of its size. Defense counsel takes responsibility for the failed file transmission but not the troubling tactics reflected in the other parts of this sequence. Had Defendants produced documents in the requested or a comparable format, a signed document would not have appeared unsigned; the signature would have been present or metadata would have revealed its removal. Plaintiffs have no way of knowing what other important information was cast aside because Defendants did not produce ESI in a proper format with metadata. Moreover, Defendants should not have waited until the day after depositions—and the day after discovery closed—to (attempt to) produce what turned out to be fifty-five additional pages. That inherently harmed Plaintiffs' ability to take effective depositions.

Of a piece with the shifting document sands, two days ago Defendants produced an errata sheet (signed April 23) purporting to substantively change HHS's Rule 30(b)(6) testimony. For example, it purports to change "They go through the briefing" to "They can go through the optional briefing, but it is not required," and "He should have received the training" to "He should have received the training for IDR, but the security briefing is optional for HIGLAS." *See* Ex. 42 (J. Wendel Errata Sheet). Both original sworn statements contribute to Plaintiffs' opening brief, ECF No. 80-1 at 18, 24, and Defendants should not be able to escape their import through a contradictory errata sheet. *See Jackson v. Teamsters Loc. Union 922*, 310 F.R.D. 179, 185–86 (D.D.C. 2015) (striking "directly contradictory statements" and "substantive and material

additions" on errata sheets, in part due to lack of evidence corroborating changes). The same

contradictions are found in the new declaration from HHS's 30(b)(6) witness, Chief Information

Officer ("CIO") Jennifer Wendel, that Defendants submitted with and rely on in their opposition

brief. Defs. Opp., ECF No. 82 at 9-10 & n.5; ECF No. 82-1 (Decl. of J. Wendel). A declaration

contradicting one's sworn testimony is infirm. *See Galvin v. Eli Lilly & Co.*, No. 03-1797, 2005

WL 3272142, at *2 & n.2 (D.D.C. Sept. 12, 2005) (affidavit from pharmacist contradicting his

prior affidavit properly excluded), *aff'd*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (discussing "sham

affidavit rule").

The new Wendel declaration also explicitly contradicts HHS' interrogatory responses

regarding the training received by DOGE Affiliates. ECF No. 82-1 at ¶¶ 4–7. Those interrogatory

responses, verified on behalf of HHS by its Chief Technology Officer ("CTO"), ECF No. 80-5 at

43, have not been corrected despite the Federal Rule of Civil Procedure 26(e)(1)(A)

supplementation requirement. This raises important questions. In this dispute between HHS' CIO

and its CTO, who is to be believed? And what other discovery provided by Defendants might be

suspect, but in a manner favorable to Plaintiffs?

The same goes for DOL. In their opposition brief, Defendants say for the first time that a

new person was added to the DOL DOGE Team and three people were given access to "a few

additional systems." Defs. Opp., ECF No. 82 at 10 n.6. Again, Defendants have not updated their

interrogatory responses, which address exactly this type of information.

These concerns tie directly to the Court's rationale for permitting expedited discovery: "it

is necessary to determine the contours of the agency actions that plaintiffs challenge." ECF No.

48 at 1. To the extent Defendants' tactics have obscured those contours, Defendants should not

be permitted to gain advantage. It is within the Court's inherent power to prevent that from

24

happening because a "court may impose issue-related sanctions, such as an adverse inference instruction, whenever a preponderance of the evidence establishes that a party's misconduct tainted the evidentiary resolution of an issue." *Paavola v. Hope Vill.*, No. 19-1608, 2021 WL 4033101, at *2 (D.D.C. Sept. 4, 2021) (Bates, J.) (cleaned up); *see Butera v. District of Columbia*, 235 F.3d 637, 661 (D.C. Cir. 2001) (with respect to the related subject of preclusionary orders, noting that they "ensure that a party will not be able to profit from its own failure to comply with the rules set forth by the court").

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in Plaintiffs' opening brief, the Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: May 2, 2025

Respectfully submitted,

*/s/* Zoila E. Hinson

Mark B. Samburg (D.C. Bar No. 1018533)
Aman T. George (D.C. Bar No. 1028446)
Rachel F. Homer (D.C. Bar No. 1045077)
Robin F. Thurston (D.C. Bar No. 462679)
Somil B. Trivedi (D.C. Bar No. 1617967)
Skye L. Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Fax: (202) 796-4426
msamburg@democracyforward.org
ageorge@democracyforward.org
rhomer@democracyforward.org
rthurston@democracyforward.org
strivedi@democracyforward.org
sperryman@democracyforward.org

Glenn Schlactus (D.C. Bar No. 475950)
Zoila E. Hinson (D.C. Bar No. 1766625)*
Alexa Milton (D.C. Bar No. 155380)*
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
gschlactus@relmanlaw.com
zhinson@relmanlaw.com
amilton@relmanlaw.com
*Counsel for Plaintiffs*

Teague P. Paterson (D.C. Bar No. 144528)
Matthew S. Blumin (D.C. Bar No. 1007008)
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, DC 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org

*Counsel for American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME)*

Rushab B. Sanghvi (D.C. Bar No. 1012814)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
*Counsel for Plaintiff American Federation of Government Employees, AFL-CIO (AFGE)*

Steven K. Ury** (D.C. Bar 1643947)
SERVICE EMPLOYEES
INTERNATIONAL UNION
1800 Massachusetts Avenue, NW,
Legal Department, 6th Floor,
Washington, DC 20036
Telephone: (202) 730-7428
steven.ury@seiu.org
*Counsel for Plaintiff Service Employees International Union*

Matthew Holder*
COMMUNICATION WORKERS OF
AMERICA, AFL-CIO
501 Third Street N.W.
Washington, D.C. 20001
Telephone: (202) 215-6788
mholder@cwa-union.org

* Admitted *pro hac vice*
** Admission pending