# EXHIBIT 44

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFL-CIO, et al.,<br><br>*Plaintiffs*,<br><br>vs.<br><br>U.S. DEPARTMENT OF LABOR, et al.,<br><br>*Defendants*. | Case No. 1:25-cv-339-JDB |

## 1. DECLARATION OF JEFFREY GRANT

I, Jeffrey Grant, am over eighteen years of age and of sound mind, and declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct:

2. I previously served as the Deputy Director for Operations in the Center for Consumer Information and Insurance Oversight ("CCIIO") within the Centers for Medicare and Medicaid Services ("CMS") at the Department of Health and Human Services ("HHS"), and served in various federal government roles for over forty years before leaving in February.

3. CCIIO is responsible for helping implement various CMS programs, including aspects of the Affordable Care Act's provisions related to private health insurance by working with states to establish new Health Insurance Marketplaces.

4. In my role at CCIIO, I led a staff of over 600 employees and thousands of contractors. I led CMS work on initiatives include the Affordable Care Act, Medicare Advantage, and Medicare Prescription Benefit programs. In my role, I had extensive exposure to and experience with a variety of sensitive data systems at CMS, including those containing personally identifying information ("PII"), protected health information (PHI) and federal tax information ("FTI"). These systems included the Medicare Advantage/Prescription Drug System

(MARx) which stored all Part C and D enrollees data, the Drug Data Processing System (DDPS) which stored all drug claims for all Part D enrollees, the Risk Adjustment System (RAS) which stored every Medicare beneficiary's diagnoses submitted to CMS on claims or risk adjustment data, the vendor management system which contained bank routing and account numbers for every entity with who we exchanged Automated Clearing House (ACH) transactions, and the Federally Facilitated Marketplace (FFM – also know as HealthCare.gov) which stored all FFM consumer data including some FTI.

5. I have read selected filings and factual materials in the above-captioned case, including the Plaintiffs' Brief in Support of Their Motion for a Preliminary Injunction, ECF No. 80-1, Defendants' Objections and Responses to Plaintiffs' Requests for Expedited Discovery, Including Supplemental Responses, ECF No. 80-5, Excerpts of the Deposition of Jennifer Wendel, ECF No. 80-15, Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, ECF No. 82, and the April 29 Declaration of Jennifer Wendel, ECF No. 82-1.

6. By reviewing those materials, I have familiarized myself with the breadth of access that has been granted to DOGE to access sensitive systems housed at CMS, which is not in keeping with usual agency practice.

7. In my time at CMS, employees received access to agency systems containing sensitive PII and FTI based on a principle of least privilege, meaning employees received access to the least amount of information possible sufficient to complete the work they needed to accomplish.

8. To obtain access to a data system, each user had to provide specific reasoning explaining why they needed to see the data they were requesting, including details

about which component of the agency they worked in and what their duties were. The first step of approval was sign-off by a supervisor, who could attest that the request for access to sensitive information related to a genuine business need for the information. The system administrator would then determine what the lowest level of access that employee could receive was. For example, they could get "role" access that would allow them to see only specific information in a system, instead of "system" access that would give them access to the entire database.

9. Expansive data access of the type that the DOGE Team at CMS has sought and been granted was not common. For example, although I ran the team that oversaw the healthcare exchanges, I did not have access to the PII and FTI contained in the exchange's consumer data because I had no need to know it. Since members of my team were the ones actually working in that system, I had no need to see the sensitive information contained in the database. I am not aware of any analogous situation in my time at HHS in which new or external employees have sought or received such expansive access to sensitive agency systems without a review of their need for such expansive access.

10. The manual collection of banking information prior to the implementation of our vendor management system provides a concrete example of my personal access limitations. I had one direct-report manager and two staff who had access to a locked room that itself had a locked file cabinet that contained the sensitive hard-copy banking records. In the two years we ran vendor management manually, I accessed that room fewer than five times. Each time I was accompanied by one of the people who was authorized access, and I signed in and out with date and time of access. On no occasion was the file cabinet unlocked during one of my visits.

11. In my time at CCIIOO, I worked with the agency's Inspector General and the Government Accountability Office, both of which were involved in investigating waste and fraud in CMS programs. IG and GAO were not given direct access to sensitive systems to search for fraud; instead, they worked with system owners and administrators to build targeted searches that would deliver the more limited subset of information relevant to their particular investigations. My teams often had extensive discussions with the auditing agencies prior to agreeing to any data extract scope and contents. Where personally-identifiable information was not required for IG and GAO investigations, we provided them with anonymized and/or aggregated data relevant to their requests.

12. I am aware from the filings in this case that the DOGE Team at HHS has been granted access to the HIGLAS system, which functions as a ledger for CMS programs and contains PII and FTI. *See* ECF No. 80-5 at 5-16. Access to the HIGLAS system was not common at the agency. Only a small number of agency and contractor personnel, including, for example, contractors who helped enter information about collections of receivables into the system or the federal staff who ran the accounting system payment processes, had access. HIGLAS contains a wide variety of highly-sensitive data, only some of which has any relevance to potential investigations into waste, fraud, and abuse. Unrestricted access to HIGLAS is not necessary to seek out waste, fraud or abuse, and results in the excessive disclosure of sensitive information to which access is generally very highly restricted.

Executed this 2nd day of May, 2025, in Silver Spring, MD.

_____
Jeffrey Grant