**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN FEDERATION OF LABOR
AND CONGRESS OF INDUSTRIAL
ORGANIZATIONS, *et al.*,

      Plaintiffs,

    v.

DEPARTMENT OF LABOR, *et al.*,

      Defendants.

Case No. 1:25-cv-00339-JDB

Judge John D. Bates

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     Introduction .................................................................................................. 1

II.    Background ................................................................................................... 2

       A.    The Privacy Act .................................................................................. 2

       B.    USDS and the DOGE Agenda ............................................................ 3

       C.    DOGE Access at the Agency Defendants ........................................... 4

III.   Standard of Review ..................................................................................... 8

IV.    Argument ..................................................................................................... 8

       A.    Plaintiffs Lack Standing To Bring Their Claims................................. 8

       B.    Associational Standing ....................................................................... 9

       C.    Organizational Standing .................................................................... 14

V.     APA Claims ................................................................................................ 16

       A.    Plaintiffs Do Not Challenge Final Agency Action ............................ 17

       B.    Plaintiffs Cannot Bring A Privacy Act Claim Through The APA ...... 21

       C.    Plaintiffs Cannot Succeed On Their Arbitrary and Capricious Claims....... 23

VI.    Defendants' Conduct Complies With the Requirements of the Privacy Act ............ 26

       A.    DOGE Team members Are Employees of the Defendant Agencies............... 27

       B.    DOGE Team member Employees Need to Access Agency Record
             Systems to Perform Their Duties.................................................... 32

VII.   Plaintiffs Do Not State An Ultra Vires Claim ........................................... 36

VIII.  The Court Cannot Order Certain Relief ..................................................... 38

IX.    Conclusion ................................................................................................. 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AFSCME v. SSA,*
 No. 25-1411, 2025 U.S. App. LEXIS 10420 (4th Cir. Apr. 30, 2025) .............................. *passim*

*AFT v. Bessent,*
 No. 25-1282, 2025 U.S. App. LEXIS 20397 (4th Cir. Aug. 12, 2025), ............................ *passim*

*AFT v. Bessent,*
 No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025) ......................................................... 13

*Am. Legal Found. v. FCC,*
 808 F.2d 84 (D.C. Cir. 1987) ................................................................................................... 14

*Ass'n of Flight Attendants—CWA, AFL-CIO v. U.S. Dep't of Transp.,*
 564 F.3d 462 (D.C. Cir. 2009) ................................................................................................... 9

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
 502 U.S. 32 (1991) ................................................................................................................... 37

*Bennett v. Spear,*
 520 U.S. 154 (1997) ................................................................................................................. 18

*Block v. Cmty. Nutrition Inst.,*
 467 U.S. 340 (1984) ................................................................................................................. 22

*Bowen v. Massachusetts,*
 487 U.S. 879 (1988) ................................................................................................................. 21

*Cell Assoc., Inc. v. NIH,*
 579 F.2d 1155 (9th Cir. 1978) ................................................................................................. 22

*Chung v. Dep't of Justice,*
 333 F.3d 273 (D.C. Cir. 2003) ................................................................................................. 22

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2013) .............................................................................................................. 9, 15

*Dickson v. Direct Energy, LP,*
 69 F.4th 338 (6th Cir. 2023) .................................................................................................... 11

*Doe v. Chao,*
 540 U.S. 614 (2004) ................................................................................................................. 23

*Doe v. OPM*,
  25-cv-234 (RDM), 2025 WL 513268 (D.D.C. Feb. 17, 2025) ................................................. 10

*Elec. Privacy Info. Center v. U.S. Dep't of Com.*,
  928 F.3d 95 (D.C. Cir. 2019) .......................................................................................... 9

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................................. 9, 15

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ..................................................................................... 9, 15

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ........................................................................................ 18

*Gadelhak v. AT&T Servs., Inc.*,
  950 F.3d 458 (7th Cir. 2020) ......................................................................................... 11

*Garey v. James S. Farrin, P.C.*,
  35 F.4th 917 (4th Cir. 2022) .......................................................................................... 11

*Griffith v. Fed. Labor Relations Auth.*,
  842 F.2d 487 (D.C. Cir. 1988) ....................................................................................... 36

*Grosdidier v. Chairman, Broad Bd. of Governors*,
  560 F.3d 495 (D.C. Cir. 2009) ....................................................................................... 22

*Hastings v. Judicial Conf. of the United Sates*,
  770 F.2d 1093 (D.C. Cir. 1985) ..................................................................................... 23

*Hill v. U.S. Dep't of the Interior*,
  699 F. Supp. 3d 1 (D.D.C. 2023) ................................................................................... 17

*Humane Soc'y of the U.S. v. Perdue*,
  935 F.3d 598 (D.C. Cir. 2019) ........................................................................................ 8

*Husain v. Power*,
  630 F. Supp. 3d 188 (D.D.C. 2022) ................................................................................. 8

*Indus. Energy Consumers of Am. v. FERC*,
  125 F.4th 1156 (D.C. Cir. 2025) ...................................................................................... 9

*Jeffries v. Volume Servs. Am. Inc.*,
  928 F.3d 1059 (D.C. Cir. 2019) ..................................................................................... 12

*Jones v. U.S. Secret Serv.*,
   701 F. Supp. 3d 4 (D.D.C. 2023) ............................................................. 17

*Judicial Watch, Inc. v. DOE*,
   412 F.3d 125 (D.C. Cir. 2005) ............................................................... 28

*Krakauer v. Dish Network*,
   925 F.3d 643 (4th Cir. 2019) ................................................................ 11

*Lepre v. Dep't of Labor*,
   275 F.3d 59 (D.C. Cir. 2001) ................................................................ 37

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................................. 9

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................ 17

*Lupia v. Medicredit, Inc.*,
   8 F.4th 1184 (10th Cir. 2021) .............................................................. 11

*Mohamed v. Select Portfolio Servicing, Inc.*,
   215 F. Supp. 3d 85 (D.D.C. 2016) ....................................................... 39

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Augo Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................ 24, 25

*Nat'l Ass'n of Home Builders v. EPA*,
   667 F.3d 6 (D.C. Cir. 2011) ................................................................. 14

*Nat'l Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995) ............................................................. 14

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................ 13

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ........................................................................ 17, 24

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ......................................................... 36, 37

*Pars v. CIA*,
   295 F. Supp. 3d 1 (D.D.C. 2018) ......................................................... 35

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ................................................................ 15

*People for the Ethical Treatment of Animals v. U.S. Fish & Wildlife Serv.*,
   130 F. Supp. 3d 999 (E.D. Va. 2015) ....................................................... 24

*Potter v. District of Columbia*,
   126 F.4th 720 (D.C. Cir. 2025) ................................................................ 40

*Public Serv. Elec. & Gas Co. v, FERC*,
   783 F.3d 1270 (D.C. Cir. 2015) ................................................................ 39

*Randolph v. ING Life Ins. & Annuity Co.*,
   973 A.2d 702 (D.C. 2009) ......................................................................... 12

*Schroer v. Billington*,
   525 F. Supp. 2d 58 (D.D.C. 2007) ........................................................... 36

*Six v. IQ Data Int'l, Inc.*,
   129 F.4th 630 (9thCir. 2025) .................................................................... 12

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .................................................................................. 10

*SSA v. AFSCME*,
   145 S. Ct. 1626 (2025) .............................................................................. 13

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ................................................................ 22

*Talavera v. Shah*,
   638 F.3d 303 (D.C. Cir. 2011) .................................................................... 8

*Touche Ross & Co. v. Redington*,
   442 U.S. 560 (1979) .................................................................................. 23

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .................................................................................. 10

*Venetian Casino Resort, L.L.C. v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008) ........................................................... 18, 19

*Wash. All. Of Tech. Workers v. DHS*,
   50 F.4th 164 (D.C. Cir. 2022) .................................................................... 8

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008) ................................................................................ 22

*Wolf v. Regardie*,
553 A.2d 1213 (D.C. 1989) ............................................................................ 11, 12

**Statutes**

5 U.S.C. § 551 *et seq.* ................................................................................................ 1

5 U.S.C. § 551 ........................................................................................................... 17

5 U.S.C. § 552 ........................................................................................................... 22

5 U.S.C. § 552a ............................................................................................. 2, 3, 26, 27

5 U.S.C. § 704 ..................................................................................................... 17, 21

5 U.S.C. § 3161 ........................................................................................................... 3

42 U.S.C. § 1395ddd ................................................................................................. 35

**Rules**

Federal Rule of Civil Procedure 56 ....................................................................... 1, 8

**Executive Orders**

Executive Order 14,158 90 Fed. Reg. 8441 (Jan. 20, 2025).............................. 3, 4, 30

Executive Order 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) .................................. 4

Executive Order 14,243, 90 Fed. Reg. 13,681 (Mar. 20, 2025)................................. 4

**Other Authorities**

Delivering a Customer-Focused Government Through Smarter IT, WhiteHouse.gov (Aug. 11, 2014), https://obamawhitehouse.archives.gov/blog/2014/08/11/delivering-customer-focusedgovernment- through-smarter-it................................................................... 3

Restatement (Second) of Torts § 652B (1977)........................................................... 11

S. Rep. No. 112-155 (2012), *as reprinted in* 2012 U.S.C.C.A.N. 589 ........................ 30

## I.    Introduction

Plaintiffs, a group of labor unions and not-for-profit organizations, seek sweeping declaratory and injunctive relief that would bar certain employees of the Department of Labor ("DOL") and the Department of Health and Human Services ("HHS"), *i.e.*, those affiliated with the United States Digital Service ("USDS"), from accessing systems at these agencies necessary to perform their Presidentially-directed mandate of reducing waste, fraud, and abuse. Because Plaintiffs have failed to demonstrate, either as to jurisdiction or as to the merits of their claims, that they are entitled to judgment as a matter of law, the Court should deny their motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because Defendants have demonstrated on the record that they are entitled to judgment as a matter of law, the Court should grant their cross motion for summary judgment.

