# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AFL-CIO, et al.,

       *Plaintiffs*,

vs.

    Case No. 1:25-cv-339-JDB

U.S. DEPARTMENT OF LABOR, et al.,

       *Defendants*.

---

### PLAINTIFFS' RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.    Plaintiffs have standing ............................................................................................. 3

    A.    Plaintiffs have associational standing ...................................................... 3

    B.    Plaintiffs have organizational standing .................................................... 6

II.   The DOGE Access Policies are subject to APA review ........................................ 10

    A.    The DOGE Access Policies are final agency action ............................... 10

    B.    The APA allows for review of the DOGE Access Policies' compliance
       with the Privacy Act .................................................................................. 14

III.  The DOGE Access Policies violate the APA ......................................................... 17

    A.    The DOGE Access Policies are contrary to the Privacy Act and
       Defendants' implementing regulations .................................................... 17

       1.    DOGE Team Members are not officers and employees of the Defendant
          Agencies................................................................................................ 17

       2.    Defendant Agencies granted DOGE access without a need to know .............. 20

    B.    The DOGE Access Policies are arbitrary and capricious....................... 25

IV.   *Ultra vires* review is appropriate ......................................................................... 26

V.    The Court may grant Plaintiffs the relief they seek ............................................ 27

    A.    Prospective relief is available at DOL .................................................... 27

    B.    The other relief Plaintiffs seek is also proper ........................................ 29

CONCLUSION.................................................................................................................. 32

# TABLE OF AUTHORITIES

**CASES**

*100Reporters LLC v. DOJ,* 307 F.R.D. 269 (D.D.C. 2014) ....................................................... 7

*Abdelfattah v. DHS*, 787 F.3d 524 (D.C. Cir. 2015) ........................................................ 31

*AFL-CIO v. DOL*, 778 F. Supp. 3d 56 (D.D.C. 2025) ............................. 1, 3, 6, 10, 12, 13, 18, 30

*AFSCME v. SSA*, No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025) ......................... 17, 33

*AFT v. Bessent*, 152 F.4th 162 (4th Cir. 2025) ....................................................... 2, 13, 16, 17, 25

*Allen v. Milligan*, 599 U.S. 1 (2023) ........................................................................... 3

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................... 12

*Bigelow v. DOD*, 217 F.3d 875 (D.C. Cir. 2000) ......................................................... 20

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................................... 15

*Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667 (1986) ................................... 14

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .............................................................. 30

*Church of Scientology of Cal. v. United States*, 506 U.S. 9 (1992) ............................... 30

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003) ............................................. 4

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ............................................... 14

*Doe v. Chao*, 540 U.S. 614 (2004) ........................................................................... 16

*Doe v. Stephens,* 851 F.2d 1457 (D.C. Cir. 1988) ....................................................... 16

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211 (9th Cir. 1997) ................................................................................................... 8

*FAA v. Cooper*, 566 U.S. 284 (2012) ........................................................................ 20

*FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293 (2003) ..................................... 14

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ............................................... 9

*Fed. Educ. Ass'n v. Trump*, No. 25-cv-01362, 2025 WL 2355747 (D.D.C. Aug. 14, 2025) ................................................................................................................ 31

*Fed. Express Corp. v. Dep't of Commerce*, 39 F.4th 756 (D.C. Cir. 2022) .................................. 27

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................. 28

*Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020) ........................................ 5

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................ 9

*Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249 (D.C. Cir. 2005) ......................... 8

*Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125 (D.C. Cir. 2005) ............................ 18

*McBride v. Merrell Dow & Pharmaceuticals, Inc.*, 800 F.2d 1208 (D.C. Cir. 1986) .................... 7

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...................................... 30

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983) ..................................... 26

*Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472 (1979) ............................. 15

*Public Citizen, Inc. v. Fed. Energy Reg. Comm'n*, 92 F.4th 1124 (D.C. Cir. 2024)..................... 28

*Radack v. DOJ*, 402 F. Supp. 2d 99 (D.D.C. 2005) ................................................ 16

*Ramos v. Garland,* 1143, 2023 WL 4547991 (D.D.C. July 15, 2023) ............................ 7

*Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702 (D.C. 2009) ...................... 4, 5

*Reporters LLC v. DOJ*, 307 F.R.D. 269 (D.D.C. 2014) ............................................ 7

*Sackett v. EPA*, 566 U.S. 120 (2012) ............................................................ 15

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................... 4

*SSA v. AFSCME,* No. 24A1063, 145 S. Ct. 1626 (June 6, 2025)................................... 17

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) .......................................... 15

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)................................................. 3, 5

*U.S. Army Corp. of Eng'rs v. Hawkes Co.,* 578 U.S. 590 (2016) ................................. 12

*Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359 (D.C. Cir. 2005)............................. 7

*Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008)................................. 12, 13

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................................................ 4

**STATUTES, RULES, AND REGULATIONS**

5 U.S.C.
    § 552a(b)(1) ............................................................................................ 17
    § 552a(g)(3) ............................................................................................ 14
    § 552a(v)(1) ............................................................................................ 15
    § 704 ...................................................................................................... 14
    § 706(2)(A) ............................................................................................ 14

Privacy Act of 1974, 88 Stat. 1896 (1974) ................................................ 20

Fed. R. Civ. P. 56(c)(1)(A) ........................................................................ 28

40 Fed. Reg. 28,948 (July 9, 1975) ...................................................... 15, 16

**OTHER AUTHORITIES**

Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025) ...................... 19

S. Rep. No. 93-1183, 93d Cong. (1974) ...................................................... 20

# INTRODUCTION

The facts of this case are well-known to this Court. As detailed at length in Plaintiffs' Memorandum in Support of Summary Judgment, ECF No. 93-2 ("Pls. MSJ Br."), when DOGE swept into the Defendants the Department of Labor and the Department of Health and Human Services earlier this year, the Agencies scrambled to quickly accede to their demands. The record shows that DOL and HHS threw open their Sensitive Systems for DOGE to access at will, exposing the sensitive records of millions of Americans in the process. This violated the guarantees of the Privacy Act and protections against such careless decisionmaking in the Administrative Procedure Act, and DOGE's access to Sensitive Systems was *ultra vires*.

Defendants' attempt to avoid these conclusions by trying to wriggle out of judicial review, and, barring that, offering flimsy excuses for creating a side door for DOGE to use to rummage through sensitive information. Neither approach should succeed.

Defendants' attempts to evade judicial review were largely rejected by this Court in its order on Defendants' motion to dismiss. *AFL-CIO v. DOL*, 778 F. Supp. 3d 56 (D.D.C. 2025) ("MTD Op."). They fare no better here. By breaching the private records of Plaintiffs and their members, Defendants have wrought numerous injuries that establish standing for Plaintiffs to sue on their own behalf and on that of their members. With respect to associational standing in particular, this Court already found at the PI stage that the Defendants had not offered any intervening changes in the law, previously unavailable facts, or evidence that this Court's decision was "clear error" that would give the Court "reason to consider its prior rejection of defendants' arguments." PI Op., ECF No. 87, at 7-8. The same holds true now, and the third time is not the charm. And because the injuries Plaintiffs suffered were the result of a new agency policy of granting DOGE unprecedented access to Sensitive Systems, they can be remedied by an APA action for violating the protections of the Privacy Act.

Defendants then argue that the Defendant Agencies' grants to DOGE of access to Sensitive Systems were just instances of normal, run-of-the-mill agency operations. But the record clearly shows that the rules and policies that the Defendants have in place for employees seeking to access Sensitive Systems did not apply to DOGE. So, Defendants argue that the White House created DOGE with a virtually boundless ambit that made it unnecessary for Defendants to subject DOGE to normal controls—like confirming why DOGE needed access to Sensitive Systems or what they would do with it. But Defendants cannot rely on executive orders to bypass the protections of the Privacy Act or the requirements of the APA; and that's doubly true where the Defendants appear to misread and misapply the executive orders themselves.

