**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, et al., <br><br> **Plaintiffs,** <br><br> **v.** <br><br> DEPARTMENT OF LABOR, et al., <br><br> **Defendants.** | Civil Action No. 25-339 (JDB) |

## MEMORANDUM OPINION

In the summer of 1974, a storm was brewing in Washington.  The Supreme Court had just ordered President Nixon to release the Watergate tapes to investigators.  Included was "the Smoking Gun"—a recording of President Nixon and his chief of staff plotting to cover up involvement in an illegal effort to wiretap the headquarters of the Democratic National Committee. The American people were outraged at the President's overreach.  The House Judiciary Committee voted on Articles of Impeachment, and President Nixon ultimately resigned.

Out of this tempest emerged the Privacy Act.  The law's principal sponsor, Judiciary Chairman Senator Sam Ervin, advocated for its passage, testifying that "[i]f we have learned anything in this last year of Watergate, it is that there must be limits upon what the Government can know about each of its citizens." 120 Cong. Rec. 12646 (1974) (statement of Sen. Sam Ervin). Congress agreed, and on December 31, 1974, President Ford signed the Privacy Act into law.  See Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896, 1896.

In its preamble, the Privacy Act declares federal agencies' "increasing use of computers and sophisticated information technology" both a boon and a scourge.  Pub. L. No. 93-579, § 2,

1

88 Stat. 1896, 1896.  While "essential to the efficient operations of the Government," these technologies "greatly magnif[y]" the harm to individual privacy that can occur from federal collection, maintenance, use, or dissemination of personal information.  Id.  To counteract this harm, the Act forbids federal agencies from disclosing records they maintain about individuals to any person or any other agency without the prior consent of the person to whom the record pertains.  5 U.S.C. § 552a(b).

But the Privacy Act's prohibition on disclosure of an individual's government records without consent is not absolute.  The statute defines a list of exceptions to its disclosure bar, the first of which balances the two interests the law identifies—individual privacy and government efficiency.  The exception allows agencies to disclose records they maintain "to those officers and employees of the agency . . . who have a need for the record in the performance of their duties."  Id. § 552a(b)(1).  How far this exception extends lies at the heart of this case.

Turning the clock forward fifty years to the early months of 2025, affiliates of President Trump's Department of Government Efficiency (DOGE) descended on many federal agencies.  Armed with executive orders, these affiliates sought broad access to the sensitive records the government holds.  Officials at the Department of Health and Human Services (HHS) and the Department of Labor (DOL) largely handed them the keys.

Plaintiffs, a collection of unions and nonprofit organizations, sued.  See Am. Compl. [ECF No. 21].  They alleged, among other things, that HHS, DOL, and the Consumer Financial Protection Bureau (CFPB) violated the Administrative Procedure Act (APA) and the Privacy Act by adopting a policy of granting DOGE affiliates access to their members' records without consent.  See id. at 59–65 (Counts II–IV).  They also alleged that the United States DOGE Service (USDS) had acted ultra vires.  See id. at 57 (Count I).

After substantial motion practice and limited discovery, the parties and claims have winnowed.  The union plaintiffs now seek summary judgment on their APA and statutory ultra vires claims against HHS, DOL and USDS (collectively, the defendants).  Pls.' Mot. [ECF No. 93-2].  And the defendants have filed a cross-motion for summary judgment on all claims against them.  Defs.' Mot. [ECF No. 95-1].

Following careful consideration of the parties' briefing and the record, the Court holds that plaintiffs have standing but denies the parties' motions as to the remaining APA claims (Counts II and IV) because genuine disputes of material fact exist.  The Court grants summary judgment for defendants on the statutory ultra vires claim (Count I) because plaintiffs have not identified a specific, clear, and mandatory statutory provision that DOGE violated.

## BACKGROUND

### I.    Factual Background

The Court recounts the story of this case in three acts, each opening with the promulgation of an executive order.

### A.  The January 20 Executive Order

On January 20, 2025, shortly after his inauguration, President Trump signed an executive order establishing the Department of Government Efficiency (DOGE) within the Executive Office of the Presidency.  See Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ("January 20 Executive Order").  That Order renamed the existing United States Digital Service as "the United States DOGE Service (USDS)" and directed USDS "to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity."  Id. § 1; see also id. § 4(a) (directing DOGE to "promote inter-operability between

3

agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization").

The January 20 Executive Order required each agency head to "establish within their respective Agencies a DOGE Team of at least four employees, which may include Special Government Employees, hired or assigned within thirty days" of the Order. Id. § 3(c). It also instructed agency heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." Id. § 4(b). The January 20 Executive Order further mandated that USDS "adhere to rigorous data protection standards." Id.

DOGE arrived at HHS the very next day. Luke Farritor, a recent hire by the General Services Administration, accepted a detail to HHS on January 21, 2025. See Defs.' Interrog. Resp. [ECF No. 80-5] at 6–7. Farritor was also detailed to USDS and CFPB. Id. at 6–7, 21.[1]

On Farritor's second day as an HHS detailee, HHS granted him administrator access to his first agency system containing personally identifiable information (PII) or personal health information (PHI)—the Agency's Payment Management System (PMS). See id. at 7. PMS facilitates the electronic transmission of grant funds to HHS grantees and contains the social security numbers of those grantees, among other PII. HHS 30(b)(6) Dep. (Wendel) Chart [ECF No. 80-14] at 2. Because of the PII in PMS, HHS adheres to the principle of least privilege and grants system access only to users with (1) a need to use that information as part of their official duties and (2) who have security level VI clearance or higher. Id.; see also HHS, Privacy Impact Assessment for Payment Management System 7–8 (Sep. 20, 2017), https://perma.cc/C3WF-3L55.

---

[1] Farritor may have been detailed or employed at other agencies, too, but HHS has thus far refused to disclose how many agencies he was concurrently detailed to or otherwise employed by. See id. at 5–7.

Over the following weeks, HHS granted Farritor access to eight other systems containing PII or PHI ("sensitive systems") at the Agency, two of which he accessed: HHS Consolidated Acquisition Solution (HCAS) and NIH ES Electronic Research Administration (eRA). Defs.' Interrog. Resp. at 7–8, 11. HCAS supports contract writing and contains PII incidental to those contracts; eRA supports NIH research grant management and contains grantee PII. HHS 30(b)(6) Dep. (Wendel) Chart at 1–2.

In late January through mid-February, several other DOGE affiliates joined Farritor at HHS, including Amy Gleason, Aram Moghaddassi, and Rachel Riley. Defs.' Interrog. Resp. at 6, 11–12, 16. While Riley was hired directly as an HHS employee, Gleason and Moghaddassi's employment statuses are uncertain during this period.[2] See id. Nevertheless, on February 19, HHS granted Moghaddassi access to its GrantSolutions system. Id. at 12. And on February 24, the Agency granted Gleason access to CMS's Acquisition Lifecycle Modernization (CALM) system. Id. at 6. These systems contain the PII of HHS grantees and vendors. HHS 30(b)(6) Dep. (Wendel) Chart at 1–2.

Meanwhile, DOL also stood up its DOGE team. On February 19th and 20th, Moghaddassi and Mike Collins—both new hires at DOL and members of the Agency's DOGE team—were granted access to DOL's New Core Financial Management System (NCFMS) and its HRConnect system. Defs.' Interrog. Resp. at 18–20. NCFMS is DOL's financial backbone and contains employee social security numbers and EIN information for contractors. DOL 30(b)(6) Dep. [ECF No. 80-9] at 126. HRConnect is DOL's instance of PeopleSoft, a HR software solution. DOL,

---

[2] Gleason was eventually hired as an HHS employee but that did not occur until March 5. See Gleason Appointment Aff. [ECF No. 65-1]. Moghaddassi, too, eventually entered into a formal employment relationship with HHS. DOL detailed him there on March 5. Defs.' Interrog. Resp. at 11.

Rep. of Off. of the Assistant Sec'y for Admin. and Mgmt. 22 (Nov. 2016), https://perma.cc/S8F5-MQ7Y.

On February 25, Marko Elez, a DOL and Treasury dual new hire and detailee to USDS, and to at least three other agencies, was granted access to three additional sensitive systems at DOL: USAccess, DOL Homeland Security Presidential Directive 12 Enterprise Physical Access Control (EPACS), and DOL Directory Resource Administrator (DRA). Defs.' Interrog. Resp. at 17–18. USAccess is the identity verification system for federal agencies, containing employee names, birthdays, and social security numbers. GSA, About USAccess, https://perma.cc/Z7JS-5CR4; see also Elez Access Request [ECF No. 80-13] at 2. The other systems appear to pertain to physical and electronic access to DOL's facilities and assets by its employees.

**B. The February 26 Executive Order**

President Trump issued a second executive order redirecting DOGE's focus away from software modernization and towards cutting government spending on February 26, 2025. See Exec. Order No. 14,222, 90 Fed. Reg. 11095 (Feb. 26, 2025) ("February 26 Executive Order"). The February 26 Executive Order charged agency heads and DOGE Team leads with reviewing "all existing covered contracts and grants." Id. § 3(b). It also authorized agency heads and DOGE team leads, where consistent with applicable law, to terminate or modify covered contracts and grants to reduce federal spending, promote efficiency, and advance administration policy. Id.

The February 26 Executive Order defined covered contracts as "discretionary spending through Federal contracts, grants, loans, and related instruments" but not "direct assistance to individuals; expenditures related to immigration enforcement, law enforcement, the military, public safety, and the intelligence community; and other critical, acute, or emergency spending." Id. § 2(d). The Order directed DOGE to "prioritize the review of funds disbursed under covered

contracts and grants to educational institutions and foreign entities for waste, fraud, and abuse." Id. § 3(b).

After this second executive order, HHS granted members of its DOGE team access to many new systems. Those systems contain some of the most sensitive data the Agency holds. Moghaddassi, by this point officially detailed to HHS, gained access to (and actually accessed) HHS's Integrated Data Repository (IDR) and its Healthcare Integrated General Ledger Accounting System (HIGLAS). Defs.' Interrog. Resp. at 11–12. IDR is "a cornerstone" of HHS's data environment. HHS 30(b)(6) Dep. (Wendel) Chart at 1. It contains data on Medicare beneficiaries, providers, and health plans. Id.; see also CMS, Privacy Impact Assessment for Integrated Data Repository Cloud (Dec. 5, 2023), https://perma.cc/3VKU-D8QF. Among the PII and PHI stored in IDR are Medicare patient names, social security numbers, demographic information, contact information, medical notes, and diagnosis codes. HHS 30(b)(6) Dep. (Wendel) Chart at 1. HIGLAS, too, contains Medicare patient data, including names, social security numbers, contact information, salaries, and health insurance claim numbers. Id.

