**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AFL-CIO et al., | |
| *Plaintiffs*, | |
| vs. | Case No. 25-cv-339-JDB |
| U.S. Department of Labor et al., | |
| *Defendants*. | |

**PLAINTIFFS' MOTION FOR LEAVE TO CONDUCT SUPPLEMENTAL DISCOVERY**

This Court's summary judgment order identified two factual disputes that are likely to be dispositive of the parties' claims, but concluded that the factual record does not currently resolve them in either party's favor. Those issues are whether DOGE's work constituted "software modernization," MSJ Op., ECF 100, at 35-36, and whether DOGE affiliates[1] were functionally within the control of agencies while working concurrently across multiple agencies. *Id.* at 43-35. This Court also identified some targeted areas for record development by Defendants. *Id.* at 36 (evidence of work on software modernization), 44-45 (evidence related to concurrent employment arrangements). And this Court has recognized the risk that allowing all further factual development in this case to be done on Defendants' terms runs the risk of prejudicing Plaintiffs. Order, ECF 103, at 1.

As described in more detail below, Plaintiffs respectfully submit that the factual questions identified in the Court's order are most likely to be resolved by allowing Plaintiffs to supplement the record with targeted discovery directly to DOGE affiliates. And that conclusion is reinforced by evidence about DOGE's activities that have come to light through similar fact development in other litigation postdating summary judgment briefing here. Plaintiffs therefore seek leave from this Court to conduct targeted supplemental discovery as detailed in the attached Exhibit A.

---

[1] At various times in this litigation, Plaintiffs have used the term "DOGE Employees" to refer to DOGE staff, including those working at the Defendant Agencies. To avoid confusion, for the purposes of this motion, Plaintiffs are using the term the Court uses, "DOGE affiliates," *see*, *e.g.*, MSJ Op. 2, to refer to the same group of individuals. Plaintiffs have sought in the attached proposed discovery requests to define this term consistent with the scope the Court articulated in its prior order on Plaintiffs' Motion to Compel. ECF 75 at 4-5 (identifying individuals "onboarded for the purpose of carrying out the DOGE Agenda" as within the scope of "DOGE Employee"). Plaintiffs' suggested definition of the term "DOGE Affiliate" in its proposed discovery requests is: "any individual who is or has been employed by DOGE U.S.D.S. or otherwise works or works worked for DOGE U.S.D.S. (including volunteers, if any) since January 20, 2025, including any individual employed by DOGE U.S.D.S. but detailed to one or more federal agencies, and any current or former member of a federal agency DOGE Team." Ex. A.

**FACTUAL BACKGROUND**

I.      **This Court identified two areas of ongoing factual uncertainty.**

This Court identified outstanding factual questions related to the scope of DOGE's work at the Defendant agencies, as well as the true reporting structure of DOGE affiliates concurrently employed at multiple agencies.

A.      **Whether DOGE's work constituted "software modernization"**

The Court found that the only executive order that Agencies could have relied on for granting DOGE access to sensitive systems in the early months of 2025 was the January 20 Executive Order, which tasked DOGE with "modernizing Federal technology and software to maximize governmental efficiency and productivity." *See* MSJ Op. 30-31 (comparing DOGE's ostensible mandate to seek out "waste, fraud and abuse" with Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025)). And the Court found that the earliest conceivable executive order vesting DOGE with broader "waste, fraud, and abuse" authority was not issued until March 20, 2025. MSJ Op. 31.

Thus, the Court was unable to find that DOGE's need to access sensitive records had been justified by existing executive orders, because the Agencies' proffered basis (a waste, fraud, and abuse mission) had not been articulated when access was granted. *See* MSJ Op. 34 ("the Agencies' explanation for their actions is incompatible with a substantial portion of the record on review."). However, the Court allowed that DOGE's access to sensitive systems could have been justified by the technology modernization mandate of the January 20 Executive Order, even though that is not the "most likely explanation". MSJ Op. 35-36. But it found that the record as it stands did not conclusively resolve whether the Agencies' grant of Sensitive System access to DOGE affiliates was "justified" by "software modernization duties," whether "the sensitive systems DOGE affiliates accessed were scoped for software modernization projects," whether "DOGE affiliates were staffed to work on those projects," or whether "Agency employees granted the affiliates access because of their involvement in those projects." MSJ Op. 35.

To resolve this uncertainty, the Court invited the production of evidence that the work of DOGE affiliates undertaken pursuant to the January 20 Order was software modernization. MSJ Op. 36.