Plaintiffs have failed to sufficiently support their alleged associational standing because their members' alleged harms arising from the mere provision of information access to government employees are not the kind of injury that Article III of the Constitution contemplates. Although this Court has previously ruled that Plaintiffs' alleged harms are sufficiently analogous to the common law harms of intrusion on seclusion and breach of confidence, Defendants respectfully disagree that Plaintiffs alleged harms satisfy this standard, or otherwise demonstrate standing at this stage of the case. Plaintiffs have also failed to sufficiently support their alleged organizational standing because their claims rely upon a threat of public disclosure unsupported by the record.

On the merits, Plaintiffs fail to sufficiently support claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* The record does not contain evidence of the necessary "final agency action" for purposes of initiating APA review. The provision of access is neither the sort of action the APA contemplates challenging, nor does it generate, on its own, the

sort of consequences characteristic of a final agency action.  Instead, the provision of access is the sort of routine, work-a-day decision that characterizes any workplace.  Plaintiffs also cannot use the APA to bypass the limitations of the Privacy Act, 5 U.S.C. § 552a, a precisely defined remedial scheme that does not encompass the sort of broad, programmatic injunctive relief on behalf of organizations that Plaintiffs seek.

Even if Plaintiffs had properly pled some type of Privacy Act claim, the record demonstrates that Defendants have fully complied with the Privacy Act and the APA, as well as the various other statutes and regulations Plaintiffs point to in their First Amended Complaint. Finally, Plaintiffs cannot salvage the fundamental flaws in their APA and Privacy Act cases by bringing a freestanding *ultra vires* claim, as the record does not support the allegedly *ultra vires* actions Plaintiffs contend Defendants committed.

For the reasons explained herein, Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment pursuant to Rule 56.

## II.    Background
### A.  The Privacy Act

The Privacy Act prohibits agencies from disclosing "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b). The Act contains thirteen exceptions to this broad prohibition including, as relevant to this litigation, disclosure "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." *Id.* § 552a(b)(1).

### B.  USDS and the DOGE Agenda

The U.S. DOGE Service was originally founded as the U.S. Digital Service in 2014 under President Barack Obama with the goal of, among other things, improving the federal government's information technology and data organization systems. *See* Delivering a Customer-Focused Government Through Smarter IT, WhiteHouse.gov (Aug. 11, 2014).[1] On January 20, 2025, President Trump signed Executive Order 14,158 ("Jan. 20 EO"), which directs changes to the previously established United States Digital Service in order to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." Exec. Order 14,158, § 4; DSUMF #    1.

Executive Order 14,158 redesignated the United States Digital Service as the United States DOGE Service, and moved it from under the Office of Management and Budget (OMB) to a free-standing component of the Executive Office of the President reporting to the White House Chief of Staff. *Id.* § 3(a). Similarly, it established a "U.S. DOGE Service Temporary Organization" within USDS pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. *Id.* § 3(b). "The U.S. DOGE Service Temporary Organization shall be headed by the USDS Administrator and shall be dedicated to advancing the President's 18-month DOGE agenda." *Id.* Separately, agency heads are required to "establish within their respective Agencies a DOGE Team of at least four employees, which may include Special Government Employees." *Id.* § 3(c). "Each DOGE Team will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney." *Id.*

On February 19, 2025, President Trump issued Executive Order 14,222, which directs Agency DOGE Teams to "review all existing covered contracts and grants and, where appropriate

---

[1]    *Available    at*    https://obamawhitehouse.archives.gov/blog/2014/08/11/delivering-customer-focusedgovernment- through-smarter-it.

and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." Exec. Order 14,222, § 3(b), 90 Fed. Reg. 11,095 (Feb. 26, 2025). "This process shall commence immediately and shall prioritize the review of funds disbursed under covered contracts and grants to educational institutions and foreign entities for waste, fraud, and abuse." *Id.* On March 20, 2025, President Trump issued Executive Order 14243 which directed Agency Heads to ensure designated Federal officials "have full and prompt access to all unclassified agency records, data, software systems, and information technology systems…for purposes of pursuing Administration priorities related to the identification and elimination of waste, fraud, and abuse." Exec. Order 14,243, § 3(a), 90 Fed. Reg. 13,681 (Mar. 20, 2025).

### C. DOGE Access at the Agency Defendants

Following the issuance of the Jan. 20 EO, DOGE Teams were created at various agencies including DOL and HHS. As part of these Teams a discrete group of DOGE Team Members[2] were given access to the Defendant Agencies' information systems on a system-by-system basis as necessary to perform their work in furtherance of the goals of the Executive Orders.

A total of ten individuals within the Department of Health and Human Services (HHS) were granted access to at least one sensitive system for purposes of implementing the President's DOGE Agenda. Defendants' Statement of Undisputed Material Fact, DSUMF # 5. All ten individuals were either employed by HHS directly or detailed to HHS from another federal agency. *Id.* Five of the individuals—Amy Gleason, Luke Farritor, Edward Corristine, Marko Elez, and

---

[2] "DOGE Team members" refers to the individuals identified in Defendants' Objections and Responses to Plaintiffs' Expedited Discovery as either employed by or detailed to DOL or HHS and working "in furtherance of the DOGE EO." ECF No. 80-5 at 6-20.

Kyle Schutt—are either also detailed to USDS or, in the case of Ms. Gleason, an employee of both HHS and USDS (where Ms. Gleason serves as Acting Administrator). *Id.* Five other individuals were part of HHS's DOGE Team and had no employment relationship with USDS—Aram Moghaddassi, Conor Fennessy, Jeremy Lewin, Zach Terrell, and Rachel Riley. DSUMF # 6.

The HHS DOGE Team members requested access to HHS information systems through the process required for all HHS employees, which remains unchanged since January 19, 2025. DSUMF # 7-8. DOGE Team members determined what systems they would need to access to complete their work and requested access through HHS's existing process. DSUMF # 8-9. These requests were evaluated, like any employee's request on the needs of the individual requester's work. *Id.* The DOGE Team Members' requests were evaluated on a system-by-system basis to confirm both that they had completed the necessary trainings and agreements and also that their job duties required access to the requested systems. DSUMF # 9-10. DOGE Team member requests were generally approved on the basis of the broad scope of their roles and responsibilities as established by the Jan. 20 EO. DSUMF # 9. Pursuant to the same policy and process, other HHS employees were granted the narrower system access required for their more specific functions. *See id.*

HHS also applied information security precautions when granting access to the DOGE Team members as it does for all employees. DOGE Team Members were required to complete training concerning their obligation to safeguard sensitive information, among other subjects, and acknowledge system rules of behavior. DSUMF # 14. Users with access to more sensitive systems were also required to complete additional training. *Id.* For the vast majority of systems, DOGE Team members were granted only "read-only access," without the ability to modify or share data. DSUMF # 11. Additionally, every HHS system contains controls that permit HHS to monitor the

systems, including whether data leaves the system. DSUMF # 12. For the systems to which DOGE Team members were granted access, all access creates a log. *Id.* These logs show that none of the DOGE Team members modified, copied, shared, or removed records, nor have they installed or requested to install any unapproved software. *Id.*

DOGE Team members also completed their HHS work on HHS assets, and *See* DSUMF #13, and their HHS work was supervised by HHS supervisors, DSUMF # 16. When individuals no longer require access to a particular HHS system to perform their work, access to that system has been deactivated. DSUMF # 14.

Only three individuals within the Department of Labor (DOL) were given access to DOL information systems for purposes of implementing the President's DOGE agenda: Marko Elez, Aram Moghaddassi, and Miles Collins. DSUMF # 18. Mr. Elez is a DOL employee. *Id.* Mr. Moghaddassi and Mr. Collins are members of DOL's DOGE Team and have no employment relationship with USDS. *Id.* These three individuals were given access to, collectively, eight systems containing sensitive information. DSUMF # 19. Mr. Moghaddassi and Mr. Collins were granted access to five sensitive systems, while Mr. Elez was granted access to four. *Id.*

Like their counterparts at HHS, DOL DOGE Team members requested access to DOL information systems through the process required for all DOL employees. DSUMF # 20-21. DOL's DOGE Team members determined what systems they would need to access to complete their work and requested access through DOL's existing process. DSUMF # 20. These requests were evaluated, like any employee's request on the needs of the individual requester's work. DSUMF # 21. The DOGE Team Members' requests were evaluated on a system-by-system basis to confirm their need to access the particular system, and access to certain systems was denied. *See* DSUMF # 21-22, 24. That evaluation considers the role and responsibilities of the requester, and that

person's need to access certain information may be apparent based on the work they are doing. *Id.* DOGE Team member requests were generally approved on the basis of the broad scope of their roles and responsibilities as established by the Jan. 20 EO. *Id.*

DOL also applied information security precautions when granting access to the DOGE Team members as it does for all employees. DOGE Team members were required to complete trainings and sign terms of use and non-disclosure agreements. DSUMF # 26. Each of the DOGE Team members signed user agreements and completed computer security training. DOL is not aware of any DOGE Team member viewing systems to which they were not granted access. DSUMF # 23. DOL is unaware of any of the DOGE-affiliated employees viewing data in systems to which they do not have access. *Id.* DOL DOGE Team members were supervised in their DOL work by DOL supervisors. DSUMF # 28.