This Court can and should grant appropriate relief that vacates the DOGE Data Access Policies at both agencies and ensures that Plaintiffs are fully redressed for their injuries.

## **ARGUMENT**

This Court has already addressed most of the legal issues raised here, and has resolved them in favor of Plaintiffs. This Court has already concluded that Plaintiffs have standing and that the DOGE Data Access Policies are reviewable under the Administrative Procedure Act. Defendants now "ask the Court to rethink [its prior] holding[s]." PI Op. at 7. But as this Court has explained, courts typically only take that extraordinary step where there has been an intervening change in law or available facts or where a prior order was clear error. *Id.* "No such extraordinary circumstance exists here." *Id.* at 8. Defendants rely repeatedly on the intervening Fourth Circuit decision in *AFT v. Bessent*, 152 F.4th 162 (4th Cir. 2025), but as detailed below, that decision does not justify this Court revisiting its prior legal conclusions. Further, *AFT's* holding is effectively subject to *en banc* review in another case challenge DOGE's access to confidential data held by

agencies. *See AFSCME v. SSA*, No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025).[1] And it is, of course, not binding on this Court, leaving only its persuasive value.

The record amply shows that the DOGE Data Access Policies violated the APA. Plaintiffs have also established their entitlement to summary judgment on their *ultra vires* claims and the appropriateness of their requested remedies.

## I.    Plaintiffs have standing

### A.    Plaintiffs have associational standing

Plaintiffs have robustly established the injury-in-fact suffered by their individual members, and this Court has repeatedly determined that injury to be sufficient to confer associational standing.[2] *See* MTD Op., 778 F. Supp. 3d at 70-73; PI Op. at 8-13. Defendants have no factual dispute with Plaintiffs' evidence of standing, leaving them to once again ask this Court to change its mind and revisit its prior legal conclusions about injury-in-fact. But they have provided no good reason, much less "extraordinary circumstances" for the Court to do so. PI Op. at 7.

Defendants' unprecedented violations of the Privacy Act have caused harm closely analogous to that caused by intrusion upon seclusion and breach of confidence, two distinct torts "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC*

---

[1] Once again, the Supreme Court's entry of a stay in *AFSCME* should not impact the Court's analysis. As the Court previously noted, the Supreme Court "did not say <u>why</u> it granted the stay," as such, its order "cannot meaningfully inform—let alone dictate—this Court's reasoning and ruling." PI Op. at 5 n.3. And now, the question of irreparable injury, which was previously before this Court as well as the Supreme Court in *AFSCME*, is no longer at issue, meaning that even the ultimate disposition of the *AFSCME* stay has no clear bearing on this matter in this posture.

Further, the Supreme Court's entry of a stay is not indicative of its disposition of a case on the merits. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 10 (2023) (affirming an injunction on the merits after previously staying it).

[2] Defendants contest only injury-in-fact, and do not dispute that Plaintiffs have satisfied all other requirements for associational standing.

*v. Ramirez*, 594 U.S. 413, 427 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016)). Each of these analogues provides independently establishes injury-in-fact for purposes of associational standing, and Defendants have no answer to either.

Defendants first argue that no unlawful disclosure has occurred, and that absent such disclosure, Plaintiffs cannot have suffered an injury analogous to either tort. This is simply a preview of Defendants' legal arguments on the merits, and, as such, cannot be a basis to rule against Plaintiffs on standing. *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims") (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). In any event, it fails for the same reasons. Defendants have disclosed Plaintiffs' members' personal and sensitive information to people with no need for that information, *see infra.*, § III.A.2, and those people are not employees of the agencies to whom Plaintiffs' members provided their information. *See infra*, § III.A.1. Defendants' disclosures were unlawful on each of these bases, and either is adequate to establish a tortious analogue.

Defendants also jump to the merits with their argument that Defendants' disclosures did not result in any offensive impact to Plaintiffs' members, and therefore cannot be analogous to intrusion upon seclusion. But the record makes clear that Defendants' disclosures have done just that, and Defendants have not called that evidence into question. *See* Pls.' MSJ Br. at 9-11. First, "the data involved here were disclosed to and viewed by someone unauthorized to do so," *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 711-12 (D.C. 2009), specifically the DOGE Team members, and Defendants' contrary suggestion again conflates standing with the merits. Further, Plaintiffs' members provided private and sensitive information to Defendants for

specific purposes—for instance, as part of serving as an employee of a Defendant, to participate in Medicare, or to collect unemployment insurance. *Id.* at 9-10. And they did so because it was necessary to obtain benefits, and did so on the expectation that their information would be closely held. *Id.* at 10-11. Contrary to Defendants' representations, Plaintiffs' members did not provide this information voluntarily with the expectation that it would be used however Defendants saw fit.

This Court has already concluded that a disclosure of the type Plaintiffs demonstrated is, as a matter of law, sufficient to constitute injury-in-fact, and Defendants do not offer a compelling reason to revisit that legal conclusion. An unauthorized person viewing "medical, financial, and other records," PI Op. at 10, is offensive for precisely the same reason as classic examples of intrusion upon seclusion: someone "oversee[ing] or overhear[ing] [a] plaintiff's private affairs" or "opening [a plaintiff's] private and personal mail [or] searching his safe or his wallet." *Id.* at 9-10 (internal quotation marks and citations omitted). And, in any event, as this Court has already explained, "[e]ven assuming defendants are right . . . there are two issues with this argument." *Id.*

First, the harm Plaintiffs have suffered need not be "an exact duplicate" of the harm required to prevail on an intrusion upon seclusion claim, so long as it "bears a sufficiently close relationship to that harm." *TransUnion*, 594 U.S. at 433. If receiving five unwanted text messages is sufficient for an analogue to intrusion upon seclusion, *see Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020) (Barrett, J.), unauthorized access to sensitive information surely must be. *See* PI Op. at 11. And second, by enacting the Privacy Act "to prevent agencies from invading individuals' privacy, . . . 'Congress identified a modern relative of a harm with long common law roots.'" *Id.* at 11-12. (quoting *Gadelhak*, 950 F.3d at 462). "Defendants' continued disagreement with that holding [should not be] enough to make the Court revisit and abandon it." *Id.* at 12.

By the same measure, Plaintiffs' harm is also sufficiently analogous to, even if not completely identical, to the harm associated with breach of confidence. Defendants have no response to this as a matter of law, and instead turn to the merits arguing that Plaintiffs freely provided their information to Defendant agencies and there was no third-party disclosure because the DOGE Team members are agency employees. They provide no basis to disturb the Court's earlier well-considered conclusion that intragovernmental disclosure can work a harm sufficiently analogous to breach of confidence to constitute injury-in-fact. *See* PI Op. at 7 n.4. This Court should continue to "remain[] steadfast in its alternative holding that the harm plaintiffs' members are suffering is concrete because it is analogous to the harm that supports a breach of confidence claim." *Id*.

Finally, Defendants rely on the *AFT* decision's contrary conclusions regarding injury-in-fact. Defendants identify no reason for this Court to treat *AFT*'s reasoning as persuasive, and the mere invocation of the opinion should not cause the Court to revisit its prior conclusion that unlawful intragovernmental disclosure of private information is a cognizable injury because Congress has "created a new sphere in which individuals not only <u>expect</u> privacy, but have a right to it—i.e., a sphere of seclusion." MTD Op., 778 F.Supp.3d at 72. As Defendants acknowledge, this Court has already "acknowledged and disagreed with" the reasoning of the *AFT* court. Defs.' XMSJ Br., ECF No. 95-1, at 13. And, of course, *AFT* has nothing to say about the breach of confidence analogue.