Edward Corristine, a detailee from GSA to USDS and HHS, and Elez were also granted access to IDR and HIGLAS, although it is unclear whether they logged into the systems. See Defs.' Interrog. Resp. at 8–10. And during this period, HHS granted Conor Fennessy, a Department of Education detailee, access to six of its sensitive systems, two of which he accessed. Id. at 12–13. The Agency also granted Jeremy Lewin, a GSA detailee, and Farritor access to two additional sensitive systems each. Id. at 7, 14.

At DOL, access requests slowed somewhat following the February 26 Executive Order. But a larger fight was brewing over the Agency's Unemployment Insurance Data and Related Records ("UIDRR") system. UIDRR contains claims data from state unemployment insurance

agencies, including the names, social security numbers, and bank account information of claimants.  DOL 30(b)(6) Dep. at 59–60.  At the time, UIDRR was housed within DOL's Office of the Inspector General and subject to strict access controls.  See id. at 59, 62.

### C.  The March 20 Executive Order

On March 20, 2025, President Trump signed a third executive order aimed at "eliminating bureaucratic duplication and inefficiency" and "enhancing the Government's ability to detect overpayments and fraud."  Exec. Order No. 14,243, 90 Fed. Reg. 13681 (Mar. 20, 2025) ("March 20 Executive Order").  The March 20 Executive Order directed agencies to tear down information silos and "ensure Federal officials designated by the President or Agency Heads (or their designees) have full and prompt access to all unclassified agency records, data, software systems, and information technology systems," including by "authorizing and facilitating both the intra- and inter-agency sharing and consolidation of unclassified agency records."  Id. § 3(a).

The Order specifically referenced the unemployment data and payment records stored at DOL's Office of the Inspector General.  It required that the Secretary of DOL and the Secretary's designees "[i]mmediately upon execution of this order" receive, "to the maximum extent consistent with law, unfettered access" to this data.  Id. § 3(d).  So the next day, DOL's CIO granted Moghaddassi and Elez access to UIDRR.  See Defs.' Interrog. Resp. at 17–18.

DOGE data access grants also continued at HHS.  On March 21, HHS granted Kyle Shutt, a GSA employee who had been detailed to HHS since March 14, access to its Unaccompanied Children Portal.  Id. at 10.  The Portal is a system maintained by the Office of Refugee Resettlement and contains highly sensitive demographic and health data about unaccompanied alien children, including photographs of the children.  HHS 30(b)(6) Dep. (Wendel) Chart at 4. The Portal also contains citizenship and financial data about the children's sponsors.  Id.

8

Beyond mid-March 2025, the Court has little knowledge of DOGE's activities at HHS and DOL.  HHS represents that its DOGE effort is ongoing, while DOL has averred that as of fall 2025, no DOGE affiliates remain at the Agency.  See Defs.' Mot. at 27.

## II.    Procedural History

Plaintiffs filed this suit against DOL following media reports that DOGE was "going after the Department of Labor" and that Agency staffers had "been ordered to give [DOGE personnel] access to anything they want—or risk termination."  Compl. [ECF No. 1] ¶ 65.  They moved for a TRO and alleged that USDS was about to "enter . . . the Department of Labor and attempt to gain access to sensitive systems" that contain the "data of millions of Americans and many federal employees," all in alleged violation of the Privacy Act.  Mot. TRO [ECF No. 2] ("First TRO Mot.") at 19.  Days later, the Court denied the motion because plaintiffs had failed to establish a substantial likelihood of standing: they had put forward no evidence that their members would be harmed, nor any evidence that the organizations had standing in their own right.  See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab. ("AFL-CIO I"), 766 F. Supp. 3d 32, 37–39 (D.D.C. 2025).

After the Court's ruling, plaintiffs filed an amended complaint, adding HHS and the Consumer Financial Protection Bureau ("CFPB") as defendants.  See Am. Compl.  They also renewed their motion for a TRO.  Renewed Mot. TRO [ECF No. 29].  In opposition to the renewed motion, defendants submitted three affidavits that confirmed that DOGE affiliates—either directly hired by the Agencies or detailed to the Agencies—were working at HHS, DOL and CFPB, and either had been or would likely be permitted to access sensitive agency systems.  See Decl. of R. J. Kryger [ECF No. 31-1] (DOL); Decl. of G. Rice [ECF No. 31-2] (HHS); Decl. of A. Martinez [ECF No. 31-3] (CFPB).

The Court denied plaintiffs' renewed TRO motion.  See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab. ("AFL-CIO II"), 766 F. Supp. 3d 105, 114 (D.D.C. 2025).  It reasoned that the Privacy Act permits an agency to disclose records to "employees of the agency . . . . who have a need for the record[s] in the performance of their duties."  Id. at 110 (quoting 5 U.S.C. § 552a(b)(1)).  And on the record as it stood, plaintiffs had not shown it was likely that the DOGE affiliates were not "employees of the agency" with a "need for the record[s]."  See id. at 110–13.

The Court granted, however, plaintiffs' motion for limited expedited discovery.  Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab. ("AFL-CIO III"), 349 F.R.D. 243, 254 (D.D.C. 2025); Pls.' Mot. Expedited Disc. [ECF No. 44].  And the Court reaffirmed its grant of limited discovery after defendants submitted evidence that the Agencies were no longer accepting detailees from USDS on their DOGE teams.  See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab. ("AFL-CIO IV"), Civ. A. No. 25-339, 2025 WL 1129202, at *5–8 (D.D.C. Mar. 19, 2025).  The Court reasoned that plaintiffs' claims largely rest on whether DOGE affiliates are agency employees with a need to access agency systems, such that the challenged record disclosures fall within 5 U.S.C. § 552a(b)(1).  See id.  Whether the DOGE affiliates were direct hires of the Agencies, detailees from other agencies, or detailees from USDS, that question remained open.  See id.  So discovery into DOGE affiliates' employment relationships was proper.  Id. at *8.  No appeal of the Court's discovery rulings was taken.

When discovery concluded, defendants moved to dismiss plaintiffs' Amended Complaint.  See Defs.' Mot. Dismiss [ECF No. 49].  The Court granted in part and denied in part defendants' motion.  As relevant here, the Court concluded that plaintiffs had adequately alleged (1) associational standing to sue HHS and DOL; (2) claims under the APA that the Agencies' DOGE data access policies were arbitrary and capricious, and inconsistent with the Privacy Act

10

and its implementing regulations; and (3) a claim that USDS acted <u>ultra vires</u> when accessing sensitive systems at the Agencies. <u>See</u> <u>Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.</u> ("<u>AFL-CIO V</u>"), 778 F. Supp. 3d 56 (D.D.C. 2025).[3]

Plaintiffs then filed a motion for a preliminary injunction, seeking to enjoin DOL and HHS from providing DOGE Affiliates access to their sensitive systems. Pls.' Mot. Prelim. Inj. [ECF No. 80]. The Court denied the motion, reasoning that while plaintiffs established that they had standing to pursue a preliminary injunction, they had not shown they were likely to suffer irreparable harm. <u>Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.</u> ("<u>AFL-CIO VI</u>"), Civ. A. No. 25-339, 2025 WL 1783899, *9, *15 (D.D.C. June 27, 2025).

The union plaintiffs—AFL-CIO, AFGE, AFSCME, SEIU, CWA, and AFT—now move for summary judgment on their claims against HHS, DOL, and USDS.[4] <u>See</u> Pls.' Mot. They assert that HHS and DOL adopted a policy of granting DOGE affiliates broad, unfettered access to agency systems—systems that contain union members' PII and PHI. <u>See</u> <u>id.</u> at 15–16. And they charge that these DOGE data access policies violate the APA because they were adopted arbitrarily and capriciously and are contrary to the Privacy Act and its implementing regulations. <u>See</u> <u>id.</u> at 18, 23. They further contend that USDS's access to and use of the Agencies' data is <u>ultra vires</u>, <u>see</u> <u>id.</u> at 35, and request declaratory and injunctive relief to remedy their members' injuries, <u>see</u> <u>id.</u> at 36.

---

[3] The Court dismissed plaintiffs' free-standing Privacy Act claims (Count V), because only individuals—not organizations—may sue under the Act. <u>Id.</u> at 88.

[4] Concurrent with their motion for summary judgment, plaintiffs filed a stipulated notice of voluntary dismissal of all claims against CFPB (Count III). <u>See</u> Dismissal Stipulation [ECF No. 92]. As a result, only union plaintiffs remain in the case. The two nonprofit organizations that survived the defendants' motion to dismiss—Virginia Poverty Law Center and Economic Action Maryland Fund—had advanced claims only against CFPB. <u>See</u> Pls.' Mot. at 4 n.1.

Defendants also move for summary judgment.  They filed a cross-motion primarily arguing that they never adopted the alleged DOGE data access policies and DOGE affiliates are employees of the agencies where they work, so plaintiffs' claims are both unreviewable and meritless.  See Defs.' Mot. at 17, 23–38.  They also contend that plaintiffs lack standing, see id. at 8–14, and that the Privacy Act's remedial scheme precludes consideration of APA claims founded on its violation, see id. at 21–23.

The parties' motions are ripe for decision.

## LEGAL STANDARDS

Before turning to the many factual and legal issues raised in this case, the Court owes a word about the proper standard of review.

### III.    Summary Judgment

Federal Rule of Civil Procedure 56 mandates the grant of summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit under the governing law and in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Upon cross-motions for summary judgment, courts consider each motion individually, view the evidence in the light most favorable to the nonmovant, and determine whether the Rule 56 standard is met.  Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer, 789 F. Supp. 3d 66, 80 (D.D.C. 2025); see also Baylor v. Mitchell Rubenstein & Assocs., P.C., 857 F.3d 939, 952 (D.C. Cir. 2017) (explaining that when the parties file cross-motions for summary judgment, courts "must accord both parties the solicitude owed non-movants").  If genuine issues of material fact

exist, summary judgment may not be granted for either party.  See, e.g., Sherwood v. Washington Post, 871 F.2d 1144, 1146, 1148 (D.C. Cir. 1989); Doe 2 v. Mattis, 322 F. Supp. 3d 92, 94 (D.D.C. 2018).  "It is of no moment" that the parties filed cross-motions for summary judgment or that they asserted there were no genuine disputes about material facts.  CEI Washington Bureau, Inc. v. Dep't of Just., 469 F.3d 126, 129 (D.C. Cir. 2006).

After denying a summary judgment motion due to the presence of disputed, material facts, the court has broad discretion to provide the movant "an opportunity to properly support or address the fact" or "issue any other appropriate order."  Fed. R. Civ. P. 56(e).[5]  Affording the parties an opportunity to properly support or address the unsupported fact is generally courts' "preferred first step."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment; see, e.g., Am. Ctr. for Int'l Lab. Solidarity, 789 F. Supp. 3d at 102 (granting defendants "another opportunity to submit and support properly a motion for summary judgment" after denying the parties' cross-motions).

## IV.    The APA Overlay

When evaluating the merits of an APA claim at summary judgment, the APA adds an additional layer to the Court's analysis—refining but not supplanting the Rule 56 standard.