**B.      Whether DOGE affiliates were controlled by agencies**

The Court found that the detailing arrangements between DOGE and the Agencies made it difficult to ascertain "what agency, 'as a practical matter,' employs the worker." MSJ Op. 42. The Court found that the record suggests that "DOGE affiliates' concurrent employment arrangements were sometimes tailored to serve DOGE's interests," and that "these concurrent appointments preserved DOGE's control over the detailed employee." MSJ Op. 43.

Within this issue, the Court identified certain open factual questions related to DOGE's control of affiliates at Agencies:

1.      "[H]ow widespread concurrent appointments were among the HHS DOGE affiliates," MSJ Op. 44;

2.      Whether HHS's "typical detail arrangements permit concurrent work at many agencies," *id.*; and

3.      What the "current policy regarding data access grants to employees or detailees who are concurrently detailed to or employed by several other agencies" is at both HHS and DOL. MSJ Op. 45.

The Court thus "compel[led] HHS to respond to plaintiffs' interrogatory and specify the number of federal agencies each of its DOGE affiliates was concurrently detailed to or employed by," and stated that it would "permit both Agencies to file declarations with the Court, should they desire, clarifying current policy regarding data access grants to employees or detailees who are concurrently detailed to or employed by several other agencies." MSJ Op. at 44-45.

## II.    Recent developments in other litigation call into question Defendants' positions on the outstanding issues in this case

Plaintiffs note that in a number of other cases challenging DOGE's actions, factual developments post-dating the summary judgment briefing have highlighted the way DOGE teams at other agencies operated outside the normal agency systems and chains of command. In January, the Social Security Administration filed a "Notice of Corrections to the Record" in ongoing litigation over DOGE's access to sensitive systems at that agency. *Am. Fed'n of State, Cnty., and Mun. Emps., AFL-CIO v. SSA*, No. 25-cv-00596, Dkt. No. 197 at 1 (D. Md. Jan. 16, 2026). SSA explained that it had "reviewed records of and relating to data access of SSA's former DOGE Team for audit and litigation purposes," and in doing so, had "identified communications, use of data, and other actions by the then-SSA DOGE Team that were potentially outside of SSA policy and/or noncompliant with" a TRO in that case. *Id.* Some of the findings disclosed in that Notice were:

- That DOGE affiliates at SSA had "copied Mr. Steve Davis, who was then a senior advisor to Defendant U.S. DOGE Temporary Organization, as well as a DOGE-affiliated employee at the Department of Labor ('DOL'), on an email to Department of Homeland Security ('DHS'). The email attached an encrypted and password-protected file that SSA believes contained SSA data," and "SSA believes that the encrypted attachment contained PII derived from SSA systems of record, including names and addresses of approximately 1,000 people." *Id.* at 3.

- That an outside political advocacy group had contacted two members of the SSA DOGE Team directly "with a request to analyze state voter rolls that the advocacy group had acquired" in order to "find evidence of voter fraud and to overturn election results in certain State." *Id.* at 5. SSA stated the group sought DOGE's assistance in "accessing SSA data to match to the voter rolls," and "one of the DOGE team members signed a 'Voter Data Agreement' in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025." *Id.* at 5, n.5.

- That SSA had discovered that its DOGE Team members "were using links to share data through the third-party server 'Cloudflare,'" and that despite SSA's normal practice of "continuous network monitoring that includes identifying unauthorized devices," SSA is unable "to determine exactly what data were shared to Cloudflare

or whether the data still exist on the server" because "Cloudflare is a third-party entity." *Id.* at 6.

- That DOGE Team members were granted access to a "shared workspace" that allowed them to pool data to which individual DOGE Team members had separately been granted access, but to which they had not collectively been approved to view. *Id.* at 4. And they used this pooled access to put data into a "data visualization tool" that could connect to other data sources and "provide access to PII." *Id.*

In *American Council of Learned Societies v. McDonald*, counsel for plaintiffs deposed Nate Cavanaugh, a DOGE affiliate who held employment relationships at several government agencies including the National Endowment for the Humanities, Institute for Museum and Library Services, and the United States Institute for Peace. *See, e.g.*, Pls. Mem. ISO MSJ, No. 1:25-cv-3657, ECF No. 247 1, 4-5 (S.D.N.Y. Mar. 6, 2026) (*ACLS*) (describing Cavanaugh deposition). Video of that deposition has since been made publicly available. In it, Mr. Cavanaugh describes how he took data from the agencies where he was operating, exported it to Excel, emailed it to himself on his personal device, and forwarded it to DOGE affiliate Steve Davis via the Signal application, an application that was not permitted on government devices. American Historical Association*, Nathan Cavanaugh Deposition in ACLS-AHA-MLA Lawsuit About the NEH, Part 6 of 7*, YouTube, at 24:36–28:07, https://www.youtube.com/watch?v=UDwAOrDi1wk.