### D.  Procedural Background

Defendants respectfully refer the Court to its recitation of the prior procedural history in its Memorandum Opinion and Order Denying Plaintiffs' Motion for Preliminary Injunction ("PI Op."), ECF No. 87, at 3-5. Since that time, the parties stipulated to the dismissal of all claims against the Consumer Financial Protection Bureau, ECF No. 92, and Plaintiffs filed their Motion for Summary Judgment, ECF No. 93.

## III.    Standard of Review

"Summary judgment is warranted if a party can 'show that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.'" *Husain v. Power*, 630 F. Supp. 3d 188, 194 (D.D.C. 2022) (quoting Fed. R. Civ. P. 56(a)). "A fact is 'material' if it could affect the outcome of the litigation under governing law, and a dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted). "The evidence is to be viewed in the light most favorable to the nonmoving

party and the court must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "[S]ummary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (citations omitted).

## IV.    Argument

### A.  Plaintiffs Lack Standing To Bring Their Claims.

Although the Court previously concluded that the Plaintiff organizations sufficiently alleged associational standing, to establish standing, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Wash. All. Of Tech. Workers v. DHS*, 50 F.4th 164, 175-75 (D.C. Cir. 2022) (quoting *Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019)). "So, at the summary judgment stage, 'the plaintiff must set forth by affidavit or other evidence specific facts that prove standing.'" *Id.*

At its "irreducible constitutional minimum," the doctrine of standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). If Plaintiffs fail to sufficiently establish any of these three elements the Court will lack jurisdiction to hear their claim. As organizations, Plaintiffs have two routes to demonstrate standing: "associational standing—*i.e.*, relying on their members' injuries—or organizational standing—*i.e.*, relying on their own." Mem. Op. and Order Denying Motion to Dismiss ("MTD Op."), ECF No. 78, at 11 (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914, 919 (D.C. Cir. 2015)).

8

### B. Associational Standing

To establish associational standing, Plaintiffs must demonstrate that "(1) at least one of [their] members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Elec. Priv. Info. Center v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019) (citations omitted); *see also Ass'n of Flight Attendants—CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009). Plaintiffs must show that their individual members have suffered injury-in-fact—"actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). For injury to be imminent, it must be "certainly impending"; mere "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). In other words, injury cannot be established through "a 'highly attenuated chain of possibilities' predicated on 'guesswork as to how independent decisionmakers will exercise their judgment.'" *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025) (quoting *Clapper*, 568 U.S. at 410).

For an alleged intangible harm to be considered concrete for purposes of injury-in-fact, it must have a "close relationship" to a "harm [] traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425-26 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–341 (2016)). While Congress "may elevate harms that exist in the real world before Congress recognized them to actionable legal status," at the same time, Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* at 426 (citations omitted). Congress may create "a statutory prohibition or obligation and a cause of action," but it

may not override Article III's injury requirement. *Id.; see also Doe v. OPM*, 25-cv-234 (RDM), 2025 WL 513268, at *5 (D.D.C. Feb. 17, 2025) ("[N]ot every statutory violation results in the type of concrete injury-in-fact sufficient to support Article III standing.").

Plaintiffs allege that their members have suffered or will imminently suffer such concrete intangible harms from the mere "disclosure of sensitive records to unauthorized government employees." Mem. in Support of Pls.' Mot. For Summ. J. ("Pls.' SJ Br."), ECF No. 93-1, at 5. In deciding the Defendants' Motion to Dismiss, the Court determined that Plaintiffs had sufficiently alleged associational standing on the face of their complaint.[3] It determined that members of some of the Plaintiff organizations had standing to challenge the allegedly unauthorized access of government employees to their Privacy Act protected information because that access was closely analogous to common law torts of intrusion on seclusion and breach of confidence. MTD Op. at 14. Defendants do not dispute that the Defendant Agencies maintain information systems containing personal information belonging to some Plaintiffs' members or that DOGE Team members[4] may access those systems in the course of their duties. *See* Pls.' SJ Br. at 9-10. However, Plaintiffs have alleged no concrete harm because their alleged injury of mere disclosure to unauthorized government employees in the course of their duties has no close historical analogue.

The tort of intrusion upon seclusion makes liable any person "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns. . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B; *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989). The tort has three

---

[3] The Court addressed organizational standing as to Defendant CFPB, but CFPB was subsequently dismissed from the case.
[4] "DOGE Team members" refers to the individuals identified in Defendants' Objections and Responses to Plaintiffs' Interrogatories as either employed by or detailed to DOL or HHS and working "in furtherance of the DOGE EO." ECF No. 80-5 at 6-20.

elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person." *Wolf*, 553 A.2d at 1217 (cleaned up). the "the kind of invasion that this cause of action seeks to redress" are various forms of offensive "invasions" including harassment, peeping, eavesdropping, etc. *See id.* at 1217–18; *see also Krakauer v. Dish Network*, 925 F.3d 643, 653 (4th Cir. 2019) (addressing "intrusions made via phone calls").[5] At summary judgment, Plaintiffs' desired comparison fails at the first step because the record evidence demonstrates the DOGE Team members are employees of the Defendant Agencies with a need to access the subject information systems and there was therefore no unlawful disclosure. *See infra* at 28-31. Nor is there any evidence that any such disclosure resulted in any subjective or perceptible, much less offensive, impact to any of Plaintiffs' members. Plaintiffs' attempt to analogize common law breach of confidence fails for the same reason. Breach of confidence "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." MTD Order at 18 (quoting *Jeffries v. Volume Servs.*

---

[5] *See also, e.g.*, *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022) (finding standing where defendants had obtained plaintiffs information to mail unsolicited advertising materials to the plaintiffs' homes); *Krakauer*, 925 F.3d at 653 (addressing "intrusions made via phone calls"); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (finding standing based on "irritating intrusions" caused by unwanted text messages, which is "analogous to [the] type of "intrusive invasion of privacy" covered by the tort of intrusion upon seclusion); *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345 (6th Cir. 2023) (concluding that "invasion-of-privacy-like harm flow[s] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into [the recipient's] private sphere"); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (standing based on unwanted telephone communications because they were an "unwanted intrusion into [the plaintiff's] peace and quiet"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir. 2025) (explaining that other courts have "found that the harm caused by *unwanted communications* bears a close relationship to intrusion upon seclusion" (emphasis added)).

11

*Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019)). Plaintiffs allege that they had a "subjective understanding that information submitted to Defendants would be held in confidence" and that their understanding was "breached when Defendants' provided Plaintiffs' members' private information to unauthorized third parties." Pls.' SJ Br. at 8-9. On the record now available, it is clear both that (1) Plaintiffs' members voluntarily provided their private information to Defendants with the expectation it would be used by Defendants, *see id.* at 9-11, and (2) the DOGE Team members were employees of the Defendant agencies authorized to access their information systems, *see infra*. Plaintiffs' members have no reasonable expectation of privacy from agency employees of the agencies to which they provided such records. *See Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 711–12 (D.C. 2009) ("Without an allegation that the data involved here were disclosed to and viewed by someone unauthorized to do so, appellants have failed to state a claim[.]"); *Wolf*, 553 A.2d at 1218 ("a colloquy in which [plaintiff] voluntarily participated, could hardly be considered intrusive.").