    B.    Plaintiffs have organizational standing

Associational standing is easily resolved in Plaintiffs' favor and the standing inquiry may end there. But they also have established organizational standing to challenge the DOL DOGE Data Access Policy. As detailed in Plaintiffs' motion for summary judgment, the Plaintiff organizations have standing to challenge DOL's grant to DOGE of "unfettered, on-demand access

to Sensitive Systems," Pls. MSJ Br. at 16, for two independent reasons: such access (1) breaches the confidentiality of sensitive records that DOL stores on the unions themselves, and (2) hampers the integrity and effectiveness of DOL's law enforcement functions, harming core activities of the Plaintiff unions.

Defendants do not contest that these injuries are legally sufficient for organizational standing.[3] Instead they only raise factual arguments that the record does not sufficiently demonstrate public disclosure of Plaintiffs' information. Defs. XMSJ Br. at 15-16. But Defendants' exclusive focus on public disclosure fundamentally misapprehends this case. This Court already made clear that while it could not grant *emergency relief* without an imminent threat of public disclosure, that standard did not limit its ability to "declare the DOGE Affiliates' access illegal" at the merits stage. *See* PI Op. at 26.

As Plaintiffs argued in the opening brief, Pls. MSJ Br. at 24-30, and reiterate below, disclosures of sensitive records to DOGE are properly treated as disclosures of records *external* to the agency. The record amply demonstrates that DOL stores voluminous confidential records about the Plaintiff unions, *see* Pls. SUMF, ECF No. 93-1, ¶¶ 64, 72. The unions have a "concrete and particularized interest in retaining the confidentiality of protected information." *Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 367 (D.C. Cir. 2005); *see also 100Reporters LLC v. DOJ*, 307 F.R.D. 269, 283 (D.D.C. 2014) (the potential release of confidential information is a "particularized and sufficiently imminent" injury). Unlawful disclosures of those records to DOGE breaches the relationship of confidence between the unions and DOL and injures them. *See supra*

---

[3] Any argument to this effect has been waived on reply. *E.g. McBride v. Merrell Dow & Pharmaceuticals, Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("We will generally not entertain arguments omitted from an . . . opening brief and raised initially in his reply brief."); *see also Ramos v. Garland*, No. 22-cv-1143, 2023 WL 4547991, at *6 (D.D.C. July 15, 2023) ("[A]rguments made for the first time in a reply brief need not be considered.").

§ II.A (breach of confidence causes Article III injuries); *cf*, *e.g.*, *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1227 (9th Cir. 1997) (articulating the elements of a breach of confidence claim between two organizations under California tort law, and requiring that the plaintiff entity show that there was "a disclosure or use in violation of" the "understanding between the defendant and the plaintiff that the confidence be maintained"); *cf. also Jerome Stevens Pharms., Inc. v. Food and Drug Admin.*, 402 F.3d 1249, 1256 (D.C. Cir. 2005) (applying breach of confidence tort to FDA's handling of an organization's confidential records).

Further, the record shows that DOL undertakes law enforcement activities whose effectiveness are core to the missions of the unions; that those law enforcement activities rely on confidential investigations, including confidential witness statements and reporting by individuals; and that those witnesses fear their confidential information being shared with DOGE. *See*, *e.g.*, Decl. of AFGE Member No. 1, ECF No. 29-12, ¶¶ 7-8 ("I understood and expected that the identifying information on my OSHA complaint was confidential. I am concerned about unauthorized individuals, including those associated with DOGE, accessing my OSHA complaint and my identifying information."); Decl. of M. Ginsburg, ECF No. 29-3, ¶¶ 8, 9 (Explaining critical role of confidentiality in enforcement efforts, and noting that "[e]ven brief access by DOGE to the Department of Labor's records will show the workers we serve that they cannot trust the Department of Labor to keep sensitive information they submit confidential, deterring them from seeking relief or assistance from the Department. If DOGE is allowed to access [DOL's] record concerning complaints and investigations, the willingness of workers to raise complaints to the Department of Labor will be chilled."); Decl. of R. Sanghvi, ECF No. 29-8, ¶¶ 13-19 (explaining AFGE's work supporting FECA claims, critical role of confidentiality, and that "[p]ermitting DOGE to access FECA records will reveal highly personal, private medical and benefits

information of AFGE members" and "erode AFGE members' trust in DOL's ability to keep claims confidential," directly harming AFGE's mission); Decl. of S. Ury, ECF No. 29-14, ¶¶ 15 ("[U]nauthorized access to DOL systems . . . presents a real, imminent, and potentially irreparable threat to SEIU's work and harm to our members").

Concerns about the confidentiality and reliability of these law enforcement efforts are further heightened in the context of DOGE being led at time DOGE received Sensitive System access by an individual whose concurrent business interests have been subject to investigation by DOL. *See* Defs. Answer to Am. Compl., ECF No. 84, ¶ 74 (Defendants' answer admits that "several companies owned, operated, or controlled by Mr. Musk have been subject to investigation and/or fines by components of DOL); Ginsburg Decl. ¶ 8 ("DOGE is identified with Elon Musk, who is the owner of major U.S. employes subject to regulation by the Department of Labor. Even brief access by DOGE to the Department of Labor's records will show the workers we serve that they cannot trust [DOL] to keep the sensitive information they submit confidential."). The breach of confidentiality in these critical law enforcement efforts significantly impairs plaintiffs' core organizational activities. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (organizational standing is proper where a defendant "perceptibly impaired" a plaintiff's organizational activities); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."). While this Court has not yet had the opportunity to rule on Plaintiffs' organizational standing to challenge the erosion of confidentiality in DOL's law enforcement efforts, it did previously grant that analogous threats to the confidentiality of the Consumer Financial Protection Bureau's consumer complaint systems

would confer standing on entities who relied on those systems (and their confidentiality) to carry out their core missions. *See* MTD Op., 778 F. Supp. 3d at 75-76. The same conclusion should carry the day here.

## II.      **The DOGE Access Policies are subject to APA review**

### A.      The DOGE Access Policies are final agency action

Defendants have adopted (and uniformly followed) policies of granting DOGE affiliates unfettered access to any systems of record they wish to access, an agency action that is final for the purpose of APA review. The Court already resolved this question as a matter of law. MTD Op., 778 F.Supp.3d at 77-78. Plaintiffs' opening brief explained why the record at summary judgment established this as a matter of fact. *See* Pls. MSJ Br. at 15-16.

Defendants' only arguments on final agency action that do not merely seek to have the Court revisit its prior legal conclusions are two paragraphs on pages 18 and 19 of their brief attempting to evade Plaintiffs' undisputed facts establishing that the Defendant Agencies adopted categorical changes with respect to DOGE Team access to Sensitive Systems. Defendants' citation to these handful of facts is unpersuasive. DOGE Team members' requests for access to Sensitive Systems are granted "more quickly . . . [and] with less individualized justification" than requests by others. Defs. XMSJ Br. at 24. That is *Defendants'* characterization of the situation—and Defendants justify that fast-track handling of access for DOGE by explaining that Executive Orders "assign DOGE Team members broad responsibilities. . . which on their face necessitate significant access." *Id*. Despite acknowledging that DOGE Team members follow a different process for accessing systems than personnel who are not DOGE Team members, Defendants baldly assert that no special access policies exist with regard to DOGE Team members.