Section 706(2)(A) of the APA instructs courts to review the administrative record and hold unlawful and set aside agency actions, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  As a practical matter, the merits of § 706 claims are almost always resolved by granting summary

---

[5] When a movant properly supports her contention that a material fact is not in genuine dispute and the nonmovant fails to respond with evidence to the contrary, Rule 56(e) supplies courts with two additional options: (1) considering the fact undisputed for purposes of the motion, and (2) granting summary judgment, if the movant is entitled to it.  See Fed. R. Civ. P. 56(e)(2), (3).  But as the D.C. Circuit explained in Winston & Strawn, LLP v. McLean, courts may not "grant judgment 'as conceded' simply because a nonmoving party fails to respond. . . . [J]udgment is granted only after the District Court satisfies itself that the record and any undisputed material facts justify granting summary judgment."  843 F.3d 503, 507 (D.C. Cir. 2016); see also Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.").

judgment for one party or the other.  This is because APA claims present a singular question—whether, as a matter of law, the evidence in the administrative record permitted the agency to act as it did.  Drs. for Am. v. Off. of Pers. Mgmt., 793 F. Supp. 3d 112, 131 (D.D.C. 2025); see also 10B Wright & Miller, Federal Practice & Procedure § 2733 (4th ed.) ("Judicial review has the function of determining whether the administrative action is consistent with law—that and no more." (quoting Louis L. Jaffe, Judicial Control of Administrative Action 595 (1965))).

Put differently, for the merits of APA claims, the defendant agency acts as factfinder by means of the administrative record, "the district judge sits as an appellate tribunal," and "the entire case on review is a question of law."  Am. Biosci., Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (citation modified); see also James Madison Ltd. ex rel. Hecht v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) ("Generally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions.").

Yet factual issues can forestall determination of whether an agency action was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law and therefore preclude entry of summary judgment.  "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."  Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 94 (1943).  Where an administrative record is so scant or nonexistent "as to frustrate effective judicial review," a court may defer decision on the merits and "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."  Camp v. Pitts, 411 U.S. 138, 142–43 (1973); see also Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971).

Alternatively, where an administrative record was compiled but is nevertheless insufficient to assess the lawfulness of the challenged action, the court must "remand to the agency for additional investigation or explanation." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); see, e.g., Dep't of Com. v. New York, 588 U.S. 752, 785 (2019) (remanding for further explanation when the Agency's offered rationale was "incongruent" with what the record showed about its priorities). The court's remand order may not, however, "dictate to the agency the methods, procedures, and time dimension of the needed inquiry and order the results to be reported to the court without opportunity for further consideration on the basis of the new evidence by the agency." Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 544–45 (1978) (citation modified).

## ANALYSIS

### I. Standing

The Court begins with its own jurisdiction to hear the case. To invoke the judicial power of the federal courts, plaintiffs must have standing. California v. Texas, 593 U.S. 659, 668 (2021). Standing requires that for each claim and form of relief sought, at least one plaintiff establishes three "well-known and firmly rooted" elements: "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 380 (2024).

The manner of proof required to establish standing depends on the phase of the litigation. TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021). At summary judgment, a plaintiff must set forth specific facts, through affidavits or other evidence, demonstrating standing's three irreducible elements. Scenic Am., Inc. v. U.S. Dep't of Transp., 836 F.3d 42, 48 (D.C. Cir. 2016);

15

Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) ("[E]ach element must be supported in the same way as any other matter . . . i.e., with the manner and degree of evidence required at the successive stages of the litigation.").

As organizations, the labor union plaintiffs have two mechanisms through which they may establish standing. Elec. Priv. Info. Ctr. v. U.S. Dep't of Com., 928 F.3d 95, 100 (D.C. Cir. 2019). They may assert associational standing, which requires that (1) at least one of their members would have standing to sue in their own right; (2) the interests the organizations seek to protect are germane to the organizations' purposes; and (3) neither the claims the organizations assert nor the relief they request require their individual members to participate in the litigation. Int'l Dark-Sky Ass'n, Inc. v. Fed. Commc'ns Comm'n, 106 F.4th 1206, 1217 (D.C. Cir. 2024). Otherwise, the unions may assert that they have standing in their own right, often referred to as "organizational standing." Abigail All. for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 132–33 (D.C. Cir. 2006). To do so they must show that they suffered an actual or threatened injury to their activities that is fairly traceable to the alleged unlawful action and likely to be redressed by a favorable court decision. Doc Soc'y v. Rubio, 141 F.4th 1273, 1276 (D.C. Cir. 2025).

In earlier stages of this litigation, this Court found that plaintiffs had adequately alleged that their members suffered two injuries in fact—the disclosure of their private information by HHS and DOL, and the unlawful consumption of this information by DOGE. See AFL-CIO V, 778 F. Supp. 3d at 69–73, 76; AFL-CIO VI, 2025 WL 1783899, at *3–7. No party disputed that those alleged injuries were fairly traceable to the challenged actions of the defendants, redressable through injunctive and declaratory relief, and germane to the unions' mission of advancing their members' privacy. The parties also agreed that individual participation of union members is

16

unnecessary for plaintiffs' APA claims, see AFL-CIO V, 778 F. Supp. 3d at 74, and the same logic applies to their ultra vires claim.

Now, at summary judgment, AFL-CIO and its member unions, AFGE, AFSCME, SEIU, CWA, and AFT, have supported these allegations with record evidence, making a sufficient showing to establish that they have associational standing for each of their claims.[6]

### A. Injury In Fact

The Court begins its analysis with the Article III standing element the parties most vehemently contest: injury in fact. An injury in fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) (citation modified).

The harms plaintiffs assert satisfy all requirements. They are rooted in the particularized interest each union member has in the privacy of his or her own PII and PHI, not some generalized public interest.[7] See id. (holding that injuries are "particularized" when they affect the plaintiff in a personal, individual way). And the harms are "actual," not speculative, because the Agencies have already granted DOGE access to systems containing the PII and PHI of the unions' members

---

[6] Because the Court concludes that plaintiffs have associational standing, it does not reach their alternate contention that they have organizational standing. See Pls.' Mot. at 6.

[7] Members of AFGE, AFSCME, SEIU, CWA, and AFT have filed declarations that they have private medical information stored in HHS systems. See, Decl. of W. Wetmore [ECF No. 80-24] (declaration of AFGE member that as a Medicare recipient, his data is stored in HHS's Medicare systems); Decl. of D.M. Smith [ECF No. 80-23] (same but for an AFSCME member); Decl. of I. Dahlgren [ECF No. 29-18] (same but for a SEIU member); Decl. of P. Welsh [ECF No. 80-22] (same but for a CWA member); Decl. of D. Gray [ECF No. 80-25] (same but for an AFT member).

Furthermore, AFGE has filed a declaration attesting that 5,000 of its members work at DOL and have their personally identifiable information stored within its systems. See Decl. of R. Sanghvi [ECF 29-8] ¶¶ 4, 7. And members of AFSCME, SEIU, CWA, and AFT have filed declarations that they have applied for unemployment insurance, so DOL's UIDRR system stores their PII. See Decl. of C. Sullivan [ECF No. 80-18] (AFSCME member declaration); Decl. of N.D. Duckett [ECF No. 80-21] (SEIU member declaration); Decl. of J. Reese [ECF No. 80-20] (CWA member declaration); Decl. of T. Fry [ECF No. 80-19] (AFT member declaration); see also Decl. of M. Evermore [ECF No. 80-17] ¶¶ 5–7 (attesting that UIDRR contains PII of everyone who has applied for unemployment insurance since March 2020).

and DOGE affiliates have accessed those systems.[8]  See All. for Hippocratic Med., 602 U.S. at 381; Defs.' Mot. at 10.

To be sure, standing to pursue injunctive relief requires more than evidence of a past injury. Plaintiffs must also establish "a substantial risk of future injury."  Murthy v. Missouri, 603 U.S. 43, 69 (2024).  That burden is met here.  Courts test jurisdiction by examining the facts at the time the suit was filed.  Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008).  And at the time plaintiffs filed their complaint, DOGE access to the Agencies' sensitive systems was imminent or ongoing.  See Decl. of R. J. Kryger; Decl. of G. Rice.[9]

The injuries plaintiffs assert are also "concrete."  An intangible injury is concrete when it has "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  TransUnion, 594 U.S. at 424 (quoting Spokeo, 578 U.S. at 341).  Such harms "include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion."  Id. at 425.  A common law analogue need not be an exact match for the harm the plaintiff alleges, however.  Congress may elevate the status of injuries that were previously

---

[8] It is undisputed that HHS granted DOGE affiliates access to IDR and HIGLAS, sensitive systems containing Medicare patient and provider data, and that DOGE affiliates actually accessed those systems.  See Defs.' Interrog. Resp. at 7–9, 12, 15.  It is also undisputed that DOL granted DOGE affiliates access to UIDRR and HRConnect, sensitive systems containing union members' unemployment insurance claims data and DOL employee data, and that DOGE affiliates accessed those systems.  See id. at 17–20.

[9] To the extent the defendants contend that the court lacks jurisdiction because no DOGE affiliates remain at DOL, see Defs.' Mot. at 27, that is a mootness argument, not a standing argument, see Friends of the Earth v. Laidlaw Env't Servs., 528 U.S. 167, 190–94 (2000).  An agency may not, however, "automatically moot a case by the simple expedient of suspending its challenged conduct after it is sued."  FBI v. Fikre, 601 U.S. 234, 241 (2024) (internal quotation marks omitted).  To show mootness, defendants must prove that the challenged practice "cannot 'reasonably be expected to recur.'"  Id. (quoting Friends of the Earth, 528 U.S. at 190); cf. City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983) ("cessation of the challenged conduct does not bar an injunction").

Defendants offer no such assurances in this case, maintaining that their actions were and remain lawful.  So the absence of DOGE affiliates at DOL does not deprive the Court of jurisdiction to issue prospective relief.  See Am. Fed'n of Gov't Emps. v. U.S. Off. of Pers. Mgmt., Civ. A. No. 25-1237, 2025 WL 3687548, at *7 (S.D.N.Y. Dec. 19, 2025) (finding a reasonable expectation of recurrence when "the executive orders that purportedly permitted OPM's broad and rushed grants of [data] access remain in place and OPM has still admitted no wrongdoing").

18

inadequate at law, and it may identify modern relatives of historical harms.  See Pileggi v. Washington Newspaper Publ'g Co., LLC, 146 F.4th 1219, 1226–27 (D.C. Cir. 2025); Gadelhak v. AT&T Servs., Inc., 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.).  What matters is that the harm alleged has "a 'close relationship' in kind, not degree," with a harm recognized by common law. Gadelhak, 950 F.3d at 462 (quoting Spokeo, 578 U.S. at 341); see also Pileggi, 146 F.4th at 1227. ("So long as Congress alters the degree of harm and not the kind of harm, congressional action can make an injury concrete.").