## LEGAL STANDARD

While challenges to agency action are "ordinarily" adjudicated without extra-record discovery, on "rare occasions" discovery is permitted in such cases to "fill[] in gaps in the record to determine what the agency actually did." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226-27 (D.C. Cir. 1993). In order for a matter to be appropriate for discovery, the matter must be "nonprivileged" and "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Discovery must also be "proportional to the needs of the case," taking into account six factors:

> the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the

5

importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

*Id.*

In evaluating the scope of discovery, the burden is on the moving party to show that the discovery is relevant; "the objecting party then bears the burden of showing why discovery should not be permitted," *Alexander v. F.B.I.*, 194 F.R.D. 316, 325-26 (D.D.C. 2000) (cleaned up), with a reviewing court "weigh[ing]" the six proportionality factors in Fed. R. Civ. P. 26(b)(1). *Cherokee Nation v. U.S. Dep't of Interior*, 531 F. Supp. 3d 87, 100 (D.D.C. 2021) (cleaned up).

## ARGUMENT

The factual disputes remaining in this case—whether the purpose and substance of DOGE's work at the Defendant Agencies was fairly described as "software modernization," and whether DOGE affiliates functionally reported to DOGE while working there—are issues that were meaningfully explored during expedited discovery in this case. As the Court found, the resulting record was nonetheless inconclusive.

Accordingly, the Court determined it would "provide the parties with an opportunity to properly support or address the genuinely disputed fact it has identified." MSJ Op. at 36. It identified specific information Defendants' possession that would be useful: an interrogatory response by Defendants and optional supplemental evidence of Defendant Agencies' approaches to concurrent employment arrangements. *Id*. at 44-45. And this Court has also acknowledged that permitting Defendants to supplement the record while denying Plaintiffs the opportunity to do so would run the risk of prejudicing Plaintiffs. Order, ECF 103 (Apr. 22, 2026). Plaintiffs respectfully submit that allowing Plaintiffs to develop the record in this case based on evidence from DOGE itself, as described further below, would be most likely to be probative concerning the remaining issues in dispute.

First, with respect to the substance of DOGE's work at the Defendant Agencies: Plaintiffs submit that the most probative additional evidence is likely in the possession of DOGE affiliates themselves, rather than, for example, declarations by agency officials who never worked on a

DOGE Team, or by agency counsel. During discovery and during summary judgment briefing, Defendants had ample opportunities to describe or characterize the mission and work of the DOGE Teams, and repeatedly characterized that work in both discovery and briefing as expansively searching for waste, fraud, and abuse at the Defendant agencies.[2] Perhaps Defendants articulated that position because they believed (wrongly) that they would be able to retroactively justify DOGE's access under the "waste, fraud and abuse" mantra using the operative executive orders. But regardless, it was the consistent, and likely considered, position of the agencies' counsel and deponents to describe DOGE's work in this manner throughout last year. Any supplemental declarations providing an additional mission for the DOGE Teams will almost necessarily raise questions about the incompleteness or inaccuracy of Defendants' prior representations that Plaintiffs should have an opportunity to explore.

Courts regularly decline to give deference to "agency litigating positions that are wholly unsupported by … administrative practice," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988), and decline to "accept appellate counsel's *post hoc* rationalizations for agency action," *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168 (1962). Plaintiffs respectfully note that any representations from Defendants at this point run a heightened risk of being just such post hoc