Additionally, since the time of the motion to dismiss decision, the Fourth Circuit in *AFT v. Bessent*, \_\_F.4th\_\_ , No. 25-1282, 2025 U.S. App. LEXIS 20397 (4th Cir. Aug, 12, 2025), a related challenge to DOGE Team access to information systems at other agencies, has rejected the validity of the intrusion on seclusion analogue and vacated the preliminary injunction in the related case partially on standing grounds. Previously, the Fourth Circuit, *en banc*, in a similar case concerning DOGE Team access to information systems at the Social Security Administration, found plaintiffs had standing\ and granted a preliminary injunction. *AFSCME v. SSA*, No. 25-1411, 2025 U.S. App. LEXIS 10420, at *71-112 (4th Cir. Apr. 30, 2025) (finding plaintiffs had asserted a concrete injury-in-fact sufficiently similar to the common law tort of intrusion upon seclusion). However, the Supreme Court subsequently granted a stay of that same injunction concluding that on at least one

of the relevant issues the Agency "has made a strong showing that [it] is likely to succeed on the merits." *SSA v. AFSCME*, 145 S. Ct. 1626, 1626-27 (2025) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

After the Supreme Court's stay of the preliminary injunction in *AFSCME*, in *AFT* the Fourth Circuit held that "Plaintiffs seemingly lack standing" because they could not assert a concrete injury premised on the "alleged harm of unauthorized access" to their information. *AFSCME*, 2025 U.S. App. LEXIS 10420 at *12-13.[6] The Court concluded that "intrusion upon seclusion" the same analogue alleged by Plaintiffs in this case, "has long been understood to guard not against disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace." *Id.* at *12. It is "the knowledge that a third party is engaged in targeted snooping, that causes the harm," and "[t]hat sort of harm is not present here." *Id.* at *14. Plaintiffs' members are not being targeted in any meaningful sense, even if their specific information, among potentially millions of datapoints, is actually accessed. *See id.* And the type of harm from database access by a few government employees is "different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi." *Id.* Plaintiffs might be harmed if their private information was publicly disclosed rather than merely accessed, but they did not allege any actual or imminent disclosure and therefore lack a concrete injury. *See id.* at *15. The same is true in this matter. At summary judgment, Plaintiffs neither allege nor support any threat of public disclosure or subjective harm to their members from the allegedly unlawful disclosure to a limited number of government employees. *See* Pls.' SJ Br. at 7-11. Simply put, Plaintiffs' alleged harm is not materially similar to the supposed historical analogue and therefore

---

[6] In the MTD opinion, this Court acknowledged but disagreed with some of the same concerns, at that time raised by Judge Richardson's concurrence in the stay of the injunction. MTD Op. at 15-16; *AFT v. Bessent*, No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025).

is not concrete for purposes of establishing Article III standing. The Court should therefore conclude that Plaintiffs lack associational standing.

### C. **Organizational Standing**

Plaintiffs also argue for the first time at summary judgment that they have direct organizational standing to sue DOL and HHS, but this contention is not supported by the record. Like an individual, an organization asserting standing on its own behalf must demonstrate that it has suffered a "concrete and demonstrable injury to [its] activities—with [a] consequent drain on [its] resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). "'[T]he organization must allege that discrete programmatic concerns are being directly and adversely affected' by the challenged action." *Nat'l Taxpayers*, 68 F.3d at 1433 (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.'" *Food & Water Watch*, 808 F.3d at 919 (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)). Further, plaintiff organizations cannot "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402; *see also All. for Hippocratic Med.*, 602 U.S. at 394 (allegedly unlawful actions must "directly affect[] and interfere[] with [the organizations'] core business activities.").

First, Plaintiffs do not identify any relevant specific facts or even allegations related to HHS at all, so by definition they have not established organizational standing as to HHS.[7] Second, Plaintiffs contend that "compromising the confidentiality of [DOL] systems" by permitting DOGE access "significantly impairs the core organizational activities of the Plaintiff unions." Pls.' SJ Br. at 14-15. However, the only record evidence Plaintiffs point to in support of this alleged risk to confidentiality relies entirely on the speculative possibility of unlawful *public* disclosure. *See id.*; Ginsburg Decl. ¶ 15, ECF No. 29-3, (union organizing activities would be impaired if DOL audit records were revealed to employers); *id.* ¶ 18 (union organizing and collective bargaining activities would be impaired if membership records were revealed to employers); *id.* ¶¶ 4-9 (members will not participate in union complaint process if they fear disclosure to employers and consequent retaliation); Ury Decl. ¶ 11, ECF No. 29-14 ("If workers' names are publicized, are accessible by their employer, or are disseminated to third parties" they will be chilled from reporting violations and working with the union.); *id.* ¶ 15 ("Members whose information is improperly disclosed or exposed…risk retaliation from their own employers and, potentially, future employers."); *id.* ¶ 19 (union will need to divert significant resources to counteract retaliation if DOL records are publicly disclosed); Sanghvi Decl. ¶¶ 13-17, ECF No. 28-9 (revealing FECA records will decrease worker willingness to join and seek assistance from the union).

This Court has twice recognized in its prior opinions that Plaintiffs have neither demonstrated nor even alleged imminent public disclosure of any information accessed by DOGE Team members. *See* MTD Op. at 13 n.6 ("Plaintiffs allege no facts that show USDS personnel will

---

[7] It is not clear whether Plaintiffs' summary judgment motion intends to assert associational or organizational standing as to USDS. Among other things, Plaintiffs' Statement of Undisputed Material Fact states that only HHS and DOL are defendants in this matter. Pls.' SUMF, ECF No. 93-1 at ¶ 1. But if they do allege standing, Plaintiffs also lack associational and organizational standing against USDS for the reasons explained herein.

publicize or otherwise share DOL or HHS data outside of USDS…" and any contentions reliant on employer receipt of data or resulting retaliation are "mere speculation."); PI Op. at 23 ("[P]laintiffs demonstrate no risk that the information will be further shared or improperly used…."); *id.* ("[T]he evidence before the Court also shows that DOGE Affiliates have an obligation not to share or otherwise disclose records to any unauthorized persons, let alone the public…and indicates the DOGE Affiliates are adhering to that obligation."); *see also id.* (collecting record citations). Plaintiffs have not identified any additional such evidence at this stage of the litigation and have therefore failed to adequately support their claims of organizational standing premised on the speculative impacts of public disclosure.

## V.    APA Claims

Because Plaintiffs do not have a cause of action for injunctive and declaratory relief under the Privacy Act, they allege they are entitled to such relief for violations of the Privacy Act under the APA. Plaintiffs' APA claims should be dismissed because they do not challenge any final agency action, the APA is not a proper vehicle for Privacy Act claims, and Defendants' actions were not arbitrary and capricious. Even if Plaintiffs could overcome all of these obstacles, their claims should still be dismissed because the record evidence does not support any violation of the Privacy Act**.**

### A.  Plaintiffs Do Not Challenge Final Agency Action

Plaintiffs cannot prevail on their APA claims because they do not challenge a final agency action. 5 U.S.C. § 704. The Court concluded at the motion to dismiss stage that Plaintiffs successfully alleged final agency action, but they have failed to adequately support that allegation at summary judgment. Specifically, the Court held that Plaintiffs plausibly

alleged the adoption of a "policy" of granting broad access to sensitive record systems. MTD Op. at 25–27.[8] Defendants respectfully disagree with the Court's conclusion, *see* Defs.' Mem. in Support of Mot. To Dismiss ("MTD Br."), at 21-25, ECF No. 49-1, but in any event, after discovery, Plaintiffs have failed to establish that there is such a policy at either DOL or HHS.

Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. That requirement has two distinct parts. *See Hill v. U.S. Dep't of the Interior*, 699 F. Supp. 3d 1, 18 (D.D.C. 2023). First, the thing being challenged must be "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent[.]" 5 U.S.C. § 551(13). Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton*, 542 U.S. at 64, against programs for which they are seeking "wholesale improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). As the *Lujan* Court explained, the APA is not intended to permit "general judicial review of the [an agency's] day-to-day operations." *Id.* at 899; *see also Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023), *aff'd* 143 F.4th 489 (D.C. Cir. 2025) (quoting *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)) ("the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency.").

Second, agency action must be "final." The Supreme Court has laid out a two part test for finality, including that (1) "the action must mark the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which "rights or obligations have been determined," or from which

---

[8] The Court did not address the parties' arguments concerning final agency action in its decision denying Plaintiff's Motion for Preliminary Injunction.

"legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]." *Id.*

At the motion to dismiss stage, Plaintiffs and this Court relied on the alleged policies' supposed similarities to the informal disclosure policy in *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008). Plaintiffs continue to rely on that comparison, contending that DOL and HHS adopted an unofficial policy of allowing the disclosure of confidential information which constitutes reviewable final agency action. Pls.' SJ Br. at 16. In the interim, however, as with Plaintiffs' standing argument, the Fourth Circuit in *AFT* rejected this exact analysis on appeal from the grant of a preliminary injunction. *See also AFSCME*, 2025 U.S. App. LEXIS 10420 at *139-41 (agency decision to allow record access was final agency action) (injunction stayed). In *AFT*, the Fourth Circuit observed that "granting IT access to certain employees – does not fit comfortably" into either the category of activities that "traditionally satisfy" the two-pronged final agency action test or those that "traditionally fail." 2025 U.S. App. LEXIS 20397, at *19-20. The court then held that the alleged DOGE access policies only "[s]uperficially" resembled the policy in *Venetian Casino*, expressing doubt that "granting IT access to a handful of employees" could even "amount[]to a disclosure policy." *Id.* at *21. As opposed to the EEOC policy, the alleged DOGE access policies, like the supposed policies in this case, lacked "four crucial features" of being "long-running, agency-wide, conceded to exist by agency counsel, and expressly written down in the agency's formal Compliance Manual." *Id.* at *20-21.

Consequently, the court concluded that it was "unlikely that the district court could so definitively find final agency action" on the merits. *Id.* at *21. As the record evidence described *infra* confirms, DOL's and HHS's actual practices with respect to granting access to the agencies' systems readily distinguish this case from the facts of *Venetian Casino Resort*. Contrary to the

EEOC's informal policy of "disclosing confidential information" as a matter of course, *Venetian Casino Resort,* 530 F.3d at 929–30, at both DOL and HHS, access is granted or denied based on the specific need of the person seeking access in keeping with existing policy for all employees. *See* Defendants' Statement of Undisputed Material Facts ("DSUMF") #7-9, 19-22.