The record reveals, and Defendants have acknowledged, a very different reality. At HHS, no DOGE Team request for access has been denied, and no individualized review has ever been

undertaken. Pls. SUMF ¶¶ 49-55. Nor would any request for access likely be denied in the future. *Id.* In other words, when DOGE Team members—and only DOGE Team members—make a request for access, HHS grants it, no questions asked.[4] Despite the absence of any apparent limitations on DOGE access, Defendants deny that the DOGE Team enjoys unfettered access, instead suggesting that because different individual members of the DOGE Team have access to different systems and different numbers of systems, no blanket policy exists. This ignores the fundamental nature of an access policy—Plaintiffs have never alleged that DOGE Team members automatically received access to all Sensitive Systems at HHS at once, only that they are automatically *granted* access to any system they request to access.[5] Individual team members making different access requests—all of which have been and will continue to be granted—do not bear on the existence of a specific access policy. Nor does Defendants' fleeting reference to DOL's denial of DOGE Team access to the Adobe Licensing Portal system call into question the existence of a blanket policy of granting systems access; that access was denied because "it did not have a read-only view of the data." DOL (Kryger) Dep., ECF No. 80-9, at 87:25-88:1. The implication is that if such a view had been available, the DOGE Team would have received access to it. But Plaintiffs do not allege that DOL has a blanket policy of granting DOGE Write/Edit access within

---

[4] Contrary to Defendants' representations that this does not reflect a change to HHS policies, *see* Defs.' SUMF ¶¶ 7-8, this in fact is unprecedented—HHS has never before provided such broad access to individual employees, Pls. SUMF ¶ 53. Defendants' efforts to recast this as simply being a reflection of the nature of the DOGE Team's positions, *see* Defs.' SUMF ¶ 53, only makes clear that this is a policy created and implemented solely with regard to the DOGE Teams.

[5] In some instances, DOGE Team members get access without completing trainings that agency employees would be expected to complete. For instance, employees accessing HIGLAS/IDR "normally" complete heightened security training before gaining access. Pls. SUMF ¶ 55. At least one DOGE Team member did not. *Id*. Despite Defendants' representations that the training is "entirely optional," Defs.' SUMF ¶ 53, Defendants never deny that heightened security training is typically part of the process to obtain access to HIGLAS/IDR.

systems, nor do their claims depend upon the DOGE Data Access Policies guaranteeing such access.

Defendants have also provided no reason for the Court to revisit its legal conclusion that the DOGE Data Access Policies constitute final agency action. Even the most cursory consideration of the Access Policies makes clear that they constitute final agency action under the familiar test laid out in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). An agency's adoption of a policy granting unfettered access to sensitive systems of records to a particular group of individuals unquestionably "mark[s] the consummation of the agency's decisionmaking process," determines "rights or obligations," and gives rise to "legal consequences." *U.S. Army Corp. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). Defendants never refute this conclusion, instead arguing (1) that no such policies exist; and (2) that *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) does not compel a conclusion that such policies would constitute final agency action.

Because the DOGE access policies indisputably satisfy the Supreme Court's *Bennett* test, they would be final agency action even if Defendants could distinguish them from the policy at issue in *Venetian Casino*. But Defendants cannot. Defendants' efforts to distinguish *Venetian Casino* are unavailing, and because the policies constitute final agency action under *Bennett*, irrelevant. Like the information disclosure policy considered by the D.C. Circuit in *Venetian Casino*, the DOGE access polices are unwritten policies under which Defendants are "disclosing certain confidential information without notice." *Id.* at 927. *Venetian Casino* leaves no doubt that Defendant's policy is final agency action subject to APA review—it "is on all fours here." MTD Op., 778 F. Supp. 3d at 78. Defendants' reliance on *AFT* to attempt to distinguish this case from *Venetian Casino* is misplaced. In addition to the limitations on *AFT*'s persuasive value, *see supra*,

§ I., the decision in *AFT* is inapplicable to the question of whether the DOGE Access Policies constitute final agency action. Defendants parrot the Fourth Circuit's conclusion that "granting IT access to a handful of employees" does not constitute a policy. But that conclusion has no bearing here: Defendants granted access to DOGE affiliates *pursuant* to a policy—the grants *demonstrate* the policy's existence, but Plaintiffs have never argued that on their own they *constitute* the policy. *See, e.g.*, Pls. MSJ Br. at 15 ("Under these 'DOGE Data Access Policies" [Defendants] systematically grant DOGE Team members access to Sensitive Systems.").

Defendants fare no better in their reliance on the Fourth Circuit's whole-cloth creation of "crucial features" of final agency action. Defs.' XMSJ Br. at 18. In *Venetian Casino*, the D.C. Circuit expressly recognized that the importance of a policy's memorialization in a compliance manual, like the importance of the grants of access here, is simply that the manual "illuminates the nature of the policy," *Venetian Casino*, 530 F.3d at 931. Similarly, agency counsel conceding the existence of a policy in *Venetian Casino*, while dispositive of the policy's *existence*, did not inform the D.C. Circuit's analysis of whether that policy constituted final agency action. *Id.* at 930. And neither the Fourth Circuit nor Defendants provide any reason to conclude that the longevity of a policy or its "agency-wide" applicability are probative of whether it constitutes final agency action—nor did the D.C. Circuit rely on either characteristic to conclude that the policy at issue there constituted final agency action.

Even if the Court relied on *AFT*'s analysis (it should not), at most, *AFT* would stand only for what it says: on a different record available to a different district court on a motion for preliminary injunction in a different case, it was "*unlikely* that the district court could . . . *definitively* find final agency action." *AFT*, 152 F.4th at 175 (emphasis added). But that is not this case—Plaintiffs have alleged, and the record has made clear, that Defendants adopted wholesale

13

policies of granting DOGE affiliates—and only DOGE affiliates—any and all systems access they requested. Such policies are inescapably final agency action, and at this stage of litigation, this Court should not defer to a different jurisdiction's conclusion that a different, undeveloped, record would not sustain a definite finding of final agency action.

B.    The APA allows for review of the DOGE Access Policies' compliance with the Privacy Act

As this Court recognized on the motion to dismiss, it has jurisdiction to review ongoing agency disclosures of sensitive data under the APA for violations of the Privacy Act. MTD Op., 778 F. Supp. 3d at 79-83. Defendants' arguments that the Court should reverse itself are unpersuasive.

Courts "begin with the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986); *see DHS v. Regents of the Univ. of California*, 591 U.S. 1, 16–17 (2020). Thus, courts may review agency action under the APA unless other laws provide an "adequate remedy in court." 5 U.S.C. § 704. The APA "requires federal courts to set aside federal agency action that is 'not in accordance with law'—which means, of course, *any* law." *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003) (quoting 5 U.S.C. § 706(2)(A)) (emphasis in original). This includes the Privacy Act.

While the Privacy Act provides some remedies by its own terms—injunctive relief to force the release or modification of particular records, and monetary damages for unlawful disclosures, 5 U.S.C. § 552a(g)(3)–(4)—these are not an adequate substitute for (nor do they displace) judicial review under the APA in other circumstances. For instance, where, as here, unlawful disclosures are ongoing, and where the government will not act to stop them, only injunctive relief can remedy the situation—monetary damages cannot stop the unlawful conduct. That is especially true when

the government's position—that it is acting lawfully—frustrates Plaintiffs' ability to access the Privacy Act's enumerated remedies. *Cf. Sackett v. EPA*, 566 U.S. 120, 127 (2012) (APA review available when plaintiff "cannot initiate" a statutory remedy and must await further injury). The government will not proactively provide notice to Plaintiffs or others that their information has been breached, frustrating their ability even to *initiate* claims under the Privacy Act's statutory remedies.