The harms plaintiffs assert here bear a close relationship to the harms recognized in two traditional common law torts: intrusion upon seclusion and breach of confidence.  The tort of intrusion upon seclusion makes liable any person "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B.  This is precisely what plaintiffs allege occurred—DOGE affiliates intruded into the sphere of privacy surrounding their members' personal affairs and gained access to their private information, including their social security numbers, bank account information, and medical records.  See Nemeth-Greenleaf v. U.S. Off. of Pers. Mgmt., Civ. A. No. 25-407, 2026 WL 607905, at *5 (D.D.C. Mar. 4, 2026) ("[DOGE's] [u]nauthorized perusal of this data is the digital equivalent of a stranger staring through a homeowner's window to glean what she is doing or rifling through another's papers to gather information about his private life." (citing Restatement (Second) of Torts § 652B)).

Defendants insist that DOGE's large-scale prying is different in kind, not just degree, from the harm traditionally giving rise to the tort of intrusion upon seclusion.  See Defs.' Mot. at 13. Quoting a recent Fourth Circuit decision, they argue that the tort "has long been understood to

19

guard not against disclosure of sensitive information as such" but instead the unease that stems from "the knowledge that a third party is engaged in targeted snooping."  Id. (quoting Am. Fed'n of Teachers v. Bessent ("AFT"), 152 F.4th 162, 175 (4th Cir. 2025)).

The Court respectfully takes a different view of the tort, as does every court in this circuit. See All. for Retired Ams. v. Bessent, 770 F. Supp. 3d 79, 101–02 (D.D.C. 2025); New Mexico v. Musk, 784 F. Supp. 3d 174, 195 (D.D.C. 2025); Ctr. for Taxpayer Rts. v. Internal Revenue Serv., Civ. A. No. 25-0457, 2025 WL 3251044, at *12–13 (D.D.C. Nov. 21, 2025); League of United Latin Am. Citizens v. Exec. Off. of the President, Civ. A. No. 25-0946, 2026 WL 252420, at *51 (D.D.C. Jan. 30, 2026); Nemeth-Greenleaf, 2026 WL 607905, at *5.

The aptly named tort of intrusion upon seclusion is founded upon the discomfort produced by intrusions into the secluded aspects of an individual's life, including an individual's home and private affairs.  Restatement (Second) of Torts § 652B.  So what produces the injury it recognizes is not targeting, as in malicious prosecution, but the knowledge that one's private space or affairs have been entered or exposed without consent.  See Pearson v. Dodd, 410 F.2d 701, 704 (D.C. Cir. 1969) (agreeing that the tort extends to "instances of intrusion, whether by physical trespass or not, into spheres from which an ordinary man in a plaintiff's position could reasonably expect that the particular defendant should be excluded"); Fox v. Dakkota Integrated Sys., LLC, 980 F.3d 1146, 1155 (7th Cir. 2020) (holding that a plaintiff's claim that her workplace unlawfully retained and shared her biometric data with a third-party database administrator was sufficiently analogous to historical claims for invasion of privacy to establish injury in fact).  The injury that plaintiffs assert here, DOGE's allegedly unauthorized intrusion into their members' private data, stems from that same harm.  Declarations from the unions' members confirm as much.  They attest to the deep

20

unease and offense the union members feel at the thought of DOGE's access to their data.  See, e.g., Decl. of D.M. Smith ¶ 9; Decl. of C. Sullivan ¶ 8.

The tort of breach of confidence supplies a second analogue.  That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another."  Jeffries v. Volume Servs. Am., Inc., 928 F.3d 1059, 1064 (D.C. Cir. 2019) (internal quotation marks omitted).  The tort requires only that "the plaintiff's trust in the breaching party is violated."  Id.  A trusted party's disclosure to an unauthorized third party is sufficient.  See id. at 1064–65.  Again, the unions allege that their members suffered exactly this harm.  They aver that their members entrusted HHS and DOL with their private data, assured by the Privacy Act's protections that the Agencies would not disclose it to others.  See, e.g., Decl. of P. Welsh ¶ 4; Decl. of N.D. Duckett ¶ 9.  Then DOGE affiliates arrived, and the Agencies breached their confidence.

Defendants forgo any legal challenge to plaintiffs' breach of confidence analogue.  Instead, they argue that the torts of breach of confidence and intrusion upon seclusion are factually inapposite because plaintiffs' members consented to HHS's and DOL's access to their data, and DOGE affiliates are employees of the Agencies.  See Defs.' Mot. at 11.  But defendants' contention mistakes standing for the merits.  Whether DOGE affiliates were internal agency employees with a need to access agency data—and were thus authorized to access that data under the Privacy Act— is a merits question.  To assess standing, the court must assume that plaintiffs will succeed on the merits of their claims.  Comm. on Judiciary of U.S. House of Representatives v. McGahn, 968 F.3d 755, 762 (D.C. Cir. 2020); LaRoque v. Holder, 650 F.3d 777, 785 (D.C. Cir. 2011).

Plaintiffs allege injuries in fact that are closely related to harms recognized by the common law torts of intrusion upon seclusion and breach of confidence.  And they have supported their

allegations with competent evidence, as is required at summary judgment.  This is sufficient to demonstrate that their members have suffered an injury in fact.

### B.  Other Elements of Associational Standing

With injury in fact established, four requirements for associational standing remain. Plaintiffs carry their burden on all of them.  There is no dispute that the injuries they allege are traceable to the challenged conduct of the defendants, or that injunctive and declaratory relief would redress the injuries.  See Carpenters Indus. Council v. Zinke, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (explaining that causation and redressability are two sides of the same coin: "if a government action causes an injury, enjoining the action usually will redress that injury").

The unions have also offered competent evidence that advancing their members' privacy rights is germane to their purposes.  See Decl. of R. Sanghvi [ECF No. 29-8] (AFGE); Decl. of K.C. Harrison [ECF No. 80-27] (AFSCME); Decl. of E.M. Neuman [ECF No. 80-39] (SEIU); Decl. of A. van Schaick [ECF No. 80-28] (CWA); Decl. of D. McNeil [ECF No. 80-26] (AFT). Finally, there is no reason to believe (and no party contends) that plaintiffs' APA and ultra vires claims require participation from individual union members.

The plaintiffs have thus established that they have associational standing.  Assured of its jurisdiction, the Court turns its attention to the merits.

### II.     APA Claims

Plaintiffs charge that the Agencies violated the APA by adopting DOGE data access policies that are both arbitrary and capricious, and inconsistent with the Privacy Act of 1974 and its implementing regulations.

Embedded within plaintiffs' APA claims are allegations that the Agencies adopted two distinct data policies: a policy of granting DOGE affiliates unfettered access to sensitive data,

regardless of their need or training, and a policy of classifying DOGE affiliates as internal agency employees for data access purposes. See Pls.' Mot. at 15. Plaintiffs' arbitrary and capricious claim targets only the former policy. It asserts that when the Agencies adopted the alleged policy, they abandoned their training requirements and prior policy restricting sensitive data access to those with a "need-to-know"—all without reasoned explanation. See id. at 16–18. Plaintiffs' contrary-to-law claim takes aim at both policies. That claim charges that the alleged policy of granting DOGE affiliates access to sensitive data, regardless of need, and the concomitant classification of DOGE affiliates as internal agency employees, violate the Privacy Act. See id. at 24.

### A. Arbitrary and Capricious Claim

The APA "requires agencies to engage in reasoned decisionmaking, and directs that agency actions be set aside if they are arbitrary or capricious." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16 (2020) (citation modified); see also 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious when the agency fails to consider the relevant data and satisfactorily explain its action. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Because agencies must explain their actions, they may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books." Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). At minimum, an agency must display awareness that it is changing position. Id.

The plaintiffs assert that precisely such a silent switch occurred at DOL and HHS, see Pls.' Mot. at 19, while the Agencies protest that no policy change occurred, so plaintiffs' claim is unreviewable, see Defs.' Mot. at 18–20, 23. The Court begins and ends its analysis of plaintiffs' arbitrary and capricious claim with this threshold question of reviewability because it finds that a genuine issue of material fact precludes entry of summary judgment for either party.

i.  APA Reviewability: Final Agency Action

Section 702 of the APA supplies a cause of action to those suffering a legal wrong because of "agency action."  See 5 U.S.C. § 702.  Courts have long understood that "agency action" is a purposefully broad term, "meant to cover comprehensively every manner in which an agency may exercise its power."  Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478 (2001); see also 5 U.S.C. § 551(13) (defining "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act").  Yet the range of agency conduct reviewable as "agency action" is not limitless.  To invoke the APA, plaintiffs must identify "discrete" or "particular" actions the agency took.  Norton v. S. Utah Wilderness All. ("SUWA"), 542 U.S. 55, 64 (2004) (quoting Lujan, 497 U.S. at 891).  Wholesale objections to an agency's operations do not suffice because they fail to clearly define the scope of the controversy and raise grievances resolvable only by Congress.  Lujan, 497 U.S. at 891; see also SUWA, 542 U.S. at 64 ("The limitation to discrete agency action precludes . . . broad programmatic attack[s].")

Section 704 of the APA further limits the scope of agency actions subject to judicial review.  Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 808 (2024).  That provision establishes that plaintiffs may only challenge "final" agency actions, unless another statute authorizes judicial review of interlocutory acts.  See 5 U.S.C. § 704.  Agency action is "final" when the action marks "the consummation of the agency's decisionmaking process," and either "rights or obligations have been determined," or "legal consequences will flow" from the agency's action.  U.S. Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 597 (2016) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)).

It bears emphasizing that the parties do not dispute that the adoption and implementation of a data access policy that determines the data privacy rights of millions of Americans, including

24

members of the plaintiff unions, would constitute final agency action.  Nor could they.  See, e.g., Venetian Casino Resort, L.L.C. v. E.E.O.C., 530 F.3d 925, 931 (D.C. Cir. 2008).  Specific, final agency actions that "apply[] some particular measure across the board" to many individual agency decisions "can of course be challenged under the APA by a person adversely affected."  Lujan, 497 U.S. at 890 n.2.  The parties instead dispute whether the alleged DOGE data policy was ever adopted and implemented, such that plaintiffs' claim targets "final agency action" and the APA supplies them with a cause of action.  See Defs.' Mot. at 18–19; Pls.' Mot. at 15–17.

In other words, whether the Agencies adopted the alleged DOGE data access policy is a material fact and the Court's first task is to determine on the record provided whether it is genuinely disputed.

### ii.   Plaintiffs' Motion for Summary Judgment

The Court begins with plaintiffs' motion for summary judgment because they shoulder the burden of proof.  See Lujan, 497 U.S. at 884. As the Court evaluates plaintiffs' motion, it draws all reasonable inferences in the nonmovant Agencies' favor and grants summary judgment only if the record reveals no genuine issue of material fact.  Anderson, 477 U.S. at 255.