---

[2] *See*, *e.g.*, HHS (Wendel) Dep., ECF 80-15 at 27:11-14 (DOGE needed access to "look at systems for waste, fraud and abuse"), 32:1-13 (HHS believed the systems it granted access to were necessary for "determining if there is fraud, waste or abuse" at HHS); 33:8-19 (DOGE never told HHS that they would be accessing particular systems to look for "waste, fraud or abuse" but HHS inferred that to be the case); 42:17-44:19 (HHS granted access to National Database of New Hires so that DOGE could see if there was waste, fraud or abuse in child support payments); 45:4-45:15 (HHS automatically believed DOGE needed access to entitlement systems to search for waste, fraud, and abuse); 46:19-47:14 (HHS granted DOGE access to unaccompanied children's portal to search for waste, fraud and abuse); DOL (Kryger) Dep., ECF 80-9 at 21:9-22 (DOGE affiliate was reviewing DOL accounting data for "expenditures … that could be considered fraud, waste or abuse"); 34:14-20 (DOGE affiliate's "role has been to … review data and information for fraud, waste and abuse"); 41:14-42:5 (DOL believed executive orders required "the establishment of … DOGE teams .. to work within the agency to identify fraud, waste and abuse"); Defs. MSJ, ECF 95-1 at 1 (Sensitive System access was "necessary" for DOGE affiliates "to perform their Presidentially-directed mandate of reducing waste, fraud, and abuse.")

rationalizations by counsel, given that the Court has invited evidence to prove a very specific point (that the substance of DOGE's work was software modernization), which the Court has already concluded the extant record calls into question. *See* MSJ Op. 35 ("The most likely explanation is that none of that happened."). This risk is particularly acute if the only evidence the Court gathers comes from agency officials with limited or no firsthand knowledge of DOGE's work (particularly any work DOGE affiliates did outside the normal Defendant Agency chain of command)To that end, Plaintiffs submit that additional factual development on the question of whether DOGE's work was simply "software modernization" would most productively by answered by DOGE affiliates themselves, specifically through targeted depositions and records requests to show the nature of the work they undertook while at the Defendant Agencies.

Second, with respect to the true nature of DOGE's reporting structure, Plaintiffs submit that targeted discovery via depositions and records requests to DOGE affiliates is also most likely to reveal relevant information on the question of "what agency, 'as a practical matter,' employ[ed]" DOGE affiliates, MSJ Op. 42. As was made clear during expedited discovery, Defendant Agencies are unlikely to have meaningful firsthand knowledge of the nature or extent of DOGE affiliates' concurrent work for *other* agencies (or for DOGE). *See*, *e.g.*, HHS (Rice) Dep., ECF 82-3 at 42:1-42:8 ("[Brad Smith is] in this dual appointment thing, that's—I don't have any visibility into what he does with USDS"); DOL (Kryger) Dep., ECF 82-5 at 34:9-35:15 (discussing DOGE Affiliate Aram Moghadassi), *id.* at 35:12-35:18 ("I don't have, off the top of my head, if he's been detailed to other agencies. My understanding is he has been detailed to other agencies. I don't know what the list of that is.")

The developments in the *AFSCME* and *ACLS* cases, above, strongly suggest that lurking beneath the anodyne descriptions of DOGE's concurrent employment arrangements and scope of work, the truth of DOGE's work is as it has always appeared in public reporting: a coordinated group of individuals reporting primarily to Elon Musk and Steve Davis, carrying out pet projects and data consolidation efforts across a wide range of agencies, in service of a centralized agenda originating outside those host agencies. The clearest evidence in those cases came from directly

reviewing "records of … SSA's DOGE Team," *AFSCME* at 1 and by directly deposing agency DOGE Team members. *Cavanaugh Deposition*.

To that end, Plaintiffs propose supplemental discovery, as described in more detail in Exhibit A, to address the outstanding issues in the case:

- Three interrogatories:[3]

  - One interrogatory largely identical to the previously propounded Interrogatory No. 1, asking that to the extent Defendants have not provided rolling updates to their previous response on April 4, 2025, they provide one now;

  - One interrogatory asking them to identify which Sensitive Systems DOGE affiliates undertook software modernization projects on; and

  - One interrogatory asking them to identify the channels of communication that DOGE affiliates at the Defendant Agencies used when communicating with other DOGE affiliates;

- Production of three categories of DOGE affiliates' records:[4]

  - Records relating to the work DOGE affiliates undertook on the Sensitive Systems that the Defendant Agencies identified as being subject to software

---

[3] These proposed interrogatories are directed to the Defendant Agencies, however, in the event Defendant Agencies assert that responsive information is not within their custody or control, Plaintiffs would seek to serve these interrogatories via subpoena to relevant custodians.