Even if the policies as alleged in the present case were similar enough to those in *Venetian Casino* to survive a motion to dismiss, the factual record now developed makes clear that no such policies actually exist, formally or otherwise. Plaintiffs contend that "DOGE Teams are to be given unfettered, on-demand access to Sensitive Systems" effectuated by "sweeping categorical changes in how each Defendant Agency approaches its obligations to safeguard Sensitive Systems." Pls.' SJ Br. At 16-17. But the record evidence does not support either of these assertions. In support of their allegations against DOL, Plaintiffs point to testimony indicating DOGE Team member access requests were approved through an expedited process directly by DOL's Chief Information Officer, and without requiring DOGE Team members to answer typical access request questions. *See id.* In support of their allegations against HHS, Plaintiffs point to testimony indicating that HHS so far approved all DOGE Team member access requests, over an unusually broad swathe of systems, without individualized review, and based on HHS's inference of Affiliates' needs. *See id.* at 17.[9] Both agencies justified broad access on the basis of the DOGE-related EOs. *Id.*

None of these alleged facts demonstrate either unrestricted access or any material change from the requirements applicable to other employees. The record demonstrates that DOGE Team members at DOL go through the same process for access to DOL systems as any other employee.

---

[9] Plaintiffs also assert that a DOGE Team member was granted access to specific HHS systems without undergoing additional security training that "staff typically complete." Pls.' SJ Br. at 17. This statement is misleading, however, as the record conclusively demonstrates that such training is by rule optional for all HHS employees accessing the system. DSUMF # 15.

DSUMF ¶ 20-21. And DOL assesses the DOGE Team members' need before granting access. DSUMF ¶ 21. Moreover, it is simply false that DOL provides "unfettered, on-demand" access to the DOGE Team. Although Plaintiffs do not acknowledge it in their brief, the record is clear that DOL has not adopted an unquestioning, across-the-board access policy. Indeed, DOL denied access to the Adobe Licensing Portal system to members of the DOGE Team, demonstrating that DOL exercises case-by-case judgment as to when granting access is appropriate. DSUMF ¶ 24; *see also id.* ¶ 19 (DOL DOGE Team members were granted access to different systems based on individual need).

The record also does not support the allegation of unfettered access or any material change to policy at HHS. HHS has made no changes to any of its practices concerning access to records since January 19, 2025. DSUMF ¶ 7. Access for each of the HHS DOGE Team members is granted or revoked based on their specific work needs at the time, just like any other employee of HHS. DSUMF ¶ 8-9. The record also demonstrates the absence of any blanket policy in an even more fundamental respect: namely, the vastly *different* access given to different DOGE-affiliated employees, based on their individual work needs. DSUMF ¶ 10.

Nor can Plaintiffs rest their APA claim on the Defendant Agencies' reliance on the EO to demonstrate the DOGE Team members' need for access. *See* Pls.' SJ Br. at 17. The access granted is not indicative of a policy, but rather that the President has given DOGE Teams a broad mandate within the agencies. As the Fourth Circuit explained in *AFT*, and the Defendant Agencies recognized, the broader the scope of an individual employee's role at an agency the broader the scope of information he may need to access in order to fulfil that role. 2025 U.S. App. LEXIS 20397, at *24-26; *see also infra* at 32-34; DSUMF # 8-9, 21-22.

### B. Plaintiffs Cannot Bring A Privacy Act Claim Through The APA

Summary judgement should also be granted in favor of Defendants because Plaintiffs' direct Privacy Act claim has been dismissed, and they cannot state a claim for relief from alleged Privacy Act violations through the APA. Defendants recognize that the Court previously rejected Defendants' "formidable" legal argument on this point, MTD Op. at 28–33.[10] Nevertheless, the Court should revisit the issue in light of the Fourth Circuit's treatment of this issue, and the Supreme Court's vacating of the preliminary injunction in *SSA*.

The Privacy Act's comprehensive statutory scheme precludes APA review. The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy." 5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."). The Privacy Act provides a "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information about individuals. *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. Dep't of Just.*, 333 F.3d 273, 274 (D.C. Cir. 2003)). When a statute provides a detailed mechanism for judicial review of certain issues by certain people implied preclusion of other review may be found. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984).

Plaintiffs plead a violation of 5 U.S.C. § 552(a)(g)(4), which permits suits only for monetary relief and only by individuals. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007). Despite this limitation, Plaintiffs, exclusively organizations, seek injunctive and declaratory relief for alleged violations of this section. Plaintiffs cannot "circumvent the [scheme's] requirements and limitations by resorting to the catchall APA," even when "the

---

[10] Defendants also raise this issue for the purposes of preserving it for any appeal, and incorporate the arguments presented in their Motion to Dismiss, ECF No. 49-1 at 25-28, and Reply, ECF No. 56 at 11-13.

plaintiff cannot prevail in a claim" under the scheme. *Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (discussing the CSRA).

In addition to the "many cases from this District that broadly declare that 'a plaintiff cannot bring an independent APA claim predicated on a Privacy Act violation,'" MTD Op. at 31, the Fourth Circuit's *AFT* opinion addressed exactly the question raised by this suit, and reversed the preliminary injunction in part based on its conclusion. *See also AFSCME,* 2025 U.S. App. LEXIS 10420 at *142-45 (plaintiffs' APA claims were not barred by an adequate remedy under the Privacy Act) (injunction stayed). In the *AFT* court's view, it was "not obvious" that the Privacy Act's scheme of review fails to provide an adequate remedy for challenges to disclosure as opposed to non-disclosure. 2025 U.S. App. LEXIS 20397, at *21-22. Because the Privacy Act's review scheme encompasses "enumerated violations and details on jurisdiction, venue, and timing," it "plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here." *Id.* at *22-23; *see also id.* at *23 (citing *Cell Assoc., Inc. v. NIH*, 579 F.2d 1155, 1159-60 (9th Cir. 1978) ("We think it unlikely that Congress would have gone to the trouble [in the Privacy Act] of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board.") (alteration in original)); *Hastings v. Judicial Conf. of the U.S.*, 770 F.2d 1093, 1104 (D.C. Cir. 1985) ("[E]ven if a violation of the Privacy Act could be made out, appellant would not be entitled to the declaratory and injunctive relief he seeks, such relief not being among those expressly made available to remedy past disclosures."). The *AFT* court also noted that the seemingly contradictory footnote in *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004), was mere dicta and that the Supreme Court "more recently reserved the question" of the availability of the APA to pursue equitable relief based on the Privacy Act. 2025 U.S. App. LEXIS 20397, at *23; *see also AFSCME,* 2025 U.S.

App. LEXIS 10420 at *144-45 (noting that defendants did not cite any precedent contrary to the cited dicta and that Supreme Court dicta is generally treated as authoritative in the Fourth Circuit) (injunction stayed).

Thus, in assessing the existence of an adequate remedy, the Court should focus not on the differences between injunctive relief and damages, but on the intent of Congress in creating a detailed remedial scheme that specifically confined those types of relief to particular claims. The Privacy Act permits certain forms of injunctive relief and, by implication, precludes all others. Although relief is not available to these particular Plaintiffs for alleged violations of the Privacy Act premised on disclosure as they are not "individuals" entitled to relief under the Act, the Privacy Act does provide relief for other classes of Plaintiffs. *Cf., e.g., Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979) ("Obviously, then, when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly.").

### C.  Plaintiffs Cannot Succeed On Their Arbitrary and Capricious Claims.

Plaintiffs cannot succeed on their claim that Defendants' DOGE access policies are arbitrary and capricious because, as explained *supra*, there are no such policies and no final agency action. Plaintiffs have not articulated proper APA claims because agencies are not subject to judicial review for every individual, internal decision to grant systems access to a particular employee whom the agency deems to require access. In any event, even if the Agency Defendants' decisions were subject to arbitrary-and-capricious review, that review is highly deferential to the agency. "[A] court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The agency is afforded a presumption that its actions are valid and need only articulate a "satisfactory explanation" that has a "rational connection between the facts found and the choice made." *Id*. And courts should be

23

wary of interfering with the day-to-day management of federal agency business, even if Plaintiffs identify a specific allegedly improper action within such ordinary decisions. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004); *People for the Ethical Treatment of Animals v. U.S. Fish & Wildlife Serv.*, 130 F. Supp. 3d 999, 1001–02 (E.D. Va. 2015).

Plaintiffs' argument relies entirely on their assertion that "the DOGE Data Access Policies differ substantially from normal practice at the agencies," Pls.' SJ Br. At 19, a claim which is entirely belied by the record. *See supra* at 18-20. They assert that Defendants have not acknowledged or justified the "wholesale changes" to their access policies, *id.*, but there have been no such changes. As discovery has revealed, the alleged "DOGE Data Access Policies" are a fiction of Plaintiffs' creation. The typical access policies remain in place, DSUMF #7-8, 20-21. And as this Court previously acknowledged, Plaintiffs failed to even adequately allege that there was any change to the agencies' relevant regulations and procedures. MTD Op. at 43–44. To the extent the typical process of evaluating access requests may conclude more quickly or with less individualized justification, Defendants clearly have explained that the Executive Orders assign DOGE Team members broad responsibilities related to information systems which on their face necessitate significant access. *See infra* at 32-34.