Contemporaneous implementing guidance and subsequent caselaw confirm the availability of APA review. When the Privacy Act was first passed in 1974, the Act directed the Office of Management and Budget to "develop and . . . prescribe guidelines and regulations for the use of agencies in implementing the provisions of" the Act. 5 U.S.C. § 552a(v)(1). OMB published these guidelines in 1975, and in describing the remedies section of the Privacy Act confirmed OMB's contemporaneous understanding that "an individual may have grounds for action under other provisions of the law in addition to those provided" by the Privacy Act. 40 Fed. Reg. 28,948, 28,968 (July 9, 1975) ("OMB Guidelines"). Among the remedies OMB explained would continue to be available was "seek[ing] judicial review under other provisions of the Administrative Procedure Act." *Id.* [6]

---

[6] The touchstone of the "adequate remedy" inquiry has always been an attempt to understand whether Congress *intended* to preclude APA review by creating another remedial scheme. *See*, *e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879, 908 (1988) ("It would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions . . . to be reviewed in a specialized forum such as the Court of Claims."); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (evaluating whether "Congress has allocated initial review to an administrative body" and whether "a statute is intended to preclude initial judicial review"). The OMB Guidelines strongly suggest that Congress did not intend the Privacy Act to comprehensively preclude other forms of judicial review. The Supreme Court has explained that "[a] regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent." *Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 477 (1979). While the OMB Guidelines are not a

Since then, the Supreme Court has expressly contemplated the likelihood that the APA's provisions for equitable relief may explain the omission of standards for it in the Privacy Act. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) (Privacy Act's silence on equitable relief in some circumstances may "be explained by the general provisions for equitable relief within the" APA). Similarly, the D.C. Circuit has expressly concluded that the APA allows for equitable relief to halt Privacy Act violations even though the Privacy Act does not itself provide for that remedy. In *Doe v. Stephens*, the D.C. Circuit considered whether a plaintiff could enjoin the Veterans Administration's dissemination of his personal files in violation of the Veterans' Records Statute and Privacy Act. 851 F.2d 1457, 1463, 1466 (D.C. Cir. 1988). The court found that while the Privacy Act did not by its terms "authorize the injunctive relief sought by" the plaintiff, *id.* at 1463, the APA *did* authorize equitable relief preventing the dissemination of his files (although the court styled the remedy as "declaratory relief against future [unauthorized] VA disclosure" rather than an injunction). *Id.* at 1466-67. *See also Radack v. DOJ*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005) (the Privacy Act does not provide an adequate remedy for plaintiffs who seek declaratory and injunctive relief; the APA is the source for equitable relief to such plaintiffs).

The availability of equitable relief under the APA to address agency action that violates the Privacy Act is well-supported by contemporaneous guidance and precedent from the Supreme Court and D.C. Circuit, notwithstanding the *AFT* decision relied on heavily by Defendants, *see* Defs. XMSJ Br. at 22-23 (citing *AFT*, 152 F.4th at 175-76). Even the *AFT* court did not squarely address this issue. It simply stated that it was "not obvious" that the APA allowed for challenges to Privacy Act violations, finding this *uncertainty* fatal to the issuance of a preliminary injunction.

---

regulation, the principle should apply with equal force here to help illustrate contemporaneous understandings of Congressional intent.

*AFT*, 152 F.4th at 175-76. And while the preliminary injunction in *AFSCME* was stayed by the Supreme Court, the Court's order contained no reasoning as to which issues it believed the government should prevail on. *SSA v. AFSCME*, No. 24A1063, 145 S. Ct. 1626 (June 6, 2025) (order staying District Court decision). The District Court's well-reasoned decision in that case on the availability of APA review of some Privacy Act violations, MTD Op., 778 F. Supp. 3d at 757-58, which the en banc Fourth Circuit declined to stay, *AFSCME v. SSA,* No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025), remains persuasive.

This Court correctly decided this issue at the motion to dismiss stage, and should not disturb its conclusion.

## III.    **The DOGE Access Policies violate the APA**

### A.    The DOGE Access Policies are contrary to the Privacy Act and Defendants' implementing regulations

The DOGE Data Access Policies are contrary to the Privacy Act and the Defendants' implementing regulations for the Privacy Act. Defendants argue that DOGE may avail itself of the Privacy Act's disclosure exception for "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." *See* Defs. XMSJ Br. at 26, quoting 5 U.S.C. § 552a(b)(1). But their argument fails for two independent reasons: (1) because DOGE Team Members are not "officers and employees" of the Defendants, and (2) because DOGE Team Members do not have a "need for" Plaintiffs' sensitive records.

#### 1.    *DOGE Team Members are not officers and employees of the Defendant Agencies*

The record shows that DOGE Team Members serve at their host Defendant agencies (and other agencies—sometimes up to eight of them) in order to effect a centralized agenda in government-wide coordination with USDS. Pls. MSJ Br. at 26-30. In spite of this, Defendants suggest that this Court ignore those facts and ask only whether they have been formally hired by

Defendant agencies and undertake no further analysis as to whether they are truly employees of those agencies for purposes of intra-agency systems access.

This Court has previously relied on the "functional approach" for determining whether any given staffer is appropriately considered an employee of the Defendant Agencies or not. MTD Op., 778 F.Supp.3d at 83. While it previously did so in the detailee context, there is no principled basis to restrict it to that context, nor do Defendants supply one. On the contrary, the cases informing the D.C. Circuit's application of the standard to detailees relied on the multi-factor analysis applicable to assessing other kinds of employment relationships. *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 131-132 (D.C. Cir. 2005) (citing cases analyzing the employee-independent contractor distinction). Accordingly, the D.C. Circuit rejected formalistic limitations on the analysis of employment status, *id*. at 131 (holding that district court erred in "rely[ing] solely upon the agency having paid their salaries"), and the Court should reject Defendants' application of a single factor test here. Such a formalistic approach would allow creative papering of employment to reduce the Privacy Act to a nullity—an administration could consolidate any Privacy Act protected information it wished through a network of formal direct hires throughout the government actually reporting to a single centralized component. Evaluating all the circumstances of an individual's employment eliminates that risk.

And that test makes clear that agency DOGE Teams do not work for their host agencies. As Plaintiffs have already argued, the text of the DOGE Executive Order requires all DOGE Teams across the government to align their work with USDS while merely advising the agencies at which they are embedded. ECF No. 80-3, Exec. Order No. 14,158 § 3(c), 90 Fed. Reg. 8,441, 8,441 (Jan. 20, 2025) ("Jan. 20 EO"). Contrary to Defendants' contention, Plaintiffs' position is supported by record evidence, namely testimony from USDS that it is, as required by the Executive Order

creating DOGE Teams, in fact coordinating with DOGE Teams across the government. USDS Dep., ECF No. 80-4, at 124:20-22.

That centralized coordination by USDS belies the government's claim that DOGE Teams' work carrying out the DOGE agenda is work "for" their respective agencies. Defs.' Mot. at 30. By Executive Order, the USDS Temporary Organization, a component within USDS, is "dedicated to advancing the President's 18-month DOGE agenda." Jan. 20 EO § 3(b). And the DOGE Teams, as Defendants do not dispute, are only present at their host agencies to accomplish that same DOGE agenda, see Defs. XMSJ Br. at 29-30. It stands to reason that DOGE Teams' work would be directed by the centralized government component with whom they are all required to coordinate—thus ensuring consistency in implementation of the DOGE agenda across government—particularly when that government component is charged with advancing the same agenda the DOGE Teams are directed to carry out.

And DOGE holds an outsized role in employment interactions where an outside government component would ordinarily have none. Defendants rely heavily on the fact that DOGE Team members report to agency supervisors while working on "agency projects," Defs. MSJ Br. at 28, but disregard that, by Executive Order, the DOGE Teams' work—whether or not it is characterized as an "agency project"—is part of the DOGE agenda which USDS is responsible for advancing. Nor does Defendants' effort to downplay DOGE's role in the selection of DOGE Team personnel, *id.* at 29, change that they play an outsized role of "advising" on third party selection of the personnel who will carry out their agenda or the fact that there are no instances in the record of a Defendant agency rejecting a DOGE hiring suggestion.