Plaintiffs marshal five categories of evidence to demonstrate that the Agencies abandoned their prior policies in favor of granting DOGE affiliates broad, unfettered access to sensitive agency systems.  These categories include:

- Evidence that the Agencies repeatedly granted DOGE affiliates access to a wide array of sensitive systems, with 10 DOGE affiliates at HHS gaining access to 19 unique systems (55 total access grants), and 3 DOGE affiliates at DOL gaining access to 8 unique systems (14 total access grants).  See HHS 30(b)(6) Dep. (Wendel) Chart; Defs.' Interrog. Resp. at 17–20.

- Evidence that the scope of the DOGE data access grants was unusual, at least at HHS.  See HHS 30(b)(6) (Wendel) Dep. [ECF No. 82-4] at 41–42 (testifying that

HHS's CIO was unaware of another role at the Agency requiring as broad of system access as the DOGE affiliates).

- Evidence that HHS and DOL leadership did not routinely confirm that DOGE affiliates needed access to a sensitive system before granting their access requests.

  For example, DOL's CIO testified that the Agency did not ask DOGE affiliates the questions typically asked before granting employees sensitive data access, including "why is the access needed" and "what will the access be used for." DOL 30(b)(6) Dep. at 75–76. HHS's CIO similarly testified that the Agency did not conduct "individualized review" of DOGE affiliates' need to know specific data. HHS 30(b)(6) (Wendel) Dep. at 31.

- Evidence that neither HHS nor DOL ever rejected a DOGE affiliate's access request because the affiliate lacked a need to know the data. See id. at 36–37, 40 (testifying that HHS had not denied any DOGE data access requests and "did not know" of any rationale that would justify denying a DOGE affiliate's access request); DOL 30(b)(6) Dep. at 87–88 (testifying that DOL rejected two DOGE data access requests—one due to ongoing litigation, and one because read-only system access was unavailable).

- Evidence that a DOGE affiliate at HHS received access to systems containing highly sensitive Medicare data for millions of Americans without completing customary security training. See Decl. of J. Wendel [ECF No. 82-1] ¶ 9.

The Agencies attack plaintiffs' motion on three fronts.

To begin, they protest that the kinds of evidence plaintiffs cite cannot support an inference that HHS and DOL adopted the alleged DOGE data access policies. The Agencies contend that courts may not infer the adoption of a final policy unless the alleged policy is long-running, agency-wide, conceded to exist, and expressly written down. See Defs.' Mot. at 18 (citing AFT, 152 F.4th at 175). So because plaintiffs have not produced evidence that the Agencies formalized the alleged data access policies in writing and admitted to adopting them, or that the alleged

policies were time-honored and applied to all agency employees, the Agencies insist that plaintiffs' summary judgment motion must fail. Id. at 18–19. The Court respectfully disagrees with the Agencies' statement of the law.

Agency action is no less final because it is new, see, e.g., Dep't of Homeland Sec., 591 U.S. at 13 (DACA rescission challenged "[w]ithin days" was final agency action), or affects only a portion of the Agency's duties. Nor must an agency concede the challenged policy exists or formalize it in writing. See, e.g., Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin., 972 F.3d 83, 100 (D.C. Cir. 2020) ("Agency action generally need not be committed to writing to be final and judicially reviewable."); Hisp. Affs. Project v. Acosta, 901 F.3d 378, 386 (D.C. Cir. 2018) (holding that agency practice can demonstrate the adoption of an unwritten, but nevertheless final policy). To hold otherwise would allow agencies to immunize unlawful acts by refusing to document them or denying that they took them. Frustration of the APA cannot be that easy. See Camp, 411 U.S. at 142–43.

Alternatively, the Agencies contend that even if the court could infer adoption of a final policy from the types of evidence plaintiffs have presented, here the record reveals only a handful of scattered, individual actions which plaintiffs may not programmatically challenge. See Defs.' Mot. at 20; SUWA, 542 U.S. at 64. After careful examination of the evidence, the Court declines to endorse defendants' view of the record.

Plaintiffs have come forward with evidence of nearly 70 instances in which HHS and DOL granted wide-ranging data access to DOGE affiliates—a far cry from a single, or even a handful, of agency acts insufficient to support the inference of a final policy. And while these grants pertain to a variety of systems at two agencies, plaintiffs cite general statements from agency leadership that they granted DOGE affiliates access to sensitive systems without asking why those affiliates

27

needed the access.  So a reasonable jury could infer from the Agencies' own testimony that an overarching policy guided each of the access grants: a new policy of permitting DOGE affiliates access to sensitive systems, regardless of demonstrated need to know the data the systems contain. Cf. Nat'l Treasury Emps. Union v. Vought, 149 F.4th 762, 804–20 (D.C. Cir. 2025) (Pillard, J., dissenting) (inferring that the Administration had adopted a final policy of shuttering the CFPB from the many actions it took to wind down the agency's operations), reh'g en banc granted, opinion vacated, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

The same cannot be said for plaintiffs' allegation that the Agencies adopted a policy of permitting DOGE affiliates to gain access to sensitive systems without first completing required training.  The Agencies are correct that a single DOGE employee electing not to complete an optional security briefing for one system cannot support the inference that the Agencies altered their training requirements for DOGE.  So the Court agrees with the Agencies that plaintiffs' motion fails on this point.

Lastly, the Agencies challenge plaintiffs' summary judgment motion by advancing their own view of the facts.  See Fed. R. Civ. P. 56(c)(1)(A).  They underscore statements from Agency leadership denying the existence of DOGE-specific data access policies.  See Defs.' Mot. at 20; HHS 30(b)(6) Dep. (Wendel) at 37 (testifying that HHS has not altered "its practices about providing access to records since January 19th, 2025"); DOL 30(b)(6) Dep. at 89–90 (stating that DOGE access requests are treated "with more urgency," but otherwise "the policy is . . . the same").  And they cite evidence that President Trump's executive orders—not a change in agency policy—explain both the broad data access granted to DOGE affiliates and the Agencies' choice not to ask those affiliates why they needed access.  Defs.' Mot. at 20; see, HHS 30(b)(6) Dep. (Wendel) at 29–31, 38 (DOGE affiliates were granted access to 19 unique systems because of the

28

broad job responsibilities assigned to them by DOGE executive orders); DOL 30(b)(6) Dep. at 75–76 (DOL did not ask DOGE affiliates why they needed to access various sensitive systems because their need was "apparent" from "their role and responsibilities outlined in the [executive orders]").

The Agencies' last contention has decisive force. If the executive orders vested DOGE affiliates with the need to access a broad range of sensitive systems, Agency employees became aware of this need by reading the orders, and DOGE team members were granted sensitive system access because of the orders, then plaintiffs' evidence would not establish that the Agencies eliminated their need-to-know data access policies for DOGE.

To be sure, the Agencies' blanket citation to the executive orders leaves many unanswered questions—questions that the Court discusses at length when considering the Agencies' motion for summary judgment. See infra 30–35. But when evaluating plaintiffs' motion for summary judgment, the Court must draw all reasonable inferences in favor of the Agencies. Faithfully applying this directive, the Court concludes that a reasonable jury could credit the Agencies' evidence that the arrival of DOGE did not herald a change in their data access policies, only the application of existing policies to new circumstances. The plaintiffs have therefore failed to establish that there is no genuine dispute as to a material fact: whether the Agencies took the final action plaintiffs contend was arbitrary and capricious. So the Court denies plaintiffs' motion for summary judgment on their arbitrary and capricious claim.

### iii.    Agencies' Motion for Summary Judgment

Turning to the Agencies' motion for summary judgment, the Court shifts and draws all reasonable inferences in plaintiffs' favor. See Anderson, 477 U.S. at 255.

The Agencies raise the same arguments in support of their motion for summary judgment as they do in opposition to the plaintiffs'. To wit, HHS and DOL contend that there is no genuine

29

dispute that they applied their preexisting policies to DOGE affiliates' data access requests. See Defs.' Mot. at 19–20. And without a change in policy, plaintiffs' claim does not challenge final agency action and may not proceed under the APA. Id. at 16–17.

The Agencies support their view of the facts with deposition testimony from their CIOs that no data access policies changed upon the arrival of DOGE and that their data access policies apply equally to DOGE affiliates and non-DOGE employees. See HHS 30(b)(6) Dep. (Wendel) at 38–39; DOL 30(b)(6) Dep. at 89–90. To rebut plaintiffs' evidence that DOGE affiliates' sensitive system access was unusually broad, the Agencies point to the affiliates' wide range of responsibilities under the executive orders. See, e.g., HHS 30(b)(6) Dep. (Wendel) at 29, 38–39 (testifying that DOGE affiliates were granted sensitive system access because of the executive orders and this access was broad because the affiliates were "brought in to look across HHS"); DOL 30(b)(6) Dep. at 78–79 (testifying that the January 20 Executive Order established DOGE affiliates' roles and responsibilities, making their data access needs "clear and apparent").

The Agencies also rely on the executive orders to explain why HHS and DOL did not always ask DOGE affiliates why they needed access to a particular system. According to the Agencies, such inquiries were unnecessary because they could infer affiliates' need to access sensitive systems from their roles and responsibilities, as laid out in the executive orders. See Defs.' Reply [ECF No. 99] at 8; DOL 30(b)(6) Dep. at 76–79; HHS 30(b)(6) Dep. (Wendel) at 33.

Close examination of the Agencies' executive order-based explanation raises substantial doubts about its veracity. Begin with HHS. On January 29, 2025, HHS granted Farritor access to HCAS, a contract writing system. Defs.' Interrog. Resp. at 7; HHS 30(b)(6) Dep. (Wendel) Chart at 2. When asked why Farritor required access to HCAS, HHS's CIO testified: "He needed access because under the executive order HHS was required to look at systems for waste, fraud and

30

abuse. . . ." HHS 30(b)(6) Dep. (Wendel) at 27. But HHS has not pointed to an executive order in place on January 29, 2025, that charged DOGE affiliates with rooting out waste, fraud, and abuse. In the Agencies' own telling, President Trump first issued such an order on February 26, 2025, nearly a month after HHS granted Farritor access to HCAS. See Defs.' Mot. at 3–4; compare January 20 Executive Order with, February 26 Executive Order.

Farritor's access to HCAS is not an isolated case. HHS granted DOGE affiliates access to 13 sensitive systems before President Trump issued the February 26 Executive Order vesting the affiliates with waste, fraud, and abuse responsibilities. See Defs.' Interrog. Resp. at 7, 16. Yet HHS has repeatedly stated that its DOGE affiliates needed access—even before February 26—to the Agency's sensitive systems to carry out DOGE executive orders targeting waste, fraud, and abuse. See HHS 30(b)(6) Dep. (Wendel) at 32–33; Decl. of G. Rice ¶ 6; Defs.' Interrog. Resp. at 6–16.