[4] These proposed requests for production are directed to the Defendant Agencies and Defendant USDS. Because some DOGE affiliates may have done work for Defendant Agencies using email addresses from other government entities, and because some DOGE affiliates may no longer be federal employees, Plaintiffs anticipate that Defendant Agencies might assert that responsive records exist that are not within their custody or control. But the D.C. Circuit has made clear that where agency records have been improperly removed from agency systems, agencies are not relieved of their preservation or recovery obligations. *Competitive Enter. Inst. v. Off. of Science & Tech. Pol'y*, 827 F.3d 145, 149 (D.C. Cir. 2016) ("records do not lose their agency character just because the official who possesses them takes them out the door"); *see also* 44 U.S.C. § 3106 (requiring federal agency heads to take steps to recover records unlawfully removed from the agency). To the extent Defendant Agencies insist that they are unable to gather responsive records, Plaintiffs would seek to gather responsive records via subpoena from any additional parties Defendant Agencies identify as potential custodians of responsive records.

modernization projects, which would allow Plaintiffs to understand the nature of the work DOGE affiliates undertook on these Systems;

- o  Correspondence between DOGE affiliates within the Defendant Agencies and DOGE affiliates outside the Defendant Agencies about Sensitive Systems, which would allow Plaintiffs to understand the reporting relationships between DOGE affiliates at Defendant Agencies and DOGE affiliates outside the Agencies; and

- Correspondence between DOGE affiliates and senior leadership at Defendant Agencies, which would allow Plaintiffs to understand the reporting relationships between DOGE affiliates and Defendant Agency leaders. Depositions of the four DOGE affiliates identified below,[5] limited to two topics: (1) the nature of DOGE affiliates' work at Defendant Agencies, and (2) the relationship of DOGE Teams to the government-wide DOGE effort, including their reporting relationships. These DOGE affiliates cover a representative set of DOGE affiliates in this case:

- o  Marko Elez (HHS and DOL): One of the DOGE affiliates who worked at both Defendant Agencies, and was identified as having been concurrently detailed to or employed by a large number of agencies, *see* Defs. Discovery Responses, ECF 80-5 at 9 ("Marko Elez is an employee of the Department of Labor (DOL) and has been detailed to HHS since March 5, 2025"), 18 ("DOL is aware of four agencies at which Mr. Elez is concurrently detailed to or otherwise employed, other than USDS.");

- o  Kyle Schutt (HHS): DOGE affiliate who was detailed to USDS, and who was granted access to the Unaccompanied Childrens' Portal at HHS, per Defendants' discovery responses; Defs' Resps. 10;

- o  Luke Farritor (HHS): DOGE affiliate who was detailed to USDS, and had the widest range of access across HHS systems, per Defendants' discovery responses; *see* Defs. Resps. 7-8 (listing systems);

- o  Aram Moghadassi (HHS & DOL): DOGE affiliate who worked at both Defendant Agencies, and had no formal employment or detailing arrangement with USDS; *see* Defs. Resps. 11-12.

---

[5] To the extent Defendant Agencies represent that these individuals are no longer agency employees who Defendant Agencies can compel to testify, Plaintiffs would seek their testimony via subpoena.

This discovery is clearly nonprivileged (the DOGE affiliates have never been described by the Defendant Agencies as lawyers or tasked with legal work). As described above, it is also plainly relevant to the remaining claims in dispute in this case.

The six proportionality factors also weigh in favor of granting Plaintiffs' requested discovery:

- *Importance:* The issues at stake in this action are incredibly weighty. As this Court described in its order, this case implicates one of the core reforms implemented by Congress after the abuses of the Nixon presidency, aiming to protect future generations of Americans from unnecessary snooping through their personal records by federal officials. MSJ Op. at 1-2. It also bears on whether a novel executive branch entity accessed Americans' sensitive records held by Defendant Agencies while functionally reporting to officials outside those Agencies. *See* MSJ Op. 41-42 (describing the relationship of DOGE to agencies). These matters "impact[] the public at large" and are of tremendous import. *Cherokee Nation*, 531 F. Supp. 3d at 100.

- *Amount in controversy:* This case is not a commercial dispute for money damages. However, the records at stake in this litigation are extensive, and extremely sensitive. *See*, *e.g.*, MSJ Op. 17 n. 7 (describing the data in DOL and HHS systems that DOGE was given permission to access, including "PII of everyone who has applied for unemployment insurance since March 2020"), 18 n. 8 (describing sensitive "Medicare patient and provider data" accessed by DOGE).

- *Parties' relative access to information:* The information Plaintiffs seek is entirely within the custody and control of the government and DOGE affiliates; Plaintiffs otherwise lack access to it.