 As there was no adoption of any policy, merely the onboarding of new employees and individualized grants of access to agency data systems, there was also no "important aspect of the problem" for DOL or HHS to consider. *State Farm*, 463 U.S. at 43. The alleged change in "policy," is, in reality, Plaintiffs' disagreement with the internal operation of DOL and HHS—*i.e.*, which employees should be allowed access to which data systems. Plaintiffs allege, *inter alia*, that Defendants should have followed the detailed guidance of the Privacy Act and other statutes and regulations in designing DOGE Team members' access to agency systems. Pls.' SJ Br. at 20-21.

As explained above, Defendants' typical access policies, made pursuant to those authorities and unchallenged in this lawsuit, remain in place and apply to DOGE Team members. Plaintiffs' allegation that the Defendants have failed to account for the reliance interests of persons who submit PII to the federal government, *id.* at 21-22, fails for the same reason. There are no new access policies and no material departures from typical procedures, including employee training and non-disclosure obligations. DSUMF #7-8, 14, 20-21, 26; *see also*, Op. Denying Renewed TRO, ECF No. 34 at 4 (DOGE "team members have signed nondisclosure agreements, received security training, and are otherwise subject to agency requirements as to data permissions and accesses."). Individuals submitting information to federal government agencies have no reasonable expectation of privacy in excess of the Privacy Act and other applicable authorities. DOGE Team members' access is consistent with the Privacy Act, *see infra*, and there is no allegation or evidence of disclosure beyond mere access, *see supra*, so no obligation to account for reliance interests can arise. Similarly, Plaintiffs have identified no record support for their final allegation, that Defendants did not properly consider potential conflicts of interest. Pls.' SJ Br. at 22. Plaintiffs attempt a "gotcha" by pointing out that the DOGE Team members' employment or detailing agreements relied upon self-disclosure of potential conflicts of interest. *Id.* However, Plaintiffs neither identify facts nor even contend that this is different from the policy applicable to any other employee.[11] *See* DSUMF # 17, 25 (HHS and DOL applied the same conflicts procedures to DOGE Team members and all other employees).

---

[11] Plaintiffs make passing reference to Elon Musk's involvement with USDS, but provide no record support for any facts relevant to potential conflicts of interest for DOGE Team members employed at the Defendant Agencies, including supposed "concurrent employment interests." Pls.' SJ Br. at 22. Musk was not, contrary to Plaintiffs' implication, heading USDS, nor is there any evidence to suggest he received or sought to obtain any sensitive information from DOGE Team members. DSUMF #2.

Plaintiffs' "contrary to law" argument fares no better. Defendants' individual grants of access to DOGE Team members are consistent with the requirements of the Privacy Act for the reasons explained *infra*. By Plaintiffs' own allegations, the Defendants' regulations implement the Privacy Act, and they have not alleged or demonstrated any specific facts to support an argument that Privacy Act-compliant actions could nevertheless violate these derivative regulations. *See* Pls.' SJ Br. at 34–35.

## VI.    Defendants' Conduct Complies With the Requirements of the Privacy Act

Even if the Court considers the merits of Plaintiffs' APA Privacy Act claims, notwithstanding the various obstacles described above, Plaintiffs cannot prevail. The Privacy Act establishes a general ban on the disclosure of the "records" of an "individual." *See* 5 U.S.C. §§ 552a(a)(2), (4) (defining "record" and "individual"); *id.* § 552a(b). But the Act broadly exempts from this rule disclosure to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). Plaintiffs' central argument is that the DOGE Team members are neither employees of the agencies that maintain the records nor have they established need to access the records, and therefore that their access is unlawful. Pls.' SJ Br. at 24. But that claim is not borne out by the record.

Plaintiffs contend that DOGE Team members are "functionally employees of DOGE" and "answer to DOGE while performing work at the Agencies" even when they are "papered" as employees of the Defendant Agencies. *Id.* at 25. They also contend that Defendants did not establish that DOGE Team members had a need to access records in the information systems prior to granting access. *Id.* at 30. Plaintiffs assert that the Court already held in their favor as to the nature of DOGE Team members' employment, but that is clearly a question of fact. In reality, the Court only held, assuming the truth of the facial allegations of the complaint, that Plaintiffs stated

a claim that DOGE Team members detailed from USDS to DOL remained employees of USDS and therefore could not access information systems under § 552a(b)(1). That allegation, along with Plaintiffs' similar allegations related to other categories of DOGE Team member employees, does not hold up now that the record has been established.

### A.  DOGE Team members Are Employees of the Defendant Agencies.

At this stage of the litigation, Plaintiffs can no longer rest on their bare allegations that the DOGE Team members have mere "formalistic relationships" with the Defendant Agencies and actually "report, first and foremost, to DOGE." Pls.' SJ Br. at 25. Plaintiffs concede, as they must, that the employees in question have been formally hired either by the agency at which they work, or by another agency which, in turn, has detailed the employee to the relevant agency. *See id.*; *see also* Defs.' Objs. & Resp. to Expedited Disc., ECF No. 80-5 at 6-20 (explaining the employment arrangements of the DOGE Teams at DOL and HHS). Accordingly, Plaintiffs fall back on an argument that, despite these working arrangements, the DOGE-affiliated employees are functionally employees of USDS. Pls.' SJ Br. at 24-29. But the Court, in ruling on the Motion to Dismiss, applied the functional standard only to detailees, not direct employees. *See* MTD Op. at 34–35 (stating that "the cases [Defendants] cite did not determine that a *detailee* was an employee of the agency to which he was detailed merely because he was detailed there" and "these cases show that, to determine a *detailee's* employment, the D.C. Circuit has adopted a functional approach[.]") (emphasis added) (internal citations and quotations omitted). None of the relevant DOGE Team members are detailees from USDS, DSUMF # 3, and many are directly employed by DOL or HHS, *see* DSUMF #5-6, 18. To the extent that any detailees remain, they are operating under typical detail arrangements from other agencies. Moreover, as explained *infra*, no DOGE Team members of any kind remain at DOL.

However, even if the functional test were to be applicable to some DOGE Team members, the record evidence demonstrates that they are employed by the respective Defendant Agencies. First, although official, direct hiring is not the only factor to be considered in determining an employment relationship, it is one factor in the totality of circumstances. *See Jud. Watch, Inc. v. DOE*, 412 F.3d 125, 131-32 (D.C. Cir. 2005). Plaintiffs dismiss the significance of these formal arrangements, but do not deny that they exist as to certain DOGE Team members. *See* Pls.' SJ Br. at 25; ECF No. 80-5 at 6-20.[12] Similarly Plaintiffs concede that the DOGE Team members are paid, if at all, by the Defendant Agencies or detailing agencies and not by USDS, Pls.' SJ Br. at 25, but incorrectly suggest that fact has no relevance to the employment analysis. *See Jud. Watch*, 412 F.3d at 131-32.

In terms of other factors that might be considered, including the matters DOGE Team members worked on, where the work was completed, and who supervised the work, *see id.*, Plaintiffs continue to rely on their opinions and not the facts adduced in discovery. Indeed, the record demonstrates that DOGE Team members conducted agency work on agency systems in agency spaces. *See* DSUMF # 13, 16, 27-28. And while working on agency projects DOGE Team members are responsible to their agency supervisors. DSUMF # 16, 28. Any DOGE Team members who are also employed by USDS are separately supervised in their USDS work by USDS and in their agency work by the Defendant Agencies. DSUMF # 29. They use separate assets and the general practice is to keep their agency work at the agency, and USDS work at USDS. *Id.*

---

[12] Plaintiffs make a blanket statement that Defendants are "documenting artificial…employment relationships" for litigation purposes, Pls.' SJ Br. at 25, but they lack support for this assertion. They do not identify any evidence that these employment relationships are not "real." Rather, they point only to the USDS deponent's statement that USDS changed from one permissible practice, detailing, to another, dual-onboarding. *See id.*

Plaintiffs' arguments to the contrary are insubstantial and cannot cure their failure to provide these necessary facts. First, Plaintiffs assert that "DOGE is choosing to place DOGE Team members in host agencies; host agencies are not hiring them sua sponte" and "DOGE…is going beyond passive consultation…affirmatively directing the onboarding of DOGE Team members at the agencies." Pls.' SJ Br. at 26. Even if that allegation were relevant to whether DOGE Team members are in fact employed by the Defendant Agencies, which it is not, it is not supported by the record. Plaintiffs' reading of the Jan. 20 EO, that "[it] explicitly calls for DOGE to direct" employee placements because it instructs Agency heads to "select the DOGE Team…in consultation" with USDS, *id.*, is facially contradictory. The authority to select DOGE Team members is vested in the agencies and USDS's role is only to advise. Moreover, the only testimony Plaintiffs point to in support of this contention confirms that HHS maintained and exercised the authority to hire or accept detailees. *See id.*; Rice Dep. 18:16-20:24; *id.* at 20:7-10 ("So there were some expertise that was recommended and HHS accepted those experts to help us perform these tasks."); *id.* at 20:20-24 ("Q: …[W]ho at HHS made the decision to enter into these arrangements?", "A: Scott Rowell is the deputy chief of staff for operations.").[13] Plaintiffs also state that having employees with multiple employment arrangements is an unusual practice at DOL, and that it "would strain credulity" to find that DOGE Team members are employees of each. Pls.' SJ Br. at 27. However, these general assertions do not provide the specific facts necessary at summary judgment to conclude that the particular DOGE Team members at issue are not employees of DOL or HHS in particular.