Defendants also have no meaningful response to Plaintiffs' argument that the nature of some individuals' employment arrangements makes clear that they cannot be employees of their

host agencies. One DOL DOGE Team member indisputably held simultaneous employment relationships at eight agencies. Pls. SUMF ¶ 26. By Defendants' telling, that individual would have been a true employee of each of those eight agencies at once, and would have enjoyed intra-agency status at *each*. That would be an absurd result, and would wholly frustrate the Privacy Act; on the other hand, evaluating all the circumstances to consider that individual's work advancing the DOGE agenda at multiple agencies, in coordination with the centralized government component charged with advancing that agenda would lead to the conclusion that he is, in fact, a DOGE employee.

### 2.    *Defendant Agencies granted DOGE access without a need to know*

Congress created the Privacy Act to "regulate the collection, maintenance, use, and dissemination of information by" federal agencies. Privacy Act of 1974, § 2(a)(5), 88 Stat. 1896, 1896 (1974). It sought to curb "overbroad[] investigation and record surveillance" by "over-zealous investigators" and protect Americans' data from "curiosity of . . . government administrators." S. Rep. No. 93-1183, 93d Cong. (1974). To that end, the Act provides a "comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies." *FAA v. Cooper*, 566 U.S. 284, 287 (2012). Under the Act, officials with access to Sensitive Systems must only examine such records "in connection with the performance of duties assigned to" them and must have "had to do so in order to perform those duties properly." *Bigelow v. DOD*, 217 F.3d 875, 877 (D.C. Cir. 2000). As Plaintiffs argued in their opening brief, these important protections should not be easily wiped away by broad and vague executive orders purporting to grant sweeping access to Sensitive Systems; the President may not effectively re-write the Privacy Act by Executive Order. *See* Pls. MSJ Br. at 31. Defendants have not provided any response to this argument, or attempted to reconcile the careful protections of the

Privacy Act with the boundless executive authority they here assert. This is sufficient to rule in Plaintiffs' favor.

But even if Defendants were correct that vague Executive Orders could provide the basis for virtually unfettered access to Sensitive Systems, the record still supports a ruling for Plaintiffs. It shows that DOGE did not establish a need, even against the backdrop of these Executive Orders, to access Sensitive Systems before Defendant Agencies granted them access. Defendants attempt to muddle these clear facts on the basis of post-hoc (and still unclear) inferences recounted by deponents, or logical leaps posited in briefing. But they cannot change the basic facts, undisputed in the record, that: (a) the Defendant Agencies guessed why DOGE Team members might need access and granted access accordingly; and (b) those guesses were based on unsupported readings of the relevant executive orders.

> a)    DOGE regularly did not proffer a need to access Sensitive Systems, and Defendants did not ask.

The record is undisputed that DOGE never told agency officials what its Team members' need to access Sensitive systems was, nor did the agency officials ask them, prior to granting Sensitive Systems access. The agencies' failures to ascertain or confirm such a need should, on its own, be sufficient to rule in Plaintiffs' favor, particularly given the context—individuals who were brand new to the government, reporting to an entity that had never existed before, purporting to hold positions within the agencies that had never existed before. The Defendant Agencies had exceedingly little information on which to base their evaluations of need.

With respect to DOL, Defendants concede that DOL granted DOGE access to Sensitive Systems based on "the scope of the responsibilities assigned to DOGE Team members," Defs. SOMF & Resp. to Pls. SUMF, ECF No. 95-2, ¶ 41 ("Defs. SOMF Resp."). Defendants also concede that DOL "did not ask" DOGE Team Members "why is the access needed," "what will

the access be used for," or "will there be any potential sharing of that data" for Sensitive Systems. *Id.* ¶¶ 43-44. These concessions clearly undercut Defendants' attempts to argue that they "conducted their typical evaluations of DOGE Team members' access requests taking into account the nature and scope of those employees roles." Defs. XMSJ Br. at 32. With respect to HHS, Defendants similarly concede that DOGE's access was granted based on HHS's understanding of "the DOGE Team members' roles and responsibilities," Defs. SOMF Resp. ¶ 52, rather than any instance of DOGE actually explaining their needs before Sensitive Systems access was granted. The record is clear that the Agencies' determination of "need" was not based on DOGE Teams telling the Agencies why they needed access to Sensitive Systems.

Instead, the record establishes that Defendants made their own judgments about why DOGE Team members might need access to Sensitive Systems and what they might do with the data accessible therein. At DOL, Defendants agree that the agency made a judgment that DOGE Teams' needs to access Sensitive Systems were "apparent" from the executive orders related to DOGE. Defs. SOMF Resp. ¶ 40. At HHS, Defendants agree that the agency relied only on its own inferences about the purpose of DOGE's requests for access, *id.* ¶ 52, rather than any explanation from DOGE about their needs to access Sensitive Systems.

        b)     The basis for the Agencies' inferences was one or more executive orders related to DOGE

It's also uncontested that executive orders relating to DOGE drove the Defendant Agencies' decisions to approve DOGE's access. At DOL, Defendants acknowledge that the agency considered it "'apparent from the executive orders' that [DOGE needs] access to agency information systems because its 'apparent that falls within th[e] roles and responsibilities as outlined in the executive orders.'" Defs. SOMF Resp. ¶ 40. At HHS, Defendants acknowledge that

the inferences the agency drew about DOGE's need to access were based on the fact that the agency "had read the executive order" so they knew what DOGE's roles were. *Id.* ¶ 52.

Given that these EO interpretations carried the weight of the Defendant Agencies's decisions, it cannot be that the specific provisions of the EOs are "of no import," as Defendants claim. Defs. XMSJ Br. at 35. The EOs must actually provide an appropriate basis for their conclusions, and they do not.

The record shows that the primary need that the Defendant Agencies articulated for DOGE Teams access to access Sensitive Systems was to eliminate waste, fraud, and abuse to meet the supposed direction of the Executive Orders. *See* Defs. SOMF Resp. ¶ 41; Pls. SOMF Reply ¶ 50. But, as described at length in Plaintiffs' opening brief, the EOs do not supply that direction. *See* Pls. MSJ Br. at 32-34. Absent any other basis in the record, and there is none, it is clear Defendants did not establish a need before adopting their access policies as to DOGE.

The Jan. 20 EO (the EO that HHS's 30(b)(6) deponent was presumably referring to when saying they "had read *the* executive order" to infer DOGE's duties, HHS (Wendel) Dep., ECF No. 80-15, at 33:15-19 (emphasis added)), tasks DOGE with government-wide software modernization, *not* a government-wide audit for "waste, fraud, and abuse" (words that do not appear in the EO at all). The Defendant Agencies could not have established that DOGE needed unfettered access to Sensitive Systems to search for waste, fraud, and abuse cased on this EO. Notably, HHS's testimony repeatedly identified this EO as the sole basis for its inferences of DOGE's need. *See* HHS (Wendel) Dep. at 27:11-15, 30:24-21:1, 33:15-19 (referring repeatedly to "the executive order")).

To the extent that Defendants rely on the Feb. 26 EO, by its own terms it did not apply to various systems that the Defendants granted DOGE access to. *See* Pls. MSJ Br. at 33.