Access grants made after the promulgation of the February 26 Executive Order raise questions, too. Recall that the February 26 Executive Order directed agency heads and DOGE affiliates to review "all existing covered contracts and grants." February 26 Executive Order § 3(b). The Order defined covered contracts and grants as "discretionary spending through Federal contracts, grants, loans, and related instruments" but not "direct assistance to individuals; expenditures related to immigration enforcement, law enforcement, the military, public safety, and the intelligence community; and other critical, acute, or emergency spending." Id. § 2(d). DOGE affiliates were not vested with broader waste, fraud, and abuse responsibilities until President Trump issued the March 20, 2025, executive order. See March 20 Executive Order.

But between the February and March executive orders, HHS granted DOGE affiliates access to several sensitive systems that do not, on their face, appear to contain data concerning

31

discretionary grant spending.  Most troublingly, during the first two weeks of March, HHS granted Corristine, Elez, Moghaddassi, and Terrell access to HHS's Integrated Data Repository (IDR). Defs.' Interrog. Resp. at 8–9, 12, 15.  IDR contains highly sensitive information about Medicare patients and their claims, including patient names, social security numbers, diagnoses, and clinical notes.  HHS 30(b)(6) Dep. (Wendel) Chart at 1.  Based on the record presented by HHS thus far, IDR does not appear to contain the kind of discretionary spending data that the February 26 Executive Order directed DOGE affiliates to audit.  The Court is therefore puzzled by how this Order could have made DOGE affiliates' need to access IDR apparent to HHS.

HHS also granted Moghaddassi and Elez access to the National Directory of New Hires (NDNH) during the period between promulgation of the February 26 and March 20 Executive Orders.  See Defs.' Interrog. Resp. at 9, 12.  When asked about their access to NDNH, HHS testified that because the system documents child support, Moghaddassi and Elez were investigating it as "an entitlement system . . . to see if it potentially would be a system that had waste, fraud and abuse."  HHS 30(b)(6) Dep. (Wendel) at 43–44.  Yet entitlement spending, by definition, is not discretionary grant spending, so it is unclear how the February 26 Executive Order could have authorized DOGE affiliates to audit NDNH.

Even after President Trump issued the March 20 Executive Order, HHS's executive order-based explanation for its DOGE access decisions proves difficult to fully accept.  That Order vested DOGE affiliates with a need to access sensitive agency systems to audit them for fraud, waste, and abuse.  It did not give affiliates carte blanche to access them for other reasons.  See Chenery Corp., 318 U.S. at 93–94 (Agency "action must be measured by what the [Agency] did, not by what it might have done.").

32

On March 21, 2025, HHS granted Kyle Shutt access to its Unaccompanied Children Portal. Defs.' Interrog. Resp. at 10.  Maintained by the Office of Refugee Resettlement, the Portal contains highly sensitive demographic and health data about unaccompanied alien children, including photographs of the children.  HHS 30(b)(6) Dep. (Wendel) Chart at 4.  It also contains citizenship and financial data about the children's sponsors.  Id.

HHS testified that Shutt needed access to the Portal "to make the determination [whether] the system had any indication of waste, fraud or abuse."  HHS 30(b)(6) (Wendel) Dep. at 47. When pressed on what evidence of waste, fraud, or abuse the Unaccompanied Children Portal could contain, the Agency referenced "employment information and sponsor information," specifically "looking to see if the payments to the sponsors were legal and legitimate."  Id. at 48. But as ORR's Sponsor Handbook makes clear, sponsors—not the government—are responsible for supporting unaccompanied alien children after they leave ORR custody.  See ORR, Sponsor Handbook 13 (revised Mar. 25, 2024), https://perma.cc/9JAN-QU29; see also Decl. of John Doe [ECF No. 83-4] ¶ 11 (denying knowledge of payments to sponsors or documentation of those payments in the Portal); HHS, Privacy Impact Assessment for the Unaccompanied Children Portal 3–5 (May 22, 2024) (listing many data elements contained within the Portal, but not sponsor payment data), https://perma.cc/E8MK-TYEK.  So it remains unclear at this stage whether the DOGE executive orders could supply affiliates with a need to access the Portal.[10]

Timing problems also cast doubt on DOL's testimony that the DOGE executive orders explain why it did not ask affiliates why they needed access to various sensitive systems before

---

[10] The Court takes judicial notice that four days after HHS granted Shutt access to the Unaccompanied Children Portal, the Administration published an Interim Final Rule in the Federal Register revoking a prior rule that precluded ORR from sharing information about the immigration status of potential sponsors of unaccompanied alien children with law enforcement or immigration enforcement.  Unaccompanied Children Program Foundational Rule; Update to Accord with Statutory Requirements, 90 Fed. Reg. 13554 (Mar. 25, 2026).  See 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . .")  The Portal contains this information. See HHS, Privacy Impact Assessment for the Unaccompanied Children Portal 3–5 (May 22, 2024).

granting that access.  See DOL 30(b)(6) Dep. at 75–76.  For example, on February 20, 2025, DOL granted Moghaddasi and Collins access to DOL's New Core Financial Management System (NCFMS).  Defs.' Interrog. Resp. at 18–20.  At its 30(b)(6) deposition, DOL explained that Moghaddassi and Collins needed this access to look for "the broad categories of fraud, waste and abuse."  DOL 30(b)(6) Dep. at 126–27.  But as of February 20, 2025, the February 26 Executive Order directing affiliates to review discretionary spending for fraud, waste, and abuse had not yet been issued.  DOL further testified that Moghaddassi and Elez began reviewing DOL data for fraud, waste, and abuse on January 19, 2025, and February 12, 2025, respectively.  Id. at 20–21, 34.  These dates, too, precede the first executive order assigning fraud, waste, and abuse responsibilities to DOGE affiliates.

And just like HHS, DOL granted DOGE affiliates access to several sensitive systems after the February 26 Executive Order but before the March 20 Executive Order that do not appear to contain discretionary grant spending data and cannot be easily justified by the February 26 Executive Order.  At DOL these systems included: USAccess, Homeland Security Presidential Directive 12 Enterprise Physical Access Control System, and DOL Directory Resource Administrator—all three of which appear to pertain to physical and electronic access to DOL's facilities and assets by its employees.  See Defs.' Interrog. Resp. at 18–19.

In short, the Agencies' explanation for their actions is incompatible with a substantial portion of the record on review.  And courts may not ignore such a disconnect between the explanation an agency gives and the action it takes.  Dep't of Com., 588 U.S. at 785.  To do so would "exhibit a naiveté from which ordinary citizens are free."  Id. (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).  It would also deny plaintiffs the

34

"solicitude" they are owed upon consideration of the Agencies' motion for summary judgment. Baylor, 857 F.3d at 952.

Considering these gaps in the Agencies' explanation and drawing all justifiable inferences in favor of plaintiffs, the Court finds that a reasonable jury could reject the Agencies' executive order-based explanation for the broad and unquestioning nature of their DOGE data access grants. The jury could then infer from plaintiffs' evidence that the Agencies abandoned their need-to-know data access policies without reasoned explanation. Thus, the Court must deny the Agencies' motion for summary judgment.

This is not to say that plaintiffs have proven that the Agencies adopted the alleged DOGE data access policies. As the Court concluded in denying plaintiffs' motion for summary judgment, a reasonable jury could also believe the Agencies' denials of policy change. Now that the Court has more thoroughly examined the Agencies' explanation for their actions, it owes a further word on this point.

Granting summary judgment for plaintiffs would be improper at this juncture because at least one possible explanation for the discrepancies highlighted here lurks in the record. In their interrogatory responses, the Agencies state that software modernization duties also justified DOGE affiliates' access to agency systems. See Defs.' Interrog. Resp. at 6–20. And the Agencies' summary judgment briefing makes a similar argument, albeit obliquely. See Defs.' Mot. at 30, 33; Defs.' Reply at 12, 15. But to date, the Agencies have not come forward with any evidence to support this assertion. They have not offered evidence that the sensitive systems DOGE affiliates accessed were scoped for software modernization projects, that DOGE affiliates were staffed to work on those projects, or that Agency employees granted the affiliates access because of their involvement in those projects. The most likely explanation is that none of that happened.

Nevertheless, it remains possible that the Agencies could produce such evidence. And depending on its provenance and persuasiveness, such evidence could dispel the temporal discrepancies the Court has identified because all access grants at issue here postdate the January 20 Executive Order directing DOGE affiliates to modernize government software.[11]

*    *    *    *    *

The Court therefore holds that a genuine issue of material fact exists as to whether the Agencies altered their data access policies for DOGE affiliates and denies both the plaintiffs' and the Agencies' motions for summary judgment. As is best practice upon denial of cross-motions for summary judgment, the Court will provide the parties with an opportunity to properly support or address the genuinely disputed fact it has identified: whether the executive orders justify the Agencies' data access grants under longstanding policy, refuting the existence of new DOGE data access policies. See Fed. R. Civ. P. 56(e).

## B. Contrary-to-Law Claim

Plaintiffs raise a second APA challenge: that the Agencies' policy of classifying DOGE affiliates as agency employees and granting them access to sensitive systems without the requisite need-to-know violates the Privacy Act and is therefore contrary to law. See 5 U.S.C. § 706(2); 5 U.S.C. § 552a(b)(1). Here, at least, the parties agree that a policy of classifying DOGE affiliates as agency employees exists.[12] See Defs.' Mot. at 5–6 (describing DOGE affiliates' access requests

---

[11] The Agencies might also explain some of their access grants by pointing to a fourth executive order, issued on February 11, 2025. See Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025). This executive order directed DOGE team leads to provide USDS with a monthly hiring report from their agencies and develop "data-driven" hiring plans at their agencies. Id. § 3(b). It also enabled DOGE team leads to veto agency new hires, subject to review by their agency head. Id. While DOL's CIO referenced the February 11 Executive Order in his deposition, see DOL 30(b)(6) Dep. at 127 (mentioning the "other" executive order about the hiring freeze), no party has cited the Order in their briefing, so the Court does not rely on it today.

[12] The Agencies dispute, of course, that they adopted a policy of allowing DOGE affiliates access to sensitive systems without a requisite need-to-know. See supra 28–29.

36

as "like any employee's request"); Defs.' Reply at 1–2 (describing DOGE affiliates as equivalent to "any other employee" for IT credentialing purposes).

The Agencies nevertheless assert that plaintiffs' contrary-to-law claim is not reviewable under the APA, because the Privacy Act supplies an exclusive remedial scheme. See Defs.' Mot. at 21. Their contention is well-trodden ground; the Agencies unsuccessfully pressed the same argument in their earlier motion to dismiss. But because additional courts have weighed in since, the Court considers the question afresh.

i.   APA Reviewability: Alternative Remedial Scheme

Section 704 of the APA makes "final agency action for which there is no other adequate remedy in a court" reviewable under the Act. 5 U.S.C. § 704. Where alternative, adequate remedial procedures exist, the APA does not duplicate them. Bowen v. Massachusetts, 487 U.S. 879, 903 (1988); see also Hawkes Co., 578 U.S. at 600.