- *The parties' resources:* The party from whom discovery is being primarily sought is the federal government.[6] It is unlikely that the federal government faces an

---

[6] With respect to testimony from DOGE affiliates who are no longer government employees, Plaintiffs are not best-positioned to estimate the resources necessary for these individuals to provide deposition testimony, however the resources likely fall far short of, for example, the burdens articulated in *Cherokee Nation*, 531 F. Supp. 3d at 101. And DOGE affiliates who were no longer federal employees have been deposed in at least one other matter. *See*, *e.g.*, Defs.' Mem. Opp. to Pls.' Mot. to Compel, *ACLS*, ECF 167 at 24 (S.D.N.Y. Dec. 17, 2025) (objecting to depositions of DOGE affiliates, "[p]articularly given that Fox and Cavanaugh are no longer

11

"inability to pay for" conducting the discovery Plaintiffs request here. *Oxbow Carbon & Mins. LLC v. Union Pacific R.R. Co.*, 322 F.R.D. 1, 8 (2017). While Defendants will be in a better position than Plaintiffs to initially estimate the resources necessary to respond to Plaintiffs' requests, Plaintiffs are not requesting discovery that is extraordinarily burdensome or resource-intensive to produce. *Cf. Cherokee Nation*, 531 F. Supp. 3d at 101 (finding that the resource and burden question weighed in favor of limiting discovery where the government estimated that discovery "would require 40% of the Office of Historical Trust Accounting's budget and could take upwards of five and a half years" to collect, review, and produce).

- *Importance of the discovery in resolving the issues:* As Plaintiffs detailed above, the discovery requested is targeted at the narrow set of issues this Court has identified as critical to resolving this case. And as Plaintiffs detailed above, given the course of discovery to date and the remaining ambiguities identified by the Court, factual development directly from the DOGE Team and its members is almost certainly necessary to provide clarity about DOGE's ambit and reporting structure.

- *Balance of burdens:* Similar to the inquiry into the parties' resources, Defendants will be in the best position to initially estimate the resource burden of responding to Plaintiffs' requests. However, Plaintiffs note that they are seeking records from a discrete set of custodians over a relatively short timeframe (by definition, no more than roughly fifteen months since DOGE was created, and there may be less than fifteen months' worth of records to review for DOGE Team members whose time at the agencies has ended), not an unreasonable burden by the standards of discovery. And Plaintiffs do not seek to depose every DOGE Team member; Plaintiffs are willing to limit the number of DOGE Team members deposed to those who would be in a position to provide representative answers to this Court's outstanding questions.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for supplemental discovery.

---

employed by the Government."); Order, ECF 169 at 2 (S.D.N.Y. Dec. 22, 2025) (Court overruling Defendants' objections and ordering depositions of DOGE affiliates to proceed).

Dated: <u>April 24, 2026</u>

Respectfully submitted,

<u>/s/ Aman T. George</u>

Aman T. George (D.C. Bar No. 1028446)
Mark B. Samburg (D.C. Bar No. 1018533)
Rachel F. Homer (D.C. Bar No. 1045077)
Robin F. Thurston (D.C. Bar No. 462679)
Skye L. Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Fax: (202) 796-4426
ageorge@democracyforward.org
msamburg@democracyforward.org
rhomer@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

Glenn Schlactus (D.C. Bar No. 475950)
Zoila E. Hinson (D.C. Bar No. 1766625)*
Alexa Milton (D.C. Bar No. 155380)*
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
gschlactus@relmanlaw.com
zhinson@relmanlaw.com
amilton@relmanlaw.com

*Counsel for Plaintiffs*

Teague P. Paterson (D.C. Bar No. 144528)
Matthew S. Blumin (D.C. Bar No. 1007008)
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, DC 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org

13

*Counsel for American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME)*

Rushab B. Sanghvi (D.C. Bar No. 1012814)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
*Counsel for Plaintiff American Federation of Government Employees, AFL-CIO (AFGE)*

Steven K. Ury (D.C. Bar 1643947)
SERVICE EMPLOYEES INTERNATIONAL
UNION
1800 Massachusetts Avenue, NW,
Legal Department, 6th Floor,
Washington, DC 20036
Telephone: (202) 730-7428
steven.ury@seiu.org
*Counsel for Plaintiff Service Employees International Union*

Matthew Holder*
COMMUNICATION WORKERS OF
AMERICA, AFL-CIO
501 Third Street N.W.
Washington, D.C. 20001
Telephone: (202) 215-6788
mholder@cwa-union.org
*Counsel for Plaintiff Communication Workers of America, AFL-CIO*

* Admitted *pro hac vice*

14