Second, Plaintiffs contend that "DOGE Team members are only present at their respective host agencies to accomplish the DOGE Agenda as laid out in the Jan. 20 EO." *Id.* at 26. But

---

[13] Plaintiffs' citation to testimony concerning a different agency in a different case is not relevant.

Plaintiffs' argument ignores the difference between the larger DOGE initiative and USDS. The Jan. 20 EO establishes an executive-wide initiative to modernize technology and software to maximize government efficiency and productivity. DSUMF #1. USDS, in turn, was reconstituted from the former U.S. Digital Service to advise and consult with agencies on the implementation of that government-wide initiative. *Id.* But the goal is to improve agency systems, not to improve USDS. *Id.* DOGE Teams within agencies, therefore, are working to implement a government-wide initiative at their agency, on behalf of and for their agency. The record evidence identified by Plaintiffs does not undermine these facts. For example, Plaintiffs contend that the similarity of Brad Smith's responsibilities as a USDS employee and as a detailee or employee at HHS[14] indicate that he has only ever worked on USDS initiatives. Pls.' SJ Br. at 27. But  HHS's deponent testified that he "d[id]n't know what [Smith's] functions are at USDS" and that at HHS, Smith was "making recommendations about the contracts activities, grants, things that we do at HHS to create efficiencies that we have within HHS." HHS (Rice Dep.), ECF No, 82-3, at 42:12-17; *see id.* at 41:22-43:24. Moreover, even if Brad Smith specifically was engaging exclusively in USDS work, which the record does not support, that conclusion cannot be extrapolated to other DOGE Team members. Similarly, the other record cites identified by Plaintiffs, Pls.' SJ Br. at 27, simply demonstrate that DOGE Team members were undertaking their roles within the Defendant Agencies to effectuate the executive-wide modernization at those Agencies.

Third, as explained above, *see* DSUMF # 16, 28, the record directly contradicts Plaintiffs' contention that "DOGE affiliates are functionally supervised by DOGE." *Id.* Plaintiffs assert that certain interagency agreements require that "DOGE affiliates expressly and formally report to the

---

[14] Brad Smith was concurrently employed by HHS and USDS beginning March 4, 2025. ECF No. 80-5 at 17.

Acting Administrator of DOGE even while performing work focused on the Defendant agenc[ies]." *Id.* But in the very same paragraph they concede that these agreements are no longer operative because the previously detailed employees are now directly employed by the Defendant Agencies. *See id.* at 27-28; *see also* Defs.' Mem. in Opp. to Mot. for PI, at 38-39 n.17, ECF No. 82 (explaining that the agreements in question are no longer operative, and "did not alter both USDS and HHS's conclusions that [DOGE Team members] were to be supervised by HHS while doing HHS work."). Nor does Plaintiffs' speculation concerning to whom DOGE Team members might report when using DOGE equipment in agency facilities or vice versa provide any actual factual support for their argument. *See* Pls.' SJ Br. at 28. Plaintiffs' attempt to rely on their interpretation of the relevant Executive Orders also cannot substitute for lack of actual evidence to support a genuine dispute of material fact as to supervision. Plaintiffs assert that the Jan. 20 EO's direction to DOGE Team members to "coordinate" with USDS "can only mean that DOGE Teams are required to work in a way that 'harmonizes' with the instructions and expectations of DOGE." *Id.*  Plaintiffs further contend  that coordination arising to the level of functional supervision is "not merely speculative, it is ongoing." *Id*. But that statement also lacks any record support. Far from providing a comprehensive factual recitation of this supposed "coordination" sufficient to contradict the explicit testimony that DOGE Team members' work for the Defendant Agencies is supervised by those agencies, the testimony Plaintiffs cite indicates only that USDS "coordinates with most, if not all, the DOGE agency teams but in varying capacities and volumes." USDS Dep., ECF No. 82-7 at 124:20-22. Similarly, the EO's general instruction to DOGE Teams to "advise" the Defendant Agencies does not somehow undermine the testimony concerning actual supervision. Neither does it follow that the "balance of control of DOGE Teams' work weighs heavily in favor of the conclusion that DOGE is their actual employer," Pls.' SJ Br. at 29, merely

because the possibility exists that USDS employees may offer advice to agencies in that capacity while reporting to a USDS supervisory chain. As explained above, none of the relevant DOGE Team members are now employed by USDS, and even if they were, the possibility of intermittently operating in a secondary capacity would not outweigh the actual evidence of agency supervision.

**B. DOGE Team member Employees Need to Access Agency Record Systems to Perform Their Duties.**

The record evidence also establishes that DOGE Team members had the requisite need to access the information systems to which they were granted access in order to perform their duties. Plaintiffs contend that DOGE Team members "necessarily fail" to meet this standard because they did not provide Defendant Agency officials "with *any* explanation of why they needed access to any given Sensitive System or what they intended to do with the records" and the Defendant Agencies "routinely approved DOGE's access requests on the basis of their own guesses or inferences about what DOGE would do with the records." Pls.' SJ Br. at 30.

But as DOL and HHS's witnesses testified, DOGE Team members' need to access various systems was "clear and apparent" from the breadth of their responsibilities as explained in the Executive Orders. DSUMF # 8-9, 21-22. Contrary to Plaintiffs' characterization, the Defendant Agencies did not treat the Executive Orders as "self-executing directives," but instead conducted their typical evaluations of DOGE Team members' access requests taking into account the nature and scope of those employees' roles. *See supra*; DSUMF #8-9, 21-22.

In *AFT,* the Fourth Circuit addressed this very issue, concluding that the breadth of DOGE Team members' mandate itself, based on the same executive orders relevant to this case, likely provided the necessary justification for broad access to agency information systems. *See also AFSCME,* 2025 U.S. App. LEXIS 10420 at *171-180 (defendants did not demonstrate a sufficient need under the Privacy Act exception for DOGE Team members to access information systems)

(injunction stayed).   Under the Privacy Act, "[a] need for the record in the performance of [employees'] duties necessarily depends on what those duties are." *AFT*, 2025 U.S. App. LEXIS 20397, at *24 (cleaned up). Providing the example of a consultant with a "broad and open-ended duty to improve efficiency and operations" at a library, the court observed that necessarily "[t]he broader an employee's duties, the broader their needs." *Id.* With such a sweeping purview, the consultant "likely needs correspondingly broad and open-ended access to the library" because at the outset she "does not know what she does not know" about where improvements are needed. *Id.* Consequently, "requiring her to specify the precise records she needs to improve the library before she knows what improvements are needed would seem to get the order of operations precisely backwards." *Id.* at *24-25. The court then observed that the "DOGE-affiliated agency employees are tasked with a similarly broad and open-ended duty" premised on the requirements of the EOs. *Id.* at *25. The DOGE Team members do not arrive with the "lay of the land" as to needed improvements, so expecting them to "explain in advance the exact information they need and why is to demand something just short of clairvoyance." *Id.* The court concluded it "does not stretch the imagination to think that an employee tasked with modernizing an agency's software and IT systems would require administrator-level access[15] to those systems," and that courts should not be "so eager to tangle the judiciary in the weeds of distinguishing the needs of one high-level IT employee from another." *Id.* at *25-26.

Thus, the review Plaintiffs themselves allege Defendants undertook, presuming that the breadth and nature of DOGE Team members' modernization responsibilities under the relevant executive orders required broad access to various information systems, Pls.' SJ Br. at 30-32, is

---

[15] The record demonstrates HHS DOGE Team members generally obtained read-only access to most systems. DSUMF # 11.

entirely consistent with the requirements of the Privacy Act. Plaintiffs' arguments to the contrary are unavailing. They contend that permitting access based on the EOs alone would "gut the very protections" of the Privacy Act because there is no need to access millions of sensitive records. *Id.* at 31. But that argument improperly frames the issue. The Defendant Agencies did not determine DOGE Team members required access to specific records, they determined that the DOGE Team members required access to information systems that happen to contain sensitive records in order to perform their duties related to improving information systems. Plaintiffs also argue that even if an executive order could justify broad access to agency information systems, the EOs at issue cannot. They assert that the Defendant Agencies would have had to infer what the DOGE Team members needed because the Affiliates did not supply their reasons, and the Defendant Agencies would have had no information on which to base those inferences. *Id.* at 32. But this is merely a retread of Plaintiffs' initial argument and should be set aside on the same basis. As the Defendant Agencies are aware from the EOs, the DOGE Team members have a very broad mandate to recommend executive-wide improvements and consequently require similarly broad access to agency information systems. *See supra*.