Only the terms of the Mar. 20 EO arguably describe a basis for concluding that DOGE Teams had a need to access Sensitive Systems. *See id.* at 33-34. But, it does not give the agencies cover either, given the undisputed facts that it post-dated DOGE's entry to the agencies, was not even relied on by HHS, and did not discuss access by DOGE at all. With respect to that EO:

- It referred to "officials designated by the President or Agency Heads (or their designees)" rather than DOGE, *see* Mar. 20 EO, ECF No. 80-8, § 3(a), and nowhere instructs agencies that DOGE Teams are those designees;

- It was signed *after* DOGE Teams were stood up at the Defendant Agencies, so could not have been the basis for any finding of need for Systems accessed prior to the EO; *see* Decl. of R. Kryger, ECF No. 31-1, ¶¶ 5-13 (USDS employees had already been detailed to DOL as of Feb. 13); Decl. of G. Rice, ECF No. 31-2, ¶ 5 (USDS employees had already been detailed to HHS as of Feb. 13); and

- Only DOL expressly relied on it as a justification for granting DOGE access to Sensitive Systems. See DOL (Kryger) Dep., ECF No. 80-9, at 74:1-25 (DOL agreeing that it was "apparent, based on the information silos EO [the Mar. 20 EO], that the DOGE team affiliates needed access to sensitive systems at DOL").

Far from being "of no import," the EOs Defendants purported to rely on as the primary (and effectively only) indicator of DOGE's need to access Sensitive Systems directly undercut their claims and cannot bear the weight Defendants ask them to bear. The Defendant Agencies should not be allowed to make a showing of "need" based on their own (unreasoned and unsupported) guesses about DOGE's needs and responsibilities, particularly given the Agencies' glaring misreadings of the documents they purported to rely on.

Defendants attempt to support their use of the executive orders with further lengthy invocations of the *AFT* decision. *See* Defs. XMSJ Br. at 32-33. But that case does not counsel or require this Court to rule for Defendants. Notably, the *AFT* court read the Jan. 20 EO as Plaintiffs do, and consistent with the EO's text—as tasking DOGE "with modernizing . . . agency software and IT systems," 152 F.4th at 177, rather than, as Defendants testified, authorizing government-wide audits of waste, fraud, and abuse. Based on the *AFT* court's understanding that DOGE Teams were "IT employees" who were "conducting [an] initial survey of the agency's technological ailments," the court thought it was imprudent for the district court to "tangle the judiciary in the weeds of distinguishing the needs of one high-level IT employee from another." *Id.* That conclusion should not control where, as here, the agencies have read and asserted an entirely different (unwritten) purpose into the same Executive Order to grant DOGE access to different Sensitive Systems at different agencies for different inferred purposes. And, separately, the *AFT* court did not consider whether allowing executive orders to so broadly sweep away the Privacy Act's protections is permissible in the first place.

    B.    <u>The DOGE Access Policies are arbitrary and capricious</u>

As detailed at length in Plaintiffs' opening brief, Defendants acted arbitrarily and capriciously in adopting the DOGE Access Policies without acknowledging or explaining the policy change or considering important aspects of the problem, such as various laws and regulations regarding the confidentiality of sensitive record or the reliance interests of those affected by Defendants' change in policy. *See* Pls. MSJ Br. at 18-35.

Defendants fail to contest the unacknowledged and unjustified nature the DOGE Access Policies, and fail to argue that they actually considered all important aspects of the underlying policy issues. *See* Defs. XMSJ Br. at 23-26. They simply fall back on their stance that "there are no such [DOGE Data Access Policies] and no final agency action." *Id.* at 23. For the reasons above,

*supra* § II.A, this contention is wrong, and the lack of reasoning, acknowledgement, or justification for the DOGE Access Policies are fatal under the APA. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).

As detailed in Plaintiffs' opening motion, Defendants failed to consider the "array of laws and regulations governing the disclosure of sensitive information" that emphasize the need for a "cautious, thorough, transparent, system-by-system approach" when designing information access policies. Pls. MSJ Br. at 20-21. Defendants offer no response to this "fail[ure] to consider . . . important aspect[s] of the problem" they faced in redesigning their access policies for DOGE. *State Farm*, 463 U.S. at 43. Defendants also offer no meaningful response to their failures to consider the reliance interests of people whose sensitive records they store on their Systems, instead simply waving away these concerns by reiterating their (incorrect) conclusion that "DOGE Team members' access is consistent with the Privacy Act," Defs. XMSJ Br. at 25.

The only issue Defendants offer any rebuttal on the potential conflicts of interest by DOGE Team members. They claim to have adequately considered this aspect of the problem by subjecting DOGE to the same conflict-of-interest procedures as other agency employees. Defs. MSJ Br. at 25-26. But the record hardly suffices to show any affirmative consideration of the issue, and it certainly does not account for unique conflicts posed by Musk and other DOGE Team members upon decision to grant DOGE access in the spring. In any event, consideration of a single "aspect of the problem," *id.* at 24, hardly meets the *State Farm* requirement for reasoned decisionmaking.

## IV.    *Ultra vires* **review is appropriate**

As Plaintiffs argued in their opening motion, DOGE Teams at Defendant Agencies lack legal authority to access, retain, modify, or utilize records from agencies' Sensitive Systems, or order that they be allowed to access those records. *See* Pls. MSJ Br. at 35-36. That is because the USDS, DOGE, and DOGE Teams are purely creatures of an executive order, lacking the authority

to stand in the shoes of statutorily-created agencies. *See id.* at 24-30, 35-36; *see also supra* § III.A.1 (explaining the genesis of DOGE and the reasons DOGE Teams should be considered external to the Defendant Agencies).

Defendants do not argue that DOGE had any authority to access Sensitive Systems that derived from "outside of their positions at the Defendant Agencies," instead simply reiterating their earlier denial that DOGE is an external actor at the Agencies. *See* Defs. XMSJ Br. at 37. But because, as Plaintiffs have argued above, this conclusion is incorrect, *ultra vires* relief against DOGE defendants is appropriate. While the Defendant Agencies violated the Privacy Act and relief may be granted against those agencies under the APA, *see supra* § II.B, DOGE is a separate entity with no statutory authority, it is not the custodian of the Agencies' records pursuant to the Privacy Act, and neither party argues that DOGE is an agency subject to the APA. Because DOGE is a distinct entity, its misappropriation of agency records (and resulting relief) is reviewable under the *ultra vires* doctrine. *Cf.*, *e.g.*, *Fed. Express Corp. v. Dep't of Commerce*, 39 F. 4th 756, 767 (D.C. Cir. 2022) (discussing the "rigorous standard for *ultra vires* review . . . even in cases in which Congress has . . . expressly withdrawn APA review").

## V.    The Court may grant Plaintiffs the relief they seek

Defendants make two claims concerning the availability of relief, each of which is flawed.

### A.    Prospective relief is available at DOL

Defendants argue that "no prospective relief is available" with respect to DOL because "there are no longer any DOGE Team members at DOL." Defs. XMSJ Br. at 38. Their argument is fatally flawed in a number of respects.

*First*, Defendants offer no competent evidence for this representation, failing to meet their burden at this stage. *See* Fed. R. Civ. P. 56(c)(1)(A) (detailing the various forms of evidence considered at summary judgment). Defendants provide only an unsourced footnote purporting to

27

describe the current employment situations of three previous DOGE Team members at DOL. Defendants do not cite to any materials to support this statement—no declarations, nor any materials that might be susceptible to judicial notice. Nor do these representations (or any supporting record evidence) appear in Defendants' statement of material facts.

*Second*, Defendants' arguments appear to sound in mootness, but they do not use the word "moot" or cite to the legal standard for mootness. But, to the extent that Defendants argue that Plaintiffs' claims against DOL are moot because DOL has voluntarily ceased hosting a DOGE Team, the burden is on Defendants to show that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to occur." *Public Citizen, Inc. v. Fed. Energy Reg. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). DOL certainly has not met that high burden here, in the absence of creditable record evidence, or any argumentation tied to the proper legal standard.