To determine whether a separate statute displaces APA review, courts assess whether "congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" Block v. Cmty. Nutrition Inst., 467 U.S. 340, 351 (1984) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 157 (1970)).[13] Relevant factors for this assessment include whether the statute: (1) creates an independent cause of action or alternative review procedure, and (2) provides relief of "the same genre" as the APA, even if not identical or as effective, or (3) establishes a remedial scheme that is "incompatible" with APA review "in major respects."

---

[13] The D.C. Circuit has described the "fairly discernible" standard as requiring "clear and convincing evidence" of legislative intent to restrict APA review. Garcia v. Vilsack, 563 F.3d 519, 523 (D.C. Cir. 2009) (quoting Abbott Laby's v. Gardner, 387 U.S. 136, 140 (1967))); see also Citizens for Resp. & Ethics in Wash. v. Dep't of Just., 846 F.3d 1235, 1244 (D.C. Cir. 2017). But some debate exists on this point. The Circuit recently observed that the Supreme Court "has 'never applied the 'clear and convincing evidence' standard in [a] strict evidentiary sense.'" Glob. Health Council v. Trump, 153 F.4th 1, 18 (D.C. Cir. 2025) (quoting Block, 467 U.S. at 350).

V.I. Hous. Fin. Auth. v. Fed. Emergency Mgmt. Agency, 151 F.4th 409, 418 (D.C. Cir. 2025) (citation modified).  At bottom, Congress's judgment is what matters.  Id.

The Privacy Act supplies plaintiffs with two types of remedies—monetary damages for harm caused by an agency's failure to comply with the Act, and injunctive relief ordering either the amendment of records or the disclosure of records an agency has improperly withheld.  See 5 U.S.C. § 552a(g)(1)–(4); Cell Assocs., Inc. v. Nat'l Insts. of Health, Dep't of Health, Educ. & Welfare, 579 F.2d 1155, 1159 (9th Cir. 1978).  The Act is silent as to an equitable cause of action for relief from imminent, unlawful disclosure of records.  It does not create one and it does not expressly preclude one.

This Court finds nothing in the Privacy Act's text or the structure of its remedial scheme that evinces fairly discernable congressional intent to displace the APA's "basic presumption of judicial review."  Abbott Laby's v. Gardner, 387 U.S. 136, 140 (1967).  The Act does not expressly bar claims for injunctive relief, nor does it channel them to a dedicated administrative body, rendering its scheme incompatible with APA review.  See Jackson v. Kennedy, Civ. A. No. 25-1750, 2026 WL 172440, at *3 (D.D.C. Jan. 22, 2026) (explaining that plaintiffs cannot bring Privacy Act claims in any administrative tribunal).

True, the Privacy Act enables persons adversely affected by an unlawful disclosure of their records to seek damages.  But damages are not in the same "genre" as equitable remedies, like injunctive and declaratory relief.  Cf. Cohen v. United States, 650 F.3d 717, 734 (D.C. Cir. 2011) (en banc) (holding that the availability of tax refunds did not preclude plaintiffs from seeking injunctive and declaratory relief under the APA from an IRS notice).  And on the crucial question here—the availability of equitable relief to prevent imminent and unlawful disclosures—the Privacy Act is silent.  In that silence the Court sees ambiguity, not certainty.  Cf. Barnhart v.

Walton, 535 U.S. 212, 218 (2002) (observing that statutory silence "normally creates ambiguity. It does not resolve it.").

Precedent from this Circuit and the Supreme Court bolster the Court's conclusion that the Privacy Act's remedial scheme does not preclude APA review of plaintiffs' claim. In Doe v. Stephens, the D.C. Circuit determined that the availability of a damages remedy under the Privacy Act did not bar the plaintiff from seeking declaratory relief under the APA. 851 F.2d 1457, 1463 (D.C. Cir. 1988); see also League of United Latin Am. Citizens, 2026 WL 252420 at *52 (holding that the Privacy Act's damages remedy did not preclude plaintiffs from seeking declaratory and injunctive relief under the APA). The Supreme Court, too, has commented in dicta that the Privacy Act's silence with respect to equitable relief may be "explained by the general provisions for equitable relief within the Administrative Procedure Act," although it has not expressly ruled on the question. Doe v. Chao, 540 U.S. 614, 619 n.1 (2004); see also F.A.A. v. Cooper, 566 U.S. 284, 303 n.12 (2012) (commenting that injunctive relief to enforce the Privacy Act's commands is "possibly" available under the APA).

The Fourth Circuit's decision in AFT does not persuade the Court otherwise. The AFT majority found only that the Privacy Act's remedial scheme, including its "enumerated violations and details on jurisdiction, venue, and timing" could "at least plausibly" evince congressional intent to preclude APA claims seeking an injunction against disclosures in violation of the Act. AFT, 152 F.4th at 175. Based on this finding and others, the Fourth Circuit denied the AFT plaintiffs' motion for a preliminary injunction. Id. at 177. But mere plausibility is insufficient to displace the "strong presumption" in favor of judicial review of administrative action. Bowen v. Mich. Acad. of Fam. Physicians, 476 U.S. 667, 670 (1986). Fairly discernable congressional intent is required. Block, 467 U.S. at 351. Neither the Agencies nor the Fourth Circuit point to any.

39

When denying the Agencies' motion to dismiss, this Court found that the APA could step into the breach and supply plaintiffs with a cause of action for injunctive and declaratory relief. AFL-CIO V, 778 F. Supp. 3d at 80. On second look, the Court reaffirms that conclusion. The Privacy Act does not preclude plaintiffs' APA claim that the alleged DOGE data access policies are contrary to law.[14]

ii.  Merits

Turning to the merits of plaintiffs' contrary-to-law claim, the Court's task is deceptively simple. Section 706 of the APA requires that agency actions "not in accordance with law" be held unlawful and set aside. 5 U.S.C. § 706(2). So the Court must determine, as a matter of law, whether evidence in the administrative record permitted the agencies to act as they did. Drs. for Am., 793 F. Supp. 3d at 131; see also Loper Bright Enters. v. Raimondo, 603 U.S. 369, 392 (2024) ("Courts will decide all relevant questions of law arising on review of agency action and set aside any such action inconsistent with the law as they interpret it." (citation modified)).

Recall that here, plaintiffs assert that two aspects of the Agencies' DOGE data access policies are not in accordance with law—their alleged policy of permitting DOGE affiliates to access sensitive systems without a need to know the data within those systems, and their policy of classifying DOGE affiliates as internal agency employees for data disclosure purposes. The Court has already found that the existence of the former policy is genuinely disputed, see supra 35–36, so the Court considers only the latter at this juncture.

---

[14] That plaintiffs are organizations does not alter the Court's analysis. The Privacy Act does not supply a damages remedy to organizations for obvious reason—the statute protects the data of individuals, not organizations, so it compensates those same individuals for violations of their rights. But as this Opinion has explained, the Act does not speak to suits for equitable relief from imminent, unlawful record disclosures. This statutory silence is insufficient to overcome the well-establish presumption in favor of judicial review of administrative action. And unlike suits for damages, suits for injunctive and declaratory relief are a mechanism by which organizations may vindicate the rights of their individual members.

Congress enacted the Privacy Act of 1974 to "protect the privacy of individuals identified in information systems maintained by Federal agencies." Pub. L. No. 93-579, 88 Stat. 1896 § 2(a)(5). Subject to an enumerated list of exceptions, the Privacy Act prohibits agencies from disclosing "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b). One exception to the Privacy Act's prohibition on nonconsensual record disclosure allows an agency to disclose records it maintains to its officers and employees who need the records to perform their duties. Id. § 552a(b)(1). Both HHS and DOL have promulgated regulations prohibiting record disclosures that do not comply with the Act. See 45 C.F.R. § 5b.9(a); 29 C.F.R. § 71; 20 C.F.R. § 10.10.

In Judicial Watch, Inc. v. Department of Energy, 412 F.3d 125, 131–32 (D.C. Cir. 2005), the D.C. Circuit adopted a functional test for determining whether a person is an employee of an agency. Judicial Watch rejected the proposition that the terms of a detail agreement or the source of a worker's pay necessarily define what agency employs that worker. Id. Instead, the D.C. Circuit invoked law distinguishing independent contractors from employees, and instructed courts to look at "all the circumstances surrounding the relationship" between the individual and the agency to determine, as "a practical matter," what agency employed the individual. Id. (citation modified). The nature of the person's work, where the person conducts that work, and who supervises them are all relevant factors in this analysis. Id.

The Agencies first defend their policy of categorizing DOGE affiliates as agency employees by contending that the affiliates must be employees because they no longer accept detailees from USDS. Instead, all their DOGE team members are either dual hires or detailees

41

from other agencies.  See Defs.' Mot. at 27; DOGE 30(b)(6) Dep. [ECF No. 82-7] at 77.  In their telling, the Court need not apply Judicial Watch, because the DOGE affiliates' papers are decisive.

The Court is unpersuaded.  There is little functional difference between a DOGE affiliate hired by USDS and detailed to HHS and other agencies, and a DOGE affiliate hired by GSA and detailed to USDS, HHS, and other agencies.  See, e.g., Defs.' Interrog. Resp. at 6–7, 26 (describing Farritor's concurrent employment).  Both arrangements raise questions about what agency, "as a practical matter," employs the worker.  So the Court must consider "all the circumstances" surrounding the employment relationships to determine whether the Agencies' policies accord with the Privacy Act.  Judicial Watch, 412 F.3d at 131–32.

The Agencies characterize these circumstances as entirely unobjectionable, if not commonplace.  They explain that DOGE is an umbrella term, encompassing USDS and a government-wide initiative to improve bureaucratic efficiency and root out waste, fraud, and abuse.  See Defs.' Mot. at 30.  Put differently, DOGE is both a government-wide initiative and the entity that coordinates that government-wide initiative.  A DOGE affiliate can therefore work on an agency's implementation of the initiative as an employee of that agency, and can also coordinate the broader initiative as an employee of USDS.  But never the twain shall meet—while working on agency projects, the DOGE affiliate works at the agency and reports to agency leadership; while working on USDS projects, the affiliate works at USDS and reports to USDS leadership.  See DOGE 30(b)(6) Dep. at 27, 81, 84–85, 88.

The Court agrees that such a personnel structure is unlikely to violate the Privacy Act.  Detail arrangements like those the Agencies describe may even be necessary for effective administration of large, transformative government projects.  Yet on the record before it, the Court cannot confirm that DOGE operates according to this structure.