Plaintiffs fare no better in their arguments that the Defendant Agencies could not have inferred a purpose of seeking "waste, fraud, and abuse" from the relevant EOs. Pls.' SJ Br. at 32-34. For the reasons explained above, the Defendant Agencies had no need to make such a specific inference since the EOs on their face establish a sufficiently broad set of responsibilities to justify the DOGE Team members' need to generally access information systems. Additionally, Plaintiffs describe "waste, fraud, and abuse" as a "mantra" or "magic words," *id.* at 31, 33, but that ignores the widespread understanding within the government that programs frequently seek to cure those specific ills. *See, e.g.,* 42 U.S.C. § 1395ddd(g)(1)(A)(iii) (through the Medicare-Medicaid Data

Match Program the Secretary shall enter contracts "increasing the effectiveness and efficiency of both such programs through cost avoidance, savings, and recoupments of fraudulent, wasteful, or abusive expenditures…"); S. Rep. No. 112-155, at 1 (2012) (stating that Congress passed the Whistleblower Protection Enhancement Act of 2012 to "strengthen the rights of and protections for federal whistleblowers so that they can more effectively help root out waste, fraud, and abuse in the federal government."); *Pars v. CIA,* 295 F. Supp. 3d 1, 3 (D.D.C. 2018) ("Presidential Policy Directive 19…seeks to 'ensure that employees serving in the Intelligence Community…can effectively report waste, fraud, and abuse while protecting classified national security information.'") (cleaned up). Additionally, as Plaintiffs concede, the latter two EOs do explicitly identify combatting waste, fraud, and abuse as a priority. Pls.' SJ Br. at 33-34. Plaintiffs' more specific gripes with the various EOs, *id.* at 32-34, are therefore of no import. The Defendant Agencies had no need to specifically find that DOGE Team members required access to specific systems for the particular purposes of identifying waste, fraud, and abuse. However, as Plaintiffs admit, the record supports a finding that the Defendant Agencies were cognizant of those interests.

For the foregoing reasons, the Court should find that the DOGE Team members are employees of the Defendant Agencies and that the Defendant Agencies correctly determined the DOGE Team members needed access to various agency information systems to perform their duties as outlined by the EOs. The Court should therefore deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion.

## VII.    Plaintiffs Do Not State An Ultra Vires Claim

Plaintiffs cannot rescue their failed APA claims by falling back on the ultra vires doctrine. Ultra vires review is a "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). More

specifically, ultra vires review of agency action is only available when an agency's error is "patently a misconstruction of [statute;]" "when the agency has disregarded a specific and unambiguous statutory directive[;]" or "when the agency has violated some specific command of a statute." *Griffith v. Fed. Labor Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations and quotations omitted). "Garden-variety errors of law or fact are not enough." *Id.*

Both the Supreme Court and D.C. Circuit have made clear that an ultra vires claim is unavailable where an alternative remedial forum exists in which a plaintiff may pursue the challenge. *See Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (non-statutory review is available only when a party would be "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights*"); Lepre v. Dep't of Labor*, 275 F.3d 59, 72 (D.C. Cir. 2001) (a "critical" requirement for ultra vires review is "the lack of any alternative means of judicial review for the plaintiffs"); *see also Nyunt*, 589 F.3d at 449.

Although this Court held that Plaintiffs had sufficiently alleged an ultra vires claim to withstand a motion to dismiss, Plaintiffs fail to support that claim as required at the summary judgment stage. The Court's holding, based on a facial challenge to the Amended Complaint, assumed the truth of Plaintiffs' allegations that "USDS has been directing operations and personnel decisions at Congressionally-created agencies" premised only on the directives of the EOs. MTD Op. at 45-46. At summary judgment, Plaintiffs contend that "DOGE Teams claimed authority to access Sensitive Systems" and USDS gave "directives" to the Defendant Agencies "that DOGE Team members be given formal titles within the Agencies in order to appropriate the Agencies' authority (despite actually reporting to DOGE)." Pls.' SJ Br. at 36. But Plaintiffs lack the necessary record support for these allegations. As demonstrated in detail *supra*, the DOGE Team members were employed, both formally and functionally, by the Defendant Agencies and requested access to information systems through those Agencies' typical processes.

The evidence cited by Plaintiffs does not support a contrary conclusion. The testimony they point to confirms that DOGE Team Members at DOL request are granted access to DOL information systems by DOL through the same process as other employees and based on evaluation of the same criteria. *See* DSUMF # 20-21. Similarly, DOGE Team Members at HHS are granted access to HHS information systems by HHS through the same process as other employees and based on evaluation of the same criteria. *See* DSUMF # 8-9. Plaintiffs do not identify any record evidence suggesting that USDS "directed" personnel decisions at the Defendant Agencies for unlawful purposes or otherwise. Indeed, the only evidence proffered by Plaintiffs confirms that USDS can make recommendations in its consulting role, but that HHS holds and exercises the authority to accept details. DSUMF # 4. In sum, there is no evidence to support Plaintiffs' allegations that DOGE Team members claimed any authority arising outside of their positions at the Defendant Agencies to access information systems nor that they in any way directed the Defendant Agencies' hiring or detailing decisions. Plaintiffs' ultra vires claims thus cannot be maintained at this stage of the litigation.[16]

In light of the above, even if DOGE Team members were improperly granted access to any systems, which they were not, those actions would be violations of the Privacy Act and subject to that Act's comprehensive remedial scheme, not ultra vires.

**VIII.   The Court Cannot Order Certain Relief**

---

[16] Plaintiffs appear to have abandoned several of the ultra vires arguments that their raised in their First Amended Complaint and their opposition to Defendants' Motion to Dismiss, including that the detail arrangements between USDS and Defendant Agencies were unlawful and that USDS has impermissibly directed restructuring at the Defendant Agencies. To the extent Plaintiffs maintain these claims, Defendants oppose them for the reasons explained in their Motion to Dismiss, ECF No. 49-1 at 36, and Reply, ECF No. 56 at 19-21. And, as Plaintiffs have not even argued these positions, they have clearly failed to sufficiently support them at summary judgment.

Plaintiffs contend that the Court should vacate the Defendant Agencies' alleged DOGE access policies and declare that those "access policies were unlawful, that USDS access to systems of record was unlawful, and that DOGE Teams are not employees of their respective agencies." Pls.' SJ Br. at 36-37. They further assert that the Court "should exercise its equitable authority to remedy the unlawful actions Defendants have taken in reliance on those policies…specifically seek destruction of any ill-gotten data and an injunction preventing further unlawful access," and "require a status report from Defendants to confirm the scope and effect of access granted under the unlawful access policies and Defendants' compliance with any relief ordered." *Id.* at 37.

However, the Court has already addressed what relief may be available to Plaintiffs if they prevail on the merits, and none of it is available on the present facts at least as  to DOL. Even if the Court concludes that the Defendant Agencies did have different access policies for DOGE Team members and those DOGE Team members' access to information systems was unlawful, there are no longer any DOGE Teams members at DOL,[17] and no prospective relief is available. Although the Court stated that it would "be able to declare the DOGE Affiliates' access illegal," PI Op. at 26, such relief would be premised on Plaintiffs' APA claims and can only be prospective, *see, e.g., Mohamed v. Select Portfolio Servicing, Inc.*, 215 F. Supp. 3d 85, 97 (D.D.C. 2016) (the Declaratory Judgment Act "does not…provide a stand-alone cause of action; it only authorizes a form of relief.").[18] If the Court were to enjoin access to DOL's records, or declare such access

---

[17] "The substantive arguments of this brief rely on the factual information provided as of the close of discovery. However, as it concerns possible relief, between the filing of Plaintiffs' motion and today Defendants' counsel have been advised that none of the three DOGE Team members identified in Defendants' Response to Expedited Discovery, ECF No. 80-5 at 17-20, remain at DOL. Aram Moghaddassi and Miles Collins have been offboarded from DOL. Marko Elez is detailed to another agency and no longer retains access to DOL information systems.

[18] The Court also stated that "[i]f plaintiffs present evidence that DOGE Affiliates will publicly disclose or misuse their members' records, then the Court will be able to prevent them from doing so, as well as from accessing additional records and retaining any records already

unlawful, under the current circumstances, it would be issuing entirely advisory, and impermissible, relief. *See, e.g., Public Serv. Elec. & Gas Co. v, FERC*, 783 F.3d 1270, 1274 (D.C. Cir. 2015) (courts "will not give advisory opinions," so "there must be a live controversy at the time [they] review the case.").

Additionally, Plaintiffs have no legal basis to request remedial relief as to any Defendant in the form of the destruction of records. As the Court noted, the retrospective relief available under the Privacy Act is "an individual right of action for damages." PI Op. at 27. Nor do Plaintiffs have any basis to ask the Court to superintend compliance with any injunction that may issue or provide what amounts to additional discovery *ab initio*. These requests are premature. Parties, including the Federal Government, are presumed to comply with lawful court orders and the burden to establish contempt lies on the party asserting it. *See, e.g., Potter v. District of Columbia*, 126 F.4th 720, 723 (D.C. Cir. 2025) (to establish civil contempt "the moving party [must meet] his burden of showing by clear and convincing evidence that the alleged contemnor has violated a clear and unambiguous order of the court.") (citation omitted).

## IX.    Conclusion

For the reasons explained above, the Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment.

Dated: September 26, 2025

Respectfully submitted,
BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director

---

accessed." PI Op. at 26. However, as explained above, Plaintiffs have neither alleged nor factually supported any threat of public disclosure or misuse of records at summary judgment. *See supra* at 15-16.

Civil Division, Federal Programs Branch

*/s/Keri L. Berman*
Benjamin S. Kurland (D.C. Bar No. 1617521)
Keri L. Berman
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 305-7538
Fax: (202) 616-8460
E-mail: Keri.l.berman@usdoj.gov

*Counsel for Defendants*