*Third*, even crediting Defendants' statement would not preclude relief. While Defendants state "there are no longer any DOGE Team members at DOL," the explanation they provide in support is simply that "none of the three DOGE Team members identified in Defendants' Response to Expedited Discovery, ECF No. 80-5 at 17-20, remain at DOL." *See* Defs. XMSJ Br. at 38, 38 n. 17. Their footnote raises as many questions as it purports to answer, including whether there have been other DOGE Team members than the three identified; whether Mr. Elez will return to the DOL DOGE Team from the detail they identify; whether the other DOGE Team members besides Mr. Elez "retain[] access to DOL information systems;" and, importantly, whether DOL intends to onboard staff to a future DOL DOGE Team to comply with the continuing requirements of the Jan.

20 EO, requires DOGE Teams to be "establish[ed]" at "each agency" to advise agency leaders on "implementing the President's DOGE Agenda." Jan. 20 EO at § 3(c). [7]

On these facts, it is unclear how Defendants' arguments could meet the high burden of showing mootness. The Court should decline their implicit request to treat this matter as moot despite not having established their entitlement to that finding as matter of fact or law.

*Fourth*, even if Defendants were able to resolve the above issues with reliable evidence, more comprehensive facts, and adherence to the legal standard for mootness, Defendants' conclusion that "no prospective relief is available" with respect to DOL because any order by this Court would only be "entirely advisory" would still be incorrect. Defs. XMSJ Br. at 38-39. Among the other relief Plaintiffs seek is the destruction of records "possessed or transmitted by DOGE Affiliates or any other person who possesses the information by virtue of access pursuant to an access policy held unlawful by" this Court's potential order. *See* Pls. MSJ, ECF No. 93, at 2. Defendants have not asserted that no such records exist, and the Court's grant of this remedy would not be "advisory."

B.    The other relief Plaintiffs seek is also proper

Defendants argue that this Court may not order the destruction of records or take proactive steps to ensure compliance with any order. Both arguments are incorrect.

*First*, Defendants argue that record destruction is inappropriate because "the retrospective relief available under the Privacy Act 'is an individual right of action for damages.'" Defs. XMSJ Br. at 39 (citing PI Op. at 27). But this argument is squarely foreclosed by this Court's prior determination that agency policies that violate the Privacy Act may be challenged under the APA,

---

[7] For example, Defendants have not represented or argued that HHS no longer has a DOGE Team.

and that the APA "permit[s] the Court to enjoin agency action alleged to be in violation of the Privacy Act despite the Privacy Act's failure to authorize such a step." MTD Op., 778 F. Supp. 3d at 80. The APA allows "[P]laintiffs" to "seek relief unavailable under the [Privacy] Act." *See id.* at 81.

Further, contrary to Defendants' argument, Plaintiffs *do* have a "legal basis to request remedial relief . . . in the form of the destruction of records." *See* Defs. XMSJ Br. at 39. Plaintiffs seek remedies that are "sufficient to redress" their injuries. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). As described above, *supra* § I., Plaintiffs' ongoing injuries stem from the misappropriation of their sensitive records. An order ensuring that unauthorized individuals no longer maintain access to those records is necessary and appropriate in order to provide Plaintiffs relief.

Courts have recognized in other contexts that where an improper disclosure occurs, while "there is nothing a court can do to withdraw all knowledge or information that [government employees] may have acquired by" way of the unlawful disclosure, "a court can fashion *some* form of meaningful relief," including by remedying the ongoing injury resulting from "the Government's continued possession of those materials." *Cf. Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12-13 (1992). "Even though it is now too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy that occurred . . . a court does have the power to effectuate a partial remedy by ordering the Government to destroy . . . any and all copies it may have in its possession." *Id.*

The only argument Defendants proffer on this point is that "the retrospective relief available under the Privacy Act is 'an individual right of action for damages.'" Defs. XMSJ Br. at 39 (quoting PI Op. at 27). Given that Plaintiffs seek prospective relief under the APA rather than retrospective relief under the Privacy Act, this argument is inapposite.[8]

*Second*, Plaintiffs do "have a basis to ask the Court" to take some proactive steps to ensure compliance with any order. *See* Defs. XMSJ Br. at 39. The nature of this case is that the government's compliance (or non-compliance) with any order will not be readily apparent or discoverable to those outside the Defendant Agencies. And, as demonstrated amply in the record, the Defendant Agencies have granted DOGE access to Sensitive Systems while having exceedingly little knowledge of what DOGE intended to do with such access. Further, the various executive orders which Defendant Agencies have interpreted to license violations of the Privacy Act are still in effect.

Finally, Defendants rest on the argument that "the Federal government [is] presumed to comply with lawful court orders." *Id*. But as another court in this District has noted, since January, "courts have seen instance after instance of departures" from the type of behavior by government litigants that underpins the "presumption of regularity." *Fed. Educ. Ass'n v. Trump*, No. 25-cv-01362, 2025 WL 2355747, at *10-11 (D.D.C. Aug. 14, 2025) (collecting dozens of examples and positing that "the President of the United States may have forfeited the right to such a presumption of regularity."). In this context and on these facts, it would be appropriate for

---

[8] It is also misleading with respect to the Privacy Act, which does contemplate the destruction of records being improperly held by the government. *Abdelfattah v. DHS*, 787 F.3d 524, 534 (D.C. Cir. 2015) ("a plaintiff may request expungement of agency records for . . . violations of the Privacy Act.").

this Court to gather the facts needed to ensure that the Defendant Agencies give any order its full effect.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment, and deny Defendants' cross-motion for summary judgment.

Dated: October 17, 2025

Respectfully submitted,

*/s/ Aman T. George*

Aman T. George (D.C. Bar No. 1028446)
Mark B. Samburg (D.C. Bar No. 1018533)
Rachel F. Homer (D.C. Bar No. 1045077)
Robin F. Thurston (D.C. Bar No. 462679)
Somil B. Trivedi (D.C. Bar No. 1617967)
Skye L. Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Fax: (202) 796-4426
msamburg@democracyforward.org
ageorge@democracyforward.org
rhomer@democracyforward.org
rthurston@democracyforward.org
strivedi@democracyforward.org
sperryman@democracyforward.org

Glenn Schlactus (D.C. Bar No. 475950)
Zoila E. Hinson (D.C. Bar No. 1766625)*
Alexa Milton (D.C. Bar No. 155380)*
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
gschlactus@relmanlaw.com
zhinson@relmanlaw.com
amilton@relmanlaw.com

*Counsel for Plaintiffs*

Teague P. Paterson (D.C. Bar No. 144528)
Matthew S. Blumin (D.C. Bar No. 1007008)
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, DC 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org

*Counsel for American Federation of State,
County, and Municipal Employees, AFL-CIO
(AFSCME)*

Rushab B. Sanghvi (D.C. Bar No. 1012814)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org

*Counsel for Plaintiff American Federation of
Government Employees, AFL-CIO (AFGE)*

Steven K. Ury (D.C. Bar 1643947)
SERVICE EMPLOYEES INTERNATIONAL
UNION
1800 Massachusetts Avenue, NW,
Legal Department, 6th Floor,
Washington, DC 20036
Telephone: (202) 730-7428
steven.ury@seiu.org

*Counsel for Plaintiff Service Employees
International Union*

Matthew Holder*
COMMUNICATION WORKERS OF
AMERICA, AFL-CIO
501 Third Street N.W.
Washington, D.C. 20001
Telephone: (202) 215-6788

mholder@cwa-union.org

*Counsel for Plaintiff Communication Workers of America, AFL-CIO*

\* Admitted pro hac vice