Plaintiffs offer evidence that DOGE affiliates have been concurrently hired by or detailed to as many as eight agencies at a time. See id. at 93 (discussing a DOGE affiliate with eight concurrent appointments); see also Defs.' Interrog. Resp. at 6–26 (disclosing several DOGE affiliates with three or more concurrent details). It is implausible that a single worker can faithfully serve so many independent loci of control. As a practical matter, many simultaneous appointments tend to align DOGE affiliates' interests with DOGE, rather than with the agencies that technically employ them. And interest alignment is a core feature of an employer-employee relationship. See Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 11 (2001) (explaining that a consultant may be regarded as an agency employee for FOIA purposes when "the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency"). Concurrent appointments also make it much more likely that DOGE functionally supervises the affiliates, because DOGE is the entity that guides all their work—not merely $\frac{1}{8}$ or even $\frac{1}{3}$ of it.

The record bears out what common sense would suggest—DOGE affiliates' concurrent employment arrangements were sometimes tailored to serve DOGE's interests. See, e.g., USDS-CMS Detail Agreement [ECF No. 80-30] at 1 (declaring that a USDS employee was detailed to CMS, in part, to guarantee "USDS has full and prompt access" to CMS systems (emphasis added)); USDS-HHS Detail Agreement [ECF No. 80-31] at 1 (same for HHS). And these concurrent appointments preserved DOGE's control over the detailed employee. See USDS-CMS Detail Agreement at 2 (stating that when a detailee conducts CMS work at USDS facilities or on USDS systems, USDS supervises them); USDS-HHS Detail Agreement at 2 (same for HHS).

Still, the Court is reluctant to declare the Agencies' policy of treating DOGE affiliates as agency employees unlawful based on the incomplete record before it. In its interrogatory

responses, HHS refused to specify the number of federal agencies each of its DOGE affiliates was concurrently detailed to or employed by. See, e.g., Defs.' Interrog. Resp. at 5–6, 9, 18 (objecting to plaintiffs' interrogatory and then disclosing Elez's details to USDS and HHS but not the three other agencies he was detailed to or employed by). HHS's refusal makes it difficult for the Court to assess how widespread concurrent appointments were among the HHS DOGE affiliates.

Furthermore, HHS represents that it altered its policies to refuse details from USDS, and that any detailees that remain at the Agency "are operating under typical detail arrangements from other agencies." See Defs.' Mot. at 27. Fair enough, HHS does not clarify, however, whether its typical detail arrangements permit concurrent work at many agencies.

Similar concerns arise for DOL. DOL responded to plaintiffs' interrogatory, revealing that concurrent details were commonplace among its DOGE affiliates in the Spring of 2025. But a year has passed since then, and no DOGE affiliates retain access to DOL's sensitive systems, leaving the Court uncertain as to DOL's current policy. See Decl. of T. Burkley [ECF No. 99-1] ¶ 4. As a result, the Court concludes that the record on review is not adequate to assess whether the Agencies' data access policies are or were inconsistent with the Privacy Act and denies both parties' motions for summary judgment.

The typical next step in such circumstances is to remand to the agency for additional investigation and explanation. See Fla. Power & Light Co., 470 U.S. at 744. But this matter presents a special case—the Agencies did not compile a traditional administrative record contemporaneous to their actions, leading the Court to take the rare step of ordering discovery last spring. See AFL-CIO III, 349 F.R.D. at 254. The Court will therefore compel HHS to respond to plaintiffs' interrogatory and specify the number of federal agencies each of its DOGE affiliates was concurrently detailed to or employed by. And it will permit both Agencies to file declarations

with the Court, should they desire, clarifying current policy regarding data access grants to employees or detailees who are concurrently detailed to or employed by several other agencies.

## III.   __Ultra Vires__ **Claim**

The plaintiffs' final claim targets DOGE directly, asserting that its activities were ultra vires: "unauthorized by any law and . . . in violation of the rights of the individual." Am. Sch. of Magnetic Healing v. McAnnulty, 187 U.S. 94, 110 (1902). This "nonstatutory" form of judicial review derives from the inherent equitable power of courts to "reestablish the limits" on executive authority after ultra vires acts. Dart v. United States, 848 F.2d 217, 224 (D.C. Cir. 1988); see also Fed. Express Corp. v. U.S. Dep't of Com., 39 F.4th 756, 765 (D.C. Cir. 2022).

The scope and stringency of ultra vires review depends on whether plaintiffs' claim is statutory or constitutional in nature. See Sustainability Inst. v. Trump, 165 F.4th 817, 829 (4th Cir. 2026). Where a plaintiff bases their ultra vires claim on allegations that an agency exceeded its statutory authority, three stringent requirements apply: (i) there must be no express statutory preclusion of all judicial review; (ii) there must be no alternative procedure for review of the claim; and (iii) the agency must plainly act "in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." Fed. Express Corp., 39 F.4th at 763.

The third requirement for statutory ultra vires review—action contrary to a specific legislative provision that is "clear and mandatory"—is particularly exacting. Id. at 764–65. To prevent easy end-runs around statutory constraints on judicial review, it demands not just "garden-variety errors of law or fact" but a clear departure by the agency from its statutory mandate or "blatantly lawless" action. Id. (citation modified); see also Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 681 (2025). In other words, an ultra vires claim alleging executive action in excess of

45

statutory authority is "essentially a Hail Mary pass," it almost never succeeds.  Changji Esquel Textile Co. v. Raimondo, 40 F.4th 716, 722 (D.C. Cir. 2022) (citation modified).

Constitutional ultra vires claims, alleging that the executive exceeded its powers under the Constitution, need not satisfy these rigorous requirements.  See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952); see also Glob. Health Council v. Trump, 153 F.4th 1, 14–15 (D.C. Cir. 2025); Sustainability Inst., 165 F.4th at 829.

A doctrinal difficulty lurks within the ultra vires statutory-constitutional dichotomy.  Every statutory ultra vires claim has a constitutional root: executive action in excess of delegated and inherent authority necessarily violates constitutional guarantees of separation of powers.  In Dalton v. Specter, the Supreme Court addressed this challenge by distinguishing between claims that the President exceeded specific statutory authority and claims where the President disclaims reliance on any statute, ostensibly in favor of inherent constitutional authority.  511 U.S. 462, 472 (1994). Ultra vires claims that allege executive action in excess of statutory authority are statutory in nature, while ultra vires claims that allege executive action in the "absence" of statutory authority are constitutional.  Id. at 473.

Neither plaintiffs' complaint nor their terse summary judgment briefing specifies whether they assert a constitutional or statutory ultra vires claim.  See Am. Compl. at 57; Pls.' Mot. at 35. In their briefing, they argue both that "no statute created DOGE, or imbued DOGE Teams with authority to access Sensitive Systems at federal agencies," implying a claim founded on action in absence of authority, and that DOGE cannot rely "on the authorities granted to the agencies and their employees," implying a claim founded on action in excess of authority.  See Pls.' Mot. at 35.

The Court ultimately construes plaintiffs' ultra vires claim as statutory for two reasons. First, plaintiffs appear to concede that the statutory ultra vires requirements apply.  In their opening

46

brief, plaintiffs cite the Supreme Court's recent precedent in <u>Nuclear Regulatory Commission v.</u> <u>Texas</u>, a suit alleging action in excess of statutory authority, and assume it governs this case. <u>See</u> Pls.' Mot. at 35 n.4. And when the Agencies contended that plaintiffs' claim does not satisfy one of the three required elements for statutory <u>ultra vires</u> review, <u>see</u> Defs.' Mot. 36–37, plaintiffs did not dispute the Agencies' statement of the law, <u>see</u> Pls.' Reply [ECF No. 97] at 26–27. Second, plaintiffs fail to invoke the Constitution at any point in their <u>ultra vires</u> briefing. Summary judgment "is no time for half-hearted advocacy," <u>Kreg Therapeutics, Inc. v. VitalGo, Inc.</u>, 919 F.3d 405, 416 (7th Cir. 2019), so this Court declines to read into the case a constitutional contention that plaintiffs themselves do not expressly make. <u>See</u> <u>Gov't of Manitoba v. Bernhardt</u>, 923 F.3d 173, 179 (D.C. Cir. 2019) (refusing to put flesh on the bones of a skeletal argument).

Applying the statutory <u>ultra vires</u> claim requirements here, DOGE is entitled to summary judgment because plaintiffs do not identify a specific, clear, and mandatory provision—of HHS and DOL enabling acts, or of any other statute—that DOGE acted in excess of and contrary to. <u>See</u> <u>Fed. Express Corp</u>, 39 F.4th at 764; <u>see also</u> Fed. R. Civ. P. 56(e). To be sure, identification of a specific statutory provision is not required for constitutional <u>ultra vires</u> claims because such claims are founded on an absence of statutory authority. <u>Sustainability Inst.</u>, 165 F.4th at 829; <u>see</u> <u>also</u> <u>AFL-CIO V</u>, 778 F. Supp. 3d at 89 (reasoning that plaintiffs were not required to plead a specific statutory provision where they challenged DOGE action as in absence of any lawful authority "statutory <u>or</u> constitutional" (emphasis added)). But as this Court has now explained, plaintiffs do not advance a constitutional claim.[15] The court therefore grants summary judgment for DOGE on plaintiffs' statutory <u>ultra vires</u> claim.

---

[15] Plaintiffs' failure to assert a constitutional violation, grounded in the absence of both statutory and constitutional authority, is more than a technical briefing error. At least as to the use of HHS and DOL data, a colorable contention exists that the Constitution's Take Care Clause vests the executive with inherent authority to use intra-

**CONCLUSION**

Summary judgment is only proper where there are no genuine disputes of material fact. Fed. R. Civ. P. 56(a).  Here, real disputes over facts foundational to plaintiffs' APA claims—including whether the Agencies altered their data access policies for DOGE affiliates, and whether DOGE structured those affiliates' employment relationships such that they were not employees of the Agencies—persist.  Accordingly, the court **DENIES** the parties' motions for summary judgment as to the APA claims (Counts II, IV).  Because plaintiffs failed to make an equivalent showing for their statutory ultra vires claim (Count I), the Court **GRANTS** defendants' motion, and **DENIES** plaintiffs' motion as to that claim.

An Order consistent with this Opinion shall issue.

**SO ORDERED.**

/s/
JOHN D. BATES
United States District Judge

Dated: March 31, 2026

---

branch data.  U.S. Const. art. II, § 3; cf. Whalen v. Roe, 429 U.S. 589, 605 (1977) (discussing the executive's right to use a huge swath of data for public purposes, including "the distribution of welfare and social security benefits" and "the supervision of public health").

The Court does not mean to imply that Congress cannot restrain inter-agency data-sharing.  See Youngstown, 343 U.S. at 637 (Jackson, J., concurring) (discussing a "zone of twilight" in which both Congress and the President may act).  Congress surely can and surely did when it enacted the Privacy Act.  It simply observes that no party alleges that DOGE violated the Privacy Act by receiving HHS and DOL data disclosures, and what legal authority DOGE may have to use the data, in absence of statutory authority, is nonobvious.  So to prevail at summary judgment on the constitutional version of their ultra vires claim, plaintiffs needed to squarely address these issues.  They did not.